# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 4:20-cr-40026** |
| | ) | |
| | ) | |
| **ANTHONY TONY GAY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ANTHONY GAY'S SENTENCING MEMORANDUM

Anthony Gay, by counsel Jennifer Soble and Rachel White-Domain, files this Sentencing Memorandum to assist the Court in exercising its discretion to impose the minimally sufficient sentence that achieves the statutory purposes of sentencing. Anthony respectfully requests that the Court impose a sentence of 12 months. Such a sentence in this case is sufficient to meet the statutory purposes of sentencing, and takes into account the unique facts and circumstances surrounding Anthony's conduct in the instant matter.

### I.    Background

On April 18, 2022, Anthony represented himself at a jury trial before this Court that lasted five days. The jury was not able to reach a unanimous verdict on either count, and this Court declared a mistrial. On May 16, 2022, Anthony represented himself at a retrial before this Court. This retrial resulted in a guilty verdict of one count of being knowingly in possession of a firearm and one count of possession of ammunition after having been convicted of a crime punishable by a term of imprisonment exceeding one year; both convictions are pursuant to 18

1

U.S.C. § 922. Although Anthony maintains his innocence of these offenses, Anthony had good reason to fear for his safety around the time of the offense:[1] a week before his arrest for possession of a firearm, two of Anthony's cousins had been shot, one of them fatally. Anthony and other members of his family had been attacked in the early hours of the following morning. Notably, there is no suggestion that Anthony was violent towards anyone. Anthony has no history of injuring others or using any weapon to harm anyone other than himself.[2]

Moreover, Anthony's unique history and characteristics strongly suggest that a sentence of 12 months is not only sufficient to punish the conduct resulting in conviction here, but is the only appropriate sentence in light of Anthony's mental health symptoms and underlying Posttraumatic Stress Disorder (PTSD). Anthony is a survivor of over 22 years of solitary confinement within the Illinois Department of Corrections (IDOC). Extended solitary

---

[1] Most people who carry a firearm do so not to commit a crime, but for protecetion. In one study conducted in Chicago's West and South Side, researchers found that: "Safety concerns—both for themselves and for their family members and friends—were among the top reasons cited for gun carrying among male respondents (figure 3). Nearly all the men who self-reported having carried said they did so to protect themselves (93 percent), while relatively few reported carrying to commit crimes (6 percent) or for status (6 percent)." *See* Urban Institute, We carry guns to stay safe, 2018, available at https://www.urban.org/sites/default/files/publication/99091/we_carry_guns_to_stay_safe_1.pdf.

[2] Mr. Gay's convictions are all for aggravated battery—incidents that were "aggravated" in each instance solely because they involved a correctional officer. Had they not involved a correctional officer, the incidents would have been simple batteries, a Class C misdemeanor in Illinois. Notably, a battery in Illinois that is aggravated based on the location or status of the complainant is not a crime of a violence, and was not even considered a crime of violence prior to *Johnson v. United States*, 576 U.S. 591 (2015). *See, e.g., United States v. Hampton*, 675 F.3d 720, 730 (7th Cir. 2012) (noting that an Illinois simple battery that is elevated to an aggravated battery because the offense involved a peace officer is not a crime of violence under the residual clause).

confinement, which is widely recognized as torture, left Anthony highly vulnerable to psychological destabilization when he is socially isolated. When Anthony experiences this psychological destabilization, he self-harms, sometimes so severely that it could kill him. The inability of the Bureau of Prisons (BOP) to ensure Anthony's safety from compulsive self-harm during the five months that Anthony spent in their custody following his conviction in the present case—during which time he self-harmed over dozens times, requiring surgery 15 times—confirms that the BOP cannot safely or adequately house or treat Anthony, and that continued incarceration poses a substantial risk to Anthony's life.

By contrast, a 12-month sentence followed by 3 years of mandatory supervised release will not only adequately punish and deter Anthony, but will allow this Court to continue to supervise him for an extended period of time, ensuring that he receives the community-based mental health support he needs to continue his positive contribution to the community, while ensuring that his life will not be put unnecessarily at risk by incarceration.

## II.    The Sentencing Statute

This Court's sentencing decision should be governed by the framework set forth in 18 U.S.C. § 3553(a), the federal sentencing statute. That statute requires this Court to impose the minimum sentence necessary to satisfy the purposes of sentencing, after considering Anthony's history and characteristics and the nature and circumstances of the offense, kinds of sentences available, the United States Sentencing Guidelines, policy statements by the United States Sentencing Commission, sentencing uniformity, and applicable restitution. *See* 18 U.S.C. § 3553(a). Those factors suggest that a sentence of 12 months is appropriate.

### A.  Nature and Circumstances of Offense

The nature and circumstances of Anthony's offenses warrant a sentence of 12 months. Even construing the evidence in the light most favorable to the government,[3] Anthony possessed a firearm *after his family was brutally attacked*, resulting in his cousin's death. Direct and fatal violence against Anthony's family is the backdrop of the instant matter.

On May 23, 2020, Anthony and his family members were shot at in two discrete incidents in Rock Island just hours apart. During the first incident, Anthony's cousins were shot around 14 ½ Street in Rock Island. Anthony was not present for that incident.[4] Anthony's cousin, Timon Mayfield, was killed. Timon's brother, Tobias Mayfield, was shot, as was his cousin, Dennis Lard. Anthony was not present at the first incident.

Approximately five hours later, after leaving the hospital where Anthony and other surviving family members were being treated, Anthony and his family were attacked again. They were driving home in a tan minivan when people in a Black Dodge Challenger shot at the minivan. According to police reports, including that excerpted below, numerous witnesses told the police that the people in the tan minivan were the ones who were shot at; i.e., Anthony and his family members were the victims of continued gun violence.

> I also spoke to another neighbor, George Sedlak, who lives at ████████ street. George stated that he heard seven shots looked out the window from a north side of the residence and observed a black Challenger facing westbound parked in the middle of intersection blocking the tan van. This suspect vehicle had tinted windows and could not see the occupants. The suspect vehicle then fired several rounds into the van and fled westbound. George said that several occupants from the van left north and walked between the houses.

The minivan was shot at least thirteen times in the windshield. Anthony's cousin, Othel Gay,

---

[3] This argument is offered *arguendo*, and in no way concedes that Anthony did in fact have a weapon or ammunition.

[4] Towards that end, Anthony objects to Paragraph 24 of the Revised PSR, which indicates that Anthony was present when his family was shot at the first time.

suffered a gunshot wound, as did his cousin, Jesse Brand.

Although Anthony and his family members were *victims of a shooting*, Anthony was stopped and searched by the police who responded to the incident. Police pointed their guns at Anthony—-who sat alone, stunned, in the tan van that was now riddled with bullet holes, after his family member fled the terrifying scene. They searched him and took personal property from Anthony, which was never returned. Anthony later sued the Rock Island Police Department in federal court for robbing him of his property. On July 2, 2022, this lawsuit resulted in a judgment for Anthony in the amount of $22,500.[5]

On May 31, 2020, Rock Island Police made a traffic stop of a vehicle in which Anthony was the passenger. According to the police, they recognized Anthony from the previous interaction and Anthony attempted to flee. One of the officers pursued Anthony and pointed his taser at him. Anthony surrendered and was placed into handcuffs. According to Officer Sailor, a Rock Island Police Officer, he then located a black Glock 36 .45 automatic handgun bearing the serial number of GKD861 in the area of the flightpath, despite the fact that no firearm was present on body camera footage of that area prior to Officer Sailor's alleged discovery.[6]

On June 14, 2020, while Anthony was being held in custody, Rock Island Police were called to the American Motor Inn by one of the owners of that hotel related to items that they had found when cleaning out Anthony's hotel room. The police located ammunition in the hotel room that had previously been rented to Anthony.

---

[5] *Gay v. Keys et al*, 4:20-cv-04250 (C.D. Ill.). The government conveniently omits mention of Anthony's successful lawsuit against the Rock Island Police Department when they accuse him of perjury related to his affidavit about being robbed. *See* Govt. Sentencing Memorandum at 9.
[6] Enhanced video footage confirms that no firearm is visible in the area where Officer Sailor alleges he recovered a firearm. *See* Defendant's Second Motion for a New Trial, May 20, 2023.

The Government is wrong when it alleges that the conduct here is "both serious and aggravated." Notably—and in stark contrast to what happened to Anthony's family members when they were victimized in *two* discrete shootings just one week before his arrest, one of which resulted in his cousin's death—Anthony did not harm anyone.

### B.  Anthony's History and Characteristics

Anthony's history and characteristics strongly suggest that a sentence of 12 months is appropriate. Anthony survived unspeakable torture over decades of solitary confinement while in IDOC. The trauma he suffered as a result  means not only that any incarcerative term will be psychologically more difficult for Anthony to endure, but also means that incarceration poses a significant risk to Anthony's life. For that reason, 12 months is more than sufficient to satisfy any and all valid purposes of punishment.

#### 1.  Childhood

As is reflected in the Pre-Sentence Investigation Report and Dr. Terry Kuper's report, Anthony had an extraordinarily painful childhood, marked by neglect, instability, and severe physical abuse. Anthony was removed from his biological mother's home when he was just an infant, after he suffered a head injury due to physical abuse and was hospitalized. Anthony then lived with his Aunt Shirley and Uncle Johnny who became his adopted and functional parents. He remained at their home until he was 12 years old, leaving to return to his mother's home after Johnny brutally beat him.

Anthony's biological mother's home, by that point, was less violent but completely destitute. There was no food to eat, and Anthony began stealing to feed and clothe himself. He landed in juvenile detention for the first time when he was just 13 years old; by that point in his

life, he had been abused and neglected by every adult who was supposed to care for him, and had begun developing symptoms of the mental illness that would define his life. Perversely, the Government frames Anthony's juvenile history as evidence of some underlying malice, as opposed to the symptoms of a child suffering from mental illness and systemic abuse and neglect. *Cf.* Forensic Evaluation, Dr. Heather Ross, Jan. 23, 2023, at 40 ("In addition to his incarceration and placement in segregation, he was exposed to childhood physical abuse and neglect, which could be further sources of trauma and could potentially lead to PTSD.").

Anthony's experiences at Arrowhead Ranch in the late 1980s and early 1990s were in some ways a precursor to his experience in the Bureau of Prisons. Children in the care of Arrowhead Ranch were not only routinely abused by staff and their peers, but they were "treated" by one another through a controversial disciplinary modality called "positive peer pressure," where by children were actively encouraged to restrain one another.[7] Young Anthony's struggles in that institution are no surprise, given the systemic and pervasive lack of support, coupled with abuse, neglect, and his own poorly treated mental illness.

### 2. Incarceration in the Illinois Department of Corrections

Anthony's history in the Illinois Department of Corrections (IDOC) is singularly defined by the fact he was held for over two decades in solitary confinement, a practice recognized internationally as torture. *See* UN Special Rapporteur on Torture report on Solitary Confinement, Aug. 5, 2011, UN Doc Number A66/268, Exhibit D (identying

---

[7] *See Dold, Bruce Dold, Wards Forced To Restrain Other Youths, Chicago Tribune, Jun 26, 1988* available at https://www.chicagotribune.com/news/ct-xpm-1988-06-26-8801100584-story.html (describing Arrowhead Ranch as one of six facilities in Illinois that encouraged children to physically discipline one another through "positive peer pressure").

prolonged solitary confinement of greater than 15 days as torture and noting its routine and extended use in the United States).[8] During this time, he was confined to an 8 by 10 foot cell 24 hours a day most days and deprived of nearly all human contact. Like so many people who experience even much shorter periods of solitary confinement, especially those individuals with pre-existing mental illness, the traumatic experience of decades in solitary deteriorated Anthony's mental health, leading him to commit egregious acts of harm *against himself*. Critically, Anthony never caused meaningful physical injury or used a weapon against anyone other than himself: his self-inflicted violence has always been singularly directed at distracting himself from his own psychological torment. *See* Expert Report of Dr. Terry A. Kupers, Exhibit A, at 21. Understanding Anthony's experience as a survivor of extended solitary confinement is critical to understanding why re-incarceration in the instant matter is so uniquely punitive and dangerous for him.

In 1994, Anthony entered IDOC at 21 years of age after he and a group of young men got into a fight with and robbed another young person of a hat; no weapons were involved.[9] This incident eventually resulted in him spending twenty-two years (from 1996 to 2018) in solitary confinement.[10] Until the entry of a federal consent decree in 2016 (and

---

[8] *Id.* at 2 "[The Special Racconteur] finds that where the physical conditions and the prison regime of solitary confinement cause severe mental and physical pain or suffering, when used as a punishment, during pre-trial detention, indefinitely, prolonged, on juveniles or persons with mental disabilities, it can amount to cruel, inhuman or degrading treatment or punishment and even torture. In addition, the use of solitary confinement increases the risk that acts of torture and other cruel, inhuman or degrading treatment or punishment will go undetected and unchallenged."

[9] This is Anthony's only adult conviction involving another person who was not a correctional officer.

[10] As explained in further detail below, Anthony was originally sentenced to 7 years in this case years and yet remained in prison because, while being held in extended solitary confinement and

8

even after that), IDOC had a widespread practice of holding prisoners diagnosed by IDOC with serious mental illnesses, like Anthony, in solitary confinement for extended periods of time. It is difficult to put into words the torture that Anthony endured over the course of those long decades, during which time he was held in a filthy cell no bigger than a closet, alone with nothing to stimulate or soothe his mind.

For the overwhelming majority of his confinement within IDOC, and continuously after the late 1990s, Anthony was categorized as "Seriously Mentally Ill," a status that recognized that Anthony had—and has—a disability. According to IDOC's Administrative Directive, incarcerated people are considered Seriously Mentally Ill (SMI) if they meet the following criteria:

> an individual in custody who as a result of a medical disorder as defined in the current edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM) of the American Psychiatric Association, exhibits impaired emotional, cognitive or behavioral functioning that interferes seriously with his or her ability to function adequately except with supportive treatment or services. These individuals also must either currently have, or have had within the past year, a diagnosed mental disorder, or must currently exhibit significant signs and symptoms of a mental disorder. A diagnosis of alcoholism or drug addiction, developmental disorders, or any form of sexual disorder shall not, by itself, render an individual seriously mentally ill. The combination of either a diagnosis or significant signs and symptoms of a mental disorder and an impaired level of functioning, as outlined above, is necessary for one to be considered Seriously Mentally Ill.

> Whether a person meets the criteria of Seriously Mentally Ill is initially determined by a comprehensive professional clinical assessment by an IDOC mental health professional in order to 1) determine if the individual has a diagnosable mental disorder as defined by the current DSM and 2) to establish the personal overall level of functioning. The appropriate threshold to establish level of functioning that equates to a Serious Mental Illness includes serious impairments in capacity to recognize reality, in work environments, school or learning environments, frequent problems with authority/rules, occasional combative behavior, serious impairments

---

experiencing mental health crisis, he decompensated and threw water, urine, and feces at guards. Rather than merely receiving disciplinary infractions, he was criminally prosecuted numerous times for this behavior that resulted from his psychological decompensation.

in relationships with friends and family, serious impairments in judgment, thinking
and mood and serious impairment due to anxiety.

Illinois Department of Corrections, Administrative Directive 05.12.103, Administration of

Discipline for Individuals in Custody Designated as Seriously Mentally Ill.

IDOC categorized Anthony as Seriously Mentally Ill just a few years after he was

admitted to IDOC custody. Over the course of Anthony's incarceration, IDOC diagnosed

him with a range of serious mental illnesses, including borderline personality disorder,

bipolar disorder, major depressive disorder, and post-traumatic stress disorder. In 1996,

IDOC placed Anthony in solitary confinement—and it kept him there for over twenty years.

Despite the frankly uncontroversial proposition that Anthony suffered from mental illness

that only got worse in solitary confinement, he was continuously held in conditions that

defy belief, let alone reason. For over 20 years, Anthony lived alone in a small, bare, stifling

cell, where he was deprived of all human contact for close to 24 hours per day. He spent 10

of these years (from 1998 to 2000, and then from 2004 to 2012) at Tamms Correctional

Center, a "supermax" facility premised on complete and total isolation. In *Westerfer v.*

*Snyder*, 725 F. Supp. 2d 735 (S.D. Ill. 2010), a federal judge described the extraordinarily

bleak conditions at Tamms: isolation that was so severe that incarcerated people would

pretend to escape just to be moved to new parts of the facility, that incarcerated people with

no history of mental illness developed auditory and visual hallucinations, and that created

long-term consequences for incarcerated people that persisted *long after* they were released

from that facility. *See Westefer v. Snyde*r, 725 F. Supp. 2d 735, 752 (S.D. Ill. 2010)

(summarizing ongoing symptoms experienced by people who had been confined at Tamms

and noting that "the psychic toll exacted by long-term confinement in the intensely isolated

circumstances of Tamms is, in many instances, a continuing one.").

Given the truly horrific effects of isolation, it is not surprising that self-harm was a widespread practice at Tamms. A 2011 monitoring report of Tamms by the John Howard Association, Illinois' prison watch-dog organization, noted that:

> [S]elf-mutilation is a widespread practice in the prison, which they try to deter by preventing inmates from access to objects with any sort of an edge. For example, staff trims inmates' fingernails and toenails to prevent there [sic] use as cutting instruments.

*See* Monitoring Tour of Tamms Supermax Prison, John Howard Association, at 8, Nov. 9, 2010.[11] An interview with an incarcerated person at Tamms described why cutting is such a common reaction to isolation:

> The inmate said he has not adjusted well at Tamms and has developed self destructive behavior.
>
> "I'm a cutter," the inmate said. His left and right arms are a mass of snarled, overlapping scar tissue. A pink, recently healed scar approximately three inches in length is visible on the side of his neck. He said he has also cut his torso and legs. His head is marked with scars and a prominent bruise which he, and another inmate, said he received by beating his forehead against the door of his cell.
>
> "I think about it all the time," the inmate said of his self-mutilation. During the interview, the inmate said repeatedly that he will kill himself at the first opportunity. He said that until then, he would like to cut off one of his hands. The inmate said these impulses came to him after having spent time at Tamms.
>
> "Something happened in my brain," the inmate said. *He said he hurts himself "to relieve the pain.* I am stuck in that cell and I have nothing to do. I put myself in that cell. I have no hope."

*Id*. (emphasis added). Although this interview was not with Anthony, the impulse he

---

[11] Available at
https://static1.squarespace.com/static/5beab48285ede1f7e8102102/t/5d1b8141a514190001efc58 2/1562083649927/Tamms+Report+2011.pdf

describes—to cut himself in order to relieve the psychological distress he feels in response to solitary confinement—is one that defined Anthony's experience in IDOC, and is now replicating itself in BOP custody. It was during these periods of extreme isolation that Anthony learned to cut himself: he developed the deeply ingrained impulse to self-harm in response to isolation. *See* Dr. Kupers Report at 50.

While incarcerated at Tamms, Anthony was not only subjected to complete and total sensory deprivation for years on end, but he also received appallingly inadequate mental health treatment. The John Howard Monitoring Report from 2011 notes that Tamms only had 12 mental health bed spaces, and that people with serious mental illness—including Anthony—were often left in general population. Anthony received no therapy, no education, and no socialization during these years. Instead, he received constant and aggressive psychotropic medication, often administered in retaliation to Anthony's legal efforts to end his prolonged isolation. In 2006, while in Tamms, Anthony was forcibly given three doses of thorazine within a short period of time and the overdose caused him to develop trouble breathing and almost killed him.[12] That overdose was the subject of a lawsuit against the psychiatrist who repeatedly and dangerously administered that medication, which resulted in a settlement. *See Gay v. Chandra,* 3:10-cv-00336 (S.D.Ill. 2016).

In addition to the ten years Anthony spent in Tamms, he also spent six total years at Pontiac Correctional Center—from 1997-98, 2000-2001, 2013-2015, and 2016-2018. Recently, a federal monitor described Pontiac as "the most chaotic and anti-therapeutic

---

[12] These near-lethal dosages were given to Anthony by Dr. Chandra shortly after Anthony sued Dr. Chandra for depriving him of food and illegally confining him in restraints. This was not Anthony's only forced medication: in 2001, he was involuntarily medicated with injected thorazine while at Menard Correctional Center.

prison unit" he had ever toured in 30 years as a national prison psychiatric expert. In Pontiac

Correctional Center, Anthony was not only subjected to continued and incessant isolation

and deprivation of therapeutic services, but he and other seriously mentally ill people were

routinely mocked, starved, instigated into fighting one another, and generally used as

playthings for correctional staff.[13]

 

Much as it is impossible to convey the

psychological harm caused by the total isolation at Tamms, it is hard to capture the layers of

horror that defined daily life for incarcerated people in solitary confinement in Pontiac.

Tamms was chilling for the ways in which it was stark, bare, cold, and deadening.

Incarcerated people in Pontiac, by contrast, live in filth, chaos, and under the constant threat

of violence, often from the correctional staff themselves. Although incarcerated people in

solitary confinement there, including people with serious mental illness like Anthony, were

not permitted any socialization, they were constantly tormented by the screams and cries of

those around them. Where there was no respite from the silence at Tamms, there was no

---

[13]  First picture: Segregated Housing Cell, Vail Report at Paragraph 24. Second picture: North
House Shower, *Id.*

respite from noise in Pontiac.[14]

Anthony, exceptional in the extreme length of time he spent in solitary confinement, was not exceptional in his psychological response to it: his history of self-harm is both extensive and well documented. *See e.g., Gay v. Chandra*, 3:05-cv-00150 (S.D. Il.) (Anthony sued his psychiatrist, noting repeated self-mutilation of his arm, leg, and penis and

 

that when he did not mutilate himself he suffered anxiety attacks); *Gay v. Chandra*, 3:10-cv-00336 (S.D. Il.) (Anthony sued his psychiatrist, again alleging deliberate indifference to his serious mental health needs, noting that he suffered from anxiety and depression and is "isolated in an extraordinarily restricted environment," which exacerbates his mental health conditions "resulting in repeated suicide attempts and self-mutilation of a severity that treatment in an area hospital has been required;" this matter settled for a monetary award). It is also not uncommon. *See e.g. Sanders v. Melvin*, 25 F.4th 475 (7th Cir. 2022) (documenting Mr. Sanders' long history of self-harming to secure mental health services). Over twenty-two years in solitary confinement, Anthony inflicted harm on his

---

[14] First picture: Segregated Housing Cell at Pontiac, Vail Report at Paragraph 24. Anthony spent six years in a cell like this. Second Picture: "Recreation Cage," North House, *Id.*

own body countless times. His arms are covered in scar tissue. He put objects into his eyes, and even cut off a testicle. He often self-harmed after being denied meaningful mental health care, despite clearly articulated requests for help. Like many other incarcerated people subject to solitary confinement, Anthony self-harmed to find some relief from the psychological pain he was experiencing as a result of years of torture. Like many others, he also self-harmed, in some instances, in what clinicians would recognize as a "cry for help." Importantly, neither his symptoms nor the prison's response to them was unique.

The impact of *over two decades* of solitary confinement on Anthony's mental health was catastrophic.[15] Deprived of any sustained human interaction, Anthony's mental condition deteriorated, and he engaged in horrific acts of self-mutilation.[16] While in IDOC custody, he routinely cut his forearms, thighs, and neck, all of which are now a web of scar tissue. He cut into his left inner thigh and wove the wound together with strips of a blanket. He cut into his scrotum and embedded a zipper there. He cut off a testicle and hung it on his cell door. He cut open his scrotum again and pierced it with paperclips. He mutilated his penis on multiple occasions, embedding a pen, plastics, and a zipper into the cuts. He stuck a pen into his eyelid and stabbed his thigh with a spoon, so deep that it had to be removed surgically. His documented acts of self-mutilation number in the *hundreds* and continued for nearly the entirety of his solitary confinement.

Mental health professionals who treated Anthony during his incarceration in IDOC

---

[15] For context about how long 22 years of solitary confinement is, consider that, in 2015, the U.N. General Assembly passed rules prohibiting solitary confinement in excess of 15 days, and the imposition of solitary confinement of any length on women, children, and persons with mental or physical disabilities.

[16] Anthony discovered self-harm, specifically cutting himself, while in solitary confinement, and has no history of that behavior prior to his placement in solitary confinement.

acknowledge that Anthony's self-harm was a product of his mental illness, and that his

dramatic decompensation was the by-product of extended solitary confinement. For

example, during the course of a deposition in a federal lawsuit about Anthony's self-harm,

Dr. Sylvia Butler, who headed Menard Correctional Center's mental health services during

Anthony's incarceration at that facility,[17] noted:

> Q:    During your time at Menard did Anthony engage in self-mutilation?
> A:    Yes, he did.
> Q:    Do you believe that to be as a result  of his serious mental illness?
> A:    Some of it I do, yes.
> Q:    Is that a form of decompensation?
> A:    Yes.
> Q:    Do you believe that decompensation was related to his long-term
> segregation?
> MS. SYRCLE:  Object to vague and foundation.
> MR. STALEY:  Join.
> BY MR. BERGIN:
> Q:    You may answer, ma'am.
> A:    I do.

Deposition of Dr. Sylvia Lane, Exhibit N, at 37.

Anthony's self-harm arose in response to stressors caused by solitary confinement

and, as described in Dr. Kupers' report, eventually became a deeply ingrained coping

mechanism for psychological pain when Anthony had no other outlet.[18] As concisely

articulated by the incarcerated person interviewed for the John Howard Association's

monitoring report, Anthony self-harmed to relieve psychological pain, a practice that is

---

[17] Anthony was housed at Menard Correctional Center from 1996, 2001-2002, 2003, and 2015-2016.

[18] It is worth noting that Anthony does not self-harm in the community, precisely because of the availability of other coping mechanisms. For example, Anthony can go for a walk, call a friend, or work on a legal matter if he feels frustrated in his own home. No prosocial coping mechanisms are available to Anthony when he is incarcerated, especially given that his incarceration  is almost always in solitary confinement.

unfortunately common for people exposed to long-term solitary confinement. Understanding that goal—physical pain as a means to relieve psychological pain—helps shed light on why Anthony has consistently directed his self-harm at the most sensitive areas of his body: his eyeball and scrotum. Anthony has repeatedly inflicted damage on those parts of his body for the simple fact that it causes not only pain, but enduring pain.

Anthony's mental illness and the self-harming behaviors associated with it are well-established and well-known to the many providers who cared for him over the years. Those same providers have also recognized the specific ways in which incarceration deepens those symptoms. For example, Dr. Pierre Nunez, a psychologist who cared for Anthony when he was incarcerated at Dixon Correctional Center from 2016 to 2018, recommended that Anthony be removed from IDOC and transferred to Chester or Elgin, both mental health hospitals.[19] *See* Deposition of Dr. Pierre Nunez, Exhibit O, at 116. Dr. Nunez made that recommendation, repeatedly, because Anthony was self-harming while on crisis watch in IDOC, and in Dr. Nunez's professional opinion, Anthony needed to be in an inpatient setting as opposed to a prison. *Id* at. 101-104.

The Government points to judicial opinions that at times Anthony self-harmed to obtain "care and compassion" from staff. *See* Govt. Memo at 12 n. 3. The notion that an incarcerated person with serious mental illness would need to self-harm in order to obtain "care and compassion" from staff over the course of *over two decades* of solitary confinement is a reflection on Illinois' correction system, not Anthony's character. To the extent that Anthony's self-harming seems directed towards a specific end—for example,

---

[19] Anthony was released before Dr. Nunez's recommendation could be acted upon.

Anthony has self-harmed when he has been denied a meeting with a mental health practitioner or a phone call—multiple expert mental health professionals with extensive experience with Anthony agree that this behavior is truly the product of dramatically changing mood swings that occurred when he is triggered. Dr. Lane explains how even those acts of self-harm are a *product of* Anthony's mental illness:

> Q:   Did Mr. Gay engage in self-harm behavior to elicit a desired response from others?
>
> A:   Yes.
>
> Q:   And would that be an indication that his behavior was volitional?
>
> A:   Not completely because if his moods changed because, you know, his mental state, then it's not, you know, it's not his will. So because his mood is fluctuating, he's not in control of his will, then okay. If he's not in control of it, then okay, he's going to do something because now, you know, I'm impacted by how I feel, you know, I'm impulsive because of what's going on with my mood. I think I'm doing it because, you know, I want attention. But what has happened is, you know, I've had this mood swing. So that's the best way I can explain it. I don't know. It's a phase, you know, I'm cycling. My mood is cycling.

Lane Deposition at 84. Mental health providers who worked with Anthony repeatedly noted how devastating the carceral setting was for him, and recommended settings for his care. *See* Nunez Deposition at 105; Residential Treatment Unit Referral by Courtney Meyers, Nov. 14, 2016, Exhibit P. Anthony has spent much of his life, and nearly *all* of his adult life, not only in custody but specifically in solitary confinement. Especially when coupled with his mental illness and the trauma associated with solitary confinement, his emotional responses and coping mechanisms reflect that fact, and events that might trigger a smaller reaction from someone else—such as being unable to talk to a trusted mental health professional—cause Anthony a tremendous amount of emotional distress. He hurts his body to distract his mind from that pain.

18

Anthony was not taken out of solitary confinement despite his constant self-harm. Although shocking, it was and is common for people who are in such extraordinary psychological distress that they self-harm—like Anthony—to be kept in isolation. Recently, the Southern District of Illinois certified a class of all incarcerated people held in solitary confinement or what IDOC officials refer to as "restrictive housing." *See* Order Certifying Class, *Davis v. Jeffries*, 3:16-cv-00600 (S.D. Ill.) (Doc. 230), Exhibit F. In certifying that class, the district court considered extensive reports from solitary confinement experts Dr. Craig Haney and Mr. Eldon Vail. *See* Report of Dr. Haney in Davis v. Baldwin, 3:16-cv-00600 (S.D. Il), Exhibit G; Report of Eldon Vail, Davis v. Baldwin, 3:16-cv-00600 (S.D. Il), Exhibit H. Dr. Haney's report notes that incarcerated people who self-harm or are suicidal are routinely kept in isolation:

> Dr. Haney's report [to the District Court in *Davis v. Jeffries*] was full of instances where inmates who self-mutilated or attempted suicide but were nevertheless kept in segregation. As one inmate at Menard told Dr. Haney, "I keep trying to kill myself and they keep putting me back in my same seg cell." Dr. Haney described another prisoner at Logan whose records showed her placement in segregation was continued, and even extended, despite "an extraordinary number of documented suicide attempts" and repeated pleas to be sent to the state mental hospital because she was certain that Logan "could not fix her brain." Dr. Haney himself observed a multitude of prisoners that were "in obvious distress, sitting on the bunks in their disheveled cells, staring vacantly," and others that he described as "nearly incoherent," "extremely unstable" , "very disturbed" and "especially fragile." And he remarked that at two facilities, he was "struck" by how many of the restrictive housing prisoners he interviewed appeared to be "profoundly mentally ill."

*See* Order Certifying Class, *Davis v. Jeffries*, 3:16-cv-00600 (S.D. Ill.) (Doc. 230) (citations omitted).

### 3.  Activism as an Adult

Although the harm Anthony suffered over twenty-two long years while in solitary

confinement was not unique, his remarkable ability to describe that harm and his drive to advocate for the end of the barbaric practice of solitary confinement truly sets him apart. Anthony left IDOC intent on using the horrors he had experienced to transform the prison system. Upon his release in 2018, Anthony immediately began working with legislators in the Illinois House of Representatives and the Illinois Senate to restrict the use of solitary confinement in Illinois. *See* IL HB3564 (2023). The bill, which at various points has carried Anthony's name, is currently pending in the Illinois legislature.

Anthony has also worked diligently to educate the public about the harms of solitary confinement. He developed relationships with reporters across the country, leading to creative coverage of the harms of solitary confinement in outlets like ABC News,[20] the Chicago Tribune,[21] and The Guardian,[22] among others. *See* Selected Media Coverage, Exhibit M. He formed friendships with civil rights activists like Professor Angela Davis,

---

[20] *Man who spent 22 years in solitary confinement fights to end the practice*, May 11, 2021, ABC News, available at, https://abcnews.go.com/US/man-spent-22-years-solitary-confinement-fights-end/story?id=77632919

[21] *Anthony Gay's decades in solitary confinement led to self-mutilation. Now a proposed law to limit prisoner isolation in Illinois is named in his honor*, May 11, 2020, Chicago Tribune, available at https://www.chicagotribune.com/news/breaking/ct-solitary-confinement-illinois-prison-law-20200310-sjujwdcklrbitotj72ywrxpbfa-story.html; *Long car rides, motivational stories and Adele: Man who spent two decades in solitary confinement starts blog with tips for coping with stay-at-home order,* April 21, 2020, Chicago Tribune, available at https://www.chicagotribune.com/featured/sns-corona-isolation-anthony-gay-advice-20200421-jjuh3g6qwfe6tdh64kfgfp3wra-story.html; *see also How solitary confinement drove a young inmate to the brink of insanity*, Jan. 9, 2019, Chicago Tribune, available at https://www.chicagotribune.com/news/ct-met-anthony-gay-solitary-confinement-suit-20181206-story.html.

[22] *Man who spent 22 years in solitary urges Illinois to curb 'psychological torture'*, May 12, 2021, The Guardian, available at https://www.theguardian.com/us-news/2021/may/12/solitary-confinement-illinois-anthony-gay,

bringing them into his fight to eliminate solitary confinement. *See* Angela Davis, "Op-ed: Solitary confinement, says Angela Davis, is torture. Illinois has a chance to restrict its use," Nov. 4, 2021, Chicago Tribune.[23]

Anthony founded a nonprofit legal support organization called the Section 1983 Initiative.[24] The Section 1983 Initiative "serves community members by hearing their complaints, entering them into a database, and connecting them to either an advocate to help them make a complaint or a referral to an attorney in our network who has agreed to take their legal case."

Since his release from IDOC custody in 2018, Anthony has written a book called "Rope of Hope" and has curated a series of videos on the harm of solitary confinement. Those videos can be seen at www.dismantlesolitaryconfinement.com. With Anthony's help, his cousin Curtis Lewis is writing a play based on Anthony's life and work. In addition to his advocacy and political work, Anthony has also written a fantasy/action film entitled Dog Days of Summer about two young friends.

Crucially, although Anthony will struggle with post-traumatic stress disorder and other conditions for the rest of his life, his mental health is substantially more stable when he is not in confinement. Anthony immediately and proactively sought help from mental health providers, and was receiving care in the community from therapists and social workers. He sought out mental health providers with whom he connected, knowing that therapeutic services would be more effective if he and his treatment provider had a good rapport. More importantly, when

---

[23] Available at
https://www.chicagotribune.com/opinion/commentary/ct-opinion-solitary-confinement-reform-illinois-20211104-pqmn6daghfde5gx5dciulxn4mq-story.html.
[24] More can be found at http://www.section1983.com.

Anthony began to feel panic or anxiety outside of a carceral setting, he had a number of coping mechanisms that helped him calm down without resorting to self-harm. He could go for a walk, call a friend, call his therapist, or pour his energy into the fight against solitary confinement. For that reason, he had no history of self-harm in the community, despite the immense emotional strain of two federal trials. None of the coping mechanisms Anthony developed to respond to stress—-the sorts of coping mechanisms most people rely upon—are available to him in custody.

### 4. History with Confinement Prior to Sentencing in the Instant Matter

From August 2020 to May 2022, while Anthony was preparing for trial, he remained in the community. During that time, he was in compliance with the conditions of his release. Over this 23-month period, he sought permission to visit his mother in a nursing home, testify before the Illinois State Legislature, and meet with advocates in Chicago, including Bobby Rush's Rainbow PUSH Coalition. Anthony diligently sought permission to modify bond conditions when necessary, and he complied with each of these Court's rulings on those proposed modifications, whether favorable or not, and accepted unfavorable rulings without an incidence of mental deterioration. He also successfully continued with mental health treatment at Robert Young Mental Health Center and benefited from trusting and efficacious relationships with his treatment providers.

However, on May 16, 2022, after being found guilty on retrial, Anthony was abruptly handcuffed in the courtroom and taken into custody; he was not not permitted to hug his family, attend to his affairs, or prepare in any way for the ordeal that lay before him. Predictably, his mental health dramatically declined. At that point, supporters and mental health professionals familiar with Anthony's case shared a singular concern: they worried

that due to his previous 22 years in solitary confinement, resulting posttraumatic stress disorder, and panic attacks and self-harm symptoms that are triggered by social isolation, Anthony was at high risk of severe injury or death. Over the past year of his incarceration, this concern has only intensified as Anthony has experienced frequent mental health crises and episodes of self harm.

### a) Peoria County Jail

From May 16, 2022, until July 5, 2022, Anthony was held at Peoria County Jail. During this time, Anthony experienced repeated episodes of mental health crises during which he committed severe self-harm at least 8 times. Over the course of his first week in custody, Anthony plunged a pencil into his arm, and then stuffed several plastic bags into the open wound. That same week, he cut his scrotum with a piece of eggshell. He was placed on 24-hour suicide watch, which went on for weeks. During the month of June 2022, he self-harmed to the extent that his injuries required medical attention on at least 6 separate occasions: he cut his arm open with a spoon, cut his arm with a toenail creating a gash large enough that he could fit his finger into, twice placed a piece of plastic in his eye, and twice cut his scrotum with a piece of plastic. During one of these incidents, he cut himself so badly that his testicle was exposed and, when transported to a hospital, he was told it may have to be amputated.

### b) FCI-Butner & Butner FMC

On July 5, 2022, Anthony was transferred to BOP custody, where he was held at FCI Butner and the Federal Medical Center (FMC) at Butner. Over the next five months (until he was transferred to Livingston County Jail in December 2022), BOP's approach to "treating" Anthony was traumatizing rather than therapeutic, and it resulted in decompensation, increased panic

attacks, and repeated incidents of self-harm. This, despite the fact that Butner is touted as one of the BOP's best equipped facilities with regard to caring for incarcerated people with mental illness. One of the most predictably harmful decisions made by the BOP has been to hold Anthony in isolation (either on suicide watch or quarantine, both of which are effectively solitary confinement) throughout his entire time in BOP custody. Tragically but not surprisingly, Anthony suffered repeated panic attacks and associated instances of self-harm during this time. Furthermore, BOP staff seemed to fundamentally misunderstand the way that isolation triggers Anthony's underlying PTSD and symptoms of compulsive self-harm. Rather than treating his episodes of self-harm as a product of mental illness, BOP staff punished Anthony for each episode. As explained in more detail below, in a document ironically named "Suicide Risk Management Plan," attached as Exhibit J, BOP doctors affirmatively and intentionally withheld social contact from Anthony in an attempt to control the self-harm he inflicts when in isolation.

Upon his arrival at FCI Butner on July 5, 2022, Anthony was immediately placed on suicide watch. Suicide watch includes being held in isolation and being observed (through glass) 24 hours a day by *other incarcerated persons* tasked with this assignment (and apparently referred to as "suicide watch companions" or "inmate companions"). Exhibit I, Selected Butner Mental Health Records, July 5, 2022; *see* Program Statement P5324.08, Suicide Prevention Program, May 15, 2007, Exhibit K, at 14. Notably, Anthony's first mental health record from FCI Butner, dated July 5, 2022, notes that his providers were aware that "social isolation" was a dynamic risk factor that was clinically likely to increase Anthony's risk for suicidal behaviors. This notation reappears nineteen more times over the course of the next five months, throughout which Anthony is consistently held in social isolation. Exhibit I, July 5, 2022.

24

After arriving at FCI Butner, Anthony remained on suicide watch for two days and was then transferred to a quarantine cell. On July 15, 2022, Anthony, while in the shower, was informed that he was not going to be returning to his own cell but rather was going to be moved to a different cell and would also not be allowed to pack his own belongings. When he became upset, he was instead moved to a suicide watch cell equipped with only a mattress, smock, and blanket. He remained there for over 4 hours. The next day, July 16, 2022, Anthony self harmed by gauging his arm, placing a toothbrush in the wound, and using a sheet to sew the object into his right arm at the elbow. The toothbrush was under scar tissue and was attached to his arm by the sheet, which also ran under the scar tissue. Anthony was transported to the outside hospital for medical care. When he returned the next day, he was placed on suicide watch again.

At 1:00pm on July 18, 2022, while still on suicide watch, Anthony alerted correctional staff that he needed to see someone from the mental heath unit, as he had previously been instructed to do by BOP mental health staff if he began to experience emotional distress. Dr. Joseph Zonno, who fielded this request, apparently decided *not* to provide Anthony with mental health care because doing so, in his opinion at that time, "would actually increase his long term risk of self directed violence, as well as his suicide risk, as it would reinforce long-standing maladaptive patterns of thought and behavior." Exhibit I, July 18, 2022. Later that day, Anthony had a panic attack and self-harmed by placing a piece of plastic in his eye. He also opened the stitches on his arm. These behaviors were documented by the "inmate companion." At 10:37 am on July 19, nearly 24 hours after Anthony requested mental health assistance, Dr. Heather Ross visited him. She observed the injuries to his eye and his arm but, based on the record of her visit

on that day, did not refer him for medical care. He was removed from suicide watch on July 21, after being on watch for over 89 hours.

On July 30, 2022, Anthony reopened an old wound on his arm and inserted a toothbrush into it. He was sent to an external hospital for medical treatment. Upon his return later that day, he was placed on suicide watch. On Monday August 1st, 2022, while still on suicide watch, Anthony self-harmed by inserting a piece of plastic in his left eye. He was briefly seen by the facility's medical doctor but returned to his cell without medical intervention; the plastic remained embedded in his eyeball. Dr. Heather Ross visited Anthony that day and documented that he had requested to see a provider "just prior to putting something in his eye" and also noted that when she visited him "one eye was open and the other was covered with a gauze pad." Exhibit I, August 1, 2022. Sometime later that same day, Anthony made an incision in his scrotum and inserted approximately 5 to 6 pieces of plastic into his scrotum. Correctional Officer Katnick (phonetic) observed him self-harming and alerted a nurse. Anthony was then transported to Duke Regional Hospital and transported to Duke University, where he underwent surgery to remove the plastic from his left eye (which had previously been merely covered with gauze). Anthony was not treated for the injury to his scrotum at this time. He remained in the hospital overnight and returned to FCI Butner on Tuesday, August 2nd, with shards of plastic still embedded in his scrotum. He was returned to suicide watch, where he remained until August 3rd, after having spent a total of over 91 hours on suicide watch.

On Sunday, August 7th, at 11:00am, Anthony informed a correctional officer that he was in severe psychological distress and asked to be seen by mental health staff immediately. By 2:00pm, no mental health staff had arrived. Anthony again asked correctional staff if he could be

seen by mental health staff immediately. At 2:30pm, Anthony was cuffed and removed from his cell and taken to an office, where Dr. Ross, who was appointed as his forensic evaluator and not his treating provider, was telephonically present via speakerphone. Lieutenant Quinn remained present in the room with Anthony, who was in restraints;  he and other officers were within easy earshot of Dr. Ross and Anthony's conversation. Anthony was unable to speak with Dr. Ross privately and thus unable to address his crisis. No confidential environment was provided and Anthony was returned to his cell. In the evening hours of that same day, Anthony made an incision and embedded 3 to 4 pieces of plastic into the skin of his arm. He also made a new incision in his scrotum and inserted 6 more pieces of plastic into the incision site. The injuries were so severe that Anthony bled all over the floor of his cell. Anthony also felt lightheaded and dizzy after losing blood from these injuries. Anthony was taken to Duke Regional, where he was sedated and the plastic was removed from his arm.

The next day, Monday August 8th, while still at Duke Regional, Anthony underwent surgery on his scrotum. Prior to being anesthetized for the surgery, medical staff informed him that they may have to remove his testicle because of the severity of the injuries to his scrotum. Anthony signed a form consenting to the removal of his testical if deemed medical necessary. Surgeons removed approximately 12 shards of plastic from Anthony's scrotum; amputation of his testicle was successfully avoided. Anthony remained in the hospital for three days. During this time, one of his treating doctors refused to discharge Anthony to FCI Butner because of the risks of self-harm presented by isolation. He was later discharged by another doctor on or about Thursday, August 11th. Upon his return, he was placed on suicide watch, where he remained for 20 hours.

On Wednesday, August 17th, Anthony again reported to staff that he was in severe

psychological distress. At that time, Dr. Ross visited him in his cell and noted he "declined to

leave his cell to meet with this writer, and appeared to be crying." Exhibit I, August 17, 2022.

She also notes, "He continued to cry intermittently through the meeting." Exhibit I, August 17,

2022. He was placed on suicide watch and held on suicide watch until about 10am on Thursday,

August 18 (for about 17 total hours). Exhibit I, August 18, 2022.

At approximately 2pm on Thursday, August 18, just six hours after being removed from

suicide watch, Dr. Joseph Zonno presented Anthony with a document that the mental health staff

refer to as the "Suicide Risk Management Plan." *See* Exhibit J, Suicide Risk Management Plan

(SRMP). The document, which is signed by Dr. Ross, Dr. Zonno, and Deputy Captain Martin,

begins by noting Anthony's extensive history of self-harm as well as his apparent triggers and

protective factors, stating: "Mr. Gay demonstrates better adjustment when he is busy, has time

out of his cell, and has increased social interactions. His self-injury usually occurs after a period

of social isolation and inactivity, which tends to be exacerbated by an extended period in the

locked mental health unit." Exhibit J, SRMP. Relatedly, the plan notes that weekends are most

difficult for Anthony because of "less time out of his cell" and confirms that a review of the

records confirmed that "his acts of self-injury have occurred on Saturday (twice), Sunday (once),

and Monday (twice)." Exhibit J, SRMP.

Despite these useful clinical insights, however, the plan then takes a sudden U-turn,

laying out a perplexing and anti-therapeutic strategy for BOP staff to withhold social interaction

from Anthony when he engages in self-harm behavior. For example, it provides:

> Mr. Gay's primary evaluator or their designee will provide 10 minutes of social
> reinforcement every regular work day, if Mr. Gay has not engaged in the target behaviors
> during the previous 24 hours. If he has engaged in the target behavior in the previous 24

hours, the psychologist will conduct brief and routine monitoring with as little social attention as possible.

Exhibit J, SRMP. It indicates a similar directive for other types of BOP staff, e.g., "Medical staff: If the inmate engages in self-injurious behavior, medical staff will attend to the wounds with as little social attention as possible." Exhibit J, SRMP.

When Dr. Zonno presented Anthony with this "plan," which blatantly prescribes social isolation as a punishment for mental health symptoms that are outside of Anthony's control, Anthony understandably refused to sign and endorse the plan.

On Friday, August 19th at approximately 2:00am, Anthony sliced open his arm and inserted a screw. Exhibit I, August 19, 2022. He then inserted plastic into his left eye, the same eye that he had surgery on just 18 days earlier. Exhibit I, August 19, 2022. Lieutenant Ruffin observed Anthony's injuries but did not intervene and, on information and belief, did not call for assistance. Approximately 15-20 minutes after Lieutenant Ruffin observed Anthony's injuries from self-harm and took no observable action, Anthony further exacerbated the injury to his scrotum. At approximately 4:00am, Lieutenant Ruffin told Anthony to put cuffs on and Lieutenant Ruffin removed him from the cell and told him, "I should slap you," for engaging in self-harm. Two other officers, including Officer Ford and an Office B— were present for this threat. Lieutenant Ruffin then put Anthony in a holding cell, where he stayed until, at approximately 7:00am, he was returned to his cell. Mental health was contacted at 8:20am and sometime after that he was seen by mental health and medical staff at the facility. Exhibit I, August 19, 2022. At 12:30pm, Anthony was transported to an outside hospital, where he was sedated and underwent surgery; the screw was removed from his arm and the plastic pieces were removed from his eye. He remained in the hospital overnight. On Saturday, August 20th,

Anthony returned to FCI Butner and was placed on suicide watch. On Sunday, August 21, he requested a book to read and was denied and told "trust would have to be built." Exhibit I, August 21, 2022. He was held on suicide watch until Monday, August 22 (for a total of 73 hours).

On Thursday, August 24th, Anthony was transferred to the Federal Medical Center (FMC) at Butner where he was again placed in isolation. On September 2, 2022, Anthony inserted foreign objects into his scrotum and inserted a plastic utensil into a preexisting wound in his arm. He was sent to the outside hospital for medical treatment and returned the next morning, at which point he received another suicide risk assessment. The mental health provider conducting that assessment, Dr. Mivshek, noted: "Although Mr. Gay is not engaging in self-directed violence in an attempt to kill himself, the risk of him accidentally killing himself appears to be moderate to high." Exhibit I, September 3, 2022. Anthony was then placed on suicide watch. Over the next three months, BOP mental health staff would note this concern—that his self-harming was so severe that it created a "moderate to high" risk of death and/or memorialized that they had actually voiced this concern to Anthony on at least 22 occasions.

On September 8, 2022, while still on suicide watch, Anthony inserted a paint chip in his eye and created a dime-sized open area on his scrotal sac. He was taken to an outside hospital. On September 11, 2022, Anthony told Dr. Mivshek that while he was attempting to use alternative coping mechanisms and to "trust psychology to do the right thing," he also felt that it was "almost impossible" for him to refrain from self-harm if he continued to remain in

effectively in isolation while on suicide watch. In the following days, he repeatedly told mental health that he was afraid he would self-harm if he continued to be held in isolation.

September 14, 2022, Anthony inserted multiple paperclips into his arm and was taken to an outside hospital where he underwent surgery to have the paperclips removed. He returned from the hospital the following day, September 15, at approximately 4pm. and was placed in restraints. When asked by BOP mental health staff about the continued risk of accidental death resulting from his self-harm, he replied, "I think it kept me from committing suicide." Exhibit I, September 15, 2022. As of September 16 at approximately 11:40am, he was still in restraints. On September 17, 2022, while still on suicide watch, Anthony inserted a plastic spoon into his arm as well as three more paper clips. Two days later, he had surgery at an outside hospital to remove those objects from his body. On September 22, 2022, Anthony inserted small plastic pieces and one small piece of metal into his arm and was taken to the outside hospital for treatment. He was returned to suicide watch at FMC Butner the following day. On October 1, 2022, Anthony was observed bleeding after he inserted a piece of sharp plastic and a piece of sharp aluminum in his scrotum. On October 3, 2022, Anthony engaged in additional self-directed harm and was placed in restraints; he remained in restraints for 20 hours (from midnight to 8pm). On October 5, 2022, Anthony inserted items into his eye and was again placed in restraints. On October 7, 2022, he was transported to an outside hospital to have the foreign objects removed from his eye. On October 8, 2022, Anthony was denied access to his legal paperwork as a punitive repercussion of previous self-harm: "As noted in the outline of the SRMP, the authorization of his legal work would not be granted on this date as he engaged in SDV on the 10/5 and due to the altered SRMP timeline." Exhibit I, October 8, 2022.

On October 19, 2022, Anthony was again placed on suicide watch after he "told the nurse he wanted to go on suicide watch and bite himself." He was on suicide watch for 25 hours. In late October, Anthony's mother died. On October 30, 2022, Anthony inserted a plastic spoon into a pre-existing wound in his arm and was placed in restraints for 6 hours and on suicide watch. He reported, "I wish I didn't have to...but I made it a long time...I can't tolerate isolation." On October 31, 2022, while on suicide watch, Anthony cut his penile shaft and then, after he was placed in restraints by BOP staff, he inserted a piece of cement into his penis. Exhibit I, October 31, 2022. On November 4, 2022, while still on suicide watch, Anthony inserted a small piece of clear plastic into his left eye. He then inserted a piece of plastic into an open wound in his right arm. Anthony was taken to the outside hospital for treatment. He was taken off suicide watch on November 9, 2022, after 237 hours on watch.

On November 14, 2022, Anthony was placed on suicide watch after he opened a wound on his arm with his fingers, which required medical intervention. On November 15, 2022, Anthony opened up a wound in his scrotum and was placed in soft ambulatory restraints; he would remain in restraints—24 hours a day—for the next week, including four days during which he was restrained to his bed. While in the restraints, Anthony attempted to reopen the wound on his scrotum again. At that point he was placed on four-point restraints. When asked why he continued to self harm, Anthony told Butner staff, "I need to leave my room, I need real therapy, I need to come out of my cell . . . . You are torturing me and I hope you are happy."

Records indicate that, as of November 17, 2022, Anthony was still in soft ambulatory restraints: "Had to be fed some meals due to placement in restraints." Exhibit I, November 17, 2022. That evening, Anthony took a piece of metal and placed it in his eye. On November 18, he

was taken to an outside hospital and, after he returned at approximately 7 am on November 19, was held in four-point restraints, which he was held in for at least 48 hours before being transitioned to ambulatory restraints. On November 21, he reported to the mental health staff that his goal in inserting a piece of metal into his eye a few days prior was "being sent to the outside hospital to have the [previously inserted] razors removed from his scrotum, and the razors remain (outside hospital would not remove them)." Exhibit I, November 21, 2022. He also told his provider that the self-harm was "worth" the brief humanizing respite of hospital care: "He also spoke highly of the physician that removed the razor from his eye and said, 'He high fived me again,' and indicated receiving the high five was 'worth' inserting the razor blade into his eye." Exhibit I, November 21, 2022. On November 29, 2022, Anthony was removed from suicide watch, after 350 hours, or about 2 weeks, on watch.

### c) Livingston County Jail

In early December, Anthony was transferred to Livingston County Jail. There, he had routine access to phone calls and was able to watch television through the bars of his cell. Staff at the Livingston County Jail made an affirmative effort to socialize with him. Anthony did continue to struggle with his mental health, but he engaged in significantly less frequent self-harm. During his time in Livingston County, he was held in restraint chairs one time at his request after reporting that he thought he might harm himself; he was promptly released. In February 2023, the razors that had been in his scrotum for months were finally removed. That same month, he cut his arm.

### d) Metropolitan Correctional Center in Chicago

On May 3, 2023, Anthony was transferred to the Metropolitan Correctional Center in Chicago, where he has been held alone on an abandoned floor in a freezing-cold cell. Since being at the MCC, he had engaged in self-harm at least three times. On May 16, he cut his scrotum and inserted paperclips into his scrotum while being watched not by mental health professionals, but by an "inmate companion," who was powerless to intervene or procure medical care. He bled for three hours before being transferred to an outside hospital where the paper clips were surgically removed.

### C.  The Sentencing Guidelines

The Revised Pre-Sentence Report suggests that Anthony's sentencing guideline range should be 100-125 months.[25] This sentence, however, is incorrect both as a matter of formality and of justice. The recommended range does not reflect the spirit of the guidelines, the facts of Anthony's case, or the ways in which incarceration poses a unique risk to Anthony's very life. A guideline range of 15-21 months is more consistent with the alleged conduct in this case and Anthony's history and characteristics. A sentence of 12 months is appropriate here.

### 1.  Criminal History

The PSR reflects a criminal history score of 39, based almost entirely on prosecutions for low-level conduct that Anthony engaged in over a year-and-a-half period midway through twenty-two years of solitary confinement. As discussed below, had Anthony not been subjected to literal decades of a form of isolation that experts agree is torture,[26] he would have a criminal

---

[25] According to the government, and based on the calculations set forth in the Pre Sentence Investigation Report, Anthony's guideline range in this case is 100-125 months, based on a Criminal History Score of VI and an offense level of 24.

[26] *See* UN Special Rapporteur on Torture report on Solitary Confinement, submitted to the General Assembly, 5 August 2011. UN Doc Number: A 66/268; *see also*, The Istanbul Statement On The Use And Effects Of Solitary Confinement

history score of 0. As a formal matter and a matter of justice, this Court should not count convictions for non-dangerous conduct committed while in solitary confinement in Anthony's guideline calculation.[27] Assuming *arguendo* that Anthony should receive points for the aggravated batteries from Cairo and Livingston Counties, then his criminal history from prior convictions should be a 11. He would receive 3 points for the 1994 robbery, 3 points for the 1998 aggravated battery, and 3 points for the Livingston County aggravated batteries (all of which were sentenced on the same day and did not involve intervening arrests), and 2 points for being on supervision at the time of the instant allegations.

### a)  Solitary Confinement is Torture.

Solitary confinement is the correctional practice of isolating a prisoner in a cell for 22–24 hours per day, removed from all social and environmental stimulation, for periods of time ranging from hours to decades. Prisoners in solitary confinement—typically referred to as "segregated housing units" or "control units"—typically spend both their sleeping and waking hours in their cells, some of which are windowless and some of which are sealed with solid doors. They receive their meals from staff through a slot in their cell doors.

---

International Psychological Trauma Symposium, Istanbul, Dec. 9 2007, available at https://www.solitaryconfinement.org/istanbul.

[27] Although Anthony does not receive any criminal history points for the Failure to Appear conviction set forth in paragraph 56 of the PSR, it is important for the Court to understand that he did not abscond or wilfully refuse to appear at a court hearing. Anthony was originally charged with activities related to a gang fight *which he was not involved in*. All of the charges against Anthony related to the alleged incident on May 27, 1993 were dismissed and Anthony's co-defendant Kevin Ford was found not guilty at trial. During the pendency of those charges, which were ultimately dismissed, Anthony was arrested and held in Illinois. He was not able to obtain a bond, and exercised his rights to engage in an extradition process. Because of the pace of the extradition process, Anthony was still incarcerated in Illinois on October 4, 1993, the date of his hearing in Iowa. *See Iowa v. Gay*, 526 N.W.2d 294 (Iowa 1995), attached.

Perhaps once a week, for an hour or so at a time, they are shackled and walked to the shower or solitary yard. And if they are allowed to exercise, they may in all likelihood do so in what amounts to a dog kennel.

Overwhelming scientific evidence demonstrates that the prolonged isolation of prisoners in conditions of solitary confinement can cause significant psychological and physical harms. Solitary confinement imposes even greater risk of serious harm on those, like Anthony, with pre-existing mental illnesses. Studies of prisoners subjected to solitary confinement have documented a wide range of psychological reactions, including anxiety, depression, insomnia, panic, withdrawal, paranoia, hypersensitivity, cognitive dysfunction, hallucinations, hopelessness, self-mutilation, and suicidal ideation and behavior. Together, these symptoms combine to form a "specific psychiatric syndrome associated with solitary confinement" that "has the characteristics of an acute organic brain syndrome." *See* Stuart Grassian, Prison Reform: Commission on Safety and Abuse in America's Prisons: Psychiatric Effects of Solitary Confinement, 22 Wash. U. J.L. & Pol'y 325 (2006). Dr. Pierre Nunez, a Wexford Health Sources psychologist[28] who knew Anthony during his incarceration, noted, "You know, any severely mentally ill patient is going to be difficult to stabilize in any setting no matter where it is. Is it harder to stabilize a patient who's severely mentally ill when they're sitting in a room 23 hours a day? The answer to that is yes." *See* Nunez Deposition at 76.

For these reasons, authorities across both scientific and legal fields have widely

---

[28]  Wexford Health Sources is the company that provides Illinois Department of Corrections to provide medical and mental health care.

recognized that solitary confinement is torture. In recognition of the grave psychological effects this isolation can produce, the American Psychiatric Association, the National Commission on Correctional Health Care, and the National Alliance on Mental Illness have all opposed the use of solitary confinement for individuals with serious mental illness. Numerous federal courts have either outlawed or significantly curtailed the practice of putting prisoners with mental illness in solitary confinement in recent years. In 2011, the U.N. Special Rapporteur on Torture declared prolonged solitary confinement a form of torture, and in 2015, the U.N. General Assembly passed rules prohibiting indefinite solitary confinement, solitary confinement in excess of 15 days, and the imposition of solitary confinement of any length on women, children, and persons with mental or physical disabilities. A growing array of states—including Washington, North Dakota, and Colorado, California, and New York—have taken steps in recent years to dramatically limit the use of solitary confinement in their correctional systems.

Here in Illinois, federal courts have condemned the use of solitary confinement as practiced by IDOC as inhumane and unconstitutional. Most recently, on June 14, 2021, the Southern District of Illinois certified a class of all incarcerated people held in solitary confinement or what IDOC officials refer to as "restrictive housing." *See* Order Certifying Class, *Davis v. Jeffries*, 3:16-cv-00600 (S.D. Ill.) (Doc. 230). In certifying that class, the district court considered extensive reports from solitary confinement experts Dr. Craig Haney and Mr. Eldon Vail. Summarizing the uncontested evidence before it about IDOC's system of solitary confinement, the district court in that case observed:

> Dr. Haney and Mr. Vail's reports paint a disturbing, and quite frankly distressing, picture. Mr. Vail characterized the conditions of the restrictive housing units he observed as "generally deplorable," "stark and horrific," "far below the standards of

> other state prison systems," and "unnecessary to achieve the relevant penological objectives." Dr. Haney likewise said the conditions in the restrictive housing units he observed were "extremely harsh," "draconian," and "precisely the kind that create a significant risk of serious harm for all the prisoners who are subjected to them." In fact, he said they were "outright dangerous to prisoners' mental health and well-being" and represented "nothing short of a system-wide crisis." He further opined that the "shockingly high number of [mentally ill] prisoners" housed in the IDOC's restrictive housing units was "frankly unconscionable."

Order Certifying Class, *Davis v. Jeffries,* p. 33 (citations omitted). The district court also

summarized the known effects of prolonged social isolation:

> Dr. Haney explained that psychologists have long known that social contact is fundamental to establishing and maintaining emotional health and well-being—the human brain is literally "wired to connect" to others. It is well established based on extensive research and data that "meaningful social contact is a fundamental human need" and the need for "caring human touch" is likewise "fundamental."
>
> Dr. Haney reported that numerous studies have shown that social deprivation, isolation, and exclusion in contexts outside of prison are potentially very harmful and known to produce a host of serious adverse cognitive, emotional, behavioral, and physical impairments, which can even cause permanent and irreparable damage to a person's overall psychological and physical functioning. For example, social isolation is a significant risk factor for anxiety and depression. It is related to paranoia, delusional or psychotic beliefs, and suicidal behavior. It can lead to decreased cognitive functions and difficulties with thinking, concentration, memory, and self-regulation. It can cause lethargy, reduced empathy, emotional numbing, an absence of meaningful thought, and aggressive or even violent behavior. Social isolation is also known to adversely impact the functioning of the human immune system and undermines health outcomes in general. In fact, social isolation has been shown to literally lower the age at which people die.
>
> Again, this is what happens to socially isolated individuals outside of prison. According to Dr. Haney, "there is every reason to believe" that the harm caused to prisoners in solitary confinement is even worse. Prisoners in solitary confinement experience not only "sheer deprivation of meaningful social contact" but also commonly experience high levels of repressive control, enforced idleness due to a dearth or complete absence of meaningful mental activity and programming, nonexistent or greatly reduced physical activity, a lack of positive environmental stimulation, and severe restrictions on property, all of which cause additional psychological distress. Consequently, the social isolation in solitary confinement is "far more stressful, harmful, and dangerous than in the larger society where these deleterious effects have been elaborately documented."

38

Extensive research has shown that prisoners in segregation display a range of predictable and problematic symptoms of psychological stress. These symptoms include: irritability, anxiety, paranoia, irrational anger, aggression, rage, hopelessness, and appetite and sleep disturbances. Research has also demonstrated a broad range of psychological reactions to extreme isolation, such as: hypersensitivity to external stimuli; difficulties with thinking, concentration, and memory; ruminations and intrusive thoughts; and panic and loss of control. Some prisoners even report hallucinations, perceptual distortions, self-mutilation, and suicidal ideation and behavior. Correlational studies have also demonstrated that suicide rates and self-mutilation are more prevalent in extreme isolation or restrictive housing. Additionally, research suggests that other violent acts, such as stabbings, attacks on staff, property destruction, and collective violence, are also more prevalent in restrictive housing.

Order Certifying Class, *Davis v. Jeffries*, pp. 9–11 (citations omitted). The court also summarized the undisputed direct observations from Dr. Craig Haney and Correctional Administration Eldon Vail—-two of the country's most prominent correctional experts—regarding the specific effects of solitary confinement as it was being practiced within IDOC during the same time period in which Anthony was held in solitary for twenty-two years:

Unsurprisingly, "virtually all" of the prisoners that Dr. Haney spoke with reported or acknowledged various forms of suffering, decompensation, and deterioration that they are experiencing as a result of the conditions in restrictive housing and the way they are treated. Dr. Haney indicated that the symptoms the prisoners acknowledged are indicative of the type of psychological trauma associated with severe forms of isolated confinement. Prisoners frequently reported depression, near constant anxiety, difficulty concentrating, ruminations, irritability, bouts of anger, and feelings of an impending breakdown. Some prisoners described visual hallucinations and auditory hallucinations. More than one prisoner even reported playing with and/or eating their own feces. And in many instances, prisoners showed Dr. Haney cuts, bite-marks, and scars from self-mutilation and described attempts to commit suicide.

*Id.* (citations omitted).

The federal court also noted how many prisoners were being held in solitary confinement within IDOC and for how long, observing that nearly 20,000 incarcerated

39

individuals had spent at least 30 days in "restrictive housing" and nearly 12,000 had spent

60 days there, but that a group of 1,619 had spent more than one year in those conditions.

Regarding this later group, the court wrote:

> Data shows that at the end of 2018, there were 1,619 prisoners in restrictive housing
> and 709 of them (or 44%) had been there for two or more years, 387 (24%) had been
> there for five or more years, 256 (16%) had been there for seven or more years; and
> 78 (5%) had been there for at least ten years. There were even eleven documented
> prisoners who had been in restrictive housing for twenty years or more.

Order Certifying Class, *Davis v. Jeffries*, pp. 11–13 (citations omitted). Anthony—had he

not been released from his sentence in August 2018 as the result of outside

advocacy—would have been the twelfth of these prisoners having served over twenty years

in solitary confinement.

For those like Anthony who were held in solitary confinement for extremely

prolonged periods of time, psychological decompensation is clinically inevitable and often

leads to behaviors such as self-injury, suicidality, and "acting out" such as by throwing

human waste. Research documents that self-mutilation may include amputation and cutting

that (if not fatal) can be permanently disfiguring. Self-mutilation can serve a variety of

psychological functions adaptive to the torturous conditions of solitary, including providing

the individual with a physical distraction from emotional suffering or with a sense of control

over something when the otherwise near-complete lack of control over one's person is

overwhelmingly terrifying.

Scholars have also documented that prisoners experiencing prolonged isolation from

human contact may experience such a psychological need for it that they endanger their own

lives merely for a moment's reprieve. In a seminal 1973 account of solitary confinement in

California, one researcher recalled seeing prisoners "become so desperate for relief that they would set their mattresses afire so as to force the staff to open the door and remove them from the torture chamber." Importantly, it is because opportunities for human contact for prisoners in solitary are so limited that prisoners' efforts to elicit human connection often manifest as antisocial conduct. Often, however, symptoms like self-cutting and suicidality result in harm only to the incarcerated individual. Indeed, most state prison systems report their highest rates of self-injury in their segregation or "lockdown" units. Likewise, other studies reveal that suicide rates are disproportionally high among prisoners in solitary confinement.

### b) Solitary Confinement and Other Forms of Abuse Were Endemic at Pontiac Correctional Center.

Seventeen of Anthony's prior convictions were the result of conduct committed while he was being held in extended solitary confinement in IDOC and psychologically decompensating; Anthony was in solitary confinement continuously from 1996 until 2018, which included the period during which he received nearly all of the additional convictions that the Government relies on to argue that Anthony has a Criminal History Score of VI and an offense level of 24. Moreover, all but one of these convictions arose from conduct that occurred while he was being held in "North House" at Pontiac Correctional Center, infamously one of the state's most dangerous and derelict carceral facilities. *See* First Annual Report of Monitor Pablo Stewart, at 42, *Rasho v. Baldwin*, 1:07-cv-01298-MMM-JEH (C.D. Ill. June 5, 2017) (describing Pontiac as "the most chaotic and anti-therapeutic prison unit" he had ever toured in 30 years as a prison psychiatric expert). The majority of these offenses involved behavior that, even to lay individuals, clearly suggests mental illness: throwing feces and urine and possessing

"weapons" which Anthony only ever used against himself (for self-mutilation).

Solitary confinement triggered Anthony's mental illness, causing him to act erratically and irrationally. One manifestation was Anthony's self-mutilation. Another was irrational "assaults" on prison staff, in which Anthony would do things like throw his body fluids at prison guards through cracks in his cell door. Instead of recognizing these acts for the manifestations of mental illness that they were, prison staff doubled down, and Anthony's torture was both compounded and extended: he was given "tickets" that punished him with consecutive sentences of solitary confinement until the year 2152—two lifetimes' worth of solitude.

Anthony was also charged criminally for his "attacks" on prison staff—again, mostly incidents involving spitting or throwing water, urine, or feces in the direction of a prison guard from behind a steel door. These criminal cases extended his torture even furtherf—his prison sentence was ultimately extended by about fifteen years, with all but a few weeks of it to be served in solitary confinement.

For decades, Pontiac, to a greater extent than other IDOC facilities, used solitary confinement as a wholesale substitute for mental health treatment, regularly subjecting mentally ill prisoners to solitary confinement under particularly inhumane conditions. In 2016, a federal consent decree was entered by the Central District Court of Illinois aiming to address these conditions within IDOC, with a particular focus on Pontiac. *See Settlement Agreement, Rasho v. Baldwin*, 1:07-cv-01298-MMM (C.D. Ill. May 10, 2016). The settlement agreement was sweeping and, in addition to the curtailment of the use of solitary confinement, it required IDOC to make major changes to its provision of mental health care

system-wide—from intake mental health screening, establishing a new inpatient treatment unit, and improving mental health staffing levels and training, to overhauling its disciplinary procedures.

The reports from the court-appointed monitor, Dr. Pablo Stewart, documented the atrocious conditions within Pontiac. In his initial visit as monitor, Dr. Stewart found the "crisis cells" in Pontiac's notorious North House, where Anthony spent the majority of his years in solitary confinement, to be "the most chaotic and anti-therapeutic prison unit" he had ever toured in 30 years as a prison psychiatric expert. First Annual Report of Monitor Pablo Stewart, at 42, *Rasho v. Baldwin*, 1:07-cv-01298-MMM-JEH (C.D. Ill. June 5, 2017).

Dr. Stewart also documented what he called a "culture of abuse" towards mentally ill prisoners in both the mental health units and segregated housing units at Pontiac. That included a disturbing and "elaborate system of retaliation perpetrated by the custody staff against the mentally ill offenders at Pontiac." As Dr. Stewart wrote, the scheme involved . . . withholding food, visits, phone calls; restricting them from participating in required activities; setting up inmates for assault by labeling them 'snitches'; providing them the means (staples, paper clips, other sharp objects) to perform self-injurious behaviors; [and] placing incriminating evidence in their cells, including weapons or other forms of contraband.

The inhumane conditions and profound human suffering documented by Dr. Stewart in his reports to the Central District in *Rasho* were also nearly identically described by Dr. Haney and Mr. Vail in their reports to the Southern District pursuant to the *Davis* case. Dr. Haney described that as he entered North House for the first time he found "a prisoner in a

restraint cage and clothed in a suicide smock." The prisoner was "nearly incoherent." Though he could "confirm for [Haney] that he was on suicide watch," he could not say "how long he had been there or when he was had been last checked on by mental health staff." In his report, Mr. Vail documented that he observed "cells where the legs of the bunk beds were rusted. In one cell a prisoner showed me a hole in the wall that he said was used by rats. Multiple prisoners complained about rodent and insect infestation." Prisoners also called out to Dr. Haney and Mr. Vail to show them "the water that came out of the sinks in their cells . . . There were small black specs [sic] in the water.  [They] had great concern that the water was contaminated in some way." As for the shower stalls (to which isolated prisoners perhaps had weekly access, if that), Dr. Haney found them "in terrible condition": rusted, caked in excrement at worst and in mildew at best. There was scant respite to be found outside, either. Those allowed out of doors (a revocable privilege limited to a few hours per week) generally took in their allotted fresh air from a glorified dog kennel.

Like Dr. Stewart, Dr. Haney and Mr. Vail also documented direct abuse of prisoners by the prison's staff: 77% of the prisoners Mr. Vail interviewed at Pontiac reported—without prompting—being "physically abused or witnessing beatings of other prisoners" while in segregation. The ground floor of Pontiac's North House, Dr. Haney and Mr. Vail noted in their reports, contained 12 "crisis cells," which housed prisoners being monitored for suicide or self-harm. One man, Dr. Haney recalled,

> . . . appeared to be very psychologically disturbed. He showed me cuts on his arms from self-mutilation. He told me that he had come from West House and was not supposed to be in segregation. He complained about what he described as a total lack of programming: "I'm not getting any counseling, no yard, no soap, no toothpaste, no group." As he put it, "I am just back here, deteriorating."

44

*See* Haney Report at 59.

The expert reports that emerged from the court monitors in these cases revealed not only blatant neglect and abuse, but moreover, a torturous cycle imposed upon Anthony and other mentally ill prisoners held in Pontiac. First, these individuals were starved of human contact, basic necessities, and adequate care, then they were punished often by further solitary confinement or other types of restraint when they responded—in clinically predictably ways—to the torturous isolation and neglect. These steps were repeated *ad infinitum*. It is a process best summed up by the testimony of one prisoner held in Pontiac's West House: "I bug up [in solitary confinement and] when I do, then they beat on me and write me up, which keeps me here . . . I'm SMI [seriously mentally ill] and they don't care."

For Anthony, and many other prisoners,[29] the cycle did not end there. At Pontiac Correctional Center, at rates exponentially higher than at any other IDOC facility dealing with similar issues, the predictable consequences of prolonged solitary confinement were met not just with intra-agency disciplinary action but with additional criminal charges. When seriously mentally ill prisoners decompensated in solitary confinement, Livingston County, working in concert with the officials at Pontiac, routinely prosecuted them for serious criminal felonies—most commonly, aggravated battery.

Under Illinois law, misdemeanor simple battery becomes felony aggravated battery when directed against a correctional officer. Moreover, no injury is required; mere physical contact is sufficient. And Livingston County—a jurisdiction of fewer than 36,000 people,

---

[29] *See* Shannon Heffernan, *Mental illness in solitary landed these men an extra 842 years in Illinois prisons, advocates say*, WBEZ Chicago (2021), https://www.wbez.org/stories/solitary-confinement-and-mental-illness-in-illinois-prisons/d77e6347-b1cc-4d10-8d76-d5540394a1a7 (last visited May 15, 2023).

93% of whom are White—prosecuted more of these cases than does any other jurisdiction in the State. Of the roughly 950 sentences for aggravated battery against an IDOC employee currently being served in Illinois, more than 350 came from Livingston County. Not surprisingly, and based on available data, 81% of people who have been identified as seriously mentally ill and are serving sentences for aggravated battery out of Livingston County are Black. While a small number of these prosecutions involved some physical injury, the vast majority involved acts of "offensive contact." Acts as innocuous as spitting or tossing a paper cup of water spurred felony indictments. Many of these cases, as with Anthony's, involved repeated acts, such as the throwing of feces or urine, by persons who were clearly mentally ill. Yet the Livingston County State's Attorney targeted this section of Pontiac's incarcerated population for prosecution like fish in a carceral barrel.

The senselessness and cruelty of these prosecutions was so apparent as to motivate now-retired Livingston County Judge Harold Frobish, who presided over dozens if not hundreds of these cases, to make repeated and frequent attempts to stop the Livingston County State's Attorney from prosecuting incarcerated people for low-level conduct that was obviously the result of mental illness. An extraordinarily unusual action for a sitting judge, Judge Frobish repeatedly wrote letters to the Warden of Pontiac Correctional Center, Director of the Department of Corrections, Illinois' Governor, and U.S. Senators in an effort to stem the tide of these prosecutions. One of these letters is excerpted below:

What action can be taken to change this circumstance? Presumably, and hopefully, the State's Attorney of Livingston would discontinue prosecution of the cases that I have just described if it received a written request to do so from the Department of Corrections. In addition, it would appear that the Department of Corrections should give consideration to the "out date" of any inmate which it is considering for further criminal prosecution.

Here I wish to emphasize that I do not dispute that a great many inmate cases should be prosecuted in Livingston County. **Inmates should be prosecuted for violating the law if the prosecution serves a useful purpose.** Livingston County has a long history of diligent and vigorous prosecution of a large volume of such cases, and will continue to do its duties. I believe you are or should be aware that  Livingston County cooperates more in this regard than any other county in Illinois. Livingston County continues to receive, however, cases such as those of Mr. Love and Mr. Gay and others where it is very difficult to make a reasonable argument that the resources of Livingston County, as well as the state, are being expended for a valid purpose.

I readily acknowledge that this type of a letter from a sitting judge is most unusual. I am most reluctant to make this communication. Under these circumstances, however, I feel compelled to do so. Part of my responsibility is to do what I can to assure that the resources of the criminal justice system are used for valid reasons and for the benefit of the public. We all should avoid actions which would undermine faith in the criminal justice system or which are wasteful. I hope you give this issue your very serious consideration.

Because we are dealing with state funds in particularly tight times, I found it appropriate to forward a copy of this correspondence to Mr. Monk as Chief of Staff of Governor Blagojevich. My previous efforts to bring about change have been unsuccessful.

*See* Letter from Judge Harold Frobish to Dept. of Corr. Dir. Roger Walker, Feb. 17, 2004, *re*: *Terrace Love, Livingston County Case No. 03-CF-310, and others like it.* Rather than being motivated by any valid penological purpose, a genuine desire to keep correctional officers safe, or attempt at true rehabilitation, the prosecutions of Anthony and others like him were the reflection of a cruel, racist, and inhumane culture, one that treats mentally ill people in prison as less than human.

Yet, there is still one step further in this senseless pattern of prosecutorial cruelty. Rather than bringing felony charges immediately after these "assaults," the Livingston County State's Attorney often waited to bring charges until the statute of limitations had almost run. For Anthony and many others, new charges were brought only after the prior

prosecutions were concluded. This practice of staggering the initiation of prosecutions meant that global pleas or even merged sentences post-trial—which would have the effect of running multiple sentences concurrently—were off the table, even for conduct that happened repeatedly or close in time before any charges were brought (and often for these defendants, during one continuous period of ongoing and untreated mental health crisis). These repeated prosecutions happened to dozens of mentally ill prisoners held in solitary confinement in Pontiac.[30]

> c) **Livingston County Charged Anthony for Conduct that was a Direct Biproduct of Torture, and Artificially Stacked Prosecutions Against Him.**

In Anthony's case, all of the incidents for which he was prosecuted in Livingston County took place between June 2000 and April 2001, less than a one year period. Despite the relatively narrow window of time, Anthony was prosecuted by Livingston County sixteen times over the course of several years, with all but two incidents occurring before the first prosecution was even initiated. These prosecutions resulted in more than 100 additional years being added to Anthony's prison sentence. The majority of these cases involved Anthony throwing liquids, urine, or feces, and all of these cases occurred while he was being held in solitary confinement at Pontiac during the time period that later gave rise to federal consent decrees addressing the horrific conditions there. At the time of Anthony's conduct resulting in these prosecutions, he was experiencing an ongoing, unaddressed

---

[30] For many, the result was an artificial and devastating "stacking" of sentences. For Anthony, the harm caused by that artificial "stacking" was twofold; in addition to being incorrectly sentenced to an additional 115 years in prison time, Anthony now faces an absurd 39 criminal history points, a calculation driven by the Livingston County State's Attorney's disengenous if not improper charging decisions.

mental health crisis resulting from prolonged solitary confinement and during which he had engaged in self-mutilation dozens of times. These prosecutions were senseless, cruel, and the result of unconstitutional treatment of Anthony, as is now coming to light in the ongoing litigation in the Central and Southern District Courts.

Given that Anthony's prosecutions for aggravated batteries were all the product of years of torture, they should not be counted towards his criminal history score. Moreover, because his 1994 sentence for robbery merged with his sentences for aggravated battery and otherwise would have expired decades ago, that sentence should similarly be excluded from his criminal history score.

### d) If They Are Scored At All, Anthony's Livingston County Sentences Should Receive 3 Points in Total.

Assuming, arguendo, that Anthony is to receive some criminal history points for the aggravated batteries, he should receive 3 points in total for 2000CF311, 2001CF75, 2001CF76, 2001CF195, 2001CF234, 2002CF22, 2003CF60, 2003CF61, 2003CF62, 2003CF146, 2003CF172, 2003CF269, 2003CF298, 2003CF299, 2004CF13, and 2004CF24. He was resentenced in each of these matters on January 31, 2014. *See* USSG § 4A1.2(a)(2) ("If there is no intervening arrest, prior sentences are counted separately unless (A) the sentences resulted from offenses contained in the same charging instrument; or (B) the sentences were imposed on the same day. Treat any prior sentence covered by (A) or (B) as a single sentence."). At the time of sentencing, Livingston County judges ran all of Anthony's cases concurrent to all of the other cases, even if he had not be charged with the prior case at the time of the new alleged conduct. Anthony was resentenced on January 14, 2014, on each of these matters because, under Illinois law, those counts should *always* have

been concurrent to one another; the sentences were incorrect when they were imposed. *See* 730 ILCS 5/5-8-4(a) ("When an Illinois court (i) imposes multiple sentences of imprisonment on a defendant at the same time or (ii) imposes a sentence of imprisonment on a defendant who is already subject to a sentence of imprisonment imposed by an Illinois court, a court of another state, or a federal court, then the sentences shall run concurrently unless otherwise determined by the Illinois court under this Section.").

Moreover, the conduct alleged in each of those counts could and *should* have been contained in a single charging instrument, and treating these matters as a single sentence is consistent with the Sentencing Guideline's goal of reducing the impact of charging decisions in subsequent sentencing. *See* USSG Part A - Introduction and Authority.[31] There is no reason why each of Anthony's cases was a separate and distinct criminal case; by contrast, in other cases, the Livingston County State's Attorney's Office could and did charge defendants with multiple counts of aggravated battery spanning days and weeks, each involving a different correctional officer, in the same indictment. For example, in 01CF159, the Livingston County State's Attorney returned a 17 count indictment against another incarcerated person at Pontiac Correctional Center, alleging aggravated battery

---

[31] "The Commission recognized that a charge offense system has drawbacks of its own. One of the most important is the potential it affords prosecutors to influence sentences by increasing or decreasing the number of counts in an indictment. Of course, the defendant's actual conduct (that which the prosecutor can prove in court) imposes a natural limit upon the prosecutor's ability to increase a defendant's sentence. Moreover, the Commission has written its rules for the treatment of multicount convictions with an eye toward eliminating unfair treatment that might flow from count manipulation. For example, the guidelines treat a three-count indictment, each count of which charges sale of 100 grams of heroin or theft of $10,000, the same as a single-count indictment charging sale of 300 grams of heroin or theft of $30,000. Furthermore, a sentencing court may control any inappropriate manipulation of the indictment through use of its departure power. Finally, the Commission will closely monitor charging and plea agreement practices and will make appropriate adjustments should they become necessary."

against a number of unique complainants across a five-month period of time. *See*

Indictment, *People v. McCoy*, 01CF159, Exhibit L.

Here, the Livingston County State's Attorney delayed and then "stacked" Anthony's

prosecutions—a practice that they applied to other mentally ill defendants. By withholding

pending indictments until the resolution of each preceding case, the local prosecutor's office

could and did prevent Anthony from resolving multiple cases at once, even though each

prosecution dealt with conduct many months if not years old. This kind of charge

manipulation is precisely the sort of conduct that the sentencing guidelines strive to prevent.

### 2.  Offense Level

Anthony's offense level should be 14, as his 1998 robbery should not affect his base

offense level, nor should he receive additional points for obstruction of justice or based on

the poorly-formed assumption that the firearm was stolen. .

### a)  Anthony's 1994 Robbery Conviction Should Not Receive Criminal History Points.

Just as Anthony's criminal history score should be 0, his base offense level should be

14, because the sentence for his 1994 robbery conviction should have expired decades ago.

It did not only because Anthony was repeatedly tortured, for decades, by the Illinois

Department of Corrections, which had the effect of artificially extending his overall

incarcerative period and thus the "recency" of his 1994 sentence. The PSR purports that

Anthony's base offense level is 20 because of a robbery that occurred in 1994, for which

Anthony eventually received 7 years of prison time to be served at 50%. *See* Para 58. Even

if he served every day of that sentence, Anthony should have been released in 2001, more

than twenty years ago.

**b)  Anthony Should Not Receive a Two-Level Enhancement
Based on Allegations that the Firearm Was Stolen.**

Anthony should not receive an additional increase to his offense level based on the

allegation that the firearm was allegedly stolen. First, the Government simply cannot meet

its burden of proof that the firearm was stolen, as opposed to lost. The original owner,

Anthony Rodriguez, reported the firearm as missing on or around May 13, 2020, roughly a

*month* after it went missing. Mr. Rodriguez told the officer that he went to St. Louis over

Valentine's Day weekend, and that he took his handgun with him on that trip. He describes

"moving around a lot" and keeping his gun in his duffle bag, which "isn't common." He

describes generally losing track of the gun—Mr. Rodriguez describes accidentally taking the

gun into the gym at some point because it was in his duffle bag. Mr. Rodriguez repeatedly

asks if the police department is connected to other departments in the area because he

wonders if the gun "fell out of [his] bag." The officer assures him that she will check other

police departments, to see if someone found the missing gun.

Mr. Rodriguez opines that someone stole his firearm "just because I've turned this

house upside down." He reported the gun missing on or about May 13, 2020 because,

according to him, he "can't seem to find it." The officer tells the owner that she'll "report it

stolen for now, and if someone reason [he] finds it, just call it and we'll take it out of

stolen." Towards the end of the short interview, the officer advises Mr. Rodriguez to check if

he left the gun in his hotel in St. Louis, which he agrees to do. She repeatedly instructs him

on steps to take if he finds the gun so that it can be "taken out of stolen" status.

Notably, Mr. Rodriguez does not describe anything else that is missing and does not

refer to anything else consistent with a theft (e.g., there are no broken windows or evidence

or forced entry to his home). The description of his own behavior after he last saw the item (looking for the item, mentally and physically retracing his steps) is consistent with a person who has personally misplaced and then lost an item. Moreover, despite this description, it is the responding officer who decides to report the weapon as stolen despite the fact that Mr. Rodriguez's explanation is inconsistent with that possibility (an inconsistency which she is obviously well aware of, as she even encourages him to check the hotel room where he last saw it and let her know if he "finds it.").

Finally, even if the firearm was stolen by someone at some point in time, there is simply no evidence that Anthony knew or even *could* have known that the firearm was stolen. The ATF does not maintain a publicly accessible database of stolen weapons, whereby would-be firearm purchasers can verify the ownership history of a gun. Although the Commentary to USSG 2K2.1 indicates that the enhancement should apply whether or not the defendant knows that the firearm was stolen, such an interpretation is both non-binding on this Court and nonsensical. This Court should reject the enhancement when the government can make no showing that the defendant knew or should have known a firearm was stolen. *See, e.g., United States v. Faison*, No. GJH-19-27, 2020 WL 815699, at *7 (D. Md. Feb. 18, 2020) (noting that every gun acquired by a felon is acquired outside of the legal marketplace, and that "the post-arrest discovery by a federal agent tracing the gun that, unbeknownst to Mr. Faison, the gun was stolen does not reflect on the need to protect the public from the defendant, the need for deterrence, or the seriousness of the offense, nor does it bear on the defendant's history and characteristics or relate to any other relevant sentencing factor.").

### c)  Anthony did not Attempt to Obstruct an Investigation.

Anthony did not attempt to obstruct or impede any investigation, so an enhancement pursuant to §3C1.1 is inappropriate. The prosecution bears the burden "to prove by a preponderance of the evidence that the enhancement is warranted." *United States v. Brown*, 843 F.3d 738, 742 (7th Cir. 2016); *see also United States v. Ewing*, 129 F.3d 430, 434 (7th Cir. 1997); *United States v. Hamm*, 13 F.3d 1126, 1129–30 (7th Cir. 1994)). In its sentencing memorandum, the Government alleges that Anthony should receive a two-level enhancement for obstruction based on an affidavit that he filed as an attachment to his *Motion to Reconsider Motion to Compel Discovery*. *See* Govt. Sentencing Memorandum at 9. Although the government might disagree with Anthony's characterization of what happened on May 23, 2020, between Anthony and the Rock Island Police Department, there is evidence Anthony successfully sued the Rock Island Police Department in federal court because they took his belongings. *See Gay v. Keys et al*, 4:20-cv-04250 (C.D. Ill.). In 2022, the court entered a judgment against Officers Scott Gable and J. T. Keys and awarded Anthony $22,500.

### D.  Purposes of Sentencing

A sentence of 12 months will provide adequate punishment to Anthony for his conduct. In light of the circumstances surrounding Anthony's alleged offense, his truly unique history and characteristics, the impact of his advocacy on the criminal legal and reform community, and the singular way in which incarceration affects him, 12 months of incarceration sufficiently punishes Anthony for his conduct. A longer prison sentence is not necessary to serve any of the legitimate purposes of punishment.

### 1.   Anthony Cannot be Safely Housed in the Bureau of Prisons.

As was made abundantly clear during Anthony's five month ordeal at FCI and FMC Butner, Anthony cannot be safely held in the Bureau of Prisons. His time there was some of the most dangerous of his incarceration; Anthony was held in constant isolation, exacerbating his mental health issues and leading to egregious and serious levels of self-harm.

As became painfully clear, the Bureau of Prison's stringent rules and one-size-fits-all procedures exacerbate Anthony's mental illness, even if they are ostensibly designed to have the opposite effect. The ironically named "Suicide Risk Management Plan" developed by BOP's mental health providers uses *isolation* as a "stick" to obtain compliance from Anthony, an approach that entirely disregards Anthony's particular and well-documented response to trauma and treats his mental illness as a choice.

> Mr. Gay's primary evaluator or their designee will provide 10 minutes of social reinforcement every regular work day, *if Mr. Gay has not engaged in the target behaviors during the previous 24 hours.* If he has engaged in the target behavior in the previous 24 hours, the psychologist will conduct brief and routine monitoring with as little social interaction as possible. . . .
>
> *If the inmate engages in self-injurious behavior*, medical staff will attend to the wounds with as little social attention as possible.

*See* Sucide Risk Management Plan at 2 (emphasis added). Notably, Anthony—who frequently explained to BOP staff why and how social isolation drives his urge to self-harm—refused to sign off on a "plan" that he knew would harm him and result in a further deterioration in his condition and continued harm in his relationship with BOP staff.

It is not the case that Anthony's condition makes any incarceration untenable. For the five months that he was held in the Livingston County Jail after returning to Illinois from Butner, Anthony was treated with respect. When he began to panic, he was permitted to make a

phone call or watch television, activities that gave his mind something to focus on other than his rising panic. Because being treated humanely does not cure mental illness, Anthony did experience mental health symptoms in the Livingston County Jail, including only two incidents of self-harm requiring outside care over a five-month period. But unlike in the BOP— including FCI Butner, FMC Butner, and MCC Chicago—Livingston County treated Anthony's self-harm as the mental health symptom that it is. They did not place him in segregation, solitary confinement, or its functional equivalent. In comparison, during his five-month period in BOP custody, Anthony self-harmed dozens of times—and 15 times harmed himself so severely that he had to be taken to an outside hospital.

By contrast, and although BOP staff repeatedly noted that the facility should not punish Anthony for his mental illness, punishment was the premise of their response: BOP staff repeatedly responded to Anthony's incidents of self-harm by placing him in either on suicide watch—which is definitionally a form of solitary confinement—or by citing him for a disciplinary infraction. In one startlingly callous incident, BOP staff wrote Anthony a ticket for failing to surrender a razor blade that was so firmly rooted in his scrotum, it had to be surgically removed.

In a policy that firmly crosses the line into the absurd, the BOP—both at Butner and MCC Chicago—tasks incarcerated people with no qualifications and no real training to monitor those on suicide watch. This stunningly misguided practice is codified in the BOP's "inmate companion program," *see* Program Statement P5324.08, Suicide Prevention Program, May 15, 2007, at 14 (establishing an inmate observer program whereby incarcerated people who are not in pretrial status, have not had a 100 level ticket in the last three years, and who are not in FRP,

GED, or Drug Ed Refuse status, are authorized to monitor those on suicide watch after receiving

four hours of semi-annual training). In lieu of mental health services, Anthony was routinely

monitored by *other incarcerated people*, who had no meaningful training, had no qualifications,

who were often mentally ill themselves, and who had no ability to intervene or bring medical

care if a person self-harmed. Were this practice not codified in the Bureau of Prisons Program

Statement, it would defy credulity that BOP would ensure the care of the most mentally

vulnerable people in their care to untrained, unqualified, and utterly unempowered peers.

There is no question that Anthony's mental health was poorly managed by the BOP, even

by the FCI and FMC Butner, ostensibly the facilities best equipped to care for a person with

complex mental health needs. Moreover, as both Dr. Ross and Dr. Kupers agree, incarceration in

the BOP is not necessary to treat Anthony's underlying mental illness. *See* Dr. Ross Forensic

Evaluation at 42 ("Although Mr. Gay is presently suffering from various mental health

disorders, he does not require custody for care or treatment in a suitable facility.").

Perhaps recognizing Butner's failure to provide Anthony adequate mental health care,

the Government offers the BOP's STAGES program as an appropriate treatment for Anthony.

This program—the only option they offer as appropriate care here—is offered at only two

facilities, with limited bed-space and presumably long waiting lists. Moreover, the program is

designed to be limited to 12-18 months in duration; it is not a model for confinement. Even

assuming that Anthony were able to secure a spot in that program, and that it met his mental

health needs, it offers no reassurance that the BOP would appropriately care for Anthony either

before or after his participation.

## 2. Incarceration is Simply Harder for Anthony.

The simple fact remains that incarceration is simply more difficult for Anthony to bear than the average person, and comes with the predictable consequence of grievous and potentially fatal injury to his body. A day, or month, or year in prison for Anthony is simply different—physically and emotionally—than it is for someone who does not have his unique history of mental illness and trauma related to not just incarceration—but extraordinarily torturous incarceration.

That reason alone is sufficient to warrant a sentence of 12 months. *See, e.g., United States v. Gray,* 416 F. Supp. 3d 784, 790 (S.D. Ind. 2019) (reducing a sentence because "Mr. Gray has served much of his sentence while seriously ill. This means that his sentence has been significantly more laborious and difficult than that served by most inmates.). The harm that Anthony has experienced over the course of just over 365 days is more intense and damaging than most will experience over a lifetime—let alone over the course of a single prison sentence. It is sufficient to punish him; no more is required or is appropriate.

### 3. Anthony has a Robust Release Plan.

Anthony has a robust release plan that will ensure his success in the community. Dozens of letters from his family, friends, and colleagues demonstrate the breadth and depth of support he will receive. *See* Letters of Support, Exhibit B. Those deep ties not only connect him to his community—in which he is deeply invested—but are all pro-social and nonviolent. Anthony's ties to pillars of our community, including civil rights lawyers, law professors, and students he has inspired will not only keep him grounded and focused on his life's work—ending solitary confinement—but will eliminate any risk that Anthony will recidivate.

Importantly, Anthony will continue receiving robust mental health care from providers

who have deep experience with people traumatized by the criminal legal system, including the National Alliance of Mental Illness and the Chicago Torture Justice Center. *See* Documents Supporting Release Plan, Exhibit C. Although he can return to his father's home, he has also been accepted for screening at St. Leonard's House, a well-established and well-regarded transitional home in Chicago. Anthony will also receive ongoing case management and supportive services from the Illinois Prison Project, including through one of IPP's licensed clinical social workers.

### 4. A Sentence of Time-Served Satisfies every other Purpose of Punishment.

By sentencing Anthony to 12 months, this Court can use this sentence to promote rehabilitation, one of the most important goals of sentencing. Here, in light of Anthony's singular devotion to his community, his long history with mental illness and trauma related to incarceration, and his immense potential for social impact, rehabilitation should be the primary sentencing goal achieved by this Court's sentence. Congress has recognized that imprisonment does not advance the goal of rehabilitation; as such, any period of incarceration must be limited to serve other goals of sentencing. *See* 18 U.S.C. § 3582(a); *Tapia v. United States*, -- U.S. --, 131 S. Ct. 2382,  2388-89 (2011) (holding that district court was not permitted to impose or lengthen a prison sentence for the purpose of rehabilitation). Instead, this Court should impose a shorter period of incarceration, placing emphasis on the period of supervised release, when Anthony will do much of the work necessary to ensure that his reintegration into the community has long-term success.

A sentence of 12 months will sufficiently serve punishment's goals of both specific and general deterrence, the only punitive goals that are properly advanced by incarceration. In

light of the effect that any incarceration at all poses to Anthony—causing severe psychological as well as physical damage—incarceration of 12 months signals the seriousness of the offense. Moreover, 12 months has been more than sufficient to deter Anthony; every day at FCI and FMC Butner and MCC Chicago have been a test of his psychological and emotional strength, a test that has broken him over and over again. Coupled with a period of supervised release, and in light of his extremely strong ties to his community via his family and a robust network of advocates and supporters, a sentence of 12 months is sufficiently long enough to deter Anthony from criminal activity, and to provide him with an additional incentive to remain in compliance with any terms of supervision.

### III. Conclusion

In light of the nature and circumstances of the offenses and his history and characteristics, and in light of the grounds for a variance from the guidelines as discussed above, Mr. Gay respectfully submits to the Court that a sentence of 12 months of imprisonment followed by a term of three years of supervised release sufficient, but not greater than necessary, to achieve the  objectives of sentencing that Congress set forth in 18 U.S.C. § 3553(a)(2).

Respectfully submitted,

/s/ Jennifer Soble
Jennifer Soble
Rachel White Domain
*Attorneys for Defendant Anthony Gay*
Illinois Prison Project
53 W. Jackson, Suite 452 Chicago, IL 60604
ph: (312) 324-4463 x701
fax: (773) 389-3344
jennifer@illinoisprisonproject.org

60

## EXHIBIT LIST

a. Expert Report of Dr. Terry A. Kupers
b. Letters of Support
c. Documents Supporting Release Plan
d. UN Special Rapporteur on Torture report on Solitary Confinement, Aug. 5, 2011, UN Doc Number A66/268
e. First Annual Report Of Monitor Pablo Stewart, Md, *Rasho v. Baldwin*, 1:07-CV-129 (C.D. Il.)
f. Memorandum and Order Granting Class Certification, *Davis v. Baldwin*, 3:16-cv-00600 (S.D. Il)
g. Report of Dr. Haney in *Davis v. Baldwin*, 3:16-cv-00600 (S.D. Il)
h. Report of Eldon Vail, *Davis v. Baldwin*, 3:16-cv-00600 (S.D. Il)
i. Selected Butner Mental Health Records
j. Suicide Risk Management Plan
k. Program Statement P5324.08, Suicide Prevention Program, May 15, 2007
l. Indictment, *People v. McCoy*, 01CF159, Livingston County
m. Selected Media Coverage of Anthony Gay
n. Deposition of Dr. Sylvia Lane
o. Deposition of Dr. Pierre Nunez
p. Residential Treatment Unit Referral by Courtney Meyers, Nov. 14, 2016

## CERTIFICATE OF SERVICE

I hereby certify that on May 20, 2023, I electronically filed the foregoing with the Clerk of the

Court using the CM/ECF system which will send notification of such filing to: AUSA John

Mehochko.

/s/ Jennifer Soble
Jennifer Soble
*Attorney for Defendant*