# Expert Report of Terry A. Kupers, M.D., M.S.P.

*Re:  USA vs. Anthony Gay, Case No. 20-40026*

## I.  Background and Qualifications

I am a board-certified psychiatrist, Institute Professor Emeritus at the Wright Institute, Distinguished Life Fellow of the American Psychiatric Association, and an expert on the psychiatric effects of prison conditions and correctional mental health issues.  I have testified more than thirty times in state and federal courts about the psychiatric effects of jail and prison conditions, the quality of correctional management and mental health treatment, and prison sexual assaults.  I have served as a consultant to the U.S. Department of Justice and Human Rights Watch.  I am author of Solitary: The Inside Story of Supermax Isolation and How We Can Abolish It (University of California Press, 2017) and Prison Madness: The Mental Health Crisis Behind Bars and What We Must Do About It (Jossey-Bass/Wiley, 1998), co-editor of Prison Masculinities (Temple University Press, 2001), and a Contributing Editor of Correctional Mental Health Report.  I have authored and co-authored dozens of professional articles and book chapters, including "Posttraumatic Stress Disorder (PTSD) in Prisoners," in Managing Special Populations in Jails and Prisons, ed. Stan Stojkovic, Kingston, NJ: Civic Research Institute, 2005; "Prison and the Decimation of Pro-Social Life Skills," in The Trauma of Psychological Torture, Editor Almerindo E. Ojeda, Vol 5 of Disaster and Trauma Psychology Series, Westport, Connecticut: Praeger, 2008; "Violence in Prisons, Revisited," (with Hans Toch), Journal of Offender Rehabilitation, 45,3/4, 49-54, 2007; two entries, "Posttraumatic Stress Disorder in Incarcerated Offenders" and "Imprisonment and Stress," in the Sage Encyclopedia of Criminal Psychology,

Sage Publications, 2019.  My *curriculum vitae* and a list of cases in which I have served as an expert in the past four years are attached to this report as Exhibits A & B.

I have been asked by Defense Counsel to perform a psychiatric examination of Mr. Gay, review relevant documents, and provide opinions about the effects of incarceration on his psychiatric status and his ability to function successfully in the community, prospects for effective mental health treatment for him, and whether or not he can be safely incarcerated from this point forward.

## II.  Preparation

I have reviewed the following:

- o The Peoria County Medical File for Mr. Gray, 5/19/2022 – 6/14/2022
- o 11/22/2021 Forensic Psychiatry and Psychology Report by Drs. J. Clore & R. Finkenbine
- o August 19, 2021 Declaration by Dr. Craig Haney
- o Mr. Gay's medical/mental health records from the Illinois Department of Corrections (IDOC)
- o Mr. Gay's Medical/Mental Health Records from the Bureau of Prisons, Butner, North Carolina, approximately 7/15/2022 through 9/26/2022
- o August 9, 2022 Pre-sentence Investigation Report
- o Affidavit of Marjorie Moss
- o 2022 Outpatient Mental Health Records for Mr. Gay at the Robert Young Center
- o January 23, 2023 Forensic Evaluation by Dr. Heather H. Ross of the U.S. Bureau of Prisons.
- o AUSA discovery (includes additional discovery from civil case, phone calls, DOJ discovery, Jail calls, jail documents from Peoria County, calls from the hotel manager, videos of shots fired and other police video footage)

- o Depositions of Dr. Butler, Dr. Nunez, and Cortney Meyer.
- o IDOC records, disciplinary reports
- o Dr. Scott Testimony, Gay v. Blackman, Case No. 3:11-00014-GPM
- o Iowa DOC, very limited Notes
- o Mr. Gay's trial transcript, Gay v Chandra
- o Mr. Gay's trial transcript, Gay v Frey
- o Affidavit by Marjorie Moss
- o Wexford Arrowhead discharge summary

On October 18, 2022, I interviewed and examined Mr. Gay over video for two hours, he at the Butner Complex, me in my Berkeley office.  On March 8, 2023 I interviewed Mr. Gay again for two hours over video, he in the Livingston County Jail, me in my Berkeley office.

## III. Mr. Gay's Background

Mr. Gay was born in Rock Island, Illinois.   He had older half-siblings who beat and abused him repeatedly as a baby. He never met his biological father. He was removed from his mother's home at about one year of age.  Presumably this was on account of neglect as well as the beatings, but he says he does not know why he was separated from his biological parents.  The family is described in Mr. Gay's August 9, 2022 Presentence Investigation Report as "violent and quite dysfunctional."  At age two he was adopted by his mother's sister and her husband.  At 12, he went back to live with his mother for a short period, but the court ruled he was a neglected minor.  He reports his adopted father was "culturally from the 1950s," and believed in harsh corporal punishment of children.  His adopted father spanked him hard, and "whupped" him.  He explains, "Discipline was very harsh because that's how they were taught growing up in the 50s."  The adopted parents used a belt for punishment.

There were no broken bones but there were bruises and cuts on his skin.  Loss of contact with his biological parents had made him feel rejected or abandoned, and then the harsh physical punishment at the hands of his adopted father made him feel even more rejected.  Abandonment became a life-long psychological issue and vulnerability for him.  He has remained in contact with his adopted mother, who was terminally ill and in hospice when I first met with Mr. Gay.  Mr. Gay's biological mother passed away in the Fall of 2022.

Mr. Gay attended public school through the 10th grade, did not graduate from high school and though he has subsequently taken preparatory courses, he has not attained a G.E.D.  He used drugs and alcohol very little through his teen years, he did not like the harm he witnessed in friends and neighbors from substance abuse.  He never developed a substance abuse disorder.  He was affiliated with a street gang that was active in his neighborhood, the Gangster Disciples, beginning when he was 14.  He avers a suicide attempt by ingestion of pills in the 8th or 9th grade, after which he spent a few days in the hospital.  This was a rare suicide attempt or incident of self-harm outside of the custodial setting, just about all of his subsequent incidents of self-harm would occur while he was in detention or incarcerated, and in solitary confinement. A cousin committed suicide as a young adult.  Two brothers have been incarcerated.

Mr. Gay had significant involvement in the criminal justice system beginning at age 13.  His juvenile records document gang involvement, and beginning at age 12 or 13 he was adjudicated for battery, burglary, theft and probation violation.  As a juvenile, he spent 4 years in juvenile detention, including the Arrowhead Ranch from June to November, 1988, where he had been sent following adjudication for running away from a group home and for probation violation. He was involved in multiple altercations at Arrowhead Ranch. In 1989, at age 15, he entered the Illinois Department of Juvenile

Justice (IDJJ), where he would be evaluated and diagnosed "conduct disorder," and placed in detention facilities at various levels of security.  He made a brief escape attempt from a juvenile facility in 1989, but was quickly caught and returned to custody (BN 500).  At various times he was charged and found guilty of arson, damaging property, assault, fighting and sexual misconduct, and was considered by staff a major management problem. Medical records from IDJJ reflect that even as a juvenile he began placing foreign objects in his ear and in his penis while in solitary confinement, as forms of self-harm.  In 1991, Mr. Gay was noted to set fire in his room on two occasions, and was evaluated for suicide risk. He spent significant time in segregation/solitary confinement as a result of these and other unacceptable behaviors.  He reported to me that all of his acts of self-harm as a juvenile in detention occurred while he was consigned to solitary confinement.  He underwent a certain amount of mental health treatment, including individual psychotherapy, in the IDJJ.

He was shot as an adolescent and a bullet remains lodged in his left leg. He was never in the military.  Mr. Gay married Rosylin Gay while incarcerated in the Pontiac Correction Center, they had a daughter who is now in her late 20s, and they split up in 2004.  He is currently in a committed relationship with a woman and they have a young son together.

Beginning at age 19, Mr. Gay has served over twenty-two years in the Illinois Dept. of Corrections on various charges, and he spent most of that time in solitary confinement -- he estimates he has done 22 years in solitary in the IDOC.  He ended all affiliation with the gang early in his prison tenure, and since 2005 has had no contact with the gang.  He explains, "After entering solitary confinement (in the Illinois Department of Corrections) at 24, I realized I should not be connected to gangs, and as I became more educated and informed by

reading and studying, I became committed instead to civil rights and helping others.  I cut off all contact with the gang by 2005."

Mr. Gay received many hundreds of disciplinary infractions in the IDOC, the overwhelming majority occurred while he was in solitary confinement. Many were for possession of contraband "weapons," including the scraps of plastic or metal he used for the purpose of self-harm.  He was transferred to Tamms Correctional Center on two occasions, spending two years there beginning in 1998, and eight years between 2004 and 2012. Tamms Correctional Center was a supermax prison within the IDOC, where all cells were solitary confinement and some were extra isolating because a metal box was affixed to the food port in the cell door to prevent the inhabitant from throwing fluid or waste through the port.  Tamms was closed in 2013 after intervention by the state legislature, in large part because isolation was so stark and punishment so harsh at Tamms.

At the time of every Offender Disciplinary Report he has received since 1996, he was consigned to solitary confinement, either a cell dedicated to segregation for rule-violating prisoners, or a Suicide Observation Cell.  The more serious rule-violations tended to occur in earlier years of Mr. Gay's prison tenure.  The most outstanding fact is that all of Mr. Gay's rule violations since '96 have occurred in solitary confinement settings -- as have all the times he has committed self-harm -- two facts that support the conclusion that something about being in solitary confinement drives Mr. Gay's rule-breaking, assaults, and self-harm.

Social Psychologist Hans Toch has described the "Disturbed/Disruptive" prisoner. Toch intervened in a debate in correctional circles about "the Mad" vs. "the Bad."  Correctional staff exercise their prerogative as peace officers to send some rule-breaking prisoners to the mental health unit, believing that mental illness is driving that prisoners' unacceptable behaviors; or if the officer

does not suspect mental illness, he has the prerogative to send the rule-breaker to "the hole," solitary confinement, as a punishment.  The Correction Officer (COs), with very little training on mental health issues, asks him- or herself, 'Did this prisoner break the rule because he suffers from a mental illness, or is he simply willfully committing a bad act?"  In other words, is he "Mad" or is he "Bad"?  Toch pointed out that in his many decades of research within prisons, he had only seen a very small number of prisoners who are entirely "Mad" or are entirely "Bad."  He found that it is almost always both.  The prisoner is both suffering from a serious mental illness and breaks rules. Toch's category of "Disturbed/Disruptive" prisoner fits Mr. Gay to a tee.  Prof. Toch[1] would have said that Mr. Gay requires concurrent management of his unacceptable behaviors through the disciplinary system, while requiring concurrent continuous mental health treatment aimed at helping him control some of his unacceptable behaviors.

Mr. Gay suffered terribly in solitary confinement.  He became very anxious and agitated, felt abandoned and persecuted, and simply could not tolerate the isolation.  He reported to an ABC journalist, "I would cut on myself. ... I would act out [and] throw urine, liquids, [at] all officers. They would extend my time and things of that sort instead of allowing me to see mental health [professionals] and taking it as a health concern. They took punitive measures."[2]

---

[1] Sadly, Professor Hans Toch died a few years ago.  He was a pioneer and giant in conducting research in carceral settings.

[2] Television interview available at < https://abcnews.go.com/US/man-spent-22-years-solitary-confinement-fights-end/story?id=77632919&cid=clicksource_4380645_1_heads_hero_live_headlines_hed>

In solitary confinement, Mr. Gay had multiple episodes of very serious self-harm where he would cut himself, often severely, and once he cut off one of his testicles.  For a while he was prescribed anti-psychotic medications over his objection, and reports they did not help at all while he was subjected to solitary confinement.  Mr. Gay had to be admitted to suicide observation on many occasions while in solitary confinement in the IDOC, was strapped or chained to gurneys, and was given many disciplinary write-ups for his behavioral disruptions and acts of self-harm.  The disciplinary write-ups led to even longer terms in solitary confinement, and then he would again commit severe and often bizarre acts of self-harm, almost always while in solitary confinement.

Mr. Gay was released on parole from the IDOC on August 27, 2018, and on July 14, 2020, while living in the community, he was discharged from parole supervision. In the community after August 27, 2018, Mr. Gay, while on parole supervision, had many restrictions, for example he had to report his whereabouts and be available for searches of his home by the probation department.  The instant case notwithstanding, he cooperated and satisfied all requirements of parole. He participated in outpatient mental health treatment in the community and was assigned a diagnosis of PTSD.  He was motivated and hard-working in psychotherapy.  He was prescribed psychotropic medications and adhered to the prescribed treatment. Meanwhile, he became a community organizer and worked very hard to enact a state law greatly limiting the use of solitary confinement in the Illinois prisons.  The Bill he designed and collaborated with legislators in steering through the Illinois legislature was titled the Anthony Gay Isolated Confinement Restriction Act. It was passed by the Illinois House of Representatives in April, 2022 and was under consideration in the Illinois Senate when he was arrested.  Mr. Gay was interviewed on ABC News about the psychological effects on him of solitary confinement, and about the Anthony

Gay Isolated Confinement Restriction Act.[3]  He was on house confinement for almost two years, August, 2018 through July, 2020.  He logged in everywhere he went and turned in required receipts, as he had been mandated by the court to do.

In July 14, 2020, he was taken into federal custody and held at the Rock Island County Jail until August 20.  There he de-compensated and committed acts of self-harm.  In May, 2022, after being convicted in this case, Mr. Gay was again taken into federal custody.  A 5/26/2022 mental health note from the Peoria County Jail reflects: "Gay was transported to Peoria County Jail by USMS and was placed on suicide watch per USMS.  He pushed a pencil through his arm on the same day and was transported to the hospital for treatment. After he returned to Peoria County Jail, he opened the wound that was treated and also cut open his scrotum."  Obviously the suicide observation cell at Peoria County Jail is not effectively suicide-proof – i.e. he had possession of the pencil he used for self-harm -- but also he was in a cell by himself 24 hours per day and had no opportunity for out-of-cell dayroom or recreation activity, and even fewer amenities in his possession than does someone in solitary confinement.  Any Observation by jail staff did not prevent his self-harm. I will explain further below why confinement in the average suicide observation cell is essentially equivalent to solitary confinement.

In a November 22, 2021 Forensic Psychiatry Report, Drs. Jean Clore and Ryan Finkenbine opine that Mr. Gay suffers from Posttraumatic Stress Disorder (PTSD), and "his PTSD prognosis in the absence of incarceration is good;

---

[3] Television interview available at < https://abcnews.go.com/US/man-spent-22-years-solitary-confinement-fights-end/story?id=77632919&cid=clicksource_4380645_1_heads_hero_live_headlines_hed>

however with incarceration the prognosis is poor." They also opine/conclude that he was competent at the time of their evaluation to stand trial, and additionally to represent himself (which he did during the first of his two trials on the gun possession charges).

A 5/13/2022 "Illinois Medicaid Comprehensive Assessment of Needs and Strengths" at the Robert Young Center included notations of "action required" for symptoms of traumatic stress, including emotional and/or physical dysregulation, intrusions/re-experiencing, hyperarousal, attachment difficulties, traumatic grief and separation, numbing of feelings, dissociation and avoidance. In the comments section of the assessment it is noted that just prior to his arrest in May, 2022, "He was out with his cousins, one of his cousins got killed and 2 other cousins got shot. " The Assessment of Needs and Strengths included a diagnosis of Posttraumatic Stress Disorder (PTSD) with a plan to continue psychotherapy to help him work through the multiple severe traumas he had experienced. (ID: 4812, pp. 1 – 10).

## IV.  Solitary Confinement

Mr. Gay has spent almost all of his prison tenure in solitary confinement of one kind or another.  As a youth, he spent years in Illinois Department of Juvenile Justice (IDJJ) facilities.  He was young when he entered prison, and there are the inevitable fights where prisoners test the newcomer's mettle.  The newcomer needs merely to make a good showing so that other prisoners will think twice about attacking him.  But a fight is likely to be detected by officers, who ask "who started the fight?"  If a new prisoner is attacked and defends himself, it is possible the officers will not give him a "ticket" or rule violation report, and he will not be sent to "the hole" (segregation, solitary confinement) as punishment.  But then the new prisoner is likely to fall prey to the unspoken

"prison code," the first rule being "don't snitch." The new prisoner who tells an officer that the other guy started the fight might avoid punishment in the moment, but will be branded a snitch and be subject to subsequent violent attacks from other prisoners.  Mr. Gay resolved from the start of his prison career not to "snitch," and therefor he had to spend a certain amount of time in "the hole" as punishment for fights early in his prison tenure.

Different prisoners respond differently to solitary confinement.  Some individuals focus on exercise, reading and letter-writing to remain sane – but research on solitary confinement evidences that everyone is eventually harmed by extended periods of solitary confinement. If the stint in solitary is brief, maybe ten days or a month, some individuals are able to emerge relatively stable.  Others fall apart within days of being consigned to solitary confinement. Similarly, for some the psychological damage caused by solitary is relatively short-lived, for others it lasts a lifetime. I will briefly summarize a large body of research on the psychological effects of solitary confinement, and then I will turn to Mr. Gay's very severe, extreme even, reaction to the experience.

It has been known for as long as solitary confinement has been practiced that human beings suffer a great deal of pain and mental deterioration when they remain in solitary confinement for a significant length of time. Human beings require at least some social interaction and productive activities to establish and sustain a sense of identity and to maintain a grasp on reality. In the absence of social interactions, unrealistic ruminations and beliefs cannot be tested in conversation with others, so they build up inside and are transformed into unfocused and irrational thoughts.  Isolated prisoners develop massive free-floating anxiety that can trigger panic. Their thinking becomes increasingly disorganized, including paranoid ideas. They become angry and then they are fearful their anger will lead to more disciplinary problems and worse

punishments. They have great trouble concentrating on a task, and they experience memory problems. If one is in an isolation cell, the activity that supports sanity is reading. But many prisoners in isolation who can read are unable to read effectively. They explain they cannot remember what they read three pages back.

There are other symptoms very widely reported by denizens of solitary confinement units, including hypersensitivity to external stimuli, perceptual distortions and hallucinations, lack of impulse control, severe and chronic depression, appetite loss and weight loss, heart palpitations, social withdrawal, blunting of affect, apathy, talking to oneself, severe problems sleeping, nightmares, dizziness, and self-mutilation.[4]

So far, I have been talking about the effects of solitary confinement on prisoners who are relatively stable from a psychiatric perspective. For prisoners who have suffered massive and repeated traumas in the past, and for those who suffer from serious mental illness or have a proclivity to self-harm, the isolation and idleness exacerbate the psychiatric disorder, for example causing a "re-traumatization" where the current stint in solitary confinement recalls traumas of the past and magnifies the post-traumatic emotional difficulties.  Or solitary confinement sets off a psychotic episode, or a suicide attempt.  In long-term isolation (or segregation) units there are a disproportionate number of prisoners suffering from severe mental illness.[5]

---

[4] Grassian, S. 2006. "Psychiatric Effects of Solitary Confinement." Washington University Journal of Law and Policy 22:325–53.; Haney, Craig. 2003a. "Mental Health Issues in Long-Term Solitary and 'Supermax' Confinement." Crime and Delinquency 49 (1): 124–56.; Kupers, T. 2013. "Isolated Confinement: Effective Method for Behavior Change or Punishment for Punishment's Sake?" In The Routledge Handbook of International Crime and Justice Studies, edited by Bruce Arrigo and Heather Bersot, 213–32. Oxford: Routledge.; Scharff Smith, Peter. 2006. "The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature." Crime and Justice 34:441–528.
[5] Hudgins, Sheilagh, and Gilles Côté. 1991. "The Mental Health of Penitentiary Inmates in Isolation." Canadian Journal of Criminology 33:177–82.; Human Rights Watch, 2003.

The psychological effects of trauma and of solitary confinement are accompanied by physical changes in the brain.[6]  An article in *Scientific American* reports on a national conference where neuroscientists shared their findings of structural changes in the hippocampus (a region of the brain) with prolonged solitary confinement.[7]  According to Neuroscientist Huda Akil: "Given that the brain is a learning machine shaped by the environment, and given the vital importance of social context for brain health, solitary confinement offers the most impoverished and damaging conditions possible. It starves the brain from key elements essential for its healthy functioning – visual and other perceptual stimulation, normal lighting conditions, and lack of human interactions and support.  The price of such starvation is a change in fundamental biology of this very critical organ."[8]

Social scientists Angela Hattery & Earl Smith provide a snapshot of the extremity of human experience in solitary confinement: "Have you ever seen a movie or a YouTube video in which a wild animal chews off a paw to escape a trap?  A quick Google search will yield dozens of these heartbreaking videos. The notion that human beings can be locked in cages for twenty-three hours a

---

Ill-Prepared: U.S. Prisons and Offenders with Mental Illness. New York: Human Rights Watch.

[6] Carol Schaeffer, *"Isolation Devastates the Brain": The Neuroscience of Solitary Confinement,* SOLITARY WATCH (May 11, 2016), https://solitarywatch.org/2016/05/11/isolation-devastates-the-brain-the-neuroscience-of-solitary-confinement/.

[7] Smith, D.G., *Neuroscientists Make a Case Against Solitary Confinement, Scientific American*, SCIENTIFIC AMERICAN (Nov. 9, 2018), https://www.scientificamerican.com/article/neuroscientists-make-a-case-against-solitary-confinement/.

[8] Huda Akil.  (2020). "The Brain in Isolation: a Neuroscientist's Perspective on Solitary Confinement."  In J. Lobel & P. Scharff Smith, Eds*., Solitary Confinement: Effects, Practices, and Pathways Toward Reform.* New York: Oxford University Press.

day, given only an hour out, if they are lucky, to shower and "exercise" is in and of itself a construction rooted in dehumanization.  After being locked in solitary confinement for even a few days, many human beings will begin to respond like the wild animal whose paw is caught in a trap.  The more we treat human beings like animals, the more they engage in behaviors none of us think we ever would. They will cut themselves, they will bang their heads against the wall until they bleed, they will spread feces on their walls, they will attempt suicide, they will do anything to get out of the cage."[9]

## V.  Suicide and Self-Harm in Solitary Confinement

Suicide and self-harm are entrenched problems in solitary confinement units. It has been known for decades that suicide is approximately twice as prevalent in prison as it is in the community. Recent research shows that, of all successful suicides that occur in a correctional system, approximately fifty percent involve the 2 to 8 percent of prisoners who are in some form of isolated confinement at any given time.[10]  This is a stunning statistical finding. The strength of the correlation provides conclusive evidence that consignment to segregation is a major causal factor in the high suicide rate among prisoners.

There is also non-suicidal self-harm, which is epidemic in solitary confinement units and is driven primarily by the anxiety and agitation that

---

[9] Angela Hattery & Earl Smith.  (2023).  *Way Down in the Hole: Race, Intimacy, and the Reproduction of Racial Ideologies in Solitary Confinement*.  New Brunswick: Rutgers University Press, p. 101.

[10] Daniel P. Mears & Jamie Watson, *Towards a Fair & Balanced Assessment of Supermax Prisons*, 23 JUST. Q. 232 (2006); Bruce Way et al., *Factors Related to Suicide in New York State Prisons*, 28 INT'L J.  L. & PSYCHIATRY 207 (2005); Raymond F. Patterson & Kerry Hughes, *Review of Completed Suicides in the California Department of Corrections & Rehabilitation, 1999 to 2004*, 59 PSYCHIATRIC SERVICES 676 (2008).

mount in solitary confinement. While the explicit purpose of what we term "non-suicidal self-harm" may not be to die (usually there is a combination of suicidal intent combined with some anxiety-driven compulsion to self-harm that is not fully explained by a conscious wish to die), it is a pathological behavioral reaction to intense emotional pain – in this case severe anxiety and agitation caused by solitary confinement.  Thus an incident of self-harm – suicidal or perhaps not entirely suicidal -- constitutes a psychiatric emergency.  And the act of self-harm typically does not involve a voluntary choice to harm the self.

Prisoners who commit self-harm, including Mr. Gay, tell me that they feel like they simply have to commit self-harm, they have no choice in the matter. Prisoners tend to use the word "driven" to describe the experience.  As a psychiatrist, I find it more on-point to use the word "compelled."  Self-harm, in most cases, is to a great extent not really a "choice" on the part of the self-harming prisoner, rather the self-harm is compelled by intolerable levels of anxiety and paranoia, the prisoner in solitary feeling compelled to self-harm. While Mr. Gay was described in the early years of his prison tenure as manipulative, manipulation is not the most significant part of his motivation to self-harm, and his acts of self-harm are mostly compelled by the extreme anxiety and feelings of abandonment he experiences in solitary confinement. There is an observable pattern in almost all prison solitary confinement units: a relatively small proportion of prisoners consigned to solitary confinement feel compelled to commit acts of self-harm.  For the prisoners in the prison sub-population that is prone to self-harm, acts of self-harm are a medical emergency, must be medically treated intensively, and can be fatal.

Even if there was no conscious wish to die, death can result by accident. Dr. Richard Scott, a forensic psychologist who examined Mr. Gay at Tamms Correctional Center in 2012, subsequently testified in court: "And in my opinion

his self-injurious behavior is so frequent and so severe and that as demonstrated in their records of what they have to do to manage him, the behavior is potentially going to occur every single day without intervention. And he is cutting himself in ways and ripping open existing wounds in ways that could cause his death.  I do believe he is at imminent risk for very severe self-harm or suicide if he is not treated properly."  With Mr. Gay there is a certain amount of suicidal intent mixed in with the anxiety-driven compulsion to self-harm, his clinical picture is quite complicated.

## VI. Mr. Gay's Experience at the Butner Federal Facility

The Butner Complex within the Federal Bureau of Prisons (BOP), near Butner, North Carolina, contains several facilities, including a Low and Medium Security Prison (FCI Butner), and the Butner Federal Medical Center (FMC Butner).  Mr. Gay was transferred to FCI Butner on July 5, 2022; and then transferred to the Medical Center, FMC Butner on August 24, 2022.  After his forensic evaluation was completed, he was transferred from FMC Butner to Livingston County Jail in Illinois on December 8, 2022.

Even compared to solitary confinement in the Illinois Department of Corrections, Mr. Gay reports that "conditions at the Butner prisons are worse than conditions at the prisons in the Illinois Department of Corrections."  When I talked to him on October 18, 2022, he told me he had already been in Suicide Observation approximately 10 times since being transferred to Butner.  An 8/25/2022 Mental Health Progress Note summarizes the incidents.  He had been in suicide observation at the Butner Complex seven times by then, once for 43 hours, another for 5 hours, another for 90 hours, another for 91 hours, another for 21 hours, another for 17 hours, and one for 73 hours.  The author of the note summarizes, "He has a long history of self-directed violence not

intended to result in death."  An 8/24/2022 BOP Forensic Examination Intake by Dr. M. Mivshek, summarizes his psychiatric history, including very many incidents of self-harm since approximately 1998, that occur only in prison and almost without exception in solitary confinement.

Mr. Gay reports, "I can't tolerate isolation.  I am put in isolation and end up stabbing my arm with a spoon.  It felt like the walls were closing in on me, I felt overwhelmed, felt like being back in solitary in Illinois, I stabbed myself with the spoon and they put me in (suicide) observation.  There's no real psychotherapy in observation.  They gave me hand-outs (printed psychological exercises) but didn't really speak to me."[11]

He explains that in Observation at Butner there is a tiny office-like space located between two cells, the mental health clinician sits in the office space and talks to each prisoner in turn, but the other prisoner can hear everything Mr. Gay says to the therapist and can see them interacting. "That's an invalidating environment, so visits from mental health actually made things worse."  Repeatedly he emphatically reports he cannot tolerate isolation.  He tells me that "the mental health doctor's plan to prevent my harming myself is to give me less social contact each time after I harm myself."  He is very sad, near tears, and tells me: "By doing that, she worsens my sense of rejection and abandonment."

Mr. Gay was next consigned to solitary confinement for 2½ months, with breaks to go to the hospital and to suicide watch, where the conditions include even more isolation and idleness than prevails in solitary confinement.  Indeed, a

---

[11] Prisoners in solitary confinement universally report great difficulty with concentration and memory.  This makes the manualized (i.e., providing them with written hand-outs to study) treatment of their psychiatric problems very problematic.  Mr. Gay, like many individuals I have encountered in solitary confinement settings, avers great difficulty learning from "hand-outs" while in solitary confinement.

9/22/2020 progress note about suicide watch prescribes:  "Due to his history of self-directed violence while on suicide watch and concern he may have items in wounds he could potentially utilize to harm himself while on watch, he is only authorized a tear-resistant smock and tear-resistant mattress (no tear-resistant blanket), to reduce his ability to obscure himself and have an opportunity to engage in self-directed violence."  In other words, suicide watch is essentially solitary confinement by another name.  The brief encounters with mental health staff do not entirely ameliorate the lack of human contact, he is stripped and lacks books and paper and pen, and he does not even get time out for recreation.

Mr. Gay was sent to the hospital more than 10 times while in solitary confinement in the Butner Complex.  Once, there was a hearing, and he was sentenced to 30 days commissary and phone restriction.  But meanwhile, he remained in isolation and there were continued incidents of self-harm, even during suicide watch!  When he is being monitored for suicide at Butner, another prisoner is locked into an area adjacent to his cell with the assignment to call staff if he seems to be harming himself.  Still, he has succeeded in cutting himself and inserting foreign bodies into his arm, his eye and his scrotum, even while on suicide watch.

According to Mr. Gay, "Once the Captain made a plan where my diet was limited to minced and moist food. I can't digest that, it made me want to vomit. Also, as part of the Captain's plan, I had to be strip-searched in order to eat." Eventually mental health staff intervened and said that the plan to feed him only pureed food was causing more harm than good, and it was discontinued.

Mr. Gay is aware that Dr. Heather Ross was the psychologist responsible for an examination for the court.  She was also involved with his treatment, so he saw her on the unit at FCI Butner.  He reports that mental health staff are

available during week days, but weekends are difficult because there are not as many mental health staff and there is more isolation.  At one point over a weekend he was thinking about self-harm and told a C.O about it, but for hours nobody from mental health came to see him. Finally, he was taken to a room by two officers and a lieutenant, and they remained in the room, phoned Dr. Ross and put her on speaker phone.  He refused to talk to her because the speaker phone contact with officers in the room was not private or confidential, he felt rejected and abandoned because she would not come to the prison to talk to him, and he felt like cutting his arm and scrotum.  (A very strong sense of abandonment, directly derivative from early abuse and abandonment by parents, is part of his clinical make-up and is intricately mixed into his narrative about self-harm.)

There is a Suicide Risk Assessment by Dr. Katherine Sunder, PsyD, on July 5, 2022, the date of Mr. Gay's arrival at the Butner Complex. At first he refused to speak to her, but she persisted and garnered a certain amount of psychiatric history.  She uncovered multiple incidents of self-harm over his 22 years of solitary confinement, including a May 20, 2022 incident at the Peoria County Jail when Mr. Gay "cut his testicle and thigh, and he was placed in a restraint chair for his safety."  He also broke a spoon and cut himself and inserted foreign bodies in his eye and his right elbow on June 21, 2020 at the jail.  And then on June 27, 2020, still at the jail, he cut his penis and leg and had to be sent to an outside hospital.  Dr. Sunder declined to place him on Covid quarantine, which would be routine at the time of admission.  She was concerned he would experience the quarantine as solitary confinement and commit self-harm, so she ordered him on suicide observation (unfortunately, suicide watch is another form of solitary confinement, and as I pointed out, above, there is significant objective evidence that suicide watch is comparable to solitary confinement in

very important ways, i.e. more than 22 hours per day alone in a cell with minimal social interactions and minimal productive activities).

Mr. Gay's medical file at the Butner Complex includes notes from each incident of self-harm, as well as their treatment. On July 16, 2022 he was admitted to the Duke Health Emergency Department for treatment of a stab wound of the antecubital area of his right arm.  The self-imposed stab wound, involving part of a tooth brush, occurred while he was in solitary confinement (and on psychiatric watch at the time), and "he stabbed himself as he could not tolerate being in the solitary room and denies trying to harm or kill himself."  He was treated surgically and returned to the prison solitary confinement cell. Then, on July 18, 2022 he drove a shard of plastic into his left eye, causing corneal abrasion, immense pain, a serious threat of retinal damage, discharge of serous fluid as well as pus, and threatening his eventual vision in that eye.  He was transferred to the Duke Hospital Ophthalmology Department where surgical removal under general anesthesia of the shard and antibiotic treatment of the infection were administered.  The ophthalmology notes include a history of four previous episodes where Mr. Gay inserted razor blades in his eye, all occurring while he was in solitary confinement in other prisons.

There are Duke Health Emergency Department notes on July 30, 2022 indicating that Mr. Gay had again stabbed himself in the right antecubital area and also inserted metal and plastic objects into his scrotal sack.  The arm and genitals were successfully treated, though some of the foreign material could not be removed from the scrotum and were to be studied radiologically at a future date.

The Duke Health Emergency Department notes for August 1, 2022, reflect that Mr. Gay re-inserted foreign objects into his eye and scrotum, and was treated and returned to the prison.  There were additional re-insertions of

foreign bodies into his eye and scrotum through at least September 3, 2022, with treatment at the outside hospital.  And there is treatment at the Duke Emergency Department on September 3 for insertion of a foreign body under the skin in the area of his right elbow, and again on September 14-16, 2022.

Dr. Jason Ryan Tatreau performed a psychiatric examination of Mr. Gay on August 7, 2022 at the Duke Regional Hospital.  He found no active psychosis, mania or depression.  He diagnosed PTSD and was quite concerned about the repetitive serious episodes of self-harm that seem to occur only in solitary confinement settings.  He mentions the possibility that release from solitary is Mr. Gay's aim.  He writes: "While I am (un)clear on the nature of his need for solitary confinement, there is no doubt that this perpetuates ongoing trauma for him and will serve as a risk for ongoing self-mutilatory behavior."

Mr. Gay explains to me that "Before I cut, I feel depressed and anxious, like the world is coming crashing down."  I ask if that includes his wanting to die, and he responds, "No, not always, cutting's more of a relief."  He continues, "I cannot stand isolation. To offset the feelings I have in isolation, I cut.  It's not always that I feel suicidal, it's that I'm trying to escape pain and feel human again."[12]

Several clinicians in the IDOC and at the Butner Complex mention that Mr. Gay avers feeling relief after he self-harms.  A May 10, 2006 mental health progress note from the IDOC states: "He says that he is not actively suicidal but he likes to cut on himself as it makes him feel relief" (BN 23307).  He is again quoted in a May 18, 2009 progress note: "As he has stated before, he stated

---

[12] Philosopher Lisa Guenther's description of the "social death" solitary confinement causes is eerily similar to Mr. Gay's discussion of the phenomenon.  See Guenther, *Solitary Confinement: Social Death and its Afterlives,* University of Minnesota Press, 2013.

that he gets relief from cutting himself.  Further he acknowledged that he no longer feels any pain whatsoever when he cuts himself, even when he cuts his testicles" (BN 25999).  Dr. Heather Ross includes in her evaluation of Mr. Gay, "He further identified cutting as a 'release' and described increasing his acts of self-harm to 'horrific self-mutilation'" (Jan. 23, 2023 Forensic Evaluation, p. 10).  And Dr. Ross cites a 2014 "Symptom Impact Analysis" from the IDOC that includes, "Offender Gay's Adaptive Functioning Deficit Areas.  Affect Regulation – self-injury alleviates intense, overwhelming negative emotions (releases pressure, stops bad feelings, and helps manage stress).  Emotions such as anger, anxiety, and frustration tend to be present before self-injury.  Mr Gay experiences a heightened experience of negative emotions.  Cutting temporarily relieves his emotional distress" (BN 41676).

I asked Mr. Gay why he chose the eye to self-harm, and he responded, "The eye is the most sensitive part of the body, the pain is more severe, that helps distract from the psychological pain."  (He believes the eye and scrotum are the most sensitive areas of the body in terms of experiencing pain, and he has wounded himself in the eye and the scrotum multiple times).  He reports, "I put two pieces of plastic in my eye on Oct. 5; usually they would send me to the hospital for that, this time they didn't send me to the hospital, they put me in restraints for 14 hours, and an officer told me they were not sending me to the hospital; I spent those hours untreated and in restraints at the prison, and I was in immense pain the whole time." The restraints were ordered by custody staff, not mental health staff, and no mental health staff person assessed him before or after he was placed in restraints.

Philosopher Lisa Guenther captures something about the way solitary confinement drives its denizens to extreme and desperate acts: "Pushed to an extreme, this institutionalized boredom can become a form of violence against

the living intentionality of the human animal.  Blocked from engaging with the world in a meaningful way, the living, sensing, thinking, speaking person can turn against itself, buckling the hinges of its relational being.  On the one hand, boredom may seem like a small price to pay for violent crimes like murder and rape.  But the extreme boredom produced and reinforced by social and sensory deprivation can amount to a living death sentence that compounds the violence of crime rather than demanding something more or something different from the offender."[13]

Mr. Gay and I reviewed his history of self-harm.  The first time he cut himself he was in solitary confinement in a juvenile facility.  In the community, he had ingested pills to kill himself once prior to that (in the 8th or 9th grade, see above). But, he reports, "I learned to cut in isolation.[14]  I saw another inmate do it severely. They called a code (emergency response team), a lot of people ran in. At first I just started scratching with a blade, and guards would say 'that ain't nothing.'  I had lost my social identity,[15] I was struggling to maintain my

---

[13] Lisa Guenther.  (2013).  *Solitary Confinement: Social Death and its Afterlives.* Minneapolis: The Regents of the University of Minnesota, p. 197.

[14] Again, cutting and other forms of parasuicidal self-harm are relatively rare in adult males, except in men confined to solitary confinement, where self-harm is near epidemic.  In the community, the phenomenon of "cutting" and other acts of self-harm are mostly limited to adolescent girls.

[15] Mr. Gay's description is similar to Lisa Guenther's description of "social death" in solitary confinement: "*Social death is less a matter of being denied the natural rights and freedoms of an individual than of being isolated in one's individuality, confined to one's separate existence and blocked from a meaningful sense of belonging to a community that is greater than oneself. Without a living relation to past and future generations, who am I? Do I still have a stake in historical time? If the meaning of my life is confined to my biological existence, then it amounts to almost nothing; one swift blow to the head, and it could all be over.*"  Lisa Guenther.  (2013).  *Solitary Confinement: Social Death and its Afterlives.* Minneapolis: The Regents of the University of Minnesota, p. xxiii.

identity.  I learned to do it deeper, I just cut deeper, I felt the physical pain and that eased my emotional pain.  Causing physical pain became my coping mechanism. The treatment always happened in isolation, too.  Observation is solitary.  The physiological relief I felt after cutting became an addiction." There is an element of habit formation here, more about the habit of self-harm further on

Mr. Gay's description of his "addiction" to self-harm is a phenomenon common to prisoners who repetitively practice self-harm. Addiction to acts of self-harm is noted in his medical chart in IDOC, and addiction supports the conclusion that Mr. Gay's self-harming is compelled, rather than being a conscious choice.  He continues, "So to keep my head together, to avoid going insane, I would sacrifice my body."  Except for the suicide attempt by ingestion of pills in the 8th or 9th grade, Mr. Gay has never committed self-harm while in the community.  He says, "When I am able to socialize, I don't feel any impulse to self-harm."[16]  But in prison he is always afraid of a return to isolation.  He receives tickets for cutting himself, and that means he goes back to isolation.  He bemoans, "even suicide watch is isolation, and I cannot tolerate isolation."

Mr. Gay tells me that after he cuts, he feels better, he can sleep, it calms him down.  He says, "It's like it was medication, a tranquilizer."  This is very different than what I hear from patients who attempted suicide because they wanted to die.  There is a big difference between a suicide attempt with lethal intent and an act of self-harm that has a more complicated motivation.  In fact, there is a virtual epidemic in correctional solitary confinement settings of self-harm that is not obviously or entirely for the purpose of suicide.  Again, non-

---

[16] The twin themes of abandonment and trauma, and the trauma of being in solitary run through his entire narrative about self-harm, and indeed the psychiatric literature on self-harm is permeated by discussion of trauma as well as abandonment issues.

suicidal self-harm is rarely seen in adult males, it is usually a self-destructive act on the part of adolescent girls, and some adult women return to the practice as adults.  The exception is adult men in solitary confinement.

Solitary confinement is well known to greatly exacerbate anxiety, especially in individuals like Mr. Gay with a history of prior trauma(s).  Severe anxiety and panic attacks are the most common symptoms reported by the denizens of solitary confinement units.  The anxiety builds to an extreme level and the isolated prisoner feels like he cannot breath or like the walls are closing in on him, and then he cuts himself or inserts foreign objects under his skin in response to the unbearable anxiety.  Some prisoners who do this report that their aim is not to die, rather it is to relieve the unbearable anxiety, and they say things like "When I saw the blood (or felt the pain) it reassured me I am alive and then I felt less anxious."

An analogy will make the distinction between suicide and other motives for self-harm more clear.  In the psychiatric emergency department the psychiatrist just coming on duty in the morning is responsible for determining which of the several patients who attempted suicide during the night -- and remain in the emergency department awaiting a safe disposition -- are at high enough risk of subsequent suicide to require hospital admission, and which ones can safely go home.  When I am the psychiatrist coming on shift, I ask the patient what it felt like when she woke up from an overdose or from cutting herself and realized she was still alive.  If she was committing self-harm for non-suicidal reasons, she will say "I felt much better, my anxiety was gone and I could think straight again."  In contrast, the patient whose depression drove the suicide attempt and who really wanted to die will wake up even more depressed and say, "Hell, I'm really a loser, I can't even succeed at killing myself."  The non-suicidal self-harm is driven by anxiety and other intolerable feelings, and

since solitary confinement leads to massive anxiety, non-suicidal self-harm occurs often in prison solitary confinement settings.  Meanwhile, people die from self-harm that is not consciously a suicide attempt.  Mr. Gay's practice of cutting off his testicle and lodging foreign bodies under his skin, in his eye and in his scrotum could lead to death.  It is imperative, according to legal precedents as well as standards in the field of mental health, that people who commit serious acts of self-harm while anxious in solitary confinement settings be removed from solitary and provided intensive mental health treatment.

## VII.  Mr. Gay's Experience in the Livingston County Jail

On December 8, 2022, Mr. Gay was transferred from the Butner Complex in the Federal Bureau of Prisons (BOP) to the Livingston County Jail (LCJ).  He reports that conditions at the jail are actually less stressful than conditions in the IDOC and in the BOP Butner Complex.  While he spends most of every day in his cell in the LCJ, he has a window in his cell, has phone access in his cell, can watch the television that is located in the common area of his pod, and he can leave his cell to go to the general population areas of the jail, including the gymnasium where he goes daily.  Still, he reported to me during our March 9, 2023 video meeting, while at LCJ he has been admitted to the hospital twice for the treatment of self-inflicted wounds, and has cut himself four or five times.  He qualifies that report by saying that is fewer incidents of self-harm and fewer hospitalizations than occurred while he was in solitary confinement in the IDOC and at the Butner (BOP) facilities.  I asked him why, if his conditions and activities in the jail constituted a welcome improvement compared to the IDOC and the BOP, he continues the self-harm.  He responded that being in jail is still dehumanizing, he spends most of his time alone in a cell, there is no mental health treatment in the jail and he believes he needs mental health treatment,

and for whatever reason he finds himself ruminating quite a lot in the jail and eventually he cuts on his body again, he is not at all clear why he does that.

## VIII. Mental Status Examination

Mr. Gay is a soft-spoken, calm and very articulate Black man in prison garb who listens closely to questions and provides earnest responses.  He is quite intelligent. He evidences no sign of hallucinations, delusions nor thought disorder.  There is a significant amount of depression and despair, mostly related to the idea he could be sentenced to more time in prison, which translates into time in solitary confinement.  He is able to abstract and does fine with cognitive tests such as serial sevens.  While it appears he does not exercise good judgement in relation to self-harm, his judgement is otherwise quite intact.  He is a man of principle, with great integrity, and is very committed to pursuing his ideals about social justice.

Mr. Gay reports many symptoms that are typically included in the list of symptoms that occur following significant trauma. These include intense anxiety, flashbacks, nightmares, re-living experiences, strong startle reaction, pre-occupation with traumatic memories, a strong need to isolate himself even more than his environment requires, constriction of his emotional range, and a sense of unreality or not existing as a person.  These are the symptoms of Posttraumatic Stress Disorder (PTSD), the diagnosis that appears prominently in several of his psychological/psychiatric assessments and his medical chart at the Butner Complex.  The first time he experienced this constellation of symptoms was while consigned to solitary confinement in the Illinois Department of Corrections (IDOC).  I asked about his childhood traumas -- abandonment by his parents, beatings from a very young age, violence on the streets, and so forth – and he responded that the childhood traumas made him

very sad and sensitive to rejections and abandonment, but there were no flashbacks, nightmares or re-living experiences until he was in solitary confinement in the IDJJ and IDOC.  And the content of his flashbacks, nightmares and re-living experiences are almost always related to being alone in a prison solitary confinement cell.  In addition, when he is in solitary confinement, his trauma-related symptoms are greatly exacerbated, notably just prior to his self-harming behavior.

In terms of suicide assessment, there is this clear pattern: Mr. Gay is not at all suicidal while in the community and interacting with a rich network of friends, family and community organizers.  In stark contrast, in prison he is dangerously prone to self-harm and repeatedly cuts himself and mutilates his body.  His self-harm seems to be, for the most part, an attempt to reduce anxiety and manage anxiety and abandonment feelings that are driven by solitary confinement.  He is mostly not intent on actual death, and his description of how self-harm incidents evolve fits the phenomenon of non-suicidal harm, especially as described in clinical research about the effects of trauma and solitary confinement.


## IX.  Forensic Evaluation by Dr, Heather H. Ross

I have had an opportunity to review the January 23, 2023, 45-page Forensic Evaluation by Dr. Heather H. Ross.  It contains a thorough review of Mr. Gay's criminal record and course in mental health treatment from adolescence until the present, including his tenure at the BOP's Butner facilities.  Dr. Ross provides a rigorous historical accounting of Mr. Gay's juvenile and adult record in the carceral system.  She reviews notes from quite a few clinicians, she diagnoses Borderline Character Disorder and Antisocial Personality as well as

(Rule Out) PTSD, and she recommends intensive mental health treatment either in the community or in the Federal Bureau of Prisons.

It is striking that Dr. Ross includes very little mention of solitary confinement in her Forensic Evaluation Report.  This is a huge gap in her account of Mr. Gay's history because, for the entirety of the time he has spent behind bars since 1996, and the entirety of the time he spent in the Butner Complex, he has been in one or another form of solitary confinement.  He has never been in the prison general population, and all his self-inflicted wounds have occurred while he was consigned to solitary confinement.

For some of Mr. Gay's tenure in jail and prison since 1996 he has been in Suicide Observation.  Again, Suicide Observation is simply another form of solitary confinement, albeit with ongoing monitoring for self-harm and with daily brief contact with mental health staff.  But in a suicide observation cell, Mr. Gay is naked except for a tear-resistant smock, he is not released from his cell even for recreation, and there is nothing to do in the observation cell.  He was in a Suicide Observation cell multiple times while at the Butner BOP facilities.  He tells me that once, from September 2 through October 12, 2022, he was in Suicide Observation for over five weeks without relief.  He adds that there was another prisoner assigned to sit outside his cell and talk to him or observe him, as needed.  But during that five-plus week stint in Suicide Observation he never got to recreation, was almost never permitted to shower, and very often he could not brush his teeth (staff took away his toothbrush, presumably to prevent him fashioning an instrument of self-harm).  Most of his contacts with mental health staff in the Suicide Observation area occurred at cell-front, i.e. the clinician spoke to him from outside his cell, within earshot of other prisoners and staff, so there was no privacy nor confidentiality.  Dr. Ross did arrange to see him in a private office a few times.  The prisoner workers stationed near his

observation cell were patients in the infirmary, too.  Often the prisoner assigned to watch him was suffering from cancer and receiving chemotherapy.  Being around cancer patients on chemotherapy made Mr. Gay very sad.  Several times Mr. Gay was placed in restraints even inside his single Suicide Observation cell. He remembers being in restraints inside his cell multiple times, once for an entire week, and Dr. Ross interviewed him during that week while he was handcuffed to a bed.

Accepting the bleak picture of life in Suicide Observation that Mr. Gay offers -- and his report is consistent with the BOP records as well as academic research accounts and reports from many other prisoners who have been on suicide observation -- Suicide Watch definitely qualifies as a form of Solitary Confinement.  According to the United Nations Standard Minimum Rules for the Treatment of Prisoners (the Mandela Rules),[17] "Rule 44: For the purpose of these rules, solitary confinement shall refer to the confinement of prisoners for 22 hours or more a day without meaningful human contact. Prolonged solitary confinement shall refer to solitary confinement for a time period in excess of 15 consecutive days."  In Suicide Observation, the individual remains in an observation cell nearly 24 hours per day, is naked except for a tear-proof suicide smock and has just about no possessions and nothing to do all day.  This is solitary confinement. The definition of solitary confinement includes "22 hours or more a day... without meaningful human contact."  Mr. Gay did not find his brief contacts with mental health staff and with the prisoner worker assigned to keep an eye on him as "meaningful human contact."

The reason I make the point that Suicide Observation is another form of solitary confinement, is that Mr. Gay has had multiple incidents of serious self-

---

[17] UN Standard Minimum Rules for the Treatment of Prisoners, United Nations Office on Drugs and Crime, United Nations, p. 14 (adopted 17 December, 2015).

harm while confined in Suicide Observation. <u>Mr. Gay has been in solitary confinement during his entire tenure in prison since 1996 (remember, he was in the community from August, 2018 to May, 2022, and practiced no self-harm while out of prison), and thus all of his acts of self-harm have occurred while he was consigned to solitary confinement.</u>

In her evaluation of Mr. Gay, Dr. Ross does not focus very much attention on the fact that all of Mr. Gay's acts of self-harm have occurred while he was in solitary confinement.  This lack of attention to solitary confinement skews Dr. Ross' opinions.  For example, in her recommendations for further treatment, she writes that "Treatment focused on all of Mr. Gay's areas of need is available in the community, as well as in the BOP."  But her statement ignores the elephant in the room:  If Mr. Gay were to be treated in the community, he would not be in solitary confinement during the treatment period; whereas if he is incarcerated he will almost certainly spend most if not all of his time in solitary confinement as he has done since 1996 in the IDOC as well as during the 5 to 6 months he spent in treatment at the Butner BOP Complex.

Dr. Ross mentions in her Forensic Evaluation that Mr. Gay was offered a transfer to general population in the Butner Complex if he would accept a cellmate, the idea being that with his history of self-harm he should not be in a cell by himself.  But Mr. Gay reported to me that he is terrified of having a cellmate.  He explains: "I've done so much time in isolation, sleeping by my cell door for fear of attack, I just can't share a cell with anyone, he could attack me while I'm asleep. Even when I am at home, I stay in my room and lock the door so nobody can enter and attack me.  So I will not accept a cellmate, it's a trigger for me, I get scared if someone else is in the room.  In the community (Aug, 2018 through May, 2022), my son's mom tried staying with me and we slept in the same room, but I would wake up in the middle of the night terrified,

even with her.  Anyway, it's nonsense that they can't leave me alone in a cell, even if I had a cellmate I could wait until he was asleep and then cut myself."  In any case, for Mr. Gay, with his exquisite fear of being attacked, double-celling in general population is not a viable alternative to solitary confinement.

Dr. Ross shares treatment plans for Mr. Gay that were created in the Butner Complex.  For example, an August 18, 2022 plan at FCI Butner includes: "Mr. Gay will be afforded incentives, to include privileges, for remaining off suicide watch; Mr. Gay's primary evaluator or their designee will provide 10 minutes of social reinforcement every regular work day…; Custody staff will allow Mr. Gay day passes to North Carolina Unit if he has not engaged in the target behaviors (including self-harm) in the previous 24 hours; Custody staff will allow Mr. Gay access to the law library… if he has not engaged in self-directed violence in the previous 24 hours…; Mr. Gay will be followed by psychiatry for medication management, if he chooses to take medications; and so forth." (Dr. Ross' Forensic Evaluation, pp. 28-29).  This is a thoughtful treatment plan, and obviously the staff at FCI Butner were making every effort to help Mr. Gay overcome his habit of self-harm.  Missing from the plan is a directive to transfer Mr. Gay out of solitary confinement.  This is essentially a "phase plan," i.e. a plan to reward pro-social behaviors with increased privileges and to provide the prisoner a route to eventually exit solitary confinement after demonstrating enough pro-social behaviors.

The problem with treatment plans that offer incremental increases in privileges and freedom <u>after</u> pro-social behavior has been demonstrated, is that if the conditions of solitary confinement cause the prisoner to decompensate and resort anew to self-harm, as has happened repeatedly with Mr. Gay, then the plan to increase privileges and freedom only after the prisoner evidences pro-social behaviors becomes a "no-win" situation.  The plan to establish phases

of incrementally increased privileges and freedom that the prisoner earns by exhibiting pro-social behavior is a very good plan for most of the denizens of solitary confinement.  But it is a plan that is doomed to failure with a very small number of prisoners, and Mr. Gay is one of them, who, because of psychiatric disability, is unable to function in solitary confinement well enough even to earn the incremental advancements in privileges and freedom.  This relatively rare subgroup of prisoners in solitary confinement is thus doomed to perpetual solitary confinement, only to be released some day from prison with little or no attendance in rehabilitation programs and no pro-social skills.  I have termed this problem "the decimation of life skills."[18]  Therefore, with this very small group of prisoners, that includes Mr. Gay, another treatment plan and a different series of phases need to be created.  Mr. Gay cannot function in solitary confinement, certainly not well enough to accomplish the steps designated in his treatment plan to earn release from solitary confinement.  He would need to function much better than his psychiatric condition permits him to function if he is to be advanced to greater privileges and freedom.  So the plan to require him to exhibit pro-social behavior prior to advancement is doomed to failure. When a prisoner continues to fail to gain rewards and eventual release from solitary confinement, as Mr. Gay has done in the IDOC as well as in the Butner Complex, the treatment plan needs to be reconsidered. The first step in an effective treatment plan for Mr. Gay would be to remove him from solitary confinement.  Dr. Ross claims the only way that can be done is for him to accept a cellmate, and then he can be transferred to general

---

[18] Kupers, T. (2008). "Prison and the Decimation of Pro-Social Life Skills," in *The Trauma of Psychological Torture*, Editor Almerindo E. Ojeda, Vol 5 of *Disaster and Trauma Psychology Series*, Series Editor Gilbert Reyes, Westport, Connecticut: Praeger.

population.  The thought of taking a cellmate terrifies Mr. Gay, and he refuses.
The alternative plan I am going to propose further on involves transferring his
mental health treatment to the community.

In solitary confinement and supermaximum security facilities around the
country, there are a certain number of prisoners who spend many years or even
decades in solitary even though their original sentence to "Ad Seg" or
Restricted Housing was measured in months.  When I talk to these individuals,
they tell me "I'm never going to get out of here, I will just die in seg."  I ask
them, if their original sentence to solitary was only a few months or even a
year, why they don't expect to ever be released.  They tell me, "Being in the
hole makes me so crazy, and so angry, that I keep getting into disputes with
the guards and get another ticket, which means more time in the hole."  In
other words, solitary causes symptoms like anxiety and anger, and other forms
of exacerbation of mental illness, that make it impossible for them to earn their
way out of solitary confinement.  Phase programs where prisoners earn greater
amenities and freedoms and programs are definitely an improvement, but too
often, with a small group of prisoners, which unfortunately includes Mr. Gay, the
damaging effects of solitary prevent them from maintaining the kinds of
behaviors that staff require to move them onward in the phase system, and
then they repeatedly fall back to the most restrictive phase when they slip up,
break a rule or become disruptive.  It simply is harmful and destructive to let
prisoners who, based on psychiatric disabilities, do not have the capacity to
advance through the phase system, to deteriorate ever more in step one, where
the conditions are the harshest and most depriving.

Solitary confinement units are a very problematic environment for the
delivery of mental health treatment.  There are two main reasons for this: 1.)
Solitary confinement causes many symptoms and disabilities, and a very high

prevalence of suicide and self-harm.  It is extraordinarily difficult to treat disorders caused or exacerbated by solitary confinement while the patient remains in solitary confinement.  The conditions exacerbate the serious mental illness, the therapist is forced to play "catch-up" most of the time, trying to lessen ongoing symptoms of solitary confinement.  2).  The conditions are so harsh, the isolation and inactivity so destructive, that mental health staff have great difficulty forming the kind of trusting therapeutic relationship that is a prerequisite for effective mental health treatment.  Consider the "cell-front" interview.  In solitary confinement settings, a large proportion of contacts between prisoners and mental health staff occur within the housing pod while the prisoner remains confined to cell, and within earshot of nearby prisoners and staff.  Many prisoners report they refuse to expose sensitive psychological information about themselves in that context, especially not their plan to harm or kill themselves.

Dr. Ross points out that there are only two possible settings for Mr. Gay's much-needed mental health treatment at this point, either in the community or in the Bureau of Prisons.  But these are not equal choices.  In the community Mr. Gay would not be in a prison cell for almost 24 hours per day.  Mental health treatment is much more effective in a community clinic setting where a compassionate psychotherapist can evolve a trusting therapeutic relationship, than it is in a prison solitary confinement unit, where the prisoner is prone to distrust the mental health staff because they seem too close and sympathetic with custody officers.

Returning for a moment to the stunning finding that fully half of prison suicides occur among the roughly 4% or 5% of the prisoner population that is consigned to solitary confinement, it becomes clear that solitary confinement must be placed high on the list of contributing causes of self-harm and suicide in

prison.  In 50% of actual deaths from suicide in prison, a contributing factor was solitary confinement.  All standard texts on suicide prevention note that suicides tend overwhelmingly to occur among prisoners who are in a cell alone.  This is a statistical finding, and we usually hesitate to make conclusions about the causality of clinical events based on statistical findings.  But this statistical finding –- 50% of suicides occur in solitary confinement, where only 5% of the population is housed – establishes, to a reasonable degree of medical certainty, the fact that solitary confinement is an important contributing factor in the suicides and self-harm of prisoners.

With rare exceptions -- and those mostly early in his prison tenure when the habit of self-harm had not yet become deeply engrained in Mr. Gay's behavioral repertoire – that Mr. Gay's solitary confinement is one of the most important contributing factors in his self-harming.  The prevalence of self-harm in solitary confinement units is very comparable to the prevalence of suicide, so I discuss suicide and self-harm together, always being very interested in the similarities and differences between suicide and non-suicidal self-harm in solitary confinement settings.  Except for a suicide attempt in the community when he was very young, Mr. Gay has not practiced self-harm outside of a solitary confinement setting.

I am entirely in agreement with Dr. Ross that Mr. Gay suffers from Serious Mental Illness – whether one diagnoses Borderline Character Disorder, as we both do, or Posttraumatic Stress Disorder (PTSD), as I do and she includes as a "Rule Out" consideration – and his condition definitely requires intensive mental health treatment.  Where we disagree is about there being comparable chances for successful treatment in the BOP or in the community.  One has to assume, as proven by his history, Mr. Gay would spend almost all of his time in custody in some form of solitary confinement, and there his anxiety level and his habit of self-harm would definitely flare up anew, just as happened while he was

undergoing mental health treatment in the BOP's Butner Complex, even while Dr. Ross was evaluating him.  As proven anew by his predilection for self-harm even while being housed in the BOP's flagship comprehensive mental health program, he still cut on himself and enacted other types of self-harm and had to be transferred to Suicide Observation very many times.

## X.  The Question of Malingering/Manipulation

Mr. Gay does not evidence malingering, nor is he deceptive.  Malingering is the exaggeration or feigning of a disease or disease symptoms for secondary gain.  There is a protocol for the identification of malingering and deception.[19]  I followed that protocol while examining Mr. Gay and discovered no signs of malingering.  Correctional staff who have interacted with Mr. Gay sometimes include statements about his cutting or mutilating himself in order to get out of solitary confinement. This is not a fair interpretation of his many incidents of self-harm. It is very clear when one talks with him in detail about why he cuts and mutilates himself that Mr. Gay is in agony while in solitary confinement, and his focus is not on manipulating anyone, rather it is on doing something desperate about the unbearable feelings.

Malingering has some common characteristics with manipulating.  But malingering is more about feigned or exaggerated symptoms, whereas manipulation is more about getting people to do things you want them to do. Manipulating requires conscious will, a person decides to do something in order to get the other person to do something they want them to do.  Mr. Gay's self-

---

[19] Resnick, P.J. (1984).  "The Detection of Malingered Mental Illness," *Behavioral Sciences and the Law*, Vol. 2, No. 1, 21-38; Rogers, R. E. H. (1997). Clinical Assessment of Malingering and Deception. New York: Guilford.; See also Kupers, T. (2004). Malingering in Correctional Settings. *Correctional Mental Health Report*, 5,6, March/April.

harming is not entirely willful at all.  Rather, his self-mutilating actions seem, to a significant degree, to be compelled.  They are compelled because of feelings like anxiety and abandonment that are prone to explode whenever he is in solitary confinement, and they are compelled by the evolving force of a habit to self-harm when extremely anxious.

Dr. Richard Scott, a forensic psychologist who examined Mr. Gay in 2012 while he was in solitary confinement at Tamms Correctional Center, was asked on the witness stand if Mr. Gay could stop cutting if he wanted to.  Dr. Scott responded:

> "Now?  He could not, no. This is an engrained pattern of behavior that is in place for many years and he – while he does it for multiple reasons, one of the reasons is the intense agitation and anxiety that he fears, especially with prolonged isolation. And he cannot simply find another way to cope with that.  You know, if he could, he could get out of Tamms.  He could be in a prison setting where he has more of the things he wants, that he's always trying to demand, that he tries to manipulate for.  And if he was able to stop the self-injurious behavior that allows him to, he would move into another prison setting where he could function more to his own liking." (Trial Transcript, Gay v. Blackman, p. 14).

One might say Mr. Gay's self-harming is what Brief Psychotherapy pioneer David Malan calls a "false solution,"[20] as if he causes himself to feel intense physical pain as a "false solution" to the problem of intense and unbearable psychological pain in solitary confinement, including intense anxiety along with an extreme sense of abandonment and aloneness, in solitary confinement.

## XI.  Diagnostic Formulation

Mr. Gay has been assigned many diagnoses.  They include Conduct Disorder (at age 14 or 15 in the IDJJ); Antisocial Personality Disorder[21] (IDOC, 1997, BN 10858; 1998, BN 11857; 2000, BN 13413); Narcissistic Personality Disorder (In IDOC, 1998, BN 11857; 2000 BN 13413); Borderline Character (or Personality) Disorder (in IDOC, 2002, BN 15519; 2014, BN 41676; Dr. Richard Scott's 2012 trial testimony and Dr. Heather Ross' 2022 Forensic Evaluation); Adjustment Disorder with Disturbance of Mood or Mood Disorder NOS (1997 in IDOC, BN 10857); Posttraumatic Stress Disorder (In the community at the Robert Young Clinic in 2018-2021, in a competency evaluation in November 2021, and as a "Rule-Out" diagnosis by Dr. Ross, Butner Complex, 2022); Unspecified Personality Disorder with Antisocial, Narcissistic and Borderline Features (IDOC 2018, BN 6690).  There are others.  This is a long and varied list of diagnoses.

Based on my psychiatric evaluation of Mr. Gay and a review of records including reports of psychiatric examinations by many clinicians over many years, I believe Mr. Gay suffers from severe PTSD, with the unofficial (not a category in DSM5) qualifier "complex" (Complex PTSD), signifying multiple relevant traumas, from his childhood experiences at home and in the community and from his experiences in prison solitary

---

[20] David Malan. (1976).  *The Frontier of Brief Psychotherapy: An Example of the Convergence of Research and Clinical Practice.*  London: Plenum Medical Book Co.
[21] A diagnosis that requires an earlier diagnosis of Conduct Disorder by age 15

confinement.  Dr. Heather Ross administered the PAI Inventory of Adult Personality, a psychological assessment instrument, which produced a profile "consistent with someone who is reporting symptoms often associated with traumatic stress…,"[22] and that was part of her rationale for including in her list of diagnoses, "Rule Out Posttraumatic Stress Disorder."  I administered the PCL-5, another psychological assessment instrument that surveys post-traumatic symptoms, and Mr. Gay's responses on the PCL-5 are consistent with a diagnosis of PTSD (See exhibit C).   He also evidences a mixed Personality Disorder.  In other words he suffers from Serious Mental Illness, and on that point Dr. Richard Scott, Dr. Healther Ross and I concur.

I am not too concerned about the difference between my firm diagnosis of PTSD and Dr. Ross' inclusion of PTSD as a disorder that must be "ruled out."  Mr. Gay has definitely experienced multiple traumas that satisfy "Criterion A" in the DSM-5 list of diagnostic criteria for PTSD.[23]  Further, Mr. Gay exhibits several of the intrusive symptoms (e.g. flashbacks, intrusive memories of the traumatic events, re-living experiences, nightmares and so forth) listed as Criterion B for PTSD; he evidences avoidance of stimuli, both memories and places, associated with the traumas, thus satisfying Criterion C for PTSD; he exhibits negative alterations in cognitions and mood associated with the traumatic events including persistent negative emotional states, markedly diminished interest in participation in significant activities and persistent inability to experience positive emotions, thus satisfying Criterion D for PTSD; He exhibits marked alterations in arousal and reactivity such as reckless or self-destructive behavior, hypervigilance and sleep disturbance, thus satisfying Criterion E for PTSD in DSM5; and his negative symptoms related to the traumas have lasted for

---

[22] Dr. Heather Ross, January 23, 2023 Forensic Evaluation, p. 36.
[23] American Psychiatric Association. (2013).  *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5).*  Washington, D.C., American Psychiatric Association, pp. 271-272.  .

years, involve significant distress in multiple realms and are not attributable to the effects of a substance, thus satisfying Criteria F., G., and H. in DSM5.

Even if, hypothetically, Mr. Gay did not satisfy sufficient criteria in DSM5 for an official diagnosis of PTSD, he would still qualify for the diagnosis of "Other Specified Trauma- and Stressor-Related Disorder" in DSM5.[24]  The differences between the diagnostic categories PTSD and Other Specified Trauma- and Stressor-Related Disorder in DSM5 are not great.  But more importantly, the specific diagnosis is not the main factor making Mr. Gay a high risk of repeated attempts at suicide and self-harm. It's the past traumas and abandonments!  It is the history of repeated trauma and abandonment that puts Mr. Gay at great risk of two very negative psychological developments: 1). Breakdown or decompensation in solitary confinement, and 2). Suicide or Self-Harm while consigned to solitary confinement.

In addition to PTSD, the diagnoses Borderline Character Disorder and Mixed Personality Disorder are also indicated.  Dr. Heather Ross includes Borderline Character Disorder among her diagnoses, and includes in her evaluation report other clinicians' statements that the Borderline Character Disorder Mr. Gay is diagnosed with qualifies as Serious Mental Illness.  Again, I concur.

The *DSM V* diagnostic criteria for Borderline Character Disorder are "a pervasive pattern of instability of interpersonal relationships, self-image, and affects, and marked impulsivity, beginning by early adulthood and present in a variety of contexts, as indicated by five or more of the following: ...." The list that follows includes frantic efforts to avoid abandonment, a pattern of unstable and intense interpersonal relationships characterized by alternating between extremes of idealization and devaluation, identity disturbances,

---

[24] American Psychiatric Association. (2013).  *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5).*  Washington, D.C., American Psychiatric Association, p. 289-292.

impulsivity, recurrent suicidal behavior, gestures, or threats, or self-mutilating behavior, affective instability, chronic feelings of emptiness, inappropriate intense anger or difficulty controlling anger, and transient, stress-related paranoid ideation or severe dissociative symptoms.[25]  Mr. Gay evidences more than five of those criterion symptoms, those symptoms are clearly reflected in clinical notes in his chart, Dr. Richard Scott firmly established a diagnosis of Borderline Personality Disorder during his 2012 trial testimony, and obviously Mr. Gay fits Borderline Character Disorder to a tee.  The bottom line is that Borderline Character Disorder, technically a personality disorder, qualifies as a Serious Mental Illness in clinical forums.  And Borderline Character Disorder is often the cause of very serious long-term psychiatric disability, as it obviously is in Mr. Gay's case.

## XII. Mr. Gay's Risk Factors for Suicide and Self-Harm in Solitary Confinement

Self-harm in solitary confinement is a very complicated phenomenon.  There are many contributing risk factors, the most important being solitary confinement itself, as well as the habit of self-harm that evolved during multiple prior episodes.  In performing suicide risk assessments, mental health clinicians consider a large number of "risk factors," the presence of which in a patient's history signal serious risk of suicide or self-harm in the present and future.  For example, individuals with a past history of serious suicide attempts are assumed to be at high risk in the present until proven otherwise.  Likewise, individuals with serious mental illness are considered a high risk of suicide because suicide is much more prevalent among individuals with serious mental illness than among individuals who have not

---

[25] American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM V), APA, 2013, p. 663.

been diagnosed with a serious mental illness.  I will briefly discuss some of the serious risk factors for suicide and self-harm that are clearly present in Mr. Gay's case.

## A. Solitary Confinement Itself

Lindsay Hayes, a national expert on suicide behind bars, notes that being alone in a cell, either in segregation or simply a single cell in general population, is very strongly correlated with the occurrence of suicide in jail.  According to Hayes: "At the time of death, approximately 60 percent of inmates who committed suicide were assigned to single occupancy cells and 40 percent were housed in multiple-occupancy cells."[26]  Solitary confinement involves "being alone in a cell," and is a very worrisome risk factor for suicide and self-harm.  As mentioned several times in this report, fully 50% of successful prison suicides, on average, occur among the approximately 4% or 5% of prisoners who are in solitary confinement.  Individuals in solitary confinement are simply at extremely high risk of suicide and self-harm.

## B. Serious Mental Illness

Serious Mental Illness is another strong risk factor for suicide.  That is obvious when the mental illness includes depression, for example Major Depressive Disorder.  But mental illnesses other than mood disorders are also a strong risk factor for suicide behind bars, if only because the individual with serious mental illness is, to a certain

---

[26] Lindsey Hayes. National Study of Jail Suicides: Twenty Years Later.  (2010). National Institute of Corrections, P. 27

extent, unpredictable, and too often unreliable when answering in the negative to the question "are you suicidal?"

## C. Past Suicide Attempts and Past Episodes of Self-Harm.

The clearest predictor of suicide in jail is a past history that involves suicide attempts and/or self-harm, especially if the prior attempts occurred in a carceral setting. According to Dr. Heather Ross, "Over the course of the evaluation period (July through December, 2022), the defendant underwent 18 suicide risk assessments (9 at FCI Butner and 9 at FMC Butner). He engaged in multiple acts of self-harm and required treatment at outside hospitals on several occasions. He also required the use of restraints on occasion to mitigate acts of self-harm. Suicide risk management plans were developed for Mr. Gay at each institution."[27] His rate of suicide attempts and self-harm in the IDOC was comparable. Mr. Gay absolutely evidences the risk factor of prior suicide attempts and self-harm.

## D.   A Vicious Cycle

There is this cycle in the way Mr. Gay is managed in prison, both in the IDOC and in the federal BOP: He is consigned to solitary confinement; there he becomes suicidal or self-harming and is transferred to a Suicide Observation Cell, usually located in the Infirmary; and as soon as the suicidal crisis seems to have abated, he is transferred back to his solitary confinement cell

---

[27] Forensic Evaluation by Dr. Heather Ross, January 23, 2023, p. 27.

where he will subsequently harm himself again.  This is a vicious cycle, solitary confinement drives acts of self-harm, and acts of self-harm earn Mr. Gay a longer stint in solitary. The repeating pattern in Mr. Gay's management in prison, involving this vicious cycle, is one more strong indicator of his risk for further attempts at suicide and self-harm when he is consigned to solitary confinement.  I have had the opportunity to review approximately three dozen successful prison suicides (i.e. resulting in death) in multiple states, and consistent with the finding that on average 50% of prison suicides occur among the 4 or 5% of prisoners in solitary confinement, a large majority of the suicides I have reviewed involved prisoners in solitary confinement settings.  Further, in almost all cases of successful suicide I have reviewed, there was this clear pattern: prior to the fatal incident, the individual had made several prior suicide attempts while in solitary confinement; each time he or she had been transferred to a suicide observation cell, usually in the infirmary; after a short time he or she was declared no longer a high suicide risk and was returned to his or her solitary confinement cell; and this cycling from a solitary confinement cell to suicide observation and back to solitary confinement repeated several times until finally his or her suicide attempt or self-harm resulted in death.

## E. Trauma

Whether Mr. Gay is assigned the diagnosis PTSD or PTSD is condition to be ruled out, the multiple traumas in his life play a critical

part in the evolution of his pattern, or habit, of self-harming.  There are very many reports of severe and repeated trauma in the lives of individuals who land in prison solitary confinement units and then practice self-harm and attempt suicide.  In fact, in my experience -- and I have examined over 500 prisoners in solitary confinement over the course of my career as a forensic psychiatrist[28] – every single prisoner I have examined who cuts himself in solitary confinement had previously experienced multiple severe traumas as a child and as an adult.

## D. Abandonment

Mr. Gay's childhood includes multiple very serious experiences of abandonment, beginning with parental neglect while he was abused by siblings during infancy, his father's absence from very early in his life, his removal from the family home at one year of age due to neglect, and subsequent failures of parenting that led to his being repeatedly beaten and abused. Feelings of abandonment became a major psychological problem for him for the remainder of his life. In prison, abandonments are inevitable.  Just as Mr. Gay was beginning to form a trusting therapeutic relationship with one member of the mental health staff, he would be moved to a different setting or that staff member would leave the unit he was on.  He would become despondent, he would feel betrayed and abandoned, and in many

---

[28] See my book, *Solitary: The Inside Story of Supermax Isolation....*  University of California Press, 2017.

instances he reports that it was the extreme reaction to feeling abandoned, along with unbearable solitary confinement conditions, that triggered a subsequent act of self-harm.

In summary, Mr. Gay exhibits every risk factor from #A to #D, including very long-term housing in solitary confinement without let-up, diagnoses that qualify as Serious Mental Illness, a history of very many prior suicide attempts and incidents of self-harm, a vicious cycle in his management in prison whereby he is alternatingly consigned to solitary confinement and transferred to Suicide Observation and back to Solitary Confinement, quite a lot of trauma throughout his life, and very serious and triggering abandonment issues.  Any treatment plan for Mr. Gay, if it is to be effective in ameliorating his psychiatric disability and halting his repeated self-harming ways, must include this critical step: Arrangements must be made to transfer him out of solitary confinement and into a setting that is conducive to mental health treatment.  The insurmountable barrier to Mr. Gay's successful mental health treatment in prison is that when he is in prison, for various reasons I have explained in this report, he is consigned to solitary confinement.  This was true even while he was confined in the Butner Complex, where even while his forensic evaluation was in progress and intensive mental health treatment plans were provided, he was consigned to solitary confinement and he proceeded to self-harm repeatedly. This reality makes it impossible to provide Mr. Gay the mental health treatment his condition requires, and to halt the incidents of self-harm, while he is in prison and consigned to solitary confinement.

## XIII. Possibilities in the Community

Mr. Gay fared very well during the almost four-year period between August, 2018 and May, 2022 while he was in the community.  He was on parole until July 14, 2020, when he was discharged from parole.  He satisfied all the restrictions and requirements of his parole, including probation officers searching his home.  The current matter not withstanding, he did not commit crimes, nor did he have hardly any contact with the police.  He participated in mental health treatment, including assessment and psychotherapy, at the Trinity Medical Center/Robert Young Center from June, 2020 through December, 2021.  He also participated in psychotherapy at Family Counseling in the Spring of 2022.   He participated in the parenting of his son and he involved himself in a campaign to pass a Bill limiting the use of solitary confinement in IDOC, a Bill that carries his name and passed one house of the legislature prior to his more recent arrest. In order to accomplish this progress on the Bill, he had to go to the library to do research, write articles about solitary confinement and the Bill, and collaborate closely with community organizers and legislators in the processing of the Bill through the legislature.  According to Ms. Marjorie B. Moss, a social work supervisor and attorney who worked with Mr. Gay beginning in 2017 while he was incarcerated and then assisted him in "navigating his reintegration back into society": "Prior to Mr. Gay's recent detainment he was doing all that he could to reintegrate with society and move forward.  This included but was not limited to going to the library several times per week to write and conduct research on ending solitary confinement, meeting with professors and governmental officials and a documentarian about his life and his experience with the Illinois Department of Corrections, assisting in the caretaking of his son and relying on friends and family to take him to run necessary errands."[29] There is no evidence of suicide attempts or self-harming while he was in the community.

---

[29] September 28, 2020 Affidavit of Marjorie B. Moss.

The sharp contrast between Mr. Gay's behavior while in the community, as compared to his self-harming behavior when he is in solitary confinement in prison, provides very strong evidence that he can live in the community and remain free of self-destructive behaviors. His success in this regard also speaks to his safety in the community.  Mr. Gay's psychiatric condition does require that he undergo mental health treatment, and he has demonstrated that he is quite motivated to do so in a community setting.  He has a strong support network and he is very capable of cooperating with probation requirements placed upon him.

## XIV. Prognosis

Psychiatric disorders, in general, have a more dire prognosis the longer the individual with mental illness is left untreated or inadequately treated, and the longer the individual remains subject to the environmental factors, such as solitary confinement, that are known to exacerbate the psychiatric disorder.  The psychopathology and disability become more habitual and chronic, and more resistant to treatment.  This is certainly the case with Mr. Gay's clinical picture.  His repetitive self-harming is, to a significant extent, an increasingly fixed habit such that as soon as he is consigned to solitary confinement he proceeds to cut and mutilate himself.  On the other hand, as evidenced in his successful residence in the community from 2018 to 2022, he thrives in the community and is able to make good use of mental health treatment there.  As mentioned above, in a November 22, 2021 Forensic Psychiatry Report at the Peoria County Jail, Drs. Jean Clore and Ryan Finkenbine opine that Mr. Gay suffers from Posttraumatic Stress Disorder (PTSD), and "his PTSD prognosis in the absence of incarceration is good; however with incarceration the prognosis is poor." The damaging effects of long-term solitary confinement are well-researched, and include many symptoms and disabilities that continue for a very long time, possibly a lifetime, in individuals who have spent significant time in solitary confinement during

their prison tenure.  In fact, research shows that formerly incarcerated individuals have a shortened life expectancy, and individuals consigned to long-term solitary confinement  have a heightened mortality rate during the year following their eventual release from prison (compared to formerly incarcerated individuals who did not spend significant time in solitary confinement).[30]  In short, Mr. Gay's prognosis is very dire if he spends more time behind bars, and quite optimistic if he is released to the community and undergoes effective mental health treatment.

The clearest empirical evidentiary findings in Mr. Gay's case, covering over 25 years of his prison tenure, are that Mr. Gay lands in solitary confinement whenever he is in jail or prison, and in solitary confinement he proceeds to repeatedly cut and mutilate himself.  This in spite of often very robust and conscientious efforts on the part of mental health staff to provide treatment that would end his tendency to self-harm, even in the mental health treatment program at the Butner Complex in the federal BOP. Obviously, solitary confinement is the most important contributing factor for his severe self-harm and mutilation. It is not acceptable, as a practice in corrections, to return a chronically self-harming and self-mutilating individual to solitary confinement, where the self-harm and self-mutilation will almost certainly reoccur, cause permanent bodily injury and possibly result in death.  And, in fact, there is quite impressive evidence, also reflected prominently in the mental health chart, that Mr. Gay cuts himself and self-mutilates in reaction to unbearable anxiety and feelings of abandonment, and his pattern of repetitive self-harm is actually a very deeply ingrained habit.  In other words,

---

[30] Bryan L. Sykes, PhD,MA, MA; Ernest Chavez, MS; Justin Strong, MS. (2021).  "Mass Incarceration and Inmate Mortality in the United States—Death by Design?".  *Journal of American Medical Association/ Open,* December 23  https://jamanetwork.com/; Lauren Brinkley-Rubinstein, PhD; Josie Sivaraman, MSPH; David L. Rosen, PhD, MD; David H. Cloud, JD, MPH; Gary Junker, PhD; Scott Proescholdbell, MPH; Meghan E. Shanahan, PhD; Shabbar I. Ranapurwala, PhD. (2019).  "Association of Restrictive Housing During Incarceration With Mortality After Release." *Journal of American Medical Association/ Open,* October 4. <https://jamanetwork.com/>.

the decision to self-harm is not willful, it is compelled by very troubling symptoms emanating from mental illness, including Borderline Personality Disorder and Posttraumatic Stress Disorder.  His self-harm and self-mutilation only occur when he is consigned to solitary confinement, and not when he is in the community.  A central tenet of the Hippocratic Oath is, "First, do no harm." Repeatedly consigning Mr. Gay to solitary confinement where it is absolutely predictable he will repeat the self-harm and mutilation is a clear violation of that Hippocratic tenet.

## XV. Recommendation Regarding Sentencing & Treatment

1. I strongly recommend a sentence for Mr. Gay that avoids any additional incarceration. It is simply not possible for him to be in prison and not be consigned to solitary confinement, and in solitary confinement he will inevitably resort again to often very serious suicidal and para-suicidal self-harm including cutting on himself and self-mutilation.  Prof. Craig Haney testified in his August 2021 Declaration: "It is my expert opinion that returning Mr. Gay to a carceral environment would be catastrophic…. He has a notable and dramatic history of extreme self-mutilation in custody, which includes cutting off his own testicle and hanging it from the window of his cell, sewing pieces of cloth into skin, storing metal objects and other things in his scrotal sack, and similar acts of self-harm." I agree with Prof. Haney.  In contrast to the "catastrophe" that would await Mr. Gay's return to prison in the BOP, and the almost inevitable failure of mental health treatment while he is consigned to solitary confinement, he has demonstrated an impressive capacity and motivation to pursue a peaceful life in the community while making good use of community-based mental health treatment.  He has

already served time in jail and prison pursuant to his conviction in this matter, from May 2022 until the present.

2.  Mr. Gay's psychiatric disorder and disability require intensive mental health treatment.  I agree with Dr. Heather Ross that Dialectical Behavior Therapy (DBT) should be part of the treatment.  DBT is a comprehensive approach to treatment that includes individual and group psychotherapy, the thoughtful creation of realistic aims for the treatment, the completion of "homework assignments," team meetings for collaborating clinicians, and so forth.  While it is true that DBT is available at some facilities within the BOP, as I have explained above it is not possible to provide effective mental health treatment, even DBT, in a solitary confinement setting.  The Butner Complex in the Federal Bureau of Prisons includes one of the best correctional psychiatric programs I have encountered.  The level of staffing with mental health professionals, the range of intervention modalities including inpatient level of care, and the professionalism of mental health as well as custody staff is quite admirable and compares favorably with that in any other correctional facility in the USA.  Yet, while consigned to the Butner Complex, even while on suicide watch in the Butner Complex mental health unit, Mr. Butner cut and mutilated himself repeatedly, causing injuries that required emergency surgical intervention and could have been fatal.  In order to undergo the mental health treatment his condition and disability requires, Mr. Gay must be released to the community with whatever monitoring and reporting requirements the court might order. Mr. Gay simply cannot be detained in a penal facility without resorting to potentially deadly self-harm.  This does not mean he cannot or should not be punished for wrongful acts.  His sentence might include supervised probation, community service, mandated mental health

treatment, and so forth.  To a reasonable degree of medical certainty, if sentenced to a period of incarceration, Mr. Gay would be returned to solitary confinement, his mental health treatment would continue to be ineffective, and Mr. Gay would repeatedly practice extreme and potentially fatal self-harm.

Respectfully submitted,


_____.        _____
Terry A. Kupers, M.D., M.S.P.                Date