

United Nations

# General Assembly

**A**/66/268

Distr.: General
5 August 2011

Original: English

---

**Sixty-sixth session**
Item 69 (b) of the provisional agenda*
**Promotion and protection of human rights: human
rights questions, including alternative approaches for
improving the effective enjoyment of human rights
and fundamental freedoms**

## Torture and other cruel, inhuman or degrading treatment or punishment

### Note by the Secretary-General

The Secretary-General has the honour to transmit to the General Assembly the interim report prepared by the Special Rapporteur of the Human Rights Council on torture and other cruel, inhuman or degrading treatment or punishment, Juan E. Méndez, in accordance with General Assembly resolution 65/205.

---

\* A/66/150.

11-44570 (E)  010911




Please recycle

A/66/268

## Interim report of the Special Rapporteur of the Human Rights Council on torture and other cruel, inhuman or degrading treatment or punishment

*Summary*

In the present report, submitted pursuant to General Assembly resolution 65/205, the Special Rapporteur addresses issues of special concern and recent developments in the context of his mandate.

The Special Rapporteur draws the attention of the General Assembly to his assessment that solitary confinement is practised in a majority of States. He finds that where the physical conditions and the prison regime of solitary confinement cause severe mental and physical pain or suffering, when used as a punishment, during pre-trial detention, indefinitely, prolonged, on juveniles or persons with mental disabilities, it can amount to cruel, inhuman or degrading treatment or punishment and even torture. In addition, the use of solitary confinement increases the risk that acts of torture and other cruel, inhuman or degrading treatment or punishment will go undetected and unchallenged.

The report highlights a number of general principles to help to guide States to re-evaluate and minimize its use and, in certain cases, abolish the practice of solitary confinement. The practice should be used only in very exceptional circumstances, as a last resort, for as short a time as possible. He further emphasizes the need for minimum procedural safeguards, internal and external, to ensure that all persons deprived of their liberty are treated with humanity and respect for the inherent dignity of the human person.

11-44570

# Contents

*Page*

I. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II. Activities related to the mandate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III. Solitary confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A. Overview of work undertaken by the mandate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    B. History and current practice of solitary confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    C. Definition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    D. Legal framework . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    E. States' rationale for the use of solitary confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    F. Conditions of solitary confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    G. Prolonged or indefinite solitary confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    H. Psychological and physiological effects of solitary confinement . . . . . . . . . . . . . . . . . . . . 17

    I. Latent effects of solitary confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    J. Vulnerable individuals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    K. When solitary confinement amounts to torture and other cruel, inhuman or degrading treatment or punishment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

IV. Conclusions and recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Annex

    Effects of solitary confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## I.  Introduction

1.    The present report, submitted pursuant to paragraph 39 of General Assembly resolution 65/205, is the thirteenth submitted to the General Assembly by the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment. It is the first report submitted by the present mandate holder.

2.    The Special Rapporteur wishes to draw attention to his report to the Human Rights Council (A/HRC/16/52), in which he outlined his vision, working methods and priorities for his tenure as Special Rapporteur.

## II.  Activities related to the mandate

3.    Below is a summary of the activities carried out by the Special Rapporteur pursuant to the mandate since the submission of his report to the Human Rights Council (A/HRC/16/52 and Add.1-6).

**Communications concerning human rights violations**

4.    During the period from 1 December 2010 to 1 July 2011, he sent 20 letters of allegations of torture to 18 Governments, and 95 urgent appeals on behalf of persons who might be at risk of torture or other forms of ill-treatment to 48 Governments. In the same period 82 responses were received.

**Country visits**

5.    With respect to fact-finding missions, an anticipated country visit to Kyrgyzstan for May 2011 was postponed, at the request of the Government, owing to ongoing political developments. By letter dated 28 July 2011, the Government of the Kyrgyz Republic proposed a country visit for the second half of August 2011. The Special Rapporteur welcomes this invitation; however, because of the short notice, he is discussing potential dates with the Government at the time of submitting the present report. He has accepted an invitation from the Government of Iraq to visit the country in October 2011. He has also been invited to visit Bahrain and is discussing dates with the Government. In addition to the pending country visit requests (see A/HRC/16/52, para. 6) the Special Rapporteur has requested a visit to Morocco with respect to Western Sahara.

6.    The Special Rapporteur conducted a visit to Tunisia from 15 to 22 May 2011. He shared his preliminary findings with the interim Government and issued a press statement on 22 May expressing his appreciation to the Government for the full cooperation extended to him. He noted that the Government had undertaken a series of positive steps towards ensuring accountability and long-term reforms. However, he is of the view that a "wait and see attitude" in anticipation of the Constituent Assembly election may be hampering the possibility of delivering bold and aggressive steps in restoring justice for past and recent abuses. The Special Rapporteur stressed that swift, effective and independent criminal investigations against alleged perpetrators of torture and ill-treatment should be ensured and administrative programmes should be launched offering redress and reparation services to victims of past and recent violations. The report of the mission to Tunisia will be presented to the Human Rights Council at its nineteenth session in March 2012.

**Key press statements**

7.    The Special Rapporteur issued the following press statements (many were joint statements with other mandate holders):

- On 31 December 2010 — expressing serious concern that enforced or involuntary disappearances, arbitrary detentions, extrajudicial, summary or arbitrary executions, and acts of sexual violence may have occurred or may still be occurring in Côte d'Ivoire in relation to the presidential elections.

- On 14 January 2011 — urging the Government of Tunisia to control the use of force against peaceful demonstrations, after at least 21 deaths were officially confirmed.

- On 3 February 2011 — on public unrest in Belarus, Egypt and Tunisia and the alleged infliction of torture or cruel, inhuman or degrading treatment in connection with suppression of peaceful demonstrations.

- On 17 February — urging the transitional Government in Egypt to establish an independent inquiry to investigate human rights violations during the revolution in that country, with the powers to transmit names and evidence for prosecution to the relevant authorities.

- On 18 February — urging the Governments of Bahrain and the Libyan Arab Jamahiriya to guarantee the right to peaceful protest and immediately cease the use of excessive and lethal force.

- On 22 February — on the situation of human rights defenders expressing serious concerns about gross violations of human rights that were being committed in the Libyan Arab Jamahiriya.

- On 3 March 2011 — condemning the violent crackdown on protesters in Yemen, and urging the Government to stop the excessive use of force as a means to end ongoing protests.

- On 22 March — expressing concerns about increased incidents of serious human rights violations in the capital of Bahrain.

- On 1 April 2011 — expressing concerns about serious human rights violations in Côte d'Ivoire, including enforced disappearances, extrajudicial killings, killing and maiming of children, and sexual violence which may amount to international crimes, and expressed the full support of the Special Rapporteur and other mandate holders for Security Council resolution 1975 (2011).

- On 11 April and 12 July — expressing frustration that despite his repeated requests to visit Private First Class Bradley E. Manning, the Government of the United States of America has not granted him unmonitored access to the detainee. The question of unfettered access goes beyond this case and touches on whether the Special Rapporteur would be able to conduct private and unmonitored interviews with detainees if he were to conduct a country visit to the United States.

- On 15 April — denouncing the rising death toll and brutal crackdown on peaceful protesters, journalists and human rights defenders in the Syrian Arab Republic despite the Government's promises of reforms and consultations to end the 48-year-old emergency rule.

- On 1 July 2011 — urging the Government of the United States to stop the scheduled execution of Humberto Leal García in Texas.

**Highlights of key presentations/consultations/training courses**

8. From 8 to 9 February 2011, the Special Rapporteur participated in a meeting sponsored by Amnesty International in London to discuss "Developing International Best Practice for Inquiries and Investigations into Torture". He also spoke at the All Party Parliamentary Group on Extraordinary Rendition.

9. On 22 February, he delivered a statement to the American Academy of Forensic Sciences at its 63rd annual meeting on "International framework and mechanisms for documenting conditions of detention, torture and ill-treatment".

10. On 28 February, he met with high-ranking officials from the Department of State and the Department of Defense of the United States of America in Washington, D.C., and again with the Department of Defense on 22 April to discuss issues of mutual concern.

11. From 6 to 10 March 2011, the Special Rapporteur was in Geneva for the sixteenth session of the Human Rights Council and met with the Ambassadors of Iraq, Kyrgyzstan, Mexico, Thailand and the United States. He also met with all the Human Rights Council regional groups except for the Africa Group, which unfortunately could not be scheduled.

12. On 16 and 17 March, in Washington, D.C., he participated in a meeting with the Chair of the Committee against Torture, the Vice-Chair of the Subcommittee on Prevention of Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, the Rapporteur on the Rights of Persons Deprived of Liberty of the Inter-American Commission on Human Rights, a representative of the European Committee for the Prevention of Torture and the Special Rapporteur on Detained Persons of the African Commission on Human and Peoples' Rights. The meeting was organized jointly by the Washington College of Law of American University and the Association for the Prevention of Torture to discuss ways to strengthen the working relations of those mechanisms.

13. From 18 to 20 March, the Special Rapporteur made two presentations to the annual General Meeting and the fiftieth anniversary commemoration of the United States Section of Amnesty International in San Francisco.

14. On 1 June 2011, he was the keynote speaker at an event in Washington, D.C., organized by several faith-based groups and entitled "Accountability Today: Preventing Torture Tomorrow".

15. From 15 to 17 June, the Special Rapporteur chaired, with the support of the Government of the Netherlands, a regional consultation on torture for the Americas in Santiago, Chile. The regional consultation was organized in partnership with the Association for the Prevention of Torture, the Centro de Estudios Legales y Sociales, Corporación Humanas — Centro Regional de Derechos Humanos y Justicia de Género and Conectas Direitos Humanos, and was an opportunity for governments, national institutions and organizations of civil society from 12 countries to discuss follow-up to recommendations of country visits and to strengthen local and regional protection mechanisms against torture and ill-treatment.

16.   On 20 June, he met with the Director General for Foreign Policy, Ministry of Foreign Affairs of Chile, in Santiago.

17.   From 27 June to 1 July, the Special Rapporteur participated in the eighteenth annual meeting of Special Rapporteurs in Geneva. He also met with representatives of the Governments of Iraq, Kyrgyzstan, the Netherlands, the Russian Federation, Tunisia and the United States of America.

18.   On 7 July 2011, he met in Brasilia with the Minister for Human Rights in the Government of Brazil.

## III.  Solitary confinement

### A.  Overview of work undertaken by the mandate

19.   In his first report as Special Rapporteur (A/HRC/16/52, para. 70), he recognized that "the question as to whether ... prolonged solitary confinement" constituted "*per se* cruel, inhuman or degrading treatment or punishment has given rise to much debate and discussion in the Human Rights Council", and believed that "the international community as a whole would greatly benefit from a dispassionate and rational discussion of the issues".

20.   The Special Rapporteur has received complaints that solitary confinement is used in some countries in the context of administrative detention for national security or as a method to fight organized crime, as well as in immigration detention. He undertook this study because he found the practice of solitary confinement to be global in nature and subject to widespread abuse. In particular, the social isolation and sensory deprivation that is imposed by some States does, in some circumstances, amount to cruel, inhuman and degrading treatment and even torture.

21.   The Special Rapporteur's predecessors have noted that prolonged solitary confinement may itself amount to prohibited ill-treatment or torture (E/CN.4/1999/61, para. 394, and E/CN.4/2003/68, para. 26 (m)).

22.   The Istanbul Statement on the Use and Effects of Solitary Confinement was annexed to the former Special Rapporteur's 2008 interim report to the General Assembly (A/63/175, annex). The report concluded that "prolonged isolation of detainees may amount to cruel, inhuman or degrading treatment or punishment and, in certain instances, may amount to torture. ... [T]he use of solitary confinement should be kept to a minimum, used in very exceptional cases, for as short a time as possible, and only as a last resort. Regardless of the specific circumstances of its use, effort is required to raise the level of social contacts for prisoners: prisoner-prison staff contact, allowing access to social activities with other prisoners, allowing more visits and providing access to mental health services" (A/63/175, paras. 77 and 83).

### B.  History and current practice of solitary confinement

23.   The history of the use of solitary confinement on detainees has been well documented. The practice can be traced to the 1820s in the United States of

A/66/268

America, where it was believed that isolation of prisoners would aid in their rehabilitation. Under this model prisoners spent their entire day alone, mostly within the confines of their cells, including for work, in order to reflect on their transgressions away from negative external influences. Beginning in the 1830s, European and South American countries adopted this practice (A/63/175, para. 81). It must be recognized that 200 years ago this model was a socially and morally progressive way to deal with punishment, as it emphasized rehabilitation and attempted to substitute for the death penalty, limb amputations and other penalties then prevalent.

24.   States around the world continue to use solitary confinement extensively (see A/63/175, para. 78). In some countries, the use of Super Maximum Security Prisons to impose solitary confinement as a normal, rather than an "exceptional", practice for inmates is considered problematic. In the United States, for example, it is estimated that between 20,000 and 25,000 individuals are being held in isolation.[1] Another example is the extensive use of solitary confinement in relation to pretrial detention, which for many years has been an integral part of the Scandinavian prison practice.[2] Some form of isolation from the general prison population is used almost everywhere as punishment for breaches of prison discipline. Many States now use solitary confinement more routinely and for longer durations. For example, in Brazil, Law 10792 of 2003, amending the existing "Law of Penal Execution", contemplates a "differentiated" disciplinary regime in an individual cell for up to 360 days, without prejudice to extensions of similar length for new offences and up to one sixth of the prison term. In 2010, the Province of Buenos Aires in Argentina instituted a Programme of Prevention of Violent Behaviour in its prisons which consists of isolation for a minimum of nine months (the initial three months in full isolation), a term that — according to prison monitors — is frequently extended.

## C.   Definition

25.   There is no universally agreed upon definition of solitary confinement. The Istanbul Statement on the Use and Effects of Solitary Confinement defines solitary confinement as the physical isolation of individuals who are confined to their cells for 22 to 24 hours a day. In many jurisdictions, prisoners held in solitary confinement are allowed out of their cells for one hour of solitary exercise a day. Meaningful contact with other people is typically reduced to a minimum. The reduction in stimuli is not only quantitative but also qualitative. The available stimuli and the occasional social contacts are seldom freely chosen, generally monotonous, and often not empathetic.

26.  Solitary confinement is also known as "segregation", "isolation",[3] "separation", "cellular",[4] "lockdown", "Supermax", "the hole" or "Secure Housing

---

[1]  Alexandra Naday, Joshua D. Freilich and Jeff Mellow, "The Elusive Data on Supermax Confinement", *The Prison Journal*, vol. 88, issue 1, p. 69 (2008).

[2]  Peter Scharff Smith, "The effects of solitary confinement on prison inmates: a brief history and review of the literature", *Crime and Justice*, vol. 34 (2006), p. 441.

[3]  Jeffrey L. Metzner, M.D., and Jamie Fellner, "Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics", *The Journal of the American Academy of Psychiatry and the Law*, vol. 38, No. 1, pp. 104-108 (2010).

[4]  Sharon Shalev, *A Sourcebook on Solitary Confinement* (London, Mannheim Centre for Criminology, 2008), p. 1.

Unit (SHU)",[5] but all these terms can involve different factors. For the purposes of this report, the Special Rapporteur defines solitary confinement as the physical and social isolation of individuals who are confined to their cells for 22 to 24 hours a day. Of particular concern to the Special Rapporteur is prolonged solitary confinement, which he defines as any period of solitary confinement in excess of 15 days. He is aware of the arbitrary nature of the effort to establish a moment in time which an already harmful regime becomes prolonged and therefore unacceptably painful. He concludes that 15 days is the limit between "solitary confinement" and "prolonged solitary confinement" because at that point, according to the literature surveyed, some of the harmful psychological effects of isolation can become irreversible.[6]

## D.  Legal framework

27.  International and regional human rights bodies have taken different approaches to address the underlying conditions of social and physical isolation of detainees, and whether such practices constitute torture or cruel, inhuman or degrading treatment or punishment. For example, while the European Court of Human Rights has confronted solitary confinement regimes with regularity, the United Nations Human Rights Committee and the Inter-American Court of Human Rights have most extensively addressed the related phenomenon of incommunicado detention. For the purposes of this report, the Special Rapporteur will highlight the work of universal and regional human rights bodies on solitary confinement only.

### 1.  International level

**General Assembly**

28.  In 1990, the General Assembly adopted resolution 45/111, the Basic Principles for the Treatment of Prisoners. Principle 7 states that efforts to abolish solitary confinement as a punishment, or to restrict its use, should be undertaken and encouraged.

29.  In the same year, the General Assembly adopted resolution 45/113, the United Nations Rules for the Protection of Juveniles Deprived of their Liberty. In paragraph 67 the Assembly asserted that "All disciplinary measures constituting cruel, inhuman or degrading treatment shall be strictly prohibited, including ... solitary confinement or any other punishment that may compromise the physical or mental health of the juvenile concerned".

**United Nations treaty bodies**

30.  The Human Rights Committee, in paragraph 6 of its General Comment No. 20, noted that prolonged solitary confinement of the detained or imprisoned person might amount to acts prohibited by article 7 of the International Covenant on Civil

---

[5] Ken Strutin, "Solitary Confinement", LLRX.com, published on 10 August 2010.
[6] Craig Haney, "Mental Health Issues in Long-Term Solitary and 'Supermax' Confinement, Crime and Delinquency", vol. 49, No. 1, pp. 124-156.

and Political Rights.[7] In its concluding observations on Rwanda, the Human Rights Committee recommended that "The State party should put an end to the sentence of solitary confinement ..." (CCPR/C/RWA/CO/3, para. 14).

31.   The Committee against Torture has recognized the harmful physical and mental effects of prolonged solitary confinement and has expressed concern about its use, including as a preventive measure during pretrial detention, as well as a disciplinary measure. The Committee has recommended that the use of solitary confinement be abolished, particularly during pretrial detention, or at least that it should be strictly and specifically regulated by law (maximum duration, etc.) and exercised under judicial supervision, and used only in exceptional circumstances, such as when the safety of persons or property is involved (A/63/175, para. 80). The Committee has recommended that persons under the age of 18 should not be subjected to solitary confinement (CAT/C/MAC/CO/4, para. 8).

32.   The Subcommittee on Prevention of Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment has pointed out that prolonged solitary confinement may amount to an act of torture and other cruel, inhuman or degrading treatment or punishment and recommended that solitary confinement should not be used in the case of minors or the mentally disabled (CAT/OP/PRY/1, para. 185). The Subcommittee has also recommended that a medical officer should visit prisoners held in solitary confinement every day, on the understanding that such visits should be in the interests of the prisoners' health. Furthermore, prisoners held in solitary confinement for more than 12 hours should have access to fresh air for at least one hour each day (CAT/OP/PRY/1, para. 184). In view of the condition of solitary confinement, the Subcommittee has pointed out that beds and proper mattresses should be made available to all inmates, including prisoners held in solitary confinement (CAT/OP/HND/1, para. 227 (a), and CAT/OP/PRY/1, para. 280).

33.   The Committee on the Rights of the Child, in its General Comment No. 10 (2007), emphasized that "disciplinary measures in violation of article 37 [of the Convention on the Rights of the Child] must be strictly forbidden, including ... closed or solitary confinement, or any other punishment that may compromise the physical or mental health or well-being of the child concerned" (CRC/C/GC/10, para. 89). Moreover, the Committee has urged States parties to prohibit and abolish the use of solitary confinement against children (CRC/C/15/Add.151, para. 41; CRC/C/15/Add.220, para. 45 (d); and CRC/C/15/Add.232, para. 36 (a)).

## 2.   Regional level

### European Court of Human Rights

34.   In its evaluation of cases of solitary confinement, the European Court of Human Rights considers the rationale given by the State for the imposition of social and physical isolation. The Court has found violations of article 3 of the European Convention on Human Rights where States do not provide a security-based

---

[7] Human Rights Committee, International Covenant on Civil and Political Rights, General Comment No. 20 (A/47/40, annex VI.A), article 7 (Prohibition of torture, or other cruel, inhuman or degrading treatment or punishment), 10 March 1992.

justification for the use of solitary confinement.[8] In circumstances of prolonged solitary confinement, the Court has held that the justification for solitary confinement must be explained to the individual and the justification must be "increasingly detailed and compelling" as time goes on.[9]

35.   Through its jurisprudence, the European Court of Human Rights emphasizes that certain procedural safeguards must be in place during the imposition of solitary confinement, for example, monitoring a prisoner's physical well-being,[9] particularly where the individual is not in good health[10] and having access to judicial review.[11]

36.   The level of isolation imposed on an individual is essential to the European Court of Human Rights' assessment of whether instances of physical and mental isolation constitute torture or cruel, inhuman or degrading treatment or punishment. A prolonged absolute prohibition of visits from individuals from outside the prison causes suffering "clearly exceeding the unavoidable level inherent in detention".[12] However, where the individual can receive visitors and write letters,[13] have access to television, books and newspapers and regular contact with prison staff[14] or visit with clergy or lawyers on a regular basis,[15] isolation is "partial", and the minimum threshold of severity — which the European Court of Human Rights considers necessary to find a violation of article 3 of the European Convention on Human Rights — is not met. Nevertheless, the Court has emphasized that solitary confinement, even where the isolation is only partial, cannot be imposed on a prisoner indefinitely.[16]

**Inter-American System on Human Rights**

37.   The jurisprudence on solitary confinement within the Inter-American System on Human Rights is more conclusive than within the bodies discussed above. Since its earliest judgments, the Inter-American Court of Human Rights has found that certain elements of a prison regime and certain physical prison conditions in themselves constitute cruel and inhuman treatment, and therefore violate article 5 of the American Convention on Human Rights, which recognizes the right to the integrity of the person. For example, the Court held that "prolonged isolation and deprivation of communication are in themselves cruel and inhuman treatment, harmful to the psychological and moral integrity of the person and a violation of the

---

[8] *Iorgov v. Bulgaria*, Application No. 40653/98, European Court of Human Rights, para. 84 (2004); *G.B. v. Bulgaria*, Application No. 42346/98, European Court of Human Rights, para. 85 (2004).

[9] *A.B. v. Russia*, Application No. 1439/06, European Court of Human Rights, para. 108 (2010).

[10] *Palushi v. Austria*, Application No. 27900/04, European Court of Human Rights, paras. 72 and 73 (2009).

[11] *A.B. v. Russia*, para. 111.

[12] *Onoufriou v. Cyprus*, Application No. 24407/04, European Court of Human Rights, para. 80 (2010).

[13] *Ocalan v. Turkey*, Application No. 46221/99, European Court of Human Rights, para. 196 (2005).

[14] *Rohde v. Denmark*, Application No. 69332/01, European Court of Human Rights, para. 97 (2005).

[15] *Ramírez Sanchez v. France*, Application No. 59450/00, European Court of Human Rights, paras. 105, 106 and 135 (2006).

[16] Ibid., para. 145.

right of any detainee to respect for his inherent dignity as a human being".[17] The Court has additionally addressed physical conditions of detention, asserting that "isolation in a small cell, without ventilation or natural light, ... [and] restriction of visiting rights ..., constitute forms of cruel, inhuman and degrading treatment".[18]

38.   The Court has additionally recognized that solitary confinement results in psychological and physical suffering that may contribute to treatment that constitutes torture. In at least one case, the Court has identified the physical conditions of solitary confinement, including "a small cell with no ventilation or natural light", and a prison regime where a detained individual "is held for 23 and a half hours a day ..., [and] permitted to see his relatives only once a month, but could have no physical contact with them", when coupled with other forms of physical and psychological aggression, in sum may constitute physical and psychological torture.[19]

39.   In its analysis of solitary confinement, the Court has noted that even when used in exceptional circumstances, procedural safeguards must be in place. For example, "the State is obliged to ensure that the detainee enjoys the minimum and non-derogable guarantees established in the [American] Convention and, specifically, the right to question the lawfulness of the detention and the guarantee of access to effective defense during his incarceration".[20] Similarly, the Inter-American Commission on Human Rights has consistently held that all forms of disciplinary action taken against detained persons must comport with the norms of due process and provide opportunity for judicial review.[21]

## E.   States' rationale for the use of solitary confinement

40.   The justifications provided by States for the use of solitary confinement fall into five general categories:

(a)   To punish an individual (as part of the judicially imposed sentence or as part of a disciplinary regime);

(b)   To protect vulnerable individuals;

(c)   To facilitate prison management of certain individuals;

(d)   To protect or promote national security;

(e)   To facilitate pre-charge or pretrial investigations.

41.   The imposition of solitary confinement as a part of an individual's judicially imposed sentence often arises in circumstances of particularly egregious crimes or

---

[17] *Velázquez-Rodríguez v. Honduras*, Inter-American Court of Human Rights, Series C, No. 4, para. 156 (1988).

[18] *Loayza-Tamayo v. Peru*, Inter-American Court of Human Rights, Series C, No. 33, para. 58 (1997).

[19] *Cantoral-Benavides v. Peru*, Inter-American Court of Human Rights, Series C, No. 69, paras. 62 and 104 (2000).

[20] *Suárez-Rosero v. Ecuador*, Inter-American Court of Human Rights, Series C, No. 35, paras. 51-56 (1997).

[21] Inter-American Commission on Human Rights, *Report on the Situation of Human Rights in Mexico* (OEA/Ser.L/V/II.100), para. 254 (2008).

crimes against the State.[22] For instance, in some central European States, individuals convicted and sentenced to capital punishment and to life imprisonment serve their time in solitary confinement (A/64/215, para. 53). In other States, such as in Mongolia, death sentences may be commuted to life sentences spent in solitary confinement (E/CN.4/2006/6/Add.4, para. 47). The use of solitary confinement as a disciplinary measure within prisons is also well documented and is likely the most pervasive rationale for the use of solitary confinement as a form of punishment.[22] Disciplinary measures usually involve the violation of a prison rule. For instance, in Nigeria detainees are punished with solitary confinement of up to three days for disciplinary offences (A/HRC/7/3/Add.4, appendix I, para. 113). Similarly, in the Abepura Prison in Indonesia, solitary confinement for up to eight days is used as a disciplinary measure for persons who violate prison rules (A/HRC/7/3/Add.7, appendix I, para. 37).

42.   Solitary confinement is also used to separate vulnerable individuals, including juveniles, persons with disabilities, and lesbian, gay, bisexual and transgender persons, for their own protection. They may be placed in solitary confinement at their own request or at the discretion of prison officials.[23]

43.   State officials also use solitary confinement as a tool to manage certain prison populations. Individuals determined to be dangerous, such as gang members, or at high risk of escape may be placed in solitary confinement.[23] Similarly, individuals determined to be at risk of injury, such as sex offenders, informants, and former correctional or law enforcement officers, are often allowed, or encouraged, to choose voluntary solitary confinement in order to protect themselves from fellow inmates.[24] Prisoners may also be placed in some form of solitary confinement in the interests of prison management before, during or after transportation to and from cells and detention facilities.[25] While the duration of solitary confinement when used as a management tool may vary considerably, it is notable that the motivation for its imposition is pragmatic rather than punitive.

44.   Individuals determined to be terrorist suspects or national security risks are often subjected to solitary confinement as well. For instance, in Equatorial Guinea a section of the Black Beach Prison consisting of single cells is used for solitary confinement of high security prisoners (A/HRC/13/39/Add.4, appendix I). Solitary confinement can be also used as a coercive interrogation technique, and is often an integral part of enforced disappearance or incommunicado detention (A/63/175, annex). As noted within category (a) in paragraph 40 above, national security also serves as a primary reason for the imposition of solitary confinement as a result of a judicial sentence. For example, in China an individual sentenced for "unlawfully supplying State secrets or intelligence to entities outside China" was allegedly held in solitary confinement for two years of her eight-year sentence (E/CN.4/2006/6/Add.6, appendix 2, para. 26).

45.   States also use solitary confinement to isolate individuals during pre-charge or pretrial detention. In some States, such as Denmark, holding individuals in solitary

---

[22] Shalev, op. cit., p. 25.
[23] Shalev, op. cit., pp. 25 and 26.
[24] Peter Scharff Smith, "Solitary Confinement: An introduction to the Istanbul Statement on the Use and Effects of Solitary Confinement", *Journal on Rehabilitation of Torture Victims and Prevention of Torture*, vol. 18 (2008), p. 56.
[25] Shalev, op. cit., p. 26.

confinement is a regular feature of pretrial detention (A/63/175, para. 78 (i)). The purposes for the use of solitary confinement in pre-charge and pretrial detention vary widely, and include preventing the intermingling of detainees to avoid demoralization and collusion, and to apply pressure on detainees to elicit cooperation or extract a confession.[26]

## F.   Conditions of solitary confinement

46.   The administration of prisons and the conditions in which prisoners are held is governed by prison regulations and national laws, as well as by international human rights law. Fundamental norms that are binding by virtue of being treaty-based or part of customary international law are supplemented and interpreted through the United Nations Standard Minimum Rules for the Treatment of Prisoners, adopted by the Economic and Social Council in 1957. Although not directly binding, the Standard Minimum Rules are widely accepted as the universal norm for the humane treatment of prisoners.

47.   The particular conditions in which detainees are held in solitary confinement vary between institutions and jurisdictions. Most, however, have a number of physical and non-physical conditions (or a prison regime) in common.

### 1.   Physical conditions

48.   The principal physical conditions relevant to solitary confinement are cell size, presence of windows and light, and access to sanitary fixtures for personal hygiene. In practice, solitary confinement cells typically share some common features, including: location in a separate or remote part of the prison; small, or partially covered windows; sealed air quality; stark appearance and dull colours; toughened cardboard or other tamperproof furniture bolted to the floor; and small and barren exercise cages or yards (E/CN.4/2006/6/Add.3, para. 47). In some jurisdictions, prisoners in solitary confinement are held in leg irons and subjected to other physical restraints (A/HRC/13/39/Add.4, para. 76 (f)).

49.   There is no universal instrument that specifies a minimum acceptable cell size, although domestic and regional jurisdictions have sometimes ruled on the matter. According to the European Court of Human Rights in *Ramírez Sanchez v. France*, a cell measuring 6.84 square metres is "large enough" for single occupancy.[27] The Court did not elaborate on why such measures could be considered adequate; the Special Rapporteur respectfully begs to differ, especially if the single cell should also contain, at a minimum, toilet and washing facilities, bedding and a desk.

50.   The presence of windows and light is also of critical importance to the adequate treatment of detainees in solitary confinement. Under rule 11 of the Standard Minimum Rules for the Treatment of Prisoners, there should be sufficient light to enable the detainee to work or read, and windows so constructed as to allow airflow whether or not artificial ventilation is provided. However, State practice reveals that this standard is often not met. For example, in Georgia, window-

---

[26] Peter Scharff Smith, "Solitary Confinement: An introduction to the Istanbul Statement on the Use and Effects of Solitary Confinement", p. 41.

[27] *Ramírez Sanchez v. France*, Application No. 59450/00, European Court of Human Rights, para. 102 (2006).

openings in solitary confinement cells were found to have steel sheets welded to the outside bars, which restricted light and ventilation (E/CN.4/2006/6/Add.3, para. 47). In Israel, solitary confinement cells are often lit with fluorescent bulbs as their only source of light, and they have no source of fresh air.[28]

51.  Rules 12 and 13 of the Standard Minimum Rules stipulate that detention facilities should provide sufficient sanitary fixtures to allow for the personal hygiene of the detainee. Therefore, cells used for solitary confinement should contain a lavatory and wash-basin within the cell.[29] In its 2006 report on Greece, the European Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment observed that isolation cells in the Komotini Prison failed to meet the necessary minimum standard for sanitary fixtures because detainees were forced to use the toilet for a wash-basin as well.[30] Other environmental factors, such as temperature, noise level, privacy, and soft materials for cell furnishings may also be implicated in the solitary confinement setting.

## 2.  Prison regime

52.  The principal aspects of a prison regime relevant to an assessment of the conditions of solitary confinement include access to outdoor exercise and programming, access to meaningful human contact within the prison, and contact with the outside world. In accordance with rule 21 of the Standard Minimum Rules for the Treatment of Prisoners, every prisoner who is not employed in outdoor work shall have at least one hour of suitable exercise in the open air daily if the weather permits. Similarly, the European Committee for the Prevention of Torture emphasizes that all prisoners without exception should be afforded the opportunity to have one hour of open-air exercise per day.[31] However, State practice indicates that these standards are not always observed. In Jordan, for example, a detainee was allowed outside of his solitary confinement cell for only one hour per week (A/HRC/4/33/Add.3, appendix, para. 21). In *Poltrotsky v. Ukraine*, the European Court of Human Rights found that a lack of opportunity for outdoor exercise, coupled with a lack of access to natural light, constitutes a violation of article 3 of the European Convention on Human Rights.[32]

53.  Access to meaningful human contact within the prison and contact with the outside world are also essential to the psychological health of detainees held in solitary confinement, especially those held for prolonged periods of time. Within prisons this contact could be with health professionals, prison guards or other prisoners. Contact with the outside world could include visits, mail, and phone calls from legal counsel, family and friends, and access to reading material, television or radio. Article 17 of the International Covenant on Civil and Political Rights grants prisoners the right to family and correspondence. Additionally, the Standard Minimum Rules for the Treatment of Prisoners provide for various external stimuli

---

[28] Solitary Confinement of Prisoners and Detainees in Israeli Prisons, Joint Project of Adalah, Al Mezan (Gaza) and Physicians for Human Rights (Israel, June 2011).

[29] Shalev, op. cit., p. 42.

[30] Council of Europe, Committee for the Prevention of Torture, Report to the Government of Greece on the visit to Greece carried out by the European Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment, 20 December 2006 (CPT/Inf (2006)), p. 41.

[31] Council of Europe, "CPT Standards" (CPT/Inf/E (2002) 1 — Rev. 2010), sect. II, para. 48.

[32] *Poltrotsky v. Ukraine*, p. 146 (European Court of Human Rights, 2006-V).

(articles 21 on exercise and sport; 37-39 on contact with the outside world; 40 on books; 41 and 42 on religion; 71-76 on work; 77 and 78 on education and recreation; and 79-81 on social relations and after-care).

### 3. Social isolation

54. Solitary confinement reduces meaningful social contact to an absolute minimum. The level of social stimulus that results is insufficient for the individual to remain in a reasonable state of mental health.[33]

55. Research shows that deprived of a sufficient level of social stimulation, individuals soon become incapable of maintaining an adequate state of alertness and attention to their environment. Indeed, even a few days of solitary confinement will shift an individual's brain activity towards an abnormal pattern characteristic of stupor and delirium.[34] Advancements in new technologies have made it possible to achieve indirect supervision and keep individuals under close surveillance with almost no human interaction. The European Court of Human Rights has recognized that "complete sensory isolation, coupled with total social isolation, can destroy the personality and constitutes a form of inhuman treatment which cannot be justified by the requirements of security or any other reason".[35]

56. According to the European Court of Human Rights, States should also take steps to reduce the negative impact of solitary confinement.[36] Where the damaging effects of solitary confinement on a particular individual are known, the regime cannot continue.[37] The conditions of confinement are relevant in this respect, because where conditions are beyond reproach, the Court considers it unlikely that the minimum threshold of severity to find a violation of article 3 will be reached.[38] Routine examination by doctors can be a factor in determining that there was no violation of article 3.[39]

## G. Prolonged or indefinite solitary confinement

57. The use of prolonged or indefinite solitary confinement has increased in various jurisdictions, especially in the context of the "war on terror" and "a threat to national security". Individuals subjected to either of these practices are in a sense in a prison within a prison and thus suffer an extreme form of anxiety and exclusion, which clearly supersede normal imprisonment. Owing to their isolation, prisoners held in prolonged or indefinite solitary confinement can easily slip out of sight of

---

[33] Peter Scharff Smith, "The effects of solitary confinement on prison inmates", *Crime and Justice*, vol. 34 (2006), p. 449.

[34] Stuart Grassian, "Psychiatric Effects of Solitary Confinement", *Journal of Law and Policy*, vol. 22 (2006), p. 325.

[35] *Ilaşcu and others v. Moldova and Russia*, Application No. 48787/99, European Court of Human Rights (2004), para. 432.

[36] *Mathew v. Netherlands*, Application No. 24919/03, para. 202.

[37] *G.B. v. Bulgaria*, para. 85.

[38] *Valasinas v. Lithuania*, Application No. 44558/98, European Court of Human Rights, para. 112 (2001); *Ocalan v. Turkey*, para. 193.

[39] *Rohde v. Denmark*, para. 97.

A/66/268

justice, and safeguarding their rights is therefore often difficult, even in States where there is a strong adherence to rule of law.[40]

58.   When a State fails to uphold the Standard Minimum Rules for the Treatment of Prisoners during a short period of time of solitary confinement, there may be some debate on whether the adverse effects amount to cruel, inhuman or degrading treatment or punishment or torture. However, the longer the duration of solitary confinement or the greater the uncertainty regarding the length of time, the greater the risk of serious and irreparable harm to the inmate that may constitute cruel, inhuman or degrading treatment or punishment or even torture.

59.   The feeling of uncertainty when not informed of the length of solitary confinement exacerbates the pain and suffering of the individuals who are subjected to it. In some instances, individuals may be held indefinitely during pretrial detention, increasing the risk of other forms of cruel, inhuman or degrading treatment or punishment or torture (CAT/C/DNK/CO/5, para. 14).

60.   Most studies fail to specify the length of time after which solitary confinement becomes prolonged. While the term may be undefined, detainees can be held in solitary confinement from a few weeks to many years. For example, in Kazakhstan, individuals can be held in solitary confinement for more than two months (A/HRC/13/39/Add.3, para. 117). Some detainees have been held in solitary confinement facilities for years, without any charge and without trial, and in secret detention centres where isolation is used as an integral part of interrogation practices.[41] In a joint report on the situation of detainees at Guantánamo Bay, experts found that although 30 days of isolation was the maximum period permissible, some detainees were returned to isolation after very short breaks over a period of up to 18 months (E/CN.4/2006/120, para. 53).

61.   There is no international standard for the permitted maximum overall duration of solitary confinement. In *A.B. v. Russia*, the European Court of Human Rights held that detaining an individual in solitary confinement for three years constituted a violation of article 3 of the European Convention on Human Rights.[42] By contrast, in the United States of America, it is reported that two prisoners have been held in solitary confinement in a Louisiana prison for 40 years after failed attempts at judicial appeal of the conditions of their confinement.[43] As explained in paragraph 26 above, the Special Rapporteur finds that solitary confinement exceeding 15 days is prolonged.

## H.   Psychological and physiological effects of solitary confinement

62.   Negative health effects can occur after only a few days in solitary confinement, and the health risks rise with each additional day spent in such conditions. Experts who have examined the impact of solitary confinement have found three common elements that are inherently present in solitary confinement —

---

[40] Peter Scharff Smith, "Solitary Confinement: An introduction to the Istanbul Statement on the Use and Effects of Solitary Confinement", p. 1.

[41] Shalev, op. cit., p. 2.

[42] *A.B. v. Russia*, Application No. 1439/06, European Court of Human Rights, para. 135 (2010).

[43] "USA: The Cruel and Inhumane Treatment of Albert Woodfox and Herman Wallace", Amnesty International (2001).

social isolation, minimal environmental stimulation and "minimal opportunity for social interaction".[44] Research further shows that solitary confinement appears to cause "psychotic disturbances," a syndrome that has been described as "prison psychoses".[45] Symptoms can include anxiety, depression, anger, cognitive disturbances, perceptual distortions, paranoia and psychosis and self-harm (see annex for a comprehensive list of symptoms).

63.   Some individuals experience discrete symptoms while others experience a "severe exacerbation of a previously existing mental condition or the appearance of a mental illness where none had been observed before".[46] Still, a significant number of individuals will experience serious health problems regardless of the specific conditions, regardless of time and place, and regardless of pre-existing personal factors.

### I.    Latent effects of solitary confinement

64.   There is a lack of research into the latent effects of solitary confinement. While the acute effects of solitary confinement generally recede after the period of solitary confinement ends, some of the negative health effects are long term. The minimal stimulation experienced during solitary confinement can lead to a decline in brain activity in individuals after seven days. One study found that "up to seven days, the [brain activity] decline is reversible, but if deprived over a long period this may not be the case".[47]

65.   Studies have found continued sleep disturbances, depression, anxiety, phobias, emotional dependence, confusion, impaired memory and concentration long after the release from isolation. Additionally, lasting personality changes often leave individuals formerly held in solitary confinement socially impoverished and withdrawn, subtly angry and fearful when forced into social interaction.[48] Intolerance of social interaction after a period of solitary confinement is a handicap that often prevents individuals from successfully readjusting to life within the broader prison population and severely impairs their capacity to reintegrate into society when released from imprisonment.[49]

### J.    Vulnerable individuals

#### 1.    Juveniles

66.   United Nations treaty bodies consistently recommend that juvenile offenders, children or minors should not be subjected to solitary confinement (CAT/C/MAC/CO/4, para. 8; CAT/OP/PRY/1, para. 185; CRC/C/15/Add.151, para. 41; and CRC/C/15/Add.232, para. 36 (a)). Juveniles are often held in solitary confinement either as a disciplinary measure, or to separate them from the adult inmate population, as international human rights law prohibits the intermingling of

---

[44] Stuart Grassian, "Psychiatric Effects of Solitary Confinement" (1993), p. 1.
[45] Ibid., p. 8.
[46] Ibid., p. 2.
[47] Ibid., p. 20.
[48] Shalev, op. cit., pp. 13 and 22.
[49] Stuart Grassian, "Psychiatric Effects of Solitary Confinement", pp. 332 and 333.

juvenile and adult prison populations.[50] Regrettably, solitary confinement as a form of punishment of juvenile detainees has been prevalent in States such as Jamaica (A/HRC/16/52/Add.3, para. 211), Paraguay (A/HRC/7/3/Add.3, appendix I, para. 46) and Papua New Guinea (A/HRC/16/52/Add.5, appendix). In regard to disciplinary measures, a report has indicated that solitary confinement does not reduce violence among juvenile offenders detained in the youth prison.[51]

### 2.  Persons with disabilities

67.   Persons with disabilities are held in solitary confinement in some jurisdictions as a substitute for proper medical or psychiatric care or owing to the lack of other institutional housing options. These individuals may not necessarily pose danger to others or to themselves, but they are vulnerable to abuse and often regarded as a disturbance to other prisoners and prison staff.[52]

68.  Research has shown that with respect to mental disabilities, solitary confinement often results in severe exacerbation of a previously existing mental condition.[53] Prisoners with mental health issues deteriorate dramatically in isolation.[54] The adverse effects of solitary confinement are especially significant for persons with serious mental health problems which are usually characterized by psychotic symptoms and/or significant functional impairments.[55] Some engage in extreme acts of self-mutilation and even suicide.[54]

### 3.  Lesbian, gay, bisexual and transgender

69.  Lesbian, gay, bisexual and transgender individuals are often subjected to solitary confinement as a form of "protective custody".[56] Although segregation of such individuals may be necessary for their safety, lesbian, gay, bisexual and transgender status does not justify limitations on their social regime, e.g., access to recreation, reading materials, legal counsel or medical doctors.

## K.  When solitary confinement amounts to torture and other cruel, inhuman or degrading treatment or punishment

70.   Because of the absence of witnesses, solitary confinement increases the risk of acts of torture and other cruel, inhuman or degrading treatment or punishment. Given its severe adverse health effects, the use of solitary confinement itself can amount to acts prohibited by article 7 of the International Covenant on Civil and

---

[50] Article 37(c), Convention on the Rights of the Child; article 8(d), United Nations Standard Minimum Rules for the Treatment of Prisoners.

[51] Robert Wildeboer, "The Impact of Solitary Confinement in a Youth Prison", *Inside and Out* (Chicago, 2010).

[52] Shalev, op. cit., p. 26.

[53] Stuart Grassian, "Psychiatric Effects of Solitary Confinement"; Shalev, op. cit., p. 10.

[54] American Civil Liberties Union, "Abuse of the Human Rights of Prisoners in the United States: Solitary Confinement" (2011).

[55] Jeffrey L. Metzner, M.D., and Jamie Fellner, "Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics", *The Journal of the American Academy of Psychiatry and the Law*, vol. 38, No. 1, pp. 104-108 (2010).

[56] Heartland Alliance National Immigrant Justice Center, letter to the Special Rapporteur on torture dated 16 June 2011.

Political Rights, torture as defined in article 1 of the Convention against Torture or cruel, inhuman or degrading punishment as defined in article 16 of the Convention.

71.   The assessment of whether solitary confinement amounts to torture and other cruel, inhuman or degrading treatment or punishment should take into consideration all relevant circumstances on a case-by-case basis. These circumstances include the purpose of the application of solitary confinement, the conditions, length and effects of the treatment and, of course, the subjective conditions of each victim that make him or her more or less vulnerable to those effects. In this section, the report discusses a few circumstances where the use of solitary confinement constitutes torture and other cruel, inhuman or degrading treatment or punishment.

72.   Solitary confinement, when used for the purpose of punishment, cannot be justified for any reason, precisely because it imposes severe mental pain and suffering beyond any reasonable retribution for criminal behaviour and thus constitutes an act defined in article 1 or article 16 of the Convention against Torture, and a breach of article 7 of the International Covenant on Civil and Political Rights. This applies as well to situations in which solitary confinement is imposed as a result of a breach of prison discipline, as long as the pain and suffering experienced by the victim reaches the necessary severity.

73.   While physical and social segregation may be necessary in some circumstances during criminal investigations, the practice of solitary confinement during pretrial detention creates a de facto situation of psychological pressure which can influence detainees to make confessions or statements against others and undermines the integrity of the investigation. When solitary confinement is used intentionally during pretrial detention as a technique for the purpose of obtaining information or a confession, it amounts to torture as defined in article 1 or to cruel, inhuman or degrading treatment or punishment under article 16 of the Convention against Torture, and to a breach of article 7 of the International Covenant on Civil and Political Rights.

74.   Where the physical conditions of solitary confinement are so poor and the regime so strict that they lead to severe mental and physical pain or suffering of individuals who are subjected to the confinement, the conditions of solitary confinement amount to torture or to cruel and inhuman treatment as defined in articles 1 and 16 of the Convention, and constitute a breach of article 7 of the Covenant.

75.   The use of solitary confinement can be accepted only in exceptional circumstances where its duration must be as short as possible and for a definite term that is properly announced and communicated. Given the harmful effects of indefinite solitary confinement, its potential use to extract information or confession during pretrial detention, and the fact that uncertainty prevents the use of remedies to challenge it, the Special Rapporteur finds that indefinite imposition of solitary confinement violates the right to due process of the concerned individual (article 9 of the Covenant, articles 1 or 16 of the Convention, and article 7 of the Covenant).

76.   The Special Rapporteur asserts that social isolation is contrary to article 10, paragraph 3, of the International Covenant on Civil and Political Rights, which states that "The penitentiary system shall comprise treatment of prisoners the essential aim of which shall be their reformation and social rehabilitation" (General Assembly resolution 2200 (XXI), annex). Long periods of isolation do not aid the

rehabilitation or re-socialization of detainees (E/CN.4/2006/6/Add.4, para. 48). The adverse acute and latent psychological and physiological effects of prolonged solitary confinement constitute severe mental pain or suffering. Thus the Special Rapporteur concurs with the position taken by the Committee against Torture in its General Comment No. 20 that prolonged solitary confinement amounts to acts prohibited by article 7 of the Covenant, and consequently to an act as defined in article 1 or article 16 of the Convention. For these reasons, the Special Rapporteur reiterates that, in his view, any imposition of solitary confinement beyond 15 days constitutes torture or cruel, inhuman or degrading treatment or punishment, depending on the circumstances. He calls on the international community to agree to such a standard and to impose an absolute prohibition on solitary confinement exceeding 15 consecutive days.

77.   With respect to juveniles, the Declaration of the Rights of the Child and the Preamble of the Convention on the Rights of the Child state that, given their physical and mental immaturity, juveniles need special safeguards and care, including appropriate legal protection. Article 19 of the Convention on the Rights of the Child (General Assembly resolution 44/25) requires States Parties to "take all appropriate legislative, administrative, social and educational measures to protect the child from all forms of physical or mental violence …" In its General Comment No. 8, the Committee on the Rights of the Child indicated that "There is no ambiguity: 'all forms of physical or mental violence' does not leave room for any level of legalized violence against children" (CRC/C/GC/8, para. 18). Paragraph 67 of the United Nations Rules for the Protection of Juveniles Deprived of their Liberty, adopted by the General Assembly in resolution 45/113 of 14 December 1990, states that "All disciplinary measures constituting cruel, inhuman or degrading treatment shall be strictly prohibited, including ... solitary confinement or any other punishment that may compromise the physical or mental health of the juvenile concerned" (see also CRC/C/GC/10, para. 89). Thus the Special Rapporteur holds the view that the imposition of solitary confinement, of any duration, on juveniles is cruel, inhuman or degrading treatment and violates article 7 of the International Covenant on Civil and Political Rights and article 16 of the Convention against Torture.

78.   The right of persons with mental disabilities to be treated with humanity and with respect for the inherent dignity guaranteed under article 10 of the Covenant should be interpreted in light of the Principles for the Protection of Persons with Mental Illness and for the Improvement of Mental Health Care, adopted by the General Assembly on 17 December 1991 (resolution 46/119, annex). Given their diminished mental capacity and that solitary confinement often results in severe exacerbation of a previously existing mental condition, the Special Rapporteur believes that its imposition, of any duration, on persons with mental disabilities is cruel, inhuman or degrading treatment and violates article 7 of the Covenant and article 16 of the Convention.

## IV.   Conclusions and recommendations

### Conclusions

79.   **The Special Rapporteur stresses that solitary confinement is a harsh measure which may cause serious psychological and physiological adverse**

A/66/268

effects on individuals regardless of their specific conditions. He finds solitary confinement to be contrary to one of the essential aims of the penitentiary system, which is to rehabilitate offenders and facilitate their reintegration into society. The Special Rapporteur defines prolonged solitary confinement as any period of solitary confinement in excess of 15 days.

80.    Depending on the specific reason for its application, conditions, length, effects and other circumstances, solitary confinement can amount to a breach of article 7 of the International Covenant on Civil and Political Rights, and to an act defined in article 1 or article 16 of the Convention against Torture. In addition, the use of solitary confinement increases the risk that acts of torture and other cruel, inhuman or degrading treatment or punishment will go undetected and unchallenged.

81.    Considering the severe mental pain or suffering solitary confinement may cause when used as a punishment, during pretrial detention, indefinitely or for a prolonged period, for juveniles or persons with mental disabilities, it can amount to torture or cruel, inhuman or degrading treatment or punishment. The Special Rapporteur is of the view that where the physical conditions and the prison regime of solitary confinement fail to respect the inherent dignity of the human person and cause severe mental and physical pain or suffering, it amounts to cruel, inhuman or degrading treatment or punishment.

**Recommendations**

82.    The Special Rapporteur calls upon States to respect and protect the rights of persons deprived of liberty while maintaining security and order in places of detention. He recommends that States conduct regular reviews of the system of solitary confinement. In this context, the Special Rapporteur reiterates that States should refer to the Istanbul Statement on the Use and Effects of Solitary Confinement as a useful tool in efforts to promote the respect and protection of the rights of detainees.

83.    The Special Rapporteur calls upon States to ensure that all persons deprived of their liberty are treated with humanity and respect for the inherent dignity of the human person as protected by article 10, paragraph 1, of the International Covenant on Civil and Political Rights. The Special Rapporteur refers to the Standard Minimum Rules for the Treatment of Prisoners and recommends that States increase the level of psychological, meaningful social contact for detainees while in solitary confinement.

84.    The Special Rapporteur urges States to prohibit the imposition of solitary confinement as punishment — either as a part of a judicially imposed sentence or a disciplinary measure. He recommends that States develop and implement alternative disciplinary sanctions to avoid the use of solitary confinement.

85.    States should take necessary steps to put an end to the practice of solitary confinement in pretrial detention. The use of solitary confinement as an extortion technique during pretrial detention should be abolished. States should adopt effective measures at the pretrial stage to improve the efficiency of investigation and introduce alternative control measures in order to segregate individuals, protect ongoing investigations, and avoid detainee collusion.

11-44570

86.    **States should abolish the use of solitary confinement for juveniles and persons with mental disabilities. Regarding disciplinary measures for juveniles, the Special Rapporteur recommends that States should take other measures that do not involve the use of solitary confinement. In regard to the use of solitary confinement for persons with mental disabilities, the Special Rapporteur emphasizes that physical segregation of such persons may be necessary in some cases for their own safety, but solitary confinement should be strictly prohibited.**

87.    **Indefinite solitary confinement should be abolished.**

88.    **It is clear that short-term solitary confinement can amount to torture or cruel, inhuman or degrading treatment or punishment; it can, however, be a legitimate device in other circumstances, provided that adequate safeguards are in place. In the opinion of the Special Rapporteur, prolonged solitary confinement, in excess of 15 days, should be subject to an absolute prohibition.**

89.    **The Special Rapporteur reiterates that solitary confinement should be used only in very exceptional circumstances, as a last resort, for as short a time as possible. He emphasizes that when solitary confinement is used in exceptional circumstances, minimum procedural safeguards must be followed. These safeguards reduce the chances that the use of solitary confinement will be arbitrary or excessive, as in the case of prolonged or indefinite confinement. They are all the more important in circumstances of detention where due process protections are often limited, as in administrative immigration detention. Minimum procedural safeguards should be interpreted in a manner that provides the greatest possible protection of the rights of detained individuals. In this context, the Special Rapporteur urges States to apply the following guiding principles and procedural safeguards.**

*Guiding principles*

90.    **Throughout the period of detention, the physical conditions and prison regime of the solitary confinement, and in particular the duration of confinement, must be proportional to the severity of the criminal or disciplinary infraction for which solitary confinement is imposed.**

91.    **The physical conditions and prison regime of solitary confinement must be imposed only as a last resort where less restrictive measures could not achieve the intended disciplinary goals.**

92.    **Solitary confinement must never be imposed or allowed to continue except where there is an affirmative determination that it will not result in severe pain or suffering, whether physical or mental, giving rise to acts as defined in article 1 or article 16 of the Convention against Torture.**

93.    **All assessments and decisions taken with respect to the imposition of solitary confinement must be clearly documented and readily available to the detained persons and their legal counsel. This includes the identity and title of the authority imposing solitary confinement, the source of his or her legal attributes to impose it, a statement of underlying justification for its imposition, its duration, the reasons for which solitary confinement is determined to be appropriate in accordance with the detained person's mental and physical health, the reasons for which solitary confinement is determined to be**

proportional to the infraction, reports from regular review of the justification for solitary confinement, and medical assessments of the detained person's mental and physical health.

*Internal safeguards*

94.    From the moment that solitary confinement is imposed, through all stages of its review and decisions of extension or termination, the justification and duration of the solitary confinement should be recorded and made known to the detained person. Additionally, the detained person should be informed of what he or she must do to be removed from solitary confinement. In accordance with rule 35 of the Standard Minimum Rules for the Treatment of Prisoners, the detained person must receive this information in plain language that he or she understands. This information must additionally be provided to any legal representative of the detained person.

95.    A documented system of regular review of the justification for the imposition of solitary confinement should be in place. The review should be conducted in good faith and carried out by an independent body. Any change in the factors that justified the imposition of solitary confinement should immediately trigger a review of the detained person's solitary confinement. All review processes must be documented.

96.    Persons held in solitary confinement must be provided with a genuine opportunity to challenge both the nature of their confinement and its underlying justification through a process of administrative review. At the outset of the imposition of solitary confinement, detained persons must be informed of their alleged criminal or disciplinary infraction for which solitary confinement is being imposed and must immediately have an opportunity to challenge the reasons for their detention. Following the imposition of solitary confinement, detained persons must have the opportunity to file a complaint to prison management through an internal or administrative complaints system.

97.    There shall be no limitations imposed on the request or complaint, such as requiring evidence of both mental or emotional suffering and physical suffering. Prison officials have an obligation to address all requests or complaints promptly, informing the detained person of the outcome. All internal administrative findings must be subject to external appeal through judicial processes.

*External safeguards*

98.    Detained persons held in solitary confinement must be afforded genuine opportunities to challenge both the nature of their confinement and its underlying justification through the courts of law. This requires a right to appeal all final decisions by prison authorities and administrative bodies to an independent judicial body empowered to review both the legality of the nature of the confinement and its underlying justification. Thereafter, detained persons must have the opportunity to appeal these judgements to the highest authority in the State and, after exhaustion of domestic remedies, seek review by regional or universal human rights bodies.

A/66/268

99.  **Individuals must have free access to competent legal counsel throughout the period in which they are held in solitary confinement. Where necessary to facilitate complete and open communication between a detainee and his or her legal counsel, access to an interpreter must be provided.**

100.  **There should be a documented system of regular monitoring and review of the inmate's physical and mental condition by qualified medical personnel, both at the initiation of solitary confinement and on a daily basis throughout the period in which the detained person remains in solitary confinement, as required by rule 32, paragraph 3, of the Standard Minimum Rules for the Treatment of Prisoners. Medical personnel monitoring detained persons should have specialized training in psychological assessment and/or the support of specialists in psychology. Additionally, medical personnel must be independent and accountable to an authority outside of the prison administration. Preferably, they should belong to the general national health structure. Any deterioration of the inmate's mental or physical condition should trigger a presumption that the conditions of confinement are excessive and activate an immediate review.**

101.  **Medical personnel should additionally inspect the physical conditions of the inmate's confinement in accordance with article 26 of the Standard Minimum Rules for the Treatment of Prisoners. Relevant considerations include the level of hygiene and cleanliness of the facility and the inmate, heating, lighting and ventilation of the cell, suitability of clothing and bedding, adequate supply of food and water and observance of the rules concerning physical exercise.**

## Annex

### Effects of solitary confinement

Many symptoms may present themselves in individuals held in solitary confinement, both concurrent with their solitary confinement and after the period of solitary confinement has terminated. The following list prepared by Dr. Sharon Shalev[a] demonstrates a range of possible symptoms.

*Anxiety*, ranging from feelings of tension to full-blown panic attacks

- Persistent low level of stress

- Irritability or anxiousness

- Fear of impending death

- Panic attacks

*Depression*, varying from low mood to clinical depression

- Emotional flatness/blunting — loss of ability to have any "feelings"

- Mood swings

- Hopelessness

- Social withdrawal; loss of initiation of activity or ideas; apathy; lethargy

- Major depression

*Anger*, ranging from irritability to full-blown rage

- Irritability and hostility

- Poor impulse control

- Outbursts of physical and verbal violence against others, self and objects

- Unprovoked anger, sometimes manifested as rage

*Cognitive disturbances*, ranging from lack of concentration to confused state

- Short attention span

- Poor concentration

- Poor memory

- Confused thought processes; disorientation

*Perceptual distortions*, ranging from hypersensitivity to hallucinations

- Hypersensitivity to noises and smells

- Distortions of sensation (e.g., walls closing in)

- Disorientation in time and space

---

[a] Sharon Shalev, *A Sourcebook on Solitary Confinement* (London, Mannheim Centre for Criminology, 2008), pp. 15-17; also Peter Scharff Smith, "The effects of solitary confinement on prison inmates: a brief history and review of the literature", *Crime and Justice*, vol. 34 (2006), p. 441.

- Depersonalization/derealization
- Hallucinations affecting all five senses (e.g., hallucinations of objects or people appearing in the cell, or hearing voices when no one is actually speaking)

*Paranoia and psychosis*, ranging from obsessional thoughts to full-blown psychosis

- Recurrent and persistent thoughts (ruminations), often of a violent and vengeful character (e.g., directed against prison staff)
- Paranoid ideas — often persecutory
- Psychotic episodes or states: psychotic depression, schizophrenia

*Self-harm*, self-directed aggression

- Self-mutilation and cutting
- Suicide attempts

---