## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| HENRY DAVIS, et al.,        ) | |
|          ) | |
|         Plaintiffs,    ) | |
|          ) | |
| vs.          ) | Case No. 3:16-CV-600-MAB |
|          ) | |
| JOHN BALDWIN,       ) | |
|          ) | |
|         Defendant.    ) | |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

This matter is currently before the Court on Plaintiffs' motion for class certification (Doc. 173) and Defendant's motions for leave to submit supplemental authority and/or evidence (Docs. 225, 227).

## INTRODUCTION

Plaintiffs are six inmates who have been housed in segregation at various facilities throughout the Illinois Department of Corrections (IDOC). They filed this two-count putative class action alleging that the IDOC's use of segregation, which they claim is tantamount to "extreme isolation,"[1] violates constitutional standards. Defendant is John Baldwin, who was the acting director of the IDOC at the time this lawsuit was filed on June 2, 2016.[2] Plaintiffs allege in Count 1 that the conditions they are subjected to in

---

[1] The meaning of the term "extreme isolation" is discussed below in the "Factual Background" section.

[2] Plaintiffs sued John Baldwin in his official capacity as Acting Director of the Illinois Department of Corrections (Doc. 1, p. 8). In June 2019, Baldwin was replaced by Rob Jeffreys, who is the current Acting Director of IDOC. Pursuant to Federal Rule of Civil Procedure 25(d), Rob Jeffreys is automatically substituted as a party to this action.

extreme isolation deprive them of basic human needs and inflict disproportionate punishment in violation of the Eighth Amendment (Doc. 1, pp. 61–63). In Count 2, Plaintiffs allege they have a protected liberty interest in avoiding extreme isolation and the IDOC's hearing and review procedures for prisoners sentenced to extreme isolation are devoid of the due process protections guaranteed by the Fourteenth Amendment (*Id.* at pp. 63–64).

Plaintiffs filed their motion for class certification on September 6, 2019 (Docs. 173, 174, 175, 176, 177, 222).[3] They seek to certify the following class:

> All prisoners who are now or will be incarcerated in adult correctional facilities by the Illinois Department of Corrections and thus who are at risk of being subjected to extreme isolation or who are currently subjected to extreme isolation.

(Doc. 173).

Defendant filed his response in opposition on December 20, 2019 (Docs. 190, 191, 192, 193, 194). Plaintiffs filed their reply on February 14, 2020 (Doc. 197, 198, 224). The undersigned was not able to hear oral arguments until July 16, 2020 due to interruptions in court proceedings caused by the COVID-19 pandemic. Following oral argument, the motion for class certification was taken under advisement, (Docs. 219, 220), and the parties submitted proposed findings of fact and conclusions of law. Since then, Defendant

---

[3] Plaintiffs initially submitted both an unsealed, redacted version of their supporting memorandum and exhibits (Doc. 174, Doc. 175) and a sealed, unredacted version (Doc. 176, Doc. 177). After the Court expressed reservations as to whether all of the redacted information and sealed exhibits truly warranted confidentiality (Doc. 219, Doc. 220; *see also* Doc. 221), the parties conferred and agreed that many of the redactions were unnecessary and a number of exhibits could also be unsealed (*see* Doc. 221). Following additional rulings and instructions from the Court, Plaintiffs filed a new public, redacted version of their supporting memorandum, exhibits, exhibit list, and reply brief (Docs. 222, 223, 224). The Court cites to the newer versions of these documents throughout this Order.

John Baldwin has filed two motions for leave to supplement his response brief (Docs. 225, 227). Plaintiffs oppose both motions (Docs. 226, 229).

### MISCELLANEOUS HOUSEKEEPING MATTERS

Plaintiffs' complaint references seven exhibits (A through G), including several documents pertaining to the Vera Institute's work with the IDOC regarding its segregation policies and recommendations for reform (*see* Doc. 1). A subsequent Stipulation and Order signed by the parties regarding the Vera Institute's work also refers back and cites to some of the complaint's exhibits (*see* Doc. 115). However, none of those exhibits were actually filed with the complaint. The Court assumes this was simply the result of an unintentional oversight (*see* Doc. 1). In order to correct the omission, Plaintiffs should file the exhibits as a new entry on the docket, and the Court will link it back to the complaint on the docket.

Similarly, Eldon Vail's expert report indicates that there is an Appendix A and an Appendix B attached to the report, however, neither of the Appendices were included with any version of the filed report (*see* Doc. 174-4; Doc. 176-4; Doc. 222-4). In order to correct the omission, Plaintiffs should submit a new public, redacted version of the report (including the Appendices) directly to the Court at MABpd@ilsd.uscourts.gov. The Court will then replace the existing report at Doc. 222-4 with the new report. If there is information in the Appendices that must be kept confidential, Plaintiffs should also submit an unredacted version of the report (including the unredacted Appendices), which the Court will use to replace the existing sealed version at Doc. 176-4.

Finally, per the Court's previous instructions, the initial versions of Plaintiffs' unsealed, redacted memorandum, their exhibit list, and their reply brief will be stricken from the docket with a note that updated versions were subsequently filed (*see* Doc. 221).

If the parties have any questions regarding these instructions, they may jointly contact chambers.

## MOTIONS TO SUPPLEMENT (Docs. 225, 227)

Defendant seeks to provide the Court with additional authority. First, Defendant wants to submit the opinions issued by the Seventh Circuit in *McFields v. Dart*, 982 F.3d 511 (7th Cir. 2020) and *Howard v. Cook County Sheriff's Office*, 989 F.3d 587 (7th Cir. 2021) as supplemental authority (Doc. 225, Doc. 227). But these opinions are not new authority that changes the law governing Plaintiffs' class action. *See* SDIL-LR 7.1. They are simply the latest opinions from the Seventh Circuit about a class action in the prison context. Although Plaintiffs object to Defendant's attempts to submit these new opinions as supplemental authority (Docs. 226, 229), the Court notes they also previously submitted supplemental authority (Doc. 209). Plaintiffs, however, filed it as a "notice," rather than as a motion (*Id.*). In other words, they simply submitted their supplemental authority without first asking the Court's permission to do so, like Defendant has here. Defendant filed a response in opposition to Plaintiffs' "notice," and asked the Court to strike it (Doc. 211), however, the Court opted not to take any action. Ultimately here, what is good for the goose is good for the gander, and therefore the Court will allow Defendant to supplement the record with their additional authority. The Court will review the *McFields* and *Howard* decisions but does not need any further briefing from the parties.

4

Defendant also seeks to provide the Court with additional evidence concerning the IDOC's continued efforts to review and revise its restrictive housing policies, which he says bears on his argument that there is no basis for class-wide relief under Rule 23(b)(2) (Doc. 225). Specifically, Defendant wants to submit the new Administrative Directive pertaining to restrictive housing (AD 05.15.100) that was enacted in October 2020 (*Id.*; *see* Doc. 225-3). Defendant contends "has contributed to a sharp decrease in the numbers of segregation prisoners"[4] (Doc. 225). Defendant also wants to submit updated data from December 31, 2020 showing the year-end segregation numbers (Doc. 225; *see* Doc. 225-4).

This request is denied. Defendant did not provide any explanation as to how the new policy actually led to a consequent reduction in the number of prisoners held in restrictive housing (*see* Doc. 225). The Court is not going to scrutinize the 17-page policy to try to draw its own conclusions about the cause-effect relationship between the policy and the reduced population in restrictive housing. Furthermore, the simple fact that the IDOC is housing fewer prisoners in restrictive housing does not somehow defeat class certification. It simply means that a smaller, although still substantial, number of prisoners are currently being subjected to the purported unconstitutional procedures and conditions of confinement regarding restrictive housing.

---

[4] This is the only reason Defendant provided for his desire to supplement the record with the new Administrative Directive (*see* Doc. 225). Defendant did not mention any other aspect of the Administrative Directive, such as any changes to the process by which prisoners are sent to restrictive housing or the conditions of confinement in restrictive housing (*see* Doc. 225). Consequently, the Court has not reviewed the Administrative Directive for those type of facts and they do not factor into the Court's decision as to whether Defendant should be allowed to supplement the record with the Administrative Directive.

For these reasons, Defendant's first motion to supplement is granted in part and denied in part, and the second motion to supplement is granted.

## MOTION FOR CLASS CERTIFICATION (Doc. 173)

The parties submitted extensive briefing and evidence in this matter. There were almost 100 exhibits, totaling approximately 2100 pages.[5] The exhibits included internal documents and records from the IDOC; depositions of at least six current or former IDOC officials, the six named Plaintiffs, and one other putative class member; and expert reports and follow-up depositions from Plaintiffs' retained expert witnesses: Dr. Craig Haney and Mr. Eldon Vail.

Dr. Craig Haney holds a PhD in psychology and a juris doctor from Stanford University, and he has been a professor at the University of California, Santa Cruz for over 40 years (Doc. 222-3, pp. 118–119; Doc. 190-13). Dr. Haney has spent decades studying the psychological effects of various prison conditions, including the nature and consequences of solitary confinement. He was retained by Plaintiffs to provide a summary of what is known about the negative psychological consequences of restrictive housing for both non-mentally ill and mentally ill prisoners. He was also asked to provide an opinion regarding the extent to which IDOC prisoners in restrictive housing are

---

[5] Given the volume of evidence, citing to all relevant documents has proven cumbersome and time-consuming. Therefore, throughout this Order, the Court cites to specific exhibits and page numbers (the ones imprinted by CM/ECF at the top of the page) when able, but at other times for the sake of ease and efficiency, the Court cites only to the parties' briefs, which in turn contain citations to the relevant exhibits. The Court wishes to note that counsel for both parties were extremely diligent in cataloging all of the relevant exhibits that support each and every fact stated throughout their briefs. Moreover, both parties were accurate and honest in their representations of the evidence without embellishments or mischaracterizations. The Court greatly appreciates this and commends both parties' efforts and candor.

subjected to conditions of confinement that place them at a serious risk of psychological harm.

Eldon Vail is former correctional administrator with 35 years of experience working in and administering adult and juvenile correctional institutions in the State of Washington (Doc. 222-4, Doc. 191-14). He was retained by Plaintiffs, in short, to evaluate the IDOC's restrictive housing policies and practices, opine on the deficiencies, and suggest reforms.

The IDOC operates 25 correctional facilities throughout the state (Doc. 190, p. 7; Doc. 222, p. 19[6]). Dr. Haney and Mr. Vail both toured and inspected six of the facilities: Stateville, Pontiac, Dixon, Menard, Lawrence, and Logan Correctional Centers (Doc. 222-3, p. 8; Doc. 222-4, p. 4). They both had brief conversations with random prisoners they encountered while touring the facilities; these were often "cell-front" conversations but some were also with prisoners out on the yard (Doc. 222-3, pp. 10, 50–51; Doc. 222-4, p. 4). They both also conducted private, individual interviews with several dozen prisoners (*Id.*).

Notably, Defendant does not have any rebuttal experts, and Dr. Haney and Mr. Vail's reports are uncontested at this time. The testimony from the inmates who were deposed is also essentially uncontested by Defendant (*see* Doc. 190). Defendant tried to pick apart the inmates' testimony by highlighting minor internal discrepancies (*see* Doc.

---

[6] It appears from the evidence that there are restrictive housing units at all 25 facilities (*see* Doc. 192-5).

190, pp. 13–26), but Defendant did not offer any of his own evidence demonstrating that life in IDOC prisons was anything other than how the inmates described it.

## FACTUAL BACKGROUND

### A. "EXTREME ISOLATION"

As previously mentioned, Plaintiffs brought this action to challenge the IDOC's use of "extreme isolation." According to Plaintiffs, "'[e]xtreme isolation' is the consensus term used by correctional experts . . . to describe segregation from the mainstream prisoner population . . . where prisoners are involuntarily confined to their cells for upwards of 22 to 24 hours a day, given only extremely limited or no opportunities for direct and normal social contact with other persons (*i.e.*, contact that is not mediated by bars, restraints, security glass or screens, and the like), and afforded extremely limited if any access to meaningful programming of any kind." (Doc. 1, ¶ 2; *see also* Doc. 222, p. 9, n.1).

The IDOC does not use the term "extreme isolation," but rather uses the term "restrictive housing" to refer to inmates confined in segregation outside of the normal general population (Doc. 190, p. 10). However, various IDOC officials admitted that extreme isolation as defined by Plaintiffs is generally what is occurring in restrictive housing throughout Illinois prisons (Doc. 191-12, pp. 24–25 (Randy Pfister); Doc. 222-19, pp. 5–6 (John Baldwin); Doc. 222-34, p. 6 (Kimberly Butler)).

Additionally, Plaintiffs' expert, Dr. Craig Haney, said "restrictive housing," particularly as it is practiced in the IDOC, clearly constitutes "solitary confinement" (Doc. 222-3, pp. 11, 15). The term "solitary confinement" as it is used in scientific, legal, and

8

human rights literature, as well as, in common correctional parlance, refers to conditions of "severe (but not total) isolation from others" (*Id.* at p. 15).[7] For the purposes of this Order, the Court uses the terms "restrictive housing," "segregation," and "extreme isolation" interchangeably and synonymously.

## B. RESEARCH ON EXTREME ISOLATION

Dr. Haney explained that psychologists have long known that social contact is fundamental to establishing and maintaining emotional health and well-being—the human brain is literally "wired to connect" to others (Doc. 222-3, pp. 7, 17–18). It is well-established based on extensive research and data that "meaningful social contact is a fundamental human need" and the need for "caring human touch" is likewise "fundamental" (*Id.* at pp. 16, 24).

Dr. Haney reported that numerous studies have shown that social deprivation, isolation, and exclusion in contexts *outside of prison* are potentially very harmful and known to produce a host of serious adverse cognitive, emotional, behavioral, and physical impairments, which can even cause permanent and irreparable damage to a person's overall psychological and physical functioning (*Id.* at pp. 10–11, 16–25). For example, social isolation is a significant risk factor for anxiety and depression. It is related to paranoia, delusional or psychotic beliefs, and suicidal behavior. It can lead to decreased cognitive functions and difficulties with thinking, concentration, memory, and self-regulation (*Id.*). It can cause lethargy, reduced empathy, emotional numbing, an

---

[7] According to Dr. Haney, "[f]or perhaps obvious reasons, total and absolute solitary confinement—literally complete isolation from any form of human contact—does not exist in prison and never has." (Doc. 222-3, p. 15).

absence of meaningful thought, and aggressive or even violent behavior. Social isolation is also known to adversely impact the functioning of the human immune system and undermines health outcomes in general (*Id*.). In fact, social isolation has been shown to literally lower the age at which people die (*Id*.).

Again, this is what happens to socially isolated individuals *outside* of prison. According to Dr. Haney, "there is every reason to believe" that the harm caused to prisoners in solitary confinement is even worse (Doc. 222-3 pp. 15–16, 25–26). Prisoners in solitary confinement experience not only "sheer deprivation of meaningful social contact" but also commonly experience high levels of repressive control, enforced idleness due to a dearth or complete absence of meaningful mental activity and programming, nonexistent or greatly reduced physical activity, a lack of positive environmental stimulation, and severe restrictions on property, all of which cause additional psychological distress (*Id*. at pp. 25, 36–37). Consequently, the social isolation in solitary confinement is "far more stressful, harmful, and dangerous than in the larger society where these deleterious effects have been elaborately documented" (*Id*. at p. 25).

Extensive research has shown that prisoners in segregation display a range of predictable and problematic symptoms of psychological stress (Doc. 222-3, pp. 26–34). These symptoms include: irritability, anxiety, paranoia, irrational anger, aggression, rage, hopelessness, and appetite and sleep disturbances (*Id*.). Research has also demonstrated a broad range of psychological reactions to extreme isolation, such as: hypersensitivity to external stimuli; difficulties with thinking, concentration, and memory; ruminations and intrusive thoughts; and panic and loss of control. Some prisoners even report

hallucinations, perceptual distortions, self-mutilation, and suicidal ideation and behavior (*Id*.). Correlational studies have also demonstrated that suicide rates and self-mutilation are more prevalent in extreme isolation or restrictive housing (*Id*.). Additionally, research suggests that other violent acts, such as stabbings, attacks on staff, property destruction, and collective violence, are also more prevalent in restrictive housing (*Id*.).

But these symptoms and psychopathological reactions to social isolation do not paint the full picture of the harm that may occur in segregation (Doc. 222-3, pp. 35–36). Prisoners in solitary confinement are forced to develop their own socially pathological adaptations in order to function and survive—over time, their patterns of thinking, acting, and feeling are changed. For example, some prisoners cope with the void of normal social contact by withdrawing even further and receding even more deeply into themselves (*Id*.). For others, social interaction becomes uncomfortable, disorienting, and even frightening (*Id*.). One inmate who Dr. Haney encountered said, "It's more normal to be alone. Even in the yard, I walk away from people. I can get a little hug from [my] family but I'm uncomfortable with the touch. It feels unnatural, even with my dad." (*Id*. at p. 89). While these adaptations are functional and even necessary in solitary confinement, they can become especially painful and disabling if taken to extremes, or if and when they are internalized so deeply that they persist long after time in isolation has ended (*Id*. at p. 36). Additionally, the prolonged and profound mental and physical inactivity in extreme isolation is a form of sensory deprivation that can destroy important perceptual, cognitive, and physical skills and capacities (*Id*. at p. 37). The extreme social deprivation prisoners face in solitary confinement can "undermine an individual's social

11

identity, destabilize [their] sense of self, and ultimately destroy [their] ability to function normally in free society." (*Id.* at p. 35).

As Mr. Vail put it, there is broad consensus in the corrections field and in the scientific and academic literature that the placement of prisoners in segregation creates a significant risk of harm, for *all* prisoners who are subjected to it, even prisoners without a preexisting mental illness (Doc. 222-4, pp. 43, 84; *see also* Doc. 222-3, pp. 27–28). However, mentally ill prisoners are especially vulnerable to the psychological pain and pressure in solitary confinement and therefore particularly at risk (Doc. 222-3, pp. 38–43).

## C. THE IDOC'S RESTRICTIVE HOUSING NUMBERS

Publicly available data shows that in 2018 the total population of the IDOC at the end of each month was, on average, around 39,000 inmates.[8] That same data shows in 2019, it was a little over 38,000 inmates,[9] and in 2020, it dropped to around 32,500.

---

[8] *See* ILLINOIS DEP'T OF CORRECTIONS, Operation and Management Reports, June 2018 through December 2018, *available at* https://www2.illinois.gov/idoc/reportsandstatistics/Pages/Operation-and-Management-reports.aspx.

[9] However, Defendant submitted excerpts of the IDOC's Weekly Segregation Tracking Spreadsheet showing the average total population of the IDOC in 2019 was 40,145 (Doc. 192-1). This same number was reflected in the Selection of 2020 Weekly Segregation Tracking dated July 9, 2020, which was provided by Defendant to the Court and Plaintiffs' counsel via email prior to the hearing on the motion for class certification.

Data submitted by the parties shows that in 2018, approximately 9,100 inmates were assigned to restrictive housing for one or more days (Doc. 177, p. 6),[10] with somewhere around 1,600 in restrictive housing on any given day.[11]

Of the inmates held in restrictive housing over a period of four years ending on December 31, 2018, there were 19,966 inmates (or approximately 64% of the inmates who were held in restrictive housing during that time period) who spent at least 30 days in restrictive housing (*see* Doc. 177, ¶4). There were 11, 891 inmates (or 38%) who spent at least 60 days in restrictive housing (*Id.*). There were 9,123 inmates (or 29%) who spent at least 90 days in restrictive housing (*Id.*). There were 5,059 inmates (or 16%) who spent at least half the year there (*Id.*). And there were 2,446 inmates (or 8%) who spent at least the whole year in restrictive housing (*Id.*).

Additionally, there are hundreds of prisoners who have spent more than one year in restrictive housing. Data shows that at the end of 2018, there were 1,619 prisoners in restrictive housing and 709 of them (or 44%) had been there for two or more years, 387 (24%) had been there for five or more years, 256 (16%) had been there for seven or more years; and 78 (5%) had been there *for at least ten years* (Doc. 177, ¶9). There were even

---

[10] This was the last year for which complete data was available at the time Plaintiffs filed their class certification brief. In 2017, there were approximately 12,200 inmates assigned to restrictive housing for one or more days; in 2016, there were approximately 13,200 inmates; and in 2015, there were approximately 15,300 inmates (Doc. 177).

[11] For example, on an unspecified date in June 2018, there were 1,612 prisoners in restrictive housing, and on December 31, 2018, there were 1,619 (Doc. 177, pp. 6, 7). In 2019, there was an average daily population of 1,499 inmates in restrictive housing (Doc. 192-1, p. 8; Selection of 2020 Weekly Segregation Tracking dated July 9, 2020).

*eleven* documented prisoners who had been in restrictive housing *for twenty years or more* (*Id*.).

## D. RESTRICTIVE HOUSING POLICIES, CRITICISMS, AND COMPLAINTS

There are four main types of restrictive housing in the IDOC: investigative status, temporary confinement, disciplinary segregation, and administrative detention (Doc. 190, p. 10). *See generally* 20 ILL. ADMIN. CODE §§ 504.40, 504.610, 504.630, 504.690 (2017).[12]

### 1. Investigative Status and Temporary Confinement

Investigative status is when an inmate is placed in segregation "while an incident or matter is being investigated." 20 ILL. ADMIN. CODE § 504.12 (2017); *see also id*. at §§ 504.40, 504.610. Temporary confinement is when an inmate is placed in segregation "until a determination is made as to whether a disciplinary report or investigative report [should] be issued" or while waiting for a hearing to be held on a disciplinary report. *Id*. at § 504.12; *see also id*. at §§ 504.40, 504.610. The supervisor decides whether to place an inmate in investigative status or temporary confinement, and the decision must be subsequently reviewed by a "reviewing officer." 20 ILL. ADMIN. CODE §§ 504.40, 504.50(b), (c) (2017). For temporary confinement, the review must be within three calendar days, whenever possible. *Id*. at § 504.50(b). For investigative status, the review must be within ten calendar days, whenever possible, and consists of the "reviewing officer" interviewing the inmate to obtain the inmate's views on the placement and then making

---

[12] The IDOC's policies regarding restrictive housing are laid out in the Illinois Administrative Code, title 20, subchapter E, part 504. It is commonly referred to as "Department Rule 504" or "DR 504" (Doc. 190, p. 10).

14

a recommendation to the warden on whether to continue the placement. *Id.* at § 504.50(c). Placement in investigative status typically lasts no more than 30 days. *Id.*

### 2. Disciplinary Segregation

If prison officials opt to proceed on a disciplinary report against an inmate, the report is assigned to the Adjustment Committee for hearing.[13] Illinois regulations provide that the inmate must receive written notice of the facts and the charges being presented against him or her at least 24 hours prior to the hearing. 20 ILL. ADMIN. CODE § 504.80(b) (2017). The inmate may request that witnesses be interviewed prior to the hearing. *Id.* at § 504.80(f). And at the hearing, the inmate may make any relevant statement or produce any relevant documents in his or her defense. *Id.*

If the Adjustment Committee decides that the inmate committed the offense charged, it recommends a disciplinary action. 20 ILL. ADMIN. CODE § 504.80 (2017). The recommendation must be reviewed and approved by either the warden or the Director of the IDOC. *Id.* An inmate may appeal the disciplinary action through the grievance procedures. *Id.*

As of 2017, when the regulations were most recently amended, segregation is a potential punishment for 28 of 46 listed offenses. *See* 20 ILL. ADMIN. CODE § 504.20, § 504

---

[13] The regulations provide that "major offenses" (as defined by the regulations) are assigned to the "adjustment committee" for hearing and "minor offenses" (as defined by the regulations) are assigned to the "program unit" for hearing. 20 ILL. ADMIN. CODE § 504.50(d)(3) (2017). However, neither party addresses the particulars of a "program unit" hearing (*see* Docs. 190, 222, 224). In fact, Defendant never even mentions the phrase "program unit" in his response brief or in his proposed Findings of Fact and Conclusions of Law (*see* Doc. 190). Rather, Defendant only speaks of Adjustment Committee hearings (*see* Doc. 190). The Court thus presumes for the purposes of this Order that the IDOC simply opts to have all disciplinary reports heard by the Adjustment Committee and the discussion regarding disciplinary hearings is limited to proceedings in front of the Adjustment Committee.

Table A (2017).[14] The maximum term of segregation varies by offense and ranges from one month, to three months, to six months, to one year; and two offenses can even be punished with an "indeterminate" term of segregation. *See id.* Additionally, the IDOC permits segregation terms to be "stacked" for back-to-back punishments (Doc. 222-3, p. 48; Doc. 222-4, p. 50).[15] In other words, prisoners in disciplinary segregation can and often do receive additional tickets for new infractions committed while they are in segregation that are then punished with additional segregation time, which is served consecutive to the term they are already serving. The "stacking" of segregation time can result in prisoners spending years, or even decades, in disciplinary segregation (Doc. 222-3, p. 50; Doc. 222-4, p. 51, 52–55, 56; Doc. 191-12, pp. 64–65). There is no limit on the amount of time a prisoner can be assigned to disciplinary segregation (Doc. 222-19, p. 9).

### 3. Complaints and Criticisms re: Disciplinary Segregation Placement

In 2009, the IDOC retained the Vera Institute of Justice, an independent, nonpartisan, nonprofit center for justice policy and practice, to study its segregation policies and to make recommendations for reform (Doc. 115, p. 1; Doc. 222-18, p. 4). The Vera Institute, in turn, retained Dr. James Austin, a renowned authority on correctional planning and research, to conduct the study (*see id.* at p. 3). After studying the IDOC's policies, visiting a number of facilities, and speaking with IDOC staff, Dr. Austin and the

---

[14] Other potential punishments include loss or restriction of privileges, demotion to B or C grade status, change in housing assignment or transfer to another facility, revocation of good time credit, and restitution. 20 ILL. ADMIN. CODE § 504.80 (2017).

[15] *See also* Doc. 222-220, p. 6 (IDOC official Mike Atchison testifying at his deposition that stacking segregation terms "was the norm").

Vera Institute presented the IDOC with a number of findings and sixteen recommendations for overhauling its segregation policies, which appears to have largely fallen on deaf ears (Doc. 115, pp. 2–4; Doc. 115-1; Doc. 222-18, pp. 5, 11–114).  Only one of the recommendations was outright accepted and implemented by the IDOC (*see* Doc. 115-1; Doc. 222-18, pp. 14–15).[16] Years later, the issues identified by the Vera Institute remain largely unchanged (*see* Doc. 222-3; Doc. 222-4).

Like the Vera Institute, Plaintiffs' expert, Eldon Vail, criticized the frequency with which disciplinary segregation is imposed in the IDOC (Doc. 222-4, p. 49; *see also* Doc. 115; Doc. 222-18). In the IDOC, disciplinary segregation is the most commonly used designation for prisoners in restrictive housing, and administrative detention is second,[17] which is "the reverse of how it works in most states," according to Mr. Vail (Doc. 222-4, p. 49). He characterized the IDOC as "an outlier" and "far out of step" with other jurisdictions in this respect (*Id.*).

The Vera Institute and Mr. Vail also both criticized the IDOC for using segregation to punish offenses that did not require it (Doc. 222-4, pp. 57; *see also* Doc. 115; Doc. 115-1; Doc. 222-18). Mr. Vail agreed with prisoners who consistently complained that they were given segregation for minor offenses (Doc. 222-3; *see also* Doc. 222-4). Specifically, he

---

[16] Specifically, the IDOC adopted and implemented the recommendation to "[r]equire the Regional Deputy Director and the Chief of Operations to approve all transfers to and from Pontiac and Tamms." (Doc. 115-1; Doc. 222-18, pp. 14–15). Tamms has since been shut down (Doc. 190, p. 15, n.2). Pontiac remains open, however.

[17] According to June 2018 data, there were 1,612 prisoners in restrictive housing and 1,390 — or 86% — were assigned to disciplinary segregation (Doc. 222-3, p. 12).

opined that the IDOC frequently uses segregation to punish offenses that do not pose any serious threat to the safety of any person or institutional security (Doc. 222-4, p. 57).[18] He cited examples of prisoners who were punished with segregation for getting a tattoo, for covering the light in their cell with paper, for throwing trash or paper onto the gallery, for kicking a toilet, and because a blade was missing from the prisoner's fan (*Id.* at pp. 58–60). Other examples include prisoners who were punished with segregation for disrupting group sessions by tearing up papers (Doc. 222-5), refusing to cuff up (Doc. 222-6), and misusing toilet paper to cover his cell window (Doc. 222-7).

The Vera Institute and Mr. Vail also criticized the IDOC for imposing segregation sentences that are far too long (Doc. 222-4, pp. 49, 90; *see also* Doc. 115; Doc. 115-1; Doc. 222-18). Mr. Vail explained that "most states" cap the maximum time spent in disciplinary segregation at 30, 60, or 90 days (Doc. 222-4, p. 50). In contrast, the IDOC permits segregation sentences of six months and one year for numerous offenses, and two offenses are even punishable with open-ended, indeterminate sentences, which Mr. Vail opined was "far outside the norm" (*Id.*). He explained that the maximum penalties are "excessive and not rationally related to improving prisoner behavior" because research has shown that "[d]isciplinary sanctions of up to a year, or longer, have no relationship to effective modification of behavior" and "are not an effective deterrent" (*Id.* at pp. 49, 56). In fact, the IDOC has had knowledge for at least a decade that more

---

[18] *See also* Doc. 222-34, pp. 104–105 (IDOC official Kimberly Butler stating she had no reason to dispute a finding that 85% of prisoners in long-term segregation were in for minor, not major, offenses).

time in segregation does not improve inmate behavior, because the Vera Institute presented this same finding to the IDOC (*Id.* at p. 88).

Furthermore, evidence submitted to the Court indicates that prisoners across the facilities consistently complained that the IDOC's disciplinary hearings are "bogus," "a joke," and "not fair" (Doc. 222-4, pp. 61–72). Specifically, prisoners are often charged with and found guilty of offenses based solely on confidential information that they were not allowed to see and had no opportunity to refute or challenge (Doc. 222-3, p. 57; Doc. 222-4, pp. 63–64; *see also* Doc. 222, pp. 20–21, n.14–16). Hearing officials often refuse to call or interview the witnesses that the inmates request. Hearing officials routinely refuse to conduct any investigation or look at available evidence of an incident, such as video recordings and photographs. The hearings are sometimes conducted in the hallway outside the prisoner's cell, in which case the proceedings are obviously not confidential and communicating through the cell door is difficult (for reasons that are explained further below in the section regarding conditions of confinement). The hearings are not recorded. And inmates are often not provided with an explanation of why they were found guilty or why a specific sentence of extreme isolation was imposed.

Mr. Vail reported that prisoners' perception of the disciplinary hearing process is "universally quite poor" and the hearings were a common subject of the prisoners' complaints (Doc. 222-4, pp. 61–72). Mr. Vail opined that "the depth of the collective angst about the hearing process by nearly every prisoner I interviewed [was] striking" (*Id.* at p. 66). As he explained, "institutional security is reliant on the perception by the inmate population that the profound authority corrections officials have over prisoners is

exercised in a legitimate manner, which is judged by prisoners as whether or not the staff are capable and demonstrate through their actions that they are fair" (*Id.*). It is dangerous "when entire systems are perceived to be unfair" (*Id.*).

Mr. Vail also confirmed that many of the prisoners' complaints are well-founded. He opined that the IDOC's overreliance on confidential information and failure to call witnesses are indeed problematic (Doc. 222-4, pp. 67–71). It is also concerning that IDOC policy does not require the Adjustment Committee to review any video footage, photographs, or other records of the relevant incident because this information is often clear evidence of whether the offense that is charged actually occurred (*Id.*). Mr. Vail opined that as a result of these flaws, prisoners are deprived of necessary opportunities to contest the facts of the incidents or other bases for placing them in restrictive housing (*Id.*). Mr. Vail also criticized the IDOC's policy for not mandating that disciplinary hearings be recorded (*Id.* at pp. 68–70). According to Mr. Vail, recording hearings is a common practice in most jurisdictions so there is a record that can be examined when needed to resolve grievances about whether or not the discipline policy was actually followed (*Id.* at p. 66).

### 4. Administrative Detention

Placement in administrative detention ("AD") is governed by 20 ILL. ADMIN. CODE § 504.690, which was amended in 2017. The IDOC also has a related internal policy called Administrative Directive 05.12.101, which was recently amended effective November 1, 2019 (Doc. 192-5). The regulations describe AD as "nondisciplinary" segregation "based on an administrative judgment that a prisoner requires separation from the main prison

population" because they are thought to pose a risk to the facility or other individuals. 20 ILL. ADMIN. CODE § 504.690 (2017). For example, IDOC official Randy Pfister testified that an inmate can be sent to AD for "safety and security of the facility, consistent negative behavior, significant authority within a security threat group [meaning they were a gang leader], serious violent assaults or murders" (Doc. 191-12, pp. 75–76).

A facility's warden has the discretion to place an inmate in administrative detention for up to 90 days, with the approval of the Director or Deputy Director of the IDOC. 20 ILL. ADMIN. CODE § 504.690 (2017). The regulations do not require a review of the initial placement decision. *See id*. The internal directive, however, does (Doc. 192-5). Specifically, a committee appointed by the warden at each facility must review an inmate's initial placement in AD within 30 days, and the committee then has another 30 days to notify the inmate of the review decision (Doc. 192-5). The warden is also required to conduct a follow-up review every 90 days to determine whether the inmate's placement in AD should be extended. 20 ILL. ADMIN. CODE § 504.690 (2017). The regulations do not require the inmate to be interviewed as part of the continued placement reviews. *Id.* But the internal directive provides that inmates can provide a written statement in advance of the review and an oral statement if they are allowed to appear in-person at the review (Doc. 192-5). Prison officials only have to give the inmate the opportunity to appear in-person "at six-month intervals," meaning at every other 90-day review (*Id.*).

The internal directive provides that there are three phases of AD with Phase I being the most restrictive and Phase III being the least restrictive (Doc. 192-5). Offenders

are placed in Phase I upon initial placement (*Id*.). They can move to less restrictive phases based on the recommendation of the review committee and approval by the warden (*Id*.). Such recommendations and decisions must be "supported by evidence that an offender's actions or conduct deem him or her as a non-threat to the safety and security of the Department and that no credible intelligence exists to the contrary" (*Id*. at p. 2).

### 5. Complaints and Criticisms re: Administrative Detention Placement

Both of Plaintiffs' experts were critical of the AD placement criteria, describing it as extremely vague and reliant on "catch-all" phrases like the "safety and security of the facility," "institutional order," and "[o]ther legitimate penological interests." (Doc. 222-4, p. 73; Doc. 222-3, p. 50). 20 ILL. ADMIN. CODE § 504.690 (2017).

Additionally, as previously noted, the regulations do not provide inmates with any opportunity to contest their placement in AD. *See* 20 ILL. ADMIN. CODE § 504.690 (2017). While the internal directive does require review of the initial placement decision, (*see* Doc. 192-5), Mr. Vail was highly critical that it gives prison officials 30 days to conduct the review and yet another 30 days to notify the prisoner of the result (Doc. 222-4, p. 75). He called the IDOC's policy "egregious" and "far beyond the policy and practice in other jurisdictions" (*Id*.). For example, the American Correctional Association calls for an "official review" within 24 hours (*Id*.). Mr. Vail remarked that as a result of these lengthy timelines, prisoners may not know for over four weeks *why* they have been moved to AD, if they are told at all (*Id*.).

Inmates consistently complained they are being held in AD for reasons that were never fully articulated to them because their placement was based on "confidential

information" (Doc. 222-4, p. 72). Inmates also complained that they do not know what they need to do to get out of AD (Doc. 222-4, pp. 72, 77–79; Doc. 222-3, p. 63). They called the review hearings "meaningless" and a "hollow formality" (Doc. 222-4, p. 78).

Based on the records he reviewed and the frustrations expressed to him by prisoners, Mr. Vail agreed that the review hearings were "perfunctory" (Doc. 222-4, p. 76). He explained that the hearings did not "meaningfully engage the prisoner to explain why they are in AD and what they have to do in order to return to general population" (*Id.*). In fact, it was "universal" amongst the prisoners Mr. Vail spoke to that they could not articulate what they needed to do to get out of restrictive housing placement (*Id.* at p. 72). Not only is there a lack of clear direction to the prisoner, the rules also provide no guidance to the prison staff (*Id.* at p. 79). Neither the regulations nor the internal directive clearly define a way to either move through the phases of AD or out of AD status entirely, despite the Vera Institute's critique about this very issue years prior (*Id.* at pp. 73, 76–80; Doc. 115, Doc. 115-1, Doc. 192-5, Doc. 222-18). *See also* 20 ILL. ADMIN. CODE § 504.690 (2017). Consequently, the decision as to whether an inmate is "ready" to be released from AD is "apparently . . . [left] up to the subjective judgment of staff . . . with no standards to guide this decision." (Doc. 222-4, pp. 79–80). Mr. Vail opined that the system was "arbitrary" (*Id.*). He stressed that there must be a structured way to get out of AD and it must be transparent and reasonable in terms of the amount of time it takes (*Id.*). He said it was "irresponsible and detrimental to good prison safety and security to place prisoners in segregation and leave them in the dark as to what they need to do to earn their way back to general population." (*Id.*).

Mr. Vail also criticized the 90-day follow-up reviews, opining that the infrequency of these reviews is problematic (Doc. 222-4, pp. 9, 75–76). He suggested that more frequent reviews were needed to not only determine whether continued placement was necessary but also to evaluate how the prisoner is handling the stress of living in a segregation cell (*Id.* at 76). For example, the American Correctional Association recommends a review every seven days for the first sixty days and at least every 30 days thereafter (Doc. 222-4, p. 75). Furthermore, Mr. Vail opined that the prisoner should always be allowed to attend every review hearing and should be able to explain why they think they should be released from AD (*Id.* at p. 76).

Mr. Vail indicated that inmates "repeatedly mocked" the characterization of AD as "nondisciplinary" (Doc. 222-4, p. 73). He agreed, stating that AD is "clearly an experience of being punished" (*Id.*). It is also "perceived as a dead end" and prisoners are left with little to no hope about their futures (*Id.* at pp. 72, 79).

### E. CONDITIONS IN RESTRICTIVE HOUSING

It is undisputed that prisoners in restrictive housing are all held in the same areas and cells, regardless of the specific form of restrictive housing they are in (*i.e.*, investigative status, temporary confinement, disciplinary segregation, or administrative detention) (Doc. 222-1, pp. 21–22; Doc. 222-2, p. 88). *See also* 20 ILL. ADMIN. CODE § 504.610 (2017).

Plaintiffs' experts indicated that all of the IDOC facilities vary in age, appearance, and level of function/disrepair (*see* Doc. 222-3, Doc. 222-4). For example, the six facilities visited by Dr. Haney and Mr. Vail range in age from nearly 150 years old to around 20

years old. Some cells have badly chipped paint on nearly every surface, while others have intact paint jobs. Some cells have windows, others don't. Some cells have nothing but a bed, toilet, and sink, while others might also have a desk and a stool/chair. Some showers are "filthy" with extensive rust and visible grime, while others are properly maintained and cleaned. Some showers lack any privacy measures. Some facilities have rodent and insect issues. Cell temperatures were a concern at every facility, with most being far too hot in the summer and freezing cold in the winter. There were also complaints of broken sinks, contaminated-looking water, broken toilets, broken lights, and long wait times to get things fixed. Plaintiffs' experts observed cells with no ladders to the top bunk, "shredded" and stained mattresses, and bunk beds with rusted legs (*see* Doc. 222-3; Doc. 222-4). Prisoners complained of low-quality food and reduced portions at some facilities (*see* citations at Doc. 222, p. 24 n.31). But despite these variations, Dr. Haney and Mr. Vail agreed that all of the restrictive housing units operate on the same core policies and procedures and subject prisoners to the same degraded conditions of confinement, extreme social isolation, and other severe forms of restrictions and deprivations (Doc. 222-3, pp. 11–13, 45, 95–96; Doc. 222-4, p. 10).

To begin with, the restrictive housing cells at the six facilities Dr. Haney and Mr. Vail toured, while varied in exact dimensions, were all "extremely small," according to Dr. Haney (Doc. 222-3, p. 46). In fact, Illinois law only requires cells in new and remodeled facilities to be at least 50 square feet, 735 Ill. Comp. Stat. 5/3-7-3, however, existing cells do not have to comply with the statute and many of them do not (*see* Doc. 222-3, p. 46; Doc. 222-4, pp. 24–26). It can be inferred from Mr. Vail's report that none of the cells he

observed meet the standard set by the American Correctional Association, which requires all restrictive housing cells to provide a minimum of 80 square feet, including 35 square feet of unencumbered space for the first occupant and an additional 25 square feet of unencumbered space if there is a second occupant (Doc. 222-4, pp. 26–27). The small size of the cells means that prisoners have "little or no ability to move about their cell," which is especially problematic given that they are confined nearly around-the-clock in their cells (Doc. 222-3, p. 46). It also means that inmates cannot physically separate their normal daily routines—in other words, they eat, sleep, and defecate in the same space (*Id.*).

Dr. Haney reported that "many" of the restrictive housing cells "are inadequate for even a single prisoner to be confined for such extended periods of time" (Doc. 222-3, p. 45). Nevertheless, many of them are double-celled (*Id.* at p. 46). Double-celling is the practice of assigning two prisoners to one cell, which state regulations permit in restrictive housing (*Id.*). 20 ILL. ADMIN. CODE § 504.620(a) (2017). Dr. Haney opined that:

> double-celling does not mitigate, and indeed may significantly exacerbate, the psychological impact of isolated confinement. The kind of forced and strained "interactions" that take place between prisoners who are confined nearly around-the-clock in a small cell does not constitute meaningful social contact. In fact, under these harsh and deprived conditions, the forced presence of another person may become an additional stressor and source of tension (and even precipitate physical conflict); it can worsen the negative psychological effects of the other deprivations to which prisoners in restrictive housing are subjected. In fact, in my experience, double-celling in restrictive housing units increases the risk of assaults and sometimes lethal violence.

(Doc. 222-3, pp. 46–47). Mr. Vail likewise called double-celling inmates in restrictive housing a "bad" and "risky" practice that should be ended (Doc. 222-4, pp. 27–28).

Additionally, Dr. Haney reported that "[a]ll of the restrictive housing cells at every facility [he] toured" impeded a prisoner's ability to communicate with people outside of their cells, such as other prisoners and staff (Doc. 222-3, p. 46). Some cells have solid steel doors with only a small window (*see id.* at pp. 44–45, 47, 53, 59, 60, 62, 65, 85, 91, 180, 196, 213–14, 219–20, 224–27, 235–39, 243, 249, 251, 253–54, 261–64, 277–78, 291–92, 296–97, 299, 305–311). Others are barred cell doors that have been covered with plexiglass or metal screens (*see id.*). Consequently, it is extremely difficult, if not impossible, for inmates in restrictive housing to meaningfully communicate with anyone outside their cells (Doc. 222-3, pp. 46, 47; *see also* Doc. 222-27, p. 6).

Prisoners' social contacts are also limited in other ways. In temporary confinement, investigative status, and disciplinary segregation, prisoners cannot make phone calls (*e.g.*, Doc. 222-23, pp. 54–56, 137–141).[19] The number of visits they can have per month is reduced (*e.g.*, Doc. 222-3, p. 47; Doc. 222-23, pp. 54–56). 20 ILL. ADMIN. CODE §§ 504.620(i), 504.130, 525.20. Generally, the policy is that they get two visits a month, lasting only one hour (Doc. 222-3, p. 50). Those visits are non-contact, through a window, and often via a phone (Doc. 222-3, p. 49). 20 ILL. ADMIN. CODE §§ 504.130, 525.20. Additionally, disciplinary segregation prisoners are kept in leg and hand restraints throughout the visits, despite being in secure areas (Doc. 222-3, pp. 49–50). Dr. Haney

---

[19] Prisoners in temporary confinement and disciplinary segregation are automatically demoted to "C" grade status. 20 ILL. ADMIN. CODE §§ 504.620(i), 504.610. (2017). Offenders in investigative confinement are provided with the same conditions as those in temporary confinement and disciplinary segregation. *Id.* at § 504.630. And in "C" grade, inmates cannot make phone calls *Id.* at §§ 504.620(i), 504.130, 525.150.

pointed out that by only allowing non-contact visits, the IDOC takes away the inmates' only real opportunity to experience caring human touch (*Id.* at p. 47).

In administrative detention, phone and visitation privileges vary by phase. In phase I, inmates get two, one-hour non-contact visits and one 15-minute phone call per month (Doc. 193-4). In phase II, inmates get three 90-minute non-contact visits and two 15-minute phone calls per month (*Id.*). In phase III, inmates get four two-hour "meet and greet" visits per month and two 15-minute phone calls per week (*Id.*).

Prisoners in restrictive housing do not attend chow; they eat their meals alone in their cells (Doc. 222, p. 38, n.62). They are not allowed to supplement their diet with items from the commissary (Doc. 222-3, p. 54; Doc. 193-4). *See* 20 ILL. ADMIN. CODE § 504.130(a)(3) (2017). They are not allowed to spend time in congregate spaces, such as day rooms, and they are not allowed to hold jobs in the prison (Doc. 222, p. 38; *see also* Doc. 222-3, Doc. 222-4).[20]

Cells in restrictive housing are barren for the most part (*see* Doc. 222-3, pp. 174–315). They have a bed, a mattress, bedding, a toilet, and a sink (*see id.*). As noted above, sometimes a desk and a stool (*see id.*). Personal property is limited—prisoners have no radios or televisions (*e.g., id.* at pp. 48–49, 54, 58, 92; Doc. 222-29, p. 26).

Access to religious or educational programming for inmates in restrictive housing is non-existent, or significantly diminished (Doc. 222-3, pp. 47–48, n.8; Doc. 222-29, pp. 16–17; *see* Doc. 190, pp. 19, 22; Doc. 193-4). Dr. Haney explained that such programming

---

[20] There was one exception to this out of the six facilities that Dr. Haney and Mr. Vail visited: segregation prisoners at Logan are at times allowed in the dayroom for indoor "recreation" time, however, they are chained to a table (Doc. 222-4, p. 45).

is "essential to prisoner well-being" (Doc. 222-3, p. 47). "Programming not only allows prisoners to engage in productive forms of self-improvement or rehabilitation but also provides them with mental and physical activities in which to engage that, in turn, can help prevent debilitation and atrophy." (*Id.* at pp. 47–48). Dr. Haney reported that "virtually all" of the prisoners in restrictive housing that he spoke with "complained about the severe levels of idleness to which they were subjected." (*Id.* at p. 51). As one prisoner put it, "all I do all day is look at the walls and think about my fuck ups and feel hopeless and it makes me want to die. . . . this is torture." (*Id.* at p. 87).

Inmates in restrictive housing are allowed out of their cells to shower. IDOC policy requires showers to be offered at least three times per week. 20 ILL. ADMIN. CODE § 504.620(g)(1). Showers last about 10-15 minutes (*e.g.,* Doc. 222-28, p. 8; Doc. 193-4). Inmates in restrictive housing are also allowed out of their cells for recreation time. Mr. Vail reported this time is essential to prisoners' wellbeing as it is one of the primary ways to relieve the stress caused by the social isolation and physical limitations that come with living in restrictive housing (Doc. 222-4, p.33). Generally speaking, the regulations require that prisoners in restrictive housing receive at least eight hours of recreation per week, to be distributed over the course of at least two days. 20 ILL. ADM. CODE § 504.670(a).[21] Each facility is allowed to determine how the hours are distributed. *Id.*

Prisoners at the various facilities most commonly reported they are allowed to go to yard two or three days per week, for between two and three hours each time (*e.g.,* Doc.

---

[21] Per the *Rasho* settlement agreement, mentally ill prisoners in segregation for longer than sixty days are supposed to receive slightly more yard time: ten hours instead of eight (Doc. 222-4, p. 49).

222-4, pp. 34–46).[22] None of the prisoners Mr. Vail talked to reported receiving the full eight hours every week (Doc. 222-4, p. 34; *see also* Doc. 222, p. 39, n.66 (stating that all prisoners who were deposed indicated that they routinely receive less than eight hours per week)). Mr. Vail noted that the IDOC's policy for recreation time fails to meet national and international standards (Doc. 222-4, p. 33). For example, the American Correctional Association requires a minimum of one hour, five days per week (*Id.*). And the United Nations Standard Minimum Rules for the Treatment of Prisoners—known as the Nelson Mandela Rules—requires at least one hour *every day* (*Id* at p. 34). Mr. Vail opined that offering recreation only two or three days a week "defeats the objective of getting segregated prisoners out of their cells as much as possible" in order to reduce the stress of living in restrictive housing (*Id.* at p. 46). Dr. Haney noted that allowing prisoners out to yard only two or three days a week means they can be confined in their cells continuously for several days at a time (Doc. 222-3, p. 49). In fact, prisoners reported not leaving their segregation cells for astounding lengths of time, including one prisoner who told Dr. Haney he had been in his cell around-the-clock for six months (*Id.* at p. 87).

The yard conditions at the different facilities are not identical, however, both Dr. Haney and Mr. Vail portray the conditions in all of the yards they toured as bleak and barren (*see* Doc. 222-3, Doc. 222-4). Dr. Haney said they are "'yard' in name only" (Doc. 222-3, p. 45). Some of the recreation areas are traditional congregate yards (Doc. 222-3 pp. 189, 222–23, 238, 282–89, 304; Doc. 222-4, pp. 33–46). They are surrounded by high fences,

---

[22] Dixon is an exception; recreation is offered two hours a day, five days a week, exceeding the ACA standard and IDOC's own policy (Doc. 222-4, p. 37).

and topped with razor wire or barbed wire. Most of them have concrete floors. Some have no equipment whatsoever, and the ones that do have nothing more than a basketball hoop. Some of them have a picnic table or chair; others have no place to sit at all. Other recreation areas are one-man metal cages with concrete floors, that one of the named Plaintiffs described as "dog cages" (*see* Doc. 222-3 pp. 222, 287, 289; Doc. 222-4, pp. 33–46; Doc. 222-25, p. 19). The metal cages are completely barren with absolutely no exercise equipment and nowhere to sit. Mr. Vail testified that they are so small they "don't leave much room for recreation or exercise" (Doc. 191-14, pp. 36–37).

Hardly any of the yards have toilets, even though prisoners are usually on the yard for well over an hour at a time (Doc. 222-4, p. 35). Mr. Vail was told that inmates "go" anyway, and some then throw their urine and feces (*Id.* at pp. 35, 38).

The congregate yards are supervised by a guard in a tower (Doc. 222-4, pp. 34–35, 37, 38, 40–41, 44, 45).[23] Consequently, there are no guards in close proximity to supervise the inmates, to diffuse tense situations, or to break up fights (*see id.* at pp. 34–46; Doc. 191-14, p. 35). Many reported being attacked or witnessing fights on the yard (Doc. 222-4, pp. 37, 38). Prisoners repeatedly told Mr. Vail that they felt yard was unsafe, and they declined to go, or rarely went, when it was offered (*Id.* at pp. 34–46; Doc. 191-14, pp. 35–36).

In addition to recreation time, mentally ill inmates are also supposed to receive ten hours of "structured" time out of their cell, for example, in group therapy (Doc. 222-3, p.

---

[23] Menard was the only facility that had a guard shack on the ground (Doc. 222-4, pp. 40–41). But prisoners reported there wasn't always a guard in there (*Id.*).

49). However, Dr. Haney received consistent reports that they were not receiving the requisite amount of structured out-of-cell time (*Id.* at pp. 49, 52). When it did occur, it was typically unrelated to any discernable therapeutic purpose or goal (*Id.* at p. 49). For example, during group therapy sessions, inmates watched "generic movies (that lacked psychological content)," including shows on the Hallmark channel, and talked about "world events," sports, or "whatever you want" (*Id.* at pp. 60, 65, 74, 83, 90). And the inmates normally spent group sessions chained to benches or sitting in cages (*Id.* at pp. 55, 59, 60, 61, 62, 75, 79–80).

Finally, prisoners consistently reported physical and verbal abuse by officers (Doc. 222-4, pp. 82–83).[24] This information was completely unsolicited and instead "simply emerged" as Mr. Vail and Dr. Haney talked to prisoners (*Id.*). Mr. Vail called the volume of the reports "astounding" and "of great concern" (*Id.*). Two-thirds of all the prisoners he spoke with reported being the victim of physical abuse or witnessing such an incident, including 100% of the inmates he spoke with at Menard, 77% of the inmates at Pontiac, 73% of the inmates at Dixon, 40% of the inmates at Stateville, 33% at Logan, and 20% at Lawrence (*Id.*). The prisoners primarily reported physical beatings, almost always out of range of security cameras. They also complained of insufficient decontamination after chemical sprays were used. African American prisoners also reported that guards routinely use racial epithets and slurs (*Id.*). Mr. Vail commented that in the last six years,

---

[24] Dr. Haney also indicated he received numerous reports about abuse from correctional officers. One inmate told him that guards "use shields, hit us, then walk out and act like it never happened." (Doc. 222-3, pp. 73). He also told Dr. Haney that one time when he attempted to hang himself, officers maced him when they came into his cell to cut him down (*Id.*). Another prisoner told Dr. Haney that guards sprayed mace in a bag and put it over his face (*Id.* at p. 67).

he has interviewed hundreds of prisoners in dozens of prisons and jails in twelve different states, and there's only been *one* other time that he's encountered such a volume of reports of physical and verbal abuse in one prison system (*Id.*).

F.  **EFFECTS OF RESTRICTIVE HOUSING IN THE IDOC**

It is important to reiterate that Dr. Haney's and Mr. Vail's reports, at this stage, are uncontested and unrebutted. Defendant did not offer any experts of his own. Dr. Haney and Mr. Vail's reports paint a disturbing, and quite frankly distressing, picture. Mr. Vail characterized the conditions of the restrictive housing units he observed as "generally deplorable," "stark and horrific," "far below the standards of other state prison systems," and "unnecessary to achieve the relevant penological objectives." (Doc. 222-4, p. 10). Dr. Haney likewise said the conditions in the restrictive housing units he observed were "extremely harsh," "draconian," and "precisely the kind that create a significant risk of serious harm for all the prisoners who are subjected to them" (Doc. 222-3, pp. 12, 96, 97, 114, 116). In fact, he said they were "outright dangerous to prisoners' mental health and well-being" and represented "nothing short of a system-wide crisis" (*Id.* at p. 12). He further opined that "shockingly high number of [mentally ill] prisoners" housed in the IDOC's restrictive housing units was "frankly unconscionable" (*Id.* at p. 96.)

Unsurprisingly, "virtually all" of the prisoners that Dr. Haney spoke with reported or acknowledged various forms of suffering, decompensation, and deterioration that they are experiencing a result of the conditions in restrictive housing and the way they are treated (Doc. 222-3, p. 96). Dr. Haney indicated that the symptoms the prisoners acknowledged are indicative of the type of psychological trauma associated with severe

33

forms of isolated confinement (*Id.*). Prisoners frequently reported depression, near-constant anxiety, difficulty concentrating, ruminations, irritability, bouts of anger, and feelings of an impending breakdown (*Id.* at pp. 60–103). Some prisoners described visual hallucinations and auditory hallucinations (*Id.*). More than one prisoner even reported playing with and/or eating their own feces (*Id.*). And in many instances, prisoners showed Dr. Haney cuts, bite-marks, and scars from self-mutilation and described attempts to commit suicide (*Id.*).

Dr. Haney's report was full of instances where inmates who self-mutilated or attempted suicide but were nevertheless kept in segregation (*see* Doc. 222-3, pp. 60–103). As one inmate at Menard told Dr. Haney, "I keep trying to kill myself and they keep putting me back in my same seg cell" (*Id.* at p. 82). Dr. Haney described another prisoner at Logan whose records showed her placement in segregation was continued, and even extended, despite "an extraordinary number of documented suicide attempts" and repeated pleas to be sent to the state mental hospital because she was certain that Logan "could not fix her brain" (*Id.* at p. 99).

Dr. Haney himself observed a multitude of prisoners that were "in obvious distress, sitting on the bunks in their disheveled cells, staring vacantly" (*Id.* at p. 59), and others that he described as "nearly incoherent" (*Id.* at p. 61), "extremely unstable" (*Id.* at p. 64), "very disturbed" and "especially fragile" (*Id.* at p. 70). And he remarked that at two facilities, he was "struck" by how many of the restrictive housing prisoners he interviewed appeared to be "profoundly mentally ill" (*Id.* at pp. 65, 72). Many of the prisoners Dr. Haney encountered expressed deep concerns about their own well-being

and whether their impaired and deteriorated mental health would ever improve (*Id.* at pp. 81, 88, 96).

Dr. Haney opined that all of the IDOC restrictive housing units he toured "appear capable of having truly harmful—even devastating and fatal—impacts on the prisoners housed in them" (Doc. 222-3, p. 96). He stated unequivocally that the "harsh, severe conditions of confinement" in IDOC restrictive housing units "are precisely the kind that create a significant risk of serious harm for all the prisoners who are subjected to them" (*Id.* at p. 114). And, in fact, most of the inmates Dr. Haney encountered in the restrictive housing units could point to harm that they had already experienced (*Id.* at pp. 93, 114).

## DISCUSSION

A plaintiff seeking to certify a class must satisfy the four requirements of Federal Rule of Civil Procedure 23(a): numerosity, commonality, typicality, and adequacy of representation. *See, e.g., Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). The plaintiff must also demonstrate that the proposed class qualifies under at least one of the three subsections of Rule 23(b). *Id.* Where, as here, certification is sought under Rule 23(b)(2), the plaintiff must show that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2). The plaintiff bears the burden of proving, by a preponderance of the evidence, that their proposed class satisfies each of the requirements of Rule 23. *Howard v. Cook Cty. Sheriff's Off.*, 989 F.3d 587, 597 (7th Cir. 2021)

"Rule 23 is more than 'a mere pleading standard[.]'" *Howard*, 989 F.3d at 597 (citation omitted). "[A] court may not simply assume the truth of the matters as asserted by the plaintiff[,]" on issues affecting class certification. *Messner*, 669 F.3d at 811. Rather, the plaintiff must "actually *prove*" that the relevant requirements have been met. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014) (emphasis in original).

"A class may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites for class certification have been met." *Lacy v. Cook Cty., Illinois*, 897 F.3d 847, 863 (7th Cir. 2018) (quoting *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 373 (7th Cir. 2015)). "Failure to meet any of the Rule's requirements precludes class certification." *Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008).

## A. Does *Rasho v. Walker* Preclude Class Certification?

Before addressing the requirements of Rule 23, the Court will first analyze Defendant's argument that the class should not be certified because the claims in this case are "subsumed" by another class action in the Central District of Illinois: *Rasho v. Walker*, CDIL case no. 07-cv-1298-MMM (Doc. 190, pp. 31–39).[25]

*Rasho* is a class action that was initiated in 2007, challenging the adequacy of mental health services provided to mentally ill prisoners in the IDOC. *Rasho* Doc. 260. In August 2015, a class consisting of all current and future inmates within the IDOC's custody who were or should have been identified as requiring mental health treatment

---

[25] References to the docket in the instant case are cited as (Doc. ___), while references to the district court's docket in *Rasho* are cited as "*Rasho* Doc. ___."

was certified pursuant to Rule 23(b)(2). *Rasho* Doc. 252.[26] Later that year, the parties reached a comprehensive settlement agreement regarding all aspects of mental health care in the IDOC, including, for example, screenings and evaluations, treatment plans, medication, staffing numbers, staff training, treatment spaces, and housing assignments. *Rasho* Docs. 710, 711-1. There were also provisions regarding segregation and discipline for mentally ill inmates. *Rasho* Doc. 711-1, pp. 16–20, 24–25. The settlement agreement was approved by the court in May 2016. *Rasho* Docs. 710, 711-1; Minute Entry dated 5/13/2016. A year and a half later, in October 2017, Plaintiffs filed a motion to enforce the settlement agreement, arguing that Defendants were not complying with the agreement in various areas, including segregation. *Rasho* Doc. 1559. The court ultimately agreed and entered a permanent injunction in April 2019. *Rasho* Docs. 2460, 2516, 2579, 2633.[27] Defendants appealed the Court's order on March 1, 2019, *Rasho* Doc. 2583, and the appeal remains pending.

Defendant notes in his brief that the *Rasho* court found around 80% of IDOC inmates in segregation are mentally ill (Doc. 190, p. 31) (citing *Rasho v. Walker,* no. 07-cv-1298-MMM (USDC-CDIL), 376 F. Supp. 3d 888, 908 (C.D. Ill. 2019)).[28] Consequently, a

---

[26] The exact class definition is: "Persons now or in the future in the custody of the Illinois Department of Corrections ("IDOC") [who] are identified or should have been identified by the IDOC's mental health professionals as in need of mental health treatment as defined in the current edition of the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association. A diagnosis of alcoholism or drug addiction, developmental disorder, or any form of sexual disorder shall not, by itself, render an individual mentally ill for the purpose of this class definition." *Rasho* Doc. 252; *also available at Rasho v. Walker*, 376 F. Supp. 3d 888, 891 (C.D. Ill. 2019).

[27] The permanent injunction order is also available at: *Rasho v. Walker*, 376 F. Supp. 3d 888 (C.D. Ill. 2019).

[28] Plaintiffs indicated they are "skeptical" of this figure, arguing that it is unclear how it was calculated or what data was used (Doc. 198, p. 15). However, Plaintiffs' counsel authored an affidavit, citing to data

chunk of the proposed class members in the instant case are also members of the *Rasho* class. Defendant suggests the instant case is thus duplicative of *Rasho* and cites to cases involving the rule against duplicative litigation (Doc. 190, pp. 31–39; Doc. 220). That rule provides that a federal suit may be stayed or dismissed for reasons of wise judicial administration whenever the suit is duplicative of a parallel action already pending in another federal court. *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 888 (7th Cir. 2012); *Cent. States, Se. & Sw. Areas Pension Fund v. Paramount Liquor Co.*, 203 F.3d 442, 444 (7th Cir. 2000).

Plaintiffs contend that *Rasho* is *not* still pending and therefore the rule against duplicative litigation does not apply (Doc. 224, pp. 11–12; *see also* Doc. 220). They further contend that the proper doctrine, if anything, would be *res judicata* (or claim preclusion) but they assert that doctrine is also inapplicable here (Doc. 224, pp. 18–19; *see also* Doc. 220).

When this issue was discussed at the hearing on the motion for class certification, defense counsel clarified that she does not believe either the rule against duplicative litigation or *res judicata* actually apply (*see* Doc. 220, pp. 40, 47–51). Specifically, counsel stated that Defendant is "not asking the Court to abstain from making determinations in

---

showing that, in 2018, 79% of the prisoners designated as seriously mentally ill at Dixon, Pontiac, and Menard were assigned to one or more days of segregation (Doc. 177, p. 7). Additionally, Plaintiffs' expert, Dr. Craig Haney, relied on Defendant's figure of 80% (Doc. 222-3, pp. 14, 39). Dr. Haney also stated more generally that "an extraordinarily high percentage of persons housed in IDOC restrictive housing units are mentally ill" and the restrictive housing units he toured were "filled with mentally ill prisoners" (Doc. 222-3, pp. 114, 115; *see also id.* at pp. 39, 72, 75, 106). So, while Defendant's 80% figure may not be precise, the number of inmates in restrictive housing who are mentally ill is undoubtedly high.

this case because of *Rasho*" and not arguing "that this case is precluded by *Rasho*." (*Id.* at pp. 47, 48). Rather, defense counsel was making more of general argument, not based on any specific legal doctrine, that there is significant overlap between the instant case and *Rasho* and so it does not make sense to proceed with the class here (*Id.* at pp. 39–44, 47–50). Counsel offered a number of reasons to support Defendant's position. First, defense counsel contended that that if the instant class proceeds, there is a risk of inconsistent and conflicting findings and directives between this case and *Rasho*, and seemed to suggest there was no way to work around this potential risk (*see id.* at pp. 39–40, 47–48). Next, counsel argued that "any of the relief that [mentally ill inmates are] seeking pertaining to segregation can still be litigated and adjudicated in the *Rasho* action" (*Id.* at p. 41). Put differently, counsel's position seemed to be that mentally ill inmates can and should use *Rasho* to litigate any and all of their issues and they cannot bring any new claims or be part of any new class (*see id.* at pp. 41, 43) (arguing that while the *Rasho* case is "mostly about mental health care . . . it's spilled over into all aspects of the Department of Corrections"). Defense counsel also argued that *Rasho* already provides for some of the relief that Plaintiffs seek in the instant matter and so it does not make sense to move forward with this second class (*Id.* at pp. 50, 57). Finally, defense counsel suggested that eliminating the *Rasho* class members from the class here was not a viable alternative because "carving out 80 percent of a class doesn't make sense" and we would not be left with anything workable (*Id.* at pp. 47–48).

The Court is unconvinced by any of Defendant's arguments. First, neither the rule against duplicative litigation nor *res judicata* apply. Both doctrines require the same or

substantially similar claims and parties in two different lawsuits.[29] But the proposed class here and the *Rasho* class are clearly different. The *Rasho* class is all current and future inmates who are or will be on (or should be on) the IDOC's mental health caseload. *Rasho* Doc. 252. Whereas, the proposed class in this case is "[a]ll prisoners who *are now or will be incarcerated*" in adult correctional facilities in the IDOC. (Doc. 173) (emphasis added). In other words, the *Rasho* class consists of mentally ill inmates, while the class here is, quite simply, *all prisoners* now and in the future. In short, the class in this case is significantly broader than that of *Rasho*. While mentally ill inmates certainly comprise a portion of it, there is, without question, a huge number of current and future inmates who are *not* mentally ill that are also part of the class proposed here.

Additionally, the claims in the instant case are not the same as the claims in *Rasho*. Broadly speaking, *Rasho* is about inadequate mental health treatment. The plaintiffs alleged, for example, that the IDOC chronically fails to diagnose mental illness in inmates, provides grossly substandard care to those who are diagnosed, fails to train its employees as to how to properly respond to and interact with mentally ill inmates, and disciplines inmates for conduct caused by their mental illness without taking that illness into account when meting out punishment. *Rasho* Doc. 260. In contrast, the instant case is about the

---

[29] *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 889 (7th Cir. 2012) ("A suit is duplicative if the claims, parties, and available relief do not significantly differ between the two actions.") (citation and internal quotation marks omitted); *see also The Haytian Republic*, 154 U.S. 118, 124 (1894) ("When the pendency of such a suit is set up to defeat another, the case must be the same. There must be the same parties, or, at least, such as represent the same interests; there must be the same rights asserted and the same relief prayed for; the relief must be founded upon the same facts, and the title, or essential basis, of the relief sought must be the same."); *United States ex rel. Conner v. Mahajan*, 877 F.3d 264, 270, 271, 272 (7th Cir. 2017) (federal claim preclusion law bars claims which were, or could have been, decided in a prior suit if there is an identity of the parties or their privies, an identity of the causes of action, and a final judgment on the merits) (citations omitted).

use of restrictive housing. Plaintiffs allege, for example, that inmates are often sent to restrictive housing for minor infractions and/or for extended periods of time, conditions of confinement in restrictive housing are inhumane, and the hearing and review procedures for prisoners sent to restrictive housing are devoid of due process protections (Doc. 1).

To be sure, there is some degree of overlap between the two cases, which Plaintiffs admit (Doc. 224, p.15, n.4; Doc. 220, pp. 17, 19). Mentally ill inmates who are in segregation are members of both classes. And that number, although imprecise, is no doubt significant. *See supra* n.28. *Rasho* also touches on disciplinary proceedings and conditions in segregation for mentally ill inmates.[30] However, *Rasho* did not ask, litigate, or resolve whether the IDOC's policies, and/or the purported systemic failure to adhere to those policies, creates inhumane conditions of confinement in restrictive housing for inmates. Nor did *Rasho* ask, litigate, or resolve whether the process that inmates are provided before and after placement in restrictive housing is constitutionally insufficient. Furthermore, *Rasho* did not adjudicate anything regarding the rights of inmates in segregation who are not mentally ill, and *none* of the relief agreed to/ordered in *Rasho* applies to them.

For these reasons, neither the rule against duplicative litigation nor claim preclusion bar certification in this case. To the extent Defendant is arguing that common sense or reasons of equity and economy counsel against certification, that argument is

---

[30] For example, the *Rasho* settlement agreement requires security staff to consult with a mentally ill inmate's treatment team before double-celling the inmate in segregation and it dictates the amount of out-of-cell time mentally ill inmates in segregation must receive. *Rasho* Doc. 711-1, pp. 16–21, 24.

likewise rejected. To begin with, this argument comes much too late in the proceedings. Arguments regarding duplicative or overlapping litigation are routinely made during the pleadings phase for the obvious reason that one of the parties is trying to put the case on ice as soon as possible, before any significant time or money has been expended. Here, Defendant could have made his argument from the outset. By the time this case was filed in June 2016, the class had been certified in *Rasho* and the settlement had been reached and approved by the Court. Any overlap this case has with *Rasho* should have been immediately apparent. But Defendant did not raise his argument at the beginning of the case (*see* Docs. 22, 36, 76). Instead, he waited until after Plaintiffs filed their motion for class certification. By that point, the Court and the parties had already dedicated a truly massive amount of work to this case. As Defendant pointed out in its brief, the parties have spent *years* on discovery related to class certification (Doc. 190, p. 60). Hundreds of thousands of pages of documents have been produced, close to 20 depositions have been taken, (*Id.*), and there have been almost three dozen hearings in this matter (*see* Docs. 1–229). It is simply too late to argue that class certification should not be considered, particularly because the argument is based on circumstances that have existed the entire time this case has been pending.

The timing and imprecision of Defendant's argument suggests it is more likely a last-ditch effort to avoid class certification than it is a serious contention about conserving resources and promoting efficiency. Additionally, contrary to Defendant's assertion, the claims in *Rasho* cannot be amended to encompass the issues raised in this case. A settlement agreement has been reached, a permanent injunction order has been entered,

and the case is on appeal. This case is not "largely duplicative" of *Rasho*, as Defendant asserts. Any overlap is minimal, and Defendant has not given the Court any reason to believe it should preclude class certification. Rather, the overlap would only come to bear on any relief ultimately agreed to or provided in this case, which can be addressed later as necessary by the parties and the Court.

## B. RULE 23 REQUIREMENTS

Having decided that *Rasho* does not preclude class certification, the Court now considers whether Plaintiffs have met all of the requirement of Rule 23.

### 1. Numerosity

The first requirement of Rule 23(a) is that the proposed class "be so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). A "class can be certified without determination of its size, so long as it's reasonable to believe it large enough to make joinder impracticable and thus justify a class action suit." *Arnold Chapman & Paldo Sign & Display Co. v. Wagener Equities Inc.*, 747 F.3d 489, 492 (7th Cir. 2014). "While there is no magic number that applies to every case, a forty–member class is often regarded as sufficient to meet the numerosity requirement." *Mulvania v. Sheriff of Rock Island Cty.*, 850 F.3d 849, 859 (7th Cir. 2017).

The putative class is, essentially, all current and future inmates in the IDOC. Data shows that in the last several years there have been between 30,000 and 40,000 prisoners in the IDOC. Somewhere around 10,000 prisoners are held in extreme isolation for some period of time each year, with approximately 1,600 confined in extreme isolation on any given day. But it is possible for all prisoners in the IDOC to end up in segregation—any

one of them could be charged with a disciplinary infraction that leads to placement in segregation and any one of them could be placed in administrative detention with no charge at all. Of course, there are also the future inmates who can and will be subjected to restrictive housing. Given the significant size of both the current and future prisoner populations, there is no question that numerosity is satisfied.

None of Defendant's arguments contesting numerosity are persuasive. First, Defendant argues that the *Rasho* class members must be excluded (Doc. 190, pp. 39–42). But as explained above, an inmate's status as a *Rasho* class member does not prevent the inmate from also being a class member in this action. Even if Defendant was correct and the *Rasho* class members were excluded, that would still leave all of the current and future non-mentally ill inmates for the instant class. This is undoubtedly a significant number—thousands, if not tens of thousands, of inmates.

Defendant next argues that Plaintiffs simply assume that every inmate who is currently serving time in restrictive housing or will in the future is a class member, but Defendant contends not every inmate has or will have a "legitimate" claim (Doc. 190, pp. 39–42; *see also* Doc. 220). (Doc. 190, p.p. 39–42). For example, according to Defendant, prisoners who served less than 30 days have no legitimate claim because such placements "have already been established to be constitutional" (*Id.* at p. 42). And maybe there are inmates who received a disciplinary hearing that was by the book or received sufficient out of cell time to prevent any harm (*Id.* at pp. 39–42). Defendant argues there is just no way to know which inmates have a claim and are thus class members without individual factual determinations (*Id.*).

44

But Defendant's argument incorrectly frames the nature of Plaintiffs' claims. Plaintiffs' claims are *not* based on the process provided to individual inmates on a specific occasion. Nor do Plaintiffs' claims hinge on conditions of confinement that individual inmates experienced on a specific occasion. That is, Plaintiffs are not contending that a collection of individual constitutional violations that already occurred (each of which hinge on particular facts and circumstances) amount to a systemic constitutional violation. Rather, Plaintiffs are alleging the IDOC's policies governing restrictive housing, which apply statewide at every facility to every inmate, and its systemic practices establish baseline conditions of confinement in segregation that are so inadequate they expose any and every inmate who is presently in restrictive housing or who will be in the future to a substantial risk of serious harm. Plaintiffs also claim the baseline conditions of confinement in segregation constitute an atypical and a significant hardship in relation to the ordinary incidents of prison life, such that they have a protected liberty interest in avoiding segregation, but the IDOC's statewide policies and systemic practices fail to provide inmates with adequate due process. Membership in the class is based on whether putative class members are or will be in IDOC custody and therefore subject to the formal policies and systemic practices at issue. It is not based on the specific application and effect of those policies on each individual class member.

Accordingly, the Court finds that the requirement of numerosity is met.

### 2. Commonality re: Conditions of Confinement Claim

The second requirement of Rule 23(a) is that there are "questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). A single common question will do. *Howard*

*v. Cook Cty. Sheriff's Off.*, 989 F.3d 587, 598 (7th Cir. 2021) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011)); *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 497 (7th Cir. 2012). But it "must be of such a nature that it is capable of classwide resolution," meaning that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Phillips v. Sheriff of Cook Cty.*, 828 F.3d 541, 550, 553 (7th Cir. 2016) (quoting *Wal-Mart*, 564 U.S. at 350). *Accord Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014) ("What matters to class certification . . . [is] the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." (citation omitted); *Jamie S.*, 668 F.3d at 497 ("[T]he plaintiffs must show that they share some question of law or fact that can be answered *all at once* and that the *single answer* to that question will resolve a central issue in all class members' claims.") (emphasis in original). "The critical point is 'the need for conduct *common* to members of the class.'" *Phillips*, 828 F.3d at 553 (quoting *Suchanek*, 764 F.3d at 756).

"[W]hen inmates provide sufficient evidence of systemic and centralized policies or practices in a prison system that allegedly expose all inmates in that system to a substantial risk of serious future harm," commonality is satisfied. *Parsons v. Ryan*, 754 F.3d 657, 684 (9th Cir. 2014). *See also Phillips*, 828 F.3d at 557 ("If plaintiffs can present classwide evidence that a prison is engaging in a policy or practice which rises to the level of a systemic indifference, then we can identify 'conduct common to members of the class' which advances the litigation." (quoting *Suchanek*, 764 F.3d at 756 (emphasis and internal quotation marks omitted))); *Jamie S.*, 668 F.3d at 498 ("[A]n illegal policy might

46

provide the 'glue' necessary to litigate otherwise highly individualized claims as a class."
(emphasis omitted)). Numerous courts within the Seventh Circuit and beyond have
concluded as much. *See id.* at 681 (collecting cases); *Lippert v Baldwin*, 10 C 4603, 2017 WL
1545672, at *2 (N.D. Ill. April 28, 2017); *Rasho v. Walker*, 07-1298-MMM, 2016 WL 11514940,
at *1 (C.D. Ill. Feb. 8, 2016); *Holmes et al. v. Godinez*, 311 F.R.D. 177, 217 (N.D. Ill. 2015);
*Jackson et al. v. Sheriff of Cook Cnty.*, No. 06 C 0493, 2006 WL 3718041, at *3 (N.D. Ill. Dec.
14, 2006); *Westefer et al. v. Snyder et al.*, Nos. 00-162-GPM, 00-708-GPM, 2006 WL 2639972,
at *3 (S.D. Ill. Sept. 12, 2006).

The commonality analysis requires "a precise understanding of the nature of the
plaintiffs' claims." *Phillips*, 828 F.3d at 552. Therefore, to begin, the Court will set forth the
legal standard for a conditions of confinement claim. *See id.* at 554.

"The Constitution does not mandate comfortable prisons, but neither does it
permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Conditions of
confinement that deprive inmates of "basic human needs" or "the minimal civilized
measure of life's necessities" violate the Eighth Amendment's proscription on cruel and
unusual punishment. *Antonelli v. Sheahan*, 81 F.3d 1422, 1427 (7th Cir. 1996) (citing *Rhodes
v. Chapman*, 452 U.S. 337, 347 (1981)). Thus, in order to succeed on an Eighth Amendment
claim for unconstitutional conditions of confinement, a prisoner must show: (1) a
deprivation that is, from an objective standpoint, sufficiently serious that it results in the
denial of the minimal civilized measure of life's necessities, and (2) prison officials were
deliberately indifferent to this state of affairs. *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir.
2016) (quotation marks and citation omitted).

Defendant argues that commonality does not exist because questions regarding conditions of confinement are too individualized to resolve at once (Doc. 190, pp. 46–47). Defendant contends that conditions of confinement vary across the IDOC facilities, and that conditions even vary within the same facility, and cites to inmate testimony regarding cell size, cleaning supplies, cell temperature and ventilation (*Id.*). Conditions such as these do indeed vary, which Plaintiffs readily admit (*see* Docs. 222, 224). However, Plaintiffs' claims do not rely on the types of conditions that differ between the facilities. Rather, Plaintiffs' claims are predicated on the baseline conditions in restrictive housing that emanate from the IDOC's formal policies and systemic practices and thus exist at every facility. Specifically, Plaintiffs allege that inmates in restrictive housing at every facility, regardless of their designation (*i.e.*, investigative status, temporary confinement, disciplinary segregation, or administrative detention), are kept in their cells for 22 to 24 hours per day without any meaningful human contact; denied basic privileges, out-of-cell-time, and programming; and subjected to double-celling and the threat of persistent, excessive physical and verbal abuse from correctional officers (Doc. 1; Doc. 222, pp. 27–43; Doc. 224, p. 25; *see also* Doc. 220). They further allege these common conditions expose all inmates, and particularly mentally ill inmates, to a substantial risk of serious physical and mental harm to which Defendant is deliberately indifferent (Doc. 1; Doc. 222, pp. 27–43; Doc. 224, p. 25; *see also* Doc. 220).

Plaintiffs support their claim with references to the Illinois regulations, admissions by IDOC officials, testimony from inmates, and expert reports from Dr. Haney and Mr. Vail. That evidence shows that cell doors regularly limit inmates' ability to communicate

with other inmates and staff from their cell. Access to phone calls, visits, religious and educational services, the chow hall, the day room, employment opportunities, and personal property is either nonexistent or significantly curtailed. Out-of-cell time is limited. Inmates routinely are not offered the full amount of yard time required by IDOC policy. Even when they are, they often refuse to go because the yards are unstimulating, unsanitary, and/or unsafe. Cells are extremely small but nevertheless frequently occupied by two inmates. Guards regularly use force against prisoners, chemical spray on prisoners, and use racial epithets and slurs when speaking. While variations undoubtedly exist between facilities as to other conditions, such as cleanliness, cell fixtures, and rodent and insect control, these dissimilarities do not bear on or somehow negate the broader, baseline conditions the facilities all have in common.[31] It is those common baseline conditions in restrictive housing that Plaintiffs contend subject inmates to extreme social deprivation, profound levels of physical and mental idleness and inactivity, and rampant mistreatment by staff. And it is those common baseline conditions that Plaintiffs' experts contend create a significant risk of serious harm for all

---

[31] Some of alleged common conditions, such as restrictions on phone calls and visits, are set by the IDOC's formal policies. Other conditions are not derived from the formal policies. For example, there is no written policy that directs officials to not provide inmates with the full eight hours of yard time each week or to subject them to physical abuse. Plaintiffs instead contend these are systemic practices that exist at every facility. However, Plaintiffs did not provide evidence as to all 25 of the IDOC's facilities. Their experts visited six facilities, and, by the Court's count, the named Plaintiffs testified about their experiences in restrictive housing at four of those same facilities (*see* Doc. 222, pp. 49–59; Doc. 190, pp. 13–26). But Defendant made no argument and provided no evidence that this sampling of facilities was not representative of all facilities (*see* Doc. 190). The Court finds that the nature and volume of Plaintiffs' evidence is sufficient as a representative sample of all IDOC facilities. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) (explaining that anecdotal testimony from 1 in every 8 class members was "significant" while anecdotal testimony from 1 in every 12,500 class members was not).

the prisoners who are subjected to them and, in fact, have already caused tremendous harm to scores of inmates.

Plaintiffs have thus met their burden by showing significant proof that common questions exist with respect to their conditions of confinement claim, namely, whether *the conditions that exist as a result of the IDOC's formal policies and systemic practices* deprive class members of their basic human needs and expose them to a substantial risk of serious harm; and whether IDOC is deliberately indifferent to that harm.

To be clear, the Court finds that Plaintiffs' evidence and arguments at this stage are sufficient to establish that common questions exist as to all putative class members and the Court is not expressing any opinion as to whether Plaintiffs will ultimately succeed on the merits of their claim. The same holds true for the analysis in all sections that follow.

### 3. Commonality re: Due Process Claim

To succeed on a due process claim, the prisoner must show they were deprived of a protected liberty interest and the procedures they were afforded were constitutionally deficient. *Lisle v. Welborn*, 933 F.3d 705, 720 (7th Cir. 2019) (citing *Scruggs v. Jordan*, 485 F.3d 934, 939 (7th Cir. 2007)).

"Avoiding segregation can constitute a protected liberty interest," but only when the more restrictive conditions in segregation impose "'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Lisle*, 933 F.3d at 720–21 (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). In assessing whether segregation implicates a protected liberty interest, the court looks to "the combined import of the

50

duration of the segregative confinement *and* the conditions endured." *Hardaway v. Meyerhoff*, 734 F.3d 740, 743 (7th Cir. 2013) (quoting *Marion v. Columbia Correction Inst.*, 559 F.3d 693, 697 (7th Cir. 2009)).

Here, Plaintiffs have met their burden of showing proof that common questions exist with respect to whether segregation in the IDOC gives rise to a protected liberty interest. As discussed above, Plaintiffs have alleged and offered significant proof that a number of harsh conditions exist in restrictive housing units across all IDOC facilities, for all restrictive housing designations. Plaintiffs have also alleged and offered significant proof that inmates are regularly placed in restrictive housing for extended periods of time. Whether the conditions implicate a protected liberty interest is a question that can be answered in a single stroke as to all class members.

There are also additional common questions related to the second part of the due process analysis, which considers whether the procedures afforded to the inmate were constitutionally deficient. Looking first to investigative status and temporary confinement, Defendant contends that inmates subjected to these types of segregation are not entitled to any process (Doc. 190, p. 44). While there are Seventh Circuit cases that say as much, *e.g.*, *Townsend v. Fuchs*, 522 F.3d at 765, 771 (7th Cir. 2008) ("[I]nmates have no liberty interest in avoiding transfer to discretionary segregation—that is, segregation imposed for administrative, protective, or investigative purposes."), more recent cases question that conclusion. *See, e.g.*, *Earl v. Racine Cty. Jail*, 718 F.3d 689, 691 (7th Cir. 2013); *Miller v. Dobier*, 634 F.3d 412, 415 (7th Cir. 2011). These newer cases suggest that non-punitive, discretionary segregation, which is typically imposed for only a short

duration, can nevertheless implicate a liberty interest if the conditions are particularly harsh and restrictive compared to ordinary prison life. *Earl*, 718 F.3d at 691; *Miller*, 634 F.3d at 415. Whether the conditions IDOC inmates face in segregation are bad enough that inmates in investigative status and temporary confinement are entitled to some kind of procedural protections is a question common to the entire class.

Turning next to disciplinary segregation, the Supreme Court requires that an inmate facing disciplinary segregation be given:

1. a hearing with 24 hours' advance written notice of the charges against them;
2. an opportunity to call witnesses and present documentary evidence in their own defense, unless doing so would jeopardize institutional safety or correctional goals;
3. the aid of a staff member or inmate in presenting a defense, if the inmate is illiterate or the issues complex;
4. an impartial tribunal; and
5. a written statement of reasons relied on by the tribunal.

*Wolff v. McDonnell,* 418 U.S. 539, 563–572 (1974).

Here, Plaintiffs have shown proof that common questions exist with respect to the procedural protections afforded to inmates facing disciplinary segregation. Plaintiffs allege that, as a matter of systemic practice, the Adjustment Committee hearings used to impose a term of disciplinary segregation are perfunctory. Plaintiffs also claim that IDOC policy permits disciplinary segregation for minor infractions and permits lengthy sentences that are excessive and disproportionate. They support their claims with documentary evidence and deposition testimony, as well as the expert report of Eldon Vail. Mr. Vail reviewed well over one hundred inmate files and the IDOC's hearing procedures, sentencing guidelines, and sentencing practices. He concluded the IDOC

regularly conducts disciplinary hearings that are anything but meaningful due to deficiencies in the written policy and bad systemic practices. He further opined that policy permits and the IDOC regularly imposes segregation for offenses that do not warrant such a sentence because the offense did not pose a serious threat to institutional security. He also concluded the IDOC imposes lengthy segregation sentences that far exceed the norm for the field of corrections nationally. Mr. Vail also noted that these lengthy segregation sentences have been shown to increase the risk of harm to prisoners and do little, if anything, to modify behavior or provide deterrence.

Plaintiffs have thus met their burden by showing proof that common questions exist with respect to their due process claim regarding disciplinary segregation, including whether the IDOC's disciplinary hearing policies and procedures fail to afford inmates adequate process to address the allegations brought against them; whether inmates in the IDOC are, as a matter of policy or practice, subjected to disproportionately unfair extreme isolation sentences; and whether the length of disciplinary segregation sentences, as a matter of policy or practice, is arbitrary and subject to abuse.

Finally, when it comes to administrative detention (or "AD" as it has been referred to previously in this Order), the required procedural protections are slightly different than those required for inmates facing disciplinary segregation. The Supreme Court requires that an inmate sent to AD must receive an "informal, nonadversary" review of the initial placement decision within a "reasonable time." *Hewitt v. Helms*, 459 U.S. 460, 474 (1983); *Proctor v. LeClaire*, 846 F.3d 597, 609 (2d Cir. 2017); *Westefer v. Neal*, 682 F.3d 679, 684–86 (7th Cir. 2012). That means the inmate must be given "some notice of the

reasons for [his] placement," "an opportunity to present his views" to the prison official who decided to place him in AD, and "enough time to prepare adequately for the administrative review." *Proctor*, 846 F.3d at 609 (quoting *Hewitt*, 459 U.S. at 476); *Westefer*, 682 F.3d at 684 (quoting *Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S. 1, 14 (1979)). The inmate must also receive "some sort of periodic review" of their placement in administrative detention to verify that they "[remain] a security risk." *Hewitt*, 459 U.S. at 477, n.9; *Westefer*, 682 F.3d 679. The periodic reviews can also be "informal and nonadversary" but they "must still be meaningful and non-pretextual." *Westefer*, 682 F.3d at 686; *Isby v. Brown*, 856 F.3d 508, 527 (7th Cir. 2017).

Here, Plaintiffs have shown proof that common questions exist with respect to the procedural protections afforded to inmates sent to administrative detention. Plaintiffs claim the IDOC's policy provides very vague criteria for placing an inmate in AD and the IDOC routinely places prisoners in AD without telling them why, for how long they will be confined, or what they need to do to get out. Plaintiffs allege that, as a matter of systemic practice, the periodic reviews are perfunctory. Again here, Plaintiffs offered documentary evidence and deposition testimony to support their claims, as well as, the expert report of Eldon Vail. Accordingly, Plaintiffs have provided evidence demonstrating commonality among the class when it comes to administrative detention: whether the IDOC's administrative detention review policies and practices fail to afford prisoners adequate process.

To conclude, commonality has been satisfied as to both of Plaintiffs' claims.

### 4. Typicality

The third requirement of Rule 23(a) is that the claims or defenses of the representative parties are typical of the claims or defenses of the class. FED. R. CIV. P. 23(a)(3). The typicality requirement is meant to ensure that there is "enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Spano v. The Boeing Co.*, 633 F.3d 574, 586 (7th Cir. 2011). In other words, the named representative's claims must have "the same essential characteristics as the claims of the class at large." *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006) (quoting *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)). It is well-established that typicality is satisfied if the named representative's claim "arises from the same event or practice or course of conduct that gives rise to the claims of other class members and . . . [the] claims are based on the same legal theory." *Oshana*, 472 F.3d at (citing *Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir. 1992)); *De La Fuente,* 713 F.2d at 232.

The standard for typicality does not require the facts underlying every claim to be identical. *De La Fuente*, 713 F.2d at 232 ("The typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members.") (citations omitted); 1 JOSEPH M. MCLAUGHLIN, MCLAUGHLIN ON CLASS ACTIONS § 4:17 (11th ed. 2014) ("[M]inor factual differences between the claim of the putative representative and class members ordinarily will not defeat a finding of typicality, as the requirement does not require perfect overlap of circumstances.").

55

Defendant focuses on the alleged factual differences among the named Plaintiffs' circumstances and insists that these differences defeat typicality (Doc. 190). But none of the named Plaintiffs are contesting the particulars of their own placement in restrictive housing. Rather, they are challenging as a general matter whether restrictive housing in the IDOC is cruel and unusual and whether it is imposed without due process. Their claims are based on conduct that is not unique to them. Both the named Plaintiffs and the class they seek to represent are *all* subject to the same formal policies and systemic practices, which expose them to a substantial risk of serious harm and denial of due process. Furthermore, they all face the risk of the same constitutional deprivations caused by those policies and practices. Thus typicality is satisfied.

### 5. Adequacy of Representation

The fourth and final requirement of Rule 23(a) is that the named plaintiffs and proposed class counsel must fairly and adequately protect the interests of the class. FED. R. CIV. P. 23(a)(4). Defendant does not challenge the adequacy of class counsel (*see* Doc. 190; Doc. 220, p. 29), and the Court has no reason to believe they are not qualified. Therefore, the Court will only analyze whether the named Plaintiffs are adequate representatives.

"A class representative must be part of the class and must 'possess the same interest and suffer the same injury' as the other class members." *Orr v. Shicker*, 953 F.3d 490, 499 (7th Cir. 2020) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011)). All six of the named Plaintiffs remain in custody—some are in restrictive housing and some have been returned to general population. Those who are currently in general

population face a potential return to restrictive housing at anytime pursuant to the system-wide policies and practices at issue in this case and thus are at risk of being exposed to the purported due process violations and unconstitutional conditions of confinement. Those who are currently in restrictive housing are actively exposed to the purported due process violations and unconstitutional conditions of confinement. While no inmate will have an experience identical to another, all inmates—including the named Plaintiffs—are subjected to the same system-wide policies and practices governing extreme isolation. Thus, the named Plaintiffs' interests are aligned with the putative class and adequacy is satisfied.

### 6. Rule 23(b)(2)

Along with satisfying Rule 23(a), a party seeking class certification must also meet one of the requirements under Rule 23(b). Plaintiffs seek to certify a class for injunctive and declaratory relief under Rule 23(b)(2); they are not seeking monetary damages. Under Rule 23(b)(2), class certification is allowed where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2).

Defendant makes a number of arguments as to why certification under Rule 23(b)(2) is not appropriate (Doc. 190, pp. 54–59), but they all relate to the merits of Plaintiffs' claims, which are not at issue at the class certification stage. None of the arguments provide any reason that certification is inappropriate. Plaintiffs seek to cure purported systemic defects in how the IDOC as a whole administers placement in

extreme isolation. "Providing a vehicle for redressing civil rights violations on a classwide basis through injunctive or declaratory relief is the fundamental purpose of Rule 23(b)(2) [and it] is routinely employed as a tool to vindicate the civil rights of prison inmates." *Westefer v. Snyder*, No. CIV. 00-162-GPM, 2006 WL 2639972, at *9 (S.D. Ill. Sept. 12, 2006) (citing cases); *accord Parsons v. Ryan*, 754 F.3d 657, 686 (9th Cir. 2014) ("[F]ollowing Rule 23(b)(2)'s text and purpose, courts have repeatedly invoked it to certify classes of inmates seeking declaratory and injunctive relief for alleged widespread Eighth Amendment violations in prison systems.") The injunctive relief sought by Plaintiffs would address the IDOC's policies and practices regarding restrictive housing and prescribe a standard of conduct applicable to all class members.

Thus, the Court finds that the requirements of Rule 23(b)(2) are satisfied.

## CONCLUSION

Defendant's first motion to supplement (Doc. 225) is **GRANTED IN PART AND DENIED IN PART**. It is granted as to the new case law but denied as to the IDOC Administrative Directive and updated restrictive housing data. Defendant's second motion to supplement (Doc. 227) is **GRANTED**.

Plaintiffs' motion for class certification (Doc. 173) is **GRANTED**. The following class is **CERTIFIED** pursuant to Federal Rule of Civil Procedure 23(b)(2):

> All prisoners who are now or will be incarcerated in adult correctional facilities by the Illinois Department of Corrections and thus who are at risk of being subjected to extreme isolation or who are currently subjected to extreme isolation.

Winston & Strawn, LLP and the Uptown People's Law Center are **APPOINTED** as counsel to the class.

The Clerk of Court is **DIRECTED** to **SUBSTITUTE** Rob Jeffreys, in his official capacity, for John Baldwin as the Defendant in this case.

The Clerk of Court is further **DIRECTED** to strike the memorandum in support of Plaintiffs' motion for class certification (Doc. 174), Plaintiffs' exhibit list (Doc. 182), and their reply brief (Doc. 197) and include a note on the docket at Docs. 174, 182, and 197 that updated versions of these documents were subsequently filed on December 14, 2021 and can be found on the docket at Docs. 222, 223, and 224.

Plaintiffs shall file the exhibits to their Complaint as a new entry on the docket. Plaintiffs shall submit directly to the Court (MABpd@ilsd.uscourts.gov) a new public, redacted version of Eldon Vail's expert report that includes his Appendices.

**IT IS SO ORDERED.**

**DATED: June 14, 2021**

**s/ Mark A. Beatty**
**MARK A. BEATTY**
**United States Magistrate Judge**