IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| HENRY DAVIS, *et al.*, | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| | ) | |
|     vs. | ) | Case No. 3:16-cv-600-MAB |
| | ) | |
| ROB JEFFREYS, | ) | Judge Mark A. Beatty |
|     Defendant. | ) | |

**EXPERT REPORT OF ELDON VAIL**

1

**I.      Assignment**

1.      I have been retained by Plaintiffs' counsel to evaluate the Illinois Department of Corrections' ("IDOC") use of Disciplinary Segregation ("DS"), Administrative Detention ("AD"), and Investigative Status ("IS") (collectively "restrictive housing") and to evaluate IDOC's policies and practices across the prison system that govern restrictive housing.  Further, I have been asked to opine on whether the deficiencies causing loss of freedom and privileges relative to other incarcerated prisoners as well as the unnecessary pain and suffering detailed by Professor Craig Haney in his report are caused by IDOC's current policies and practices. I also have been asked to opine on whether the desired penological objectives could be achieved after implementation of any feasible reforms that would rectify the identified deficiencies and whether those reforms could be implemented by IDOC.

2.      I am compensated at a rate of $175 per hour in this matter, and my compensation is independent of the ultimate opinions I render.

3.      I reserve the right to amend my opinions based on additional information that may come to light while retained by plaintiffs' counsel to opine on these matters.

**II.      Materials Relied Upon**

4.      I reviewed a large variety of documents to reach the opinions described in this report. Those documents include IDOC policies, various depositions of named plaintiffs and defendants, and recommendations of the Vera Institute of Justice. Additionally, I rely upon the materials listed below, including my inspections of six IDOC prison facilities.  A complete list of all materials considered is listed in Appendix 1. Additionally, I conducted several prison visits:

    o   I inspected three IDOC prisons between July 24 - 27, 2018. I spent two days at Pontiac Correctional Center, two days at Dixon Correctional Center, and one day at Stateville Correctional Center. I interviewed twenty-nine prisoners, some of whom were suggested by plaintiffs' counsel and the remainder randomly selected by me. All interviews were conducted in a private setting. In addition to these formal interviews, I had brief conversations with a few dozen prisoners at cell front or in the yard during my tours of these three prisons. All prisoners interviewed were living or had lived in restrictive housing.

    o   I inspected another three IDOC prisons between September 24 – 28, 2018. I spent two days at Menard Correctional Center, one day at Lawrence Correctional Center, and two days at Logan Correctional Center. During these inspections, I also had the opportunity for private interviews with twenty-five prisoners, some of who were suggested by plaintiffs' counsel, and the remainder were randomly selected by me. In addition, I had brief conversations with a few dozen prisoners at cell front or in the yard during my tours of these three prisons. All prisoners interviewed were living or had lived in restrictive housing.

Upon completion of the inspections, I requested from counsel and later received from counsel more detailed files on the prisoners I selected for private interviews. I reviewed these files as well as the files of randomly selected prisoners who are or were housed in restrictive housing at the remaining IDOC facilities as noted above.

### III.    Summary of Qualifications

5.    A complete copy of my resume, detailing my work experience as a practitioner and expert witness/correctional consultant is attached as Appendix 2.

6.    I am a former correctional administrator with 35 years of experience working in and administering adult correctional institutions. Before becoming a corrections administrator, I held various front line and supervisory level positions in a number of adult prisons and juvenile facilities in the State of Washington. I have served as the Superintendent (Warden) of three adult institutions, including facilities that housed

3

maximum, medium, and minimum-security inmates. Two of those facilities housed men and one housed women.

7.    I served for seven years as the Deputy Secretary for the Washington State Department of Corrections ("WDOC"), responsible for the operation of prisons and community corrections. I briefly retired, but was asked by former Governor of Washington, Chris Gregoire, to come out of retirement to serve as the Secretary of the WDOC in the fall of 2007. I served as the Secretary for four years, until I again retired in 2011. In sum, I served for a total of eleven years in the top one or two positions over the agency.

8.    As a Superintendent, Assistant Director of Prisons, Assistant Deputy Secretary, Deputy Secretary, and Secretary of the WDOC, I was responsible for the safe and secure operations of one, some, and then all adult prisons in the State of Washington, a jurisdiction that saw and continues to see a significant downward trend in prison violence. When I became Secretary, the rate of violent infractions throughout the prison system was 1.23 events per 100 prisoners. When I left it was 0.66 per 100 prisoners, a 46% reduction in 4 years.[1]  I am experienced in sound correctional practice.

9.    My experience as a prison and corrections administrator included responsibility for, and a focus on, the mentally ill population and their custody, housing, and treatment. As a Superintendent, as an Assistant Director of Prisons, as Deputy Secretary and, later, as Secretary, I focused on providing proper treatment for the mentally ill in prison on a system-wide basis across the State of Washington.

---

[1] Washington Department of Corrections, Violent Infraction Rates – All Prisons, July 7, 2015.

10.     My opinions are based upon my substantial experience working in and running correctional institutions and presiding over a statewide prison system for more than a decade, a system that successfully addressed the challenge created by the rapid influx of mentally ill individuals into the prison environment. In my thirty-five years of work in corrections as a practitioner, I spent considerable time working to provide for the proper custody and care of all prisoners, especially those in restrictive housing and the mentally ill.

11.     Since my retirement I have served as an expert witness and correctional consultant for cases and disputes over 50 times in multiple jurisdictions—state, local and federal. As an expert witness and correctional consultant, I have been retained to evaluate and offer my opinions on a variety of issues in the correctional environment.

12.     A complete listing of the matters in which I have offered expert testimony is contained in Appendix 2.  Specifically, over the last few years, I have testified in the following cases:

> ***Coleman, et al. v. Brown, et al.***
> No. 2:90-cv-0520 LKK JMP P
> United State District Court, Eastern District of California,
> Testified, October 1, 2, 17 and 18, 2013
>
> ***Graves v. Arpaio***
> No. CV-77-00479-PHX-NVW,
> United States District Court, District of Arizona
> Testified, March 5, 2014
>
> ***Corbett v. Branker***
> No. 5:13-CT-3201-BO
> United States District Court, Eastern District of North
> Carolina, Western Division
> Special Master appointment November 18, 2013
> Testified, March 21, 2014
>
> ***C.B., et al. v. Walnut Grove Correctional Authority, et al.***

5

No. 3:10-cv-663 DPS-FKB,
United States District Court for the Southern District of
Mississippi, Jackson Division
Testified, April 1, 2 and 27, 2015

***Fontano v. Godinez***
No. 3:12-cv-3042
United States District Court, Central District of Illinois,
Springfield Division
Testified June 29, 2016

***Doe v. Kelly***
No. 4:15-cv-00250-DCB
United States District Court, District of Arizona
Testified, November 14, 2016

***Braggs, et al. v. Dunn, et al.***
No. 2:14-cv-00601-WKW-TFM
United States District Court, Middle District of Alabama
Testified, December 22, 2016, January 4, 2017,
February 21, 2017 and December 5, 2017

***Wright v. Annucci, et al.***
No. 13-CV-0564 (MAD)(ATB)
United States District Court, Northern District of New York
Testified, February 13, 2017

***Padilla v. Beard, et al.***
No. 2:14-cv-01118-KJM-CKD
United States District Court, Eastern District of California,
Sacramento Division
Testified April 19, 2017

***Cole v. Livingston***
No. 4:14-cv-1698
United States District Court, Southern District of Texas,
Houston Division
Testified, June 20, 2017

***Holbron v. Espinda***
Civil No. 16-1-0692-04 RAN
Circuit Court of the First Circuit, State of Hawai'i
Testified, December 20, 2017

***Dockery v. Hall***
No. 3:13-cv-326 TSL JMR

United States District Court for the Southern District of
Mississippi, Jackson Division
Testified March 5–7, 2018

13.     Several of these cases involved issues similar to the current *Davis*
litigation, specifically the overuse of restrictive housing and the treatment of mentally ill
or disabled prisoners.  Some of these cases are *Coleman v. Brown*, *Padilla v. Beard* and
*Asker v. Governor of the State of California* (California); *Graves v. Arpaio* (Maricopa
County in Arizona); *C.B. v. Walnut Grove* and *Dockery v. Hall* (Mississippi); *Parsons v.
Ryan* (Arizona); *Peoples v. Fischer* and *Wright v. Annucci* (New York); *Commonwealth
of Virginia* and *Latson v. Clarke* (Virginia); *Community Legal Aid Society Inc. v. Robert
M. Coupe* (Delaware); *P.D. v. Middlesex County* and *C-Pod Inmates of Middlesex County
Adult Correction Center v. Middlesex County* (New Jersey); and *Johnson v. Mason
County* and *Dahl v. Mason County* (Washington). Related consulting work has been
performed in Georgia for the United States Department of Justice and for Sacramento
County in California on behalf of the county sheriff.

## IV.     Summary of Opinions

14.     IDOC's policies and practices concerning restrictive housing across the
prison system lead to the deprivation of freedom and privileges of prisoners in restrictive
housing relative to other incarcerated prisoners held in the general population, as well as
the unnecessary pain and suffering detailed by Professor Craig Haney in his report.  I
conclude that these problems could be rectified by implementation of common policies
and practices throughout the IDOC prison system in a manner that is conducive to
institutional safety and security in terms of who is placed in restrictive housing, the
procedures used to decide who is placed in restrictive housing, and how long they are

confined in restrictive housing. Further, I conclude that the "sanction grid"[2] for the disciplinary process punishes prisoners with DS time for offenses that do not create a serious threat to institutional security and do not otherwise warrant deprivation of such freedoms and privileges.

15.     IDOC's system of disciplinary segregation, the primary source of prisoners' being placed in restrictive housing, is rare in other correctional jurisdictions and is far outside of accepted correctional standards. Their use of AD[3] is their secondary source of prisoners held in restrictive housing.

16.     The disciplinary hearing process in the IDOC is flawed and does not provide prisoners with the necessary opportunities to contest the facts of the incidents or other bases for placing the prisoners in restrictive housing. I conclude that these deficiencies could be cured by uniform policies and practices established by IDOC.

17.     The process for placing prisoners in AD is not adequate to explain to prisoners why they are being placed in restrictive housing so that they can present a proper defense. There appear to be no standards at all for when a prisoner will be released from AD, providing no clear pathway for prisoners to follow to regain their freedom and privileges. The infrequent reviews of placement in AD offer little information to the prisoner and do not give the prisoner clear knowledge of a pathway to earn his or her way out of AD.

18.     Based on my years of experience I conclude that that prisoners, including prisoners with mental illness, do better when there are clear rules that are fairly applied,

---

[2] Illinois Department of Corrections, *DR 504: Administration of Discipline, A User's Guide for Policy Implementation* at 81–84 [038756–59] (2017).
[3] This is commonly referred to Administrative Segregation in other jurisdictions.

8

and where alternatives to punishment instead of placement in restricted housing are utilized in a more robust manner, leads to a more safe and secure correctional environment. Such an approach is not present in the IDOC. Rather, placement of prisoners in restricted housing in the IDOC is for too long, often without sufficient bases justifying such placement, and with very unclear and nearly non-existent pathways to be placed back into general population.

19.     Prisoners in IS and TC are generally housed in the same areas and cells as those held in other forms of restrictive housing, such as DS and AD, subjecting prisoners to the same conditions as prisoners in DS and AD.  Prisoners are held in IS and TC while an incident is being investigated or a determination is being made as to whether to proceed to issue a disciplinary or investigative report.[4]

20.     I conclude that the conditions of confinement for prisoners in IDOC's restrictive housing unnecessarily deprive the prisoners of freedom and privileges that are afforded to prisoners who are not in restrictive housing in the IDOC. I also conclude that the conditions of IDOC's restrictive housing units are stark and horrific and far below the standards of other state prison systems.  Further, they are unnecessary to achieve the relevant penological objectives.

### V.     Conditions of Confinement

21.     Conditions of confinement in the IDOC's restrictive housing units that I inspected are generally deplorable. While each facility is different from the others, there is a commonality of concerns in the areas of sanitation, cell conditions, time out of cell for programs, and exercise and double celling.

---

[4] Pfister Dep. at 21:19-22:15; Taylor Dep. at 88:9-12; 20 Ill. Admin. Code § 504.40 and § 504.12.

### A. Cell Interiors

22.     Cell fixture maintenance, such as keeping the toilets and sinks in the cells functional, is a priority in correctional systems in many jurisdictions due to health and sanitation concerns. In Illinois I found multiple concerns expressed by the prisoners with long waits between reporting a problem and seeing it fixed.

23.     At Stateville while inspecting the restrictive housing unit I witnessed two broken sinks, at least one cell with no cold water, and complaints from the prisoners about the lack of a ladder to the top bunk of a two-man cell.  Prisoners reported this as a problem, and especially so for some prisoners who are older and/or have mobility challenges.  Prisoners demonstrated for me that the main method for accessing the top bunks is to climb on the toilet and sink to access the top bunk, or alternatively to step on the bottom bunk and climb up to the top bunk—an obviously unsafe design.





24. At Pontiac, as we inspected the tiers, multiple prisoners wanted to show us the water that came out of the sinks in their cells and a few did so. There were small black specs in the water. Prisoners had great concern that the water was contaminated in

some way. I also saw cells where the legs of the bunk beds were rusted. In one cell a prisoner showed me a hole in the wall that he said was used by rats. Multiple prisoners complained about rodent and insect infestation.





25.     Another issue emerged at Dixon. I witnessed multiple, shredded mattresses, some with what appeared to be blood stains on them. While I did not request to see prisoners' mattresses, as I spoke with the prisoners at their cell front, several made it a point to insist that I look at their mattresses so I could understand what they were expected to live with. Based on my experience running prisons, many of the mattresses I saw were far beyond their useful life and should have been removed from the unit long ago.

26.     At Menard I saw one cell where the water would not shut off, some cells with no hot water, and another cell where the prisoner reported his cell light had just been repaired after having no cell lights for about three weeks. Other prisoners showed me

13

dead cockroaches they had recently killed. One showed me his recent bug bites. Others

showed me their stained and soiled mattresses.

27.     At Lawrence, like other facilities, there were multiple complaints about

insects. In one cell I saw that the water in the sink would not turn off. One prisoner told

me his toilet was broken for twenty-five days before it was repaired.

28.     During my interviews prisoners reported to me that extermination efforts

they had witnessed were limited to the corridors and not the cells, resulting in insects

being driven into the cells, making the problem worse.

29.     The prisoners' interrogatory responses clearly articulate their cell

conditions and are consistent with what I observed on my inspections of the six prisons

facilities I visited.

- Mr. Filmore's cell is tiny and dirty, with his bed, toilet, and sink all within inches of each other. A metal box covers the only window to his cell, so there is little access to natural light, and he cannot open the window because of a large amount of bird feces.[5]

- Mr. Gardner is confined to a cell infested with bugs and with a toilet that he cannot flush immediately after using. There is a constant stream of bugs in his cell that he constantly has to keep out of his food and keep from biting him.[6]

- Mr. Jones was confined to a dark cell nearly 24 hours a day with the window to his cell covered by a steel shield.  He was only allowed to eat meals in his cell. And the toilet in his small cell was on a 15-minute timer.[7]

---

[5] 2016.12.12 Aaron Fillmore's Responses to Defendant's First Set of Interrogatories, page 5.
[6] 2016.12.12 Deshawn Gardner's Responses to Defendant's First Set of Interrogatories, page 5.
[7] 2016.12.12 Jerome Jones's Responses to Defendant's First Set of Interrogatories, page 5.

- Mr. Dansberry's cell in restrictive housing was
  dark. He was provided with a small cup of
  watered-down disinfectant to clean his cell. His
  cell often had bugs, cockroaches, and mice. He was
  forced to plug the bottom of his cell door to keep
  the mice out.[8]

30.     These physical plant problems are extreme in the IDOC. A more focused effort is required to improve the conditions to an adequate and humane level for the prisoners in restrictive housing.

**B.     Showers**

31.     The physical plants containing the restrictive housing units at Menard, Pontiac and Stateville are old and poorly maintained. For example, during my inspection of each of these facilities, I found the showers in restrictive housing to be filthy, and it appeared that they were rarely cleaned.

32.     At Menard, some showers in restrictive housing had adequate privacy for the person taking a shower and some did not. One of the showers leaked and another would not drain properly, resulting in standing water.

---

[8] 2016.12.12 Percell Dansberry's Responses to Defendant's First Set of Interrogatories, page 5.



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600
0349324



Attorney's Eyes Only         Davis v. Baldwin USDC-SD IL 16-600
0349237

33.      At Stateville there was visible rust and caked on dirt in the showers.

17







34. Shower conditions at Pontiac were the same—visible rust and caked on dirt. I met one prisoner who refused to use the showers in restrictive housing, electing

instead to wash himself only in his sink due to his concerns about the filth and unsanitary conditions in the unit's showers.





35. The showers at Dixon were adequate, but the showers at Logan and Lawrence were not as clean as they should have been indicating the same lack of focus on providing adequate facilities for the prisoners in those institutions.

36. The showers at Dixon were what I would expect in a correctional facility. You could see that they were frequently cleaned and all had adequate privacy protection, demonstrating that the IDOC has the capacity to do so when this issue is given appropriate attention.

37. While it is a greater challenge to maintain shower cleanliness and repair in older facilities, in my own experience overseeing two prisons over 100 years old in the State of Washington, we made it a priority by simply making sure the selected prisoners regularly and thoroughly clean the showers. If I had walked into any of the prisons

22

referenced above as the Secretary in my own state and found similar shower conditions, I would have called the Superintendent and demanded that corrective action occur immediately. It is a matter of health and safety for the prisoners and the staff. Further, it is a reflection of human dignity towards the prisoner population. No one should be expected to shower in such conditions. This is one of the easiest things the IDOC could fix with minimal cost, a little elbow grease, and focused attention by the maintenance staff.

38.    When basics like sanitation and maintenance are allowed to deteriorate as badly as they have at Menard, Stateville, and Pontiac, it sends a very negative message to prisoners that the administration does not care about them. Giving prisoners a sense that the authorities care about them as human beings is an important management tool. It improves the prisoners' perception of the state's exercise of their authority when they respond and solve legitimate problems. This is a critical ingredient in the management of a safe and secure correctional facility.

**C.    Cell Size and Double-Celling**

39.    The size of the cells at Menard was startlingly small, and many were double bunked. I asked one prisoner to place his hand on the cell wall and then reach across to place his hand on the other wall. He did so and could touch both sides of his cell with a hand on one cell wall and his bent elbow touching the other. Another prisoner explained to me that there is not enough room in these cells for both prisoners to be on the floor of the cell at the same time. One must work it out with their cell partner and ask permission to get off of their bunk. These cells should not be double bunked. In fact, it is

my understanding these cells fall below the Illinois statutory requirement that cells be at least fifty square feet.[9]



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600
0349224

---

[9] Baldwin, John 2018.10.17 deposition, Exhibit 13 (730 ILCS 5/3-7-3).



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600
0349230

40.    The American Correctional Association (ACA) standards for restricted

housing require even more space.

> All cells/rooms in Restrictive Housing provide a minimum
> of 80 square feet, and shall provide 35 square feet of
> unencumbered space[10] for the first occupant and 25 square

---

[10] "Unencumbered space" is usable space that is not encumbered by furnishing or
fixtures. At least one dimension of the unencumbered space is not less than seven feet. In
determining unencumbered space, all fixtures must be in operational position and must
provide the following minimum areas per person; bed, plumbing fixtures, desk and

feet of unencumbered space for each additional occupant.[11]

41.     In his deposition, Director Baldwin was informed of the state statue and that some cells at Menard, Stateville and Pontiac did not meet this requirement of fifty square feet. He reported he was recently made aware of the problem at Menard due to a recent court case. When asked if he would keep this requirement in mind for any future remodeling he said that he would but did not indicate any plans to address the problem at each of these facilities.[12] At a minimum, it is my strong opinion that these cells should not be double celled.

42.     Former Chief of Operations Mike Atchison comes close to sharing this opinion when he says in his deposition,

> Well, yeah, in a perfect world most -- I mean the oldest
> prisons were built -- you know. You know better than
> most -- they weren't necessarily built for two cells or two
> beds in a cell, so, you know, in a perfect situation, we
> wouldn't have to have that many that were double celled.[13]

43.     Double celling prisoners in segregation is a bad practice. Sharing a small space by two people is a security risk for both prisoners and the staff. The State of Nebraska continues this risky practice as well and it has resulted in a tragic murder of a prisoner and staff assaults.[14]

44.     My work on the overuse of disciplinary segregation in the New York Department of Corrections and Community Supervision began in 2013. In 2012, Dr.

---

locker. ACA Standard 4-4131

[11] American Correctional Association, *Restrictive Housing Performance Based Standards*, ACA Standard 4-RH-0006 (Ref: 4-4141) (Aug. 2016).

[12] Baldwin, John 2018.10.17 deposition, page 164, line 11 – page 15, line 22

[13] Atchison, Mike 10-22-2018 deposition, page 46, lines 7 – 13.

[14] State of Nebraska Office of Inspector General of Corrections, Summary of the Report on the Death of Terry Berry (Aug. 28, 2017), https://nebraskalegislature.gov/pdf/reports/public_counsel/2017berry.pdf.

Haney and Dr. Grassian, a psychiatrist who has done extensive work on the impact of restrictive housing, had their work highlighted in *Boxed In: The True Cost of Extreme Isolation in New York's Prisons*:

> In *Madrid v. Gomez*, a case examining conditions of extreme isolation at California's Pelican Bay State prison where "[r]oughly two-thirds of the inmates [were] double celled," the court cited testimony from Professor Haney and Dr. Stuart Grassian in observing: [Double-celling] does not compensate for the otherwise severe level of social isolation . . . . The combination of being in extremely close proximity with one other person, while other avenues for normal social interaction are virtually precluded, often makes any long-term normal relationship with the cellmate impossible. Instead, two persons housed together in this type of forced, constant intimacy have an 'enormously high risk of becoming paranoid, hostile, and potentially violent towards each other.' The existence of a cellmate is thus unlikely to provide an opportunity for sustained positive or normal social contact.[15]

45.     In my own state we ended this practice in the early 1980's, concerned about the safety for all involved. Illinois should do the same.

**D.     Cell Climate**

46.     Cell temperature was a concern at every facility inspected. Prisoners described how hot it gets in the summer and how cold it gets in the winter. These complaints, especially regarding conditions during the summer months, were consistent with my own actual experience of being in IDOC restrictive housing units in July and September. While some units were hotter than others, some definitely met the definition of unbearable and were hotter inside the units than were the outside temperatures. It was a relief to exit the cellblock and get some fresh air—something that prisoners in

---

[15] Scarlet Kim et al., *Boxed In: The True Cost of Extreme Isolation in New York's Prisons* at 60 n.115 (Oct. 2, 2012) (quoting 889 F. Supp. 1146, 1229–30 (N.D. Cal. 1995)).

restrictive housing cannot do. Prisoner complaints about heat and cold during my cell-front and private interviews were consistent—far too hot in the summer and freezing cold in the winter.

47.     In observing the cells, particularly at Menard and Pontiac, it appeared that the closed front cells had no way for fresh air to enter the cells at all. Each had no windows in the cell, and the closed front meant no fresh air could enter the cell from the corridor. During my interviews many prisoners confirmed this observation.

48.     Even in those cells where there were windows, they were so poorly designed and/or maintained that they did little good. As noted above, Mr. Fillmore testified that the window in his cell at Lawrence could not be opened, as the box over the window was filed with bird feces.

49.     One prisoner who had a window in Menard's AD unit described his experience:

> Poor ventilation in the winter. It was so cold that the
> administration had to pass out plastic and tape to place –
> for us to place over the windows.[16]

50.     Another prisoner, who had served time in restrictive housing at Pontiac and Lawrence said,

> They allow us our fan and like the weather when it gets in
> the 80s and 90s, it is not doing – they got these blowers
> that are supposed to be circulating the air for us, but they
> aren't working. They're only circulating hot air, sucking in
> and exhausting hot air that makes the room even more
> hotter. So you're in your cell like a sweat hog.[17]

---

[16] Dansberry, Percell 06-27-2018 deposition, page 18, lines 9 –13.
[17] Davis, Henry 06-26-2018 deposition, page 44, lines 6 – 13.

28

51.     Even more disturbing, the same prisoner described how IDOC staff use control of temperature as punishment. In his deposition he said,

> Q. And where have you heard of freezing out?
>
> A. Excuse me?
>
> Q. Like where have you heard it being referred to as freezing out?
>
> A. That's what -- that's what the inmates and all of us -- that's the name we give it, freezing us out because if the guys banging and kicking on the doors and stuff like that, they'll turn the blowers on and they will make us cold so that's just a term we use, freezing out.
>
> Q. Have any DOC employees told you that they were doing that on purpose to stop inmates from doing stuff?
>
> A. Well, what I have heard was if you don't stop, I'm going to turn the blowers on.
>
> Q. From correctional staff threatening that?
>
> A. Yes. So with that being said, that's how we come up with the term that's what they be doing. They will turn the blowers on and freeze us out, and that's how the term and all that came about.
>
> Q. And in the time you heard that threat did they in fact turn the blowers on you?
>
> A. Plenty of times.
>
> Q. How long will it last?
>
> A. Hours.
>
> Q. Multiple hours?
>
> A. Multiple hours.[18]

---

[18] Ibid, page 47, line 8 – page 48, line 13.

Such conduct on the part of IDOC staff is abusive and contrary to good institution security. In my experience, treating prisoners with such disrespect is likely to increase anger and frustration and lead to more acting out behavior by those suffering such abuse.

52.     Another prisoner, speaking of his experience at Menard in his deposition said,

> Now, conditions determined on -- how it felt outside, that's how we feel in the cell. So if it was hot outside, it would be extremely hot in the cell. It was extremely cold outside, it would be extremely cold in the cell. In the wintertime conditions, which I actually had to file a lawsuit for this for confinement in Menard. In the wintertime, the heating ducts were completely broken. You know, they didn't have any heat coming into the cells or on the wing period. So the cell, the window, which you can close it, open and close it; however, with the fixtures being so old, air would seep through the sides completely, so they would have to give us plastic and tape it up to the window to keep the air from, to keep the air from pushing through and coming in, but in the meantime, you would have ice on the windows. You know, you can actually breathe -- when you breathing out of your mouth, like the smoke, the mist actually came out of your mouth. It would be extremely cold.[19]

53.     Another prisoner, who has been held in restrictive housing at Stateville and Menard said in his interrogatory,

> His cell was unbearably cold in the window, with missing or broken window panes letting cold air directly into his cell. He was not permitted to use his blanket to cover the window.[20]

54.     There is clearly a lack of air-conditioning in IDOC restrictive housing units. According to former Director Baldwin, speaking of his restrictive housing cells, he

---

[19] Shearrill, Kilsey 01-26-18 deposition, page 28, lines 5 – 24.
[20] 2016.12.12 Douglas Coleman's Responses to Defendant's First Set of Interrogatories, page 6

said, "I don't believe there are many that are air-conditioned"[21]. In my training and experience the lack of air conditioning leads to increased stress in the prisoner population. And, for prisoners on psychotropic medications and certain health conditions, extreme temperatures are medically contraindicated. As a correctional administrator involved in the design and remodel of several prison facilities, we made certain that indoor temperatures were controlled so as not to cause unnecessary harm to individual prisoners at risk of heat related illness.

55.     Oddly, and even though it was only late September when I inspected Logan, I noticed as I began to speak with prisoners at their cell fronts, that the prisoners were wrapped in blankets. I asked why and they told me it was freezing. Later in the day and the following morning I was provided a re-purposed cell so I can could conduct private interviews with the prisoners. Sitting on metal bench it wasn't long until I was freezing too. I attempted to close the window in the cell but the window latch was broken and cold air continued to pour in. The same was true when I came back to the same re-purposed cell the next morning for more interviews. It was still freezing cold. At least on the days I visited Logan their restrictive housing unit wasn't providing adequate temperature control.

56.     Although the State of Washington has a relatively temperate climate, all of our prisons (except for minimum-security units where prisoners have access to go outside) are air-conditioned. I was personally involved in the construction and design of the Coyote Ridge Corrections Center and the expansions of the Walla Walla State Penitentiary and the Washington Corrections Center for Women, including decisions to

---

[21] Baldwin, John 2018.10.17 deposition, page 154, lines 4 – 5.

install air-conditioning. Though we were conscious of the lack of political appetite for providing air conditioning to prisoners, we understood that even if the public found it distasteful that it was necessary to make the prisons safe. As a reality, prison administrators are responsible for the safety of the inmates housed in their care. Unlike members of the public, prisoners cannot remove themselves from a hot environment during the summer (such as going to an air-conditioned movie theater or public library on a hot day). Faced with this deliberate decision, we knew it was necessary to install air-conditioning to make the facilities that experienced hot summers safe. IDOC appears to not share that concern for safety.

### E.        Out of Cell Time and Yard Conditions

57.     One of the primary reasons out of cell time is so important is due to the stress of social isolation and physical limitations that come with living in restrictive housing. Time out of cell for recreation and exercise is one of the primary ways to relieve that stress. IDOC, relatively recently, increased the time allowed out of cell for exercise. However, what they came up with fails to meet national and international standards.

58.     The ACA has extensive standards on recreation/exercise for prisoners in restrictive housing. Those standards require,

> Written policy, procedure, and practice provide that inmates in Restrictive Housing receive a minimum of one hour of exercise outside their cells, five days per week, unless security or safety considerations dictate otherwise.[22]

---

[22] American Correctional Association, *Restrictive Housing Expected Practices*, ACA Standard, 4-RH-0025 (Ref: 4-4270) (Jan. 2018). "Restrictive Housing" is a synonym for segregation.

59.     The United Nations has standards for the treatment of prisoners, officially called the Mandela Rules.  Mandela Rule 23 recognizes the need for daily exercise for prisoners:

> Every prisoner who is not employed in outdoor work shall have at least one hour of suitable exercise in the open air daily if the weather permits.[23]

60.     The IDOC does not have such a requirement. Instead they say,

> Offenders in segregation status shall be afforded the opportunity to recreate outside their cells a minimum of eight hours per week distributed in increments over no less than two days per week.[24]

The policy then allows the local prison authority to determine how those hours are distributed, and how they are distributed is the problem. In my opinion, the reason driving both the ACA and the Mandela standards is the need to relieve the pressure of being confined to a cell by allowing prisoners the opportunity for exercise every day or, as ACA requires, at least five days a week. With one exception, that is not how opportunities for recreation are distributed to the prisoners in IDOC restrictive housing units in the prisons I inspected. What is consistent about the IDOC is that its practices vary widely from institution to institution.

61.     There are both congregate and individual recreation cages at Pontiac The prisoners I interviewed indicated that they received recreation two or three days a week for two hours or two and a half hours at a time, depending on who is on duty. Not a single prisoner reported receiving the full eight hours established as a minimum in IDOC policy. Typical of several other IDOC facilities, there is no on the ground supervision of the yard

---

[23] United Nations Standard Minimum Rules for the Treatment of Prisoners (the Nelson Mandela Rules), Rule 23.
[24] 20 Ill. Adm. Code 504.670(a).

by correctional officers. Supervision is provided from a tower. The result is that some prisoners refuse recreation describing it to me as not safe. There are also no toilets, even though prisoners are given access to these areas for up to two and a half hours. Some inmates will "go" anyway and some then will throw their urine and feces. Prisoners reported that sometimes there are water jugs available to them but that this practice is not consistent.





35



Attorney's Eyes Only      Davis v. Baldwin USDC-SD IL 16-600 Pontiac    134838

62.    At Dixon, recreation is offered two hours a day, five days a week, exceeding the ACA standard and IDOC's own policy. However, the recreation area is unsupervised (except from a tower), and up to eight prisoners are allowed out to the area at a time. There is no toilet in the yard. Of the prisoners I interviewed, the majority told me they refused or rarely go to yard because there are "too many fights" and it is not safe. One prisoner explained to me that in order to get the officer's attention if you are feeling threatened or simply need to go to the bathroom, you have to "climb the gate." Two of the prisoners I interviewed told me that they had actually been in fights in the yard. The absence of officers in the yard serves as a disincentive for prisoners to access the recreation areas. In my experience as a practitioner and as an expert and corrections

consultant, I have found that prisoners in restrictive housing will access recreation facilities if they are safe and if there is something to do once they are placed in that area.

63.     At Stateville, prisoners consistently shared that they get access to recreation for a total of three times a week for a total of five hours. During our inspection we witnessed prisoners being moved to a congregate yard. There are also no toilets in these yard areas but inmates will sometimes "go" anyway. Prisoners reported lots of fights in the yard. One told me he did not go to recreation out of fear that he would be double celled while he was gone.





64.     There are also large congregate yards at Menard as well as single-man

cages.  It surprised me how few prisoners were accessing the yard during my inspection

of that facility. The officer leading the tour acknowledged that most prisoners did not in

fact take advantage of the opportunity to go to yard. Menard prisoners reported varying

times of yard access per week. Some said they get yard access two days a week, five

hours one time and two and a half hours the next for a total of seven and a half hours a

week. Another said he got yard two hours a day, twice a week for a total of four hours a

week. Yet another said he got yard twice a week for four hours at a time for a total of

eight hours a week. The yards at Menard have portable toilets and some have drinking

fountains, telephones and tables. These yards are also set below a tower but there is a

shack for a correctional officer on the ground. An officer occupied the shack during our

inspection but prisoners told me this is not always the case. One prisoner told me that he does not go to the yard because of the lack of predictability that an officer will be present in the shack supervising the recreation area. Without that officer, he did not feel safe. Staff informed us that up to twenty-five prisoners at a time were provided yard access. One person told me that he arrived August 1 but had not yet been offered yard as of September 24. Another told me officers sometimes don't offer recreation but log that the prisoners refused. Yet another told me he had not been offered recreation for two months but did not know why.



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600
0349295



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600
0349272



Attorney's Eyes Only      Davis v. Baldwin USDC-SD IL 16-600
0349290

    65.    At Lawrence there are also no officers on the ground in the recreation areas. Supervision is provided from a tower, which once again causes some prisoners to frequently not access the yard feeling it is not safe. Lawrence allows three prisoners in the yard at a time. Most of the prisoners at Lawrence said they received yard access three times a week for two hours for a total of six hours a week. Others said it was three hours, only twice a week, also for a total of six hours. Again, there is no toilet in the yard area, which prisoners can find challenging if they need to relieve themselves.

43

66.     At Logan there are two outside yard areas where the ground is covered by grass. There is a chair provided but no recreation equipment. There is no toilet in the outside yard area nor is there a correctional officer supervising this area. One prisoner told me she refuses yard time because she doesn't feel safe outside of officer supervision. Recreation time is either in the yard or in the dayroom chained to a table where the prisoner can watch TV. Prisoners do not get to choose if their recreation time will be inside or outside. Recreation was reported to be three times a week for a total of eight hours although some reported receiving only six hours.



67.     In sum, the practices of recreation access for IDOC prisoners in restrictive housing tend to discourage their use. Several prisoners told me the officers do not like them to access recreation because it drives their workload as they must escort the prisoners to the recreation areas in restraints. During interviews, I was told that the prisoners understood there was competition among the guards to see who could generate the most "refusals" in a week. I found this both very disturbing, and emblematic of the

44

entire IDOC attitude—time out of cell is viewed as a bother, rather than as an important part of maintaining people's wellbeing, and thus furthering the goals of security. Support for these statements is inherent in the lack of toilets, the lack of on the ground supervision of the recreation areas, and the high number of prisoners who told me they refuse recreation because they do not feel that it is safe. As a result, some prisoners rarely leave their cells. For those who do access recreation, with the exception of Dixon, prisoners are confined to their cells four or five days a week without access to exercise in the recreation areas. In my opinion and in my experience, this is counterproductive to the reason the standards require access to recreation—to reduce the stress of living in restrictive housing. Offering recreation on only two or three days a week defeats the objective of getting segregated prisoners out of their cells as much as possible. There is no security reason to do otherwise. And restrictive housing yard activities definitely need to be supervised by an officer on the ground and not by an officer in a tower. If that were to happen, more prisoners would feel safe going to the yard resulting in less stress and potential mental health deterioration for those prisoners.

### F.    Cell Checks

68.    The ACA also has standards for frequent checks on prisoners in restrictive housing in their cells to ensure their safety and to make certain that the facility is secure. The relevant standard states,

> Written policy, procedure, and practice require that all Restrictive Housing inmates are personally observed by a correctional officer twice per hour, but no more than 40 minutes apart, on an irregular schedule.[25]

---

[25] American Correctional Association, *Restrictive Housing Expected Practices*, ACA Standard 4-RH-0011 (Ref: 4-4257) (Jan. 2018).

If such a standard exists in the IDOC, Defendants did not disclose it. Nor were any unit

or individual logs documenting activities of prisoners housed in IDOC restrictive housing

units disclosed, which would show that such checks are or are not being conducted.

However, whenever I asked prisoners about the frequency of tier checks during my

interviews, the response was consistent. Common comments were that the officers

"rarely come back here", that "tier checks are hours apart" and that tier checks are

infrequent. The risk of harm to prisoners of infrequent checks of prisoners in restrictive

housing have been studied and established.

69.     Multiple studies have illustrated than the risk of suicide is much greater

for inmates in Administrative Segregation compared to those in general population. One

of them, a three-year study in the New York City jail, clearly illustrates the risk of suicide

and self-harm attempts for inmates in restrictive housing:

> In 1303 (0.05%) of these incarcerations, 2182 acts of self-harm were committed, (103 potentially fatal and 7 fatal). Although only 7.3% of admissions included any solitary confinement, 53.3% of acts of self-harm and 45.0% of acts of potentially fatal self-harm occurred within this group. After we controlled for gender, age, race/ethnicity, serious mental illness, and length of stay, we found self-harm to be associated significantly with being in solitary confinement at least once, serious mental illness, being aged 18 years or younger, and being Latino or White, regardless of gender.[26]

Should this case go forward, the primary means of protecting prisoners from risk of harm

by security checks consistent with the ACA standard must be closely evaluated.

---

[26] *Solitary Confinement and Risk of Self-Harm Among Jail Inmates*, March 2014, Vol. 104, No. 3 American Journal of Public Health, Research and Practice, Fatos Kaba, MA, Andrea Lewis, PhD, Sarah Glowa-Kollisch, MPH, James Hadler, MD, MPH, David Lee, MPH, Howard Alper, PhD, Daniel Selling, PsyD, Ross MacDonald, MD, Angela Solimo, MS, Amanda Parsons, MD, MBA, and Homer Venters, MD, MS, page 1.

46

70.     The combination of all these conditions—lack of adequate heat and ventilation; lack of regular and meaningful opportunities to exercise; the size of some cells and lack of visibility into and out of cells; poor sanitation; lack of opportunities for programs; and failure to regularly check on prisoners in their cells only serve to increase the risk of harm to prisoners in restrictive housing in the IDOC.

71.     This general perception is supported by Dr. Pablo Stewart, the court appointed monitor in the *Rasho v. Baldwin* case. Dr. Stewart said in his June 2018 report to the court,

> The segregation units are countertherapeutic for the mentally ill offenders housed there. These units tend to be filthy, loud, chaotic and worsen the psychiatric and medical conditions of those offenders who are housed there. The mentally ill offenders should be removed from segregated housing.[27]

I concur with Dr. Stewart but would extend my opinion to say a combination of physical plant deficiencies and operational practices make them unsuitable for all prisoners in restrictive housing, not just the mentally ill.

### G.     Temporary Confinement and Investigative Status

72.     IDOC houses prisoners assigned to TC and IS in the same conditions as prisoners in DS and AD. *See* 20 Ill. Admin. Code § 504.620 (governing the "[s]tandards for living conditions in segregation," defined to include "[t]emporary confinement pending a disciplinary hearing or investigation" and "[d]isciplinary segregation resulting from a disciplinary hearing" in Section 504.610).

---

[27] Second Annual Report of Monitor Pablo Stewart, MD, *Rasho v. Baldwin*, No. 1:07-cv-1298-MMM-JEH at Dkt. No. 2122, page 57 (C.D. Ill. June 8, 2018).

47

73.     My opinions regarding the conditions of prisoners placed in DS and AD are therefore the same as those prisoners who are placed in DS and AD.

**VI.     Excessive Use of Disciplinary Segregation**

74.     IDOC is an outlier in their extensive use of DS when compared to other jurisdictions. DS is the primary source of restrictive housing placement in Illinois. AD is the secondary source, the reverse of how it works in most states. Length of time in DS is driven by specific sanctions from a sanction grid after a finding of guilt in a disciplinary hearing, with sanctions lasting up to a year, and sometimes longer.[28] AD placement is driven by an assessment of the individual prisoner that they are a risk in general population,[29] often after a disciplinary sanction to restrictive housing has been completed. This is the opposite of how placement into restrictive housing works in most other states where AD (more commonly called Administrative Segregation) is the primary source of extended stays in restrictive housing, not DS.

75.     This difference is important. Disciplinary sanctions of up to a year, or longer, have no relationship to effective modification of behavior because the original offense drives the length of time the person stays in restrictive housing instead of program involvement or improved behavior by the prisoner while in restrictive housing. Additionally, a study commissioned by IDOC found that lengthier stays in restrictive housing are not an effective deterrent.[30]

76.     Similarly, indeterminate assignment to long-term restrictive housing, via AD, should be coupled with a specific plan for the individual prisoner where they are

---

[28] 038756 - 038759
[29] 010868 - 010877
[30] 008061

48

required to engage in program activities in order to learn and earn their way back into general population.

77. Most states cap the maximum time spent in DS at 30 days, some cap it at 60 days, others at 90 (Delaware). At least one state (Nebraska) has eliminated DS altogether. IDOC's maximum sanction to restrictive housing is 1 year and in some cases "indeterminate," which is far outside the norm. Such a length of time in restrictive housing increases the risk of harm to prisoners and does little to improve institution security.

78. Disciplinary time in restrictive housing is often lengthened for prisoners when they receive additional restrictive housing sanctions for behavior that occurs while they are in restrictive housing. This practice is sometimes referred to as "back-to-back" or "stacking" infractions, resulting in stays beyond the original sanction, some as long as years. Many of these infractions are of relatively minor behaviors that do not require restrictive housing placement. Nothing in the rules of the IDOC prohibit this stacking of sanctions to DS beyond the original sanction.

79. This practice was confirmed in the deposition of IDOC Deputy Director Randy Pfister:

> Q. So if an offender kept getting additional segregation sentences, those would essentially be stacked one after the other?
>
> A. Added on, yes.
>
> Q. And that's how offenders could get these very large segregation sentences?

A.     Yes.[31]

Earlier in his deposition, Mr. Pfister also confirmed the excessive amount of restrictive

housing time some prisoners accumulate, acknowledging in successive order than some

are 5, 10,15 and 20 years long. He stopped at 30 years, telling plaintiff's counsel, "Now

you are pushing it".[32]

80.     In his deposition, former Chief of Operations Mike Atchison, goes as far

as explaining the prevalence of back-to-back restrictive housing sanctions is the "norm"

in IDOC.[33]

81.     What is deeply troubling is that in his deposition, former Director Baldwin,

responding to questions about IDOC policies on stacking restrictive housing sanctions

and extending DS into AD, says, "I do not know"[34] and "I have no idea"[35]. Earlier in his

deposition Director Baldwin indicated he is concerned about prisoners who have been

stuck in restrictive housing for years.[36] It is surprising and concerning that he is not aware

of one of the primary reasons it is happening in the department that was under his

command.

82.     This practice was also acknowledged in the 2018 ASCA-Liman survey

when the IDOC reported,

> Illinois reported that maximum "penalties per charge" had
> been "reduced," resulting in a reduction of "the total,
> maximum amount of restrictive housing time for all offenses
> by 107 months (8.9 years," although there was "no
> maximum duration" to a prisoner's placement in restrictive

---

[31] Pfister, Randy 10-23-2018 deposition, page 67, line 23 – page 68, line 5.
[32] Ibid, page 64, lines 2 – 15.
[33] Atchison, Mike, 10-12-2018, page 196, lines 12 – 14.
[34] Baldwin, John 2018.10.17 deposition, page 78, line 18.
[35] Ibid, page 79, line 3.
[36] Ibid., page 67, lines 10 – 21.

> housing if the prisoner received "continuous sanctions for
> separate incidents that would run consecutively."[37]

Former Director Baldwin indicated that he "likes" the work of Liman.[38] It is puzzling

why he was not aware that they pointed out one of the systemic drivers of long stays in

restrictive housing in the IDOC.

83.    A prisoner I interviewed from Menard is a perfect example of the practice

that keeps individuals in restrictive housing for years due to back-to back disciplinary

reports. He went to restrictive housing the first time at Hill Correctional Center for an

event that occurred on July 7, 2015. The description of his behavior includes, "striking

this Sgt.'s arm while attempting (to) give his ID to C/O Livingston". He was charged

with and found guilty of "Assaulting Any Person - Staff," "Insolence," and "Disobeying

a Direct Order," and he was given "3 Months Segregation".[39] Nearly a year later he was

still in restrictive housing, continuing to receive disciplinary reports and piling up the

amount of time he had to serve.

84.    To analyze his experience during the first week of June 2016, he received

the following disciplinary reports and restrictive housing sanctions.

- On June 1 at 1:00 pm, "Inmate had a safety blanket
  stuffed inside his toilet". This caused the gallery to
  flood. The sanction was 3 months segregation.[40]

- On June 1, at 1:05 pm, 5 minutes after the above
  incident, he "flood[ed] his cell by stuffing his

---

[37] *Reforming Restrictive Housing: The 2018 ASCA-Liman Nationwide Survey of Time-in-Cell*, The Association of State Correctional Administrators, The Liman Center for Public Interest Law at Yale Law School, October 2018, pages 129 - 130, note 184.
[38] Baldwin, John, 2018.10.17 deposition, page 190, line 18 – page 191, line 12.
[39] 0181269
[40] 0180996

suicide blanket in the toilets'. The sanction was 1 month segregation.[41]

- On June 2, at 1 pm, he spit on an officer and was sanctioned to 1 year in segregation,[42] later reduced to 3 months.[43]

- On June 2, at 1:05 pm he spit on an officer. The sanction was 1 year segregation,[44] later reduced to 2 months.[45]

- On June 2, at 2 pm, "inmate had covered the front of his cell with the foam from inside of his state issued mattress, and had water coming out under the door, causing an unsafe working condition". The sanction was 3 months segregation.[46]

- On June 3, at 9 am, he threw urine on an officer and received a sanction of 1 year segregation.[47]

- On June 3, at 9:55 am, he refused to cuff up and stood at his cell front with a safety blanket covering his face. He received a 15-day segregation sanction.[48]

- Also on June 3, at 7 pm, he threw wadded up toilet paper at an officer and received 1 year segregation,[49] later reduced to 4 months.[50]

- On June 4, at 6:34 am, he placed his hand in the food port in the door of his cell and would not remove it. The sanction was 15 days segregation.[51]

---

[41] 0180991
[42] 0183858
[43] 0183856
[44] 0181444
[45] 0181439
[46] 0181004
[47] 0183839; if this sentence was reduced, any evidence of that was not near to the adjustment committee report in IDOC's production.
[48] 0181328
[49] 0183849
[50] 0183847
[51] 0180969

- Also on June 4, at 10:25 am, he refused to pull his hand out of the food hatch and he attempted to throw feces on a Sergeant. He was sanctioned to 1 year of segregation,[52] but it was later reduced to 1 month .[53]

- Two days after that, on June 6, at 12:40 pm he threw feces on a Major. He received 1 year segregation as a sanction[54], later reduced to 1 month.[55]

- On June 6, at 12:48 pm he "was given 3 direct orders to cuff up and didn't comply with any orders." The sanction was 15 days segregation.[56]

- On the same day, at 4:00 pm he committed an act of self-harm. The disciplinary report says, "officer observed inmate cutting his leg with a piece of pen and was given 3 direct orders to stop cutting and inmate would not comply." The sanction was 15 days segregation.[57]

- The following day, June 7, "inmate had his hand in the food hatch while feeding and would not remove it." The sanction was 1 month segregation.[58]

85.     All of these hearings were held on June 21, 2016. So, on this day he received about 33 months of additional restrictive housing time. Each one of the hearing reports says, "Inmate was on crisis watch prior to hearings and is currently off watch." Each of the reports says, "Inmate pled not guilty stated he wasn't in the right state of mind." Each of the mental health reviews said, in boilerplate language, "It should be noted that lengthy segregation time for a[] [Seriously Mentally Ill] person is not

---

[52] 0183815
[53] 0183813
[54] 0183835
[55] 0183833
[56] 0180981
[57] 0180974
[58] 0180986

recommended."[59] This statement did not seem to connect with the recommendations from mental health or the ultimate sanctions that were assigned. This individual prisoner is classified as Seriously Mentally Ill (SMI).

86.    This is evidence of a broken system. This SMI person had already been in restrictive housing for nearly a year, from July of 2015 until these hearings in June 2016, when he received an additional 33 months to serve for behavior over a seven-day period, punctuated by time spent on crisis watch. But his stay in restricted housing did not end there as he is still in DS. It is well and good that some of the lengthier sanctions assigned were reduced from a year to 1 – 4 months, but it is largely irrelevant, given the consecutive nature of restrictive housing sanctions routinely given out in the IDOC.

87.    His problems continued in the subsequent months and years:

- In October 2016, he was sanctioned to 6 months of DS for covering himself with a blanket in his cell.[60]

- Later in October 2016 he was sanctioned to 1 month of DS for yelling obscene language at a Major.[61]

- In July 2017 he was again sanctioned for putting his arm through the food hatch and refusing to remove it. He was on crisis watch when this occurred. This time he received a sanction of 1 month DS.[62]

- Also in July 2017 and again while on watch he was sanctioned to 2 months in DS for masturbating.[63]

- In March of 2018 he refused his medication and threatened to throw an unknown liquid on staff. He was sanctioned to 1-month DS.[64]

---

[59] For example, 0180979, 0180989
[60] 0181049
[61] 0181037
[62] 0181187, 0181189
[63] 0181181
[64] 0181555

88.     There are literally dozens of disciplinary reports written on this prisoner in the last several years, and many do not warrant a restrictive housing sanction. I do not assert that this is an easy prisoner to manage. To the contrary, he is difficult. But based on my experience overseeing programs for the mentally ill, constantly maintaining such an individual in restrictive housing is not a solution to help improve his behavior. This individual clearly suffers from mental illness and has committed several acts of self-harm. He needs treatment in a safe and secure mental health unit where he gets out of his cell regularly for structured treatment and recreational activities. Simply keeping him confined does no good and is likely exacerbating his mental illness.

89.     There are multiple example[65] of prisoners given restricted housing sanctions, supported by the recommendations of mental health staff, even though the recommendation says, "Confinement in segregation is likely to significantly impact the offender's mental health," including several times for the prisoner discussed above.[66]

90.     The IDOC has modified and reduced the amount of time that prisoners can be sanctioned to DS, but their new Maximum Penalties for Offenders chart[67] is still excessive and not rationally related to improving prisoner behavior. This is compounded by the frequent back-to-back DS sanctions for prisoners who act out, sometimes due to the stress of DS, and see their sanction time extended after their initial placement and, as is documented above, can extend for years.

91.     Basically, the length of stay in DS for prisoners in the IDOC is sentence based. This is contrary to what is going on in the field of corrections nationally. The

---

[65] For example, 0179952, 0343778, 0305270
[66] See 0181069 and 0181079
[67] 038756 – 038759

Association of State Correctional Administrators (ASCA) is the primary professional organization for directors of state corrections departments. They began to become concerned with the overuse of DS several years ago. As a result, they published a resolution that included guidelines for how DS is to be used. They say,

> Determine an offender's length of stay in restrictive status housing on the nature and level of threat to the safe and orderly operation of general population as well as program participation, rule compliance and the recommendation of the person[s] assigned to conduct the classification review as opposed to strictly held time periods[68]

92.     IDOC uses restricted housing sanctions for offenses that do not require it, based on my own experience as a practitioner and as an expert working in multiple jurisdictions around the country.  It is also contrary to the ACA standard that limits restrictive housing to "those circumstances that pose a direct threat to the safety of persons or a clear threat to the safe and secure operations of the facility."[69] The IDOC is far out of step with this standard for how disciplinary segregation is used and what is occurring in other jurisdictions around the country.

93.     I interviewed a prisoner at Pontiac who has been in some form of restricted housing since 1998. He received disciplinary reports as follows.

- Unauthorized Movement; Trading or Trafficking— prisoner went into another's cell and took something that could not be identified—1 month segregation.[70]

- Contraband/Unauthorized Property—dandruff rinse, shampoo, combs, ink pens, plastic cup, newspapers,

---

[68] ASCA Resolution # 24, September 4, 2013, page 2, # 5, https://asca.memberclicks.net/documents.
[69] American Correctional Association, *Restrictive Housing Performance Based Standards*, ACA Standard 4-RH-0001 (Aug. 2016).
[70] 0316303

56

t-shirts, boxers, pillow cases, sock hats, socks, 11
tapes—1 month segregation.[71]

94.     A prisoner I interviewed at Lawrence who has been in restricted housing

since 2012 received the following:

- Damage or Misuse of Property; Violation of
  Rules—threw shredded documents onto the
  gallery—1 month segregation.[72]

- Insolence; Disobeying a Direct Order—refused to
  move into a cell with "a known feces thrower"—3
  months segregation.[73]

- Dangerous Contraband; Damage or Misuse of
  Property; Contraband/Unauthorized Property;
  Health, Smoking or Safety Violations—prisoner
  was in possession of homemade tattoo supplies and
  a fresh tattoo was found on his arm—6 months
  segregation.[74]

95.     Another prisoner I interviewed at Lawrence received the following:

- Damage of Misuse of Property; Insolence—threw
  trash out of his cell and spoke rudely to an officer—
  1 month segregation.[75]

- Sexual Misconduct—while on a transportation bus
  was accused of taking his penis out and stroking it.
  Prisoner testified he had to go to the bathroom and
  urinated into a juice carton—3 months
  segregation.[76]

96.     A prisoner I interviewed at Menard received the following:

- Insolence—said to a female staff member, "there is
  juicy;" inmate said he actually called her by her
  first name, Lucy, and adjustment committee "asked

---

[71] 0316306
[72] 0143355
[73] 0143370
[74] 0143373
[75] 0140130
[76] 0140139

if Offender thought it was appropriate to call staff by first name"—1 month segregation.[77]

- Damage or Misuse of Property—blade missing from a fan—1 month segregation.[78]

- Impeding or Interfering with an Investigation; Giving False Information to an Employee—alleged an officer touched his buttocks during escort—2 months segregation.[79]

- Intimidation or Threats; Insolence—threatened to file lawsuits and to write up mental health professionals after they told him to stop sexually inappropriate remarks—1 month segregation.[80]

97. Another prisoner I interviewed at Menard received the following:

- Impairment of Surveillance; Disobeying a Direct Order—covered light in cell with paper—1 month segregation.[81]

- Contraband/Unauthorized Property; Health, Smoking or Safety Violations—Received tattoo from another prisoner—1 month segregation.[82]

98. A prisoner I interviewed at Pontiac received a 1-year segregation sanction for writing an article in a journal. In that journal he said,

The statement of the New movement deals with the inmates in the Illinois Department of Corrections to be safe from getting beat up by correctional officers and getting denied medical treatment by medical staff. I would like to be the founder of the movement called the Heart and Safe Movement and I would like to start it outside with people like lawyers and politicians and the Illinois State Police and the United States Department of Justice and reporters and private investigators. I would like to start this team so

---

[77] 0235449
[78] 0235435
[79] 0235546
[80] 0235549
[81] 0179953
[82] 0179993

58

> inmates can stop getting hurt by medical staff and
> correctional officers. I would like for people to contact me
> on this issue. Help me start this movement.[83]

The charge for this language was for Gang or Unauthorized Organization Activity.

Reaching out to state police and the U.S. DOJ for help is a far cry from gang

participation. In my experience this charge is simply not accurate. Instead, it is a search

for help from legitimate authorities for the pain of his experience serving a prison

sentence in the IDOC.

99.    The same prisoner received a sanction of 1 month's segregation for simply

kicking his toilet.[84]

100.    A prisoner I interviewed at Dixon broke a diet tray and tried to cut himself.

He was charged and found guilty of Damage or Misuse of Property. He received a 15-day

sanction of segregation. During the hearing he said, "I took the tray and broke it and tried

to cut myself. I felt like I didn't want to live, everything was going downhill."[85] This

prisoner is described as someone that "meets the criteria for Bipolar 1 Disorder…."[86] It is

completely inappropriate for discipline a prisoner for suicidal actions, yet I have seen

several such examples in the files I have reviewed.

101.    This same prisoner received a sanction of 1-month segregations for

Intimidation or Threats, Insolence, and Disobeying a Direct Order. He had raised his

voice threatening to get a couple of officers fired.[87]

---

[83] 0161107
[84] 0161127
[85] 0305273
[86] 0307571
[87] 0305287

102.    In the limited sample I have seen there were dozens of examples of prisoners receiving a sanction of disciplinary segregation for behaviors that are not serious threats to institution security. This limited sample suggests that hundreds of prisoners are similarly treated this way.

**VII.    Disciplinary Hearings**

103.    The way a prisoner is sanctioned to DS in IDOC is through their hearing procedures for infractions, and there are multiple problems with the IDOC's practices, including an overreliance on confidential information, failure to call witnesses, and the lack of a permanent audio record of the hearing itself that could be accessed on appeal if the finding of the Adjustment Committee is challenged.

104.    The perception of prisoners of the process for imposing discipline is universally quite poor. I heard this during my interviews with prisoners when I inspected IDOC facilities, and it is a common refrain in their answers to defendants' interrogatories prisoners submitted for this case.

105.    In the interrogatories, prisoners made the following statements,

> ▪ Mr. Fillmore responds that he received indeterminate Disciplinary Segregation along with a determinate sentence for non-fatally injuring a guard 17 years ago. Despite serving that sentence, he remains in extreme isolation. Mr. Fillmore has filed many grievances related to his indeterminate time in extreme isolation, and has not received responses to at least 10 of those grievances. Further, he is not allowed to present evidence or call his own witnesses at any hearings he receives.[88]

---

[88] 2017.06.20 Supplemental Interrogatory Responses of A. Fillmore, page 14

- Mr. Davis responds that on several occasions, he had hearings where he was not permitted to call witnesses nor question his anonymous accuser.[89]

- Mr. Dansberry was sentenced to three months in Disciplinary Segregation for allegedly belonging to a gang in 2013,[90] despite the fact that he had not been a member of the gang since on or around 2004. Mr. Dansberry filed a grievance contesting his membership, and in particular complained that IDOC did not verify the reliability of the informant.[91] In 2017, Mr. Dansberry was again sentenced Segregation for what appears to have been the same allegations of STG activity.[92] This time, not only did the Disciplinary report withhold the name of the informant, it also withheld the date of the report.[93]

106. In my interviews with prisoners, similar concerns were expressed.

107. One inmate at Pontiac told me that the hearings are "bogus" and that witnesses are routinely refused. Another at Pontiac told me that there was no evidence presented at his disciplinary hearing other than what was described as "confidential." Another said there are "no real investigations" and that "witnesses are not called." Another described a situation where he was in AD, received an infraction for gang activity for which he received DS based solely on confidential information that he had no opportunity to refute or challenge, and when done with his DS sanction was immediately returned to AD status. Yet another at Pontiac said the hearing process is a joke, you present your case but it does not matter. He once called for five witnesses and none were called, and there was no reason given to him for their denial. He also asked for a copy of

---

[89] 2016.12.12 Henry Davis's Reponses to Defendant's First Set of Interrogatories, page 6
[90] Doc. 0159319.
[91] 2016.12.12 Percell Dansberry's Response to Defendant's First Set of Interrogatories, page 6.
[92] Doc. 0159307.
[93] *Id*.

a related internal affairs investigation that was used against him during his hearing but received no response to his request. And another at Pontiac said the Adjustment Committee that conducts the hearings refuses to review any videos of incidents resulting in infractions for staff assault, even though the videos are available and may well exonerate the prisoner.

108. A prisoner at Dixon described his hearing being conducted at his cell front and no witnesses were called, even though he had requested them. Another prisoner at Dixon confirmed the practice of holding hearings at the cell front. He has also called for witnesses but had no knowledge that his witnesses were ever interviewed.

109. During my inspection at Dixon I witnessed hearings being conducted at cell front. This is a very poor practice. First of all it is not confidential as non-involved prisoners and staff can hear what is being discussed. Second, based on my experience of trying to communicate through cell doors, simple human conversation is simply much more difficult when both parties are standing, cannot clearly see the other person, and have to attempt to speak through the door. The picture below shows one such cell-front hearing.



Attorney's Eyes Only

Davis v. Baldwin USDC-SD IL 16-600   03/8524

110.    A prisoner I interviewed at Logan told me the hearings were "not fair." She grieved that her witnesses had not been called during her disciplinary hearing. The response to the grievance confirms the IDOC's practice of calling witnesses only when they choose to:

> Per Logan Correctional Center policy, the Institutional Adjustment Committee may use their discretion not to call witnesses if their testimony would be considered irrelevant, cumulative, jeopardize the safety of the institution or disrupt the security of the facility. [94]

While in my experience prison officials holding disciplinary hearings should have some discretion to call or not call witnesses, any decision not to do so should be part of the

---

[94] 0211190

hearing record, including an articulation on the record of why they choose not to do so. No such articulation was made in this case.[95]

111.    A Menard prisoner described being found guilty of multiple tickets for gang activity, but never got a chance to see any evidence as it was based on confidential information that was not provided to him. Another told me about an infraction he received that was expunged on appeal, yet he was held in segregation on AD status after that fact was known. Other prisoners at Menard also described the hearing process as "bogus."

112.    A prisoner at Lawrence told me he had been pressured by internal affairs staff to "snitch" on inmates, refused to do so, and then received a ticket for STG activity. Another said he was finally released to general population after several years on AD status but within 15 days received another infraction for STG activity, based solely on confidential information, which he was not provided during his hearings. Following his DS sanction he was returned to AD.

113.    A prisoner at Logan described to me that the hearings process is "not fair." Another described the process as "bogus." Characterizations I heard across the prisons. A third prisoner at Logan told me her hearing was, "not like a hearing" and that it was not fair. And another said that internal affairs rely on snitches, but prisoners have figured that out and give false information on other prisoners in order to get their enemies in trouble. The use of such consistent language, including "not fair" and "bogus", in my opinion, indicates uniformity in the perception and experience of the prisoner population of IDOC hearings.

---

[95] 0210630

114.    While there are other areas of operation in the IDOC that undermine prisoners' perception of legitimate authority by IDOC officials, the depth of the collective angst about the hearing process by nearly every prisoner I interviewed is striking and very important to understand why IDOC's systemic use of restrictive housing is so troubled.  In my own experience as a correctional administrator, institutional security is reliant on the perception by the inmate population that the profound authority corrections officials have over prisoners is exercised in a legitimate manner, which is judged by prisoners as whether or not the staff are capable and demonstrate through their actions that they are fair. Authorities that run prison systems sometimes make mistakes, but when they do, it is critical for institutional security that prisoners know mistakes will be corrected when they are identified by actually making the relevant corrections. But it is even worse when entire systems are perceived to be unfair. That is certainly my opinion based on my experience when I was a Superintendent of a prison and when I supervised Superintendents for over 20 years of my 35-year career in corrections.

115.    But this is more than a personal opinion. Researchers have looked at the issue of the legitimate exercise authority when studying violence in prisons.

> In England, the prestigious Woolf Inquiry into the disturbances at Manchester Prison and elsewhere in 1990 took the view that a widespread sense of injustice among prisoners about their general treatment in prison was causally implicated in the scale of the disorders (see, e.g., Woolf 1991,paras. 9.24, 14.437-38). "Injustice" was a term used by Lord Justice Woolf in a rather broad way, to include the basic "quality of life" for prisoners (adequate living quarters, food, and so on), various informal aspects of inmate life (including the manner of prisoners' treatment at the hands of staff), and formal procedures (such as the **disciplinary** [emphasis added] and grievance systems).

> Woolf did not use the term "legitimacy," but in the debates
> following publication of the Woolf Report, my colleagues
> and I took the view that, if indeed "justice" does help to
> sustain order in prisons (as Woolf proposed) then it does so
> because of the contribution that it makes to the legitimation
> of the prison authorities and the prison regime in the eyes
> of the prisoners. In our analysis, the acquiescence or
> otherwise of prisoners to the kinds of authority claimed or
> exercised over them by officials is a variable matter,
> centered around a complex matrix of interactions between
> prisoners' expectations of their captivity, and the reality of
> that captivity. In particular, the core issue is whether,
> judged by the reasonable standards of the wider community
> in which the prison is set, prisoners come to see the
> behavior of their custodians as being justifiable,
> comprehensible, consistent and hence fair-or, alternatively,
> unwarranted, arbitrary, capricious, and overweening (for
> fuller analyses, see Sparks and Bottoms 1995; Sparks,
> Bottoms, and Hay 1996).[96]

116.    While the perception of authority is critical to the disciplinary hearing

process, there are also a number of problems with the related IDOC policy,

Administrative Directive 504.600 – 504.680, Administration of Discipline. This policy

was recently revised in 2017.

117.    A quick, low cost and very efficient way to improve the perception of

legitimacy of the disciplinary process is to require that the disciplinary hearing be

recorded, to include the testimony of all witnesses. This is a common practice in most

jurisdictions and creates a record of what actually happened at the hearing that can be

examined on appeal or if there are disputes about whether or not the discipline policy was

actually followed. It also has the secondary impact of improving the professionalism of

the staff involved since their performance can and should be reviewed by higher

---

[96] Anthony E. Bottoms, Interpersonal Violence and Social Order in Prisons, Crime and Justice, Volume 26, Prisons (1999), page 254.

authorities. The absence of a record makes it impossible to determine what transpired during the hearing. The current policy for IDOC makes this critical practice of recording hearings permissive.

> The Adjustment Committee may require that any part of the hearing process be recorded, including, but not limited to, a self admission of guilt by the offender.[97]

This was a complaint I heard from the prisoners I interviewed, that there was no actual record of what happened at the hearing. As a former Superintendent, I sometimes relied on these recordings to inform my decision making when responding to a prisoner's appeal. This would not be possible in the IDOC unless the Adjustment Committee elects to record the hearing.

118.     The reluctance of IDOC to record their hearings is demonstrated in the deposition of Mike Atchison, former Chief of Operations for IDOC. First, he says it is a matter of cost.[98] While there is certainly a cost it is relatively minimal for a large agency. But then he says, when discussing the possibility of recording hearings, "That has an undermining effect on staff too."[99] He expresses his concern that the staff may not feel they are trusted if the hearings were to be recorded. I think he is clearly wrong about this, and it does have the flavor that the tail is wagging the dog. It is not about trusting the staff. The purpose of recording hearings is to establish a record that can be reviewed when important decisions are being made about the freedoms and privileges of the prisoner or whether or not someone might be sanctioned to restrictive housing.

---

[97] 010891
[98] Atchison, Mike 10-22-2018 deposition, page 69, line 6.
[99] Ibid, page 71, line 1

119.    Another problem with the current policy, it does not require that the Adjustment Committee review any video or photograph that may be available of the incident being adjudicated. If the prisoner challenges the accuracy of the officer's disciplinary report and video or photographs exist, it should be required viewing by the adjustment committee, and must include a process whereby the prisoner is able to view the video or photos. Videos can be and often are clear evidence to determine whether or not misconduct occurred. Several prisoners shared with me they believed they would have been exonerated if the Adjustment Committee had viewed by the related video.

120.    And another issue, the current policy allows the use of a voice stress analyzer (VSA).

> Polygraph or voice stress analysis results may be considered, but may not be the sole basis for finding the offender guilty of the offense.[100]

The reliability of the VSA has been questioned for more than a decade. In 2004, Mitchell S. Summers, an associate professor from the Washington University in St. Louis said, "In our evaluation, voice-stress analysis detected some instances of deception, but its ability to do so was consistently less than chance — you could have gotten better results by flipping a coin."[101] A second study, reported in 2008, used nearly identical language in describing the VSA: "According to a recent study funded by the National Institute of Justice (NIJ), two of the most popular VSA programs in use by police departments across

---

[100] 010891
[101] Jerry Everding, Research Casts Doubt on Voice-Stress Lie Detection Technology (Feb. 10, 2004), available at http://news.wustl.edu/news/Pages/669.aspx.

the country are no better than flipping a coin when it comes to detecting deception regarding recent drug use".[102]

121.    The fact that the VSA is apparently used in the Illinois Department of Corrections is of great concern to this writer. In my experience as the Deputy Secretary in the Washington State Department of Corrections, when I directly supervised the chief investigator for our agency, we explored and rejected the potential use of the VSA in our system. We determined it was a tool without sufficient evidence of its efficacy to use in inmate discipline cases where liberty interests were at stake. Unfortunately, it is apparently relied upon within the IDOC, and they should abandon this practice.

122.    Other problems with the IDOC hearing process include frequent reliance on confidential information to find prisoners guilty—witness testimony that cannot by definition be rationally challenged since the details of the testimony are not shared with the prisoner, making it next to impossible for the prisoner to mount a defense. Many prisoners wind up in DS (and in AD) as a result of confidential information. And, sometime hearing officials call witnesses to the hearing requested by the prisoners and sometimes they do not. When prisoner witnesses are not called there must be clear documentation in the record that they were not called and why they were not called.

123.    In August of 2018 the hearing record for a prisoner says, "No witnesses requested."  Then, on the same page in the narrative report it says, "I/M Martinez was put down as a witness but was not called as a witness due to the fact that there was not an

---

[102] Kelly R. Damphousse, Ph.D., National Institute of Justice, "Voice Stress Analysis: Only 15 Percent of Lies About Drug Use Detected in Field Test," March 16, 2008, nij.ojp.gov: http://nij.ojp.gov/topics/articles/voice-stress-analysis-only-15-percent-lies-about-drug-use-detected-field-test

inmate number provided."[103] Based on my experience (I served as a disciplinary hearing officer during my career for most of the 1980's) it would not be all that difficult to make some inquiries to figure out who the requested prisoner was. However, the accused prisoner's own nine-page statement submitted in advance of the hearing clearly shows he identified four witnesses he asked to have called, including two prisoners he identified by cell number. The accused prisoner also identified in his nine-page statement questions he would like to have his witnesses asked. He also raised several problems with the allegations, which do not appear to have been considered by hearing officials.[104] In this incident the hearings officials relied on confidential informants to convict the prisoner of assault and gang activity but failed to even identify when or where the alleged misconduct occurred, saying they did so "for the safety and security of the institution."[105] The prisoner was assigned a sanction of 6 months in DS without the ability to adequately challenge the allegations or have his witnesses testify. This pattern is typical in the IDOC.

124.    Failing to call witnesses requested by the accused prisoner has been going on for a long time in the IDOC. In June 2013 a prisoner refused to move into a cell with another prisoner known as a feces thrower. He identified a witness he wanted to have called, but that person was not called. The reason given was, "Testimony Would Be Irrelevant."[106] He was found guilty and received a sanction of 3 months segregation without the opportunity to present an adequate defense.

125.    The IDOC disciplinary hearing process would be greatly improved if there were an audio recording of hearings. That would allow the prisoner to construct an

---

[103] 0345349
[104] 0345355 – 0345363
[105] 0345349
[106] 0143370

adequate appeal (to include possible litigation) when they believe the hearing process was unfair or violated IDOC hearing rules. Absent that kinds of accurate information, it is impossible for the prisoners to challenge what they believe are errors in the hearing process.

126.    As a result of these flaws in policy and practice in IDOC disciplinary hearings, prisoners are unnecessarily placed at risk of harm when they are sentenced to time in restrictive housing and subject to the stresses well-known of such placement.

**VIII.   Placement in Administrative Detention and Subsequent Reviews**

127.    I interviewed several prisoners in AD. It was universal that these prisoners could not articulate what they needed to do to get out of restrictive housing placement, and many were being held for reasons that were never fully articulated to them. They were simply told, over and over again, that the information resulting in their confinement was confidential. Some had been in this status for years, some for decades. AD placement is perceived as a dead end and prisoners were left with little hope about their futures. This is a very bad way to manage a restrictive housing population. Prisoners in restrictive housing, as do the staff, need to know what a prisoner must do in order to gain release to general population. Such a structure impacts the staff's approach to managing the restrictive housing population and it clarifies for the prisoner a pathway out of their current situation. And if they are not likely suitable for release anytime soon, which should be a very rare occurrence, they still need to know what is expected of them to improve their conditions of confinement. Again, the perception by the prisoners is that IDOC's authority is not being exercised in a legitimate manner. IDOC policy describes

AD as a "nondisciplinary status of confinement."[107]  The prisoners don't believe it and repeatedly mocked that policy statement. I agree with them. It is clearly an experience of being punished.

128.    Section 504.690 of Title 20 of the Illinois Administrative Code governs AD placement in the IDOC, revised in 2017.[108] There is also a related policy, 05.12.101, Administrative Detention Placement. On the eve of completing this report, Plaintiffs' received a revised version of 05.12.101, effective on September 1, 2019. While ever hopeful that perhaps this version would be an effort by IDOC to catch up with what is going on nationally regarding restricted housing, the new policy makes very few changes. Further, as explained below, it does not clearly define a way to either move through the phases or out of AD status entirely, provides no clearly defined criteria for who gets placed in AD status, nor any improvements to the hearing process, and the isolation in AD remains extreme and potentially without limit.

129.    Criteria for placement in AD is very vague in the Administrative Directive and includes such catch-all language as,"[i]nstitutional order" and "safety and security."[109] This is unchanged by the new policy. While those are important principles in corrections, they have been modified in other jurisdictions as corrections professionals have learned the risk of harm that segregation can present to prisoners.

130.    The American Correctional Association has modified their standards to further reduce reliance on the historical catch-all language used by the IDOC (and

---

[107] 20 Ill. Adm. Code 504.690.
[108] 010906 – 010907
[109] 010907

historically used in other jurisdictions) so that the specific threat is articulated and genuine. The current standard reads as follows:

> Written policy, procedure and practice provide that the placement of an inmate in Restrictive Housing shall be limited to those circumstances that pose a direct threat to the safety of persons or a clear threat to the safe and secure operations of the facility.[110]

ACA has inserted "direct threat" and "clear threat" in their standard, language that emphasizes that restrictive housing placement must be weighed against the risk of harm to the individual prisoner. These additions make clear that the risk is real and that they must be articulated both in policy and in the documentation of individual cases. The IDOC policy has not made changes consistent with this standard.

131.    For prisoners placed on AD status in the IDOC, if appears that no review of the decision for AD placement is required to take place for 30 days.[111] The policy language says,

> Absent a finding of exigent circumstances[112] by the Committee, an administrative review hearing shall be conducted within thirty days after an offender's initial placement in administrative detention.[113]

132.    Even worse, the policy does not require that the prisoner be informed of the committee's decision for up to another 30 days. The policy says,

> The decision shall be documented, in writing, and a copy provided to the offender within 30 days of the Committee review, and the original shall be maintained in the offender's master file.[114]

---

[110] American Correctional Association, Restrictive Housing Expected Practices, January 2018, 4-RH-0001. "Restrictive Housing" is a synonym for segregation.
[111] 010870
[112] "Exigent circumstances" is not explained or defined.
[113] 010870
[114] 010871

This is unchanged in the new policy.

133.    In my experience as a practitioner and corrections expert these time frames for a hearing and notice to the prisoner is far beyond the policy and practice in other jurisdictions and will result in prisoners being held in restrictive housing when they could and should be released as a result of an official review.

134.    The ACA calls for an "official review" within 24 hours.[115] IDOC has no such requirement until after the person has been placed in segregation for thirty days. This omission in policy and practice alone is egregious and likely to result in problems with prisoners who are not told for over four weeks why they have been moved to segregation.

135.    The ACA then requires that,

> Written policy, procedure, and practice provide for a review of the status of inmates in Restrictive Housing by the classification committee or other authorized staff every seven days for the first 60 days and at least every 30 days thereafter.[116]

136.    The IDOC also ignores this standard and instead calls for subsequent reviews to take place every ninety days. Their policy says,

> The Committee shall meet at least once every 90 days, or sooner if deemed appropriate, to conduct a review of each offender placed in administrative detention to determine if continued placement is appropriate. The Committee shall afford the offender the opportunity to appear in-person before the Committee at six-month intervals during the time of one of the 90-day reviews.[117]

---

[115] American Correctional Association, Restrictive Housing Expected Practices, January 2018, 4-RH-0001.

[116] American Correctional Association, Restrictive Housing Expected Practices, January 2018, 4-RH-0008 (Ref: 4-4253).

[117] 010871

74

This is unchanged in the new policy.

137. The IDOC ignores the standard that prisoners be reviewed every seven days for the first sixty days, a requirement that in my opinion that allows the correctional staff to determine how the prisoner is doing managing the stress of living in a segregation cell. The IDOC requirement for ninety-day reviews after the first review is longer than the ACA requirement for sixty-day reviews after the first thirty-day review. These review requirements are unchanged by the new policy.

138. Additionally, problematic is that the IDOC only allows the prisoner to attend every other one of the reviews, not every one. This omission in policy does not allow the prisoner to always be there to present their case, another frustration for the prisoner. The prisoner should be allowed to attend every hearing and be able to explain why they think they should be released from AD status. This is unchanged in the new policy.

139. Unfortunately, the hearings that do occur are perfunctory and do not meaningfully engage the prisoner to explain why they are in AD and what they have to do in order to return to general population. This can be seen in the records of those hearings, that often say very little, and in the frustration expressed to me by prisoners on AD status during my private interviews.

140. This is confirmed in the deposition of former Chief of Operations, Mike Atchison when discussing if there is a way a prisoner knows what they need to do to get back to general population from AD status,

> Q. There is no contract or guidance or anything like that that is given to a prisoner saying if you do A, B, and C then we are going to let you out of here?

75

A.  I don't know of one, no.[118]

141.    The new policy does reference "programming participation"[119] in

determining whether or not to continue placement in AD as part of the review process,

but there is no way, at this point, to determine if such programming is even available or

will meaningfully impact the length of time a prisoner must serve in restricted housing.

142.    One of the prisoners I interviewed told me he did not know what he had to

do to get out of AD and that there is no program associated with AD that might help him

achieve his release. I reviewed the available records of his reviews[120] and he is correct.

This individual first was assigned to AD at Menard[121] in August of 2015 after serving a

6-month restrictive housing sanction for possession of a weapon and staff assault.[122] In

that initial review there is nothing to tell the prisoner how long he will be in AD status or

what he must do to earn a return to general population. In January of 2016 his status was

reviewed again and the information provided in this report is essentially the same as what

was said in his initial placement review—he is accused of being a high ranking member

of a gang and had disciplinary reports for staff assault and possession of a weapon.[123] A

written notice followed to the prisoner telling him that he was being advanced from Phase

2 to Phase 3,[124] although it gives no information on what he did to be advanced. Nor is

there any information describing what he needs to do to earn his way off of AD. This

---

[118] Atchison, Mike 10-22-2018 deposition, page 141, lines 18 – 22
[119] Administrative Detention Placement, .05.12.010, effective 9/1/19, I.5.c
[120] The last review I have for this person dates from July 2016, however he was still on AD when I interviewed him in 2018.
[121] He had previously been in AD at Tamms since 2011. He has been primarily rotating between AD and DS ever since.
[122] 0252167 – 0252168
[123] 0252163
[124] 0252164

pattern then follows for subsequent reviews; including notations that he has received no additional disciplinary reports during the review period.[125] In the last review the report says he was "Recently named by multiple sources as highly influential and very active with the Latin Folks,"[126] but there is no detail about who, when, or where this was said and what "highly influential" means to IDOC authorities. This person is simply stuck, with no articulated path out of AD. This pattern is typical of other prisoners I interviewed who were in AD status.

143.    I interviewed several prisoners who were in AD status.[127] The "no way out" nature of AD best describes their comments. Here are comments from a few of them:

- There are no programs in AD. The AD review process is meaningless.

- His ticket was expunged but they keep him in AD anyway. "I could not tell you what it takes to get out of AD."

- He has been in AD for violent behavior since 1999. He says he has no disciplinary reports for violence since.

- He stopped going to the AD reviews; it is a waste of time. Won't ever get back to GP. The only way out is to snitch.

- The only programs for AD are if you are SMI. He was told, "If he did not become a snitch, we will put you in AD."

- He was in a fight in 2016. Staff wanted him to snitch, but he couldn't. The written response after a hearing simply says, "remain." He told me the hearings were a "hollow formality." At any time the

---

[125] 0252159 and 0252155
[126] 0252155
[127] I interviewed 4 prisoners on AD status at Lawrence. Inexplicably, there was nothing in their disclosed files documenting any of their AD reviews.

STG issue can be raised to keep him locked up or to
lock him back up.

- He attends his hearings; they ask questions but are
disrespectful. They are not clear why he is in AD.
He received a gang ticket in 2002. It was expunged,
but he believes this may be what is keeping him in
AD. He has not received a ticket in 2 years. They
want him to snitch, but he can't. It would put him
and his family outside the prison in danger.

- "Does anything I do matter?" No idea how to get
out. He offered me this poem:

    Hopelessness is a poster on my wall.
    I didn't put it up, but I can't take it down.
    When I watch TV to distract myself, I can see it out
    of the corner of my eye.
    When I go outside, I can escape it.
    When I go back in, dread sets in.
    I know I will have to look at it again.

144. What is common about all of these cases is a lack of clear direction to the
prisoner or of any kind of system to work prisoners out of segregation. The problem is
not just that prisoners are not told of what they need to do to get out of AD—the rules
themselves provide no guidance to staff. This apparently leaves the decision up to the
subjective judgment of staff that a person is "ready" to be released from AD, with no
standards to guide this decision. The perception among prisoners that the system is
arbitrary is correct.

145. Dr. Austin, who worked with Vera in 2011 to assess IDOC's use of
restrictive housing, is a widely recognized corrections expert, and he said in his
deposition,

    And then if you are admitted to administrative segregation,
    there has to be a structured way that you can get out of an
    administrative segregation. And that has to be transparent

78

> and I guess reasonable in terms of how long it's going to
> take you to get out of an administrative segregation.[128]

I have worked with Dr. Austin on segregation issues in the states of New York and

Mississippi. I have great respect for his work and could not agree more with the opinion

he expressed above. It is irresponsible and detrimental to good prison safety and security

to place prisoners in segregation and leave them in the dark as to what they need to do to

earn their way back to general population.

146.    The IDOC is out of step with changes in corrections practices regarding

restrictive housing that are taking place in multiple jurisdictions around the country.

147.    In my own state, in the Washington Department of Corrections (WDOC),

we began focusing on ways to decrease the numbers of prisoners in restrictive housing,

especially those who frequently returned to that status, over a decade ago. When I was

working in the WDOC, we launched two programs aimed at getting inmates off of

Intensive Management Status (IMS)—the equivalent of the IDOC restrictive housing

population—one at the Washington State Penitentiary in Walla Walla and one at the

Clallam Bay Corrections Center. Researchers from the University of Washington (UW)

tracked outcomes of both programs.[129] [130]

148.    The outcomes for the program were impressive. The evaluation of the

program at Walla Walla was open and candid. It concluded that inmates who went

---

[128] Austin, Ph.D., James Frank 10-02-2017 deposition, page 103, lines 18 - 24

[129] *The Reintegration Program (RIP at Washington State Penitentiary, A Program Evaluation*, David Lovell, Ph.D., M.S.W., University of Washington, August 2009 and Memo from David Lovell, *CBCC ITP Evaluation*, July 20, 2010.

[130] We lost the program at Walla Walla (it has since been reconstituted) as well as our twenty-year contract for a collaborative relationship with the UW due to lack of funding caused by the global economic collapse of 2008.

through the program were four times more likely to not return to restrictive housing than those in a control group.

149.    The program at Clallam Bay is still in existence to this day. As our contract with the UW was ending, the lead researcher authored a memo that indicated inmates who completed the program were six times more likely not to return to restrictive than those in a control group.[131] The last time I spoke to the manager of this program at Clallam Bay, he told me that 80% of program graduates were not returning to restrictive housing.

150.    In the State of New York, a Settlement Agreement with the state was achieved regarding their restrictive housing practices in 2015. The practices in New York then were very comparable to the practices in Illinois today regarding their overreliance on disciplinary segregation and very poor conditions of confinement in their restrictive housing units. I have served as monitor for the Plaintiffs in the *Peoples v. Annucci* case[132] and inspected their prisons for compliance with the agreement twice a year since 2016. Their system has changed dramatically. Their total restrictive housing population has been reduced by about 40%, and the conditions for prisoners have improved. They established step-down programs and other specialty programs to help prisoners learn new skills to help keep them from returning to restrictive housing. While there is still work to do in New York, much has been achieved.

151.    I have also been part of achieving settlement agreements regarding restrictive housing in the states of Arizona and Delaware. Similar changes are going on in multiple jurisdictions around the country, some due to litigation and others due to agency

---

[131] *CBCC ITP Evaluation,* David Lovell, July 20, 2010.
[132] No. 1:11-cv-02694 (S.D.N.Y.)

leadership. It is unfortunate that Illinois has done so little in this regard when there is so much more they could be doing to improve the safety and security of their prison facilities.

### IX.   Reports of Excessive Physical Force and Verbal Abuse

152.    Incident reports and videos of use of force events were not provided in discovery for this report. However, prisoners consistently reported to me many examples of both during my private interviews. I have interviewed hundreds of prisoners in dozens of prisons and jails in twelve different states working as a corrections expert or consultant during the last six years. Only once in a single prison system have I encountered such a volume of reports of physical and verbal abuse[133] as I heard during my prison inspection of IDOC segregation units. The volume of such reports from the prisoners was astounding and is of great concern to me as a long time corrections professional.

153.    Dr. Stewart in his report as a monitor in the *Rasho v. Baldwin* case said,

> The final area I wish to point out in this summary is the persistent evidence of physical abuse perpetrated by the custody staff at Pontiac on the mentally ill offenders housed in the mental health unit as well as other segregated housing units at Pontiac. . . . I am requesting that the Department conduct a full scale investigation of this abuse and report the results to the monitoring team as this is clearly a component of the Settlement Agreement.[134]

---

[133] During that prison inspection the Deputy Director of the department was at the prison. I took him aside and told him what I had been hearing from the inmates in his prison during my interviews. He acknowledged he was aware of the problem and had the funding to install cameras in the area where most of the abuse was occurring. A year later I inspected the same facility and the Deputy was again present. He took me to the areas of concern and showed me the new cameras. I then interviewed prisoners and reports of abuse had all but been eliminated.

[134] Second Annual Report of Monitor Pablo Stewart, MD, *Rasho v. Baldwin*, No. 1:07-cv-1298-MMM-JEH at Dkt. No. 2122 (C.D. Ill.), page 10.

* * *

> Corporal punishment is an open question with persistent
> complaints at Pontiac that the Monitor finds credible and
> which have not, in his view, been adequately addressed in
> almost 24 months of raising it. Multiple examples of
> alleged custody staff abuse as well as several alleged
> incidents of unprofessional conduct at Logan are very
> troubling.[135]

154.    Unfortunately, the reports I received from prisoners went beyond Pontiac

and Logan. I had private interviews with fifty-four prisoners during my inspection of six

IDOC prisons. Thirty-six prisoners reported being the subject of physical abuse or of

personally witnessing such incidents. 77% at Pontiac, 73% from Dixon, and 100% of the

prisoners at Menard made this claim.[136] This was not information I was seeking in my

interviews. It simply emerged as prisoners described to me their experience in IDOC

segregation units (not necessarily the prison they were in at the time).

155.    The types of claims made were primarily physical beatings, almost always

out of range of security cameras. Other concerns were expressed about insufficient

decontamination after chemical sprays were used and officers demanding that two

prisoners fight before they would move them from a double cell situation. There were

also racial complaints, primarily at Menard, where racial epitaphs were made towards

African American prisoners. As we were departing Lawrence after spending a day at the

facility, the Major said, "We are the septic tank of IDOC." That comment was

unprofessional and indicative of a culture that in not conducive to good security or

rehabilitation.

---

[135] Ibid, page 94.
[136] The rate at Stateville was 40%, 33% at Logan, and 20% at Lawrence.

156.     While I have not had an opportunity to review all of IDOC's Use of Force policies, I have seen their policy on cell extractions.[137] It is fundamentally flawed, as it does not require an attempt to de-escalate a potential use of force situation for a prisoner who is securely locked in his cell but refuses to cuff up or otherwise exit the cell. I have been working on this issue in the Maricopa County jail since 2013. In my first report to the court I recommended that the county require an intervention by mental health staff for prisoners prior to force being initiated. In my subsequent reviews and reports to the court I found that about 60% of the time force was avoided. Such a change in practice has an impact on the culture of the facility as officers learn that it is safer for everyone when force can be avoided. The IDOC should adopt such a practice.

157.     I strongly concur with Dr. Stewart's recommendation that a full-scale investigation be conducted. I do not know whether or not this is occurring. I do know that any future work on this case about segregation in the IDOC should include a full review of how force is being used in those segregation units.

## X.     Risk of Harm to Prisoners Held in Segregation

158.     There is broad consensus in the corrections field and in the academic literature that the placement of prisoners in segregation creates a significant risk of harm, for both people who are mentally ill and people without a preexisting mental illness. Corrections administrators have a responsibility to know this information and respond to reduce the risk of harm to prisoners in their care. It is not just the moral and legal imperative of organizing around the principle of reducing the risk of harm—in my

---

[137] IDOC 05.01.173, Calculated Use of Force Cell Extractions

experience reducing the use of segregation actually makes the prison safer for both

employees and the prisoners.

159.    Dr. Terry Kupers, one of the country's foremost psychiatric experts on the

impact of segregation on the mentally ill prisoner has said:

> It is stunningly clear that for prisoners prone to serious
> mental illness, time served in isolation and idleness
> exacerbates their mental illness and too often results in
> suicide. This is the main reason that federal courts have
> ruled that prisoners with serious mental illness must not be
> subjected to long-term isolation.[138]

160.    In 2012, the American Psychiatric Association issued the following

position statement:

> Prolonged segregation of adult inmates with serious mental
> illness, with rare exceptions, should be avoided due to the
> potential for harm to such inmates. If an inmate with
> serious mental illness is placed in segregation, out-of-cell
> structured therapeutic activities (i.e., mental
> health/psychiatric treatment) in appropriate programming
> space and adequate unstructured out-of-cell time should be
> permitted. Correctional mental health authorities should
> work closely with administrative custody staff to maximize
> access to clinically indicated programming and recreation
> for these individuals.[139]

161.    Dr. Terry Kupers has also opined on the dangerous effects of segregation

on all prisoners, regardless of whether they have preexisting mental health conditions:

> It is predictable that prisoners' mental state deteriorates in
> isolation. Human beings require at least some social
> interaction and productive activities to establish and sustain
> a sense of identity and to maintain a grasp on reality. In the
> absence of social interactions, unrealistic ruminations and

---

[138] Kupers, T., 2013, *Isolated Confinement: Effective Method for Behavior Change or Punishment for Punishment's Sake?* The Routledge Handbook of International Crime and Justice Studies (2013), page 4.

[139] APA Official Actions, Position Statement on Segregation of Prisoners with Mental Illness (approved Dec. 2012; retained Dec. 2017)

> beliefs cannot be tested in conversation with others, so they build up inside and are transformed into unfocused and irrational thoughts. Disorganized behaviors emerge. Internal impulses linked with anger, fear and other strong emotions grow to overwhelming proportions.[140]

162.    Dr. Haney, a professor from the University of California-Santa Cruz and who is another expert in this case, has been involved with several landmark cases related to the impacts of segregation. He has said, based on the results of several decades of research, that,

> There is not a single published study of solitary or supermax-like confinement in which non-voluntary confinement lasting for longer than 10 days, where participants were unable to terminate their isolation at will, that failed to result in negative psychological effects. The damaging effects ranged in severity and included such clinically significant symptoms as hypertension, uncontrollable anger, hallucinations, emotional breakdowns, chronic depression, and suicidal thoughts and behavior.[141]

163.    In 2016, the American Public Health Association said,

> Prisoners in long-term solitary confinement are subject to significant mental suffering and deterioration. They may develop anxiety, panic attacks, paranoia, cognitive impairment, social withdrawal, somatic symptoms, hypersensitivity to external stimuli, and perceptual disturbances.[142]

164.    One of the more recent studies about the risk of suicide comes out of the New York City jail system. That report found,

> [T]hat acts of self-harm were strongly associated with assignment of inmates to solitary confinement. Inmates

---

[140] Kupers, T., *Isolated Confinement: Effective Method for Behavior Change or Punishment for Punishment's Sake?* The Routledge Handbook of International Crime and Justice Studies (2013), page 5.

[141] Haney, C., *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, Crime & Delinquency (2003), page 49.

[142] American Public Health Association, *Solitary Confinement as a Public Health Issue*, Policy No. 201310, November 5, 2013.

> punished by solitary confinement were approximately 6.9
> times as likely to commit acts of self-harm after we
> controlled for the length of jail stay, SMI, age, and
> race/ethnicity.[143]

165.    Based on my training and experience, segregation also presents risk to

inmates who have not been previously diagnosed as mentally ill. The American Bar

Association acknowledges this reality and the related research in their public statements:

> Some prisoners are sufficiently mentally resilient (or their
> stays in segregation sufficiently short) that isolating
> confinement does them no lasting harm; for others, the
> human cost can be devastating. Abundant research
> demonstrates that prisoners in segregation often
> experience physical and mental deterioration.[144]

166.    In the face of the research and the consensus of standards on the issue,

multiple jurisdictions, including my own, have taken steps to mitigate the risk that

segregation presents to the mentally ill. Prison systems throughout the country have

found that an overreliance on restrictive housing is not necessary for good institutional

safety and security or conductive to motivating prisoners to change their behavior, and it

often inflicts serious harm on prisoners.

167.    As I referenced earlier in this report, the Washington DOC worked for

more than a decade to establish effective step-down programs for prisoners who

repeatedly returned to segregation. We targeted the most recalcitrant prisoners to see

what we could do to offer them structured interventions that developed the internal skills

and self-control necessary to help them live in general population. Researchers from the

University of Washington studied our success with program outcomes. Much has been

---

[143] Venters, et al., *Solitary Confinement and Risk of Self-Harm Among Jail Inmates,
Research and Practice*, American Journal of Public Health, Vol. 104, No. 3, March 2014,
page 445.
[144] American Bar Association, *ABA Standards for Criminal Justice, Third Edition:
Treatment of Prisoners* (2011), page 33.

learned in Washington from these initial efforts and their step-down programs continue to operate and improve to this day.

168.    While the IDOC has made some effort to reform their use of restrictive housing, their current practice continues to overuse the practice, placing too many prisoners at ongoing risk of harm in living conditions that are far below contemporary standards.

## XI.    Supplementation of Opinions

169.    I reserve the right to supplement or amend my opinions in light of any critique of my report, any alternative opinions advanced by or on behalf of defendant, or additional evidence, testimony, discovery, or other information that may be provided to me after the date of this report.  In addition, I expect that I may be asked to consider and testify about issues that may be raised by Defendant's fact witnesses and experts at trial or in their reports.  It may also be necessary for me to modify or to supplement my opinions as a result of ongoing expert discovery, Court rulings, testimony at trial, or ongoing studies and investigations.

## XII.    Conclusion

170.    The IDOC has known for nearly a decade that the more time a prisoner spends in restrictive housing that his or her behavior does not improve. The IDOC invited the Vera Institute for Justice into study IDOC's use of restrictive housing, a team that included Dr. Austin who I reference above. Vera told them in 2011,

> Prisoners who spent <u>less time </u>in segregation were <u>not</u> more likely to commit new violations during the first 12 months of release to general population.[145]

---

[145] 008061

87

171.    Yet the IDOC has persisted in this failed strategy, making only minor modifications to the length of restricted housing sanctions that hearing officials may impose.

172.    Vera had many more important messages to the IDOC regarding their restrictive housing practices, which have been ignored. Some of Vera's findings included the following:

> 1. The current system is based predominantly on punishment and degraded conditions of confinement, which assumes that current levels of punishment are <u>deterring</u> subsequent behavior.
>
> 2. The conduct exhibited by prisoners admitted to DS and ADS warrant sanctions, but it is not clear that the times of placement and lengths of stay are <u>proportionate</u> to prior and current negative behavior.
>
> * * *
>
> 5. The <u>conditions of confinement</u> in DS are not acceptable with respect to recreation, showers, mental health treatment, or contacts with clinical-services staff, are not in line with best or standard practices in other systems.
>
> 6. The use of the Step Down Program from ADS is extremely limited. In part, this <u>maintains</u> the size of the ADS population and contributes to long stays. Pontiac has achieved positive outcomes in their ADRMP Step Down Program and believes they can successfully serve more participants in the program.[146]

173.    In sum, Vera informed the IDOC, and I strongly concur, that they are relying on lengthy stays in restricted housing, and it does not change behavior; that the conditions of confinement in their restrictive housing units are unacceptable; and they

---

[146] 010946

needed to expand their step down program. The IDOC did not heed this wise advice at the time, but it is time to do so now. To that end I recommend:

174.    The IDOC limit the amount of DS time to 30 days, and that any subsequent sanctions are not served consecutively. If a prisoner receives a 30 day sanction and then another, there be a break between serving those sentences. Limiting DS to 30 days will require a change in policy.

175.    The policy guiding disciplinary hearings needs to be revised to require audio recording of all hearings. Findings of guilt for gang involvement must be based on actual behavior and not simply the perception that someone is a "gang leader."

176.    Rather than allow staff members from the facility to conduct disciplinary hearings, the IDOC should have individual hearing officers report outside the chain of command of the prison where they are doing hearings. A best practice is to have hearing officers report to central office and have them trained by attorneys familiar with prison case law, either the Illinois AG's office or by IDOC in-house counsel. This will ease the perception that the hearings are not fair since the hearing officers report to a central authority and not through the chain of command to the facility warden. In my experience, training developed and delivered by subject-matter expert attorneys will also reduce disciplinary-related litigation overall.

177.    Prisoners who require secure confinement after serving their DS sentences should be moved to AD. The policy for AD must be rewritten to mirror current ADA standards for restrictive housing placement and review.

178.     All prisoners in AD must be eligible to participate in a step down program.

Again, Vera offered concrete suggestions that are patterned after other jurisdictions,

including my own in the WDOC:

>   Proposed Incentive Program
>
>   - 90 Days in segregation
>
>   - Request to be in the program
>
>   - 3 Tiers/ 90 days in each tier
>
>   - Face to face reviews
>
>   - Mutual behavioral contract
>
>   - Incentives and privilege restorations will increase
>     with the completion of each tier and behavior
>     contract.[147]

179.     I concur but go further. The content of the step down program must be

based on the principles of cognitive behavior therapy (CBT). The National Institute of

Corrections offers several studies about the program's effectiveness.[148] In addition,

implementation of CBT is relatively low-cost. Those offering the program must be

trained, and fidelity to the program model is crucial, but it does not require an advanced

degree to deliver CBT. Additionally, prisoners in the step down program should have 8 –

10 hours of out-of-cell structured treatment time each week and, beginning with the ACA

standard of 1-hour out-of-cell recreation a day, should advance to 10 hours of

unstructured out-of-cell recreation time each week.[149]

---

[147] 016198

[148] https://nicic.gov/cognitive-behavioral-therapy

[149] It is my understanding that the *Rasho* settlement requires 10 hours out of cell time for prisoners with a diagnosed mental illness. My comments here apply to all prisoners, not just those suffering from mental illness.

180.     Unfortunately, the IDOC started down the road of a step down program at Pontiac but by 2018 no high-ranking official could speak to its status in the IDOC.[150] When asked about it former Director Baldwin said in his deposition, "I have no idea what that is."[151] Other IDOC officials made similar statements.[152] It is clear there is no adequate step down program in the IDOC. It is time to implement one, and there are several models in other jurisdictions to inform development of such a program in Illinois.

181.     Additionally, in the step down program, privileges should increase as prisoners graduate from one tier to another, as suggested by Vera, but small incentives, such as additional phone calls, increase in commissary purchases, phone calls home, and extra showers have been shown to be powerful motivators to improve behavior both in the WDOC and in prisons in New York State during each tier or phase of the program. Misconduct while in the program, except for the most serious offenses, should be handled by the step down treatment team in the form of information reports so that the misbehavior is rationally related to an individual's treatment plan.

182.     The conditions of confinement in IDOC's restrictive housing units need to be dramatically improved to include:

- Meeting ACA minimum standards for recreation

- Recreation yards must be supervised by officers on the ground and not in a tower

- Ending double celling in restricted housing

- Improved cleanliness in restricted housing units

---

[150] I understand that this was a program specifically meant for people stepping down from supermax. Once the supermax closed, the program ended.
[151] Baldwin, John 2018.10.17 deposition, page 217, line 5.
[152] See Taylor, Gladyse C., 2018.10.18 deposition, page 68, line 12 – page 69, line 70, line 6; Butler, Kimberly, 2018.10.15 deposition, page 70, line 21 – page 71, line 16.

- Cell fixtures, such as toilets and sinks, must be kept in good repair

- Make certain that individuals at risk for heat-related illness are not housed in units that increase the risk of harm

183. Such changes are not that difficult. They have been and are being implemented in a number of jurisdictions. It will involve retraining officers who work in the restricted housing units and closely monitoring to see that the changes are fully implemented. Without such fundamental change, the IDOC will continue to put prisoners in restricted housing at a significant risk of serious harm.

I declare under penalty of perjury that the foregoing is true and correct.

Eldon Vail

Executed on: 9/6/19