1       IN THE UNITED STATES DISTRICT COURT
2      FOR THE CENTRAL DISTRICT OF ILLINOIS
3              PEORIA DIVISION
4   ANTHONY GAY,                )
5          Plaintiff,     )
6    vs.                  )  No. 1:19-CV-01133
7   JOHN BALDWIN, et al.,       )
8          Defendants.    )
9       The deposition of SYLVIA BUTLER LANE,
10  called for examination pursuant to the Rules of
11  Civil Procedure for the United States District
12  Courts pertaining to the taking of depositions,
13  taken before Jennifer Buckley, a Certified
14  Shorthand Reporter, via video conference, on
15  January 20, 2023, at the hour of 10:00 o'clock
16  a.m.
17
18
19
20
21
22
23  Jennifer Buckley
24  License No:  084-004095

1

1   APPEARANCES:
2     ROMANUCCI & BLANDIN LLC
3     BY:  MS. SAM HARTON
4     321 North Clark Street
5     9th Floor
6     Chicago, Illinois  60654
7     (312) 458-1000
8     Sharton@rblaw.net
9        - A N D -
10
11    FULMER SILL
12    BY:  MR. CHRISTOPHER BERGIN
13    1101 North Broadway Avenue
14    Suite 102
15    Oklahoma City, Oklahoma  73103
16    (405) 433-7414
17    Cbergin@fulmersill.com
18       Representing the Plaintiff;
19
20
21
22
23
24

2

1   Appearances continued:
2     OFFICE OF THE ATTORNEY GENERAL
3     BY:  MR. NICHOLAS S. STALEY
4     100 West Randolph Street
5     13th Floor
6     Chicago, Illinois  60601
7     (312) 814-3711
8     Nstaley@atg.state.il.us
9        Representing John Baldwin, Jeffery
10       Sims, Shane Reister, Melvin Hinton,
11       Jamie Lynn Chess, Sylvia Butler,
12       Michael Melvin, Terri Kennedy, Emily
13       Ruskin, John Varga, Justin Wilks,
14       Sonja Nicklaus, and Rob Jeffreys;
15
16
17
18
19
20
21
22
23
24

3

1   Appearances continued:
2     CASSIDAY SCHADE, LLP
3     BY:  MS. JOY SYRCLE and
4     MR. JOSEPH N. RUPCICH
5     3100 Montvale Drive
6     Springfield, Illinois  62704
7     (217) 572-1714
8     Jsyrcle@cassiday.com
9     Jrupcich@cassiday.com
10       Representing Kelly Ann Renzi,
11       William Puga, and Wexford Health
12       Sources, Inc.;
13
14
15
16
17
18
19
20
21
22
23
24

4

Page 5:

1  Appearances continued:
2      DONOHUE, BROWN, MATHEWSON & SMYTH,
3      BY:  MR. BRIAN P. O'KANE
4      131 South Dearborn Street
5      Suite 1600
6      Chicago, Illinois  60603
7      (312) 422-0900
8      Okane@dbmslaw.com
9          Representing Pierre Nunez, Ph.D.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 7:

1  Exhibit No. 12                          67
2  Exhibit No. 13                          68
3  Exhibit No. 14                          70
4  Exhibit No. 15                           8
5  Exhibit No. 16                           8
6  Exhibit No. 17                           8
7  Exhibit No. 18                           8
8  Exhibit No. 19                          72
9  Exhibit No. 20                          75
10 Exhibit No. 21                          89
11 Exhibit No. 22                          87
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 6:

1                I N D E X
2  WITNESS                         EXAMINATION
3  SYLVIA BUTLER LANE
4    By Mr. Bergin                         9
5    By Ms. Syrcle                        80
6    By Mr. Bergin                        89
7    By Mr. Staley                        90
8
9
10
11              E X H I B I T S
12  NUMBER                      MARKED FOR ID
13  Lane Deposition Exhibit
14    Exhibit No. 1                        40
15    Exhibit No. 2                        48
16    Exhibit No. 3                        55
17    Exhibit No. 4                        56
18    Exhibit No. 5                        56
19    Exhibit No. 6                        61
20    Exhibit No. 7                        61
21    Exhibit No. 8                        61
22    Exhibit No. 9                        65
23    Exhibit No. 10                       65
24    Exhibit No. 11                       66

Page 8:

1              (Whereupon, Lane Deposition
2              Exhibit Nos. 1-21 were
3              previously marked for
4              identification.)
5              (Whereupon, the witness was
6              duly sworn.)
7      MR. BERGIN:  Would you please state your full
8  name.
9      THE WITNESS:  Sylvia A. Lane.
10     MR. BERGIN:  Ms. Lane, my name is Christopher
11 Bergin and I together with Sam Harton represent
12 the plaintiff here Anthony Gay and we're from
13 the firm of Romanucci & Blandin.
14     THE WITNESS:  Okay.
15     MR. BERGIN:  Let the record reflect that this
16 deposition is taken pursuant to notice and the
17 Federal Rules of Civil Procedure and the
18 applicable rules of the United States District
19 Court for the Central District of Illinois.
20         Where are you today, ma'am?
21     THE WITNESS:  I'm at home.
22     MR. BERGIN:  Let me start by just talking to
23 you about the ground rules.  I know you've been
24 deposed before, but the woman who is our court



1 reporter can't record the nod of the head or the
2 shrug of the shoulders in a written transcript.
3 And likewise if we talk over each other, she
4 can't take down accurately when two people are
5 talking at once.  You appreciate that, ma'am?
6      THE WITNESS:  Yes.
7      MR. BERGIN:  My questions from time to time
8 may be confusing or garbled or just otherwise
9 imprecise.  If you don't understand my question,
10 would you please just ask and I'll have it
11 rephrased or read back to you by the court
12 reporter?
13      THE WITNESS:  Yes, I will.
14           SYLVIA BUTLER LANE,
15 called as a witness herein, was examined and
16 testified as follows:
17           EXAMINATION
18 BY MR. BERGIN:
19      Q.  Let me start with a somewhat impolite
20 question under other circumstances.  What is
21 your date of birth?
22      A.  February 23, 1958.
23      Q.  You grew up in Chicago?
24      A.  I did.

9

1      Q.  When did you graduate from high school?
2      A.  I didn't graduate from high school.  I
3 have a GED.
4      Q.  Okay.  How much actual classroom high
5 school did you complete?
6      A.  I completed my freshman year and then
7 part of my sophomore year.
8      Q.  When did you get your GED?
9      A.  I believe it was 1981.
10      Q.  Okay.  And what kind of work were you
11 doing in that time period?
12      A.  I was a typist.
13      Q.  Okay.  What was the next type of
14 employment you had?
15      A.  I was a typist up until the time the
16 secretary -- up until the time I became a
17 psychologist.
18      Q.  Okay.  You did at some point get a
19 college degree, correct?
20      A.  Yes.
21      Q.  And that was from Chicago State?
22      A.  Yes.
23      Q.  When was that?
24      A.  1999 I graduated.

10

1      Q.  Okay.  Did you do actual classroom work --
2      A.  Yes.
3      Q.  -- pursuing that degree?
4      A.  Yes, I did.
5      Q.  My understanding is a portion of -- I'm
6 sorry.  My understanding is a portion of your
7 academic requirements were satisfied by life
8 skills; is that correct?
9      A.  Yes.
10      Q.  And prior experience?
11      A.  Yes.
12      Q.  Approximately how many college hours of
13 credit did you get for that?
14      A.  I believe it was 36.
15      Q.  36 credit hours?
16      A.  Yes.
17      Q.  And the remainder of them would have
18 been classroom work, correct?
19      A.  Yes.
20      Q.  And what is your degree confer in?
21      A.  It's -- the undergraduate?
22      Q.  Yes, ma'am.
23      A.  It's called Board of Governors.
24      Q.  Okay.  It's a Board of Governors

11

1 degree, correct?
2      A.  Right.
3      Q.  Did you have any particular major or
4 concentration other than knowing that it's a
5 Board of Governors degree?
6      A.  My minor was in psychology.
7      Q.  Okay.  What was your major?
8      A.  The major was called Board of
9 Governors.
10      Q.  Okay.  In your undergraduate program
11 did you take any courses in criminology?
12      A.  I did not.
13      Q.  Did you go immediately from
14 undergraduate to pursuing your graduate
15 psychology degree?
16      A.  I was off for one semester.
17      Q.  Okay.  My understanding is that your
18 degree is a PSD; is that correct?
19      A.  It's called PsyD.
20      Q.  Pardon me?
21      A.  It's called PsyD.
22      Q.  Okay.  And what is a PsyD?
23      A.  It's a clinical degree as opposed to
24 the Ph.D., which is a research degree.

12



1    Q.    Is it a doctor's degree?
2    A.    Yes.
3    Q.    When was that conferred?
4    A.    October 2005.
5    Q.    And by what institution?
6    A.    The Chicago School of Professional
7    Psychology.
8    Q.    Do you have any other degrees?
9    A.    I do not.
10   Q.    Are you licensed by the State of
11   Illinois?
12   A.    I am.
13   Q.    And what is the title of your
14   licensure?
15   A.    Clinical psychologist.
16   Q.    Did you take an exam for that?
17   A.    Yes, I did.
18   Q.    What year?
19   A.    The original year 2008.
20   Q.    And do you have to be recertified every
21   number of years?
22   A.    Every two years.
23   Q.    And do you have to take continuing
24   education?

13

1    A.    I do.
2    Q.    How many hours do you have to take a
3    year?
4    A.    24.
5    Q.    And has your license been continuous
6    from the time it was granted until today?
7    A.    Yes.
8    Q.    Okay.  Let me take you through, if I
9    can, the work you've had since the conferring of
10   your doctor's degree.  What was the first
11   employment you had after you got your doctor's
12   degree and you were licensed?
13   A.    I did a post-doc in private practice,
14   private practice for about three years.
15   Q.    That would take us up to what year,
16   ma'am?
17   A.    2008.
18   Q.    And after 2008 what did you do?
19   A.    Well, 2008 and during that period of
20   time I also worked for part-time for a couple of
21   social service agencies as well doing some
22   part-time work.
23   Q.    Did any of that work involve treating
24   the seriously mentally ill?

14

1    A.    Yes.
2    Q.    Under what circumstances?
3    A.    Well, during private practice I had
4    patients who suffered from serious mental
5    illness, so treating the seriously mentally ill
6    patients, patients who have mental disorders
7    such as major depression, schizophrenia.  So I
8    treated patients with serious mental illness.
9    So I worked for a social service agency treating
10   sex -- well, not treating sex offenders, victims
11   of sexual abuse.  I worked a short time treating
12   people, well, mostly children.
13   Q.    And that was clinical treatment,
14   correct?
15   A.    Yes.
16   Q.    Okay.  Did you work at a facility
17   called Choate?
18   A.    Yes.  But I also during that time I
19   started my own private practice in 2007 and so I
20   phased out of the private practice that I was
21   working for.  So I had my own private practice
22   from 2007 through 2013.
23   Q.    Okay.  And then in 2013 what did you
24   do?

15

1    A.    I closed my practice and I started to
2    do some locum tenens work.  So that's how I
3    started working for Choate Mental Health.
4    Q.    How long did you do locum tenens work?
5    A.    I did it for about a year and a half.
6    Q.    So that brings us up almost to August
7    of 2015?
8    A.    That brings us up to about October of,
9    well, October 2014 is when I stopped doing the
10   locum tenens.  So I started in like May I
11   believe of 2013.  I should have my CV in front
12   of me but I don't.
13   Q.    That's okay, ma'am.  You're doing
14   really good on memory.  Was Choate one of the
15   facilities that you were employed at as a locum
16   tenens?
17   A.    Yes.
18   Q.    How long were you at that facility?
19   A.    It was seven months.
20   Q.    Okay.  Where is it located?
21   A.    It's in Anna, Illinois.
22   Q.    Is it an Oklahoma -- excuse me.  Wrong
23   state.  Is it an Illinois Department of Mental
24   Health facility?

16

1    A.   Yes.
2    Q.   Okay.  That facility has inpatient
3 mental health care, correct?
4    A.   Yes.  It was a locked-in patient
5 facility.
6    Q.   Okay.  Were any of those patients from
7 the Illinois Department of Corrections?
8    A.   No.
9    Q.   So you have some months of direct
10 experience working with the seriously mentally
11 ill in an inpatient treatment center program,
12 correct?
13    A.   Yes.  I also worked with patients in a
14 locked facility during my period as a practicum
15 student.  And as when I worked as an intern
16 during my internship, I worked in a hospital in
17 Illinois with patients.
18    Q.   Based on your experience, do you agree
19 with me that a portion of the seriously
20 ill -- seriously mentally ill population need
21 inpatient treatment?
22    A.   Yes, I do.
23    Q.   After your time as a locum tenens
24 employee, what was the next employment you

17

1 chose?
2    A.   I worked with, I worked with wexford
3 for a short time in the prison and then I
4 started working for the state in the prison.
5    Q.   Was that Menard?
6    A.   Well, I worked at Pinckneyville first
7 and then I worked at Menard.
8    Q.   Okay.  When did you go to work for
9 Pinckneyville or at Pinckneyville?  Excuse me.
10    A.   When I first worked for Pinckneyville,
11 I believe it was May, May of 2014 through
12 October of 2014 I believe.
13    Q.   Who was your employer?
14    A.   It was Wexford.
15    Q.   And what was your title?
16    A.   Clinical psychologist.
17    Q.   Okay.  And you worked as a clinical
18 psychologist at Pinckneyville for approximately
19 eight months; is that correct?
20    A.   Five months.
21    Q.   Okay.  During that time did you see
22 patients who were also inmates?
23    A.   Yes.
24    Q.   Did that facility have an inpatient

18

1 mental health unit?
2    A.   I don't know what an inpatient mental
3 health unit is.  We -- I don't know what that
4 is.  So, no, I would say no because I don't in
5 the prison system I don't -- we don't have
6 inpatient mental health units.
7    Q.   What did you do -- now during that time
8 you provided therapy to inmates, correct?
9    A.   Yes, outpatient therapy.  I provided
10 outpatient therapy for offenders.
11    Q.   Was -- did you provide -- where was
12 that therapy conducted generally?
13    A.   It was generally in the housing units.
14    Q.   Was it group or individual or both?
15    A.   It was individual.  It was individual
16 and then I also provided segregation rounds, saw
17 the individuals when I would go into the housing
18 units.  And so by mainly it was individual I
19 would see them.
20    Q.   Can you define for me what segregation
21 is?
22    A.   Segregation is where they keep
23 offenders that are housed differently.
24 Segregation is where individuals are kept

19

1 basically in the restrictive housing units.
2 They have less privileges than other offenders
3 is how I can explain it in terms of they don't
4 have -- it's not general housing.  So there's
5 restrictive housing and then there's general
6 housing where offenders in the segregation or
7 restrictive housing have less privileges.  They
8 don't have the same type of visitation.  They
9 don't have the same type of commissary or
10 outside privileges that offenders in general
11 housing would have.
12    Q.   Is segregation sometimes used as
13 punishment?
14    A.   It is to deter conduct when someone
15 has -- when someone has done something, yes,
16 it's part of when people break the rules, they,
17 yes, they are sent to segregation restrictive
18 housing.
19    Q.   Are segregation and restrictive housing
20 synonymous?
21    A.   They are.
22    Q.   They're really solitary confinement,
23 correct?
24    A.   Well, we --

20

1    MR. STALEY:  Objection to form.  Go ahead,
2 Dr. Butler.
3    THE WITNESS:  What's segregation?  I haven't
4 heard solitary -- I've never heard the word
5 solitary confinement.  When I've been in the
6 prison system, it's been segregation.  And then
7 now, well, I'm not in the prison system anymore
8 but restrictive housing is the term that we use.
9 BY MR. BERGIN:
10    Q.   Were there any limits in your
11 experience in the prison system on how long an
12 inmate could be in restricted housing or
13 segregation?
14    A.   Were there limits?
15    Q.   Yes.
16    A.   Yes.  It would be based -- yes, there
17 were limits.  It was based on what the ticket
18 was that a person would receive would be the
19 limit.  Yeah, it would vary.
20    Q.   In your experience were there inmates
21 who were in segregation for a period of years?
22    A.   Yes.
23    Q.   Can segregation have detrimental
24 effects on the seriously mentally ill?

21

1    A.   Yes, it can.
2    Q.   Can it cause them to decompensate?
3    A.   Yes, it can.
4    Q.   Can you tell me what that means to
5 decompensate?
6    A.   Decompensate means that the person
7 starts to not function.  They can sometimes they
8 might not eat.  Sometimes they might try to harm
9 themselves.  Sometimes they may withdraw, become
10 depressed.
11    Q.   Is it fair and accurate to say that the
12 conditions you just described are a consequence
13 of long-term segregation in the seriously
14 mentally ill?
15    A.   It can be.  It's not -- it doesn't
16 happen to everyone but it can be.
17    Q.   How did you come to leave Wexford's
18 employ?
19    A.   Which one?  I was employed with them
20 twice.
21    Q.   The first time.
22    A.   My contract ended the first time I had
23 a contract with them, and for some reason
24 unbeknown to me the contract ended so then I

22

1 left.
2    Q.   Is it fair and accurate to say your
3 contract just wasn't renewed?
4    A.   No.  It ended.
5    Q.   Right.  But they didn't offer to renew
6 it, correct?
7    A.   No, that's not correct.
8    Q.   Okay.  After the contract ended, what
9 was the next employment you had in mental
10 health?
11    A.   I took a permanent job with Wexford.
12    Q.   All right.  I'm perhaps being confused,
13 and it's certainly not your fault.  You've had a
14 contract with Wexford originally, correct?
15    A.   Yes.
16    Q.   And when that ended, did you go back to
17 work for Wexford or did you go to work for IDOC
18 or someone else?
19    A.   I took a permanent job with Wexford.
20    Q.   What was the title there?
21    A.   I went back to Pinckneyville for
22 Wexford and I was a clinical psychologist but it
23 was only for 30 days.
24    Q.   Okay.  And what did you do after that?

23

1    A.   I went to IDOC.
2    Q.   Approximately when was that?
3    A.   April of 2015.
4    Q.   And where were you hired to work?
5    A.   Menard Correctional Center.
6    Q.   And who was your supervisor there at
7 Menard?
8    A.   He wasn't at Menard.  He was the
9 regional supervisor was Dr. Shane Reister.
10    Q.   Okay.  Was he or she a Wexford
11 employee?
12    A.   No.  I worked for the State of
13 Illinois.
14    Q.   Okay.  And you worked there at Menard,
15 correct?
16    A.   Correct.
17    Q.   And if my notes are correct, you worked
18 at Menard from August of '15 to November of '16;
19 is that correct?
20    A.   No, that's not correct.
21    Q.   Okay.  Tell me your dates of employment
22 at Menard.
23    A.   I worked at Menard from April of 2015
24 to May of 2017.

24

Q.   While we're on this route, let's go ahead and just finish up your employment.  Did you leave the employment of the Illinois Department of Corrections in 2017?

A.   No.

Q.   Okay.  Where did you go after Menard?

A.   I went to Pinckneyville Correctional.

Q.   And how long were you there?

A.   I was there until recently.  I left in basically October of 2022.

Q.   And why did you leave that position?

A.   Due to illnesses and back injuries, I didn't want to return there because it was too risky to go back into the prison system.  I didn't, I didn't, I didn't want to go back there because, like I said, injuries and surgeries. So I didn't want to go back into the prison.

Q.   Since that time have you been employed?

A.   I'm employed right now.

Q.   And what do you do?

A.   I'm working for the Illinois Department of Human Services and I'm working for Williamson County Family Resource Center.  I'm working as a public aide eligibility assistant.

25

Q.   When you went to work at Menard, I believe that was 2015, correct?

A.   Yes, April.

Q.   At some point did you become aware of the Rasho decision?

A.   Yes, I did.

Q.   Would that have been about the time you started at Menard?

A.   I don't remember.

Q.   Did you receive any training regarding the requirements of the Rasho decision?

MS. SYRCLE:  Object to vague.

BY MR. BERGIN:

Q.   You may answer.

A.   There were policies and procedures that we had to read and train our staff on and we had, as far as I remember, maybe a few trainings that we went through or webinars that we did regarding Rasho.  That's my recollection.

Q.   Was there a Rasho compliance officer at Menard when you were there?

A.   No, not to my -- that I can remember.

Q.   Do you have an understanding of what a behavioral treatment unit is?

26

A.   Somewhat.

Q.   Tell me what your understanding is.

A.   The behavioral treatment unit was going to be -- it wasn't established before I left, but the behavioral treatment unit was going to be for offenders who were -- who met the criteria that were going to be able to leave prison that had serious mental illness that couldn't be managed in the prison and they were going to be going to the behavioral treatment unit to receive care there, which was going to have the intensive program, programming, psychiatry, all the different services and resources that they were going to need that weren't inside of the prison.  It was still going to be managed by the Department of Corrections, but it wasn't just going to be corrections, you know, it wasn't going to be secure like corrections or how we understand the prison, the prison as we manage mental health. That's my understanding of the unit.

Q.   Was there a behavioral treatment unit at Menard when you were there?

A.   No.

27

Q.   Is it fair and accurate to say one was in the planning stages or the construction stages?

A.   When I was there, no.

Q.   Is there a difference between a behavioral treatment unit within a prison system and a psychiatric hospital?

A.   I would say yes.

Q.   Can you tell me what those differences would be?

A.   Well, I believe that the hospital is not going to have the security that a behavioral treatment unit is going to have because it is basically you have dangerous criminals whereas, you know, they still have, you know, time that they have, you know, to serve as opposed to, you know, maybe a locked inpatient mental hospital.

Q.   In the use of mental health treatment would a behavioral treatment unit in a facility like Menard provide the same kind of treatment as an inpatient psychiatric hospital?

A.   Can you repeat the question.

Q.   Sure.  Would a behavioral unit in a prison situation provide the same kind of mental

28

1  health treatment that would be founded in an
2  inpatient psychiatric hospital?
3      A.  Oh, the same type of mental health
4  treatment.
5      Q.  Yes.
6      A.  I think so, the mental health
7  treatment.
8      Q.  Have you ever testified as an expert
9  witness in a court case?
10     A.  I have not.
11     Q.  Do you anticipate --
12     A.  I don't remember.  I don't remember if
13 I have.  No, I don't think so.
14     Q.  Do you anticipate providing any expert
15 testimony in this case?
16     A.  No.
17     Q.  Okay.
18     A.  I just found out about this case.
19     Q.  Did you review any documents prior to
20 testifying here with us today?
21     A.  I reviewed a few, yes.
22     Q.  Do you have them in front of you by any
23 chance?
24     A.  No.

                                                29

1      Q.  To the best of your recollection what
2  did you review?
3      A.  I reviewed the special treatment
4  referral for Mr. Gay.  And I also reviewed it
5  was one other document.  What else?  The
6  involuntary referral for -- involuntary referral
7  for medication, the involuntary referral for
8  medication for Mr. Gay.
9      Q.  Do you have an independent recollection
10 of Anthony Gay?
11     A.  I do.
12     Q.  Did you provide treatment to him?
13     A.  I did.
14     Q.  For approximately how long?
15     A.  I can't say for how long but I saw him
16 for at least five, six sessions to my
17 recollection, maybe more.
18     Q.  What was the circumstances that caused
19 you to do those sessions?
20     A.  He may have requested to see me.  I may
21 have saw him -- I know I saw him in terms of him
22 being in crisis and then also I saw him in terms
23 of working as part of his behavior modification
24 plan that we put in place for him.

                                                30

1      Q.  Let me cover a couple basics here.  Do
2  you agree that Anthony Gay was seriously
3  mentally ill?
4      A.  I do.
5      Q.  Was Anthony in segregation the entire
6  time you were at Menard?
7      A.  He was.
8      Q.  What did you understand his mental
9  health diagnosis to be?
10     A.  I understood -- he had a couple of
11 diagnoses but I understood it to be bipolar
12 disorder at one point.  I understood him to have
13 borderline personality disorder and there may
14 have also been major depressive disorder that he
15 was diagnosed with.
16     Q.  From time to time while you were at
17 Menard was Anthony medicated?
18     A.  Yes, from time to time he would take
19 some medications.
20     Q.  When you were there and Anthony was in
21 segregation, was his recreation time limited?
22     A.  Yes.
23     Q.  Was his ability to participate in
24 treatment programs limited?

                                                31

1      A.  Yes.  All prisoners in segregation
2  their time is limited.
3      Q.  During your time at Menard did Anthony
4  Gay's condition deteriorate?
5      A.  From time to time, yes.
6      Q.  Tell me what crisis intervention is.
7      A.  Crisis intervention is when we do
8  crisis intervention, it is a method or
9  procedures that we use to keep a person from
10 harming themselves.  And so we might put a
11 person in a crisis cell, take away their
12 personal property, give them crisis property,
13 and put a security person there to watch them so
14 they don't harm themselves.  And they will have
15 a mental health person to speak to them on a
16 daily basis to try to find out what is going on
17 with them, you know, what has brought on this
18 crisis.  And they would be seen by psychiatry
19 and/or given medication and try to figure out if
20 the medication if they're taking their
21 medication, what's going on, what has brought on
22 the crisis.  So basically it's basically to
23 prevent something from happening is the
24 intervention.

                                                32

1    Q.   And it's still in segregation, correct?
2    A.   It can be in segregation.  Sometimes
3  they are brought to the health care unit.  If
4  the person is if they're in their housing
5  unit -- no.  If they go on crisis -- let me
6  restate that.  If they go on crisis, they are
7  not kept in segregation.  I misspoke on that.
8  They are placed in a crisis cell.
9    Q.   And what's the difference between a
10  crisis cell and a segregation cell?
11    A.   Well, the difference between a crisis
12  cell and the person's regular housing whether
13  they're in general pop or whether they're in
14  restrictive housing the cell is constructed so
15  the person doesn't have means to hurt
16  themselves.  Within their own cells they have
17  their personal property and things of that
18  nature where they could get something to harm
19  themselves.  So the crisis cell is basically
20  like a boxed cell and they don't have a
21  mattress, that type of a mattress or, like I
22  said, the regular things that they would have in
23  their cell where they can harm themselves.
24  Everything is basically removed out of there.

33

1  health director she supervised the mental health
2  professionals there.  But in terms of our
3  relationship, I just made sure that the policies
4  and procedures were followed, the mental health,
5  you know, professionals did what they were
6  supposed to do and I communicated that to
7  basically to the mental health director that
8  they had.  So that was basically the
9  relationship that I was, you know, that I made
10  sure that the policies were followed within --
11    Q.   Who was the Wexford mental health
12  director?
13    A.   It was Dr. Christian Gillespie at the
14  time that I was there.  She did leave and they
15  had someone else but I don't remember who it
16  was.
17    Q.   Were the individuals providing therapy
18  Wexford employees or Illinois Department of
19  Corrections' employees?
20    A.   They were mainly Wexford.  We did have
21  some -- oh, we did now that I think about it, we
22  did have some State of Illinois employees as
23  well.
24    Q.   Is it fair and accurate to say that

35

1  And they do have a mattress but it's a different
2  kind of a mattress.  It's a crisis mattress.  So
3  whether they're in their general cells where
4  they have their mattress or restrictive housing
5  where they live, the crisis cell is different.
6  And you can see, you can see in there.  They're
7  not the bars.  In the regular cells there's
8  bars.  So you can see every -- basically right
9  through the cell.
10    Q.   During your time at Menard was Anthony
11  Gay in crisis cell from time to time?
12    A.   Yes, he was.
13    Q.   Who was the mental health director for
14  Menard?
15    A.   I was.
16    Q.   And were you mental health director
17  throughout the time you worked there?
18    A.   Yes.
19    Q.   What relationship did you have with
20  Wexford?
21    A.   Well, Wexford was a contractor.  And so
22  the mental health professionals -- now they also
23  had a mental health director and so we worked
24  very closely together.  Basically the mental

34

1  there was a chronic staff shortage in mental
2  health when you were at Menard?
3    MS. SYRCLE:  Object to foundation.
4    MR. STALEY:  Join.
5  BY MR. BERGIN:
6    Q.   You can answer, ma'am.
7    A.   No, we did not have a shortage when I
8  was there.
9    Q.   You were fully staffed?
10    A.   We were.
11    Q.   And I should have spoken of this
12  earlier, ma'am, and I don't want to confuse you.
13  From time to time the other attorneys on this
14  case may have objections to my questions.  Under
15  those circumstances you can still answer the
16  question.  In fact, you're required to unless
17  your attorney directs you specifically not to
18  answer.
19    A.   Okay.
20    Q.   Is there any yearly mental health
21  training for staff at Menard?
22    A.   Yes.  We have quarterly trainings.
23    Q.   Who provides that?
24    A.   The state provided the quarterly

36



1  trainings, but we also had some in-house
2  trainings as well that were done more
3  frequently.
4      Q.   During your time at Menard did Anthony
5  engage in self-mutilation?
6      A.   Yes, he did.
7      Q.   Do you believe that to be as a result
8  of his serious mental illness?
9      A.   Some of it I do, yes.
10     Q.   Is that a form of decompensation?
11     A.   Yes.
12     Q.   Do you believe that decompensation was
13  related to his long-term segregation?
14     MS. SYRCLE:  Object to vague and foundation.
15     MR. STALEY:  Join.
16  BY MR. BERGIN:
17     Q.   You may answer, ma'am.
18     A.   I do.
19     Q.   Do you have an understanding of the
20  Americans with Disabilities Act, ADA?
21     A.   No, I don't have an understanding of
22  the full act, no.
23     Q.   When you worked at Menard, did you have
24  an understanding that the ADA applied to the

37

1  seriously mentally ill?
2      A.   No, I did not.
3      Q.   Was there an ADA compliance officer at
4  Menard when you were there?
5      A.   I don't know.
6      Q.   Do you have an understanding of the
7  rehabilitation act, the federal statute?
8      A.   I do not.
9      Q.   So I presume then that you don't have
10  any understanding whether it applied to the
11  seriously mental ill inmates like Anthony,
12  correct?
13     A.   That's correct.
14     MR. BERGIN:  Why don't we take a break here
15  for about ten minutes and come back.  Is that
16  all right, ladies and gentlemen?
17     THE WITNESS:  Yes.
18              (Whereupon, a short break was
19               taken.)
20  BY MR. BERGIN:
21     Q.   Do you recall a lady named Cortney
22  Meyer?
23     A.   Yes.
24     Q.   Was she at Menard when you were?

38

1      A.   Yes, she was.
2      Q.   What was her position?
3      A.   She was a mental health professional.
4      Q.   By who was she employed?
5      A.   Wexford.
6      Q.   Did she see Anthony Gay for treatment?
7      A.   Yes, she did.
8      Q.   We have a number of exhibits that we're
9  going to talk about today, ma'am, and Ms. Harton
10  is going to put them on the screen and I'm going
11  to ask you to review them and read some portions
12  into the record.  All right?
13     A.   Yes.
14     MR. BERGIN:  Our first exhibit I believe is
15  Exhibit 13; is that correct, Sam?
16     MS. HARTON:  We can start there if you want.
17     MR. BERGIN:  Okay.  Let's do that.
18     MS. HARTON:  Okay.  Give me one sec.
19     MR. BERGIN:  Sure.
20     MR. STALEY:  Just so there's no confusion,
21  the documents that you guys sent over right
22  before the dep there were two Exhibit 13's.
23     MR. BERGIN:  Yeah.  Let's -- let me behave
24  like a normal person here.  Excuse me, Sam.

39

1  Let's go ahead and just begin with Exhibit 1.
2      MS. HARTON:  Nick, I'm seeing that now.  I'm
3  going to relabel one of the Exhibit 13's as
4  Exhibit 21 and then I'll resend them to you and
5  the court reporter.  Does that sound okay?
6      MR. STALEY:  That works.
7      MS. HARTON:  Okay.  Thanks.
8      MR. BERGIN:  Sam, if you would, I'll give you
9  a moment to go ahead and do that and then we'll
10  go ahead and start with Exhibit 1, all right?
11     MS. HARTON:  All set.
12     MR. BERGIN:  This is Exhibit 13, right?  Oh,
13  this is Exhibit 1.  Okay.  Here we go.
14  BY MR. BERGIN:
15     Q.   Ma'am, do you see what we've marked as
16  Exhibit 1 there on your screen?
17     A.   Yes, I do.
18     Q.   And that's a Treatment Review Committee
19  Hearing Summary, correct?
20     A.   Yes.
21     Q.   Do you recall if you've seen this
22  document before?
23     A.   I don't recall at this time.
24     Q.   Would you typically see this document?

40

1    Ma'am, is this a document you would
2 typically see?
3    A.  I'm sure it is something that I would
4 see, yes.  I don't remember it but yes.
5    Q.  This hearing date was November the 14th
6 of 2016, correct?
7    A.  Yes.
8    Q.  And Cortney Meyer was listed there as a
9 witness, correct?
10    A.  Yes.
11    Q.  And her designation is LCSW.  What does
12 that mean?
13    A.  Licensed clinical social worker.
14    Q.  Okay.  Would you take a moment and
15 review that document, ma'am.
16    A.  Okay.  Okay.  Can you go down a little
17 bit.  Okay.  There's more.  Go down a little bit
18 further.
19    Q.  The purpose of this hearing as I
20 understand it from the document was to determine
21 whether Anthony Gay was going to have his
22 medications dispensed to him involuntarily.  Is
23 that a fair characterization?
24    A.  Yes.

41

1    Q.  And it says in what I believe is the
2 third paragraph there in the summary of
3 proceedings and evidence that offender Gay
4 suffers from the mental illness identified as
5 borderline personality disorder, which is
6 diagnosed as received from his assigned
7 psychiatrist.  Do you see that?
8    A.  Yes.
9    Q.  Is that an incomplete statement of
10 Anthony's diagnosis?
11    A.  Is that a what?
12    Q.  An incomplete statement of his mental
13 health diagnosis?
14    A.  No.
15    Q.  To put it another way, ma'am, did
16 Anthony Gay suffer from other mental illnesses
17 beyond borderline personality disorder?
18    A.  Diagnoses change over time.  So at the
19 time of this November '16 this is what he was
20 diagnosed with.  So to say that this was an
21 incomplete diagnosis, I can't say that this is
22 an incomplete diagnosis.  This was the diagnosis
23 at the time.
24    Q.  But as I believe you testified, he

42

1 suffered from other elements of mental illness
2 at least from time to time, correct?
3    A.  Right.  I said that from my
4 recollection he suffered from borderline
5 personality disorder.  He suffered from bipolar
6 disorder.  He suffered from depression.  So you
7 don't have necessarily all of the same diagnoses
8 at the same time.  And then certain physicians,
9 certain doctors diagnose individuals with
10 different diagnoses.  So this was -- I don't
11 know which psychiatrist this was that signed off
12 on this.  If this was his diagnosis, I can't say
13 that this was an incomplete diagnosis.  That's
14 my answer.
15    Q.  The only witnesses to this hearing were
16 Cortney Meyer and Lieutenant Watkins, correct?
17    A.  Witnesses to the treatment hearing?
18    Q.  Yes.
19    A.  Yes, to this document that's what it
20 says.
21    Q.  Okay.  And the third paragraph there
22 that begins with offender Gay could you read
23 that into the record, please?
24    A.  Offender Gay suffers from the mental

43

1 illness identified as borderline personality
2 disorder, which is a diagnosis he received from
3 his assigned psychiatrist.  Offender Gay has
4 refused psychiatric medication to treat his
5 mental health symptoms.  Offender Gay continues
6 to harm himself and is unable to take
7 responsibility for his maladaptive behavior.  He
8 has repeatedly self-harmed and his self-harming
9 behaviors have intensified in frequency and
10 severity over the past weeks.  If offender Gay
11 is left untreated, a substantial risk exists
12 that his condition would further deteriorate
13 causing the likelihood of severe physical harm
14 to himself.  Therefore, it is in the offender's
15 best interest that he receives enforced
16 medication at this time.
17    Q.  Could you also just read the next
18 paragraph basis for decision, please.
19    A.  Basis for decision all of the following
20 factors are present:  1, the committed person
21 suffers from a mental illness or mental
22 disorder.  2, the medication is in the mental,
23 excuse me, is in the medical interest of the
24 committed person.  3, the committed person is

44



1  either gravely disabled or poses a likelihood of
2  serious harm to himself or others because as a
3  result of a mental illness or mental disorder,
4  one or more of the following determinations has
5  been made. Can you go down a little bit?
6      Q.  Sure.
7      A.  And it says, A, the committed person is
8  in danger of serious physical harm resulting
9  from his failure to provide for his essential
10 human needs of health and safety. And, C, a
11 substantial risk exists that physical harm will
12 be inflicted by the committed person upon his
13 own self as evidenced by among other things,
14 threats or attempt to commit suicide or inflict
15 physical harm on himself.
16     Q.  And as a result then?
17     A.  Okay. And then the action concur with
18 involuntary administration of psychotropic
19 medication.
20     Q.  Okay. Who was his assigned
21 psychiatrist at that time?
22     A.  I don't know. It might be on this
23 page. I'm not sure.
24     Q.  I don't believe it is, ma'am, but we'll

45

1  see.
2      MR. STALEY: There's a third page to this or
3  another page to this document if you want to
4  show her that.
5  BY MR. BERGIN:
6      Q.  Okay. Here we go. This is the
7  chairman on this is Dr. Sylvia Butler, correct?
8      A.  Yes.
9      Q.  And that's your signature?
10     A.  Yes, it is.
11     Q.  Okay. And Dr. Trost there is listed
12 there as medical director, correct?
13     A.  Yes.
14     Q.  So this is an opinion that you
15 concurred that Anthony Gay should be subject to
16 involuntary administration of psychotropic
17 medication, correct?
18     A.  Yes.
19     Q.  Okay. Let's go to the next exhibit.
20     A.  I'd like to say something about the
21 witnesses now that I'm looking at this document.
22     Q.  Go ahead, ma'am.
23     A.  The witnesses just means that these are
24 the people serving the document. That's all

46

1  that that means.
2      Q.  But certainly before signing off on it
3  you would have read it and reviewed it?
4      A.  Yes. But what I'm saying when you're
5  saying that earlier you were saying that the
6  witnesses to the person's borderline -- to their
7  I guess stating that this was the person's
8  diagnoses, these were the only two people
9  signing off on it. I'm just saying the
10 witnesses represent in this document just the
11 people serving the patient with the document.
12 That's what the witnesses is about in this
13 document coming back to my memory. They just
14 have to sign off that they are serving the
15 document to the offender. That's why the
16 witness is listed.
17     Q.  Let's go to the signature block,
18 please. In signing that -- go back if you could
19 just to the bottom of the last page. That
20 section there says action, concur with
21 involuntary administration of psychotropic
22 medication, correct, ma'am?
23     A.  Yes.
24     Q.  And then your signature I believe if we

47

1  scroll down appears right after that you'll see
2  that the box do not concur is not selected,
3  correct?
4      A.  Correct.
5      Q.  Okay. And there is your signature as
6  the chairperson, correct?
7      A.  Yes.
8      Q.  And the section you mentioned about
9  serving it is just a notice below signed by
10 Samantha Stellhorn, correct?
11     A.  Correct.
12     Q.  So you did, in fact, confer -- concur
13 with this decision to involuntarily provide
14 psychotropic medications to Anthony Gay?
15     A.  Yes. I'm not denying that.
16     Q.  Okay. I just want the record to be
17 clear, ma'am, and I certainly wasn't accusing
18 you of anything. I just wanted to create a
19 clear record.
20         Let's go to the next exhibit. Okay.
21 This is a State of Illinois Department of
22 Corrections Disciplinary Tracking Inmate
23 Disciplinary Card. Do you see that?
24     A.  Yes.

48



1    Q.  Okay.  This, in fact, is Anthony Gay's
2  disciplinary history from 1998 to January of
3  2019, correct?
4    A.  Yes.
5    Q.  Let's scroll down to the time period
6  when you were at Menard, if we can.
7    MS. HARTON:  Do you have a specific date you
8  want to start off with, Chris?
9    MR. BERGIN:  Just the date that corresponds
10  to her working at Menard.  So we're talking
11  about I believe August of '15.
12    THE WITNESS:  April.
13    MR. BERGIN:  I'm sorry.  Thank you for
14  correcting me, ma'am.
15  BY MR. BERGIN:
16    Q.  Do you see there, ma'am, we're on July
17  the 16th, 2015.  He had 15 days in segregation
18  for disobeying a direct order?
19    A.  Yes.
20    Q.  That's punitive, correct?
21    MR. STALEY:  Object to foundation.
22    MR. BERGIN:  Counsel, are you suggesting this
23  is not an accurate record from the Department of
24  Corrections?

49

1    MR. STALEY:  I'm not.  I'm just objecting
2  whether she has the foundation to testify
3  whether segregation was punitive in this
4  particular instance.  You can go ahead and
5  answer, if you know, Dr. Lane.
6  BY MR. BERGIN:
7    Q.  Doctor, do you agree that getting 15
8  days of segregation for disobeying a direct
9  order is punishment?
10    A.  Yes, it's for misconduct.
11    Q.  And it's punishment for misconduct,
12  correct?
13    A.  I believe that's the intent for going
14  to restrictive housing.
15    Q.  And that's -- he wasn't going to
16  restrictive housing.  He was continuing in
17  segregation, correct?
18    A.  That's correct.
19    Q.  On November (sic) 27 we have another
20  major infraction for fighting, correct?
21    A.  Correct.
22    Q.  And as a result of that, he got a
23  month, an additional month of segregation,
24  correct?

50

1    A.  Correct.
2    Q.  And a commissary restriction and a yard
3  restriction, correct?
4    A.  Correct.
5    Q.  Directing your attention to the entry
6  of July the 18th, 2016, he was found to have
7  contraband and damage or misuse of property,
8  correct?
9    A.  Yes.
10    Q.  And as a result of that, he received an
11  additional six months of segregation and a
12  six-month commissary restriction, correct?
13    A.  Yes, and C grade level.
14    Q.  What does C grade level mean?
15    A.  I don't remember.
16    Q.  On August the 2nd, 2016, he was cited
17  for intimidation or threats and being insolent,
18  correct?
19    A.  Correct.
20    Q.  As a result, he received another
21  month's segregation and another month's
22  commissary restriction, correct?
23    A.  Correct.
24    Q.  August 20, 2016, he was cited for

51

1  assaulting a staff person and he received six
2  months additional segregation, six months
3  commissary restriction and six months contact
4  visit restriction, correct?
5    A.  Correct.
6    Q.  And with each of these violations,
7  ma'am, they're cumulative, correct?  So during
8  your six months in segregation you have another
9  violation, that month is added on, correct?
10    A.  Correct.
11    Q.  All right.  Let me see if we have any
12  more.  Let's see if we have any more during your
13  time there.  We do.  Directing your attention to
14  August 20, 2016, you see there's another staff
15  assault, correct?
16    A.  Correct.
17    Q.  For that he received an additional two
18  months segregation, two months commissary
19  restriction, and six months contact visit
20  restriction, correct?
21    A.  Correct.
22    Q.  October 18, 2016, there was a citation
23  for insolence and disobeying a direct order,
24  correct?

52



1    A.   Correct.
2    Q.   What does SMI mean?
3    A.   Seriously mentally ill.
4    Q.   Okay.  And that's in reference to
5  Anthony Gay, correct?
6    A.   Yes.
7    Q.   And on November (sic) 24 he's got a
8  health, smoking, or safety violation with
9  that -- well, I'm going to strike that really
10  because we don't know what grade C level means.
11  But in each of these violations it is under
12  disciplinary action it indicates under other
13  that SMI that Anthony Gay is seriously mentally
14  ill, correct?
15    A.   Yes.  What I think has happened when it
16  says SMI, you see that there's no time, no
17  disciplinary action that's being applied when
18  you see SMI.  So that tells me that he's not
19  getting any time for these offenses like he was
20  getting before because basically now because he
21  has serious mental illness, they're not adding
22  this time.  They're not adding time on to his
23  sentence.  And --
24    Q.   Let me direct your attention -- I'm

53

1  sorry, ma'am.  Were you finished?
2    A.   Yes, I'm finished.
3    Q.   My apologies.  Let me direct your
4  attention to the January 17, 2017, entry there
5  that's an attempt to transfer funds.  Do you see
6  that?
7    A.   Yes, I do.
8    Q.   And in that circumstance it shows other
9  and SMI, correct?
10    A.   Yes.
11    Q.   But it also shows an additional 15 days
12  in segregation, correct?
13    A.   Yes.
14    Q.   Were you aware of these violations and
15  the increase segregation time for Anthony Gay
16  when you were at Menard?
17    A.   I'm sure I knew he was getting tickets,
18  yes.
19    Q.   Did you believe he was also getting
20  less well?
21    MR. STALEY:  Object to vague.
22  BY MR. BERGIN:
23    Q.   Do you understand my question, ma'am?
24    A.   No, I don't understand.

54

1    Q.   I'll be glad to rephrase it.  Was it
2  your understanding during this time that Anthony
3  Gay's mental health was deteriorating?
4    A.   There were times when Anthony Gay was
5  doing better.  He would improve and then he
6  would get worse.  So he would go back and forth.
7  So I can't say what instances when he would get
8  tickets that he was in a state of
9  decompensation.  That's my answer.
10    Q.   Thank you, ma'am.  Let's go to the next
11  exhibit.  This is Exhibit 3 for the record.
12  Ma'am, this exhibit, Exhibit 3, relates to an
13  administrative directive for ADA accommodations,
14  that is Americans with Disabilities Act.  My
15  understanding, ma'am, is that you're not
16  familiar with the ADA as it relates to your time
17  at Menard, correct?
18    A.   I'm not familiar with them right now.
19    Q.   Were you familiar with it then?
20    A.   I went over policies and procedures a
21  lot.
22    Q.   But you didn't have any specific
23  recollection that the ADA applied to the
24  seriously mentally ills, correct?

55

1    A.   I can't remember all of the policies
2  and procedures that I had to -- that applied to
3  inmates and to -- I just can't remember
4  everything.  That's my answer.
5    Q.   Let me direct your attention to
6  Exhibit -- is this Exhibit 4?  I'm sorry.  Sam,
7  is this Exhibit 4?
8    MS. HARTON:  Yep.
9  BY MR. BERGIN:
10    Q.   Okay.  Let me direct your attention to
11  Exhibit 4.  This is a Standard Operating
12  Procedure Manual For Mental Health.  Do you see
13  that, ma'am?
14    A.   Yes, I do.
15    Q.   Were you familiar with this document
16  when you worked at Menard?
17    A.   Yes, I was.
18    Q.   And were you familiar with its
19  applicability to seriously mentally ill
20  patients?
21    A.   Yes, I was.
22    Q.   Let's go to Exhibit 5.  I guess it's
23  Exhibit 6.
24    MS. HARTON:  No.  It's Exhibit 5.

56



1    MR. BERGIN:  Okay.  Thank you.
2  BY MR. BERGIN:
3    Q.  Ma'am, why don't you take a moment and
4  read the first page of that document.
5    A.  Can you make it a little bigger,
6  please.
7    MR. O'KANE:  Hey, Sam, while we're looking at
8  that, this is Brian O'Kane, the set of exhibits
9  that we received doesn't appear to have an
10  Exhibit 5.
11    MS. HARTON:  Okay.  I will send over a new
12  batch to you guys and the court reporter.  We've
13  used this document in past depositions so thank
14  you though.
15    MR. O'KANE:  Thanks.
16  BY MR. BERGIN:
17    Q.  Doctor, would you take a moment and
18  read that I believe it's an e-mail.
19      Have you had an opportunity to read
20  that, Dr. Butler?
21    A.  Yes, I read it.
22    Q.  And this is a note from you to Cortney
23  Meyer, correct?
24    A.  Yes.

57

1    Q.  And it is one that you wrote in your
2  capacity as a licensed clinical psychologist and
3  as a psychologist administrator at Menard
4  Correctional Center, correct?
5    A.  Yes.
6    Q.  Could you just read that note into the
7  record, please.
8    A.  Hi, Cortney.  Thanks for agreeing to
9  see offender Gay as part of your caseload.  I
10  met with him today and I informed him we will
11  work with him in a collaborative way to provide
12  the best possible mental health treatment.  I am
13  requesting that you see him out of cell, Mr. Gay
14  for a minimum of two times per week for 30
15  minutes per session beginning with Thursday,
16  8/27.  He has requested Monday or Tuesday as a
17  second day due to needed to process thoughts and
18  feelings after a long weekend.  Discuss and
19  develop a comprehensive treatment plan by your
20  third session.  Due to the complexity of the
21  case, he should be seen more frequently at this
22  time.  And as he progresses, sessions can be
23  reduced.  Consult with myself or Dr. Gillespie
24  if you run into any difficulty in treating this

58

1  offender or have questions.  Attached is some
2  information from his previous therapist.  Please
3  review this information and discuss with him.
4  Andrea Moss is available to answer any questions
5  you may have.
6    Q.  Who is Andrea Moss?
7    A.  She was the previous mental health
8  therapist, mental health professional.
9    Q.  Okay.  Now let's turn if we can to that
10  attachment.  And this is titled Anthony Gay's
11  Symptom Impact Analysis 2014, correct?
12    A.  Yes.
13    Q.  The first section says offender Gay
14  meets the diagnostic criteria for BPD.  What is
15  BPD?
16    A.  I think that's probably going to be
17  bipolar disorder.  It could be bipolar disorder.
18  It could be borderline personality disorder.
19    Q.  Well, why don't you read those elements
20  there and tell me which you believe they're
21  consistent with.
22    A.  You want me to read them aloud or to
23  myself?
24    Q.  Just to yourself, ma'am.

59

1    A.  It's going to be borderline personality
2  disorder.
3    Q.  Okay.  And you agree with that, don't
4  you, ma'am?
5    A.  Yes, I do.
6    Q.  Would you read the first paragraph
7  there below the number 8 that begins with
8  offender Gay.
9    A.  Offender Gay should be considered
10  severely mentally ill due to his impaired
11  emotional, behavioral, and interpersonal
12  functioning which significantly interferes with
13  his ability to function adequately without
14  supportive behavioral/mental health services.
15  That is Tamms Super Max facility, which is
16  considered a behavioral residential treatment
17  unit and crisis watch placement which is for
18  short-term stabilization usually less than ten
19  days or is considered clinically necessary by
20  the mental health treatment team.  Offender Gay
21  is extremely character disoriented (sic).
22    Q.  And what is the reference there to
23  Tamms Super Max facility?
24    A.  I understand that that's -- I don't

60

1  have a lot of knowledge about it, but it was a
2  super max prison that was closed.  They held
3  very dangerous offenders.  I don't know much
4  about it.
5      Q.  But she's suggesting there behavioral
6  residential treatment unit and crisis watch
7  placement, correct?
8      A.  Yes.
9      Q.  Okay.  Let me direct your attention to
10  Exhibit 6.  This is the First Annual Monitor
11  Report from Dr. Stewart under the Rasho
12  decision.  Do you know if you ever read or
13  consulted this report?
14      A.  I don't remember.
15      Q.  Thank you.  Let's go to Exhibit 7.
16  This is the Midyear Report of Monitor of
17  Dr. Stewart in Rasho.  Likewise, ma'am, do you
18  remember reading or considering this report?
19      A.  I don't remember.
20      Q.  I direct your attention to Exhibit 8.
21  This is an incident report on Anthony Gay dated
22  August 19, 2015.  Do you see that, ma'am?
23      A.  Yes, I do.
24      Q.  And this is when you were at Menard,

61

1  correct?
2      A.  Yes, it was.
3      Q.  And it's from Christian Gillespie.  Who
4  was Dr. Gillespie?
5      A.  Yes.
6      Q.  Who was he?
7      A.  It's a she.  She was the Wexford mental
8  health director.
9      Q.  Was her position --
10      A.  Manager and mental health services
11  director.
12      Q.  Was her position parallel to your own?
13      A.  Somewhat.  She was over the Wexford
14  employees.  It wasn't parallel because I worked
15  for the State of Illinois so I was the
16  administrator for the state.  So basically
17  Wexford was the state's employer -- I mean
18  contractor.
19      Q.  You were the administrator and she was
20  the director of mental health services at Menard
21  as an employee of Wexford, correct?
22      A.  Right.  But she only supervised Wexford
23  employees.  She was not over the state employees
24  or the state affairs.

62

1      Q.  Let's look, if we can, at the second
2  page of this document.  You'll see that this is
3  an e-mail from Dr. Gillespie, Wednesday, August
4  19, 2015, correct?
5      A.  Yes.
6      Q.  It went to Yolande Johnson and Dana
7  DeLong.  Who were they?
8      A.  Dana DeLong was a regional manager
9  administrator.  And Yolande Johnson, she was
10  some type of regional manager person from
11  Wexford.
12      Q.  Can you read Dr. Gillespie's note there
13  into the record, please.
14      A.  Hello Yolande and Dr. DeLong.  Please
15  be aware that Anthony Gay B62251 arrived at
16  Menard yesterday evening around 2:30 p.m.  He
17  was evaluated by mental health suicide
18  potential.  No watch was ordered.  This
19  afternoon he cut himself in his thigh with a
20  pen.  The cut was not very significant as he was
21  reportedly treated with a Steri-Strip.  He was
22  then evaluated for suicide ideation by QMHP
23  Jacob Weatherford.  He denied suicidal ideation
24  plan or intent.  He admitted that he cut himself

63

1  in hope that he could get a different cell.  He
2  reported that he had no intention of killing
3  himself.  Weatherford consulted with Dr. Suneja
4  who also evaluated inmate Gay and determined
5  that he does not require a crisis watch at this
6  time.  Inmate Gay did not transfer to Menard on
7  any psychotropic medication.  He is primarily
8  identified as having a mood disorder secondary
9  to being axis II, manipulative and behavioral.
10  He was returned to his cell at this time.  He
11  will be on Dr. Butler's caseload.  Jacob will
12  write an incident report on the issue.  Thank
13  you, Christian Gillespie, Ph.D.
14      Q.  Now this indicates that when Anthony
15  Gay came to Menard, he wasn't on any
16  psychotropic meds, correct?
17      A.  Correct.
18      Q.  I think that's the end of this
19  document.  Let's just scroll down.  No.  Okay.
20  Let me just see.  I think that's the end of the
21  content but let's see.  Let me see that document
22  just a second.  If you scroll up just a little.
23  Okay.  And scroll down then.  Stop there.  This
24  is another e-mail in that string although it's

64

1  part of the same exhibit.  Do you see this note
2  from Christian Gillespie August 19, 2015, that
3  you were cc'd on?
4      A.   Yes.  This is the same note.
5      Q.   Okay.  All right.  I think that's it
6  then, ma'am.  We'll go to the next exhibit.
7  This is Exhibit 9, an incident report.  This is
8  a report of an incident of self-mutilation,
9  correct?
10     A.   Can you -- it looks like it, yes.
11     Q.   Okay.  And this incident happened on
12 August 24 of '15; is that correct?
13     A.   That looks like August 19, '15, that
14 signature over there on that side.
15     Q.   The substance of this was that he was
16 self-mutilating.  He was determined not to be
17 suicidal and he was returned to his cell; is
18 that correct?
19     A.   Yes, that's what it looks like, yes.
20     Q.   Thank you.  Let me direct your
21 attention to Exhibit 10.  This is an e-mail of
22 December the 30th, 2015, and it makes reference
23 to a flooding situation and transfer of inmates.
24 Do you see that?

65

1      A.   Yes, I do.
2      Q.   And this is from you, correct?
3      A.   Yes.
4      Q.   What is the flooding situation that you
5  were referring to in this e-mail?
6      A.   I do not know.
7      Q.   Okay.  Let's go to the next numbered
8  exhibit.  I believe this is Exhibit 11?
9      MS. HARTON:  Yes.
10 BY MR. BERGIN:
11     Q.   Okay.  If you'll scroll down there.
12 Okay.  Let's see, this note from or note to
13 Roderick Matticks is from Yolande Johnson,
14 correct?
15     A.   Yes, it looks that way.
16     Q.   And she's asking Dr. Matticks to speak
17 to Dr. Trost regarding treatment for Anthony who
18 was self-mutilating, correct?
19     A.   Correct.
20     MS. SYRCLE:  Object to foundation.
21 BY MR. BERGIN:
22     Q.   Were you aware of this correspondence
23 and this situation?
24     A.   I can't recall at this time.

66

1      Q.   Who did Roderick or Dr. Matticks work
2  for?
3      A.   I don't know at this time.
4      Q.   We'll go to the next exhibit, which I
5  believe is Exhibit 12.  This is from
6  Dr. Gillespie, correct?
7      A.   Yes.
8      Q.   And it's cc'd to you, correct?
9      A.   Yes.
10     Q.   And it's to Anthony Williams.  Who is
11 that?
12     A.   He was the AWP, which is the assistant
13 warden of programs, which is our immediate boss.
14     Q.   Can you read the content of that e-mail
15 into the record, please.
16     A.   Hello, AWP.  Attached is a letter from
17 Teri Anderson from the Office of Inmate Issues
18 Administrative Review Board on Anthony Gay
19 B62251.  Offender Gay has good time revocation
20 pending which keeps him from ever getting good
21 time back.  However, this letter from Teri
22 says that we can't revoke good time that does
23 not exist and that the good time revocation
24 should have been vacated from Pontiac but it

67

1  never was.  So can you please advise how we
2  might be able to get this removed or point me in
3  the right direction of how to address this
4  offender's concern.
5      Q.   Do you know what was done to address
6  that concern?
7      A.   No, I don't at this time.
8      Q.   But the situation it identifies is one
9  that he's had his good time revoked, correct?
10     A.   It was pending.
11     Q.   Right.  And that would mean that the
12 time he had otherwise earned towards reducing
13 his sentence would be wiped out, correct?
14     MS. SYRCLE:  Object to foundation.
15     MR. STALEY:  Join.
16 BY MR. BERGIN:
17     Q.   You can answer, ma'am.
18     A.   Can you repeat the question?
19     MR. BERGIN:  Madam Court Reporter, can you
20 read that back for us.
21          (whereupon, the record was read
22           as requested.)
23     THE WITNESS:  Yes.
24

68



BY MR. BERGIN:

Q.  Let me direct you to Exhibit 13.  This is an e-mail cover from Dr. Gillespie and among the recipients is Bill Elliott in risk management.  Did you have any contact with him?

A.  Yes, I did.

Q.  In what circumstances?

A.  He visited the office.  He would visit Menard from time to time.

Q.  Was he a Wexford employee?

A.  Yes, he was.

Q.  So he worked in risk management for Wexford, correct?

A.  Yes.

Q.  Let's take a look, if we can, at an enlarged view of the attached document that he was forwarding which is a Serious Event and Incident Report form.  Wexford had their own incident reports, correct?

A.  Correct.

Q.  Were those separate from the ones that the Illinois Department of Corrections had?

A.  Yes.

Q.  And this is an incident that happened

69

on 4/29 of 2016, correct?

A.  Yes, I see the date now.

Q.  Okay.  And at the time he was in north 2 in segregation, correct?

A.  Yes.

Q.  And if you'll just read the description of incident to yourself if you would for a moment.  And you can scroll up a little.  That's good.  This report summarizes an incident of Anthony Gay causing himself harm, correct?

A.  Yes.

Q.  He was treated by Dr. Trost and then put on ten-minute suicide watch, correct?

A.  Yes.

Q.  Is this another example of self-mutilation?

A.  Yes.

Q.  Let me direct your attention to Exhibit 15.

MS. HARTON:  I think we're on 14, Chris.

MR. BERGIN:  Okay.  Thank you.  14, please.

BY MR. BERGIN:

Q.  This is a Medical Director QA Emergency Reporting form, correct?

70

A.  Yes.

Q.  And this involves the scrotal laceration incident of self-abuse, correct?

MS. SYRCLE:  Object to foundation.

BY MR. BERGIN:

Q.  You can answer, ma'am.

A.  Yes.

Q.  Okay.  If you go down to the bottom of the document a little.  Okay.  And what meds was he on at the time?

MS. SYRCLE:  Same objection.

BY MR. BERGIN:

Q.  Can you read there what he was on?

A.  Yeah.  It said -- can you scroll back down.  It says Thorazine, Haldol, and Prolixin.

Q.  So he was on these psychotropic medications at the time that this self-mutilation occurred on 7/15 of 2016, correct?

MS. SYRCLE:  Object to vague and foundation.

THE WITNESS:  It's my guess.  They're written down there.  That's what I'm thinking.

MR. BERGIN:  Thank you, ma'am.  Let's take a five-minute break if we can, ladies and

71

gentlemen.

(whereupon, a short break was taken.)

BY MR. BERGIN:

Q.  Doctor, let me direct your attention to what we marked as Exhibit 19 to your deposition.  This is a Wexford form, correct?

A.  Yes.

Q.  And the inmate is of course Anthony Gay, correct?

A.  Yes.

Q.  And this is a physician referral form, correct?

MS. SYRCLE:  Object to foundation.

BY MR. BERGIN:

Q.  You can answer, ma'am.

A.  This is a reporting form.

Q.  Okay.  This is November the 10th of 2016, correct?

A.  Yes.

Q.  And who is Dr. Trost?

A.  He was the medical director at Menard.

Q.  And he was a Wexford employee, correct?

A.  Yes, I think so.

72



1    Q.   Can you read there what it says about
2  Anthony's medications?
3    A.   Haldol, Prolixin, Thorazine.
4    Q.   And this is a medical referral
5  regarding his self-mutilation of his scrotum,
6  correct?
7    MS. SYRCLE:  Object to form, vague.
8  BY MR. BERGIN:
9    Q.   Is that what it says there, ma'am?
10   A.   Yes.  He's referring him.
11   Q.   And the form indicates he's referring
12 him for self-mutilation of his scrotum, correct?
13   A.   Yes.
14   Q.   And if you can scroll down, please.
15 I'm sorry.  Scroll back up.  I wanted to get the
16 hospital.  I missed it.  There.  And this is a
17 transfer to Carbondale Hospital, correct?
18   A.   Yes.
19   Q.   Do you recall when this happened?
20   A.   I do.
21   Q.   Did Dr. Trost consult you at this time?
22   A.   No.
23   Q.   Shortly after this was Anthony
24 transferred to another facility, to another

73

1  prison?
2    MS. SYRCLE:  Object to foundation.
3    THE WITNESS:  I don't remember.
4  BY MR. BERGIN:
5    Q.   Do you remember Anthony being
6  transferred to Pontiac?
7    A.   I remember looking at the paperwork
8  earlier when I reviewed it that he was
9  transferred.
10   Q.   Do you know why he was transferred to
11 Pontiac?
12   A.   I don't remember exactly why, no.
13   Q.   Was he decompensating at this time?
14   MS. SYRCLE:  Object to vague.
15   MR. STALEY:  Join.
16   THE WITNESS:  At the time of this incident
17 November '16 or at the time of the referral?
18 BY MR. BERGIN:
19   Q.   At the time of this incident.
20   A.   Yes.  This is, this is a clear example
21 of a person who is in a period of crisis and a
22 period of decompensation.
23   Q.   Do you know who Jeff Hutchinson is?
24   A.   I can't recall the name at this time.

74

1    Q.   Did you have any discussions with
2  anybody either from the Illinois Department of
3  Corrections or from Wexford regarding his
4  transfer to Pontiac?
5    A.   I don't remember if I talked to -- who
6  I talked to about his transfer specifically to
7  Pontiac.  I don't recall it.
8    Q.   Do you know why he was being
9  transferred?
10   A.   I don't know why, no.
11   Q.   Let me direct you to Exhibit 20.  This
12 is a referral to the residential treatment unit
13 at Menard of November 14, 2016; is that correct?
14   A.   Right.  This is from this is his
15 current facility, yes.
16   Q.   And can you tell me what the form says
17 Anthony's provisional diagnosis was?  Just read
18 it into the record if you could.
19   A.   Okay.  It says offender Gay's current
20 diagnosis is borderline personality disorder.
21 Since 6/13/2016 offender Gay has been diagnosed
22 with the following:  Adjustment disorder with
23 cluster B features, anti-social personality
24 disorder, borderline personality disorder with

75

1  narcissistic features, impulse control disorder
2  NOS, mood disorder NOS, narcissistic personality
3  disorder, rule out depressive disorder,
4  personality disorder NOS, PTSD, bipolar
5  disorder, unspecified anxiety disorder, and
6  unspecified depressive disorder.
7    Q.   Do you believe that was an accurate
8  diagnosis for him at this time?
9    MS. SYRCLE:  Object to vague and foundation.
10   MR. STALEY:  Join.
11 BY MR. BERGIN:
12   Q.   You can answer.
13   A.   Borderline personality disorder I
14 believe is the correct diagnosis at the time of
15 November 14, 2016.
16   Q.   But do you agree that since 6/13/2016
17 Anthony had been diagnosed with the other
18 disorders that are listed there?
19   A.   Hello?  Did I just lose you guys?
20   Q.   I can hear you.
21   A.   Okay.  Because my screen just left.
22   Q.   Would you like to have the question
23 read back, ma'am?
24   A.   Yes.  Can you guys see me because I

76

1 just lost everybody?
2    Q.   I can see you.
3    A.   Oh, okay.  My screen is gone.  Okay.
4 There you go.  Yes, read the question back,
5 please.
6              (whereupon, the record was read
7                 as requested.)
8    THE WITNESS:  Yes, he had been diagnosed with
9 the different disorders.  Yes, I do agree with
10 that.
11 BY MR. BERGIN:
12    Q.   You didn't have any contact with
13 Anthony after he was transferred to Pontiac,
14 correct?
15    A.   That's correct.
16    Q.   During the time you were at Menard, did
17 you take any actions to prevent Anthony from
18 continued self-harm?
19    A.   I don't understand the question.
20    Q.   Well, let me withdraw that question and
21 ask you another.  Do you believe at the time you
22 were at Menard that Anthony Gay would have
23 benefitted from inpatient psychiatric treatment?
24    MS. SYRCLE:  Object to vague.

77

1    MR. STALEY:  Join.
2    THE WITNESS:  I believe he would have
3 benefitted from a special treatment unit such as
4 Dixon special treatment unit or I do believe the
5 other special treatment unit was Pontiac.  I
6 believe he could have benefitted from those
7 treatment units.
8 BY MR. BERGIN:
9    Q.   Did you ever attempt to have him
10 transferred to a better treatment unit?
11    A.   Yes.  That was one of the
12 recommendations that I made.
13    Q.   Who did you make that recommendation
14 to?
15    A.   Well, this document right here
16 is -- well, I made it to actually to the
17 treating mental health professional in
18 collaboration with her and collaboration with
19 the psychiatrist.  So it was a treatment team
20 effort.
21    Q.   Okay.  And who would the members of
22 that team be?
23    A.   I'm not sure.  I know Cortney Meyer was
24 part of that team.  I'm not sure who the

78

1 psychiatrist was at the time.  It might have
2 been Dr. Suneja or it might have been Dr. Trost
3 or even Dr. Baig.  He's had a few psychiatrists
4 at the time.  I think Dr. Gillespie was part of
5 that treatment team as well at some point.
6    Q.   What was the result of that treatment
7 team recommendation?
8    A.   Well, this referral is the way that we
9 refer them to special treatment.  So it's
10 written up in this manner such as this referral
11 that you see.  So if he's transferred to special
12 treatment, that would be the result that he does
13 get transferred.
14    Q.   And that then would be his transfer to
15 Pontiac?
16    A.   Yes, or to Dixon would be the, you
17 know, would be --
18    Q.   But at this time, at this time the
19 Illinois Department of Corrections did not have
20 any inpatient psychiatric treatment available to
21 inmates, correct?
22    MS. SYRCLE:  Object to vague.
23    MR. STALEY:  Join.
24

79

1 BY MR. BERGIN:
2    Q.   You can answer, ma'am.
3    A.   Well, when we say inpatient, if you're
4 talking about a hospital, DOC did not have
5 hospitals if that's what you mean.
6    Q.   That's the kind of facility you worked
7 at at Choate, correct?
8    A.   Yes, that's correct.
9    MR. BERGIN:  That's all I have at this time,
10 Doctor.  Thank you.  And I pass the witness.
11    MS. SYRCLE:  I'm sorry.  I don't know if
12 anybody else has questions.  I have a few.
13              EXAMINATION
14 BY MS. SYRCLE:
15    Q.   Dr. Lane, you were asked earlier about
16 the relation between Mr. Gay's time in
17 segregation and his self-harm behavior.  Do you
18 remember those questions?
19    A.   Some of them.
20    Q.   I believe you testified that you saw
21 him five to six times; is that correct?
22    A.   Yes, maybe more, maybe more but around
23 that I remember.
24    Q.   Have you reviewed his entire medical

80

Sylvia Butler Lane 01/20/2023

1  record or his entire mental health record?
2      A.  No, I have not.
3      Q.  Did you talk with his other providers
4  about any impact his time in segregation may
5  have had on his self-harm behavior?
6      A.  I remember that being a point of
7  discussion.
8      Q.  With whom did you have those
9  discussions?
10     A.  I had this discussion with Cortney
11 Meyer.  I had it with Dr. Gillespie.  And I've
12 had it with at least one of the psychiatric
13 providers.  More than likely it was probably
14 Dr. Senajia.
15     Q.  And what was that discussion?
16     A.  The discussion was how segregation it
17 was problematic for him, that it was problematic
18 for him and that it was difficult for him not,
19 you know, being able to socialize with other
20 offenders from my recollection.  But it also
21 being difficult for him because he had poor
22 socialization skills and so it was basically
23 like a catch-22 that it's difficult for him to
24 socialize with people but then him being, you

81

1  know, restricted, it was, you know, also
2  difficult too because he didn't know how, you
3  know, to socialize but so those kinds of things.
4  But then he would be very, you know, it was just
5  stressful not being able to go out and have, you
6  know, privileges that, you know, other inmates
7  had and just things like that.
8      Q.  We saw an exhibit earlier that was his
9  disciplinary history.  Is the degree to which
10 Mr. Gay was disciplined as a result of his
11 inability to socialize with others?
12     MR. BERGIN:  Object to the form of the
13 question.
14     THE WITNESS:  Can you repeat the question?
15 BY MS. SYRCLE:
16     Q.  We looked earlier -- Mr. Gay has a
17 pretty extensive disciplinary history.  Do you
18 agree with that?
19     A.  Yes.
20     MR. BERGIN:  Object to form.
21 BY MS. SYRCLE:
22     Q.  And was his discipline in relation to
23 his difficulty in socializing with others?
24     A.  Some of it was because some of it he

82

1  couldn't get along with others and then he was
2  always trying to find ways to protect himself
3  from others so, you know, in getting contraband.
4  And so I guess the answer would be yes.
5      Q.  That he was trying to find ways to get
6  contraband was part of that?
7      A.  Right.  Getting objects to protect
8  himself or, you know, metal objects to protect
9  himself.  Like if they would catch him with
10 things to make weapons because he was afraid of
11 others or, you know, like I said get things to
12 protect himself because he wasn't -- couldn't
13 get along with other people, those kind of
14 things or fighting and then turning to, you
15 know, find things to protect himself.  So the
16 socialization piece being there that, okay, I
17 can't get along with others so I got to protect
18 myself.  So, therefore, you have these
19 disciplinary issues going on.
20     Q.  And do you believe that Mr. Gay's
21 self-harm was volitional?  Was he in control of
22 his behavior?
23     MR. BERGIN:  Object to form.
24     THE WITNESS:  Partly.  I don't think he had

83

1  full control.
2
3  BY MS. SYRCLE:
4      Q.  Did Mr. Gay engage in self-harm
5  behavior to elicit a desired response from
6  others?
7      A.  Yes.
8      Q.  And would that be an indication that
9  his behavior was volitional?
10     A.  Not completely because if his moods
11 changed because, you know, his mental state,
12 then it's not, you know, it's not by his will.
13 So because his mood is fluctuating, he's not in
14 control of his will, then okay.  If he's not in
15 control of it, then okay, he's going to do
16 something because now, you know, I'm impacted by
17 how I feel, you know, I'm impulsive because of
18 what's going on with my mood.  I think I'm doing
19 it because, you know, I want attention.  But
20 what has happened is, you know, I've had this
21 mood swing.  So that's the best way I can
22 explain it.  I don't know.  It's a phase, you
23 know, I'm cycling.  My mood is cycling.
24     Q.  So we looked at some records earlier.

84

1  Let me get the exhibit number.  I'm going to
2  share my screen if I have the rights to do that
3  in the Zoom.  Do you see a document here?  This
4  was marked as Exhibit 8, and we talked about it
5  earlier.  Can you see that document?
6      A.  Yes.
7      Q.  This is the incident from August 19 of
8  2015.  Do you recall that?
9      A.  Yes.
10     Q.  Mr. Gay here about halfway through it
11 says he admitted that he cut himself in hope
12 that he could get a different cell.
13     A.  Yes.
14     Q.  This indicates his behavior is
15 motivated by a desired outcome, correct?
16     A.  Correct.
17     Q.  Let me stop sharing and pull up a
18 different exhibit.  I'm going to share can you
19 see the incident report from April 29, 2016?
20     A.  Yes.
21     Q.  And this was previously marked as
22 Exhibit 13.  If we look down under the
23 description of incident, he expressed that he
24 engaged in this self-injury in an attempt to get

85

1              (Whereupon, Lane Deposition
2              Exhibit No. 22 was marked for
3              identification.)
4  BY MS. SYRCLE:
5      Q.  Do you see a document on your screen
6  now?
7      A.  Yes, I do.
8      Q.  Do you recognize what this document is?
9      A.  Yes.  It's an Offender Infirmary
10 Progress Note.
11     Q.  Okay.  And I know this isn't your note,
12 but if you read the subjective, I want warden
13 here now.  Go get Butler.  Is that correct?
14     A.  Yes.
15     Q.  Is that you?
16     A.  Yes.
17     Q.  And get me the warden now, correct?
18     A.  Yes.
19     Q.  And I will scroll down.  Patient stated
20 if he did not get the warden here, he would bug
21 up.  Am I reading that correctly?
22     A.  Yes.
23     Q.  If I scroll down to the next page, it
24 says mood appeared angry, threatening self-harm

87

1  sent to an outside hospital.  Do you recall
2  that?
3      A.  Yes.
4      Q.  Again, it's his behavior is motivated
5  by a desired outcome; is that correct?
6      MR. BERGIN:  Object to the form of the
7  question.
8      THE WITNESS:  Yes.  That's why I said partly.
9  I'm not saying that everything he does is, you
10 know, is not intentional.  But I'm saying that
11 there are times where he thinks that he's in
12 control but he's not and his mood is changing
13 and he's being impulsive.  That's all I'm
14 saying.
15 BY MS. SYRCLE:
16     Q.  Do you have any knowledge as to whether
17 Mr. Gay was impulsive and engaged in similar
18 behaviors prior to him ever having been in
19 segregation?
20     A.  I don't know.  I don't know.
21     Q.  I'm going to share -- this has not been
22 previously marked but for the record it's
23 Bates -- it's Gay medical records Bates 2066 and
24 2067.

86

1  behavior.  And if you look at the bottom of that
2  section, threatening self-harm behavior if
3  warden does not come and speak with him.  Do you
4  see that?
5      A.  I do.
6      Q.  Do you recall Mr. Gay making these
7  types of demands and threats that he would
8  self-harm if he didn't get to see a person that
9  he wanted to see or get a response from someone
10 that he wanted?
11     A.  I do.
12     MS. SYRCLE:  I don't know how you want to do
13 exhibits.  I mean I can circulate this and we
14 can make this I think it's 22.
15     MS. HARTON:  That's fine.
16 BY MS. SYRCLE:
17     Q.  Give me one sec.
18         Did mental health staff at the facility
19 have the authority to have an inmate released
20 from segregation?
21     A.  No, we did not.
22     MS. SYRCLE:  I don't have any other
23 questions.
24     MR. STALEY:  Brian, do you have anything?

88

1    MR. O'KANE:  No questions, Nick.
2    MR. STALEY:  I don't have anything.
3    MR. BERGIN:  Signature?
4    MR. STALEY:  We'll waive.
5    MR. BERGIN:  Doctor, I have the proverbial
6    one more question.
7                   EXAMINATION
8    BY MR. BERGIN:
9    Q.   Did you or anyone else in mental health
10   at Menard have the authority to recommend that
11   an inmate such as Anthony Gay be released from
12   segregation?
13   A.   Yes.
14   MR. BERGIN:  That's all I have.
15   MS. HARTON:  Wait.  Hold on.  I'm sorry,
16   Chris, real quick.  Can we take a two-minute
17   break?
18   MR. BERGIN:  Sure.
19              (Whereupon, a short break was
20               taken.)
21   BY MR. BERGIN:
22   Q.   Doctor, I'm going to direct your
23   attention to one more exhibit.  It's Exhibit 21
24   and we'll put it up in just one moment here.

89

1    This is a note from Dr. Gillespie to William
2    Rees and you're cc'd on it and I believe as of
3    May 11, 2016, it identifies inmates who have
4    been in segregation for more than 60 consecutive
5    days.  Do you see that, ma'am?
6    A.   I can barely see it.
7    Q.   Obviously the inmates are blocked out.
8    Do you see Anthony Gay and his inmate number
9    there?
10   A.   Yes, uh-huh.
11   Q.   So as of May 11, 2016, you would have
12   been aware that he had been in segregation for
13   more than 60 days, correct?
14   A.   Correct.
15   MR. BERGIN:  Thank you.  That's all I have.
16   MS. SYRCLE:  Nothing further from us.
17   MR. STALEY:  I do have just a couple
18   questions.  Sam, would you be able to pull up
19   Exhibit 2, which is the disciplinary history.
20   Thank you.  We can keep it right there.  That's
21   perfect.
22                   EXAMINATION
23   BY MR. STALEY:
24   Q.   Dr. Lane, do you recall answering some

90

1    questions about this document earlier in your
2    deposition?
3    A.   Yes, I do.
4    Q.   I believe just recently you were asked
5    the question whether mental health could make
6    the recommendation that an individual be
7    released from segregation.  Do you recall that?
8    A.   Yes, I do.
9    Q.   I believe you testified that that
10   recommendation could be made, correct?
11   A.   Correct.
12   Q.   If you look at this document starting
13   with 10/18/2016, I believe this was one of the
14   dates that we went over earlier.  And the
15   disciplinary action it says three months C grade
16   level and then it says other SMI.  Do you see
17   that?
18   A.   Yes, I do.
19   Q.   And you indicated earlier that when it
20   says other SMI, what you believe that meant is
21   that this individual did not receive additional
22   segregation time because of his or her mental
23   illness, correct?
24   A.   Correct.

91

1    Q.   Would this be one of the ways that
2    mental health could make a recommendation about
3    segregation time as far as the disciplinary
4    process?
5    A.   Yes, that's correct.
6    Q.   In looking at this document, is it your
7    understanding that that's probably what happened
8    here?
9    MR. BERGIN:  Object to the form of the
10   question.
11   THE WITNESS:  Yes.  Looking at this document,
12   that's what I think happened here that during
13   the Rasho lawsuit that this is what we did.  We
14   were reviewing tickets.  Mental health were
15   involved in reviewing tickets and making
16   recommendations about reducing segregation time
17   and asking for no segregation time on different
18   offenses such as the ones I see here disobeying
19   a direct order or insolent, reducing them or
20   asking for different types of reductions or no
21   time at all for these different types of
22   offenses.
23   BY MR. STALEY:
24   Q.   Thank you.  Sam, could you also pull up

92

1   what was marked as Exhibit 19, I'm sorry,
2   Exhibit 20.
3           Dr. Lane, do you recall looking at this
4   document?
5       A.  Yes, I do.
6       Q.  I believe you testified that it was a
7   referral form?
8       A.  Referral to special treatment.
9       Q.  Correct.  Is this one of the ways that
10  the treatment team or a specific provider could
11  recommend a specific individual be placed in a
12  special or residential treatment unit?
13      A.  Yes.  The treatment team makes a
14  decision to refer the offender to the we call it
15  the residential treatment.
16      Q.  And I believe you testified there were
17  two such units during your time at Menard, one
18  at Dixon and one at Pontiac; is that correct?
19      A.  Yes, that's correct.
20      Q.  And you would have been a part of this
21  treatment team for Mr. Gay during your time at
22  Menard, correct?
23      A.  Correct.  And if I wasn't a part of the
24  treatment team, the treatment team would have

93

1   come to me to get my clinical consultation about
2   it before they went forth if they weren't
3   working with me but just consult with me and
4   they would have consulted with the psychiatrist
5   as well.
6       Q.  And the date of this document is 11/14
7   of 2016.  If you can scroll up a little bit so
8   the doctor can confirm that.  Is that correct?
9       A.  Yes.
10      Q.  And if I told you that Mr. Gay was
11  transferred to Pontiac on November 15 of 2016,
12  which would have been the day after this
13  referral, would that sound correct to you?
14      A.  Yes.
15      Q.  And if it were true that he was
16  transferred the next day, looking at this
17  document, would you assume that this document
18  facilitated that transfer?
19      A.  Yes, I would.
20  MR. STALEY:  I have nothing further.
21  MR. BERGIN:  Nothing further.  Thank you,
22  ladies and gentlemen.
23  MR. STALEY:  Thank you, Dr. Lane.
24          (Proceedings concluded at 12:40 p.m.)

94

1       I, Jennifer Buckley, do hereby certify
2   that heretofore, to-wit, on January 20, 2023,
3   appeared via video conference, SYLVIA BUTLER
4   LANE, in a cause now pending and undetermined in
5   the United States District Court, Central
6   District of Illinois, Peoria Division, wherein
7   ANTHONY GAY is the Plaintiff, and JOHN BALDWIN,
8   et al., are the Defendants.
9       I further certify that the said witness was
10  first duly sworn to testify the truth, the whole
11  truth and nothing but the truth in the cause
12  aforesaid; that the testimony then given by said
13  witness was reported stenographically by me in
14  the presence of the said witness, and afterwards
15  reduced to typewriting by Computer-Aided
16  Transcription, and the foregoing is a true and
17  correct transcript of the testimony so given by
18  said witness as aforesaid.
19      I further certify that the signature to the
20  foregoing deposition was waived by counsel for
21  the respective parties.
22      I further certify that the taking of this
23  deposition was pursuant to Notice, and that
24  there were present at the deposition the

95

1   attorneys hereinbefore mentioned.
2       I further certify that I am not counsel for
3   nor in any way related to the parties to this
4   suit, nor am I in any way interested in the
5   outcome thereof.
6       IN TESTIMONY WHEREOF:  I have hereunto set my
7   verified digital signature this 25th day of
8   January, 2023.
9
10
11
12      _____
13      LICENSE NO. 084-004095
14
15
16
17
18
19
20
21
22
23
24

96

**Exhibits**

**Ex 01**
6:14 40:1,10,13,16
**Ex 02**
6:15 90:19
**Ex 03**
6:16 55:11,12
**Ex 04**
6:17 56:6,7,11
**Ex 05**
6:18 56:22,24 57:10
**Ex 06**
6:19 56:23 61:10
**Ex 07**
6:20 61:15
**Ex 08**
6:21 61:20 85:4
**Ex 09**
6:22 65:7
**Ex 10**
6:23 65:21
**Ex 11**
6:24 66:8
**Ex 12**
7:1 67:5
**Ex 13**
7:2 39:15,22 40:3,12
69:2 85:22
**Ex 14**
7:3
**Ex 15**
7:4 70:18,19
**Ex 16**
7:5
**Ex 17**
7:6
**Ex 18**
7:7
**Ex 19**
7:8 72:6 93:1
**Ex 20**
7:9 75:11 93:2
**Ex 21**
7:10 40:4 89:23
**Ex 22**
7:11 87:2

**1**

**1**
40:1,10,13,16 44:20
**1-21**
8:2
**10**
65:21
**10/18/2016**
91:13
**10th**
72:18
**11**
66:8 90:3,11
**11/14**
94:6
**12**
67:5
**13**
39:15 40:12 69:2
85:22
**13's**
39:22 40:3
**14**
70:20,21 75:13
76:15
**14th**
41:5
**15**
24:18 49:11,17 50:7
54:11 65:12,13

70:19 94:11
**16**
24:18 42:19 74:17
**16th**
49:17
**17**
54:4
**18**
52:22
**18th**
51:6
**19**
61:22 63:4 65:2,13
72:6 85:7 93:1
**1958**
9:22
**1981**
10:9
**1998**
49:2
**1999**
10:24

**2**

**2**
44:22 70:4 90:19
**20**
51:24 52:14 75:11
93:2
**2005**
13:4
**2007**
15:19,22
**2008**
13:19 14:17,18,19
**2013**
15:22,23 16:11
**2014**
16:9 18:11,12 59:11
**2015**
16:7 24:3,23 26:2
49:17 61:22 63:4
65:2,22 85:8
**2016**
41:6 51:6,16,24
52:14,22 70:1 71:18
72:19 75:13 76:15
85:19 90:3,11 94:7,
11
**2017**
24:24 25:4 54:4
**2019**
49:3
**2022**
25:10
**2066**
86:23
**2067**
86:24
**21**
40:4 89:23
**22**
87:2 88:14
**23**
9:22
**24**
14:4 53:7 65:12
**27**
50:19
**29**
85:19
**2:30**
63:16
**2nd**
51:16

**3**

**3**
44:24 55:11,12
**30**
23:23 58:14
**30th**
65:22
**36**
11:14,15

**4**

**4**
56:6,7,11
**4/29**
70:1

**5**

**5**
56:22,24 57:10

**6**

**6**
56:23 61:10
**6/13/2016**
75:21 76:16
**60**
90:4,13

**7**

**7**
61:15
**7/15**
71:18

**8**

**8**
60:7 61:20 85:4
**8/27**
58:16

**9**

**9**
65:7

**A**

**ability**
31:23 60:13
**abuse**
15:11
**academic**
11:7
**accommodations**
55:13
**accurate**
22:11 23:2 28:1
35:24 49:23 76:7
**accurately**
9:4
**accusing**
48:17
**act**
37:20,22 38:7 55:14
**action**
45:17 47:20 53:12,
17 91:15
**actions**
77:17
**actual**
10:4 11:1

**ADA**
37:20,24 38:3 55:13,
16,23
**added**
52:9
**adding**
53:21,22
**additional**
50:23 51:11 52:2,17
54:11 91:21
**address**
68:3,5
**adequately**
60:13
**Adjustment**
75:22
**administration**
45:18 46:16 47:21
**administrative**
55:13 67:18
**administrator**
58:3 62:16,19 63:9
**admitted**
63:24 85:11
**advise**
68:1
**affairs**
62:24
**afraid**
83:10
**afternoon**
63:19
**agencies**
14:21
**agency**
15:9
**agree**
17:18 31:2 50:7 60:3
76:16 77:9 82:18
**agreeing**
58:8
**ahead**
21:1 25:2 40:1,9,10
46:22 50:4
**aide**
25:24
**aloud**
59:22
**Americans**
37:20 55:14
**Analysis**
59:11
**and/or**
32:19
**Anderson**
67:17
**Andrea**
59:4,6
**angry**
87:24
**Anna**
16:21
**Annual**
61:10
**answering**
90:24
**Anthony**
8:12 30:10 31:2,5,
17,20 32:3 34:10
37:4 38:11 39:6
42:21 42:16 46:15
48:14 49:1 53:5,13
54:15 55:2,4 59:10
61:21 63:15 64:14
66:17 67:10,18
70:10 72:9 73:23
74:5 76:17 77:13,17,
22 89:11 90:8
**Anthony's**
42:10 73:2 75:17

**anti-social**
75:23
**anticipate**
29:11,14
**anxiety**
76:5
**anymore**
21:7
**apologies**
54:3
**appeared**
87:24
**appears**
48:1
**applicability**
56:19
**applicable**
8:18
**applied**
37:24 38:10 53:17
55:23 56:2
**approximately**
11:12 18:18 24:2
30:14
**April**
24:3,23 26:3 49:12
85:19
**arrived**
63:15
**assault**
52:15
**assaulting**
52:1
**assigned**
42:6 44:3 45:20
**assistant**
25:24 67:12
**assume**
94:17
**attached**
59:1 67:16 69:16
**attachment**
59:10
**attempt**
45:14 54:5 78:9
85:24
**attention**
51:5 52:13 53:24
54:4 56:5,10 61:9,20
65:21 70:18 72:5
84:19 89:23
**attorney**
36:17
**attorneys**
36:13
**August**
16:6 24:18 49:11
51:16,24 52:14
61:22 63:3 65:2,12,
13 85:7
**authority**
88:19 89:10
**aware**
26:4 54:14 63:15
66:22 90:12
**AWP**
67:12,16
**axis**
64:9

**B**

**B62251**
63:15 67:19
**back**
9:11 23:16,21 25:12,
14,15,17 38:15
47:13,18 55:6 67:21
68:20 71:14 73:15
76:23 77:4

**Baig**
79:3
**barely**
90:6
**bars**
34:7,8
**based**
17:18 21:16,17
**basically**
20:1 25:10 28:14
32:22 33:19,24 34:8,
24 35:7,8 53:20
62:16 81:22
**basics**
31:1
**basis**
32:16 44:18,19
**batch**
57:12
**Bates**
86:23
**begin**
40:1
**beginning**
58:15
**begins**
43:22 60:7
**behave**
39:23
**behavior**
30:23 44:7 80:17
81:5 83:22 84:5,9
85:14 86:4 88:1,2
**behavioral**
26:24 27:3,5,10,22
28:6,12,19,23 60:11,
16 61:5 64:9
**behavioral/mental**
60:14
**behaviors**
44:9 86:18
**benefitted**
77:23 78:3,6
**Bergin**
8:7,10,11,15,22 9:7,
18 21:9 26:13 36:5
37:16 38:14,20
39:14,17,19,23 40:8,
12,14 46:5 49:9,13,
15,22 50:6 54:22
56:9 57:1,2,16
66:10,21 68:16,19
69:1 70:21,22 71:5,
12,23 72:4,15 73:8
74:4,18 76:11 77:11
78:8 80:1,9 82:12,20
83:23 86:6 89:3,5,8,
14,18,21 90:15 92:9
94:21
**bigger**
57:5
**Bill**
69:4
**bipolar**
31:11 43:5 59:17
76:4
**birth**
9:21
**bit**
41:17 45:5 94:7
**Blandin**
8:13
**block**
47:17
**blocked**
90:7
**Board**
11:23,24 12:5,8
67:18
**borderline**
31:13 42:5,17 43:4



44:1 47:6 59:18 60:1
75:20,24 76:13
**boss**
67:13
**bottom**
47:19 71:8 88:1
**box**
48:2
**boxed**
33:20
**BPD**
59:14,15
**break**
20:16 38:14,18
71:24 72:2 89:17,19
**Brian**
57:8 88:24
**brings**
16:6,8
**brought**
32:17,21 33:3
**bug**
87:20
**Butler**
9:14 21:2 46:7 57:20
87:13
**Butler's**
64:11

**C**

**call**
93:14
**called**
9:15 11:23 12:8,19,
21 15:17
**capacity**
58:2
**Carbondale**
73:17
**Card**
48:23
**care**
17:3 27:11 33:3
**case**
29:9,15,18 36:14
58:21
**caseload**
58:9 64:11
**catch**
83:9
**catch-22**
81:23
**caused**
30:18
**causing**
44:13 70:10
**cc'd**
65:3 67:8 90:2
**cell**
32:11 33:8,10,12,14,
19,20,23 34:5,9,11
58:13 64:1,10 65:17
85:12
**cells**
33:16 34:3,7
**center**
17:11 24:5 25:23
58:4
**Central**
8:19
**chairman**
46:7
**chairperson**
48:6
**chance**
29:23
**change**
42:18

**changed**
84:11
**changing**
86:12
**character**
60:21
**characterization**
41:23
**Chicago**
9:23 10:21 13:6
**children**
15:12
**Choate**
15:17 16:3,14 80:7
**chose**
18:1
**Chris**
49:8 70:20 89:16
**Christian**
35:13 62:3 64:13
65:2
**Christopher**
8:10
**chronic**
36:1
**circulate**
88:13
**circumstance**
54:8
**circumstances**
9:20 15:2 30:18
36:15 69:7
**citation**
52:22
**cited**
51:16,24
**Civil**
8:17
**classroom**
10:4 11:1,18
**clear**
48:17,19 74:20
**clinical**
12:23 13:15 15:13
18:16,17 23:22
41:13 58:2 94:1
**clinically**
60:19
**closed**
16:1 61:2
**closely**
34:24
**cluster**
75:23
**collaboration**
78:18
**collaborative**
58:11
**college**
10:19 11:12
**commissary**
20:9 51:2,12,22
52:3,18
**commit**
45:14
**committed**
44:20,24 45:7,12
**Committee**
40:18
**communicated**
35:6
**complete**
10:5
**completed**
10:6
**completely**
84:10
**complexity**
58:20

**compliance**
26:20 38:3
**comprehensive**
58:19
**concentration**
12:4
**concern**
68:4,6
**concur**
45:17 47:20 48:2,12
**concurred**
46:15
**condition**
32:4 44:12
**conditions**
22:12
**conduct**
20:14
**conducted**
19:12
**confer**
11:20 48:12
**conferred**
13:3
**conferring**
14:9
**confinement**
20:22 21:5
**confirm**
94:8
**confuse**
36:12
**confused**
23:12
**confusing**
9:8
**confusion**
39:20
**consecutive**
90:4
**consequence**
22:12
**considered**
60:9,16,19
**consistent**
59:21
**constructed**
33:14
**construction**
28:2
**consult**
58:23 73:21 94:3
**consultation**
94:1
**consulted**
61:13 64:3 94:4
**contact**
52:3,19 69:5 77:12
**content**
64:21 67:14
**continued**
77:18
**continues**
44:5
**continuing**
13:23 50:16
**continuous**
14:5
**contraband**
51:7 83:3,6
**contract**
22:22,23,24 23:3,8,
14
**contractor**
34:21 62:18
**control**
76:1 83:21 84:1,14,
15 86:12
**correct**
10:19 11:8,18 12:1,

18 15:14 17:3,12
18:19 19:8 20:23
23:6,7,14 24:15,16,
17,19,20 26:2 33:1
38:12,13 39:15
40:19 41:6,9 43:2,16
46:7,12,17 47:22
48:3,4,6,10,11 49:3,
20 50:12,17,18,20,
21,24 51:1,3,4,8,12,
18,19,22,23 52:4,5,
7,9,10,15,16,20,21,
24 53:1,5,14 54:9,12
55:17,24 57:23 58:4
59:11 61:7 62:1,21
63:4 64:16,17 65:9,
12,18 66:2,14,18,19
67:6,8 68:9,13
69:13,19,20 70:1,4,
10,13,24 71:3,19
72:7,10,13,19,23
73:6,12,17 75:13
76:14 77:14,15
79:21 80:7,8,21
85:15,16 86:5 87:13,
17 90:13,14 91:10,
11,23,24 92:5 93:9,
18,19,22,23 94:8,13
**correcting**
49:14
**Correctional**
24:5 25:7 58:4
**corrections**
17:7 25:4 27:17,18,
19 48:22 49:24
69:22 75:3 79:19
**Corrections'**
35:19
**correctly**
87:21
**correspondence**
66:22
**corresponds**
43:9
**Cortney**
38:21 41:8 43:16
57:22 58:8 78:23
81:10
**Counsel**
49:22
**County**
25:23
**couple**
14:20 31:1,10 90:17
**courses**
12:11
**court**
8:19,24 9:11 29:9
40:5 57:12 68:19
**cover**
31:1 69:3
**create**
48:18
**credit**
11:13,15
**criminals**
28:14
**criminology**
12:11
**crisis**
30:22 32:6,7,8,11,
12,18,22 33:5,6,8,
10,11,19 34:2,5,11
60:17 61:6 64:5
74:21
**criteria**
27:7 59:14
**cumulative**
52:7
**current**
75:15,19

**cut**
63:19,20,24 85:11
**CV**
16:11
**cycling**
84:23

**D**

**daily**
32:16
**damage**
51:7
**Dana**
63:6,8
**danger**
45:8
**dangerous**
28:14 61:3
**date**
9:21 41:5 49:7,9
70:2 94:6
**dated**
61:21
**dates**
24:21 91:14
**day**
58:17 94:12,16
**days**
23:23 49:17 50:8
54:11 60:19 90:5,13
**December**
65:22
**decision**
26:5,11 44:18,19
48:13 61:12 93:14
**decompensate**
22:2,5,6
**decompensating**
74:13
**decompensation**
37:10,12 55:9 74:22
**define**
19:20
**degree**
10:19 11:3,20 12:1,
5,15,18,23,24 13:1
14:10,12 82:9
**degrees**
13:8
**Delong**
63:7,8,14
**demands**
88:7
**denied**
63:23
**denying**
48:15
**dep**
39:22
**Department**
16:23 17:7 25:4,21
27:16 35:18 48:21
49:23 69:22 75:2
79:19
**deposed**
8:24
**deposition**
8:1,16 72:6 87:1
91:2
**depositions**
57:13
**depressed**
22:10
**depression**
15:7 43:6
**depressive**
31:14 76:3,6
**description**
70:6 85:23

**designation**
41:11
**desired**
84:5 85:15 86:5
**deter**
20:14
**deteriorate**
32:4 44:12
**deteriorating**
55:3
**determinations**
45:4
**determine**
41:20
**determined**
64:4 65:16
**detrimental**
21:23
**develop**
58:19
**diagnose**
43:9
**diagnosed**
31:15 42:6,20 75:21
76:17 77:8
**diagnoses**
31:11 42:18 43:7,10
47:8
**diagnosis**
31:9 42:10,13,21,22
43:12,13 44:2 75:17,
20 76:8,14
**diagnostic**
59:14
**difference**
28:5 33:9,11
**differences**
28:9
**differently**
19:23
**difficult**
81:18,21,23 82:2
**difficulty**
58:24 82:23
**direct**
17:9 49:18 50:8
52:23 53:24 54:3
56:5,10 61:9,20
65:20 69:2 70:18
72:5 75:11 89:22
92:19
**Directing**
51:5 52:13
**direction**
68:3
**directive**
55:13
**director**
34:13,16,23 35:1,7,
12 46:12 62:8,11,20
70:23 72:22
**directs**
36:17
**Disabilities**
37:20 55:14
**disabled**
45:1
**disciplinary**
48:22,23 49:2 53:12,
17 82:9,17 83:19
90:19 91:15 92:3
**discipline**
82:22
**disciplined**
82:10
**discuss**
58:18 59:3
**discussion**
81:7,10,15,16



**discussions**
75:1 81:9
**disobeying**
49:18 50:8 52:23
92:18
**disorder**
31:12,13,14 42:5,17
43:5,6 44:2,22 45:3
59:17,18 60:2 64:8
75:20,22,24 76:1,2,
3,4,5,6,13
**disorders**
15:6 76:18 77:9
**disoriented**
60:21
**dispensed**
41:22
**District**
8:18,19
**Dixon**
78:4 79:16 93:18
**DOC**
80:4
**doctor**
50:7 57:17 72:5
80:10 89:5,22 94:8
**doctor's**
13:1 14:10,11
**doctors**
43:9
**document**
30:5 40:22,24 41:1,
15,20 43:19 46:3,21,
24 47:10,11,13,15
56:15 57:4,13 63:2
64:19,21 69:16 71:9
78:15 85:3,5 87:5,8
91:1,12 92:6,11 93:4
94:6,17
**documents**
29:19 39:21
**due**
25:12 58:17,20
60:10
**duly**
8:6

**E**

**e-mail**
57:18 63:3 64:24
65:21 66:5 67:14
69:3
**earlier**
36:12 47:5 74:8
80:15 82:8,16 84:24
85:5 91:1,14,19
**earned**
68:12
**eat**
22:8
**education**
13:24
**effects**
21:24
**effort**
78:20
**elements**
43:1 59:19
**elicit**
84:5
**eligibility**
25:24
**Elliott**
69:4
**Emergency**
70:23
**emotional**
60:11

**employ**
22:18
**employed**
16:15 22:19 25:18,
19 39:4
**employee**
17:24 24:11 62:21
69:10 72:23
**employees**
35:18,19,22 62:14,
23
**employer**
18:13 62:17
**employment**
10:14 14:11 17:24
23:9 24:21 25:2,3
**end**
64:18,20
**ended**
22:22,24 23:4,8,16
**enforced**
44:15
**engage**
37:5 84:4
**engaged**
85:24 86:17
**enlarged**
69:16
**entire**
31:5 80:24 81:1
**entry**
51:5 54:4
**essential**
45:9
**established**
27:4
**evaluated**
63:17,22 64:4
**evening**
63:16
**Event**
69:17
**evidence**
42:3
**evidenced**
45:13
**exam**
13:16
**EXAMINATION**
9:17 80:13 89:7
90:22
**examined**
9:15
**excuse**
16:22 18:9 39:24
44:23
**exhibit**
8:2 39:14,15,22
40:1,3,4,10,12,13,16
46:19 48:20 55:11,
12 56:6,7,11,22,23,
24 57:10 61:10,15,
20 65:1,6,7,21 66:8
67:4,5 69:2 70:18
72:6 75:11 82:8
85:1,4,18,22 87:2
89:23 90:19 93:1,2
**exhibits**
39:8 57:8 88:13
**exist**
67:23
**exists**
44:11 45:11
**experience**
11:10 17:10,18
21:11,20
**expert**
29:8,14
**explain**
20:3 84:22

**expressed**
85:23
**extensive**
82:17
**extremely**
60:21

**F**

**facilitated**
94:18
**facilities**
16:15
**facility**
15:16 16:18,24 17:2,
5,14 18:24 28:19
60:15,23 73:24
75:15 80:6 88:18
**fact**
36:16 48:12 49:1
**factors**
44:20
**failure**
45:9
**fair**
22:11 23:2 28:1
35:24 41:23
**familiar**
55:16,18,19 56:15,
18
**Family**
25:23
**fault**
23:13
**features**
75:23 76:1
**February**
9:22
**federal**
8:17 38:7
**feel**
84:17
**feelings**
58:18
**fighting**
50:20 83:14
**figure**
32:19
**find**
32:16 83:2,5,15
**fine**
88:15
**finish**
25:2
**finished**
54:1,2
**firm**
8:13
**five-minute**
71:24
**flooding**
65:23 66:4
**fluctuating**
84:13
**form**
21:1 37:10 69:18
70:24 72:7,12,17
73:7,11 75:16 82:12,
20 83:23 86:6 92:9
93:7
**forwarding**
69:17
**found**
29:18 51:6
**foundation**
36:3 37:14 49:21
50:2 66:20 68:14
71:4,20 72:14 74:2
76:9

**founded**
29:1
**frequency**
44:9
**frequently**
37:3 58:21
**freshman**
10:6
**front**
16:11 29:22
**full**
8:7 37:22 84:1
**fully**
36:9
**function**
22:7 60:13
**functioning**
60:12
**funds**
54:5

**G**

**garbled**
9:8
**Gay**
8:12 30:4,8,10 31:2
34:11 39:6 41:21
42:3,16 43:22,24
44:3,5,10 46:15
48:14 53:5,13 54:15
55:4 58:9,13 59:13
60:8,9,20 61:21
63:15 64:4,6,15
67:18,19 70:10
72:10 75:21 77:22
82:10,16 84:4 85:10
86:17,23 88:6 89:11
90:8 93:21 94:10
**Gay's**
32:4 49:1 55:3 59:10
75:19 80:16 83:20
**GED**
10:3,8
**general**
20:4,5,10 33:13 34:3
**generally**
19:12,13
**gentlemen**
38:16 72:1 94:22
**get along**
83:1,13,17
**Gillespie**
35:13 58:23 62:3,4
63:3 64:13 65:2 67:6
69:3 79:4 81:11 90:1
**Gillespie's**
63:12
**give**
32:12 39:18 40:8
88:17
**glad**
55:1
**good**
16:14 67:19,20,22,
23 68:9 70:9
**Governors**
11:23,24 12:5,9
**grade**
51:13,14 53:10
91:15
**graduate**
10:1,2 12:14
**graduated**
10:24
**granted**
14:6
**gravely**
45:1

**grew**
9:23
**ground**
8:23
**group**
19:14
**guess**
47:7 56:22 71:21
83:4
**guys**
39:21 57:12 76:19,
24

**H**

**Haldol**
71:15 73:3
**half**
16:5
**halfway**
85:10
**happen**
22:16
**happened**
53:15 65:11 69:24
73:19 84:20 92:7,12
**happening**
9:14
**harm**
22:8 32:14 33:18,23
44:6,13 45:2,8,11,15
70:10
**harming**
32:10
**Harton**
8:11 39:9,16,18
40:2,7,11 49:7 56:8,
24 57:11 66:9 70:20
88:15 89:15
**head**
9:1
**health**
16:3,24 17:3 19:1,3,
6 23:10 27:20 28:18
29:1,3,6 31:9 32:15
33:3 34:13,16,22,23
35:1,4,7,11 36:2,20
39:3 42:13 44:5
45:10 53:8 55:3
56:12 58:12 59:7,8
60:14,20 62:8,10,20
63:17 78:17 81:1
88:18 89:9 91:5
92:2,14
**hear**
76:20
**heard**
21:4
**hearing**
40:19 41:5,19 43:15,
17
**held**
61:2
**Hey**
57:7
**high**
10:1,2,4
**hired**
24:4
**history**
49:2 82:9,17 90:19
**Hold**
89:15
**home**
8:21
**hope**
64:1 85:11
**hospital**
17:16 28:7,11,17,21
29:2 73:16,17 80:4
86:1

**hospitals**
80:5
**hours**
11:12,15 14:2
**housed**
19:23
**housing**
19:13,17 20:1,4,5,6,
7,11,18,19 21:8,12
33:4,12,14 34:4
50:14,16
**human**
25:22 45:10
**hurt**
33:15
**Hutchinson**
74:23

**I**

**ideation**
63:22,23
**identification**
8:4 87:3
**identified**
42:4 44:1 64:8
**identifies**
68:8 90:3
**IDOC**
23:17 24:1
**II**
64:9
**ill**
14:24 15:5 17:11,20
21:24 22:14 31:3
38:1,11 53:3,14
56:19 60:10
**Illinois**
8:19 13:11 16:21,23
17:7,17 24:13 25:3,
21 35:18,22 48:21
62:15 69:22 75:2
79:19
**illness**
15:5,8 27:8 37:8
42:4 43:1 44:1,21
45:3 53:21 91:23
**illnesses**
25:12 42:16
**ills**
55:24
**immediately**
12:13
**impact**
59:11 81:4
**impacted**
84:16
**impaired**
60:10
**impolite**
9:19
**imprecise**
9:9
**improve**
55:5
**impulse**
76:1
**impulsive**
84:17 86:13,17
**in-house**
37:1
**inability**
82:11
**incident**
61:21 64:12 65:7,8,
11 69:18,19,24 70:7,
9 71:3 74:16,19
85:7,19,23
**incomplete**
42:9,12,21,22 43:13



Sylvia Butler Lane 01/20/2023

**increase**
54:15
**independent**
30:9
**indication**
84:8
**individual**
19:14,15,18 91:6,21
93:11
**individuals**
19:17,24 35:17 43:9
**Infirmary**
87:9
**inflict**
45:14
**inflicted**
45:12
**information**
59:2,3
**informed**
58:10
**infraction**
50:20
**injuries**
25:12,16
**inmate**
21:12 48:22 64:4,6
67:17 72:9 88:19
89:11 90:8
**inmates**
18:22 19:8 21:20
38:11 56:3 65:23
79:21 82:6 90:3,7
**inpatient**
17:2,11,21 18:24
19:2,6 28:17,21 29:2
77:23 79:20 80:3
**inside**
27:15
**insolence**
52:23
**insolent**
51:17 92:19
**instance**
50:4
**instances**
55:7
**institution**
13:5
**intensified**
44:9
**intensive**
27:12
**intent**
50:13 63:24
**intention**
64:2
**intentional**
86:10
**interest**
44:15,23
**interferes**
60:12
**intern**
17:15
**internship**
17:16
**interpersonal**
60:11
**intervention**
32:6,7,8,24
**intimidation**
51:17
**involuntarily**
41:22 48:13
**involuntary**
30:6,7 45:18 46:16
47:21
**involve**
14:23

**involved**
92:15
**involves**
71:2
**issue**
64:12
**issues**
67:17 83:19

**J**

**Jacob**
63:23 64:11
**January**
49:2 54:4
**Jeff**
74:23
**job**
23:11,19
**Johnson**
63:6,9 66:13
**Join**
36:4 37:15 68:15
74:15 76:10 78:1
79:23
**July**
49:16 51:6

**K**

**killing**
64:2
**kind**
10:10 28:20,24 34:2
80:6 83:13
**kinds**
82:3
**knew**
54:17
**knowing**
12:4
**knowledge**
61:1 86:16

**L**

**laceration**
71:3
**ladies**
38:16 71:24 94:22
**lady**
38:21
**Lane**
8:1,9,10 9:14 50:5
80:15 87:1 90:24
93:3 94:23
**lawsuit**
92:13
**LCSW**
41:11
**leave**
22:17 25:3,11 27:7
35:14
**left**
23:1 25:9 27:4 44:11
76:21
**letter**
67:16,21
**level**
51:13,14 53:10
91:16
**license**
14:5
**licensed**
13:10 14:12 41:13
58:2
**licensure**
13:14
**Lieutenant**
43:16

**life**
11:7
**likelihood**
44:13 45:1
**likewise**
9:3 61:17
**limit**
21:19
**limited**
31:21,24 32:2
**limits**
21:10,14,17
**listed**
41:8 46:11 47:16
76:18
**live**
34:5
**located**
16:20
**locked**
17:14 28:17
**locked-in**
17:4
**locum**
16:2,4,10,15 17:23
**long**
16:4,18 21:11 25:8
30:14,15 58:18
**long-term**
22:13 37:13
**looked**
82:16 84:24
**lose**
76:19
**lost**
77:1
**lot**
55:21 61:1

**M**

**Madam**
68:19
**made**
35:3,9 45:5 78:12,16
91:10
**major**
12:3,7,8 15:7 31:14
50:20
**make**
57:5 78:13 83:10
88:14 91:5 92:2
**makes**
65:22 93:13
**making**
88:6 92:15
**maladaptive**
44:7
**manage**
27:20
**managed**
27:9,16
**management**
69:5,12
**manager**
62:10 63:8,10
**manipulative**
64:9
**manner**
79:10
**Manual**
56:12
**marked**
8:3 40:15 72:6 85:4,
21 86:22 87:2 93:1
**Matticks**
66:13,16 67:1
**mattress**
33:21 34:1,2,4

**max**
60:15,23 61:2
**means**
22:4,6 33:15 46:23
47:1 53:10
**meant**
91:20
**medical**
44:23 46:12 70:23
72:22 73:4 80:24
**medicated**
31:17
**medication**
30:7,8 32:19,20,21
44:4,16,22 45:19
46:17 47:22 64:7
**medications**
31:19 41:22 48:14
71:17 73:2
**meds**
64:16 71:9
**meets**
59:14
**members**
78:21
**memory**
16:14 47:13
**Menard**
18:5,7 24:5,7,8,14,
18,22,23 25:6 26:1,
8,21 27:23 28:20
31:6,17 32:3 34:10,
14 36:2,21 37:4,23
38:4,24 49:6,10
54:16 55:17 56:16
58:3 61:24 62:20
63:16 64:6,15 69:9
72:22 75:13 77:16,
22 89:10 93:17,22
**mental**
15:4,6,8 16:3,23
17:3 19:1,2,6 23:9
27:8,20 28:17,18,24
29:3,6 31:8 32:15
34:13,16,22,23,24
35:1,4,7,11 36:1,20
37:8 38:11 39:3
42:4,12,16 43:1,24
44:5,21,22 45:3
53:21 55:3 56:12
58:12 59:7,8 60:20
62:7,10,20 63:17
78:17 81:1 84:11
88:18 89:9 91:5,22
92:2,14
**mentally**
14:24 15:5 17:10,20
21:24 22:14 31:3
38:1 53:3,13 55:24
56:19 60:10
**mentioned**
48:8
**met**
27:6 58:10
**metal**
83:8
**method**
32:8
**Meyer**
32:22 41:8 43:16
57:23 78:23 81:11
**Midyeyar**
61:16
**minimum**
58:14
**minor**
12:6
**minutes**
38:15 58:15

**misconduct**
50:10,11
**missed**
73:16
**misspoke**
33:7
**misuse**
51:7
**modification**
30:23
**moment**
40:9 41:14 57:3,17
70:8 89:24
**Monday**
58:16
**Monitor**
61:10,16
**month**
50:23 52:9
**month's**
51:21
**months**
16:19 17:9 18:19,20
51:11 52:2,3,8,18,19
91:15
**mood**
64:8 76:2 84:13,18,
21,23 86:12 87:24
**moods**
84:10
**Moss**
59:4,6
**motivated**
85:15 86:4

**N**

**named**
38:21
**narcissistic**
76:1,2
**nature**
33:18
**necessarily**
43:7
**needed**
58:17
**Nick**
40:2 89:1
**nod**
9:1
**normal**
39:24
**north**
70:3
**Nos**
8:2 76:2,4
**note**
57:22 58:6 63:12
65:1,4 66:12 87:10,
11 90:1
**notes**
24:17
**notice**
8:16 48:9
**November**
24:18 41:5 42:19
50:19 53:7 72:18
74:17 75:13 76:15
94:11
**number**
13:21 39:8 60:7 85:1
90:8
**numbered**
66:7

**O**

**O'KANE**
57:7,8,15 89:1

**misconduct**
**Object**
26:12 36:3 37:14
49:21 54:21 66:20
68:14 71:4,20 72:14
73:7 74:2,14 76:9
77:24 79:22 82:12,
20 83:23 86:6 92:9
**objecting**
50:1
**objection**
21:1 71:11
**objections**
36:14
**objects**
83:7,8
**occurred**
71:18
**October**
13:4 16:8,9 18:12
25:10 52:22
**offender**
42:3 43:22,24 44:3,
5,10 47:15 58:9
59:1,13 60:8,9,20
67:19 75:19,21 87:9
93:14
**offender's**
44:14 68:4
**offenders**
15:10 19:10,23 20:2,
6,10 27:6 61:3 81:20
**offenses**
53:19 92:18,22
**offer**
23:5
**office**
67:17 69:8
**officer**
26:20 38:3
**Oklahoma**
16:22
**Operating**
56:11
**opinion**
46:14
**opportunity**
57:19
**opposed**
12:23 28:16
**order**
49:18 50:9 52:23
92:19
**ordered**
63:18
**original**
13:19
**originally**
23:14
**outcome**
85:15 86:5
**outpatient**
19:9,10

**P**

**p.m.**
63:16
**paperwork**
74:7
**paragraph**
42:2 43:21 44:18
60:6
**parallel**
62:12,14
**Pardon**
12:20
**part**
10:7 20:16 30:23
58:9 65:1 78:24 79:4
83:6 93:20,23



part-time
14:20,22
participate
31:23
partly
83:24 86:8
pass
80:10
past
44:10 57:13
patient
17:4 47:11 87:19
patients
15:4,6,8 17:6,13,17
18:22 56:20
pen
63:20
pending
67:20 68:10
people
9:4 15:12 20:16
46:24 47:8,11 81:24
83:13
perfect
90:21
period
10:11 14:19 17:14
21:21 49:5 74:21,22
permanent
23:11,19
person
21:18 22:6 32:9,11,
13,15 33:4,15 39:24
44:20,24 45:7,12
52:1 63:10 74:21
88:8
person's
33:12 47:6,7
personal
32:12 33:17
personality
31:13 42:5,17 43:5
44:1 59:18 60:1
75:20,23,24 76:2,4,
13
Ph.d.
12:24 64:13
phase
84:22
phased
15:20
physical
44:13 45:8,11,15
physician
72:12
physicians
43:8
piece
83:16
Pinckneyville
18:6,9,10,18 23:21
25:7
place
30:24
placement
60:17 61:7
plaintiff
8:12
plan
30:24 58:19 63:24
planning
28:2
point
10:18 26:4 31:12
68:2 79:5 81:6
policies
26:15 35:3,10 55:20
56:1
Pontiac
67:24 74:6,11 75:4,7

77:13 78:5 79:15
93:18 94:11
poor
81:21
pop
33:13
population
17:20
portion
11:5,6 17:19
portions
39:11
poses
45:1
position
25:11 39:2 62:9,12
post-doc
14:13
potential
63:18
practice
14:13,14 15:3,19,20,
21 16:1
practicum
17:14
present
44:20
presume
38:9
pretty
82:17
prevent
32:23 77:17
previous
59:2,7
previously
8:3 85:21 86:22
primarily
64:7
prior
11:10 29:19 86:18
prison
18:3,4 19:5 21:6,7,
11 25:14,17 27:8,9,
15,20 28:6,24 61:2
74:1
prisoners
32:1
private
14:13,14 15:3,19,20,
21
privileges
20:2,7,10 82:6
problematic
81:17
Procedure
8:17 56:12
procedures
26:15 32:9 35:4
55:20 56:2
proceedings
42:3
process
58:17 92:4
professional
13:6 39:3 59:8 78:17
professionals
34:22 35:2,5
program
12:10 17:11 27:12
programming
27:12
programs
31:24 67:13
Progress
87:10
progresses
58:22
Prolixin
71:15 73:3

property
32:12 33:17 51:7
protect
83:2,7,8,12,15,17
proverbial
89:5
provide
19:11 28:20,24
30:12 45:9 48:13
58:11
provided
19:8,9,16 36:24
provider
93:10
providers
81:3,13
providing
29:14 35:17
provisional
75:17
PSD
12:18
psychiatric
28:7,21 29:2 44:4
77:23 79:20 81:12
psychiatrist
42:7 43:11 44:3
45:21 78:19 79:1
94:4
psychiatrists
79:3
psychiatry
27:13 32:18
psychologist
10:17 13:15 18:16,
18 23:22 58:2,3
psychology
12:6,15 13:7
psychotropic
45:18 46:16 47:21
48:14 64:7,16 71:16
Psyd
12:19,21,22
PTSD
76:4
public
25:24
pull
85:17 90:18 92:24
punishment
20:13 50:9,11
punitive
49:20 50:3
purpose
41:19
pursuant
8:16
pursuing
11:3 12:14
put
30:24 32:10,13
39:10 42:15 70:13
89:24

quick
89:16

Q

QA
70:23
QMHP
63:22
quarterly
36:22,24
question
9:9,20 28:22 36:16
54:23 68:18 76:22
77:4,19,20 82:13,14
86:7 89:6 91:5 92:10
questions
9:7 36:14 59:1,4
80:12,18 88:23 89:1

90:18 91:1
quick
89:16

R

Rasho
26:5,11,19,20 61:11,
17 92:13
read
9:11 26:16 39:11
43:22 44:17 47:3
57:4,18,19,21 58:6
59:19,22 60:6 61:12
63:12 67:14 68:20,
21 70:6 71:13 73:1
75:17 76:23 77:4,6
87:12
reading
61:18 87:21
real
89:16
reason
22:23
recall
38:21 40:21,23
66:24 73:19 74:24
75:7 85:8 86:1 88:6
90:24 91:7 93:3
receive
21:18 26:10 27:11
91:21
received
42:6 44:2 51:10,20
52:1,17 57:9
receives
44:15
recently
25:9 91:4
recertified
13:20
recipients
69:4
recognize
87:8
recollection
26:19 30:1,9,17 43:4
55:23 81:20
recommend
89:10 93:11
recommendation
78:13 79:7 91:6,10
92:2
recommendations
78:12 92:16
record
8:15 9:1 39:12 43:23
48:16,19 49:23
55:11 58:7 63:13
67:15 68:21 75:18
77:6 81:1 86:22
records
84:24 86:23
recreation
31:21
reduced
58:23
reducing
68:12 92:16,19
reductions
92:20
Rees
90:2
refer
79:9 93:14
reference
53:4 60:22 65:22
referral
30:4,6,7 72:12 73:4
74:17 75:12 79:8,10
93:7,8 94:13

referring
66:5 73:10,11
reflect
8:15
refused
44:4
regional
24:9 63:8,10
regular
33:12,22 34:7
rehabilitation
11:17
Reister
24:9
relabel
40:3
related
37:13
relates
55:12,16
relation
80:16 82:22
relationship
34:19 35:3,9
released
88:19 89:11 91:7
remainder
11:17
remember
26:9,17,22 29:12
35:15 41:4 51:15
56:1,3 61:14,18,19
74:3,5,7,12 75:5
80:18,23 81:6
removed
33:24 68:2
renew
23:5
renewed
23:3
repeat
28:22 68:18 82:14
repeatedly
44:8
rephrase
55:1
rephrased
9:11
report
61:11,13,16,18,21
64:12 65:7,8 69:18
70:9 85:19
reported
64:2
reportedly
63:21
reporter
9:1,12 40:5 57:12
68:19
reporting
70:24 72:17
reports
69:19
represent
8:11 47:10
requested
30:20 58:16 68:22
77:7
requesting
58:13
require
64:5
required
36:16
requirements
11:7 26:11
research
12:24
resend
40:4

residential
60:16 61:6 75:12
93:12,15
Resource
25:23
resources
27:14
response
84:5 88:9
responsibility
44:7
restate
33:6
restricted
21:12 82:1
restriction
51:2,3,12,22 52:3,4,
19,20
restrictive
20:1,5,7,17,19 21:8
33:14 34:4 50:14,16
result
37:7 45:3,16 50:22
51:10,20 79:6,12
82:10
resulting
45:8
return
25:13
returned
64:10 65:17
review
29:19 30:2 39:11
40:18 41:15 59:3
67:18
reviewed
29:21 30:3,4 47:3
74:8 80:24
reviewing
92:14,15
revocation
67:19,23
revoke
67:22
revoked
68:9
rights
85:2
risk
44:11 45:11 69:4,12
risky
25:14
Roderick
66:13 67:1
Romanucci
8:13
rounds
19:16
route
25:1
rule
76:3
rules
8:17,18,23 20:16
run
58:24

S

safety
45:10 53:8
Sam
8:11 39:15,24 40:8
56:6 57:7 90:18
92:24
Samantha
48:10
satisfied
11:7



Sylvia Butler Lane 01/20/2023

schizophrenia
15:7
school
10:1,2,5 13:6
screen
39:10 40:16 76:21
77:3 85:2 87:5
scroll
48:1 49:5 64:19,22,
23 66:11 70:8 71:14
73:14,15 87:19,23
94:7
scrotal
71:2
scrotum
73:5,12
sec
39:18 88:17
secondary
64:8
secretary
10:16
section
47:20 48:8 59:13
88:2
secure
27:19
security
28:12 32:13
segregation
19:16,20,22,24 20:6,
12,17,19 21:3,6,13,
21,23 22:13 31:5,21
32:1 33:1,2,7,10
37:13 49:17 50:3,8,
17,23 51:11,21 52:2,
8,18 54:12,15 70:4
80:17 81:4,16 86:19
88:20 89:12 90:4,12
91:7,22 92:3,16,17
selected
48:2
self-abuse
71:3
self-harm
77:18 80:17 81:5
83:21 84:4 87:24
88:2,8
self-harmed
44:8
self-harming
44:8
self-injury
85:24
self-mutilating
65:16 66:18
self-mutilation
37:5 65:8 70:16
71:18 73:5,12
semester
12:16
Senajia
81:14
send
57:11
sentence
53:23 68:13
separate
69:21
serve
28:16
service
14:21 15:9
services
25:22 27:13 60:14
62:10,20
serving
46:24 47:11,14 48:9
session
58:15,20

sessions
30:16,19 58:22
set
40:11 57:8
severe
44:13
severely
60:10
severity
44:10
sex
15:10
sexual
15:11
Shane
24:9
share
85:2,18 86:21
sharing
85:17
short
15:11 18:3 38:18
72:2 89:19
short-term
60:18
shortage
36:1,7
Shortly
73:23
shoulders
9:2
show
46:4
shows
54:8,11
shrug
9:2
sic
50:19 53:7 60:21
side
65:14
sign
47:14
signature
46:9 47:17,24 48:5
65:14 89:3
signed
43:11 48:9
significant
63:20
significantly
60:12
signing
47:2,9,18
similar
86:17
situation
28:24 65:23 66:4,23
68:8
six-month
51:12
skills
11:8 81:22
SMI
53:2,13,16,18 54:9
91:16,20
smoking
53:8
social
14:21 15:9 41:13
socialization
81:22 83:16
socialize
81:19,24 82:3,11
socializing
82:23
solitary
20:22 21:4,5
sophomore
10:7

sound
40:5 94:13
speak
32:15 66:16 88:3
special
30:3 78:3,4,5 79:9,
11 93:8,12
specific
49:7 55:22 93:10,11
specifically
36:17 75:6
spoken
36:11
stabilization
60:18
staff
26:16 36:1,21 52:1,
14 88:18
staffed
36:9
stages
28:2,3
STALEY
21:1 36:4 37:15
39:20 40:6 46:2
43:21 50:1 54:21
68:15 74:15 76:10
78:1 79:23 88:24
89:2,4 90:17,23
92:23 94:20,23
Standard
56:11
start
8:22 9:19 39:16
40:10 49:8
started
15:19 16:1,3,10 18:4
26:8
starting
91:12
starts
22:7
state
8:7 10:21 13:10
16:23 18:4 24:12
35:22 36:24 48:21
55:8 62:15,16,23,24
84:11
state's
62:17
stated
87:19
statement
42:9,12
States
8:18
stating
47:7
statute
38:7
Stellhorn
48:10
Steri-strip
63:21
Stewart
61:11,17
stop
64:23 85:17
stopped
16:9
stressful
82:5
strike
53:9
string
64:24
student
17:15
subject
46:15

subjective
87:12
substance
65:15
substantial
44:11 45:11
suffer
42:16
suffered
15:4 43:1,4,5,6
suffers
42:4 43:24 44:21
suggesting
49:22 61:5
suicidal
63:23 65:17
suicide
45:14 63:17,22
70:13
summarizes
70:9
summary
40:19 42:2
Suneja
64:3 79:2
super
60:15,23 61:2
supervised
35:1 62:22
supervisor
24:6,9
supportive
60:14
supposed
35:6
surgeries
25:16
swing
84:21
sworn
8:6
Sylvia
8:9 9:14 46:7
Symptom
59:11
symptoms
44:5
synonymous
20:20
SYRCLE
26:12 36:3 37:14
66:20 68:14 71:4,11,
20 72:14 73:7 74:2,
14 76:9 77:24 79:22
80:11,14 82:15,21
84:3 86:15 87:4
88:12,16,22 90:16
system
19:5 21:6,7,11 25:14
28:6

___

### T

taking
32:20
talk
9:3 39:9 81:3
talked
75:5,6 85:4
talking
8:22 9:5 49:10 80:4
Tamms
60:15,23
team
60:20 78:19,22,24
79:5,7 93:10,13,21,
24
tells
53:18

ten
38:15 60:18
ten-minute
70:13
tenens
16:2,4,10,16 17:23
Teri
67:17,21
term
21:8
terms
20:3 30:21,22 35:2
testified
9:16 29:8 42:24
80:20 91:9 93:6,16
testify
50:2
testifying
29:20
testimony
29:15
therapist
59:2,8
therapy
19:8,9,10,12 35:17
thigh
63:19
things
33:17,22 45:13 82:3,
7 83:10,11,14,15
thinking
71:22
thinks
86:11
Thorazine
71:15 73:3
thoughts
58:17
threatening
87:24 88:2
threats
45:14 51:17 88:7
Thursday
58:15
ticket
21:17
tickets
54:17 55:8 92:14,15
time
9:7 10:11,15,16
14:6,20 15:11,18
17:23 18:3,21 19:7
22:21,22 25:18 26:7
28:15 31:6,16,18,21
32:2,3,5 34:10,11,17
35:14 36:13 37:4
40:23 42:18,19,23
43:2,8 44:16 45:21
49:5 52:13 53:16,19,
22 54:15 55:2,16
58:22 64:6,10 66:24
67:3,19,21,22,23
68:7,9,12 69:9 70:3
71:10,17 73:21
74:13,16,17,19,24
76:8,14 77:16,21
79:1,4,18 80:9,16
81:4 91:22 92:3,16,
17,21 93:17,21
times
55:4 58:14 80:21
86:11
title
13:13 18:15 23:20
titled
59:10
today
8:20 14:6 29:20 39:9
58:10
told
94:10

Tracking
48:22
train
26:16
training
26:10 36:21
trainings
26:17 36:22 37:1,2
transcript
9:2
transfer
54:5 64:6 65:23
73:17 75:4,6 79:14
94:18
transferred
73:24 74:6,9,10 75:9
77:13 78:10 79:11,
13 94:11,16
treat
44:4
treated
15:8 63:21 70:12
treating
14:23 15:5,9,10,11
58:24 78:17
treatment
15:13 17:11,21
26:24 27:3,5,10,22
28:6,13,18,19,20
29:1,4,7 30:3,12
31:24 39:6 40:18
43:17 58:12,19
60:16,20 61:6 66:17
75:12 77:23 78:3,4,
5,7,10,19 79:5,6,9,
12,20 93:8,10,12,13,
15,21,24
Trost
46:11 66:17 70:12
72:21 73:21 79:2
true
94:15
Tuesday
58:16
turn
59:9
turning
83:14
two-minute
89:16
type
10:13 20:8,9 29:3
33:21 63:10
types
88:7 92:20,21
typically
40:24 41:2
typist
10:12,15

___

### U

uh-huh
90:10
unable
44:6
unbeknown
22:24
undergraduate
11:21 12:10,14
understand
9:9 27:19 31:8 41:20
54:23,24 60:24
77:19
understanding
11:5,6 12:17 26:23
27:2,21 37:19,21,24
38:6,10 55:2,15 92:7
understood
31:10,11,12



**unit**
19:1,3 26:24 27:3,5,
11,21,22 28:6,13,19,
23 33:3,5 60:17 61:6
75:12 78:3,4,5,10
93:12
**United**
8:18
**units**
19:6,13,18 20:1 78:7
93:17
**unspecified**
76:5,6
**untreated**
44:11

---

**V**

---

**vacated**
67:24
**vague**
26:12 37:14 54:21
71:20 73:7 74:14
76:9 77:24 79:22
**vary**
21:19
**victims**
15:10
**view**
69:16
**violation**
52:9 53:8
**violations**
52:6 53:11 54:14
**visit**
52:4,19 69:8
**visitation**
20:8
**visited**
69:8
**volitional**
83:21 84:9

---

**W**

---

**Wait**
89:15
**waive**
89:4
**wanted**
48:18 73:15 88:9,10
**warden**
67:13 87:12,17,20
88:3
**watch**
32:13 60:17 61:6
63:18 64:5 70:13
**Watkins**
43:16
**ways**
83:2,5 92:1 93:9
**weapons**
83:10
**Weatherford**
63:23 64:3
**webinars**
26:18
**Wednesday**
63:3
**week**
58:14
**weekend**
58:18
**weeks**
44:10
**Wexford**
18:2,14 23:11,14,17,
19,22 24:10 34:20,
21 35:11,18,20 39:5
62:7,13,17,21,22

63:11 69:10,13,18
72:7,23 75:3
**Wexford's**
22:17
**William**
90:1
**Williams**
67:10
**Williamson**
25:22
**wiped**
68:13
**withdraw**
22:9 77:20
**witnesses**
43:15,17 46:21,23
47:6,10,12
**woman**
8:24
**word**
21:4
**work**
10:10 11:1,18 14:9,
22,23 15:16 16:2,4
18:8 23:17 24:4 26:1
58:11 67:1
**worked**
14:20 15:9,11 17:13,
15,16 18:2,6,7,10,17
24:12,14,17,23
34:17,23 37:23
56:16 62:14 69:12
80:6
**worker**
41:13
**working**
15:21 16:3 17:10
18:4 25:21,22,23
30:23 49:10 94:3
**works**
40:6
**worse**
55:6
**write**
64:12
**written**
9:2 71:21 79:10
**Wrong**
16:22
**wrote**
58:1

---

**Y**

---

**yard**
51:2
**year**
10:6,7 13:18,19
14:3,15 16:5
**yearly**
36:20
**years**
13:21,22 14:14
21:21
**yesterday**
63:16
**Yolande**
63:6,9,14 66:13

---

**Z**

---

**Zoom**
85:3

