**Page 1**

```
1            IN THE UNITED STATES DISTRICT COURT
2          FOR THE CENTRAL DISTRICT OF ILLINOIS
3                    PEORIA DIVISION
4
5    ANTHONY GAY,               )
6         Plaintiff,            )
7    vs.                        )  No. 1:19-CV-01133
8    JOHN BALDWIN, et al.,      )
9         Defendants.           )
10       The recorded deposition of PIERRE NUNEZ,
11   Ph.D., called for examination pursuant to the
12   Federal Rules of Civil Procedure for the United
13   States District Courts pertaining to the taking
14   of depositions via Zoom videoconference, on the
15   22nd day of April, 2022, at the hour of
16   9:18 a.m.
17
18
19
20
21
23   Reported by:  Vicki L. D'Antonio, CSR, RPR
24   License No. 084-004344
```

**Page 2**

```
1    REMOTE APPEARANCES:
2
3         ROMANUCCI & BLANDIN, LLC, by
          MS. NICOLETTE WARD
4         321 North Clark Street
          9th Floor
5         Chicago, Illinois  60654
          (312) 458-1000
6         nward@rblaw.net
7             Representing the Plaintiff;
8
     OFFICE OF THE ATTORNEY GENERAL, by
9    MR. NICHOLAS S. STALEY
     100 West Randolph
10   13th Floor
     Chicago, Illinois  60601
11   (312) 814-3711
     nstaley@atg.state.il.us
12
         Representing Defendants John
13       Baldwin, Jeffery Sims, Shane
         Reister, Melvin Hinton, Jamie Lynn
14       Chess, Sylvia Butler, Michael
         Melvin, Terri Kennedy, Emily Ruskin,
15       John Varga, Justin Wilks, Sonja
         Nicklaus, and Rob Jeffreys;
16
17   CASSIDAY SCHADE, LLP, by
     MR. JOSEPH N. RUPCICH
18   MS. JOY C. SYRCLE
     3100 Montvale Drive
19   Springfield, Illinois  62704
     (217) 572-1714
20   jrupcich@cassiday.com
     jsyrcle@cassiday.com
21
         Representing Defendants Kelly Ann
22       Renzi, William Puga, and Wexford
         Health Sources, Inc.;
23
24
```

**Page 3**

```
1    REMOTE APPEARANCES:  (Continued)
2
3         DONOHUE BROWN MATHESON & SMYTH, LLC, by
          MR. STETSON F. ATWOOD
4         140 South Dearborn Street
          Suite 800
5         Chicago, Illinois  60603
          (312) 422-0900
6         stetson.atwood@dbmslaw.com
7             Representing Defendant Pierre Nunez,
              Ph.D.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 4**

```
1                     I N D E X
2    WITNESS                                  PAGE
3    PIERRE NUNEZ, Ph.D.
4        Examination by Ms. Ward...............   6
         Examination by Mr. Rupcich............ 140
5        Further Examination by Ms. Ward....... 212
6
7
8                  E X H I B I T S
9    NUMBER                                   PAGE
10       Exhibit 1    ........................   16
         Exhibit 2    ........................  118
11       Exhibit 3    ........................  123
         Exhibit 4    ........................  127
12       Exhibit 5    ........................  130
         Exhibit 6    ........................  134
13       Exhibit 7    ........................  161
         Exhibit 8    ........................  199
14
15
16
     NOTE:  Exhibits retained by Counsel.
17
18
19
20
21
22
23
24
```

1        THE COURT REPORTER:  The attorneys
2  participating in this deposition acknowledge
3  that I am not physically present in the
4  deposition room and that I will be reporting
5  this deposition remotely.  They further
6  acknowledge that, in lieu of an oath
7  administered in person, the witness will
8  verbally declare his testimony in this matter is
9  under penalty of perjury.  The parties and their
10  counsel consent to this arrangement and waive
11  any objections to this manner of reporting.
12        Please indicate your agreement by
13  stating your name and your agreement on the
14  record.
15        MS. WARD:  Nicolette Ward on behalf of
16  Anthony Gay.  We're in agreement with this
17  procedure.
18        MR. ATWOOD:  Stetson Atwood on behalf
19  of Dr. Nunez.  We agree with the procedure.
20        MR. RUPCICH:  Joe Rupcich for the
21  Wexford defendants.  Agreed.
22        MR. STALEY:  Nick Staley for the IDOC
23  defendants.  Agreed.
24        (Whereupon, the witness was duly
                                                    5

1        sworn.)
2        PIERRE NUNEZ, Ph.D.,
3  having been first duly sworn, was examined and
4  testified as follows:
5              EXAMINATION
6  BY MS. WARD:
7    Q.  Good morning.  How are you doing today?
8    A.  Good.  Thank you.
9    Q.  Good.  I'm glad to hear it.
10        Could you please state and spell your
11  first and last name on the record here for our
12  court reporter?
13    A.  Sure.  My first name is Pierre,
14  P-I-E-R-R-E, last name Nunez, N-U-N-E-Z, Pierre
15  Nunez.
16    Q.  Doctor, have you ever given a
17  deposition prior to today?
18    A.  Yes.
19    Q.  On how many occasions?
20    A.  Six.
21    Q.  Have all of those been in your
22  professional capacity as a psychologist?
23    A.  Yes.
24    Q.  In any of those prior instances in
                                                    6

1  which you were deposed, were you named as a
2  defendant in the matter other than --
3    A.  A co-defendant, yes, uh-huh, a --
4        MR. ATWOOD:  Can I ask you a favor,
5  Doctor?  Wait till she's done with the question,
6  and then answer it.  If you don't do that, then
7  Vicki's going to reach through that computer and
8  get very angry.
9        THE WITNESS:  Got it.  You're right.
10  Sorry.
11        Yes.
12  BY MS. WARD:
13    Q.  How about before we get into some of
14  the circumstances of this deposition, I'll give
15  you some of the admonishments that I think your
16  very capable counsel was about to give you, and
17  that might help move things along a little more
18  efficiently.
19        Because we're doing this with the
20  benefit, or maybe lack thereof, of the Zoom
21  teleconferencing service and because we have
22  Vicki here taking everything down that we're
23  saying verbatim, it's particularly important to
24  make sure that we don't speak over one another,
                                                    7

1  so in instances where you absolutely know where
2  I'm going with the question, and I'm certain
3  that's going to happen a number of times in this
4  deposition, I'll still ask that you wait until I
5  finish asking my question before you start
6  answering.  I'm going to do my best to wait
7  until you're done answering before I start
8  speaking.  That way, we have a clear record.
9  Does that sound fair?
10    A.  Of course, yes.  Sorry about that.
11    Q.  No, no need to apologize.  I'm certain
12  I'm going to step on you unintentionally at some
13  point.
14        Similarly, even though you and I might
15  understand nonverbal communication or things
16  like uh-huh or uh-uh because we can see other,
17  I'll ask that you refrain from those things and
18  try to articulate everything verbally so that we
19  can make sure that our record is as clear as
20  possible for people who are just reading it.
21  Does that sound fair?
22    A.  Yes.
23    Q.  I'm going to do my best to move things
24  along quickly.  I, like a lot of other lawyers,
                                                    8

1  do have a tendency of talking a bit more than
2  I'd like to, so if you ever need a break, please
3  let me know.  The only thing that I'll ask is if
4  there's a pending question, I will ask you
5  answer the pending question before you go on
6  your break.  Does that sound fair?
7      A.  Yes.
8      Q.  I will apologize now.  I think it's
9  likely at some point that I'm going to ask a
10  badly worded or confusingly phrased question.
11  It is not my intent here today to trip you up.
12  I want to make sure that we're on the same page.
13  If you're ever not sure what it is that I'm
14  asking you, please let me know and I'm happy to
15  try to rephrase the question, but if you do
16  answer the question, I'm going to assume that
17  you understood it the way that I phrased it.
18  Does that sound fair?
19      A.  Yes.
20      Q.  From time to time, I would anticipate
21  that some of the attorneys here are going to
22  have objections to some of the questions that
23  I'm posing.  Just to make sure that our record
24  is clear, if you hear somebody talking, I'll

9

1  just ask that you wait until the objection is
2  finished before you start answering.  Unless
3  your counsel instructs you not to answer the
4  question and you elect to take that advice, I
5  will ask you to still answer the question once
6  the objection is done being spoken.  Does that
7  sound fair?
8      A.  Yes.
9      Q.  I may ask you questions in this
10  deposition regarding your opinions and some of
11  the treatment rendered to Mr. Gay, as well as
12  certain customs and general procedure.  I'll ask
13  that the opinions that you give in this matter
14  be to a reasonable degree of psychological
15  certainty, and to the extent that you don't hold
16  opinion to that extent, I'll ask that you let me
17  know that.  Does that sound fair?
18      A.  Yes.
19      Q.  Finally, I've had some issues with lag
20  via Zoom in the last week.  If for some reason
21  my camera freezes or you can't hear or see me,
22  just let me know and I'm happy to repeat as
23  needed.  Does that sound fair?
24      A.  Yes.

10

1      Q.  Okay.  Excellent.
2          Doctor, could you take me through and
3  describe for me your educational background that
4  informs your current career as a psychologist?
5      A.  I have a Ph.D. in psychology from
6  Northwestern University in 1991, and I became
7  licensed a year after that in 1993 after passing
8  the licensure exam.  I did a two-year post doc
9  at Northwestern Institute of Psychiatry in
10  emergency and crisis intervention services.
11      Q.  Are you currently licensed to practice
12  in any state other than Illinois?
13      A.  No.
14      Q.  Has your license ever been suspended or
15  revoked for any reason?
16      A.  No.
17      Q.  Are you currently an employee of
18  Wexford?
19      A.  Yes.
20      Q.  How long have you been employed by
21  them?
22      A.  Since June of 2017.
23      Q.  Have you held the same position within
24  Wexford since your hiring date of June of 2017?

11

1      A.  Yes, I have.  I've been transferred
2  between locations, but my title is the same,
3  yes.
4      Q.  What title do you currently have?
5      A.  I'm a part-time psychologist.  I
6  work -- I provide weekend coverage as a
7  part-time clinical psychologist.
8      Q.  What facilities or institutions have
9  you been assigned to during your time with
10  Wexford?
11      A.  There have been two.  The first one was
12  Dixon Correctional Center, which at the time was
13  the primary mental health facility for Illinois
14  Department of Corrections.  I was there for
15  two years, then when they built -- they built
16  out the facility for Illinois Department of
17  Corrections inmates at Elgin Treatment Center,
18  they transferred me to Elgin, and that's where I
19  am now.  Elgin is the state psychiatric hospital
20  that Illinois Department of Corrections took
21  over two units there to provide inpatient mental
22  health services to people that were inmates in
23  Illinois Department of Corrections.
24      Q.  Approximately what month and year were

12

1  you transferred to Elgin?
2       A.  I was transferred in September 2019. I
3  started -- I was at Dixon June 2017 to
4  September 2019. I've been at Elgin 2019 until
5  the present day.
6       Q.  You mentioned that during the time that
7  you were at Dixon that it was the primary mental
8  health facility for the Department of
9  Corrections. Can you explain to me what you
10  mean by that?
11      A.  The patients that are designated as
12  SMI, meaning severely mentally ill in Illinois
13  Department of Corrections, are earmarked for the
14  residential treatment program in Dixon. It at
15  the time was the main setting for mental health
16  services in the state system. There were
17  psychiatric patients in other facilities, but
18  Dixon was the primary setting. They've since
19  created Joliet Treatment Center and Elgin
20  Treatment Center.
21      Q.  Taking a step back, and I'll tell you
22  now that when I'm asking you questions,
23  typically, I'm going to be referring to a period
24  from about early to mid 2018.

13

1       Around that time, were you employed by
2  any other employers, facilities, anything like
3  that?
4       A.  Yes. I work at, first, Cermak Health
5  Services at Cook County Jail. It's the
6  inpatient unit. It's the hospital, basically,
7  on the grounds of Cook County Jail.
8       Q.  How long have you been employed by
9  Cermak?
10      A.  22 years as a doctoral level person,
11  and I was there for three years as a master's
12  level person before that, so 25 years
13  altogether.
14      Q.  I apologize, are you still employed by
15  Cermak to this day?
16      A.  Yes.
17      Q.  Before I talk to you a little bit more
18  about your experience, I want to take a step
19  back and talk to you about the depositions that
20  you had mentioned, and forgive me, I think you
21  said that there are certain subset of the
22  depositions that you've given before in which
23  you were named as a defendant. Am I recalling
24  correctly?

14

1       A.  No, you're right. I was a defendant, a
2  co-defendant one time, I was a fact witness
3  four times, and the other time -- let's see.
4  Okay. There were six altogether. This is the
5  sixth, so I was a co-defendant once, I was a
6  fact witness three times, and I was an expert
7  witness once.
8       Q.  In the instance in which you were a
9  co-defendant, very briefly, what were the
10  allegations made against you by the plaintiff in
11  that matter?
12      A.  It was related to a suicide that took
13  place in Cook County Jail in 2001. I was a
14  co-defendant along with the sheriff's office,
15  Cook County Health & Hospitals System, and there
16  were also specific individuals named following
17  the suicide of a patient not in my unit, in a
18  different part of the jail, but we were all
19  named in the suit. The suit was eventually
20  thrown out.
21      Q.  Do you recall, was that -- did that
22  case proceed in Cook County or in a federal
23  district court?
24      A.  It was a federal -- it was a lawsuit in

15

1  federal court.
2       Q.  In the instance in which you were named
3  as an expert witness and offered testimony in
4  that capacity, what party were you providing
5  expert testimony on behalf of?
6       A.  The plaintiff.
7       Q.  Can you recall what jurisdiction that
8  case --
9       A.  It was also in federal court.
10      Q.  Was that here in Illinois?
11      A.  Yes.
12      Q.  You'll have to forgive me for my long
13  pauses. I take notes by hand a little bit too
14  rigorously, I think.
15           I'm going to show you a document that's
16  been provided to me which appears to be -- I'll
17  pull it up on the screen. If you could let me
18  know, Doctor, if you're able to see it. I'm
19  going to refer to this as Nunez Exhibit 1.
20           Are you able to see the document okay?
21      A.  It's my vitae, yeah.
22      Q.  My only question is has your curriculum
23  vitae changed in any way from the version that
24  we're looking at here? And if you'd like me to

16



1  scroll through the entire thing so you can look,
2  I'm happy to do that.
3      A.  Yes, it has.
4      Q.  What changes or amendments would you
5  make to this CV?
6      A.  Okay.  My responsibility at Cook
7  County, I'm not the quality improvement staff
8  training coordinator anymore.  I'm the unit
9  director for all the male units at Cook County
10  now, the male inpatient psychiatric units.
11     Q.  When did you become the unit director
12  at Cook County?
13     A.  It's been over a -- it's been about a
14  year and a half -- a year.  15 months.
15     Q.  Any other amendments or additions --
16     A.  Yeah.  I won an award from the Cook
17  County Health & Hospitals System for the work
18  that I did helping the Cook County Health &
19  Hospitals System complete the agreed order
20  obligations that we had with the U.S. Department
21  of Justice.  We were under an agreed order from
22  2000 to 2018, and in January of 2020, I was the
23  inaugural honoree for an award they created
24  called the ICARE award, which is an award for

17

1  exemplary staff performance by the employees of
2  the Cook County Health & Hospitals System.
3  There are 7,000 employees in the system.
4      Q.  Is there a particular case name
5  associated with that agreed order for which you
6  helped complete Cook County's obligations?
7      A.  I'm trying to remember the name of the
8  lead plaintiff, but it was U.S. Department of
9  Justice sued us versus Cook County Sheriff's
10  Office, Cook County Health & Hospitals System,
11  and then a bunch of named individuals after
12  that, but it was the justice department that
13  actually sued us.
14     Q.  And I may -- if it's all right with
15  you, I may ask if you could provide that name to
16  your counsel so that --
17     A.  Yeah, he has it.
18         MR. ATWOOD:  We'll find it.
19         THE WITNESS:  Yeah, I've given him a
20  copy of the agreed order.
21         MS. WARD:  Excellent.
22         THE WITNESS:  I, just off the top of my
23  head, don't remember the order of the
24  defendants.

18

1  BY MS. WARD:
2      Q.  What are your responsibilities as unit
3  director with Cook County?
4      A.  I'm the senior administrator for four
5  male inpatient psychiatric units at Cermak
6  Health Services.  It's a total of 72 beds, but
7  usually, we have more than 72 patients.
8  Usually, we have anywhere between 72 and 85
9  patients on the unit at any given time.
10     Q.  What were your responsibilities as the
11  quality improvement and staff training
12  coordinator?
13     A.  I kept track of all of the statistics
14  and was deposed by the monitor -- I was
15  interviewed by the monitor during his visits
16  twice a year.  I also served on the morbidity
17  and mortality review committee and investigated
18  suicides and what they call negative outcomes,
19  meaning people dying in jail custody at Cook
20  County.
21     Q.  In your capacity in that role, were you
22  the, for lack of a better term, primary person
23  responsible for investigating suicides and
24  negative outcomes within Cook County?

19

1      A.  I wouldn't say that.  The chief
2  psychiatrist is also on the committee.  The
3  medical director of Cermak Health Services, the
4  executive director of Cook County Jail was on
5  the committee.  I would say that I was the
6  person that usually would do most of the
7  legwork, but I wasn't the primary person, no.  I
8  wasn't the person, for example, that would write
9  the report, you know, as an outcome of the
10  suicide, you know, describing the events and
11  recommendations for changes.
12     Q.  Tell me what your responsibilities are,
13  then, in your capacity as part-time psychologist
14  with Wexford specifically.
15     A.  To provide weekend coverage for --
16  well, at the time that I was at Dixon, my role
17  was to provide weekend coverage to meet with the
18  crisis patients and maintain them in X-House,
19  which is the maximum security segregation area
20  for the prison.  They also have crisis patients
21  that are housed in X-House, as well as SMI
22  segregation patients, severely mentally ill
23  segregation patients.  I also had the
24  responsibility of doing groups on the weekend.

20



1     Q.   In that capacity, did you have a
2  regular shift or shifts on the weekend or were
3  you called in as needed to fill in for other --
4     A.   No, I had regular shifts.  At the time,
5  I was working two eight-hour days, Saturday and
6  Sunday.  Actually, I currently work two ten-hour
7  days at Elgin Treatment Center, but at the time,
8  I was working two eight-hour days on Saturdays
9  and Sundays every weekend.
10    Q.   During your time at Dixon in early to
11 mid 2018, were you the only psychologist
12 providing the weekend coverage that you've just
13 described?
14    A.   Often, but not all the time, no.  They
15 also had other people that were full-time staff
16 that they would call in to work overtime on an
17 as-needed basis because they were short-staffed.
18         The reason I was there was because they
19 had called Cook County because they were
20 short-staffed to begin with, and my wife had
21 been quite ill for quite some time and we needed
22 extra money.  She had leukemia and was in the
23 hospital for almost a year and a half.
24         MR. ATWOOD:  You answered her question.

21

1         THE WITNESS:  Okay.  Yes, I did.
2         So yes, I was primarily the one, but
3  they also had other psychologists that were
4  full-time people either at Dixon or other
5  facilities that they would call in to Dixon on
6  the weekend to work overtime as needed.
7  BY MS. WARD:
8     Q.   Understood.
9         Just so I can take this exhibit down,
10 is there anything else that we haven't discussed
11 in terms of --
12    A.   Yes, I was also promoted -- I was also
13 promoted at the Chicago School of Professional
14 Psychology.  I'm a full adjunct professor there
15 now.
16    Q.   When did you receive that promotion?
17    A.   On April 1st.  Three weeks ago.
18    Q.   Oh, congratulations.
19    A.   Thank you.
20    Q.   Any other changes, amendments to your
21 curriculum vitae beyond what we've discussed?
22    A.   No, that's all.
23    Q.   I don't want to know anything that you
24 discussed with your counsel, but in preparation

22

1  for today's deposition, did you review any
2  documentation or materials?
3     A.   Yes.
4     Q.   What did you review?
5     A.   I reviewed my notes.  I reviewed my
6  e-mails back and forth to the regular staff.  I
7  reviewed parts of the medical record that I had
8  access to.
9     Q.   The portions of the medical record that
10 you reviewed, did those pertain to Mr. Gay's
11 time in Dixon specifically or did it encompass
12 other facilities?
13    A.   At Dixon.
14    Q.   Did you review any other materials
15 other than the ones that you've just named?
16    A.   No.
17    Q.   You mentioned a moment ago when we were
18 talking that you had some responsibility within
19 Cermak of investigating -- I might misuse the
20 term -- did you say adverse outcomes?
21    A.   Negative outcomes, yes.
22    Q.   Negative outcomes.
23    A.   Yes.
24    Q.   Did that include instances of self-harm

23

1  or self-injury by inmates?
2     A.   Yes.
3     Q.   In doing some of my research, I saw
4  something online that purports to be, I think,
5  your bio from the Chicago School where you note
6  that you undertook a project evaluating the root
7  causes of self-injury rates in the jail.  Is
8  that something that you undertook?
9     A.   Yes.
10    Q.   Tell me a little bit about your work on
11 that project.
12    A.   That was at the request of the justice
13 department.  We had a very high rate of
14 self-injury in certain locations in the jail,
15 primarily in the maximum security segregation
16 areas and primarily specific individuals within
17 those areas, and I did timelines of the people
18 that were involved in the most self-injuries in
19 those areas and who they had contact with -- I'm
20 talking about other inmates -- and whether or
21 not other inmates than also began to injure
22 themselves when in contact with these signal
23 inmates.
24         We had specific inmates -- we had a --

24



1  the issue had to do with this jailhouse gang
2  called Savage Life that had sprung up in the
3  jail, and it wasn't a street gang.  It was a
4  gang from Cook County Jail that started and
5  which people would -- had a goal of causing
6  disruption in the jail, and one of the main
7  types of disruption they would cause had to do
8  with self-injuries.
9      Q.  When did you undertake this project?
10     A.  It was an ongoing project over the
11  course of the, you know, period of time that we
12  were under court monitors from 2010 to 2018.
13     Q.  If I understand correctly, then, did
14  the justice department request that you
15  particularly under -- excuse me, particularly
16  investigate what the causes of the high rates of
17  self-injury were?
18     A.  Yes, right, yes.
19     Q.  It sounds like one of your conclusions
20  in the capacity was contact with certain I think
21  you said signal individuals; is that right?
22     A.  That's right, yes.
23     Q.  In your work on that project, did you
24  come to any other conclusions about other causes

25

1  that were affecting these rates of self-injury?
2      A.  Yes.
3      Q.  What were those?
4      A.  Whether people were housed by
5  themselves or with other people, the access to
6  fire-starting materials, lack of visibility into
7  the cells, lack of cameras.  These were all
8  issues that we addressed over the course of
9  time.  Also in -- at the request of the justice
10  department, built a new building to house the
11  medical and psychiatric step-down patients --
12  that's people after they leave the inpatient
13  units and go to the residential programs -- so
14  that the units were safer.  There was better
15  visibility.  People also do better when they're
16  housed with other people than when they're
17  housed alone.  Almost all jailhouse suicides
18  take place when people are housed by themselves.
19     Q.  Did this finding that you made
20  regarding housing alone versus with other
21  individuals, did you find that individuals who
22  were housed alone were having higher rates of
23  self-injury, not just successful suicide, but
24  self-injury?

26

1      A.  Yes.
2      Q.  In the course of your study, did you
3  come to any conclusions as to why that was the
4  case within Cook County that individuals were
5  self-harming at higher rates when they were by
6  themselves?
7      A.  Most of those people were housed in
8  segregation units where they're in a cell
9  23 hours a day by themselves with no
10  stimulation.  You know, they don't have any
11  personal property with them.  You know, the
12  average inmate is usually housed with other
13  people in a -- either in a two-man cell or a
14  dormitory setting, and inmates are allowed to
15  keep personal property with them and are allowed
16  to spend more time out of their cells.
17     But when people are in segregation,
18  they're not allowed to keep their property and
19  they're housed alone and they spend 23 hours a
20  day in their cell, so they have less access to
21  the phones, less access to other people, and
22  oftentimes, depending on which tier they're on,
23  the lights are kept on 24 hours a day, and
24  there's a tendency for folks to lose their time

27

1  sense and start to hallucinate or suffer other
2  psychiatric symptoms in addition.  Yeah.
3      Q.  In the course of your investigation,
4  what did you conclude about how the lack of
5  access to other individuals by those in Cook
6  County segregation -- what impact did you find
7  that that had on people's psychological
8  outcomes?
9      A.  Well, it was causing them to do worse
10  in the jail, so we came up with recommendations
11  and made changes on how we manage them.
12     Q.  I think I understand what you mean when
13  you say that they "do worse," but could you
14  explain to me specifically what you mean in a
15  clinical sense by they tend "to do worse"?
16     A.  Well, they're more likely to hurt
17  themselves, more likely to kill themselves, more
18  likely to become aggressive when the door -- you
19  know, when let out of their cells, more likely
20  to develop psychotic symptoms.
21     Q.  Based on these findings, what
22  recommendations did you make to Cook County to
23  reduce the rates of those symptoms?
24     A.  Limit people's period of time in

28

1  segregation to 15 days or less, especially SMI
2  patients -- especially severely mentally ill
3  patients.  Most of those folks we ended up
4  moving to the hospital to do their seg time on
5  the inpatient units and limiting it to 15 days
6  or less.  Letting people out of their cells for
7  longer periods of time.  We had our staff do
8  rounds three times a week and nursing staff do
9  rounds the other two times a week so that we
10  were checking on people five times a week.  We
11  also saw the people for medication management
12  services and other psychiatric services more
13  often.
14      Q.  When you say that you recommended the
15  limitation of 15 days or less in segregation,
16  was that a recommendation of 15 continuous days?
17      A.  Right, yeah, yes, 15 continuous days or
18  less, yes.
19      Q.  Why was that the kind of temporal limit
20  that you put on it?
21      A.  That was in discussion with the -- our
22  monitor, the psychiatrist from the justice
23  department that -- his recommendation.  He
24  thought -- based on his experience, he thought

29

1  15 days was a good number.
2      Q.  In making that recommendation, was
3  there a conclusion that these adverse or
4  negative outcomes tended to increase after a
5  period of the 15 days?
6      A.  Yes, that's right.
7      Q.  Why did you make, including your
8  recommendations, the recommendations to let
9  people out of their cells more frequently?
10      A.  I'm sorry.  Just ask the question one
11  more time?
12      Q.  Of course.  You told me one of the
13  recommendations that you made was for Cook
14  County to let people out of their cells more
15  frequently; is that correct?
16      A.  Yes.
17      Q.  Why did you make that recommendation?
18      A.  Because people don't do as well when
19  they're locked up 23 hours a day in a
20  5-by-8 room by themselves with no stimulation.
21  I mean, this...
22      Q.  It sounded like you were about to say
23  something.
24      MR. ATWOOD:  Did you finish your

30

1  answer?
2      THE WITNESS:  Yes, I did.  I finished.
3  BY MS. WARD:
4      Q.  Why did you include in your
5  recommendation -- and I suppose let me -- you
6  included a recommendation that individuals be
7  seen through rounds five times a week; is that
8  correct?
9      A.  Yes.
10      Q.  Was that all individuals in segregation
11  or was that just a certain subset of individuals
12  in Cook County segregation?
13      A.  It was -- well, it was the SMI patients
14  primarily, although on the units where the SMI
15  patients were housed, our staff also saw the
16  non-SMI patients housed on those units.  The SMI
17  patients were housed on specific segregation
18  units, but if there were non-SMI patients on
19  those units too, the staff would see them also,
20  so the staff would see all the patients on a
21  given tier if there were SMI patients on that
22  tier.
23      Q.  You mentioned that it was
24  particularly -- I understood you to mean that

31

1  your recommendations as you gave them to Cook
2  County applied particularly to severely mentally
3  ill individuals; is that correct?
4      A.  Yes.
5      Q.  Why were your recommendations
6  particularly geared towards SMI patients?  Why
7  were those recommendations important to you for
8  that population?
9      A.  They were the most vulnerable patients.
10      Q.  Explain to me what you mean when you
11  say they're "the most vulnerable."
12      A.  They're the most likely to suffer
13  decompensation under stressful conditions of
14  confinement.
15      Q.  Clinically, in lay terms, what does
16  "decompensation" mean?
17      A.  Suffering psychiatric symptoms, usually
18  psychotic symptoms, hallucinations, delusions,
19  major depressive symptoms, loss of time sense,
20  insomnia, paranoia, suicidality.
21      Q.  What are the stressful conditions of
22  confinement that you mentioned a moment ago that
23  can trigger this kind of decompensation, in your
24  experience?

32

1    A.   Not being able to tell day from night,
2  being locked up in a single setting with no
3  stimulation 23 hours a day, not being able to
4  have adequate contact with supportive people on
5  the outside, like family members with, you know,
6  visits or phone calls.  People in segregation
7  only get one 15-minute phone call per week.
8  People who are not in segregation get daily use
9  of the telephone and twice-a-week visitation.
10    Q.   Did Cook County implement the
11  recommendations that yourself and your team
12  made?
13    A.   Yes.
14    Q.   What, if any, changes in those negative
15  outcomes did you see as a result of them?
16    A.   Well, it's a complicated question
17  because with COVID, you know, we've had a
18  difficult time in the last two and a half years,
19  but by and large, the rate of suicides dropped
20  and the number of people in the jail that
21  self-injured dropped, and we started to review
22  cases of people who were doing segregation time
23  that were SMI people, we started reviewing their
24  cases regularly and reduced the amount of

33

1  segregation time folks were doing.
2    Q.   Can you recall when approximately Cook
3  County started to implement these
4  recommendations?
5    A.   It was in the mid 2000-teens.  We
6  implemented them over time in the, you know,
7  '14, '15, '16 period.  We were in full
8  compliance on that issue with the justice
9  department well before 2018.  You need two years
10  of full compliance on each line item in order to
11  be listed as having full compliance on an
12  ongoing basis.
13       MS. WARD:  I'm terribly sorry to do
14  this.  Somebody is desperately trying to get
15  ahold of me via telephone.  Does anybody mind if
16  we take a quick two-minute break?
17       MR. ATWOOD:  Nope.  Thanks.
18       THE WITNESS:  Sure.  That's fine.
19       MS. WARD:  Thank you.  We'll be back in
20  a couple minutes here.  Thank you so much for
21  your courtesy.
22            (Whereupon, a short break was
23             taken.)
24

34

1  BY MS. WARD:
2    Q.   Dr. Nunez, when we left off, we were
3  talking about your study in the context of Cook
4  County regarding the effect of some of the
5  adverse effects of segregation.
6         Taking a step back to your education as
7  a psychologist, at any point in your training,
8  did you receive an education on the effects of
9  segregation or solitary confinement on
10  incarcerated individuals?
11    A.   At Northwestern, you mean?
12    Q.   Yes.
13    A.   No.
14    Q.   How about during your employment at
15  Wexford, were you ever provided any training on
16  the topic of segregation and its impact on
17  incarcerated people?
18    A.   I don't recall.  We have monthly
19  training modules.  I would have to go back and
20  check.
21    Q.   Other than the study that we spoke
22  about within Cook County, have you performed any
23  kind of study or investigation in any other
24  facilities regarding either segregation or

35

1  inmate self-harm?
2    A.   Well, I mean, I've been involved in
3  reviewing the literature my whole career,
4  basically, at Cook County.  I mean, that's, you
5  know, the number one issue for mental health
6  staff at Cook County, so we're always reviewing
7  the literature on suicides and self-injuries in
8  correctional settings.
9    Q.   Would you agree that inmate self-harm
10  and suicide is also a significant issue in your
11  capacity as an employee of Wexford working
12  within the Illinois Department of Corrections?
13    A.   Yes.
14    Q.   I recognize this may be a bit of a
15  broad question, but in your familiarity and your
16  review of literature pertaining to these issues,
17  is there any kind of psychological consensus as
18  to the effect of segregation on self-harm in
19  incarcerated individuals?
20       MR. RUPCICH:  Object to vague.
21       MR. ATWOOD:  You can answer, Doctor.
22       THE WITNESS:  Consensus.  Well, I mean,
23  the NCCHC has guidelines that the justice
24  department was using as their guide -- the

36

1   National Commission for Correctional Health Care
2   has guidelines that the justice department was
3   using as a guide in their work with us as our
4   monitors in the agreed order.  Is that what
5   you're referring to?
6   BY MS. WARD:
7       Q.   Sure.  So let me ask you this:  What
8   are the guidelines provided by the NCCHC
9   regarding the use of segregation that you're
10  referring to?
11      A.   Well, the 15-day limit on people in
12  segregation housed alone who are SMI, monitoring
13  them during that period of time by daily checks,
14  whether five-day-a-week checks, doing rounds,
15  that's -- we call it doing rounds, making sure
16  that people are receiving their prescribed
17  medications, monitoring the state of their
18  mental health, helping -- making sure that they
19  are given the opportunity to get more time out
20  of cell than one hour a day.
21      Q.   So those recommendations are all things
22  that are incorporated in the NCCHC guidelines on
23  these issues.  Am I correct in understanding
24  that?

37

1       A.   Yes, I -- yes.
2       Q.   Were these guidelines that you relied
3   upon in making your recommendations to Cook
4   County regarding how they could reduce incident
5   of self-harm and suicide?
6       A.   Were my recommendations based on the
7   NCCHC recommendations?
8       Q.   Yes.
9       A.   Well, our recommendations -- our
10  findings fit with the recommendations that they
11  made, and we confirmed the need to adopt them in
12  order to reduce -- what they were saying was
13  right about the self-injuries increased
14  dramatically after the two-week period for
15  long-term people in segregation that were SMI.
16      Q.   So am I correct in understanding, then,
17  that your independent investigation...
18      A.   Corroborated with, yes.
19      Q.   Thank you.  I was looking for the word
20  "corroborated."
21           Your independent investigation
22  corroborated the recommendations set out in the
23  NCCHC guidelines; is that correct?
24      A.   Yes.

39

1       A.   Yes.
2           MR. RUPCICH:  I'm going to object to
3   vague as to time frame.
4   BY MS. WARD:
5       Q.   These guidelines that you're referring
6   to, when were those propounded by the NCCHC?
7       A.   I would have to go back and check.
8           MR. ATWOOD:  If you don't know, you
9   don't know.
10          THE WITNESS:  I don't know.
11  BY MS. WARD:
12      Q.   Are these guidelines something that you
13  consulted in the context of your work within
14  Cook County --
15      A.   Yes.
16      Q.   -- starting in the mid 2000s?
17      A.   In the early 2000s, yes -- in the early
18  2010s after the suit.  The suit was settled in
19  2010, and that's when the monitoring started.
20      Q.   So if I understand correctly, then, the
21  latest that these orders -- excuse me, the
22  latest these guidelines would have been
23  propounded would have been sometime
24  approximately in the early 2010s?

38

1       Q.   We've been talking quite a bit about
2   Cook County.  I want to -- I want to turn now
3   towards your work with Wexford and the Illinois
4   Department of Corrections.
5           These principles that we've been
6   talking about regarding, for example, inmates
7   who are housed alone versus with another
8   individual increasing the rate of self-harm, in
9   your experience within the Illinois Department
10  of Corrections, have you also found that to be
11  true within IDOC?
12      A.   Well, I mean, the folks that I was
13  seeing who were in segregation, I was doing
14  groups with them, that was in concert with the
15  fact that people who are SMI and in segregation
16  need more time out of cell, you know, offering
17  them groups, yard -- you know, recreation, time
18  in the yard, and, you know, was part of the
19  additional time out of cell that they were being
20  offered because of the recommendation -- you
21  know, the guidelines from NCCHC that the justice
22  department was also involved in, but the justice
23  department wasn't involved in IDOC, but these
24  were the recommendations and the IDOC was

40

1 following them.
2    Q.   So as a general principle, then, your
3 conclusion that inmates tend to decompensate
4 after prolonged segregation, in your
5 understanding and your experience, is that true
6 regardless of the particular facility they're
7 housed in?  Is that a general, you know,
8 applicable finding?
9    A.   I -- you know, I mean, Cook County and
10 Illinois Department of Corrections are the only
11 two places I've worked, aside from Wisconsin
12 Department of Corrections where I worked for a
13 year in 1979, so I don't know.  I mean, I
14 couldn't make a statement of all segregation
15 inmates across all facilities in the U.S.
16    Q.   Turning to Anthony Gay in particular, I
17 assume that that's a name that's familiar to you
18 as you sit here today?
19    A.   Yes.
20    Q.   Do you have an independent recollection
21 of Mr. Gay?
22    A.   Independent of what?
23    Q.   I suppose -- you mentioned that you
24 reviewed some documentation relating to

41

1 Mr. Gay's time at Dixon; is that correct?
2    A.   Yes.
3    Q.   Prior to your review of those
4 materials, did you have a memory of Mr. Gay and
5 his time at Dixon?
6    A.   Yes.
7    Q.   I'd like to talk about Dixon, and,
8 again, when I'm asking these questions, I'm
9 referring particularly to, say, early 2018 until
10 maybe the fall of 2018.
11         At that time, talk me through who was
12 responsible at Dixon for implementing a
13 treatment plan for a mentally ill individual who
14 is brought into Dixon.
15    A.   The week -- the regular staff and the
16 mental health authorities at Dixon, the
17 full-time team, mental health team staff, and
18 the mental health authorities with supervisory
19 responsibility at Dixon.
20    Q.   When you say "regular staff," who would
21 that regular staff be comprised of, typically?
22    A.   The full-time psychiatrists,
23 psychologists, and what they call the QMHPs, the
24 qualified mental health professionals, and the

42

1 BHTs, the behavioral health technicians.
2         MR. ATWOOD:  Why don't we wait one
3 second till this ambulances goes by so Vicki can
4 hear what's going on.
5 BY MS. WARD:
6    Q.   I'm sorry, could you repeat what a QMHP
7 stands for?
8    A.   Oh, a qualified mental health
9 professional.  Those are master's level --
10 licensed master's level people who either have a
11 licensed master's in social work or licensed
12 professional counselor qualification.
13    Q.   At this time, who would the -- you
14 refer to mental health authorities.  Who would
15 those individuals have been within Dixon as of
16 this time period?
17    A.   The names of the people?
18    Q.   We'll start with what their titles
19 would be, and then we can get into their names.
20    A.   Well, the title -- the regional -- the
21 state of -- there's a State of Illinois regional
22 authority that -- I don't know if that's the
23 exact title, but it's the regional director for
24 mental health for the State of Illinois

43

1 Department of Corrections, and then Wexford has
2 an equivalent person for the Wexford staff.
3    Q.   Who would the regional authority or
4 director for the State of Illinois been at this
5 time in 2018?
6    A.   Who was it?
7    Q.   Yes.
8    A.   Jamie Chess.
9    Q.   And is that J-A-M-I-E, last name
10 C-H-E-S-S?
11    A.   That's it, yes.
12    Q.   How about the equivalent of Dr. Chess
13 over at Wexford, who would that have been?
14    A.   You know, my recollection is that the
15 position was open at the time, but the person
16 that was the acting -- in the acting role was
17 Manny Gonzalez.  He was the training director
18 for the north region and he was the person
19 that -- he was my direct contact -- the person I
20 would --
21         THE COURT REPORTER:  Can you repeat
22 your last -- "the person I would"?
23         THE WITNESS:  Oh, actually, they hired
24 somebody --

44

1    MR. ATWOOD:  You got -- why don't
2 you --
3 BY MS. WARD:
4    Q.  I think we heard the person you would
5 something to on the weekends, and it sounded
6 like the microphone got bumped or something.
7    A.  Okay.  Sorry.  The person I was
8 reporting to during this period who was the
9 Wexford employee was the north region training
10 director, Manny Gonzalez, G-O-N-Z-A-L-E-Z, but
11 they hired a person who was there for
12 three months and then left.  Her name was Jayne
13 Braden, B-R-A-D-E-N.
14    Q.  Can you recall what the time period
15 that Jayne Braden was employed in that position
16 was?
17    A.  June, July, and August of 2018.
18    Q.  Were you also reporting to Jayne Braden
19 during that three-month period when she was
20 working for Wexford?
21    A.  Yeah, she was Manny's boss, yes.
22    Q.  Now, when you say that you were
23 reporting to these individuals, did you have
24 obligations to provide reports to them on

45

1 regular intervals?
2    A.  Yes, daily.  I would send them e-mails
3 or call them on the phone on Saturdays and
4 Sundays and if -- yes.
5    Q.  What kinds of information were you
6 providing these two individuals?
7    A.  Well, updates on the status of people
8 on crisis watch and new crisis cases on the
9 weekends.
10    Q.  Did both of those individuals have
11 authority to direct your work as a psychologist?
12    A.  Yes.
13    Q.  Were you reporting to anybody else
14 during this time period in 2018?
15    A.  Yes.
16    Q.  Who else did you report to?
17    A.  Al Doyle, the patient's psychiatrist.
18    Q.  Is it D-O-Y-L-E?
19    A.  Yeah, his name is actually Randy Allan
20 Doyle, and then as I got to know him better, he
21 said he preferred Al, so Al Doyle, Randy Allan
22 Doyle.
23    Q.  When you say "the patient's
24 psychiatrist," do you mean he was Mr. Gay's

46

1 psychiatrist particularly?
2    A.  He was his attending psychiatrist
3 during his time at Dixon.
4    Q.  Between yourself and Dr. Doyle, how
5 would your -- how would your treatment of
6 Mr. Gay overlap, I guess, is the term that I'll
7 use?
8    A.  I don't know what -- I'm not a -- I'm
9 not a psychiatrist.  He's a psychiatrist.
10    Q.  I suppose that was a badly worded
11 question.
12    I suppose my question is, did you in
13 the capacity of your work as Mr. Gay's
14 psychologist have authority to direct
15 Dr. Doyle's work as Mr. Gay's psychiatrist?
16    A.  No.
17    Q.  Did Dr. Doyle have authority to direct
18 your work as Mr. Gay's psychologist?
19    A.  Yes.
20    Q.  How frequently in your estimation would
21 Dr. Doyle provide you with direction,
22 particularly with regard to Mr. Gay's case?
23    A.  Well, I saw Anthony Gay seven times in
24 April, or that was the extent of my direct

47

1 access to Mr. Gay, and I talked to Dr. Doyle
2 three of the weekends that I -- three of the
3 four weekends that I was working there, and then
4 I also had conversations with him after that
5 about Mr. Gay.
6    Q.  In terms of psychological care at Dixon
7 at this time period, then, was there anyone else
8 in -- above you in your chain of command that we
9 haven't already discussed?
10    A.  Well, there was a full-time
11 psychologist, Sheila Stone, who often worked
12 overtime on the weekends who then became the
13 primary therapist for Anthony Gay.  She was the
14 primary person involved with his care as a
15 psychologist.
16    Q.  Approximately when did Dr. Stone take
17 over Mr. Gay's care as his psychologist?
18    A.  When he was transferred to the
19 infirmary at Dixon.
20    Q.  Can you recall when approximately in
21 2018 that would have been?
22    A.  It was -- he was transferred to the
23 infirmary for the first time on April 15th and
24 he was -- let's see.  On April 15th, he was

48

1  transferred to the infirmary and returned to
2  X-House on April 24th and then returned again to
3  the infirmary on May 3rd, and after that, I
4  didn't have contact with Anthony Gay after the
5  28th -- sorry, the 29th of April.
6      Q.   Based on your understanding, what was
7  the reason, if any, that Dr. Stone assumed
8  responsibility as Anthony's psychologist around
9  April 29th or May 3rd?
10     A.   Because he was transferred to the
11 infirmary.  He was transferred to a higher level
12 of care.
13     Q.   During your treatment of Mr. Gay in
14 2018, were you familiar with a settlement
15 agreement that the Illinois Department of
16 Corrections entered into as part of litigation
17 that I'll refer to as the Rasho litigation?
18     A.   Yes.
19     Q.   How did you become familiar with that
20 settlement agreement in that litigation?
21     A.   I read the settlement agreement.
22     Q.   When did you read it?
23     A.   I don't know when I read it.
24     Q.   To the best of your recollection, were

49

1  you required to read it as part of your job
2  responsibilities or did you just read it as part
3  of your due diligence as a medical professional?
4      A.   I read it before I was employed by
5  Wexford.
6      Q.   In Dixon as of the period of your
7  treatment with Mr. Gay, who, if anyone, were you
8  aware of was responsible for ensuring Dixon's
9  compliance with that settlement agreement?
10     A.   Well, the mental health authorities in
11 IDOC and Wexford.
12     Q.   Based on your review of the settlement
13 agreement, were you generally familiar with the
14 requirements for mental healthcare that that
15 settlement agreement placed on the Department of
16 Corrections?
17     A.   Yes.
18     Q.   Was it your understanding that that
19 settlement agreement included a recognition that
20 the Department of Corrections prior to that time
21 had been providing inadequate mental health
22 treatment to severely mentally ill individuals
23 in department custody?
24          MR. RUPCICH:  Object to the foundation.

50

1          MR. STALEY:  Join.
2          MR. ATWOOD:  Do you understand what
3  she's asking?
4          Vicki, can you reread that question,
5  please.
6               (whereupon, the record was read
7                as requested.)
8          MR. ATWOOD:  So just so the record's
9  clear, every defendant's objected to that
10 question on foundation, but if you understand
11 the question, you can answer it.
12          THE WITNESS:  Well, that was the
13 finding -- you know, that was the agreement.
14 That was the settlement agreement.
15          MR. ATWOOD:  You've answered it.
16 BY MS. WARD:
17     Q.   Did you understand that finding within
18 the settlement agreement to also include Dixon?
19          MR. RUPCICH:  Object to the foundation
20 and form, vague.  The finding of inadequate
21 mental healthcare, Counsel?
22          MS. WARD:  That's correct.
23          MR. RUPCICH:  Can you show him the
24 document or point out what document you're

51

1  referring to?
2          MR. ATWOOD:  Here's the thing, if you
3  don't remember exactly what she's asking you --
4  don't guess or speculate.
5          THE WITNESS:  Okay.  I can't recall
6  about Dixon, you know, what it says about Dixon.
7  BY MS. WARD:
8      Q.   If you don't understand, that's fine.
9          MS. WARD:  I will object to the
10 speaking objections.
11 BY MS. WARD:
12     Q.   But if you don't recall, I'll accept
13 that answer.
14          MR. RUPCICH:  Counsel, I mean, I think
15 you're misrepresenting the agreement to try to
16 get an agreement to something that's not in
17 there.  If you can show me where it's in there
18 and that's a good faith question, then I'll stop
19 objecting.
20          MR. ATWOOD:  Repeat the question.  He
21 doesn't know what it said.
22          THE WITNESS:  Yeah, I mean, I wasn't
23 employed by Wexford in the period --
24          MR. ATWOOD:  You've answered the

52



1  question.
2        THE WITNESS:  -- yeah, before this.
3        MR. ATWOOD:  You're fine.  You answered
4  the question.
5  BY MS. WARD:
6     Q.    You mentioned a moment ago or touched
7  on levels of care within the Illinois Department
8  of Corrections.
9           As of your -- the time of your
10  treatment with Anthony Gay, could you walk me
11  through what levels of care existed within Dixon
12  specifically?
13    A.    Well, he was on crisis watch as a
14  special -- as an STC level of care -- as a
15  residential level of care patient, which is one
16  step below infirmary level of care patient.  He
17  was being housed in the crisis watch tier in
18  X-House.  So it's the highest level of care
19  short of the infirmary.
20    Q.    Below -- I'm sorry, what does STC stand
21  for in the context of what you just told me?
22    A.    Special Treatment Center.  He was a --
23  he was a segregation patient, so he couldn't be
24  housed in the Special Treatment Center unit, but

53

1  he was on crisis watch, so he was being housed
2  in X-House, which is the maximum security seg
3  unit, but it also has one unit for crisis
4  patients who are STC status, SMI patients
5  Special Treatment Center level of care patients
6  who are severely mentally ill and would normally
7  be in segregation except for they're on crisis
8  watch, so they're being housed in the crisis
9  watch area where they can be monitored on, you
10  know, full-time basis.
11    Q.    Was there a level of -- what would be
12  the level of mental healthcare treatment
13  available at Dixon that was below crisis watch?
14    A.    STC -- being housed in a unit as an STC
15  patient without the crisis watch, without the
16  continuous monitoring.
17    Q.    What would be the level of mental
18  healthcare available at Dixon below STC?
19    A.    I don't know the name -- outpatient,
20  general population with medication.  That would
21  be like what would be the equivalent in the
22  community of being -- having prescription
23  medication and living at home and, you know,
24  just being in the community, so being in general

54

1  population but with psychiatric medication and
2  psychiatric follow-up.
3     Q.    At the time that you assumed care or
4  began assisting in Mr. Gay's care, did you
5  understand him to have been designated
6  previously as a severely mentally ill
7  individual?
8     A.    Yes.
9     Q.    What did you understand the nature of
10  his mental illness to be at the time that you
11  began working with him?
12    A.    Schizoaffective disorder and a
13  personality disorder and a long history of
14  self-injury, aggression, and indecent exposure
15  to staff, you know, numerous types of acting out
16  behavior including self-injury, aggression, and
17  sexual acting out.
18    Q.    What did you know about Mr. Gay's
19  history of self-injury at the time you began
20  working with him?
21    A.    I knew that he had many, many
22  self-injury episodes, that he had been housed in
23  Tamms until it closed.  I knew that he had come
24  from Pontiac to Dixon and that he was going to

55

1  be released in three or four months after his
2  transfer to us from Pontiac.
3     Q.    Were you given any understanding of why
4  he had been sent to Dixon from his previous
5  institution at Pontiac?
6     A.    I know that he was in segregation in
7  Pontiac and he had been placed on crisis watch
8  there and had self-injuries there.  I can't tell
9  you beyond that.  I knew that it had to do
10  with -- okay.
11        MR. ATWOOD:  You answered the question.
12  BY MS. WARD:
13    Q.    What did you understand that it had to
14  do with?
15    A.    This is what happens when you open your
16  mouth.
17        I knew that it had to do with a need to
18  manage him safely, and Pontiac felt that his
19  needs were such that he needed to be managed in
20  the, you know, mental health area of Illinois
21  Department of Corrections.
22    Q.    At this time, then, did Dixon offer
23  higher levels of mental health treatment than
24  what would have been available at Pontiac at

56



1    that time?
2        A.    You know, I never worked at Pontiac.  I
3    can't really comment on crisis watch status at
4    Pontiac and I don't know the staff at Pontiac.
5        Q.    As of 2018, were you aware of whether
6    any other facilities within the Illinois
7    Department of Corrections offered higher levels
8    of mental healthcare that Dixon did not offer?
9        A.    Well, they were working on --
10          MR. ATWOOD:  She's asking for that
11    period of time.
12          THE WITNESS:  No.
13    BY MS. WARD:
14        Q.    What were they working on at that
15    particular time?  I'm a good listener.  I
16    apologize.
17        A.    No, they were working on Joliet
18    Treatment Center, which was planned as a new
19    facility specifically for SMI people who were
20    long-term segregation people, behavioral
21    management unit that they were setting up, and
22    Elgin Treatment Center where I currently work.
23        Q.    When you say "long-term segregation
24    people," does that term have a specific meaning
                                                    57

1    within the Illinois Department of Corrections?
2        A.    I'm not -- I don't know.  I'm saying
3    longer than -- you know, longer than 15 days.
4          MR. ATWOOD:  We've been going for a
5    while.  Can we take a quick break?
6          MS. WARD:  Of course.  How long do you
7    want?
8          MR. ATWOOD:  Five minutes.
9          MS. WARD:  Sounds good.
10              (whereupon, a short break was
11               taken.)
12    BY MS. WARD:
13        Q.    Doctor, when we left off, we were
14    talking about the levels of care available at
15    Dixon at the time of Mr. Gay's incarceration.
16          Who within I guess we'll term the chain
17    of command makes the determination as to a
18    patient's required level of care?
19        A.    I know that it's a decision that they
20    run by security.  I mean, Jamie Chess and
21    Janet [sic] Braden I know were involved in the
22    decisions along with Al Doyle, but I know that
23    they would have to get permission in moving
24    people between locations from security.
                                                    58

1        Q.    During Mr. Gay's period of
2    incarceration at Dixon, were you yourself ever
3    consulted on the movement of a mentally ill
4    patient from one level of care to another?
5        A.    No.
6        Q.    During your time at -- during your time
7    at Dixon, was there a facility within the
8    Illinois Department of Corrections where the
9    most severely mentally ill individuals were sent
10    for placement?
11        A.    No -- or, well, there was one
12    anticipated, which is where I am now, at Elgin
13    Treatment Center.
14        Q.    If I understand correctly, Elgin
15    Treatment Center was not yet up and running at
16    the time that you were working with Mr. Gay; is
17    that correct?
18        A.    That's my understanding, yes.
19        Q.    That was on the horizon, but it wasn't
20    somewhere where patients could be sent at that
21    time?
22        A.    Right.
23        Q.    Was there a facility at the time that
24    you were at Dixon where patients would be sent
                                                    59

1    for specifically mental health treatment that
2    was beyond the ken of what Dixon was able to
3    provide?
4        A.    I don't know when Joliet Treatment
5    Center became -- went online.  I don't know
6    when.  That would be the other place.  Those two
7    were the two places that were anticipated.  I
8    couldn't tell you the dates when they became
9    open to accept patients.
10        Q.    Tell me a little bit about what Elgin's
11    function is now in terms of taking on severely
12    mentally ill individuals from other
13    institutions.
14        A.    Well, stabilizing them psychiatrically.
15        Q.    Are you familiar now with who makes the
16    decision as to whether to transfer a given
17    inmate to Elgin for psychiatric stabilization?
18        A.    Well, I don't participate, and those
19    are conference calls made between the directors
20    in Springfield and the staff in Elgin and the
21    staff in whatever the home site is that they're
22    transferring the patient from.  I couldn't tell
23    you the names of the people on those conference
24    calls.
                                                    60



Q.  And that's fair.
    Have you been called upon to
participate in any of those conference calls up
until today's date?
A.  No.
Q.  Is it your understanding that Elgin
currently provides a higher level of care than
the care provided by Dixon?
A.  Yes.
Q.  How is that -- I suppose how is that
level of -- what level of care does Elgin
provide that Dixon doesn't or didn't?
A.  Elgin is a hospital.  It's a state
hospital.  It provides 24-hour nursing care.  It
provides the care that -- the level of care that
you would see in a community Joint Commission
approved hospital in terms of staffing pattern,
monitoring of patients, plus they have IDOC
security staff there because the folks are under
guard because they're state prisoners.
Q.  Was that a level of care that Dixon
provided at the time that you were still
stationed at Dixon?
A.  Well, it's a higher level of care.

61

Q.  At any time while you were particularly
positioned at Dixon, was Dixon providing a
24-hour nursing care level of care?
A.  Well, they have in the infirmary
24-hour nursing care.
Q.  So in your estimation, is the infirmary
level of care provided by Dixon in 2018
comparable to the level of care that is
currently provided by the Elgin hospital
facility?
A.  Well, no, no.
Q.  What would be the difference, then,
between the infirmary level of care at Dixon as
it existed in 2018 and the level of care
provided by Elgin?
A.  Well, they have 24-hour monitoring of
patients in the infirmary, but, you know, the --
and they have individual contact with mental
health staff, but as far as other things that
you associate with inpatient level of care, like
programming, you know, group programming,
recreation, other components of care that you
see in a psychiatric unit in a psychiatric
hospital, the community, they don't have.

62

Q.  They don't have at Elgin or at Dixon?
A.  No, Dixon, Dixon.
Q.  So as of 2018, what kinds of
programming was provided for, let's say, inmates
in a crisis level of care?
    MR. ATWOOD:  Form to that question,
Nicolette.  Where?
    MS. WARD:  At Dixon.
BY MS. WARD:
Q.  I'm sorry.  I probably failed to
mention that.
    At Dixon in 2018, what kind of
programming was provided for inmates at the
crisis level?
A.  Well, individual monitoring on a daily
basis by mental health staff member, regular
visits by psychiatry, and direct or observation
checks by security staff.
Q.  One of the items that you mentioned was
individual monitoring by mental health staff.
    Can you describe for me the individual
monitoring that was provided, again, in Dixon in
2018 for crisis level patients?
A.  Daily meetings seven days a week with a

63

mental health staff person, either a QMHP or a
psychologist, to assess and maintain a patient
on crisis watch.
Q.  How long would these daily meetings be?
A.  20 to 30 minutes.
Q.  Was there some kind of rule or policy
that set those at 20 to 30 minutes or was that
just the general practice at the time?
A.  I don't know the answer to that.
Q.  As of 2018, was there any kind of
written guideline that required daily meetings
with the mental health staff person for people
on crisis at Dixon?
A.  There was, yes.
Q.  Where did that guideline originate
from?
A.  The standard operating procedure
manual.
Q.  Was that manual issued by Wexford or by
the Department of Corrections?
A.  By the Department of Corrections.
Q.  Before I ask you a little bit more
about treatment for patients on crisis, can you
describe for me just in lay terms what an

64



1  individual in crisis would mean in the context
2  of your work?
3      A.  I'm sorry, just ask -- can you just ask
4  me again?
5      Q.  Sure.  We've been using the term
6  "crisis" to refer to a certain subset of
7  mentally ill individuals.
8          When we use the term "crisis," what
9  does that mean in lay terms in your line of
10 work?
11     A.  Right.  Sure.  Suicidal people, people
12 with recent suicide attempts or self-injury
13 episodes, people that have -- that are grossly
14 decompensated or severely decompensated,
15 medication -- refusing people that are
16 decompensated that are waiting for treatment
17 review committee meetings to determine whether
18 or not they're going to be medicated on an
19 enforced basis because of inability to give
20 consent for treatment.
21     Q.  As of the time of your treatment of
22 Anthony Gay in 2018, did you have a sense of
23 what percentage of inmates Dixon had some kind
24 of mental health diagnosis?

65

1      A.  I couldn't tell you percentage.
2      Q.  At the time, did you know what
3  percentage of Dixon inmates were at severely
4  mentally ill?
5      A.  I think that's what you just asked me.
6  I just don't know the percentage.  I can't tell
7  you.
8      Q.  Were you familiar with how, if at all,
9  severely mentally ill people were being tracked
10 by Wexford or by the Department of Corrections,
11 again, in 2018?
12         MR. RUPCICH:  Object to vague,
13 compound.
14         MR. STALEY:  Join.
15         MR. ATWOOD:  Nicolette, are you talking
16 through the entire system?
17         MS. WARD:  I'm talking at Dixon
18 specifically.
19         MR. ATWOOD:  Can you just re-ask that
20 question so we can get a clear question and
21 answer on that.
22         MS. WARD:  Sure, sure.
23 BY MS. WARD:
24     Q.  At Dixon particularly in 2018, were you

66

1  aware of any means that was being used by Dixon
2  or by Wexford to track individuals designated as
3  severely mentally ill?
4      A.  Well, people that had an alert --
5          MR. ATWOOD:  Listen to the question
6  she's asked.
7          THE WITNESS:  Was I aware of a method
8  that IDOC and/or Wexford used to track mentally
9  ill people in Dixon; is that right?
10 BY MS. WARD:
11     Q.  That's right.
12     A.  Yes.
13     Q.  What was that method?
14     A.  The use of an SMI alert.
15     Q.  Tell me what an SMI alert is.
16     A.  It's a severe mental illness alert.
17     Q.  What form does that take?
18     A.  It's listed in the state's correctional
19 population database.
20     Q.  Did you, as a staff psychologist, have
21 access to these SMI alerts for patients at Dixon
22 in 2018?
23     A.  Yes.
24     Q.  As of 2018 for individuals that were

67

1  designated as severely mentally ill at Dixon,
2  were those people assigned what would be called
3  a treatment team?
4      A.  Yes.
5      Q.  Within an individual treatment team,
6  what kinds of professionals would be
7  representing within an individual discrete team?
8  Do you understand what I'm asking?
9      A.  Yes.  Among the full-time staff, it
10 would be attending psychiatrist, psychologist,
11 the qualified mental health professionals, and
12 the behavior health technicians.
13     Q.  For each individual patient, would that
14 team be static or would the personnel on that
15 team potentially change over time?
16     A.  People's assignments would change
17 according to staff availability.  It's
18 difficult -- I don't -- I can't track -- I don't
19 know -- you know, staff availability at
20 different times in Wexford and Illinois
21 Department of Corrections and how team
22 assignments were made, they weren't always the
23 same, if that's what you're asking, but what led
24 to changes, I don't know how patients were

68



changed or staff people were changed in their
team memberships.

Q.   I suppose let me ask you maybe a more
helpful question.

You mentioned at one point earlier that
during your treatment of Mr. Gay, Dr. Stone took
over your role as Mr. Gay's psychologist.

A.   I wasn't his primary psychologist.  He
was in crisis -- he was on crisis watch in
X-House where I worked on weekends, so I was
seeing him in that capacity, but I wasn't his
primary psychologist.

Q.   Was that true for the entirety of
Mr. Gay's time at Dixon?

A.   I was never his primary psychologist.

Q.   Was Dr. Stone Mr. Gay's primary
psychologist throughout his tenure at Dixon?

A.   I know that she was assigned to him
when he was assigned to -- when he was sent to
the infirmary.  Before that --

MR. ATWOOD:  If that's what you know,
that's what you know.

THE WITNESS:  Yeah, that's what I --
yeah.

69

BY MS. WARD:

Q.   Do you know approximately what your
caseload was at the time that you first began
working with, interacting with, Mr. Gay?

A.   Well, I would do two groups of seg
patients each day on the weekends and I would
see the crisis watch patients usually with one
other staff person.  We would divide up the
crisis watch patients.

Q.   Approximately how many crisis watch
patients were being seen on the weekends between
yourself and the other staffer?

A.   I think they usually had about 12 folks
in crisis watch on the unit, and we would split
them.  I'd see half of them.

Q.   I don't mean to misstate, but I think
you mentioned earlier way up top of your
deposition that from time to time, you
understood that individuals from other
institutions would come and assist part time
because of some staffing storages.  Am I
misremembering or misstating?  If I am, you can
correct me.

A.   No, that's right, that's right.

70

Q.   How frequently would individuals be
brought in from other facilities to assist due
to those staffing shortages?

A.   Usually every weekend one of the
two days or sometimes both of the two days, they
would have somebody from another facility
covering usually the mental health evaluations,
the evaluations of new patients arriving from
other facilities.

Q.   In the course of your work as a
psychologist, were you ever consulted on the
staffing shortages that existed at Dixon at that
time?

A.   How do you mean "consulted"?

Q.   Were you ever present in any kind of
meeting regarding staffing shortages in the
mental health staff?

A.   No, I wasn't involved in any meetings
at all.

Q.   And do you mean across the board and
not just as it concerns issues of staffing
shortages?

A.   No, the meetings took place on the
weekdays, and I was not present for any of the

71

meetings.

Q.   To the best of your understanding, did
Mr. Gay's treatment team then hold any sort of
regular meetings during the weekdays?

MR. ATWOOD:  Objection, foundation.

THE WITNESS:  Yeah, I'm not -- you
know, I don't -- I'm not aware of what meetings
were held on the weekdays -- well, you know,
when I wasn't there.  I wasn't invited to the
meetings and I don't know how often they were
held and who attended them.  You know, I just
wasn't involved in the meetings at all.  I was a
weekend coverage person.

BY MS. WARD:

Q.   So to the extent that Mr. Gay's broader
treatment team was having meetings, that would
not have been something that you would have
participated in during your time treating
Mr. Gay; is that fair to say?

A.   Yes, that is.

Q.   Do you have any familiarity with how
many Wexford staff were employed at Dixon as of
2018?

A.   I don't know the answer to that.

72



1    Q.  Do you know who would have been
2  responsible for hiring and filling Wexford staff
3  positions at Dixon as of 2018?
4    A.  I don't know who did the hiring.
5    Q.  Do you know who would have been
6  responsible at Wexford as of 2018 for
7  determining whether the level of staffing was
8  adequate for the needs of the patients under
9  your care?
10   A.  I don't know the answer to that
11 question.  I wasn't involved in the staffing
12 patterns at all at Dixon.
13   Q.  In your observation, your experience,
14 your opinion, did the quality of healthcare
15 provided to severely mentally ill individuals at
16 Dixon vary in any way over the time that you
17 were specifically stationed at Dixon?
18         MR. ATWOOD:  Let me object to form and
19 foundation.
20         MR. RUPCICH:  And vague.  I join.
21         THE WITNESS:  Can you tell me what you
22 mean by "vary"?
23 BY MS. WARD:
24   Q.  During your time at Dixon, in your

73

1  observation, did the adequacy of the care
2  provided to severely mentally ill people either
3  go up or down during any period?
4         MR. ATWOOD:  Just object to form and
5  foundation again.
6         MR. RUPCICH:  Join.
7         MR. STALEY:  Join as well.
8         THE WITNESS:  I don't know how to
9  answer that.  I don't know what you mean "up or
10 down."
11 BY MS. WARD:
12   Q.  During any period of time that you were
13 at Dixon, did you ever form the opinion that the
14 care being provided to severely mentally ill
15 individuals was inadequate based on the needs of
16 that population?
17         MR. ATWOOD:  I'll object to form and
18 foundation on that again.
19         MR. RUPCICH:  Join.
20         MR. STALEY:  I will join.
21         THE WITNESS:  I don't know how to
22 answer your question.  You know, I wasn't
23 involved in the decision-making roles of these
24 folks.  I'm not sure exactly what you're asking.

74

1  BY MS. WARD:
2    Q.  At any point, based on your experience
3  working with incarcerated individuals and
4  providing mental health treatment, did you ever
5  come to the conclusion that at Dixon, the level
6  of care being provided to specifically the
7  severely mentally ill subset was not enough to
8  maintain those individuals' mental wellness?
9         MR. ATWOOD:  Objection, form and
10 foundation again.
11         MR. RUPCICH:  Join.
12         MR. STALEY:  Join.
13         MR. ATWOOD:  Vicki, can you read back
14 that question for the doctor.
15         (whereupon, the record was read
16          as requested.)
17         THE WITNESS:  You know, the question
18 you're asking, I mean, you know, is the care
19 offered at Dixon comparable to Northwestern
20 hospital, no.  I mean, it's not.  Is it -- I
21 mean, I don't know exactly, you know, how to
22 respond to the question you're asking.  If
23 you're comparing Dixon to a private tertiary
24 care psychiatric facility, you know, no, it's

75

1  not comparable to a private tertiary -- to
2  Northwestern, to a major medical center?  Is
3  that the question you're asking?
4  BY MS. WARD:
5    Q.  I suppose the question that I'm asking
6  is did you ever feel while you were at Dixon,
7  based on your experience of working with
8  incarcerated people, that your severely mentally
9  ill population was decompensating due to an
10 overall level of inadequate care?
11         MR. ATWOOD:  Objection, form and
12 foundation again.
13         MR. RUPCICH:  Join.
14         MR. STALEY:  Join.
15         THE WITNESS:  You know, any severely
16 mentally ill patient is going to be difficult to
17 stabilize in any setting no matter where it is.
18 Is it harder to stabilize a patient who's
19 severely mentally ill when they're sitting in a
20 room 23 hours a day?  The answer to that is yes.
21 BY MS. WARD:
22   Q.  We talked a little bit about Mr. Gay
23 particularly.
24         Can you recall when you first began to

76



1  familiarize yourself with Mr. Gay in his history
2  within the Department of Corrections?
3      A.  March 31, 2018.
4      Q.  Are you looking at a particular
5  document?  I just want to know what the Bates
6  number is so --
7      A.  Timeline of my contacts with Mr. Gay.
8      Q.  Was that something you yourself created
9  in order to prepare for the deposition?
10     A.  Yes.
11     Q.  How did you become familiar with
12 Mr. Gay on March 31st of 2018?
13     A.  I met with him for a crisis visit and I
14 reviewed the medical record of recent contacts
15 that folks had had with him, you know, what was
16 available to me at the time.
17     Q.  What information did you receive with
18 regard to those recent contacts others had had
19 with him?
20     A.  There was a list of incident reports,
21 PREA complaints that he had filed, Prison Rape
22 Elimination Act complaints, patient notes, and
23 evaluations.
24     Q.  I think I understand from your earlier

77

1  testimony that around that time, you became
2  familiar with Mr. Gay's history prior to
3  arriving at Dixon; is that correct?
4      A.  Well, yes.
5      Q.  By March 31st of 2018, had Mr. Gay been
6  sent from Dixon to an outside facility for any
7  care or treatment?
8      A.  Before March 31st?  I don't know the
9  answer to that question.  You're talking about
10 Bethune hospital?  I don't know.
11     Q.  On March 31st of 2018, was that a
12 face-to-face visit that you had with Mr. Gay?
13     A.  Yes.
14     Q.  Was that common at the time for you to
15 make your initial assessments in a face-to-face
16 meeting?
17     A.  Yes.
18     Q.  Where at the facility did you have this
19 meeting with Mr. Gay?
20     A.  In the crisis watch tier X-House
21 B wing, B, as in boy, wing.
22     Q.  Was Mr. Gay in his cell at that time?
23     A.  I'd have to check my notes.  I -- yes,
24 I believe so.

78

1      Q.  At the time of your first meeting with
2  Mr. Gay, based on his history, had he been
3  identified in the way as a particularly severely
4  mentally ill individual?
5      A.  He was an SMI patient, yes.
6      Q.  Did you become familiar at that time
7  with Mr. Gay's history of housing in segregation
8  at other facilities?
9      A.  Yes.
10     Q.  What did you come to understand about
11 Mr. Gay's history and segregation?
12     A.  That he had spent nine years in Tamms,
13 that he had been housed in segregation in
14 Pontiac.
15     Q.  All told, did you become familiar with
16 how much time Mr. Gay had spent in segregation
17 at those facilities, Tamms and Pontiac?
18     A.  I can't quote you the total number of
19 weeks or months or years that he spent in
20 segregation across the board during his time in
21 IDOC.
22     Q.  Based on your experience of working
23 with individuals and incarcerated individuals,
24 did it seem to you that Mr. Gay had spent an

79

1  unusually high amount of time in segregation
2  prior to his arrival at Dixon?
3          MR. ATWOOD:  Just object to foundation
4  on that.  He just testified that he did not know
5  how long he had been in the isolation.
6          THE WITNESS:  Yeah, right, yeah, I
7  don't know how long he was in segregation
8  altogether.
9  BY MS. WARD:
10     Q.  Even if you can't recall the specific
11 number, do you recall having any impressions
12 about the amount of time that Mr. Gay had spent
13 in segregation prior to his transfer to Dixon?
14         MR. ATWOOD:  Objection, form and
15 foundation.
16         You can answer.
17         THE WITNESS:  Nine years in Tamms would
18 not be considered a short stay in segregation.
19 BY MS. WARD:
20     Q.  I'm sorry, you said --
21     A.  Was he in segregation for a long time.
22 I mean, Tamms was only open for 13 years.  He
23 spent 9 years in Tamms.  I wouldn't consider
24 that a short stay.

80



1    Q.   Was your understanding, then, that
2  Mr. Gay had been housed in segregation during
3  his time at Tamms?
4    A.   Well, everybody in Tamms is in
5  segregation, or was.
6    Q.   Based on your experience and up until
7  that point, would nine years of segregation be a
8  prolonged period of segregation?
9        MR. RUPCICH:  Object to vague.
10        MR. STALEY:  Join.
11        MR. ATWOOD:  You can answer her if you
12  understand.
13        THE WITNESS:  I mean, this isn't based
14  on me.  You know, Tamms was closed because of
15  repeated litigation against the place, you know,
16  for what was characterized as long term --
17        MR. ATWOOD:  If you can't answer her
18  question, tell her you can't answer the
19  question.
20        THE WITNESS:  Yeah, I can't comment on
21  the specific.  I mean, you already know Tamms
22  was closed because of repeated litigation.
23  BY MS. WARD:
24    Q.   What I'm getting at is as of the time

81

1  that you first met with Mr. Gay March 31st of
2  2018, can you recall up until that point working
3  with any other individuals who had spent
4  nine years or more in segregation?
5    A.   Yeah, I had spent -- I had seen other
6  people that had spent nine years or more in
7  segregation, yes.
8    Q.   Up to that point, approximately what
9  proportion of the individuals that you had
10  worked with had spent nine years or more in
11  segregation within DOC custody?
12    A.   I couldn't tell you.  I couldn't tell
13  you that.  I didn't keep track of that
14  statistic.
15    Q.   Were you aware of whether anyone within
16  the Department of Corrections did keep track of
17  that statistic?
18    A.   No, I'm not aware.  I don't know.
19    Q.   Was there any process that you became
20  aware of at Dixon by which inmates' total
21  continuous time in segregation was monitored or
22  tracked?
23    A.   I couldn't tell you that.  I don't know
24  that.

82

1    Q.   So am I correct in understanding that
2  as you sit here today, you don't recall being
3  introduced to any such system?
4    A.   No.  I mean, I'm aware of Cook County
5  because that's -- that was part of my job.  I
6  have no idea how it was handled in the state
7  system.
8    Q.   Following your initial meeting with
9  Mr. Gay on March 31st of 2018 -- strike that.
10        Based on your understanding of
11  Mr. Gay's history, what level of care was
12  Mr. Gay on as of your first meeting with him on
13  March 31st of 2018?
14    A.   He was on crisis watch as an STC SMI
15  patient who was also in segregation.
16    Q.   Were you given any information on what
17  the reason for his designation as someone in
18  segregation was?
19    A.   I don't know what the disciplinary
20  tickets were.  I don't have access to people's
21  disciplinary tickets.
22    Q.   Is it fair to say that it wouldn't have
23  been common during the time that you were at
24  Dixon to be given a rundown of the reasons that

83

1  people were placed in segregation?
2    A.   Yeah, they don't tell us what people's
3  tickets are.
4    Q.   Based on Mr. Gay's designation as
5  someone with crisis STC SMI placement, how
6  frequently was Mr. Gay supposed to be seen by
7  his mental health team or his treatment team?
8    A.   Seven days a week.
9    Q.   Forgive me.  I think I asked this.
10        You were not the person that made the
11  determination that Mr. Gay should be on STC --
12  crisis STC SMI placement; is that correct?
13    A.   He was already on crisis STC when I met
14  him.
15    Q.   For individuals like Anthony who are on
16  that placement, where would those contacts,
17  those daily contacts occur?
18    A.   On the crisis watch unit, B wing in
19  X-House.
20    Q.   Was that where Mr. Gay's cell was
21  located?
22    A.   Yes.
23    Q.   Would these contacts, based on your
24  understanding, then occur cell side at Mr. Gay's

84

1  actual cell?
2      A.   Most of the time, yes.
3      Q.   In those instances in which they
4  weren't cell side, was there somewhere else that
5  those contacts would ordinarily occur?
6      A.   In an interview room in B wing.
7      Q.   Was it common for individuals who were
8  on crisis STC SMI placement to have those
9  contacts occurring cell side?
10     A.   Was it common?
11     Q.   Yes.
12     A.   Yes.
13     Q.   Did you yourself have occasion to see
14 Mr. Gay's cell in B wing in X-House?
15     A.   I'm sorry.  Can you ask one more time?
16     Q.   Yeah.  Did you yourself ever see
17 Mr. Gay's cell in B wing in X-House?
18     A.   Did I see his cell?
19     Q.   Yes.
20     A.   The cell he was in?
21     Q.   Yes.
22     A.   Yes, I did.
23     Q.   Could you describe for me what the
24 appearance of his cell was?

85

1      A.   I couldn't tell you the exact size of
2  it.  It's a cell with a mattress.  He was
3  wearing a safety smock.  He had a safety
4  blanket.  People weren't allowed other personal
5  property in a crisis watch cell.  I don't know
6  the exact size.  It's a single-person cell.
7      Q.   Were there any windows in Mr. Gay's
8  cell?
9      A.   I don't know off the top of my head.
10     Q.   For individuals who were designated
11 crisis STC SMI, were there any guidelines for
12 how much time those individuals were spending
13 out of their cells?
14     A.   Yes, there were.
15     Q.   How much time at any given day were
16 those individuals supposed to be sending --
17 spending out of their cells based on the
18 guidelines?
19     A.   You know, I can't answer that
20 specifically.  The standard operating procedure
21 manual outlined -- you know, I wasn't involved
22 in opening the cell doors and letting people out
23 for time out of cell.
24     Q.   Who within the facility, then, would

86

1  have been responsible for ensuring that Mr. Gay
2  receive the appropriate amount of out-of-cell
3  time?
4      A.   The security chief, you know, the
5  on-site security chief and the treatment team.
6      Q.   Do you know one way or the other
7  whether Mr. Gay's treatment team had the ability
8  to recommend that Mr. Gay's allotted amount of
9  out-of-cell time be increased?
10     A.   I know that -- would the mental health
11 treatment team be involved in a decision to give
12 him more out-of-cell time?
13          MR. ATWOOD:  No, that's not the
14 question.  Listen to the question she's asking.
15 Answer that question.
16          THE WITNESS:  Can you repeat it?  I'm
17 sorry.
18          MS. WARD:  Vicki, could you please read
19 back the question.
20               (whereupon, the record was read
21                as requested.)
22          THE WITNESS:  I don't -- do I know one
23 way or the other whether the treatment team
24 would have say-so over Anthony Gay getting out

87

1  of his cell?
2  BY MS. WARD:
3      Q.   Yes.
4      A.   Okay.  My understanding would be it was
5  the decision made by the mental health treatment
6  team in conjunction with the security chief.
7      Q.   In the course of your treatment of
8  Mr. Gay, were you ever notified or did you ever
9  receive information that Mr. Gay's out-of-cell
10 time had been increased?
11     A.   I'd have to check the individual dates
12 of contact that I had with him.  I don't know
13 the answer to that off the top of my head.
14     Q.   During your weekend shifts,
15 approximately how many patients were you seeing
16 in any given shift?
17     A.   Well, I would have two groups of about
18 5 to 7 patients each and then half of the crisis
19 folks, about 6 -- I don't know, 15, 16 people
20 per day.
21     Q.   Looking at Mr. Gay specifically, based
22 on your familiarity of his history of self-harm,
23 did you perceive that Mr. Gay had serious
24 psychological needs?

88



1      MR. RUPCICH:  Object to vague.
2      THE WITNESS:  He was an SMI patient.
3  BY MS. WARD:
4      Q.   I mean, is that a yes that because he
5  was a severely mentally ill patient that he
6  required serious psychological treatment?
7      MR. RUPCICH:  Object to vague.
8      THE WITNESS:  He was -- you know, he
9  was diagnosed with a severe psychiatric illness.
10  BY MS. WARD:
11      Q.   With regard to Mr. Gay, who at the time
12  of your treatment with him would have had the
13  final responsibility to ensure that his
14  treatment plan was therapeutically effective for
15  him?
16      MR. STALEY:  Objection to form,
17  foundation.
18      MR. RUPCICH:  Join, and vague.
19      MR. ATWOOD:  You can answer if you
20  understood it.
21      THE WITNESS:  Well, the mental health
22  authority and the treating -- you know, the
23  bosses, the IDOC and Wexford mental health
24  administrators and the treating psychiatrist.

89

1  BY MS. WARD:
2      Q.   On May 31st of 2018 and going forward,
3  how were you involved, if at all, in formulating
4  Mr. Gay's plan for treatment?
5      A.   May 31st?  I had no contact with
6  Mr. Gay at all after May 31st.
7      Q.   Excuse me.  I misspoke.
8           After your initial contact with him on
9  March 31st of 2018, how, if at all, were you
10  involved in creating or enacting a treatment
11  plan?
12      A.   Jayne Braden asked me to write up his
13  treatment plan.  She had just started as the
14  Wexford administrator and she had been on-site
15  visiting that Saturday to get to know the
16  weekend staff, and while she was there, she
17  asked me to write up his treatment plan, which I
18  did, and I submitted it to her.
19      Q.   Was it common at that time for you as a
20  psychologist to draw up treatment plans for
21  severely mentally ill patients?
22      A.   That was the only one I ever did at
23  Dixon.  She happened to -- it was her first
24  weekend after being hired.  That was the only

90

1  one I ever did.
2      Q.   Am I understanding correctly, then,
3  that Ms. Braden or the person ordinarily filling
4  that role would typically be the person
5  responsible for the creation of treatment plans?
6  Is that right or wrong?
7      A.   Yeah, that's right.
8      Q.   Following your initial contact with
9  Mr. Gay, did you ever become aware that Mr. Gay
10  had self-harmed while at Dixon?
11      A.   Yes.
12      Q.   How did you become aware of that?
13      A.   When I came to work the following
14  weekend, he had already gone to Bethune hospital
15  following a self-injury and returned to Dixon.
16      Q.   What was the nature of the self-injury?
17      A.   Cutting into his testicles, cutting
18  into his scrotum.
19      Q.   Did that kind of self-harm, in your
20  estimation, pose a danger medically to Mr. Gay?
21      A.   I've never of anybody cutting into
22  their testicles where you would consider it a
23  trivial self-injury.
24      Q.   I suppose I don't mean to be

91

1  indelicate, but based on your experience, would
2  mutilation or self-harm to one's genitals, had
3  you seen that frequently in your experiences
4  with inmates self-harming?
5      A.   Can you define what you mean by
6  "frequently"?
7      Q.   Yeah, was that a -- it sounds like from
8  your experience you had a good working
9  familiarity with how incarcerated people --
10      A.   Self-injure?
11      Q.   Yes.  How frequently did you see
12  self-injury take the form of self-injury to
13  one's genitals?
14      A.   Several times a year.  I couldn't give
15  you the exact number off the top of my head.
16  Several times a year.
17      Q.   In terms of correctional mental
18  healthcare at Dixon, what does the term
19  "backlog" mean?
20      A.   Backlog?
21      Q.   Yes.
22      A.   I don't know.  I don't know.  Like
23  backlog --
24      MR. ATWOOD:  You answered the question.

92

1      THE WITNESS:  I don't know.  I don't
2  know the answer to that.
3  BY MS. WARD:
4      Q.   During the time while you were at --
5  while you were involved in Mr. Gay's treatment,
6  did you ever speak with the warden of Dixon
7  about Mr. Gay or about the treatment being
8  rendered to him?
9      A.   The warden?  No.
10     Q.   I'm going to take a step back and kind
11 of, I suppose, talk in broader terms and not
12 just with regard to Mr. Gay.
13          In your career, has the bulk of your
14 psychological experience been in the prison
15 context?
16     A.   The bulk?
17     Q.   Yes.
18     A.   In terms of the number of years?
19     Q.   Yes.
20     A.   I've spent more years in correctional
21 settings than in private practice, yes, where at
22 Northwestern -- yes.
23     Q.   In your experience, does the prison
24 environment present any unique challenges to

93

1  mentally ill individuals?
2      A.   Can you tell me what you mean by
3  "unique"?
4      Q.   Is there anything unique to the prison
5  environment as opposed to sort of the open world
6  at large that can be especially challenging to
7  an individual who has a mental illness?
8      MR. RUPCICH:  Object to vague.
9      MR. ATWOOD:  Join.
10     THE WITNESS:  I mean, you know, by
11 definition, the purpose of prison is to limit
12 people's freedom, so anybody that's in prison is
13 going to have their freedom limited.  Is that
14 what you're asking?
15 BY MS. WARD:
16     Q.   I guess what, if any, impacts, in your
17 experience, does that have on individuals who
18 have mental illnesses?
19     MR. RUPCICH:  Object to vague.
20     MR. ATWOOD:  Join.
21     You can answer.
22     THE WITNESS:  I'm really not sure what
23 to say about this.  I mean, anybody that's in a
24 correctional facility is in an environment

94

1  controlled by other people, and the purpose of
2  prison is different than the purpose of being in
3  a hospital, a medical or a psychiatric hospital.
4  So in providing mental healthcare in a
5  correctional setting, you have to take into
6  account the fact that the person's freedom is
7  going to be limited, and it's not the province
8  of the mental health staff to change that.  You
9  know, it's not like the mental health staff can
10 open the door and release the person.  They
11 would put us in jail if we did that.
12 BY MS. WARD:
13     Q.   As of 2018 within Dixon, were there any
14 institutional limits on the length of time that
15 an individual could be in segregation?
16     A.   I don't know the answer to that.
17     Q.   During the time that you've been
18 working for Wexford within the Illinois
19 Department of Corrections, have you become aware
20 of any changes to IDOC policy on the use of
21 segregation?
22     A.   I don't know the answer to that,
23 either.
24     Q.   In terms of the level of mental

95

1  healthcare, can you describe for me what the
2  distinction would be between an individual in
3  segregation versus an individual in crisis
4  segregation?
5      MR. ATWOOD:  At Dixon?
6      MS. WARD:  At Dixon, yes, thank you.
7      THE WITNESS:  All of the -- all of the
8  people in crisis watch in Dixon are housed in
9  X-House.  There aren't any people in Dixon who
10 are housed -- that I'm aware of housed outside
11 of X-House.  Everybody on crisis watch is in
12 X-House whether they're from segregation or not
13 from segregation, at least at that time.
14 BY MS. WARD:
15     Q.   During your time at Dixon specifically,
16 did you ever discuss with any of your immediate
17 superiors your project that you had conducted
18 within Cook County about reduction of self-harm
19 and suicidal behaviors?
20     A.   Yes.
21     Q.   When was the first time that you can
22 recall discussing that project with your
23 higher-ups within Wexford and the DOC?
24     A.   I couldn't tell you the date.  I don't

96

1  know.
2     Q.   Would that have been, if you can
3  recall, before or after Mr. Gay's arrival at
4  Dixon?
5     A.   I don't know the answer to that.  I
6  couldn't tell you.  I mean, I was working at
7  Dixon for a year almost, ten months or so,
8  before his arrival.  I don't know the answer to
9  that.
10    Q.   What was the context of your
11  conversations with your higher-ups about your
12  experience and research on self-harm within Cook
13  County?
14    A.   I talked to the folks about the Savage
15  Life people that were now in IDOC -- the Savage
16  Life people that we had had before at Cook
17  County that had been convicted and sentenced and
18  were now in X-House in D wing and C wing in
19  Dixon.  That was, I would say, the primary focus
20  of the conversations that I had with the staff
21  there.
22    Q.   Can you recall with whom specifically
23  you had that conversation about the Savage Life
24  individuals?

97

1     A.   That was something I talked to a number
2  of people about regularly.  I couldn't tell you
3  specifically who -- I mean, these were people
4  that I had been seeing for some years in Cook
5  County that were now in IDOC and I knew them
6  pretty well, and I would talk to the other staff
7  people that were there about them and about
8  their histories and behaviors.
9     Q.   Did you ever speak with your higher-ups
10  at Wexford or the Department of Corrections
11  about your conclusions regarding out-of-cell
12  time decreasing the incidence of self-injurious
13  behaviors at Cook County?
14    A.   That's difficult -- I can't say for
15  sure if I spoke directly about that specific
16  thing.
17       MR. ATWOOD:  Can we take another short
18  break, please?
19       MS. WARD:  Sure.  How long would you
20  like?
21       MR. ATWOOD:  Five minutes.
22       MS. WARD:  Sounds good.
23          (Whereupon, a short break was
24           taken.)

98

1  BY MS. WARD:
2     Q.   When we left off a moment ago, we were
3  talking about a conversation or conversations
4  you held with your higher-ups regarding your
5  experiences at Cook County with self-harm
6  reduction.
7     A.   Yeah.
8     Q.   Just so I'm certain, can you recall any
9  instance in which you spoke to your superiors at
10  either IDOC or Wexford about the conclusions you
11  reached in your experience at Cook County with
12  effective self-harm reduction methods?
13    A.   You want to -- you're asking me the
14  dates of conversations?
15    Q.   Can you recall any conversations of
16  that type that you had?
17    A.   I mean, I know that I had conversations
18  with my bosses about this.  I couldn't tell you
19  off the top of my head without checking my notes
20  what the dates of the conversations were.
21    Q.   Specifically, I suppose what I'm asking
22  is -- let me take a step back.
23       It sounds like from your research and
24  your work at Cook County that you'd experience

99

1  success in finding harm reduction methods; is
2  that correct?
3     A.   Yes.
4     Q.   You got an award for bringing Cook
5  County into compliance with regards of an order
6  presumably applying to self-harm; is that
7  correct?
8     A.   Yes.
9     Q.   So at any point, did you go to your
10  superiors at IDOC or Wexford and say these are
11  some methods that I have seen success with over
12  at Cook County and maybe we could apply those
13  here within the Illinois Department of
14  Corrections?
15    A.   I had conversations that were like
16  that, yes.  I can't tell you off the top of my
17  head what the dates of the conversations were
18  without checking my notes.
19    Q.   Do you have -- did you make
20  contemporaneous notes reflecting conversations
21  of that type?
22    A.   I included in the patient notes and in
23  my e-mails documenting my conversations with my
24  bosses.

100



Q.   Did you ever have conversations with your bosses about your successful harm reduction methods specifically with regard to Mr. Gay's treatment?

A.   Yes.

Q.   On approximately how many occasions did you have those conversations with your bosses with regard to Mr. Gay specifically?

A.   I would have to check my notes.  I don't know.

Q.   When you say your bosses, what individuals specifically do you mean by that?

A.   Jamie Chess, Janet [sic] Braden, Manny Gonzalez, and Al Doyle.

Q.   What form did those conversations take?  Was it e-mail, telephone calls, in-person meetings?

A.   They weren't in-person meetings -- that's not true, because Al Doyle was there on a couple of the weekend dates and I did talk to him in person.  Mostly they were telephone calls on the weekends that I made to the administrators and e-mails during the week.

Q.   With regard to these telephone calls

101

specifically, approximately how many conversations did you have telephonically about Mr. Gay's treatment in the context of your harm reduction work at Cook County?

A.   I would have to check my notes.  I don't know the answer off the top of my head.

Q.   What was this -- first of all, would you say that it was more than one telephone call?

A.   Yes.

Q.   Would you say it was more than three telephone calls?

A.   I'd have to check my notes.  I don't know the exact number.

Q.   What was, generally speaking, the substance of those conversations?

A.   I thought he would do better in an inpatient setting than on crisis watch in the X-House.

Q.   Why was that your belief that Mr. Gay would do better in an inpatient setting than in crisis watch?

A.   Because he was self-injuring in crisis watch.

102

Q.   What benefit did you see in an inpatient setting that -- in your belief that would make that a better therapeutic environment?

A.   Well, it removes the us against them -- you know, the power struggle that you often see between the patient and the staff, you know, the back and forth between the staff that the patient sees as being restrictive and withholding.  You know, it's -- the focus is not as much on the authoritarian correctional side of things and it's more on, you know, the treatment and the care side of things.

Q.   Was there any other benefit to -- in your perception to the inpatient environment versus crisis that you believed could assist Mr. Gay at that time?

A.   Well, anybody that's locked in a room 23 hours a day by themselves with no other sources of stimulation is going to do worse.  That's not only true for psychiatric patients.  That's true for anybody in any setting.  Anybody that's locked up in a room by themselves all day long, day in and day out, 7 days a week,

103

23 hours a day is going to do worse.  So anybody that's in a hospital versus in that type of setting has, you know, the benefit of having more sources of stimulation, more ability to leave their room, more ability to have interactions with other staff people, make phone calls, talk to family, watch television, interact in group therapy, et cetera.

Q.   Did you believe at the time that you had these conversations that Mr. Gay was decompensating?

A.   Yes.

Q.   Did you believe that Mr. Gay's isolation crisis was contributing to that decompensation you were seeing?

A.   It wasn't helping him.

Q.   Was it hurting him?

MR. ATWOOD:  Just object to asked and answered.

THE WITNESS:  Yeah, it definitely was not helping.

BY MS. WARD:

Q.   Was it hurting him?

MR. ATWOOD:  Same objection.

104



1      THE WITNESS:  I can't say if it was
2  hurting more than he was already hurt or not,
3  but I definitely know it wasn't helping.  I
4  can't compare the setting he was in, in Pontiac
5  to the setting he was in, in Dixon.  I don't
6  know if Dixon's worse, better, not the same, the
7  same, but, you know, I had the strong feeling he
8  would do better in a hospital setting.
9  BY MS. WARD:
10     Q.   As a general proposition, would you
11  agree that regular social stimulation is needed
12  for good psychiatric health?
13     MR. RUPCICH:  Object to vague.
14     THE WITNESS:  I mean, if you're asking
15  this as a common-sense question, I'm sure
16  anybody would agree with that statement.
17     If you're asking that question as a
18  mental health person, I probably would still
19  agree.
20     If you're asking as a correctional
21  mental health, you know, sure.  I mean, is it
22  better to have contact with the outside world
23  than not have contact with the outside world, I
24  would say it's better to have contact with the
                                                   105

1  outside world.
2      I would also say, however, part of the
3  purpose of being sentenced to prison is to limit
4  an individual's contact with the outside world.
5  That's something that the mental health staff
6  does not have control over in a correctional
7  facility.
8  BY MS. WARD:
9      Q.   Are there any methods providing inmates
10  with social contact or social stimulation the
11  mental health staff in the Dixon Correctional
12  setting does have control over?
13     A.   That, I can't -- I don't know the
14  answer to that.  I don't know the answer to
15  that.
16     Q.   I'm not trying to ask a trick question,
17  but as you sit here today, do you know of any
18  methods available to the Dixon mental health
19  staff as of 2018 for providing severely mentally
20  ill inmates with social stimulation?
21     A.   I'm not aware.  I don't know the answer
22  to that question.
23     Q.   In your experience in the correctional
24  mental health setting, is there a therapeutic
                                                   106

1  benefit of long-term segregation?
2      A.   I'm sorry.  I was coughing.
3      Q.   No problem.
4      Is there a -- in your experience
5  specifically in the correctional mental health
6  setting, is there a therapeutic benefit of
7  long-term segregation?
8      A.   The purpose of long-term --
9      MR. ATWOOD:  Hold on, hold on, Doctor.
10  Do you need to take --
11     THE WITNESS:  I just have to take a
12  cough drop.  It'll take one second.
13     MR. ATWOOD:  Vicki, while he's doing
14  that, can you read that question back, please.
15         (whereupon, the record was read
16            as requested.)
17     THE WITNESS:  You'll never see a mental
18  health professional in any setting recommend
19  that a person spend 23 hours a day in a box as a
20  treatment approach for any psychiatric illness.
21  BY MS. WARD:
22     Q.   Why not?
23     A.   Because the reduction in the amount of
24  stimulation a person experiences causes the
                                                   107

1  individual to be more prone to experiencing
2  psychotic symptoms as a result of stimulus
3  deprivation.  Losing a person's time sense,
4  understanding when it's daytime, when it's
5  night, whether they've been in seg for a day, a
6  month, a year, ten years, et cetera, anybody who
7  can't tell the difference between daytime and
8  nighttime is going to have a problem with their
9  time sense after a certain period of time and
10  think that they've been where they are for much,
11  much longer periods of time than they actually
12  have.  They're also going to start to experience
13  hallucinations because the person's brain is
14  going to take over providing stimulation when
15  there isn't any in the outside environment.
16     Q.   Would you agree with me that long-term
17  segregation can degrade a person's psychological
18  coping mechanisms?
19     A.   Of course, sure.
20     Q.   In your experience in the prison
21  setting, is segregation associated with I guess
22  what you'd call acting out behaviors?
23     A.   That's right, yes, people get
24  disciplinary tickets for breaking the rules in
                                                   108



1 prison settings, and then they're sentenced to a
2 certain number of days or weeks or months in
3 segregation if they've been found guilty of a
4 specific -- breaking a specific rule in the
5 institution.
6     Q.    In your experience, can segregation for
7 mentally ill people increase, for example,
8 symptoms of aggression?
9     A.    Yes.  I mean, it can.  Now, if the
10 person --
11         MR. ATWOOD:  You answered the question.
12         THE WITNESS:  Okay.
13 BY MS. WARD:
14     Q.    In your experience, can -- for severely
15 mentally ill inmates, can aggression towards
16 others be a symptom of their mental illness?
17     A.    It can be, but there are people that
18 are not mentally ill that are also aggressive.
19     Q.    In your time working at either Cook
20 County or at Wexford, have you become familiar
21 with individuals who have on occasion declined
22 to participate in available mental health
23 services?
24     A.    Of course.

109

1     Q.    From the tone, is that something that
2 you've commonly experienced in your work either
3 at Cook or at IDOC?
4     A.    Yes.
5     Q.    In your experience, can that refusal be
6 a sign of psychological decompensation?
7     A.    Yes.
8     Q.    How, in your experience, can those two
9 things be related to one another?
10     A.    When people become paranoid, they
11 become suspicious of contact with outside
12 parties, including mental health staff.
13     Q.    At Dixon specifically as of 2018, if an
14 individual declined to participate in
15 specifically mental health treatment, how was
16 that noted or tracked by mental health staff, if
17 at all?
18     A.    Well, I mean, when people refused to
19 talk to me, I would write a progress note saying
20 that the person declined to meet with me and I
21 would notify, you know, my bosses in the reports
22 that I would submit at the end of the weekend
23 who agreed to meet with me, what they -- you
24 know, how they were doing, and who refused to

110

1 meet with me.
2     Q.    During these -- you know, going back to
3 the conversations then that you had with your
4 superiors about Mr. Gay's treatment and your
5 recommendations, do you recall telling your
6 superiors particularly that you believed that
7 Mr. Gay's social isolation was adversely
8 affecting him?
9         MR. ATWOOD:  I think that's asked and
10 answered.  I'll object on that.
11         Go ahead.
12         THE WITNESS:  Yeah, yeah, yeah, I've
13 talked about that already.
14         MR. ATWOOD:  You can answer the
15 question again.
16         THE WITNESS:  Yes, I did.
17 BY MS. WARD:
18     Q.    What, if anything, did your superiors
19 do in response to those recommendations that you
20 made with regard to Anthony's treatment
21 specifically?
22     A.    That, I don't -- I mean, that, I don't
23 know.  I know that he was moved to the
24 infirmary.

111

1     Q.    Was he moved to the infirmary, to your
2 recollection, before or after these
3 conversations that you had about your
4 recommendations for Mr. Gay's treatment?
5     A.    I don't know the answer to that.
6     Q.    You mentioned to me earlier in the
7 deposition that part of your responsibilities at
8 this time was to lead weekend groups; is that
9 correct?
10     A.    Yes.
11     Q.    To your recollection, did Mr. Gay
12 participate in these weekend groups specifically
13 during the time that you were still involved
14 with his treatment?
15     A.    No, he didn't.
16     Q.    Were you ever given any sense of why
17 Mr. Gay didn't participate in those groups?
18     A.    Yes.  He thought I was a homosexual.
19 That's why.  He wanted to meet with a female
20 staff person, and the male staff people, his
21 general complaint was that they were gay and
22 pressuring him for sex, so he wanted to meet
23 with female staff people.
24     Q.    Was that something that was relayed

112

1  directly to you or was that relayed to you
2  through another individual at Dixon?
3      A.  Both.
4      Q.  I suspect from our earlier
5  conversations I know the answer to this
6  question.
7          With regard to placement of individuals
8  in four-point -- with regard to the placement of
9  individuals in four-point restraints, was that
10  something that you had any say over in terms of
11  your patients?
12      A.  No.
13      Q.  Did you have any familiarity during
14  your time at Dixon with under what circumstances
15  an individual would be placed in four-point
16  restraints?
17      A.  No.  I mean, I -- from Cook County,
18  but, no, not at Dixon.
19      Q.  During your treatment of Anthony, we've
20  spoken about that Anthony was at least on one
21  occasion transferred to an outside facility for
22  treatment of some physical injuries, correct?
23      A.  Yes.
24      Q.  Was there ever a discussion about

113

1  sending Mr. Gay to an outside hospital for
2  treatment of his mental illness specifically?
3      A.  Yes.
4      Q.  Was there a facility, a particular
5  facility that came up in the course of those
6  conversations?
7      A.  Yes.
8      Q.  What facility was that?
9      A.  Elgin Treatment Center.
10      Q.  Was that your recommendation
11  specifically?
12      A.  Yes.
13      Q.  Were you given any information or
14  explanation as to why Mr. Gay wasn't transferred
15  to Elgin Treatment Center?
16      A.  Not exactly.  They said it wasn't ready
17  yet.
18      Q.  Did you ever discuss with your
19  superiors sending Mr. Gay to a private hospital
20  outside of the Illinois Department of
21  Corrections for treatment of Mr. Gay's mental
22  illness?
23      A.  A private hospital?
24      Q.  Yes.

114

1      A.  Or a state -- no.
2      Q.  How about any other state facility
3  other than Elgin?
4      A.  Yes.
5      Q.  What other state facilities did you
6  speak about sending Anthony to with your
7  superiors?
8      A.  Chester Mental Health Center.  That's
9  the other state hospital that takes forensic
10  patients in Chester, Illinois.
11      Q.  How long has Chester been open?
12      A.  I don't know the answer to that.  Since
13  the 1800s.
14      Q.  Is that spelled just like it sounds,
15  C-H-E-S-T-E-R?
16      A.  Yes.  I don't know when it opened.
17      Q.  In particular, did you recommend to
18  your superiors that Mr. Gay be transferred to
19  the Chester Mental Health facility?
20      A.  Well, when they -- I mean, when they
21  said that Elgin wasn't ready, I suggested
22  Chester.
23      Q.  To whom did you specifically make the
24  suggestion?

115

1      A.  Al Doyle.
2      Q.  What, if anything, did Dr. Doyle say in
3  response to that?
4      A.  He appreciated my concern about the
5  patient.
6      Q.  Did he say anything else to you about
7  the suggestion you gave him?
8      A.  Like -- no.  I mean, he appreciated the
9  suggestion.  He thanked me for offering it.  He
10  wasn't the only decision maker.  You know, that
11  was the extent of his response.  He wasn't in a
12  position to green light something like that.
13      Q.  Did he say anything to you about who
14  was in a position to approve that transfer?
15      A.  I don't know the answer to that.
16      Q.  Do you know whether Mr. Gay was
17  ultimately transferred to Chester?
18      A.  He wasn't.  He was released.  He was
19  released in August.
20      Q.  Can you recall approximately when you
21  made the suggestion to Dr. Doyle that Anthony be
22  transferred to Chester?
23      A.  I'd have to check my notes.
24      Q.  During your time at Dixon, had you ever

116

1  previously made the suggestion that any other
2  inmate be transferred to either Elgin or
3  Chester?
4      A.   Yes.
5      Q.   On how many occasions?
6      A.   I don't know the answer to that.
7      Q.   Of those inmates for whom you suggested
8  they be transferred to either Elgin or Chester,
9  do you know whether any of them eventually were
10  actually transferred to those facilities by the
11  Department of Corrections?
12      A.   Well, I don't know.  I mean, I don't
13  know.
14      Q.   Doctor, I'm going to show you a few
15  documents here.  I'm going to pull them up on my
16  screen, and I'll, for the record, refer to them
17  by their Bates numbers.  Let me know if you
18  can't see the document or if you want me to
19  scroll around within it so that you can have a
20  look at it before you start answering questions.
21  Does that sound fair?
22      A.   Yes.
23      Q.   Are you able to see the PDF here on the
24  screen?

117

1      MR. ATWOOD:  You've got the same
2  document in front of you, Doctor, if you want
3  to --
4      THE WITNESS:  Yes.
5  BY MS. WARD:
6      Q.   Great.  And for the record, I'm
7  referring to Bates No. Gay E-Mails Bates 518
8  through 521, and I'm going to refer to this as
9  Exhibit 2.
10      Is that a document that you have in
11  front of you, Doctor?
12      A.   Yes.
13      Q.   Is this a document that you're familiar
14  with?
15      A.   Yes.
16      Q.   What is this document?
17      A.   The treatment plan for Anthony Gay that
18  Jayne Braden asked me to work on when I met with
19  her.
20      Q.   Had you met with Mr. Gay prior to
21  creating this document?
22      A.   Yes.
23      Q.   I think you told me that was an
24  in-person meeting; is that correct?

118

1      A.   Yes, I'd met with him three times.
2      Q.   I'm looking at an item here on the
3  bottom of Page 2 of the document, but it'll be
4  Bates No. Gay E-Mails Bates 519.
5      One of the items of therapeutic focus
6  that you noted was threats of self-injury and
7  nonlethal self-injurious behavior.
8      Do you see that?
9      A.   Yes.
10      Q.   It appears that your objective was --
11  in both the short and the long term was simply
12  to reduce the rates of Mr. Gay's self-injury?
13      A.   Yes.
14      Q.   One of the items that you recommended
15  for intervention and treatment activities was
16  "Provide predictable continuity of care."
17      Do you see that?
18      A.   Yes.
19      Q.   What do you mean by "provide a
20  predictable continuity of care"?
21      A.   When you have -- when people have
22  trouble trusting the staff or when people feel
23  uncomfortable meeting with staff or are paranoid
24  about staff, you don't want them to engage in

119

1  acting out behavior in order to occasion a
2  meeting with staff, because people, you know,
3  when they feel desperate but have trouble
4  trusting tend to act out more, act out when
5  they're feeling desperate or agitated or upset
6  or desperate -- I guess I said that.
7      So, you know, instead, it's much better
8  to meet with people on regularly scheduled times
9  frequently.  Frequent but regularly scheduled
10  meetings so that it's built into the person's
11  treatment that you have regular daily contact
12  with the person at a certain time of day.  They
13  know when to expect it, they know who's going to
14  be meeting with them, the folks they're meeting
15  with are familiar to them, and they don't have
16  to act out in order to occasion a meeting with
17  the staff.
18      Q.   Did you feel that that predictable
19  continuity of care was something that had been
20  provided to Mr. Gay up until that point in his
21  treatment?
22      A.   I have no idea.
23      Q.   One of your further goals was to reduce
24  crisis watch status to DC as soon as it is safe

120



1  and clinically feasible.
2          What does DC stand for in this context?
3      A.   Discharge crisis watch status and the
4  crisis watch status.
5      Q.   Just as a general matter, why was it
6  one of your clinical goals to reduce Mr. Gay's
7  crisis watch status?
8      A.   Because when people are on crisis watch
9  status, they're wearing a safety smock and
10  blanket, they're in a bare cell, they spend
11  23 hours in the cell, whereas even if the person
12  is in segregation, the person still has, you
13  know, opportunity for recreation and out-of-cell
14  time and group attendance, plus greater
15  access -- well, more access to the telephone
16  than they would have if they were on crisis
17  watch when they have no access to the phone.
18      Q.   When an individual at Dixon is on
19  crisis watch, do they not have access to certain
20  group opportunities that people who are just in
21  segregation have?  Is that...
22      A.   That's right.
23      Q.   What would be the difference in
24  opportunities for group activities available to

121

1  someone simply in segregation versus somebody in
2  crisis watch?
3      A.   Crisis watch, there's no group
4  activity.  Segregation, I don't know what they
5  were doing on the weekdays, but I was seeing the
6  people for group on Saturdays and Sundays.  I
7  don't know how much group contact they had
8  during the week.  I wasn't involved in the
9  treatment planning and the scheduling during the
10  week, but I would see people in group on both
11  Saturday and Sunday.
12      Q.   Were you receiving any kinds of e-mails
13  or regular updates as to the kinds of group
14  opportunities that Mr. Gay may have been
15  afforded during the week when you weren't
16  present?
17      A.   So when he was on crisis watch, my
18  understanding is that people on crisis watch
19  didn't have group opportunities.
20          MR. ATWOOD:  Her question's a little
21  different.
22          THE WITNESS:  Oh.
23          MR. ATWOOD:  Listen closely to the
24  question.

122

1          Do you want to re-ask that?
2          MS. WARD:  Vicki, could you read the
3  question back.
4              (whereupon, the record was read
5               as requested.)
6          THE WITNESS:  No.
7  BY MS. WARD:
8      Q.   This item here, "Transfer to STC
9  setting for regular programming," am I correct
10  in understanding, then, that one of the goals
11  was to reintegrate Mr. Gay back in the
12  programming that was available for individuals
13  not on crisis?
14      A.   Yes.
15      Q.   Did you feel that those opportunities
16  would be beneficial to him from a psychological
17  standpoint?
18      A.   Yes.
19      Q.   I'm going to refer you next to a
20  document that I'm going to refer to as
21  Exhibit 3.  It may be in front of you.
22          For the record, those Bates numbers are
23  going to be Gay E-Mails Bates 575 and 576.
24          Is that a document that you have in

123

1  front of you, Doctor?
2      A.   Yes.
3      Q.   I want to direct you to the third
4  complete paragraph in this e-mail that begins --
5  well, first, let me ask you this:  Is this an
6  e-mail -- at the top of this document, is this
7  an e-mail that you drafted and sent?
8      A.   Yes.
9      Q.   It appears that you sent that to
10  Dr. Doyle, Dr. Braden, Dr. Gonzalez, and
11  Dr. Chess?
12      A.   Yes.
13      Q.   And that would have been on April 22 of
14  2018; is that correct?
15      A.   Yes, ma'am.
16      Q.   With regard to that paragraph, and I'll
17  read the first couple paragraphs, it says:
18  "Regarding Anthony Gay, nursing staff was
19  already claiming that they expected the medical
20  doctor to return him to X-House tomorrow
21  morning.  I just don't see this helping."
22          Was it your understanding this was a
23  medical doctor from an outside facility or was
24  this a medical doctor within Dixon Correctional?

124

1    A.    A medical doctor within Dixon
2  Correctional.
3    Q.    You indicate to your superiors that
4  you -- as you say, you don't see this helping.
5         Am I correct in understanding that from
6  your perspective that this wouldn't be a good
7  outcome for Mr. Gay?
8    A.    That's correct.
9    Q.    Why did you not believe that that was
10  going to be a good outcome for Mr. Gay?
11    A.    Well, I say -- the next sentence.
12    Q.    I'll read that: "He already has a
13  history of institutional infection and I can't
14  imagine it would make sense from a due diligence
15  perspective to return him to segregation with a
16  serious self-inflicted wound, a recent" --
17    A.    Yes.
18    Q.    Oh, I'm sorry, did I cut you off?
19    A.    No, that's it.  I mean, he had injured
20  himself.  He was sent to Bethune hospital in
21  Dixon for emergency treatment.  Once he got
22  there, he refused treatment.  He refused
23  antibiotics.  He already had had MRSA before.
24  He had refused medical care over there.  He came

125

1  thought it was more likely he would agree to
2  antibiotic treatment in a medical-type setting
3  than in X-House.
4    Q.    Why did you think that that would be
5  more likely?
6    A.    Because there's more medical staff
7  availability in a medical setting than there is
8  in X-House.  There's more opportunity to present
9  his, you know, treatment options and to secure
10  his trust in a medical setting than there would
11  be in X-House.
12    Q.    As a psychologist at this time in
13  Dixon, was it common for you to make
14  recommendations about inmate placement?
15    A.    No.
16    Q.    Given that it wasn't common for you to
17  do it, why did you feel that it was important to
18  make this remark with regard to Mr. Gay?
19    A.    Because he'd cut open his scrotum and
20  had to go to an outside hospital for emergency
21  medical care.
22    Q.    I'm going to refer you now to -- I'll
23  refer to this as Exhibit 4, and this will just
24  be Bates No. Gay E-Mails Bates 781.  I'll pull

127

1  back.  He was in the infirmary.  He refused care
2  there.  They wanted -- the doctor wanted to
3  return him to X-House, and I just -- you see my
4  comment.
5    Q.    When you say -- when you refer to it
6  not making sense from a due diligence
7  perspective, what do you mean by that?
8    A.    From the perspective of doing
9  everything possible to protect the patient from
10  further injury or health problems related to
11  their behavior.  If a person has a history of
12  infection, they have an open wound, you're
13  returning them to a setting, they're refusing
14  medical care, you already know you're going to
15  have a problem.
16    Q.    What from your perspective was the risk
17  of returning Mr. Gay to segregation in the
18  context of his recent --
19    A.    Opportunistic infection.
20    Q.    What, in your opinion, was your hope
21  for Mr. Gay rather than being returned to
22  segregation?
23    A.    Well, my hope was that he would agree
24  to antibiotic treatment, and, you know, I

126

1  it up on the screen here also.
2         Are you able to see the document,
3  Doctor?
4    A.    Yes.
5    Q.    My questions on this one are fairly
6  brief.
7         Who is Mark Fisher?
8    A.    He's another attending at Dixon,
9  another attending psychiatrist.
10    Q.    You indicate in this e-mail that you
11  were attempting to reach out to Dr. Fisher with
12  regard to Mr. Gay; is that correct?
13    A.    He was on call that weekend.  The
14  attendings take turns rotating on-call
15  psychiatry availability, and it was his turn
16  that weekend.
17    Q.    This appears to have been sent on
18  June 3rd of 2018; is that correct?
19    A.    Yes.
20    Q.    You indicate that Mr. Gay had been
21  involved in what you call very serious
22  self-injuries.
23         Do you recall what the nature of those
24  injuries was?

128



1    A.   On June 3rd?  I hadn't seen him for a
2  month at that point, but he was in -- he was in
3  Bethune -- he was sent to Bethune hospital for
4  three days on the 29th of May through the 1st.
5  He was supposed to be coming back -- I guess he
6  had come back already from the hospital on
7  the 3rd.  He was in the infirmary.  He was in
8  the infirmary, then they moved him back to
9  X-House on the 2nd, according to my timeline.
10   Q.   Did you interact with Mr. Gay during
11  the time that he was in the infirmary following
12  that self-injury?
13   A.   No.
14   Q.   Based on the fact that Mr. Gay had
15  continued to self-injure, did it appear to you
16  that Mr. Gay remained in a state of
17  decompensation?
18   A.   Yes.
19   Q.   What was the particular reason you were
20  reaching out to Dr. Fisher to address Mr. Gay's
21  self-harm?
22   A.   You know, I don't know.  I don't have
23  in my notes because I didn't see him after the
24  29th of April, but I know that he had

129

1  self-injured because he went to Bethune on
2  the -- May 29th to June 1st and he had come back
3  and was in the infirmary for one day, then
4  returned to X-House, so I'm assuming it had
5  something to do with his return to X-House.
6    Q.   Did you have concerns with Mr. Gay's
7  return to X-House following that serious
8  self-injury?
9    A.   I don't exactly remember, but I
10  wouldn't have tried to call the attending on
11  call to chitchat with him.  You know, I mean, I
12  would never call the attending on call on a
13  weekend for no particular reason.
14   Q.   Based on that, then, do you think it's
15  likely that you perceived Mr. Gay's immediate
16  mental health as an emergent situation?
17   A.   I can't say for sure if it was an
18  emergency, but I was concerned.
19   Q.   I'll direct you now to -- I'll refer to
20  it as Exhibit 5.
21       That Bates number, for the record, is
22  going to be Bates No. Gay E-Mails Bates 841.  I
23  think that might be the next page of the
24  document.  Do you have it in front of you?

130

1    A.   I do.  This is hard to read.  I have
2  to -- I can't tell you what this is.  I'm not
3  familiar with this document.
4    Q.   So this is not a document that you
5  yourself generated; is that fair to say?
6    A.   Right, yeah.
7    Q.   Is this a type of document that you
8  have seen or used before in your work at Dixon?
9    A.   No.
10   Q.   I'm reading this document to indicate
11  that Mr. Gay had been on watch for 704 days.
12       Assuming that that is accurate, based
13  on your experience with psychology in the
14  correctional setting, is that a significant time
15  for an individual to spent on watch within a
16  prison?
17       MR. ATWOOD:  You know, before we answer
18  that question, can you direct us to where you're
19  looking at on this?
20       MS. WARD:  Yeah.  So on document
21  Bates 41, there's a single line in the top
22  segment of the document that's unredacted that
23  pertains to Mr. Gay, and in the fourth column to
24  the right of Mr. Gay's name is where I'm seeing

131

1  this number.
2       THE WITNESS:  Yeah, the copy's not very
3  clear.  I see where you're saying, yes.  I mean,
4  you're asking me is that a long time to be on
5  crisis watch?
6  BY MS. WARD:
7    Q.   Yes.
8    A.   Well, I mean, by definition, crisis
9  watch is supposed to be for short-term crisis
10  situations.  700 days is almost 2 years.
11   Q.   What would that indicate to you about
12  Mr. Gay's mental state if he had, indeed, been
13  on crisis watch for 702 days?
14       MR. RUPCICH:  Object to vague and lack
15  of foundation.
16       MR. ATWOOD:  Do you understand that
17  question?
18       THE WITNESS:  What did it say about his
19  mental state?
20       MR. ATWOOD:  Read that one back,
21  please, Vicki.  Sorry about that.
22            (whereupon, the record was read
23             as requested.)
24       THE WITNESS:  He wasn't doing well.

132



BY MS. WARD:

Q.   When you said a moment ago that crisis watch is meant for short-term situations, can you explain to me what you mean by that?

A.   Well, by definition, a crisis is an acute uptick in concern about a person's mental health, either an acute period of decompensation, an acute period of suicidality, an acute period of aggressiveness related to psychotic symptoms, something like that, something that you then work to stabilize as quickly as possible.

Q.   In your work within the Department of Corrections, can you recall encountering any individual who had been on crisis watch for nearly a period of two years?

A.   I haven't seen these types of forms before.  I don't know how long people were on crisis watch -- I mean, I didn't see every single person on crisis watch.  You know, I generally divided up the people on crisis watch with another staff person, like a QMHP, and they -- I wasn't aware of how long people were on crisis watch.

133

Q.   In other words, is it fair to say that during your time treating Mr. Gay, you weren't receiving regular reports of how long your patients had been designated on crisis watch?

A.   Right.  That's right.

Q.   I'm going to refer you now to -- it's going to be Bates No. Gay E-Mails Bates 1537 through 1539.  I'm going to refer to that as Exhibit 6.  Let me know if you have it in front of you.  I'll pull it up on my screen as well in case you need it.

A.   I see it.

Q.   That's something that you have in front of you?

A.   13 -- oh, I'm sorry.  1537?

Q.   That's correct.

A.   Yes, I have it.  November 27, 2018?

Q.   That's correct.  This is also an e-mail sent by you; is that correct?

A.   Yes.

Q.   And particularly, it concerns your involvement in this particular litigation; is that correct?

A.   Yes.

134

Q.   I want to point you to -- there's a segment here in this e-mail in which you say: "I consulted with Dr. Doyle, the patient's psychiatrist; Dr. Stone, the patient's psychologist; and Dr. Chess, the state site administrator over my concerns about the patient's care."

Do you see that?

A.   I do, yes.

Q.   When you say that you consulted with them over your "concerns about the patient's care," can you explain to me what you mean by that?

A.   Well, we already looked at one of the e-mails, and there were other, you know, instances where I expressed concern about the care he was getting.

Q.   Were those the conversations that we spoke about earlier that occurred via telephone?

A.   Telephone and e-mail.

Q.   Other than those conversations that we've already discussed, can you recall any other instance in which you communicated with IDOC or Wexford employees about concerns with

135

Mr. Gay's care?

A.   Well, I can't say specifically.  I'm sure I talked to security also about Mr. Gay, but I don't have notes about that.

Q.   Why do you believe that you spoke to security with regard to Mr. Gay?

A.   Security was always manning the crisis watch tier, and the lieutenant or whoever was the shift commander was in charge of that area, and there would be regular discussion of Anthony Gay and other folks, but especially Anthony Gay because he wasn't doing well over there.

Q.   What was the substance of your discussion with security and about Mr. Gay not doing well?

A.   Basically, they kept -- the security staff would ask how come he kept being returned to the crisis watch tier, and I would express my concern about the fact that, you know, he was being moved out of the infirmary or being moved back from the hospital, those kinds of things.

Q.   Was it uncommon for an individual to return to crisis watch with the frequency that Mr. Gay was during the time you were having

136



1   these conversations with security?
2       A.   I don't know the answer to that.  I'm
3   not sure I -- I'm not sure how to answer that
4   question.
5       Q.   And specifically when you were having
6   these conversations with security, were you
7   expressing to them that you believed that
8   Mr. Gay would be better situated in the
9   hospitals he had been in?
10      A.   The hospitals -- you mean Bethune
11  hospital?
12      Q.   Yes.
13      A.   Well, Bethune...
14      MR. ATWOOD:  Do you want her to read
15  the question back?
16      THE WITNESS:  Not the hospitals that he
17  had been in, no.
18      MS. WARD:  Actually, Vicki, could you
19  read the question back for me.
20          (Whereupon, the record was read
21          as requested.)
22  BY MS. WARD:
23      Q.   So I'm going to -- I'm going to tweak
24  that question a little bit.

137

1           When you were speaking with security
2   during these conversations you've identified to
3   me, were you expressing to them that you
4   believed Mr. Gay would be better situated in an
5   outside hospital facility than in crisis watch?
6       A.   Yes.
7       Q.   On how many occasions would you
8   estimate that you had these conversations with
9   security?
10      A.   I don't know the answer to that.
11      Q.   Did you believe that these outside
12  hospitals would be able to provide Mr. Gay with
13  psychological care commensurate with his needs?
14      A.   Yes.  I hoped so.
15      MS. WARD:  May I have just two minutes?
16  I'm going to look at my notes.  I think I'm just
17  about done here.
18      MR. ATWOOD:  Sure.  Take a quick break.
19          (Whereupon, a short break was
20          taken.)
21      MS. WARD:  I just had a couple of other
22  questions, Doctor.
23  BY MS. WARD:
24      Q.   In the instances in which you met with

138

1   Mr. Gay yourself at Mr. Gay's cell, did Mr. Gay
2   ever request to you to speak to you in a more
3   private environment?
4       A.   I had one -- I had one meeting with him
5   in an interview room and Al Doyle joined us for
6   the meeting.  He was more comfortable with Al
7   Doyle.
8       MR. ATWOOD:  She asked you a different
9   question, though.
10      THE WITNESS:  Did he ever request --
11      MR. ATWOOD:  Listen to the question
12  she's asking.
13  BY MS. WARD:
14      Q.   In the instances in which you met
15  Mr. Gay cell side, did he ever ask you to --
16      A.   No.
17      Q.   -- meet with him -- okay.
18      He did not ask you to meet with him in
19  a more private environment.  Is that what I'm
20  hearing?
21      A.   That's right.
22      MS. WARD:  I don't have any further
23  questions for you at this time.  I think the
24  other attorneys will, but I appreciate you

139

1   taking the time with me here this morning.
2       THE WITNESS:  Thank you.
3       MR. RUPCICH:  I have a few questions.
4   If you all don't mind, I'll go.
5           EXAMINATION
6   BY MR. RUPCICH:
7       Q.   I'm Joe Rupcich, Doctor.  I represent
8   Wexford Health Sources, Dr. Renzi, and Dr. Puga.
9   I have a few follow-up questions for you, okay?
10      A.   Sure.
11      Q.   I want to talk about your time at Cook
12  County.
13      How long did you say you've been
14  providing mental healthcare at Cook County for
15  Cermak?
16      A.   I've been there 22 years, this time as
17  a doctor level psychologist, and I was there for
18  3 years as a master's person before that.
19      Q.   So you would have started there --
20      A.   Well, I started as a doctoral level
21  person in the year 2000, and I was there as a
22  master's level person from '81 to '83.  Then I
23  went to Northwestern, got my doctorate, I was
24  working at Northwestern and teaching there and

140

1  in private practice, then in 2000, I went back
2  to the jail as a psychologist.
3      Q.   And you have continuously provided care
4  at the jail since 2000?
5      A.   That's right.
6      Q.   Is that your full-time job?
7      A.   Yes.
8      Q.   Do you work Monday through Friday
9  there?
10     A.   Yes.
11     Q.   Has that been consistent since 2000?
12     A.   Yes.
13     Q.   I want to ask you about the study that
14  you said you participated in on the impacts of
15  segregation on inmates at Cook County, your
16  research?
17     A.   Uh-huh, yes.
18     Q.   Over what time frame are we talking
19  about that you gathered data?
20     A.   I started in 2010.
21     Q.   When did you finish?
22     A.   I'm still collecting data.
23     Q.   So have you made preliminary
24  conclusions along the way?

141

1      A.   I provided in-house reports along the
2  way in response to justice department requests
3  that were not under justice department
4  monitoring anymore, but I'm still collecting the
5  data.
6      Q.   Am I to understand there was a period
7  where Cook County Jail's mental health delivery
8  was under a consent decree?
9      A.   Right, yes.
10     Q.   Do you know when that consent decree
11  went into effect?
12     A.   Yes.
13     Q.   When?
14     A.   2010.  We were sued in 2008, the
15  settlement took place in 2010, and the
16  settlement was terminated -- the agreed order
17  was terminated by the courts in 2018, so the
18  period was 2010 to 2018.
19     Q.   Did that consent decree include a
20  finding that there was constitutionally
21  inadequate mental healthcare being provided in
22  Cook County?
23     A.   Yes.
24     Q.   Was a component of that finding related

142

1  to seriously mentally ill inmates?
2      A.   Yes.
3      Q.   Am I understanding that you were tasked
4  with working with a court monitor to remedy the
5  unconstitutional mental healthcare that was to
6  be resolved by the consent decree?
7      A.   I was tasked with monitoring -- I
8  wasn't asked by myself to remedy the problems.
9  I was asked by the monitor and by my own bosses
10 in the health and hospital system to track the
11 problem areas and come up with recommendations
12 along with my bosses, but my component of it was
13 tracking the incidents, and then working with
14 the other administrators on the solutions.
15     Q.   Was there a specific finding or -- was
16 there a specific finding in the consent decree
17 that you were specifically tasked with working
18 on to help remedy a particular problem?
19     A.   There were 41 line items that pertained
20 to mental health.  The rest of them pertained
21 either to medical, nursing, the sheriff's
22 office, or environmental services.  Our
23 component of it was 41 specific line items that
24 we were supposed to be looking into, monitoring,

143

1  and improving.
2      Q.   Were you in a supervisory role at
3  Cermak at all between 2000 and 2010?
4      A.   I would describe my role as middle
5  management.
6      Q.   Explain where you -- explain that,
7  please.
8      A.   Well, I supervised mental health staff.
9  I was an administrator on the inpatient unit
10 that was my responsibility at the time.  Now I
11 have all the inpatient male units, but I also
12 was responsible for training and with quality
13 improvement, but I wasn't the boss of the mental
14 health department.  I wasn't the director or the
15 chief psychiatrist or chief psychologist.  I
16 wasn't the chief of the department.
17     Q.   How big was the mental health staff
18 between 2000 and 2010?
19     A.   About 103 people.
20     Q.   How many did you supervise when you
21 said you were inpatient?
22     A.   At any point, 20.  That might be high.
23 I couldn't tell you exactly.  Less than 20.  15.
24     Q.   Of the 41 specific line items that

144



1  related to mental health in the consent decree,
2  were you tasked with any particular ones from
3  2010 on or were you --
4      A.  Yes.
5      Q.  What specifically were you tasked with?
6      A.  I couldn't tell you all of them.  I
7  didn't have all of them.  Some of them didn't
8  pertain to me.  Some of them had to do with
9  psychiatry, outpatient appointments and the
10  frequency, and that was something that we
11  monitored separately, and I didn't have to watch
12  that because it was tracked by the Cerner
13  system -- electronic medical record system, but
14  I had a number of topics that I was directly
15  responsible for.  Off the top of my head, I
16  couldn't tell you the exact number.  I would say
17  maybe, I don't know, 16 or 17 of them, something
18  like that.
19      Q.  And did I understand that one or more
20  of them touched on seriously mentally ill
21  patients in segregation?
22      A.  Yes.
23      Q.  Was that one topic or multiple?
24      A.  Well, more than one topic.

145

1      Q.  Are you able to see explain how that
2  topic broke down in the consent decree?
3      A.  I don't have the consent decree in
4  front of me, but things that we were monitoring
5  had to do with the number of staff assaults
6  involving segregation patients, the number of
7  staff assaults involving specifically mentally
8  ill segregation patients, the number of
9  use-of-force incidents, the number of
10  self-injuries, the number of completed suicides,
11  and then the response, once we started
12  programming in those areas and rounding, you
13  know, having staff contact with folks in those
14  areas, changes in those indices over time.
15      Q.  Do you remember the name of the consent
16  decree, like the -- I'm sorry, the name of the
17  case, the plaintiff's name?
18      A.  I think the other attorney asked me
19  that.  I just, off the top of my head, I don't
20  remember the lead defendant's name because
21  that -- I know Tom Dart -- I'm pretty sure Tom
22  Dart was listed as the number one as the first
23  named defendant.
24      Q.  He usually was.

146

1      MR. ATWOOD:  If you don't know, you
2  don't know.
3  BY MR. RUPCICH:
4      Q.  Okay.  No worries.
5      So it sounds like you would have been
6  collecting statistics on these staff assaults,
7  staff assaults in segregation by seriously
8  mentally ill inmates, and then tracking those
9  trends over time?  Am I understanding you?
10      A.  Yes.
11      Q.  How long was the data collection period
12  on these issues?  Did that go all the way until
13  the consent decree was dissolved?
14      A.  I'm still tracking the self-injuries
15  and the suicides.  Use-of-force incidents I
16  haven't been tracking since the end of the
17  consent decree.  My responsibilities changed and
18  I haven't had time to monitor everything that I
19  monitored before.
20      Q.  Were you asked to provide the raw data
21  to the court monitor?
22      A.  Yes.
23      Q.  Were you asked to interpret and draw
24  conclusions from that data for the court

147

1  monitor?
2      A.  Yes.
3      Q.  Who asked you to do that?
4      A.  The chief psychiatrist and, you know,
5  the chief psychologist.  Now, again, this wasn't
6  like I was providing these conclusions myself.
7  They would review my reports and make -- you
8  know, and approve them or make changes if they
9  thought they were necessary.
10      Q.  Do you know at what point between 2010
11  and 2020 you began providing conclusions based
12  on the data?
13      A.  I mean, I was interviewed twice a year.
14  The monitor would come a week at a time twice a
15  year, and I would be interviewed usually several
16  times during the week, often for several hours,
17  and we would go over all of my numbers, all of
18  my reports, all of the specific information with
19  the monitor, county attorneys, and the justice
20  department attorneys.  I couldn't give you exact
21  dates.
22      Q.  That's fine.
23      Did you include your conclusions and
24  recommendations in your reports or were those

148



1  something that were merely discussed, incidents
2  that you were providing them?
3      A.  Both, both.  I would include them in
4  the reports and we discussed them.
5      Q.  Were any of your recommendations
6  related to segregation of SMI inmates accepted
7  and implemented as Cook County policy or
8  procedure?
9      A.  I know that changes were made.  I don't
10  know if it's -- I don't want to make the
11  statement that they said, oh, Nunez said we
12  should do this, so let's do it.
13      Q.  What changes are you referring to?
14      A.  Limiting the amount of time my patients
15  spent in segregation, limiting the amount of
16  time people were housed alone in segregation
17  when they were in segregation, limiting -- you
18  know, changes in the amount of out-of-cell time
19  of segregation people.
20      Q.  When you say alone in seg, you mean not
21  double celled?
22      A.  Right, yes, housed individually versus
23  housed double cell.
24      Q.  And you mentioned a patient's time
149

1  alone in seg, meaning how long they could be in
2  segregation and single celled?
3      A.  Yeah, or in seg at all, you know,
4  reducing -- mitigating the ticket -- the number
5  of days people were supposed to spend in seg
6  based on severity of illness to limit the amount
7  of time in segregation.
8      Q.  Do you know when the policy or
9  procedure change limiting the amount of
10  segregation a seriously mentally ill inmate
11  could have at Cook County was made?
12      A.  I don't know.  I don't want to lie to
13  you.  I'd have to check my notes.  I don't know
14  off the top of my head.
15      Q.  Are you able to approximate if it was
16  closer to 2010 or closer to the end, closer to
17  2020?
18      A.  I just --
19      Q.  And that's fine if you don't know, but
20  I'm just trying to get a ballpark if you have
21  it.
22      A.  It had to be in the '13 or '14 window
23  because I know that we -- that was one of the
24  line items that we had 48 months full
150

1  compliance -- it was one of the earlier
2  compliance items.
3      Q.  When you say "compliance items," one of
4  the things the monitor recommended you do, and
5  then the county had 48 months to come into
6  compliance with it?
7      A.  No, that we had 48 -- we had 48 months
8  of full compliance, and the monitor didn't have
9  to track it in every single visit unless there
10  was an identified issue.  In other words, he'd
11  already signed off on it.
12      Q.  And same question with respect to
13  single celling in seg and changes in out-of-cell
14  time, is it fair that you don't remember the
15  specific dates those changes were made?
16      A.  Yeah, those were -- those were all --
17  you know, they were all part of the segregation
18  of SMI patients issue, and it was one of the
19  main -- that and the self-injury -- the general
20  self-injury issue, those were two of the main
21  things we tackled immediately.  They were two of
22  the biggest problem areas.
23      Q.  Would you agree with me that during
24  your time in correctional psychology, the
151

1  thinking on segregation and mental illness has
2  evolved?
3      A.  Yes, yes, I would agree with that.
4      Q.  It's changed over time?
5      A.  Yes, I do agree with you.
6      Q.  And the change has been moved toward
7  less segregation of mentally ill inmates?
8      A.  I would agree with that statement, yes.
9      Q.  And that's probably changed since you
10  started in 2000 up to 2010, right?
11      A.  Yes, I would say so, yes.  I couldn't
12  tell you the exact date, but over time, I have
13  seen it change, yes.
14      Q.  You had mentioned NCCHC standards on, I
15  believe you said, if I heard you correctly,
16  limiting segregation time to 15 days.  Did I
17  hear that right?
18      A.  Of SMI patients, yes.
19      Q.  Of SMI patients?
20      A.  Severely mentally -- yeah.  Not across
21  the board, but for SMI people.
22      Q.  Are you referring to the general
23  standards for health services in prisons that
24  NCCHC puts out at various times?
152



1    A.  Their manual, you know, the NCCHC
2  guidelines and revised guidelines for mental
3  health services in correctional institutions,
4  but, again, the comment I'm making is specific
5  to people that are designated SMI in jails and
6  prisons.
7    Q.  So it's a specific set of NCCHC
8  standards for mental health services?
9    A.  For mental health services of severely
10  mentally ill individuals in pretrial detention
11  and sentenced people in prison.
12    Q.  You don't happen to know any of the
13  dates of issue of this manual that would include
14  this 15-day recommendation, do you?
15    A.  It's on their website.  You know, every
16  few years, they issue a revision.  I, just off
17  the top of my head, can't tell you which
18  revision we were using at the time.  You know,
19  every few years, they reissue the manual for
20  mental healthcare, for medical care, and make
21  changes in it, and I don't want to be a liar and
22  tell you, oh, I -- I just can't tell you off the
23  top of my head.
24    Q.  I understand.

153

1        Dixon had an inpatient level of care in
2  2018 when Mr. Gay was there when we're talking
3  about, between March and August, right?
4    A.  Yes, he did -- yes, they did.
5    Q.  A patient could be designated inpatient
6  level of care?
7    A.  That's right.
8    Q.  And that would impact the frequency of
9  contact with mental health providers?
10    A.  Yes, that's right.
11    Q.  Now, I think you said a patient on
12  crisis watch, that's a different level of care?
13    A.  Right, that's right.
14    Q.  And they would have daily interactions
15  with a mental health provider?
16    A.  Yes, yeah.
17    Q.  You mentioned at one point an SMI alert
18  that was listed in the state's database.  Are
19  you talking about Offender 360?
20    A.  Yes, yes, that's exactly what I'm
21  talking about.
22    Q.  You were asked a few questions about
23  Tamms and you had mentioned that you were aware
24  that it -- I think was open for about 13 years

154

1  and then closed, right?
2    A.  Yes.
3    Q.  Did you ever visit there?
4    A.  No.
5    Q.  So you don't know what programming they
6  provided to mental health -- I'm sorry, to
7  seriously mentally ill inmates or inmates with
8  serious mental illnesses at Tamms?  You don't --
9    A.  That's correct, I don't know.
10    Q.  Would it be fair to say you don't know
11  specifically what services Mr. Gay was receiving
12  at any prison other than Dixon?
13    A.  That's correct.
14    Q.  You were asked at one point if the
15  treatment team could recommend increases in
16  out-of-cell time, and I believe you had said --
17  well, I don't know exactly what you said, but
18  correct me if I'm wrong.  My understanding was
19  the in -- I'm sorry, the out-of-cell time
20  available to SMI inmates was divided into
21  structured and unstructured?
22    A.  Yes.
23    Q.  And they would get a certain amount of
24  hours of structured and unstructured out-of-cell

155

1  time per week if they weren't on crisis?
2    A.  If they were not on crisis.
3    Q.  Is that right?
4    A.  Right, if they were not on crisis
5  watch, that's right.
6    Q.  That was established by the IDOC
7  standard operating procedure?
8    A.  That's my understanding, yes.
9    Q.  And then you were asked if the mental
10  health team could increase the amount, which I
11  understood to be asking you if they can increase
12  it above a ten hours structured, ten hours
13  unstructured that was typically available.  Do
14  you know the answer to that?
15    A.  No.  My memory is that I was asked
16  whether the mental health staff was able to
17  change the amount of time out of cell crisis
18  watch people had.
19    Q.  Well, my notes say could mental health
20  team increase out-of-cell time and --
21    A.  Of crisis watch -- well, okay.
22    Q.  Well, let's address that, then.
23        Did inmates on crisis watch get
24  out-of-cell time?

156



Pierre Nunes, Ph.D. 04/22/2022

1    A.   Yes, if the treatment team approved it,
2  along with the security administrator, like to
3  take a shower, for example.
4    Q.   So when an inmate was on crisis, the
5  out-of-cell time was a discretionary matter
6  based on the inmate's stability or risk of harm
7  to themself?
8    A.   That's right.
9    Q.   But an SMI inmate who was not on
10  crisis, they had set amounts of time they would
11  get out of their cell?
12    A.   That's my understanding, yes.
13    Q.   I see.
14         Do you know if Mr. Gay took his
15  out-of-cell time when he was not on crisis
16  watch?
17    A.   Well, I don't know the answer to that.
18  That was after my contact with him.  He was off
19  crisis watch after the end of April.
20    Q.   Do you know if he was offered
21  out-of-cell time while on crisis watch?
22    A.   Well, there was an instance where there
23  was some discussion about whether he was going
24  to be permitted to take a shower or not, and

157

1  that was based on, you know, the treatment
2  team's call, and I remember there was debate
3  back and forth about whether the treatment team
4  had approved it or not.  My understanding was
5  that this was something that was supposed to be
6  addressed on the weekdays by treatment team,
7  and, you know, I wasn't in a position to say one
8  way or the other.
9    Q.   Do you recall what the considerations
10  at play in whether he would get that out-of-cell
11  time were?
12    A.   He had a staff assault in the few days
13  prior to that weekend, and that was the -- that
14  was what was given as the reason for holding
15  things up.
16    Q.   The concern was safety?
17    A.   Safety, yes.
18    Q.   You were asked who -- this question, it
19  was a very specific question counsel asked you,
20  and I'm just not sure -- I want to make sure you
21  caught the nuance of it.  You were asked who had
22  responsibility for ensuring a treatment -- for
23  ensuring the effective -- sorry, give me one
24  second.  I can't read my own writing.

158

1    A.   Sure.
2    Q.   I believe the question was who had
3  responsibility for ensuring that a treatment
4  plan was effective for the patient, and I think
5  you said the mental health authority.
6    A.   Yeah.
7    Q.   Well, doesn't the effectiveness of the
8  treatment plan to some extent require the
9  patient's participation in that plan?
10    A.   Yes.
11    Q.   So a mental health authority, mental
12  health provider cannot guarantee the
13  effectiveness of the treatment plan, can they?
14    A.   No.  Guarantee it, no.
15    Q.   They can ensure the appropriateness of
16  the treatment plan, right?
17    A.   Right.
18    Q.   But whether it's effective depends on
19  the patient.  Do you agree?
20    A.   Sure.  Yes.
21    Q.   Okay.  I want to show you -- you were
22  asked about the Rasho settlement agreement.  Do
23  you recall that, toward the beginning?
24    A.   Yes.

159

1    Q.   And you were invited to agree with
2  counsel that the Rasho settlement agreement
3  included a finding the mental health treatment
4  was inappropriate.  Do you recall that?
5    A.   Yes.
6    Q.   You don't know that, do you?
7    A.   I can't comment on -- you know, I
8  wasn't employed by, you know, Wexford or IDOC
9  and I wasn't present in any other facilities
10  during the period under review in the lawsuit.
11    Q.   I appreciate and understand that, but
12  for purposes of the record, you would agree that
13  counsel suggested to you that that settlement
14  agreement included a finding that the mental
15  health treatment in the department was
16  constitutionally inadequate.  Do you remember
17  that question?
18    A.   I remember being asked that.  I mean --
19    Q.   I'm not saying you agreed to it.
20    A.   Okay.
21    Q.   I'm saying you were asked it.
22    A.   I was asked it.  I don't have -- I
23  don't have a copy of the agreed order in front
24  of me.

160



1    Q.   Lucky for us, I do.
2    A.   Oh, okay.  Okay.
3    Q.   Can you see it?
4         Can everyone see what I'm sharing?
5    A.   Yes, I see it.
6         MR. RUPCICH:  What exhibit are we on?
7    Let's make this 7.
8    BY MR. RUPCICH:
9    Q.   Doctor, I'm showing you a document
10   we'll mark Exhibit 7, Ashoor Rasho Amended
11   Settlement Agreement, and I will scroll to the
12   bottom and show it was entered 23, May, signed
13   in May 2016.
14        I want to specifically have you look
15   at -- give me one second -- Subparagraph F of
16   the introduction:  "Without conceding any
17   infirmity in their claims or defenses, after
18   extensive discovery, the parties have engaged in
19   arm's length settlement negotiations to resolve
20   the claims raised by this action as set forth in
21   Plaintiffs' third amended complaint.  Plaintiffs
22   and defendants have reached an agreement for
23   settling this litigation and the parties" --
24   "that the parties believe is fair, reasonable,

161

1    and adequate to protect the interests of all
2    parties.  The parties believe this settlement
3    agreement will benefit mentally ill offenders
4    who are confined in correctional facilities
5    under defendants' control."
6         Moving on to Subparagraph H:  "By
7    entering this settlement agreement, the
8    defendants do not admit to any liability
9    regarding the allegations made in this action.
10   Moreover, this settlement may not be used as
11   evidence of liability or lack of liability in
12   any other legal proceeding."
13        Did I read that correctly?
14   A.   Yes.
15   Q.   Who are the Savage Life?  I didn't
16   catch what exactly that was, the Savage Life
17   people?
18   A.   Savage Life was a jailhouse gang that
19   started in Cook County among a very small group
20   of pretrial detainees who had a very high rate
21   of self-injury of various types and other types
22   of disruptive acting out behavior, and they
23   called themselves Savage Life, and the issue was
24   that they were trying to cause as much

162

1    disruption as possible in the jail, damage to
2    property, flooding, self-injury requiring trips
3    to the hospital, staff assaults, et cetera.
4    Q.   And some of these gang members came to
5    Dixon?
6    A.   Just about all of them.  There were
7    about 30 or 35 people, and by the time I got to
8    Dixon, most of them were on C wing in X-House.
9    They had been convicted by that point.  These
10   were all people with serious charges who were in
11   Division 9 in the super max division at Cook
12   County Jail, fighting serious charges at the
13   time.
14   Q.   Is C wing X-House segregation?
15   A.   Yes, it's a segregation unit.
16   Q.   Which wing of X-House was crisis?
17   A.   B, as in boy.  C was the SMI seg unit.
18   Q.   As a practical matter, if you are on
19   crisis watch at Dixon in let's say 2018 when
20   Mr. Gay was there, whether you are seg status at
21   the time you were on crisis watch or nonseg
22   status, does that affect any of your privileges,
23   out-of-cell time, contacts with mental health,
24   or is it the same for everyone on crisis?

163

1    A.   I would say it doesn't directly affect
2    it.  You're right.  You're right.  It doesn't
3    directly affect it, but if you had a staff
4    assault in the immediate period within a -- you
5    know, a few days before the contact, then, you
6    know, like in Mr. Gay's, that would be a basis
7    for saying, well, you can't let this guy out to
8    take a shower because he just attacked a staff
9    person two days ago or three days ago or
10   whatever it was.
11   Q.   That makes sense.
12        You'd said you discussed some of the
13   reduction methods used in Cook County with
14   people after you came to Dixon.  Do you remember
15   saying that?
16   A.   Yes.
17   Q.   What specific reduction methods are you
18   referring to?
19   A.   Capping seg time for SMI patients.
20   Q.   Did you have an understanding if there
21   were any mechanisms in place in 2018 in which
22   SMI offenders' mental health was taken into
23   account in disciplinary proceedings?
24   A.   I can't answer that question.  I don't

164



1  know.
2      Q.   You don't know as you sit here if in
3  2018, SMI offenders had their mental health
4  considered in meting out discipline?
5      A.   Right, I don't know.
6      Q.   Other than capping seg time, any other
7  specific reduction methods that you discussed
8  with people at corrections?
9      A.   Can you repeat -- can ask me that --
10  say that one more --
11     Q.   Sure.  Other than the capping of
12  segregation time, are there any other of the
13  reduction methods that you used at Cook County
14  that you discussed with people within IDOC after
15  coming to IDOC?
16     A.   See, at Cook County, we don't have
17  crisis watch status.  You know, we don't have
18  crisis watch status.  We have close observation
19  when people are in the hospital, but we don't
20  have crisis watch status when people are not in
21  the hospital, so the system is a little
22  different that way, so the things that we talked
23  about, you know, there were differences in the
24  way things are set up at IDOC that made -- some
165

1  of the changes that we made, you know, it's sort
2  of difficult to apply to IDOC, I guess, is the
3  way I would put it.
4      Q.   But my specific question was you had
5  mentioned that you brought up capping seg
6  time --
7      A.   Yeah, capping seg time.
8      Q.   -- with people at IDOC, and my question
9  is was there anything else other than that you
10  brought up?
11     A.   Yeah, I mean, you know, capping seg
12  time, time out of cell, programming of seg
13  people -- you know, programming for seg people.
14  Those were the main things.
15     Q.   Now, in 2018, there was a protocol for
16  structured and unstructured out-of-cell time for
17  segregation in --
18     A.   There was, yes.
19     Q.   Oh.  Were you recommending further
20  changes to that?
21     A.   I was recommending the application of
22  those changes to crisis watch people.
23     Q.   Right.  Capping segregation time would
24  not have impacted Mr. Gay because he was on --
166

1  he was on crisis watch; is that fair?
2      A.   Yeah, I mean -- yeah, I -- yes.
3      Q.   So it was your belief individuals on
4  crisis watch should receive programming and more
5  out-of-cell time?
6      A.   Yes.
7      Q.   Now, how would you balance that with an
8  offender who had just committed a staff assault
9  that was viewed as being a threat to the safety
10  of the institution?
11     A.   Well, again, the purpose of having
12  people out of their cell is not so that you give
13  them a fresh opportunity to attack you again
14  after they just attacked you two days ago, so,
15  you know, obviously, I'm not giving, as a
16  general example, you attacked me yesterday, so
17  let me let you out of the cell, give you a
18  second crack at me today.
19     Q.   So what you're saying is, as a general
20  matter, it was worth considering ways of getting
21  more out-of-cell time and mental health
22  programming to crisis watch offenders?
23     A.   Yes, that's right.
24     Q.   But obviously, it would have to be
167

1  looked at on a case-by-case basis?
2      A.   Yes, that's right.
3      Q.   And you are not saying here today that
4  Mr. Gay was an appropriate candidate at any
5  particular time for additional out-of-cell time
6  while on crisis watch?
7      A.   Yeah, I can't comment on -- you know,
8  I -- yeah, I can't comment on the specifics.  I
9  know that he had that staff assault.  You know,
10  I know that he was sent back and forth to the
11  infirmary and to outside hospitals.  I didn't
12  track his acting out episodes on a day-to-day
13  basis because I was only there on weekends and I
14  wasn't involved in his care at all after the
15  first month after April.  I can't comment on
16  when he might have been an appropriate candidate
17  or when he wouldn't be an appropriate candidate.
18     Q.   So those recommendations were not made
19  specifically as to Mr. Gay.  They were general?
20     A.   Right.  That's right.
21     Q.   Now, we did talk a little bit about you
22  specifically recommending Mr. Gay be moved
23  either to Elgin or to Chester Mental Health,
24  right?
168



1    A.   Yes.
2    Q.   And I jotted down the names of the
3  people that you referred to as your bosses to
4  whom this communication was made.  I got Chess,
5  right?
6    A.   Yeah, the people that -- the specific
7  conversations that I usually had about this
8  particular issue was when they were talking
9  about civilly committing him on his release
10  date, and the person that I talked to the most
11  about this was Al Doyle, because they were
12  talking about sending him to a state psychiatric
13  hospital, which would have been Elgin or Chester
14  anyway, so my argument was if the plan is to
15  send this guy to a state hospital when he's
16  released from prison, why not send him now
17  two months before he's released or whatever it
18  is, 90 days before he's released, and they'll be
19  in a much better position to evaluate him on his
20  release date, if he does need to be civilly
21  committed, to remain in the state hospital.
22    Q.   I see, and Chester Mental Health is
23  operated by the Illinois Department of Human
24  Services, right?

169

1    A.   Right, they both are.
2    Q.   They both are?
3    A.   Yeah, I mean, except for Elgin
4  Treatment Center has two units that are run by
5  IDOC.  That's where I'm working now.
6    Q.   Okay.  Right, but it was you were told
7  when Mr. Gay was at issue those units were not
8  taking inmates?
9    A.   That's right.
10    Q.   Do you know if IDHS was taking any
11  current inmates into their facilities?
12    A.   I don't know the answer to that.
13    Q.   In your years with corrections now
14  since you started with Wexford, are you aware of
15  any patients who were serving their IDOC
16  sentences who were transferred to the Illinois
17  Department of Human Services?
18    A.   No, I don't know the answer to that.
19    Q.   As you sit here, you don't recall any?
20    A.   Well, I couldn't -- I mean, I have a
21  vague memory, but I couldn't tell you the names
22  of any specific individual.  I mean, we're
23  talking about over the history of IDOC and DHS?
24  I seem to recall there might have been, but I

170

1  just couldn't tell you who and I couldn't tell
2  you when.  I mean, if it was categorically out
3  of the question, you know, I wouldn't -- you
4  know, wouldn't have been worth bringing up.
5    Q.   Did you do any research into the issue
6  before recommending Mr. Gay be sent early to
7  IDHS?
8    A.   No, I didn't.
9    Q.   Did you discuss it with the treatment
10  team at Dixon?
11    A.   Yes.
12    Q.   Who would that be?
13    A.   Al, I talked to Al Doyle about this
14  more than once.
15    Q.   Was Al -- forgive me, was he Mr. Gay's
16  treating psychiatrist?
17    A.   Yes, yes.
18    Q.   Did he say anything about the
19  Department of Corrections' ability to transfer
20  current inmates serving a criminal sentence to
21  the Department of Human Services?
22    A.   He didn't comment one way or the other.
23  He just thanked me for my concern and said he
24  would mention it to the treatment team.

171

1    Q.   Who was the mental health authority at
2  Dixon?
3    A.   Jamie Chess.
4    Q.   Did you ever specifically talk to
5  Dr. Chess about transferring Mr. -- sorry, let
6  me finish -- transferring Mr. Gay to IDHS?
7    A.   No.  My conversations with Jamie Chess
8  were earlier during the period when he was, you
9  know, self-injuring and in crisis watch and
10  going back and forth to Bethune hospital and
11  then back to the -- you know, back and forth
12  between the infirmary and X-House.
13         My conversations with Al Doyle were
14  later when it was getting closer to his release
15  date and they were talking about civilly
16  committing him.
17    Q.   So would it be fair to say that the
18  issue of placing him in IDHS early was triggered
19  by your knowledge that they were considering
20  putting him there on civil commitment on
21  release?
22    A.   Yes.  Yeah, my concerns about the
23  infirmary -- yes, my concerns about -- yes,
24  that's right.

172



1    Q.   Would it be correct that your
2  discussions with Dr. Doyle about the transfer of
3  Mr. Gay to IDHS came about after you had stopped
4  seeing Mr. Gay on crisis?
5    A.   Well, that particular thing, the Elgin
6  Treatment Center discussion had to do with the
7  fact that he was refusing medical care when they
8  would send him to Bethune hospital after he slit
9  open his scrotal sac and was inserting pieces of
10 gravel into it and then, you know, refusing
11 antibiotic treatment after he had already had
12 MRSA, and I thought he should go back to the
13 hospital, or if Bethune wouldn't take him back,
14 then either JTC or ETC.
15   Q.   Were you looking more towards his
16 transition back to the community?  Is that what
17 your concern was?
18   A.   That was my concern later, but in
19 April, my concern --
20   Q.   Right.
21   A.   -- the risk of him getting an
22 opportunistic infection because of refusing care
23 at Bethune then being sent back and then
24 refusing care again in the infirmary, and

173

1  instead of staying in the infirmary, being sent
2  back to X-House.
3    Q.   Right.  We looked at that e-mail where
4  you had said that nursing staff had suggested
5  the doctor may return Mr. Gay to X-House?
6    A.   Right, that's right, and I didn't think
7  it would help.
8    Q.   Right.  So that was just sort of based
9  off of hearsay from the nurses?
10   A.   He had had an opportunistic infection
11 previously because of refusing care after a
12 self-injury episode, and I was worried that he
13 might get another one.
14   Q.   Now, did you look at the medical
15 records to determine after your e-mail if
16 Mr. Gay was, in fact, discharged back to X-House
17 or whether he remained in the infirmary?
18   A.   I saw him again in X-House the
19 following weekend.
20   Q.   Do you have all the dates of your
21 encounters written down there?
22   A.   Yes.
23   Q.   Would you mind reading them off to me?
24   A.   Sure.  I saw him on March 31, April 7,

174

1  April 14, April 15, April 22, April 28, and
2  April 29.  The particular phone conversation --
3         MR. ATWOOD:  He asked you the dates you
4  saw him.  You gave them to him.
5         THE WITNESS:  Okay.  Right.
6  BY MR. RUPCICH:
7    Q.   What was the date of that phone
8  conversation you were talking about?
9    A.   Okay.  I talked to Chess and Doyle on
10 the 15th of April and...
11   Q.   What are you looking at to determine
12 you talked to Chess and Doyle on the 15th of
13 April?
14   A.   My e-mails and the patient notes.
15   Q.   Is there a Bates number on the e-mail
16 from 4/15 to Chess and Doyle?  Is that one we
17 looked at today?
18   A.   No -- or I don't know if it is.  Let me
19 check.  I don't know that we did.  I have my own
20 copies --
21         MR. RUPCICH:  Have these been produced?
22         MR. ATWOOD:  All the e-mails that he
23 has sent to anybody have been produced in this
24 case.  Regarding Mr. Gay, that is.

175

1         THE WITNESS:  I don't think it's in
2  this packet of e-mails.  I don't see it, but I
3  know that I sent it.
4         MR. ATWOOD:  You answered his question.
5  It's not in the e-mails that were reviewed
6  today.
7         THE WITNESS:  That's correct.
8  BY MR. RUPCICH:
9    Q.   It is not in any e-mails you reviewed
10 to prepare for your deposition?
11   A.   That's not what I said.
12         MR. ATWOOD:  No, it's not in the
13 exhibits that were reviewed today.
14         THE WITNESS:  Right.  That's right.
15 BY MR. RUPCICH:
16   Q.   Do you have it there with you?
17   A.   Yes.
18   Q.   Does it have a Bates number on it?
19   A.   What's that?
20         MR. ATWOOD:  He's looking at his own
21 set of e-mails, I think.  We'll find it.  Hold
22 on, I'll get you the date.
23         MR. STALEY:  For the sake of time, I
24 don't know if this is the one you're looking

176



1  for, but Bates 533 includes an e-mail from
2  April 15th.  That should be in the packet that
3  we received this morning.
4  MR. RUPCICH:  533?
5  MR. STALEY:  Right.
6  BY MR. RUPCICH:
7  Q.  Doctor, are you referring to the e-mail
8  where you sent your treatment plan?
9  MR. ATWOOD:  Doctor, listen to the
10 question he's asking.
11 BY MR. RUPCICH:
12 Q.  I'm sorry.  I was asking you to look
13 for something, but maybe I can cut to the chase.
14 A.  I'm looking for e-mails that pertain
15 specifically to the concerns that I had about
16 Mr. Gay when he was first moved to the hospital
17 after his -- after slitting open his scrotum
18 around the time of the 15th.
19 Q.  So it's not this e-mail from Pierre
20 Nunez, April 15, to Braden and --
21 A.  The lower one, the 22nd.
22 MR. ATWOOD:  Doctor, hold on.  Stop.
23 He asked you a question.
24

177

1  BY MR. RUPCICH:
2  Q.  It's not this one I put up.  That's not
3  what you're talking about.  That's what Nick --
4  MR. RUPCICH:  Nick, that's what you're
5  referring to, right?
6  MR. STALEY:  Correct.
7  THE WITNESS:  That's not the one.
8  MR. ATWOOD:  You're referring to a
9  Sunday, April 22, 2018 e-mail?
10 THE WITNESS:  Yes.
11 MR. RUPCICH:  I thought he had said he
12 had in his notes an e-mail of April 14 to Chess
13 and Doyle.
14 THE WITNESS:  It's a phone consult.
15 MR. ATWOOD:  We got to stop.  We got to
16 get organized.  You got too many things in front
17 of you.
18 MR. RUPCICH:  Here's what I want to do.
19 I'll finish questioning, maybe we'll take a
20 quick break, and you guys figure out what he has
21 there.  Does that work?
22 MR. ATWOOD:  What exactly is the
23 document we're looking for now?
24 MR. RUPCICH:  Well, he referenced

178

1  April 15, 2018 e-mail to Chess and Doyle.
2  MR. ATWOOD:  Pay attention to the
3  question.
4  BY MR. RUPCICH:
5  Q.  April 15, 2018 e-mail to Chess and
6  Doyle.  That's what you mentioned when you were
7  looking at your notes, and I'm wanting to know
8  that e-mail.
9  MR. ATWOOD:  In your timeline that you
10 have here, April 15th, what is it?
11 THE WITNESS:  Phone consult with
12 Dr. Chess and Doyle.
13 MR. ATWOOD:  It's a phone consult?
14 THE WITNESS:  Right.
15 MR. ATWOOD:  And you're saying that
16 there's an e-mail that confirms that that phone
17 consult exists.
18 THE WITNESS:  I'm looking for it.
19 MR. ATWOOD:  Okay.  Why don't we take
20 five minutes and we'll try to see if we can find
21 it.
22 MR. RUPCICH:  Okay.
23 (whereupon, a short break was
24 taken.)

179

1  BY MR. RUPCICH:
2  Q.  I wanted to ask you, you've referred
3  several times to your notes.
4  Are those notes that you made to help
5  yourself prepare for the deposition?
6  A.  No.  E-mails and patient notes.
7  Q.  So you're referring to your e-mails and
8  your patient -- Mr. Gay's progress notes,
9  essentially?
10 A.  Right, that's right.
11 Q.  Did you do your own search through your
12 e-mail accounts for stuff related to Mr. Gay?
13 A.  Yes.
14 Q.  So the ones that you have, did you
15 print some and --
16 A.  Yes.
17 MR. ATWOOD:  Yeah, he printed some of
18 his e-mails, and that's the stuff I just
19 referred to.
20 BY MR. RUPCICH:
21 Q.  Did those come from an Illinois.gov
22 e-mail or a Wexford e-mail?  Do you know?
23 A.  Illinois.gov because I don't have a
24 Wexford e-mail account anymore.  I don't know,

180



1  they -- I don't have two, you know, accounts,
2  two separate accounts.  My account is
3  Illinoiscare.nunez@illinois.gov.
4      Q.   Fair enough.  I'll just wait till I see
5  them.
6           You listed the dates of your encounters
7  with Mr. Gay, and I just want to make sure I
8  have them:  March 31, April 7, April 14,
9  April 15, April 22, April 28, and April 29?
10     A.   You know, she's got my copy of the
11  timeline -- oh, here, she's coming.
12          March 31, April 7, April 14, April 15,
13  April 22, April 28, April 29, so it's seven
14  visits.
15     Q.   Were these -- were any of these group
16  therapy or are these all crisis watch?
17     A.   Crisis.
18     Q.   They're all crisis?
19     A.   All crisis.
20     Q.   Do you recall Gay ever attending a
21  group you led?
22     A.   He didn't attend any of the groups.  I
23  have his refusals -- I have all of his refusals
24  listed.

181

1      Q.   So that e-mail that you sent to -- let
2  me see if I can -- sorry.  Give me one second.
3  Okay.  I'm going to share with you.
4           Did that share the e-mail of June 3,
5  2018?
6      A.   Yes.
7      Q.   You had sent this to Dr. Fisher, you
8  said?
9      A.   Yeah.  I was trying to reach him, yes.
10     Q.   So according to the dates you gave me,
11  you had not had any encounters with Mr. Gay in
12  over a month as of the time you sent this?
13     A.   Right.
14     Q.   How did you come to acquire information
15  about Mr. Gay if you had not had any clinical
16  interaction with him in over a month?
17     A.   Self-injuries -- let me just check the
18  dates.  Okay.  He had had two self-injuries on
19  the same day, May 29th.  He went to Bethune
20  hospital, then came back and was sent the same
21  day, 29th -- he came back to the infirmary, then
22  he was sent back to X-House, then he injured
23  himself again in X-House that same -- on the
24  29th again, then went back to Bethune again that

182

1  same day and stayed there for three days, and
2  I'm assuming this had to do with his return from
3  Bethune to Dixon.
4      Q.   So my question is, how did you find out
5  this information about Mr. Gay to reach out to
6  Dr. Fisher?
7      A.   I don't know the answer to that
8  question.  Obviously, I was told by somebody
9  that there was a concern about him.  I just -- I
10  can't remember off the top of my head and I
11  don't know what it was.
12     Q.   After you stopped seeing Mr. Gay on
13  crisis watch in April of 2018, did you continue
14  to follow his medical and mental health records?
15  Did you continue to look at them?
16     A.   No, it wasn't that.  It was the staff
17  expressing concern about him.  I just can't
18  remember exactly what it was, but I know that I
19  was aware he had been going back and forth
20  between the infirmary and Bethune, and staff was
21  concerned about him, and, you know, I mean, I'm
22  the weekend psychologist, so the subject comes
23  up where they're saying, like, you know, we're
24  having a problem with Anthony Gay again, he hurt

183

1  himself, he went to the hospital, he came back,
2  he's refusing care, but I couldn't give you the
3  exact description of what happened that
4  particular day, but I know he went twice in a
5  24-hour period to Bethune, and I'm assuming it
6  had to do with that.
7      Q.   When the plaintiff's counsel was
8  questioning you about this time frame when you
9  sent this e-mail, you agreed that Mr. Gay was in
10  a state of decompensation.  Do you remember
11  that?
12     A.   I don't know about June 1st or whatever
13  it is, June 3rd specifically.  I don't know that
14  she asked me about June 3rd, did she?  I
15  don't --
16     Q.   Do you recall being asked anything
17  about Mr. Gay being in a state of
18  decompensation?
19     A.   Ever?  Sure.
20     Q.   What do you remember?
21     A.   Well, that she asked me if he was
22  decompensated, and I said he was.
23     Q.   When were you referring to?
24     A.   Definitely the times I saw him, and

184



1  when I didn't see him and he was sent back and
2  forth twice in one day to Bethune from Dixon, I
3  mean, I think anybody would say that's not
4  evidence of stabilization, you know.  I mean,
5  it's not like this guy's doing great.  He just
6  went back and forth twice in one day to Bethune
7  hospital.
8      Q.   Do you know what his baseline behavior
9  was?
10     A.   His baseline with us?
11     Q.   Yes.
12     A.   I didn't really see him long enough,
13 but from what I understood, he wasn't doing
14 well.  I mean, I haven't -- you know, this is a
15 guy that was locked up for more than 20 years.
16 I really don't -- couldn't tell you what, you
17 know, his baseline over that 20-year period was.
18     Q.   Well, to make a determination he was
19 decompensating, wouldn't you need to know what
20 his baseline was?
21     A.   Maybe a more accurate way of describing
22 it is that he was coming to staff attention
23 because of repeated self-injuries that required
24 outside hospitalization.

185

1      Q.   Okay.  I appreciate that.
2      A.   Now, whether they're baseline or not
3  baseline, you're right.  I mean, that's -- I
4  can't comment because I didn't lay eyes on him,
5  but he was in a state of, you know, repeated
6  self-injury within a 24-hour window that
7  required, you know, hospital attention outside
8  of Dixon.
9      Q.   When you say Mr. Gay on crisis watches
10 in April, was he cooperative with you?
11     A.   No.
12     Q.   Did he engage you?
13     A.   He talked to me, but he wasn't happy
14 about talking to me.  He wanted to talk to a
15 female staff person and thought I was a
16 homosexual and that I was -- he was going to
17 file a PREA complaint against me.  He didn't
18 actually file one, but he said he was going to,
19 you know, that kind of stuff.
20     Q.   Do you recall what level watch he was
21 on, continuous, ten minute?
22     A.   Well, it was on different levels on
23 different occasions.  I could check my notes
24 here and tell you.  Do you want me to --

186

1      Q.   Well, I guess what my question was
2  going to be, first, did you ever recommend
3  lowering his level of watch?
4      A.   Yes.
5      Q.   You did?
6      A.   Yes, yeah.
7      Q.   Did you ever recommend he be removed
8  entirely from crisis watch?
9      A.   That, I'm not allowed to do.  I'm not
10 allowed to take people off watch on the
11 weekends.  The weekday team are the only folks
12 that are allowed to take people off crisis
13 watch.
14     Q.   You're allowed to change the frequency
15 of the watch, but you can't entirely end the
16 watch; is that correct?
17     A.   Right, right, that's right.
18     Q.   Are you able to make a recommendation
19 for weekday staff to terminate watch when they
20 get there on Monday?
21     A.   Yeah, I can make a recommendation.
22 It's not like -- I mean, the person has to be on
23 30-minute watch to be considered to be taken off
24 watch.  I could put a person who's on 15-minute

187

1  watch to 30-minute watch, and the fact of being
2  on 30-minute watch conveys the idea that he's on
3  the last step of crisis watch, and therefore,
4  eligible to come off crisis watch at some point
5  during the week because I'm not able to take him
6  off on the weekend.
7      Q.   I understand, so a patient is not able
8  to sort of skip rungs of the watch.  You must go
9  from 10 to 15 to 30, right?
10     A.   Yes.
11     Q.   Are you able to determine if you ever
12 moved Mr. Gay to 30-minute watch?
13     A.   I'd have to check.  I would have to
14 look.  I'm looking real fast here.
15          No, I don't believe I did.  I know that
16 I downshifted him, and the rest of the times --
17 I mean, he was going back and forth between
18 Bethune and the infirmary, and I wouldn't be in
19 a position to downshift him on the day that he
20 was returning from Bethune.  You know, I mean,
21 they would be calling me up on Monday morning,
22 asking me what the hell did you do that for, you
23 know, that kind of thing.
24     Q.   So it's fair to say during the month

188

1  you were seeing Mr. Gay for crisis you were
2  never in a position to move him to 30-minute
3  watch as the --
4      A.  Coverage person, weekend coverage,
5  right, that's right.
6      Q.  And to your knowledge, he was never on
7  a 30-minute watch when you saw him on the
8  weekends in April, so no one else moved him to
9  30?
10     A.  I mean, if he was moved to 30, I'm not
11 aware of it.
12     Q.  Understood.
13         MR. RUPCICH:  Do we have those records
14 yet?
15         MR. ATWOOD:  I'm going to send it to
16 you right now.
17 BY MR. RUPCICH:
18     Q.  Doctor, right at the end, you had said
19 there were discussions between you and security
20 staff at Dixon about Mr. Gay's placement in
21 X-House on crisis watch.  You recall that?
22     A.  Yes.
23     Q.  Do you know specifically what security
24 staff, wing officer, lieutenant, white shirt?
                                              189

1      A.  What are they -- the name of the
2  person?
3      Q.  Or the position.
4      A.  Well, the boss of the security staff in
5  X-House is a lieutenant, so, you know, the
6  lieutenant, there's also -- they also have the
7  sergeant, but, I mean, I just couldn't tell you
8  off the top of my head.  I mean, they've got a
9  lot of, you know, shift commanders.  They rotate
10 through the institution.  People provide
11 coverage when another person isn't there.  You
12 know, they've got a lot of white shirts.  I just
13 couldn't tell you the names after four years of
14 specific white shirts they had over there at any
15 given time, but the general tone of the
16 conversation was what are we supposed to do with
17 this guy in this building, you know.  This guy
18 is self-injuring all the time, they're having
19 problems with him all the time, what are we
20 supposed to do with him.
21     Q.  That's what security's position was?
22     A.  Yeah, well, they were responsible for
23 watching him 24/7.  You know, they were
24 providing coverage.  You know, it's 12 cells,
                                              190

1  and they have, I don't know, three or four
2  officers sitting there watching these guys
3  24 hours a day, 7 days a week, plus the
4  lieutenant that's there, you know, who's moving
5  in and out, but, you know, the lieutenant's not
6  standing there continuously, but, you know,
7  they're consulting with their lieutenant and
8  were saying, look, this guy is hurting himself
9  all the time, like, what are we supposed to do
10 with this guy.
11     Q.  And your response?
12     A.  My response was I see your point and
13 let me notify, you know, the mental health staff
14 so they know the concerns you have, you know,
15 which is why I was sending these e-mails out
16 about this guy, you know, injuring himself,
17 refusing care, refusing antibiotics, going out
18 to the hospital, like as soon as he gets to the
19 hospital, they bounce him back within a couple
20 hours.  You know, he says I don't want care.
21 They say good, go back.
22         You know, Bethune hospital --
23         MR. ATWOOD:  You answered the question.
24         THE WITNESS:  I answered it.
                                              191

1          MR. ATWOOD:  Previously, there was a
2  question asked, Joe, about the discussion about
3  transferring the patient earlier to either
4  Chester or Elgin Mental Health Center, and you
5  asked for an e-mail or documentation about that,
6  and that's what I sent you.  That's that
7  August 5, 2008 e-mail.  My understanding, this
8  has been produced in the Wexford or IDOC
9  documents.  This one's not Bates stamped.  I
10 just pulled it from our records.
11         MR. RUPCICH:  I understood that there
12 was an e-mail dated April 15 that he was talking
13 about that was to Chess and Doyle.
14         MR. ATWOOD:  Doctor?  Let me see if we
15 got...
16         THE WITNESS:  That was a phone
17 conversation and the follow-up --
18         MR. ATWOOD:  He asked you for an
19 e-mail.
20         THE WITNESS:  I don't -- yeah.
21         MR. ATWOOD:  Is there and e-mail from
22 April 15 that you would have?
23         THE WITNESS:  I believe I said that it
24 was a telephone conversation.
                                              192

1    MR. ATWOOD:  It was a telephone
2 conversation?
3    THE WITNESS:  Yeah.
4    MR. ATWOOD:  Okay.  Confirm that with
5 him.
6    THE WITNESS:  Yeah.  It was a telephone
7 conversation.
8 BY MR. RUPCICH:
9    Q.  Okay.  Well, how do you know there was
10 a telephone conversation?  What are you using to
11 rely on for the fact there was a telephone
12 conversation on April 15, 2018?
13    A.  I contacted --
14    Q.  My question's -- well, what are you
15 looking at?
16    A.  Well, I'm looking at my e-mail from the
17 15th that says that I tried to -- that's to
18 Jayne Braden and Manny Gonzalez, saying that I
19 tried to contact Mark Fisher, and my patient
20 note on that date -- hang on one second.
21    Yeah, it must have been that he was
22 there I said in the note -- that was the
23 day that Jayne Braden was actually there at
24 Dixon, and it also says in the note that I

193

1 talked to -- that I had to go home, but they
2 were expecting him back from the hospital and
3 that Al Doyle was there and he said he would see
4 him so that I didn't have to wait for the guy to
5 come back to the hospital because he told me he
6 would see him.
7    Q.  You say it's in your note.  Are you
8 talking about your April 15 note in Mr. Gay's
9 records?
10    A.  Hang on just one second.
11    Okay.  It's my patient note on the
12 22nd.  It says I had consulted with Dr. Doyle on
13 site at the time about the plan to address
14 immediate safety issue.  This is referring to
15 the previous weekend.  So on April 22nd, I'm
16 referring back to last weekend.
17    "Patient seen in infirmary on
18 continuous watch as an inpatient of crisis watch
19 following return from outside hospital yesterday
20 at about 4:00 p.m.  Had consulted with Dr. Doyle
21 on site at the time about plan to address
22 immediate safety issue.  Patient had been sent
23 to hospital earlier and" --
24    MR. ATWOOD:  You got to slow down and

194

1 speak up because Vicki can't -- mumbling.
2    THE WITNESS:  Sorry.
3    "Had consulted with Dr. Doyle on
4 site" -- that means he was there -- "at the time
5 about plan to address immediate safety issue.
6 Patient had been sent to hospital earlier in
7 week due to insertion of several foreign bodies
8 in scrotum.  Patient had reportedly also
9 suffered significant blood loss prior to
10 transport to outside hospital.
11    "Per Dr Doyle in conversation
12 yesterday" -- meaning the 21st -- "patient
13 agreed not to self-injure and agreed to accept
14 medication and medical care for wound in scrotum
15 in effort to elicit consensual treatment
16 agreement and promote treatment alliance.
17    "Alternative of restraining patient to
18 prevent further self-harm had been considered
19 and held off in effort to use less coercive
20 plan."
21    MR. ATWOOD:  You answered his question.
22 Now listen to the next question.
23    THE WITNESS:  Okay.
24

195

1 BY MR. RUPCICH:
2    Q.  My question is, you had previously said
3 there was a phone conference on the 15th with
4 Chess and Doyle and you were referring to some
5 document.  I'm trying to figure out what the
6 basis of your belief is, or are you saying there
7 was not a phone conference on April 15th with
8 Chess and Doyle?
9    A.  No.  I'm saying there was one, and I'm
10 looking for the documentation for it.
11    MR. ATWOOD:  If you don't know where
12 the documentation for it is right now, just tell
13 him you don't know where the documentation is,
14 but trying to answer his questions at the same
15 time you're looking for it is impossible, so
16 stop looking for it.  Just tell him --
17    THE WITNESS:  Okay.  I don't know where
18 it is right now.
19 BY MR. RUPCICH:
20    Q.  If you were able to find that
21 documentation, what would it be, an e-mail?
22    A.  Either an e-mail or I would include it
23 in my patient note that I contacted the mental
24 health authority or the on-call attending or the

196



1  psychiatrist regarding the patient's condition
2  or care.
3      Q.  Is that something that you have
4  reviewed in the last few days that you have
5  seen, that documentation that you rely on for
6  that phone conference having occurred?
7      A.  I can't say that I saw it in the last
8  few days, but I know at the time that I wrote
9  the timeline that I had found it and I had seen
10  it as documentation.
11      Q.  When did you write the timeline?
12      A.  When I was sued.  When I was notified
13  that I was a co-defendant in this lawsuit.
14      Q.  So a couple years ago?
15      A.  Yes, uh-huh, 2019, I think it was.
16      Q.  Did you do that before you were
17  represented by Mr. Atwood?  Did you make that up
18  for yourself?
19      A.  No.  When we were talking about --
20      Q.  Don't tell me what you talked about.
21  I'm just trying to get an idea if this is
22  something you created to refresh yourself or if
23  this is something that you made for your lawyer.
24      A.  Well, it was something I created so I
                                                    197

1  could track --
2          MR. ATWOOD:  Listen to the question
3  he's asking you and answer that question.
4          THE WITNESS:  I made it for myself so I
5  could keep track of my contacts with him.
6  BY MR. RUPCICH:
7      Q.  Does that timeline include information
8  other than the eight dates of personal
9  encounters you had with Mr. Gay?
10      A.  I only had seven personal encounters.
11      Q.  Seven.  Sorry.
12      A.  It does have other information.
13      Q.  What other information?
14      A.  The dates that he went to the hospital,
15  to Bethune hospital, and the dates that he was
16  listed in the infirmary and the dates that he
17  was transferred from the infirmary to X-House
18  and the dates that he was transferred within
19  X-House to C wing and to crisis watch --
20          MR. ATWOOD:  I'll e-mail it to you,
21  Joe, right now if you want it.  There's nothing
22  on it other than dates.
23          MR. RUPCICH:  Okay.  Will you copy Joy
24  as well?
                                                    198

1          MR. ATWOOD:  Yeah.
2          MR. RUPCICH:  We should be on
3  Exhibit 8?  All right.
4  BY MR. RUPCICH:
5      Q.  I'm going to show you Exhibit 8, which
6  is a list of -- or a packet of two pages of
7  e-mails that your counsel has e-mailed to me
8  during this deposition.
9          Can you see that, Doctor?
10      A.  Yes.
11          MR. RUPCICH:  Nick, do you have this?
12          MR. ATWOOD:  Yeah, I sent it to Nick.
13          MR. STALEY:  Yeah, I have it.
14          MR. RUPCICH:  Okay.  Great.
15          And I assume Nicolette has it as well,
16  then.
17          MR. ATWOOD:  Yeah, she was copied on
18  the e-mail.
19          MS. WARD:  I have a copy.
20  BY MR. RUPCICH:
21      Q.  This appears to be a series of e-mail
22  exchanges from August of 2018; is that right?
23      A.  April 18th?
24          MR. ATWOOD:  No.  Look at what he's
                                                    199

1  showing you.
2          THE WITNESS:  What you're showing me is
3  August 11.
4  BY MR. RUPCICH:
5      Q.  August 11, August 8, August 5,
6  August 4, August 4.  You see that?
7      A.  Uh-huh.
8      Q.  So I don't see anywhere in here where
9  Gay is mentioned.  All I see is regarding
10  Dupree.
11      A.  No, Dupree is a different person.
12          MR. ATWOOD:  Go to the next page, Joe.
13  I thought this was when -- remember when you
14  were talking about whether or not he was going
15  to be sent earlier?
16          THE WITNESS:  Yeah, August 1st.
17          MR. ATWOOD:  Hold on.
18          I sent you this because in looking at
19  the e-mails, I thought this was talking about
20  sending somebody earlier to Chester or to --
21  this might be the wrong guy.
22          THE WITNESS:  The start of the e-mail
23  chain is August 1st.
24
                                                    200



1  BY MR. RUPCICH:
2      Q.  No, it's August 4th.
3          THE WITNESS:  At the bottom there?
4          MR. ATWOOD:  This isn't referring to --
5  Joe's right.  This is referring to Dupree.  Were
6  you meant to be referring to Gay in these
7  e-mails?
8          THE WITNESS:  Yes.
9          MR. ATWOOD:  Well, tell him.
10         THE WITNESS:  Yes, this is about
11  Anthony Gay.
12  BY MR. RUPCICH:
13     Q.  It's about Gay, but there's no mention
14  of Gay in any of these e-mails.
15     A.  It doesn't mention his name.
16     Q.  Well, I mean, I can tell you that it
17  wouldn't have been produced by either the state
18  or us since it doesn't have Gay in it.
19         MR. ATWOOD:  Right.  I'm not saying it
20  would have been if it doesn't have Gay in it.
21  You're right, because you would have searched
22  for that.
23         MR. RUPCICH:  Well, there's got to be a
24  start to this e-mail chain, then, because it

201

1  says "Re: Re: Dupree; "Re: Re: Dupree."  Mine
2  starts August 4th.
3          MR. ATWOOD:  What's the date that you
4  have this e-mail chain starts?
5          THE WITNESS:  I don't have the very
6  first e-mail in this chain, but the first
7  reference to Anthony Gay is August 1st.
8  BY MR. RUPCICH:
9      Q.  How do you know that if we don't have
10  the e-mail?
11     A.  I have it.
12         MR. ATWOOD:  Let me see it.
13         Are you telling me when you put in this
14  e-mail it says Dupree, you meant to put Gay?
15         THE WITNESS:  No, it was -- I don't
16  remember what the initial thing about Dupree, I
17  don't remember that person, but we were
18  continuing -- there's the same e-mail chain and
19  talking about Gay because he was getting ready
20  to be released -- I mean, the content of it is
21  all about Gay.  He was getting ready to be
22  released --
23         MR. ATWOOD:  All right.  But to be fair
24  to Joe, Gay's name isn't anywhere in this

202

1  e-mail.
2          THE WITNESS:  Right.  I understand, I
3  understand.  I'm not arguing the fact, but the
4  specifics --
5          MR. ATWOOD:  All right.  Let Joe ask
6  the question.  We'll figure this all out after.
7  BY MR. RUPCICH:
8      Q.  Do you have in front of you the
9  August 1st e-mail that you say starts this
10  chain?  Is that on your --
11     A.  Yes, I do.
12     Q.  Just read it to me.
13     A.  Okay.  August 1st at 11:43 a.m.  It's
14  regarding Dupree, except this isn't about
15  Dupree.  This is from Doyle.  He says:  "I
16  agree.  He is quite psychotic.  Chart reveals
17  this has been his baseline for quite some
18  time" -- "for some time."
19     Q.  Wait, who are we talking about, Dupree?
20     A.  No.  Anthony Gay.
21     Q.  But the subject line says Dupree?
22     A.  Right.
23     Q.  How the hell -- how did you know who he
24  was talking about?

203

1      A.  Because the details have to do with
2  Anthony Gay.
3      Q.  Okay.  Go ahead.  Read it.  Sorry.
4      A.  Okay.  "Strangely, he will have an
5  occasional day when he appears normal."  This is
6  still Al talking.  "I started Haldol Decanoate
7  last week along with oral Haldol.  Will titrate
8  up as safe and tolerated.  I think the plan is
9  to commit him at discharge to DHS.  Demented is
10  a strong possibility.  Basic biographical data
11  is in dispute, being married, having children,
12  et cetera."
13         Then I say in response on the 4th:  "I
14  appreciate your response, Randy.  It sounds like
15  you were well aware of this patient.  Is there
16  any other setting where he can be maintained?
17  Would he do better at Joliet Treatment Center or
18  perhaps Elgin? "
19         Then on the same day, he says back:  "I
20  don't think he could participate" -- "he could
21  effectively participate in the programming at
22  JTC.  Several of us think he will need to be
23  committed to Elgin or another state facility.
24  We need to get cracking, however, because the

204

1  MSR is 10/17/18.  He's better on the shots but
2  still quite bizarre.  Appreciate your concern
3  for him."
4      Q.  I don't think this is about Gay because
5  Gay didn't get out 10/17/18.
6      A.  He got out early.  He was released
7  early.
8      Then after that, I say:  "Randy, I hope
9  it helped.  Any news from the meeting?"  And
10  then -- or I'm sorry.  "I don't think we could
11  commit him to Elgin at this point.  Will
12  discuss" -- hang on one second.  Hang on one
13  second.
14      So then the 5th:  "Randy, yes, I
15  understand.  In the jail, the justice department
16  goes nuts when we have" --
17      MR. ATWOOD:  He's got that.  You don't
18  need to --
19  BY MR. RUPCICH:
20      Q.  Yeah, I have that.
21      A.  Okay.  All of this --
22      Q.  Is there a -- is there the start of
23  this chain anywhere that does not have "Subject
24  Re:" that is like the first e-mail?

205

1      A.  No, not that I have in front of me, no.
2      Q.  Are you able to point me to any written
3  document, communication, anything before this
4  e-mail chain where you discussed with someone
5  Mr. Gay being sent to an IDHS facility?
6      A.  Would have to go back and check my
7  e-mails --
8      MR. ATWOOD:  The answer is no, right
9  now, right?  As you sit here right now, the
10  answer's no.
11      THE WITNESS:  I don't have access to it
12  right now.
13      MS. WARD:  I'm going to object to
14  counsel providing the witness with an answer.
15  I'll object to the...
16  BY MR. RUPCICH:
17      Q.  As you sit here, this is the first
18  documentation that you can point me to?  As you
19  sit here right now, this would be the first
20  series of communications in writing you can
21  direct me to that concern you having any
22  involvement in the possibility of Mr. Gay going
23  to an IDHS facility?
24      MR. ATWOOD:  Listen to the question he

206

1  asked.
2      THE WITNESS:  I'm listening, I'm
3  listening.
4      My first reference to him going to an
5  outside facility is in April.
6  BY MR. RUPCICH:
7      Q.  What do you rely on for that?  And I'm
8  not talking about outside hospital to get his
9  scrotum sewed up.  I'm talking about you
10  recommending he be sent to some outside
11  inpatient mental health treatment center.
12      A.  Okay.  So on the 22nd of April, my
13  e-mail to Al Doyle, Jayne Braden, Manny
14  Gonzalez, and Jamie Chess, 4:12 p.m. on
15  April 22nd says that:  "Speak with mental health
16  department administrator by phone regarding
17  concerns for patient's refusal to accept medical
18  care, particularly wound care and antibiotic
19  treatment to prevent infection.  Patient has
20  suffered recent MRSA infection following similar
21  foreign body insertion.  Placed call to
22  attending psychiatrist regarding concerns over
23  patient safety.  Will provide information to
24  next shift and administrators.  Maintain on

207

1  continuous watch status.  Recommend patient
2  remain infirmary until effective treatment for
3  wound becomes possible."
4      Q.  Where in what you just read to me did
5  you recommend that he be transferred to an
6  inpatient mental health facility?
7      A.  No, you're right.  It has to do with
8  medical treatment.
9      Q.  Okay.  Back to my question:  Are you
10  able to point me to anything in writing where
11  you are recommending he be sent to an inpatient
12  mental health facility?
13      A.  I read to you the notes from August
14  that you're saying don't pertain to him that I'm
15  saying do pertain to him, and that's the best I
16  can do at this moment.
17      Q.  Do you have an independent recollection
18  of anything else out there in writing that would
19  bear on that issue?
20      A.  I would have to check.
21      Q.  So you don't know?
22      MR. ATWOOD:  Answer the question.
23      THE WITNESS:  I would have to -- I
24  don't know.

208



1      MR. ATWOOD:  Just do you have an
2  independent memory.  That's what he's asking.
3      THE WITNESS:  Well, I remember talking
4  to Al Doyle about this and e-mailing him back
5  and forth about it and I remember that this
6  pertained to Anthony Gay, and I will look for
7  the start of the e-mail chain where we switched
8  subjects from this other person to Anthony Gay.
9  BY MR. RUPCICH:
10     Q.  Okay.  And that was in August?
11     A.  Right.
12     Q.  So when you refer to communications
13  with Al Doyle about Mr. Gay and having him sent
14  to IDHS early, are you referring to these
15  discussions in August of 2018?
16     A.  Yes.
17     Q.  Do you believe that was the beginning
18  of when those discussions that you were involved
19  in happened?
20     A.  Yes.
21     Q.  Other than -- is Al Doyle a Wexford
22  employee?
23     A.  Yes.
24     Q.  Other than Al Doyle, do you recall

209

1  discussing with any other Wexford Health
2  employee your recommendation that Mr. Gay be
3  sent to an IDHS facility before his committal?
4      A.  I can't answer that question.
5      Q.  Because you don't remember?
6      A.  I know that I had more than one
7  discussion about it, but I know that Jayne
8  Braden quit like right around that time, like
9  the second week of August, and I know that Manny
10  then went back to being the Wexford supervisor,
11  and I can't recall off the top of my head
12  whether -- the conversations I had with Jayne,
13  then I, you know, went back to Manny and
14  reiterated the same things I had discussed with
15  her.
16     Q.  Would that be in a similar time frame
17  to these e-mails in August with Al Doyle?
18     A.  Yes, at the beginning of August.
19     Q.  I know you said that Dr. Doyle thanked
20  you for your concern.
21         Do you recall any response from Manny
22  or Dr. --
23     A.  They thanked me in April, Jayne Braden.
24     Q.  But you just told me that the

210

1  discussions were in August about sending him to
2  Elgin, so why would they be thanking you for it
3  in April?
4      A.  Well, they were thanking -- they were
5  thanking me about my concern about his medical
6  care in April.
7      Q.  I'm strictly on this issue of his
8  transfer to an IDHS facility, okay?  That's what
9  I'm focused on.
10         Did either Manny or -- and I'm
11  blanking.  What's the other doctor?
12     A.  Jayne Braden.
13     Q.  Did either of them --
14     A.  No.
15         MR. ATWOOD:  Doctor, Doctor, you can't
16  possibly know to answer yes or no because Joe
17  hasn't even finished his question yet.  You need
18  to slow down, so let him finish his question and
19  then answer.
20         THE WITNESS:  Okay.  Sure.
21  BY MR. RUPCICH:
22     Q.  Dr. Braden or Manny, did either of them
23  give you any response about Mr. Gay being
24  transferred to an IDHS facility when you

211

1  communicated with them in August?
2      A.  No.
3      Q.  Do you have any independent
4  recollection of what either of them said?
5      A.  No.
6      Q.  Do you know if they did not respond at
7  all or if they just said it was out of their
8  ability?
9      A.  I don't have any recollection one way
10  or the other.
11         MR. RUPCICH:  Okay.  Those are all my
12  questions.  Thank you.
13         THE WITNESS:  Thank you.
14         MR. STALEY:  Can you guys give me just
15  like five minutes?
16         MR. ATWOOD:  Sure.
17             (whereupon, a short break was
18             taken.)
19         MR. STALEY:  Thanks for taking a short
20  break.  I actually have no further questions.
21         MR. ATWOOD:  Anybody else?
22         MS. WARD:  I've just got a couple here.
23         FURTHER EXAMINATION
24

212

BY MS. WARD:
Q.   The first one's an easy one, hopefully.
     Can you spell Bethune?
A.   Bethune? B-E-T-H-U-N-E. The name of
that facility --
     MR. ATWOOD: She asked you to spell
Bethune. You spelled it.
BY MS. WARD:
Q.   To the extent you were asked -- you
were asked some questions a moment ago by
Mr. Rupcich regarding attendance of Anthony Gay
in group.
     As you sit here, do you have any
information as to whether Mr. Gay attended
groups during the week when you weren't present?
A.   I don't have information about that
subject.
Q.   Clinically, as a psychologist, is there
any situation in which an individual could
self-harm to the point of hospitalization twice
in one day that you would consider it a healthy
mental state?
A.   No.
Q.   You mentioned instances in which, you

213

know, you indicated that Mr. Gay wasn't
particularly cooperative with you when you spoke
with him.
     In your history as a psychologist
practicing within correctional institutions, is
it common that people you're working with may
not be particularly cooperative with you at
first?
A.   Yes.
Q.   Can that lack of cooperation, in your
experience, be a symptom of the underlying
mental illness?
A.   No.
Q.   Your experience, can it be a sign of
mental decompensation?
     MR. RUPCICH: Object to vague,
incomplete hypothetical.
     Doctor, go ahead.
     THE WITNESS: No.
BY MS. WARD:
Q.   You mentioned the -- and I want to make
sure that I understand. You mentioned the
individual in the correctional staff that you
spoke with regarding your concerns about

214

Mr. Gay, and you mentioned a lieutenant.
     Were you indicating that that person
was a lieutenant or were you saying that you
recall them having a leadership role of some
kind within --
A.   Lieutenant.
Q.   Okay. With regard to the Rasho
litigation, other than the settlement agreement,
have you read any other court documents stemming
from that litigation?
A.   Yes.
Q.   Which ones?
A.   The monitor's report -- the monitor's
update reports.
Q.   When you made your recommendations
regarding Mr. Gay's placement beginning in
April, was an element of your recommendation
that Mr. Gay be placed in an outside facility
based on Mr. Gay's mental status and the
manifestations of that mental status?
     MR. RUPCICH: Object to the foundation,
misstates his testimony.
     MR. STALEY: Join.
     MR. ATWOOD: Object to the form of that

215

question too.
     Go ahead.
     THE WITNESS: It was based on his
medical need.
BY MS. WARD:
Q.   When you say "medical need," what
specifically do you mean by that?
A.   He had an open wound, had a history of
opportunistic hospital-related infection, and
had refused medical care at the hospital
facility, was returned to IDOC.
     MS. WARD: I don't have any other
questions.
     MR. ATWOOD: We all done?
     MR. RUPCICH: I don't have anything
else.
     THE COURT REPORTER: Signature?
     MR. ATWOOD: Reserve.
          (whereupon, the deposition
           concluded at 3:33 p.m.)

216



**Page 217**

```
 1       IN THE UNITED STATES DISTRICT COURT
 2     FOR THE CENTRAL DISTRICT OF ILLINOIS
 3              PEORIA DIVISION
 4  ANTHONY GAY,            )
 5       Plaintiff,         )
 6   vs.                    ) No. 1:19-CV-01133
 7  JOHN BALDWIN, et al.,   )
 8       Defendants.        )
 9
10      This is to certify that I have read the
11  transcript of my deposition taken in the
12  above-entitled cause by Vicki L. D'Antonio,
13  Certified Shorthand Reporter, on April 22, 2022,
14  and that the foregoing transcript accurately
15  states the questions asked and the answers given
16  by me as they now appear.
17
18      _____
            PIERRE NUNEZ, Ph.D.
19
20
21  SUBSCRIBED AND SWORN TO
    before me this _____ day
22  of _____, 2022.
23
    _____
24   Notary Public
```

**Page 219**

```
 1  the foregoing deposition was waived by counsel
 2  for the respective parties.
 3      I further certify that the taking of this
 4  deposition was pursuant to notice and that there
 5  were present at the deposition the attorneys
 6  hereinbefore mentioned.
 7      I further certify that I am not counsel
 8  for nor in any way related to the parties to
 9  this suit, nor am I in any way interested in the
10  outcome thereof.
11      IN TESTIMONY WHEREOF:  I have hereunto
12  set my verified digital signature this 29th day
13  of April, 2022.
14
15
16
17      NOTARY PUBLIC, COOK COUNTY, ILLINOIS
        CSR LIC. NO. 84-004344
18
19
20
21
22
23
24
```

**Page 218**

```
 1        C E R T I F I C A T E
 2
 3      I, Vicki L. D'Antonio, a Notary Public
 4  within and for the County of Cook and State of
 5  Illinois, do hereby certify that heretofore,
 6  to-wit, on the 22nd day of April 2022, appeared
 7  before me via Zoom videoconference PIERRE NUNEZ,
 8  Ph.D., a witness in a certain cause now pending
 9  and undetermined in the United States District
10  Court, Central District of Illinois, Peoria
11  Division, wherein ANTHONY GAY is the Plaintiff
12  and JOHN BALDWIN, et al., are the Defendants.
13      I further certify that the said PIERRE
14  NUNEZ, Ph.D., was by me first duly sworn to
15  testify the truth, the whole truth, and nothing
16  but the truth in the cause aforesaid; that the
17  testimony then given by said witness was
18  reported stenographically by me via Zoom
19  videoconference and afterwards reduced to
20  typewriting by Computer-Aided Transcription, and
21  the foregoing is a true and correct transcript
22  of the testimony so given by said witness as
23  aforesaid.
24      I further certify that the signature to
```

**Page 220**

```
 1        McCorkle Litigation Services, Inc.
           200 North LaSalle Street, Suite 770
 2            Chicago, Illinois 60601-1014
 3
    April 29, 2022
 4
 5  Donohue Brown Mathewson & Smyth, LLC
    Mr. Stetson F. Atwood
 6  140 South Dearborn Street, Suite 800
    Chicago, Illinois  60603
 7
    IN RE:  Gay v. Baldwin
 8  COURT NUMBER:  1:19-CV-01133
    DATE TAKEN:  April 22, 2022
 9  DEPONENT:  Pierre Nunez, Ph.D.
    Dear Mr. Atwood:
10
11  Enclosed is the deposition transcript of Pierre
    Nunez, Ph.D., in the above-entitled cause.  Also
12  enclosed are additional signature pages, if
    applicable, and errata sheets.
13
    Per your agreement to secure signature, please
14  submit the transcript to the deponent for review
    and signature.  All changes or corrections must
15  be made on the errata sheets, not on the transcript
    itself.  All errata sheets should be signed and
16  all signature pages need to be signed and notarized.
    After the deponent has completed the above,
17  please return all signature pages and errata
    sheets to me at the above address, and I will
18  handle distribution to the respective parties.
19
    If you have any questions, please call me at the
20  phone number below.
21  Sincerely,
22
    Cindy Alicea          Court Reporter Present:
23  Signature Department  Vicki L. D'Antonio
24  cc:  All attorneys of record.
```

Pierre Nunes, Ph.D. 04/22/2022

**1**

**1**
16:19
**10**
188:9
**10/17/18**
205:1,5
**103**
144:19
**11**
200:3,5
**11:43**
203:13
**12**
70:13 190:24
**13**
80:22 134:15 150:22
154:24
**14**
34:7 150:22 175:1
178:12 181:8,12
**15**
17:14 29:1,5,15,16,
17 30:1,5 34:7 58:3
88:19 144:23 152:16
175:1 177:20 179:1,
5 181:9,12 188:9
192:12,22 193:12
194:8
**15-day**
37:11 153:14
**15-minute**
33:7 187:24
**1537**
134:7,15
**1539**
134:8
**15th**
48:23,24 175:10,12
177:2,18 179:10
193:17 196:3,7
**16**
34:7 88:19 145:17
**17**
145:17
**1800s**
115:13
**18th**
199:23
**1979**
41:13
**1991**
11:6
**1993**
11:7
**1st**
22:17 129:4 130:2
184:12 200:16,23
202:7 203:9,13

**2**

**2**
118:9 119:3 132:10
**20**
64:5,7 144:22,23
185:15
**20-year**
185:17
**2000**
17:22 140:21 141:1,
4,11 144:3,18
152:10
**2000-teens**
34:5
**2000s**
38:16,17

**2001**
15:13
**2008**
142:14 192:7
**2010**
25:12 38:19 141:20
142:14,15,18 144:3,
18 145:3 148:10
150:16 152:10
**2010s**
38:18,24
**2016**
161:13
**2017**
11:22,24 13:3
**2018**
13:24 17:22 21:11
25:12 34:9 42:9,10
44:5 45:17 46:14
48:21 49:14 57:5
62:7,14 63:3,12,23
64:10 65:22 66:11,
24 67:22,24 72:23
73:3,6 77:3,12 78:5,
11 82:2 83:9,13
90:2,9 95:13 106:19
110:13 124:14
128:18 134:17
142:17,18 154:2
163:19 164:21 165:3
166:15 178:9 179:1,
5 182:5 183:13
193:12 199:22
209:15
**2019**
13:2,4 197:15
**2020**
17:22 148:11 150:17
**21st**
195:12
**22**
14:10 124:13 140:16
175:1 178:9 181:9,
13
**22nd**
177:21 194:12,15
207:12,15
**23**
27:9,19 30:19 33:3
76:20 103:19 104:1
107:19 121:11
161:12
**24**
27:23 191:3
**24-hour**
61:14 62:3,5,16
184:5 186:6
**24/7**
190:23
**24th**
49:2
**25**
14:12
**27**
134:17
**28**
175:1 181:9,13
**28th**
49:5
**29**
175:2 181:9,13
**29th**
49:5,9 129:4,24
130:2 182:19,21,24
**2nd**
129:9

**3**

**3**
123:21 140:18 182:4

**30**
64:5,7 163:7 188:9
189:9,10
**30-minute**
187:23 188:1,2,12
189:2,7
**31**
77:3 174:24 181:8,
12
**31st**
77:12 78:5,8,11 82:1
83:9,13 90:2,5,6,9
**35**
163:7
**360**
154:19
**3:33**
216:20
**3rd**
49:3,9 128:18 129:1,
7 184:13,14

**4**

**4**
127:23 200:6
**4/15**
175:16
**41**
131:21 143:19,23
144:24
**48**
150:24 151:5,7
**4:00**
194:20
**4:12**
207:14
**4th**
201:2 202:2 204:13

**5**

**5**
88:18 130:20 192:7
200:5
**5-by-8**
30:20
**518**
118:7
**519**
119:4
**521**
118:8
**533**
177:1,4
**575**
123:23
**576**
123:23
**5th**
205:14

**6**

**6**
88:19 134:9

**7**

**7**
88:18 103:24 161:7,
10 174:24 181:8,12
191:3
**7,000**
18:3
**700**
132:10
**702**
132:13

**704**
131:11
**72**
19:6,7,8
**781**
127:24

**8**

**8**
199:3,5 200:5
**81**
140:22
**83**
140:22
**841**
130:22
**85**
19:8

**9**

**9**
80:23 163:11
**90**
169:18

**A**

**a.m.**
203:13
**ability**
87:7 104:4,5 171:19
212:8
**absolutely**
8:1
**accept**
52:12 60:9 195:13
207:17
**accepted**
149:6
**access**
23:8 26:5 27:20,21
28:5 48:1 67:21
83:20 121:15,17,19
206:11
**account**
95:6 164:23 180:24
181:2
**accounts**
180:12 181:1,2
**accurate**
131:12 185:21
**acquire**
182:14
**act**
77:22 120:4,16
**acting**
44:16 55:15,17
108:22 120:1 162:22
168:12
**action**
161:20 162:9
**activities**
119:15 121:24
**activity**
122:4
**actual**
85:1
**acute**
133:6,7,8,9
**addition**
28:2
**additional**
40:19 168:5
**additions**
17:15
**address**
129:20 156:22
194:13,21 195:5

**addressed**
26:8 158:6
**adequacy**
74:1
**adequate**
33:4 73:8 162:1
**adjunct**
22:14
**administrator**
19:4 90:14 135:6
144:9 157:2 207:16
**administrators**
89:24 101:23 143:14
207:24
**admit**
162:8
**admonishments**
7:15
**adopt**
39:11
**adverse**
23:20 30:3 35:5
**adversely**
111:7
**advice**
10:4
**affect**
163:22 164:1,3
**affecting**
26:1 111:8
**afforded**
122:15
**aggression**
55:14,16 109:8,15
**aggressive**
28:18 109:18
**aggressiveness**
133:9
**agitated**
120:5
**agree**
36:9 105:11,16,19
108:16 126:23 127:1
151:23 152:3,5,8
159:19 160:1,12
203:16
**agreed**
17:19,21 18:5,20
37:4 110:23 142:16
160:19,23 184:9
195:13
**agreement**
49:15,20,21 50:9,13,
15,19 51:13,14,18
52:15,16 159:22
160:2,14 161:11,22
162:3,7 195:16
215:8
**ahead**
111:11 204:3 214:18
216:2
**ahold**
34:15
**alert**
67:4,14,15,16
154:17
**alerts**
67:21
**Allan**
46:19,21
**allegations**
15:10 162:9
**alliance**
195:16
**allotted**
87:8
**allowed**
27:14,15,18 86:4
187:9,10,12,14

**Alternative**
195:17
**altogether**
14:13 15:4 80:8
**ambulances**
43:3
**amended**
161:10,21
**amendments**
17:4,15 22:20
**amount**
33:24 80:1,12 87:2,8
107:23 149:14,15,18
150:6,9 155:23
156:10,17
**amounts**
157:10
**and/or**
67:8
**angry**
7:8
**answer's**
206:10
**answering**
8:6,7 10:2 117:20
**Anthony**
41:16 47:23 48:13
49:4 53:10 65:22
84:15 87:24 113:19,
20 115:6 116:21
118:17 124:18
136:10,11 183:24
201:11 202:7 203:20
204:2 209:6,8
213:11
**Anthony's**
49:8 111:20
**antibiotic**
126:24 127:2 173:11
207:18
**antibiotics**
125:23 191:17
**anticipate**
9:20
**anticipated**
59:12 60:7
**anymore**
17:8 142:4 180:24
**apologize**
8:11 9:8 14:14 57:16
**appearance**
85:24
**appears**
11:6 119:10 124:9
128:17 199:21 204:5
**applicable**
41:8
**application**
166:21
**applied**
32:2
**apply**
100:12 166:2
**applying**
100:6
**appointments**
145:9
**appreciated**
116:4,8
**approach**
107:20
**appropriateness**
159:15
**approve**
116:14 148:8
**approved**
61:17 157:1 158:4
**approximate**
150:15



Pierre Nunes, Ph.D. 04/22/2022

**approximately**
12:24 34:2 38:24
48:16,20 70:2,10
82:8 88:15 101:6
102:1 116:20

**April**
22:17 47:24 48:23,
24 49:2,5,9 124:13
129:24 157:19
168:15 173:19
174:24 175:1,2,10,
13 177:2,20 178:9,
12 179:1,5,10 181:8,
9,12,13 183:13
186:10 189:8
192:12,22 193:12
194:8,15 196:7
199:23 207:5,12,15
210:23 211:3,6
215:17

**area**
20:19 54:9 56:20
136:9

**areas**
24:16,17,19 143:11
146:12,14 151:22

**arguing**
203:3

**argument**
169:14

**arm's**
161:19

**arrival**
80:2 97:3,8

**arriving**
71:8 78:3

**articulate**
8:18

**as-needed**
21:17

**Ashoor**
161:10

**assault**
158:12 164:4 167:8
168:9

**assaults**
146:5,7 147:6,7
163:3

**assess**
64:2

**assessments**
78:15

**assigned**
12:9 68:2 69:18,19

**assignments**
68:16,22

**assist**
70:20 71:2 103:16

**assisting**
55:4

**associate**
62:20

**assume**
9:16 41:17 199:15

**assumed**
49:7 55:3

**assuming**
130:4 131:12 183:2
184:5

**attack**
167:13

**attacked**
164:8 167:14,16

**attempting**
128:11

**attempts**
65:12

**attend**
181:22

**attendance**
121:14 213:11

**attended**
72:11 213:14

**attending**
47:2 68:10 128:8,9
130:10,12 181:20
196:24 207:22

**attendings**
128:14

**attention**
179:2 185:22 186:7

**attorney**
146:18

**attorneys**
9:21 139:24 148:19,
20

**Atwood**
7:4 18:18 21:24
30:24 34:17 36:21
38:8 43:2 45:1 51:2,
8,15 52:2,20,24 53:3
56:11 57:10 58:4,8
63:6 66:15,19 67:5
69:21 72:5 73:18
74:4,17 75:9,13
76:11 80:3,14 81:11,
17 87:13 89:19
92:24 94:9,20 96:5
98:17,21 104:18,24
107:9,13 109:11
111:9,14 118:1
122:20,23 131:17
132:16,20 137:14
138:18 139:8,11
147:1 175:3,22
176:4,12,20 177:9,
22 178:8,15,22
179:2,9,13,15,19
180:17 189:15
191:23 192:1,14,18,
21 193:1,4 194:24
195:21 196:11
197:17 198:2,20
199:1,12,17,24
200:12,17 201:4,9,
19 202:3,12,23
203:5 205:17 206:8,
24 208:22 209:1
211:15 212:16,21
213:6 215:24
216:14,18

**August**
45:17 116:19 154:3
192:7 199:22 200:3,
5,6,16,23 201:2
202:2,7 203:9,13
208:13 209:10,15
210:9,17,18 211:1
212:1

**authoritarian**
103:11

**authorities**
42:16,18 43:14
50:10

**authority**
43:22 44:3 46:11
47:14,17 89:22
159:5,11 172:1
196:24

**availability**
68:17,19 127:7
128:15

**average**
27:12

**award**
17:16,23,24 100:4

**aware**
50:8 57:5 67:1,7
72:7 82:15,18,20
83:4 91:9,12 95:19
96:10 106:21 133:23
154:23 170:14
183:19 189:11

204:15

---

**B**

**B-E-T-H-U-N-E**
213:4

**B-R-A-D-E-N**
45:13

**back**
13:21 14:19 23:6
34:19 35:6,19 38:7
75:13 87:19 93:10
99:22 103:8 107:14
111:2 123:3,11
126:1 129:5,6,8
130:2 132:20 136:21
137:15,19 141:1
158:3 168:10
172:10,11 173:12,
13,16,23 174:2,16
182:20,21,22,24
183:19 184:1 185:1,
6 188:17 191:19,21
194:2,5,16 204:19
206:6 208:9 209:4
210:10,13

**background**
11:3

**backlog**
92:19,20,23

**badly**
9:10 47:10

**balance**
167:7

**ballpark**
150:20

**bare**
121:10

**based**
28:21 29:24 39:6
49:6 50:12 74:15
75:2 76:7 79:2,22
81:6,13 83:10 84:4,
23 86:17 88:21 92:1
129:14 130:14
131:12 148:11 150:6
157:6 158:1 174:8
215:19 216:3

**baseline**
185:8,10,17,20
186:2,3 203:17

**Basic**
204:10

**basically**
14:6 36:4 136:16

**basis**
21:17 34:12 54:10
63:16 65:19 164:6
168:1,13 196:6

**Bates**
77:5 117:17 118:7
119:4 123:22,23
127:24 130:21,22
131:21 134:7 175:15
176:18 177:1 192:9

**bear**
208:19

**beds**
19:6

**began**
24:21 55:4,11,19
70:3 76:24 148:11

**begin**
21:20

**beginning**
159:23 209:17
210:18 215:16

**begins**
124:4

**behalf**
16:5

**behavior**
55:16 68:12 119:7
120:1 126:11 162:22
185:8

**behavioral**
43:1 57:20

**behaviors**
96:19 98:8,13
108:22

**belief**
102:20 103:2 167:3
196:6

**believed**
103:16 111:6 137:7
138:4

**beneficial**
123:16

**benefit**
7:20 103:1,14 104:3
107:1,6 162:3

**Bethune**
78:10 91:14 125:20
129:3 130:1 137:10,
13 172:10 173:8,13,
23 182:19,24 183:3,
20 184:5 185:2,6
188:18,20 191:22
198:15 213:3,4,7

**BHTS**
43:1

**big**
144:17

**biggest**
151:22

**bio**
24:5

**biographical**
204:10

**bit**
9:1 14:17 16:13
24:10 36:14 40:1
60:10 64:22 76:22
137:24 168:21

**bizarre**
205:2

**blanket**
86:4 121:10

**blanking**
211:11

**blood**
195:9

**board**
71:20 79:20 152:21

**bodies**
195:7

**body**
207:21

**boss**
45:21 144:13 190:4

**bosses**
89:23 99:18 100:24
101:2,7,11 110:21
143:9,12 169:3

**bottom**
119:3 161:12 201:13

**bounce**
191:19

**box**
107:19

**boy**
78:21 163:17

**Braden**
45:13,15,18 58:21
90:12 91:3 101:13
118:18 124:10
177:20 193:18,23
207:13 210:8,23
211:12,22

**brain**
108:13

**break**
9:2,6 34:16,22 58:5,
10 98:18,23 138:18,
19 178:20 179:23
212:17,20

**breaking**
108:24 109:4

**briefly**
15:9

**bringing**
100:4 171:4

**broad**
36:15

**broader**
72:15 93:11

**broke**
146:2

**brought**
42:14 71:2 166:5,10

**building**
26:10 190:17

**built**
12:15 26:10 120:10

**bulk**
93:13,16

**bumped**
45:6

**bunch**
18:11

---

**C**

**C-H-E-S-S**
44:10

**C-H-E-S-T-E-R**
115:15

**call**
19:18 21:16 22:5
33:7 37:15 42:23
46:3 102:9 108:22
128:13,21 130:10,
11,12 158:2 207:21

**called**
17:24 21:3,19 25:2
61:2 68:2 162:23

**calling**
188:21

**calls**
33:6 60:19,24 61:3
101:16,21,24 102:12
104:7

**camera**
10:21

**cameras**
26:7

**candidate**
168:4,16,17

**capable**
7:16

**capacity**
6:22 16:4 19:21
20:13 21:1 25:20
36:11 47:13 69:11

**capping**
164:19 165:6,11
166:5,7,11,23

**care**
37:1 48:6,14,17
49:12 53:7,11,14,15,
16,18 54:5 55:3,4
58:14,18 59:4 61:7,
8,11,14,15,21,24
62:3,5,7,8 13,14,20,
22 63:5 73:9 74:1,14
75:6,18,24 76:10
78:7 83:11 103:13
119:16,20 120:19
125:24 126:1,14
127:21 135:7,12,17
136:1 138:13 141:3
153:20 154:1,6,12

168:14 173:7,22,24
174:11 184:2
191:17,20 195:14
197:2 207:18 211:6
216:10

**career**
11:4 36:3 93:13

**case**
15:22 16:8 18:4 27:4
47:22 134:11 146:17
175:24

**case-by-case**
168:1

**caseload**
70:3

**cases**
33:22,24 46:8

**catch**
162:16

**categorically**
171:2

**caught**
158:21

**cause**
25:7 162:24

**causing**
25:5 28:9

**cell**
27:8,13,20 37:20
40:16,19 78:22
84:20,24 85:1,4,9,
14,17,18,20,24 86:2,
5,6,8,22,23 88:1
121:10,11 139:1,15
149:23 156:17
157:11 166:12
167:12,17

**celled**
149:21 150:2

**celling**
151:13

**cells**
26:7 27:16 28:19
29:6 30:9,14 86:13,
17 190:24

**center**
12:12,17 13:19,20
21:7 53:22,24 54:5
57:18,22 59:13,15
60:5 76:2 114:9,15
115:8 170:4 173:6
192:4 204:17 207:11

**Cermak**
14:4,9,15 19:5 20:3
23:19 140:15 144:3

**Cerner**
145:12

**certainty**
10:15

**cetera**
104:8 108:6 163:3
204:12

**chain**
48:8 58:16 200:23
201:24 202:4,6,18
203:10 205:23 206:4
209:7

**challenges**
93:24

**challenging**
94:6

**change**
68:15,16 95:8 150:9
152:6,13 156:17
187:14

**changed**
16:23 69:1 147:17
152:4,9

**characterized**
81:16



**charge**
136:9
**charges**
163:10,12
**Chart**
203:16
**chase**
177:13
**check**
35:20 38:7 78:23
88:11 101:9 102:5,
13 116:23 150:13
175:19 182:17
186:23 188:13 206:6
208:20
**checking**
29:10 99:19 100:18
**checks**
37:13,14 63:18
**Chess**
44:8,12 58:20
101:13 124:11 135:5
169:4 172:3,5,7
175:9,12,16 178:12
179:1,5,12 192:13
196:4,8 207:14
**Chester**
115:8,10,11,19,22
116:17,22 117:3,8
168:23 169:13,22
192:4 200:20
**Chicago**
22:13 24:5
**chief**
20:1 87:4,5 88:6
144:15,16 148:4,5
**children**
204:11
**chitchat**
130:11
**circumstances**
7:14 113:14
**civil**
172:20
**civilly**
169:9,20 172:15
**claiming**
124:19
**claims**
161:17,20
**clear**
8:8,19 9:24 51:9
66:20 132:3
**clinical**
12:7 28:15 121:6
182:15
**clinically**
32:15 121:1 213:18
**close**
165:18
**closed**
55:23 81:14,22
155:1
**closely**
122:23
**closer**
150:16 172:14
**co-defendant**
7:3 15:2,5,9,14
197:13
**coercive**
195:19
**collecting**
141:22 142:4 147:6
**collection**
147:11
**column**
131:23
**comfortable**
139:6

**command**
48:8 58:17
**commander**
136:9
**commanders**
190:9
**commensurate**
138:13
**comment**
57:3 81:20 126:4
153:4 160:7 168:7,8,
15 171:22 186:4
**Commission**
37:1 61:16
**commit**
204:9 205:11
**commitment**
172:20
**committal**
210:3
**committed**
167:8 169:21 204:23
**committee**
19:17 20:2,5 65:17
**committing**
169:9 172:16
**common**
78:14 83:23 85:7,10
90:19 127:13,16
214:6
**common-sense**
105:15
**commonly**
110:2
**communicated**
135:23 212:1
**communication**
8:15 169:4 206:3
**communications**
206:20 209:12
**community**
54:22,24 61:16
62:24 173:16
**comparable**
62:8 75:19 76:1
**compare**
105:4
**comparing**
75:23
**complaint**
112:21 161:21
186:17
**complaints**
77:21,22
**complete**
17:19 18:6 124:4
**completed**
146:10
**compliance**
34:8,10,11 50:9
100:5 151:1,2,3,6,8
**complicated**
33:16
**component**
142:24 143:12,23
**components**
62:22
**compound**
66:13
**comprised**
42:21
**computer**
7:7
**conceding**
161:16
**concern**
116:4 133:6 135:16
136:19 158:16
171:23 173:17,18,19
183:9,17 205:2

206:21 210:20 211:5
**concerned**
130:18 183:21
**concerns**
71:21 130:6 134:21
135:6,11,24 172:22,
23 177:15 191:14
207:17,22 214:24
**concert**
40:14
**conclude**
28:4
**concluded**
216:20
**conclusion**
30:3 41:3 75:5
**conclusions**
25:19,24 27:3 98:11
99:10 141:24 147:24
148:6,11,23
**condition**
197:1
**conditions**
32:13,21
**conducted**
96:17
**conference**
60:19,23 61:3 196:3,
7 197:6
**confined**
162:4
**confinement**
32:14,22 35:9
**Confirm**
193:4
**confirmed**
39:11
**confirms**
179:16
**confusingly**
9:10
**congratulations**
22:18
**conjunction**
88:6
**consensual**
195:15
**consensus**
36:17,22
**consent**
65:20 142:8,10,19
143:6,16 145:1
146:2,3,15 147:13,
17
**considerations**
158:9
**considered**
80:18 165:4 187:23
195:18
**consistent**
141:11
**constitutionally**
142:20 160:16
**consult**
178:14 179:11,13,17
**consulted**
38:13 59:3 71:11,14
135:3,10 194:12,20
195:3
**consulting**
191:7
**contact**
24:19,22 25:20 33:4
44:19 49:4 62:18
88:12 90:5,8 91:8
105:22,23,24 106:4,
10 110:11 120:11
122:7 146:13 154:9
157:18 164:5 193:19

**contacted**
193:13 196:23
**contacts**
77:7,14,18 84:16,17,
23 85:5,9 163:23
198:5
**contemporaneous**
100:20
**content**
202:20
**context**
35:3 38:13 53:21
65:1 93:15 97:10
102:3 121:2 126:18
**continue**
183:13,15
**continued**
129:15
**continuing**
202:18
**continuity**
119:16,20 120:19
**continuous**
29:16,17 54:16
82:21 186:21 194:18
208:1
**continuously**
141:3 191:6
**contributing**
104:14
**control**
106:6,12 162:5
**controlled**
95:1
**conversation**
97:23 99:3 175:2,8
190:16 192:17,24
193:2,7,10,12
195:11
**conversations**
48:4 97:11,20 99:3,
14,15,17,20 100:15,
17,20,23 101:1,7,15
102:2,16 104:10
111:3 112:3 113:5
114:6 135:18,21
137:1,6 138:2,8
169:7 172:7,13
210:12
**conveys**
188:2
**convicted**
97:17 163:9
**Cook**
14:5,7 15:13,15,22
17:6,9,12,16,18
18:2,6,9,10 19:3,19,
24 20:4 21:19 25:4
27:4 28:5,22 30:13
31:12 32:1 33:10
34:2 35:3,22 36:4,6
38:14 39:3 40:2 41:9
83:4 96:18 97:12,16
98:4,13 99:5,11,24
100:4,12 102:4
109:19 110:3 113:17
140:11,14 141:15
142:7,22 149:7
150:11 162:19
163:11 164:13
165:13,16
**cooperation**
214:10
**cooperative**
186:10 214:2,7
**coordinator**
17:8 19:12
**copied**
199:17
**copies**
175:20

**coping**
108:18
**copy**
18:20 160:23 181:10
198:23 199:19
**copy's**
132:2
**correct**
30:15 31:8 32:3
37:23 39:16,23 42:1
51:22 59:17 70:23
78:3 83:1 84:12
100:2,7 112:9
113:22 118:24 123:9
124:14 125:5,8
128:12,18 134:16,
18,19,23 155:9,13,
18 173:1 176:7
178:6 187:16
**correctional**
12:12 36:8 37:1
67:18 92:17 93:20
94:24 95:5 103:11
105:20 106:6,11,23
107:5 124:24 125:2
131:14 151:24 153:3
162:4 214:5,23
**corrections**
12:14,17,20,23 13:9,
13 36:12 40:4,10
41:10,12 44:1 49:16
50:16,20 53:8 56:21
57:7 58:1 59:8
64:20,21 66:10
68:21 77:2 82:16
95:19 98:10 100:14
114:21 117:11
133:14 165:8 170:13
**Corrections'**
171:19
**correctly**
14:24 25:13 38:20
59:14 91:2 152:15
162:13
**corroborated**
39:18,20,22
**cough**
107:12
**coughing**
107:2
**counsel**
7:16 10:3 18:16
22:24 51:21 52:14
158:19 160:2,13
184:7 199:7 206:14
**counselor**
43:12
**county**
14:5,7 15:13,15,22
17:7,9,12,17,18
18:2,9,10 19:3,20,24
20:4 21:19 25:4 27:4
28:6,22 30:14 31:12
32:2 33:10 34:3
35:4,22 36:4,6 38:14
39:4 40:2 41:9 83:4
96:18 97:13,17 98:5,
13 99:5,11,24 100:5,
12 102:4 109:20
113:17 140:12,14
141:15 142:7,22
148:19 149:7 150:11
151:5 162:19 163:12
164:13 165:13,16
**County's**
18:6
**couple**
34:20 101:20 124:17
138:21 191:19
197:14 212:22
**court**
6:12 15:23 16:1,9

25:12 44:21 143:4
147:21,24 215:9
216:17
**courtesy**
34:21
**courts**
142:17
**coverage**
12:6 20:15,17 21:12
72:13 189:4 190:11,
24
**covering**
71:7
**COVID**
33:17
**crack**
167:18
**cracking**
204:24
**created**
13:19 17:23 77:8
197:22,24
**creating**
90:10 118:21
**creation**
91:5
**criminal**
171:20
**crisis**
11:10 20:18,20 46:8
53:13,17 54:1,3,7,8,
13,15 56:7 57:3
63:5,14,23 64:3,13,
23 65:1,6,8 69:9
70:7,9,10,14 77:13
78:20 83:14 84:5,12,
13,18 85:8 86:5,11
88:18 96:3,8,11
102:18,22,23 103:16
104:14 120:24
121:3,4,7,8,16,19
122:2,3,17,18
123:13 132:5,8,9,13
133:2,5,15,19,20,21,
24 134:4 136:7,18,
23 138:5 154:12
156:1,2,4,17,21,23
157:4,10,15,19,21
163:16,19,21,24
165:17,18,20 166:22
167:1,4,22 168:6
172:9 173:4 181:16,
17,18,19 183:13
186:9 187:8,12
188:3,4 189:1,21
194:18 198:19
**current**
11:4 170:11 171:20
**curriculum**
16:22 22:21
**custody**
19:19 50:23 82:11
**customs**
10:12
**cut**
125:18 127:19
177:13
**cutting**
91:17,21
**CV**
17:5

---

**D**

**D-O-Y-L-E**
46:18
**daily**
33:8 37:13 46:2
63:15,24 64:4,11
84:17 120:11 154:14



damage
163:1
danger
91:20
Dart
146:21,22
data
141:19,22 142:5
147:11,20,24 148:12
204:10
database
67:19 154:18
date
11:24 61:4 96:24
152:12 169:10,20
172:15 175:7 176:22
193:20 202:3
dated
192:12
dates
60:8 88:11 99:14,20
100:17 101:20
148:21 151:15
153:13 174:20 175:3
181:6 182:10,18
198:8,14,15,16,18,
22
day
13:5 14:15 27:9,20,
23 30:19 33:1,3
37:20 70:6 76:20
86:15 88:20 103:19,
23,24 104:1 107:19
108:5 120:12 130:3
182:19,21 183:1
184:4 185:2,6
188:19 191:3 193:23
204:5,19 213:21
day-to-day
168:12
days
21:5,7,8 29:1,5,15,
16,17 30:1,5 58:3
63:24 71:5 84:8
103:24 109:2 129:4
131:11 132:10,13
150:5 152:16 158:12
164:5,9 167:14
169:18 183:1 191:3
197:4,8
daytime
108:4,7
DC
120:24 121:2
debate
158:2
Decanoate
204:6
decision
58:19 60:16 87:11
88:5 116:10
decision-making
74:23
decisions
58:22
declined
109:21 110:14,20
decompensate
41:3
decompensated
65:14,16 184:22
decompensating
76:9 104:11 185:19
decompensation
32:13,16,23 104:15
110:6 129:17 133:8
184:10,18 214:15
decreasing
98:12
decree
142:8,10,19 143:6,

16 145:1 146:2,3,16
147:13,17
defendant
7:2 14:23 15:1
146:23
defendant's
51:9 146:20
defendants
18:24 161:22 162:8
defendants'
162:5
defenses
161:17
define
92:5
definition
94:11 132:8 133:5
degrade
108:17
degree
10:14
delivery
142:7
delusions
32:18
Demented
204:9
department
12:14,16,20,23 13:8,
13 17:20 18:8,12
24:13 25:14 26:10
29:23 34:9 36:12,24
37:2 40:4,9,22,23
41:10,12,44:1 49:15
50:15,20,23 53:7
56:21 57:7 58:1 59:8
64:20,21 66:10
68:21 77:2 82:16
95:19 98:10 100:13
114:20 117:11
133:13 142:2,3
144:14,16 148:20
160:15 169:23
170:17 171:19,21
205:15 207:16
depending
27:22
depends
159:18
deposed
7:1 19:14
deposition
6:17 7:14 8:4 10:10
23:1 70:18 77:9
112:7 176:10 180:5
199:8 216:19
depositions
14:19,22
depressive
32:19
deprivation
108:3
describe
11:3 63:21 64:24
85:23 96:1 144:4
describing
20:10 185:21
description
184:3
designated
13:11 55:5 67:2 68:1
86:10 134:4 153:5
154:5
designation
83:17 84:4
desperate
120:3,5,6
desperately
34:14
details
204:1

detainees
162:20
detention
153:10
determination
58:17 84:11 185:18
determine
65:17 174:15 175:11
188:11
determining
73:7
develop
28:20
DHS
170:23 204:9
diagnosed
89:9
diagnosis
65:24
difference
62:12 108:7 121:23
differences
165:23
difficult
33:18 68:18 76:16
98:14 166:2
diligence
50:3 125:14 126:6
direct
44:19 46:11 47:14,
17,24 63:17 124:3
130:19 131:18
206:21
direction
47:21
directly
98:15 113:1 145:14
164:1,3
director
17:9,11 19:3 20:3,4
43:23 44:4,17 45:10
144:14
directors
60:19
discharge
121:3 204:9
discharged
174:16
disciplinary
83:19,21 108:24
164:23
discipline
165:4
discovery
161:18
discrete
68:7
discretionary
157:5
discuss
96:16 114:18 171:9
205:12
discussed
22:10,21,24 48:9
135:22 149:1,4
164:12 165:7,14
206:4 210:14
discussing
96:22 210:1
discussion
22:21 113:24
136:10,14 157:23
173:6 192:2 210:7
discussions
173:2 189:19
209:15,18 211:1
disorder
55:12,13
dispute
204:11

disruption
25:6,7 163:1
disruptive
162:22
dissolved
147:13
distinction
96:2
district
15:23
divide
70:8
divided
133:21 155:20
division
163:11
Dixon
12:12 13:3,7,14,18
20:16 21:10 22:4,5
23:11,13 42:1,5,7,
12,14,16,19 43:15
47:3 48:6,19 50:6
54:13,18 55:24 56:4,
22 57:8 58:15 59:2,
7,24 60:2 61:8,12,
21,23 62:2,7,13
63:1,2,8,12 64:13
65:23 66:3,17,24
67:1,9,21 68:1
69:14,17 71:12
72:22 73:3,12,16,17,
24 74:13 75:5,19,23
76:6 78:3,6 80:2,13
82:20 83:24 90:23
91:10,15 92:18 93:6
95:13 96:5,6,8,9,15
97:4,7,19 105:5
106:11,18 110:13
113:2,14,18 116:24
121:18 124:24
125:1,21 127:13
128:8 131:8 154:1
155:12 163:5,8,19
164:14 171:10 172:2
183:3 185:2 186:8
189:20 193:24
Dixon's
50:8 105:6
doc
11:8 82:11 96:23
doctor
6:16 7:5 11:2 16:18
36:21 58:13 75:14
107:9 117:14 118:2,
11 124:1,20,23,24
125:1 126:2 128:3
138:22 140:7,17
161:9 174:5 177:7,9,
22 189:18 192:14
199:9 211:11,15
214:18
doctoral
14:10 140:20
doctorate
140:23
document
16:15,20 51:24 77:5
117:18 118:2,10,13,
16,21 119:3 123:20,
24 124:6 128:2
130:24 131:3,4,7,10,
20,22 161:9 178:23
196:5 206:3
documentation
23:2 41:24 192:5
196:10,12,13,21
197:5,10 206:18
documenting
100:23
documents
117:15 192:9 215:9

door
28:18 95:10
doors
86:22
dormitory
27:14
double
149:21,23
downshift
188:19
downshifted
188:19
Doyle
46:17,20,21,22 47:4,
17,21 48:1 58:22
101:14,19 116:1,2,
21 124:10 135:3
139:5,7 169:11
171:13 172:13 173:2
175:9,12,16 178:13
179:1,6,12 192:13
194:3,12,20 195:3,
11 196:4,8 203:15
207:13 209:4,13,21,
24 210:17,19
Doyle's
47:15
drafted
124:7
dramatically
39:14
draw
90:20 147:23
drop
107:12
dropped
33:19,21
due
50:3 71:2 76:9
125:14 126:6 195:7
duly
6:3
Dupree
200:10,11 201:5
202:1,14,16 203:14,
15,19,21
dying
19:19

E

e-mail
101:16 124:4,6,7
128:10 134:18
135:2,20 174:3,15
175:15 177:1,7,19
178:9,12 179:1,5,8,
16 180:12,22,24
182:1,4 184:9 192:5,
7,12,19,21 193:16
196:21,22 198:20
199:18,21 200:22
201:24 202:4,6,10,
14,18 203:1,9
205:24 206:4 207:13
209:7
e-mailed
199:7
e-mailing
209:4
e-mails
23:6 46:2 100:23
101:23 118:7 119:4
122:12 123:23
127:24 130:22 134:7
135:15 175:14,22
176:2,5,9,21 177:14
180:6,7,18 191:15
199:7 200:19 201:7,
14 206:7 210:17

earlier
69:5 70:17 77:24
112:6 113:4 135:19
151:1 172:8 192:3
194:23 195:6
200:15,20
early
13:24 21:10 38:17,
24 42:9 171:6
172:18 205:6,7
209:14
earmarked
13:13
easy
213:2
education
35:6,8
educational
11:3
effect
35:4 36:18 142:11
effective
89:14 99:12 158:23
159:4,18 208:2
effectively
204:21
effectiveness
159:7,13
effects
35:5,8
efficiently
7:18
effort
195:15,19
eight-hour
21:5,8
elect
10:4
electronic
145:13
element
215:17
Elgin
12:17,18,19 13:1,4,
19 21:7 57:22 59:12,
14 60:17,20 61:6,11,
13 62:9,15 63:1
114:9,15 115:3,21
117:2,8 168:23
169:13 170:3 173:5
192:4 204:18,23
205:11 211:2
Elgin's
60:10
elicit
195:15
eligible
188:4
Elimination
77:22
emergency
11:10 125:21 127:20
130:18
emergent
130:16
employed
11:20 14:1,8,14
45:15 50:4 52:23
72:22 160:8
employee
11:17 36:11 45:9
209:22 210:2
employees
18:1,3 135:24
employers
14:2
employment
35:14
enacting
90:10



encompass
23:11
encountering
133:14
encounters
174:21 181:6 182:11
198:9,10
end
110:22 147:16
150:16 157:19
187:15 189:18
ended
29:3
enforced
65:19
engage
119:24 186:12
engaged
161:18
ensure
89:13 159:15
ensuring
50:8 87:1 158:22,23
159:3
entered
48:16 161:12
entering
162:7
entire
17:1 66:16
entirety
69:13
environment
93:24 94:5,24 103:4,
15 108:15 139:3,19
environmental
143:22
episode
174:12
episodes
55:22 65:13 168:12
equivalent
44:2,12 54:21
essentially
180:9
established
156:6
estimate
138:8
estimation
47:20 62:6 91:20
evaluate
169:19
evaluating
24:6
evaluations
71:7,8 77:23
events
20:10
eventually
15:19 117:9
evidence
162:11 185:4
evolved
152:2
exact
43:23 86:1,6 92:15
102:14 145:16
148:20 152:12 184:3
exam
11:8
EXAMINATION
6:5 140:5 212:23
examined
6:3
Excellent
11:1 18:21
exchanges
199:22

excuse
25:15 38:21 90:7
executive
20:4
exemplary
18:1
exhibit
16:19 22:9 118:9
123:21 127:23
130:20 134:9 161:6,
10 199:3,5
exhibits
176:13
existed
53:11 62:14 71:12
exists
179:17
expect
120:13
expected
124:19
expecting
194:2
experience
14:18 29:24 32:24
40:9 41:5 73:13 75:2
76:7 79:22 81:6
92:1,8 93:14,23
94:17 97:12 99:11,
24 106:23 107:4
108:12,20 109:6,14
110:5,8 131:13
214:11,14
experienced
110:2
experiences
92:3 99:5 107:24
experiencing
108:1
expert
15:6 16:3,5
explain
13:9 28:14 32:10
133:4 135:12 144:6
146:1
explanation
114:14
exposure
55:14
express
136:18
expressed
135:16
expressing
137:7 138:3 183:17
extensive
161:18
extent
10:15,16 47:24
72:15 116:11 159:8
213:9
extra
21:22
eyes
186:4

F

face-to-face
78:12,15
facilities
12:8 13:17 14:2 22:5
23:12 35:24 41:15
57:6 71:2,9 79:8,17
115:5 117:10 160:9
162:4 170:11
facility
12:13,16 13:8 41:6
57:19 59:7,23 62:10
71:6 75:24 78:6,18
86:24 94:24 106:7

113:21 114:4,5,8
115:2,19 124:23
138:5 204:23 206:5,
23 207:5 208:6,12
210:3 211:8,24
213:5 215:18 216:11
fact
15:2,6 40:15 95:6
129:14 136:19 173:7
174:16 188:1 193:11
203:3
failed
63:10
fair
8:9,21 9:6,18 10:7,
17,23 61:1 72:19
83:22 117:21 131:5
134:1 151:14 155:10
161:24 167:1 172:17
181:4 188:24 202:23
fairly
128:5
faith
52:18
fall
17:41 49:14,19
50:13 60:15 66:8
77:11 78:2 79:6,15
109:20 118:13
120:15 131:3
familiarity
36:15 72:21 88:22
92:9 113:13
familiarize
77:1
family
33:5 104:7
fast
188:14
favor
7:4
feasible
121:1
federal
15:22,24 16:1,9
feel
76:6 119:22 120:3,
18 123:15 127:17
feeling
105:7 120:5
felt
56:18
female
112:19,23 186:15
fighting
163:12
figure
178:20 196:5 203:6
file
186:17,18
filed
77:21
fill
21:3
filling
73:2 91:3
final
89:13
Finally
10:19
find
18:18 26:21 28:6
176:21 179:20 183:4
196:20
finding
26:19 41:8 51:13,17,
20 100:1 142:20,24
143:15,16 160:3,14

findings
28:21 39:10
fine
34:18 52:8 53:3
148:22 150:19
finish
8:5 30:24 141:21
172:6 178:19 211:18
finished
10:2 31:2 211:17
fire-starting
26:6
Fisher
128:7,11 129:20
182:7 183:6 193:19
fit
39:10
five-day-a-week
37:14
flooding
163:2
focus
97:19 103:10 119:5
focused
211:9
folks
27:24 29:3 34:1
40:12 61:19 70:13
74:24 77:15 88:19
97:14 120:14 136:11
146:13 187:11
follow
183:14
follow-up
55:2 140:9 192:17
foreign
195:7 207:21
forensic
115:9
forgive
14:20 16:12 84:9
171:15
form
51:20 63:6 67:17
73:18 74:4,13,17
75:9 76:11 80:14
89:16 92:12 101:15
215:24
forms
133:17
formulating
90:3
forward
90:2
found
40:10 109:3 197:9
foundation
50:24 51:10,15 72:5
73:19 74:5,18 75:10
76:12 80:3,15 89:17
132:15 215:21
four-point
113:8,9,15
fourth
131:23
frame
38:3 141:18 184:8
210:16
freedom
94:12,13 95:6
freezes
10:21
frequency
136:23 145:10 154:8
187:14
Frequent
120:9
frequently
30:9,15 47:20 71:1
84:6 92:3,6,11 120:9

fresh
167:13
Friday
141:8
front
118:2,11 123:21
124:1 130:24 134:9,
13 146:4 160:23
178:16 203:8 206:1
full
22:14 34:7,10,11
150:24 151:8
full-time
21:15 22:4 42:17,22
41:10 54:10 68:9
141:6
function
60:11

G

G-O-N-Z-A-L-E-Z
45:10
gang
25:1,3,4 162:18
163:4
gathered
141:19
gave
32:1 116:7 175:4
182:10
gay
10:11 41:16,21 42:4
47:6,23 48:1,5,13
49:4,13 50:7 53:10
59:16 65:22 69:6
70:4 72:19 76:22
77:1,7,12 78:5,12,
19,22 79:2,16,24
80:12 81:2 82:1
83:9,12 84:6,11
87:1,24 88:8,21,23
89:11 90:6 91:9,20
93:7,12 101:8
102:20 103:17
104:10 112:11,17,21
114:1,14,19 115:18
116:16 118:7,17,20
119:4 120:20 122:14
123:11,23 124:18
125:7,10 126:17,21
127:18,24 128:12,20
129:10,14,16 130:22
131:11,23 134:2,7
136:3,6,11,14,24
137:8 138:4,12
139:1,15 154:2
155:11 157:14
163:20 166:24
168:14,19,22 170:7
171:6 172:6 173:3,4
174:5,16 175:24
177:16 180:12
181:7,20 182:11,15
183:5,12,24 184:9,
17 186:9 188:12
189:1 198:9 200:9
201:6,11,13,14,18,
20 202:7,14,19,21
203:20 204:2 205:4,
5 206:5,22 209:6,8,
13 210:2 211:23
213:11,14 214:1
215:1,18
Gay's
23:10 42:1 46:24
47:13,15,18,22
48:17 55:4,18 58:15
59:1 69:7,14,16
72:3,15 78:2 79:7,11
83:11 84:4,20,24
85:14,17 86:7 87:7,8

88:9 90:4 93:5 97:3
101:3 102:3 104:13
111:4,7 112:4
114:21 119:12 121:6
129:20 130:6,15
131:24 132:12 136:1
139:1 164:6 171:15
180:8 189:20 194:8
202:24 215:16,19
geared
32:6
general
10:12 41:2,7 54:20,
24 64:8 105:10
112:21 121:5 151:19
152:22 167:16,19
168:19 190:15
generally
50:13 102:15 133:21
generated
131:5
genitals
92:2,13
give
7:14,16 10:13 65:19
87:11 92:14 148:20
158:23 161:15
167:12,17 182:2
184:2 211:23 212:14
giving
167:15
glad
6:9
goal
25:5
goals
120:23 121:6 123:10
Gonzalez
44:17 45:10 101:14
124:10 193:18
207:14
good
6:7,8,9 30:1 52:18
57:15 58:9 92:8
98:22 105:12 125:6,
10 191:21
gravel
173:10
great
118:6 185:5 199:14
greater
121:14
green
116:12
grossly
65:13
grounds
14:7
group
62:21 104:8 121:14,
20,24 122:3,6,7,10,
13,19 162:19
181:15,21 213:12
groups
20:24 40:14,17 70:5
88:17 112:8,12,17
181:22 213:15
guarantee
159:12,14
guard
61:20
guess
47:6 52:4 58:16
94:16 108:21 120:6
129:5 166:2 187:1
guide
36:24 37:3
guideline
64:11,15
guidelines
36:23 37:2,8,22



38:5,12,22 39:2,23
40:21 86:11,18
153:2
**guilty**
109:3
**guy**
164:7 169:15 185:15
190:17 191:8,10,16
194:4 200:21
**guy's**
185:5
**guys**
178:20 191:2 212:14

**H**

**Haldol**
204:6,7
**half**
17:14 21:23 33:18
70:15 88:18
**hallucinate**
28:1
**hallucinations**
32:18 108:13
**hand**
16:13
**handled**
83:6
**hang**
193:20 194:10
205:12
**happen**
8:3 153:12
**happened**
90:23 184:3 209:19
**happy**
9:14 10:22 17:2
186:13
**hard**
131:1
**harder**
76:18
**harm**
100:1 101:2 102:3
157:6
**head**
18:23 86:9 88:13
92:15 99:19 100:17
102:6 145:15 146:19
150:14 153:17,23
183:10 190:8 210:11
**health**
12:13,22 13:8,15
14:4 15:15 17:17,18
18:2,10 19:6 20:3
36:5 37:1,18 42:16,
17,18,24 43:1,8,14,
24 50:10,21 56:20,
23 60:1 62:19 63:16,
20 64:1,12 65:24
68:11,12 71:7,17
75:4 84:7 87:10 88:5
89:21,23 95:8,9
105:12,18,21 106:5,
11,18,24 107:5,18
109:22 110:12,15,16
115:8,19 126:10
130:16 133:7 140:8
142:7 143:10,20
144:8,14,17 145:1
152:23 153:3,8,9
154:9,15 155:6
156:10,16,19 159:5,
11,12 160:3,15
163:23 164:22 165:3
167:21 168:23
169:22 172:1 183:14
191:13 192:4 196:24
207:11,15 208:6,12
210:1

**healthcare**
50:14 51:21 54:12,
18 57:8 73:14 92:18
95:4 96:1 140:14
142:21 143:5 153:20
**healthy**
213:21
**hear**
6:9 9:24 10:21 43:4
152:17
**heard**
45:4 152:15
**hearing**
139:20
**hearsay**
174:9
**held**
11:23 72:8,11 99:4
195:19
**hell**
188:22 203:23
**helped**
18:6 205:9
**helpful**
69:4
**helping**
17:18 37:18 104:16,
21 105:3 124:21
125:4
**high**
24:13 25:16 80:1
144:22 162:20
**higher**
26:22 27:5 49:11
56:23 57:7 61:7,24
**higher-ups**
96:23 97:11 98:9
99:4
**highest**
53:18
**hired**
44:23 45:11 90:24
**hiring**
11:24 73:2,4
**histories**
98:8
**history**
55:13,19 77:1 78:2
79:2,7,11 83:11
88:22 125:13 126:11
170:23 214:4 216:8
**hold**
10:15 72:3 107:9
176:21 177:22
200:17
**holding**
158:14
**home**
54:23 60:21 194:1
**homosexual**
112:18 186:16
**honoree**
17:23
**hope**
126:20,23 205:8
**hoped**
138:14
**horizon**
59:19
**hospital**
12:19 14:6 21:23
29:4 61:13,14,17
62:9,24 75:20 78:10
91:14 95:3 104:2
105:8 114:1,19,23
115:9 125:20 127:20
129:3,6 136:21
137:11 138:5 143:10
163:3 165:19,21
169:13,15,21 172:10
173:8,13 177:16

**hospital-related**
216:9
**hospitalization**
185:24 213:20
**hospitals**
15:15 17:17,19 18:2,
10 137:9,10,16
138:12 168:11
**hour**
37:20
**hours**
27:9,19,23 30:19
33:3 76:20 103:19
104:1 107:19 121:11
148:16 155:24
156:12 191:3,20
**house**
26:10
**housed**
20:21 26:4,16,17,18,
22 27:7,12,19 31:15,
16,17 37:12 40:7
41:7 53:17,24 54:1,
8,14 55:22 79:13
81:2 96:8,10 149:16,
22,23
**housing**
26:20 79:7
**Human**
169:23 170:17
171:21
**hurt**
28:16 105:2 183:24
**hurting**
104:17,23 105:2
191:8
**hypothetical**
214:17

**I**

**ICARE**
17:24
**idea**
83:6 120:22 188:2
197:21
**identified**
79:3 138:2 151:10
**IDHS**
170:10 171:7 172:6,
18 173:3 206:5,23
209:14 210:3 211:8,
24
**IDOC**
40:11,23,24 50:11
61:18 67:8 79:21
89:23 95:20 97:15
98:5 99:10 100:10
110:3 135:24 156:6
160:8 165:14,15,24
166:2,8 170:5,15,23
192:8 216:11
**ill**
13:12 20:22 21:21
29:2 32:3 42:13
50:22 54:6 55:6
59:3,9 60:12 65:7
66:4,9 67:3 68:1
73:15 74:2,14 75:7
76:9,16,19 79:4 89:5
90:21 94:1 106:20
109:7,15,18 143:1
145:20 146:8 147:8
150:10 152:7 153:10
155:7 162:3

**Illinois**
11:12 12:13,16,20,
23 13:12 16:10
36:12 40:3,9 41:10
43:21,24 44:4 49:15
53:7 56:20 57:6 58:1
59:8 68:20 95:18
100:13 114:20
115:10 169:23
170:16
**Illinois.gov**
180:21,23
**Illinoiscare.
nunez@illinois.
gov.**
181:3
**illness**
55:10 67:16 89:9
94:7 107:20 109:16
114:2,22 150:6
152:1 214:12
**illnesses**
94:18 155:8
**imagine**
125:14
**immediately**
151:21
**impact**
28:6 35:16 154:8
**impacted**
166:24
**impacts**
94:16 141:14
**implement**
33:10 34:3
**implemented**
34:6 149:7
**implementing**
42:12
**important**
7:23 32:7 127:17
**impossible**
196:15
**impressions**
80:11
**improvement**
17:7 19:11 144:13
**improving**
144:1
**in-house**
142:1
**in-person**
101:16,18 118:24
**inability**
65:19
**inadequate**
50:21 51:20 74:15
76:10 142:21 160:16
**inappropriate**
160:4
**inaugural**
17:23
**incarcerated**
35:10,17 36:19 75:3
76:8 79:23 92:9
**incarceration**
58:15 59:2
**incidence**
98:12
**incident**
39:4 77:20
**incidents**
143:13 146:9 147:15
149:1
**include**
23:24 31:4 51:18
142:19 148:23 149:3
153:13 196:22 198:7
**included**
31:6 50:19 100:22

**Illinois**
160:3,14
**includes**
177:1
**including**
30:7 55:16 110:12
**incomplete**
214:17
**incorporated**
37:22
**increase**
30:4 109:7 156:10,
11,20
**increased**
30:13 87:9 88:10
**increases**
155:15
**increasing**
40:8
**indecent**
55:14
**indelicate**
92:1
**independent**
39:17,21 41:20,22
208:17 209:2 212:3
**indicating**
215:2
**indices**
146:14
**individual**
40:8 42:13 55:7
62:18 63:15,20,21
65:1 68:5,7,13 79:4
88:11 94:7 95:15
96:2,3 108:1 110:14
113:2,15 121:18
131:15 133:15
136:22 170:22
213:19 214:23
**individual's**
106:4
**individually**
149:22
**individuals**
15:16 18:11 24:16
25:21 26:21 27:4
28:5 31:6,10,11 32:3
35:10 36:19 43:15
45:23 46:6,10 50:22
59:9 60:12 65:7
67:2,24 70:19 71:1
73:15 74:15 75:3
79:23 82:3,9 84:15
85:7 86:10,12,16
94:1,17 97:24
101:12 109:21
113:7,9 123:12
153:10 167:3
**individuals'**
75:8
**infection**
125:13 126:12,19
173:22 174:10
207:19,20 216:9
**infirmary**
48:19,23 49:1,3,11
53:16,19 62:4,6,13,
17 69:20 111:24
112:1 126:1 129:7,8,
11 130:3 136:20
168:11 172:12,23
173:24 174:11,17
182:21 183:20
188:18 194:17
198:16,17 208:2
**infirmity**
161:17
**information**
46:5 77:17 83:16
88:9 114:13 148:18
182:14 183:5 198:7,

**Illinois**
12,13 207:23
213:14,16
**informs**
11:4
**initial**
78:15 83:8 90:8 91:8
202:16
**injure**
24:21
**injured**
125:19 182:22
**injuries**
113:22 128:24
**injuring**
191:16
**injury**
126:10
**inmate**
27:12 36:1,9 60:17
117:2 127:14 150:10
157:4,9
**inmate's**
157:6
**inmates**
12:17,22 24:1,20,21,
23,24 27:14 40:6
41:3,15 63:4,13
65:23 66:3 92:4
106:9,20 109:15
117:7 141:15 143:1
147:8 149:6 152:7
155:7,20 156:23
170:8,11 171:20
**inmates'**
82:20
**inpatient**
12:21 14:6 17:10
19:5 26:12 29:5
62:20 102:18,21
103:2,15 144:9,11,
21 154:1,5 194:18
207:11 208:6,11
**inserting**
173:9
**insertion**
195:7 207:21
**insomnia**
32:20
**instance**
15:8 16:2 99:9
135:23 157:22
**instances**
6:24 8:1 23:24 85:3
135:16 138:24
139:14 213:24
**Institute**
11:9
**institution**
56:5 109:5 167:10
190:10
**institutional**
95:14 125:13
**institutions**
12:8 60:13 70:20
153:3 214:5
**instructs**
10:3
**intent**
9:11
**interact**
104:8 129:10
**interacting**
70:4
**interaction**
182:16
**interactions**
104:6 154:14
**interests**
162:1
**interpret**
147:23



intervals
46:1
intervention
11:10 119:15
interview
85:6 139:5
interviewed
19:15 148:13,15
introduced
83:3
introduction
161:16
investigate
25:16
investigated
19:17
investigating
19:23 23:19
investigation
28:3 35:23 39:17,21
invited
72:9 160:1
involved
24:18 36:2 40:22,23
48:14 58:21 71:18
72:12 73:11 74:23
86:21 87:11 90:3,10
93:5 112:13 122:8
128:21 168:14
209:18
involvement
134:22 206:22
involving
146:6,7
isolation
80:5 104:14 111:7
issue
25:1 34:8 36:5,10
151:10,18,20
153:13,16 162:23
169:8 170:7 171:5
172:18 194:14,22
195:5 208:19 211:7
issued
64:19
issues
10:19 26:8 36:16
37:23 71:21 147:12
item
34:10 119:2 123:8
items
63:19 119:5,14
143:19,23 144:24
150:24 151:2,3

J

J-A-M-I-E
44:9
jail
14:5,7 15:13,18
19:19 20:4 24:7,14
25:3,4,6 28:10 33:20
95:11 141:2,4 163:1,
12 205:15
Jail's
142:7
jailhouse
25:1 26:17 162:18
jails
153:5
Jamie
44:8 58:20 101:13
172:3,7 207:14
Janet
58:21 101:13
January
17:22
Jayne
45:12,15,18 90:12
118:18 193:18,23

207:13 210:7,12,23
211:12
job
50:1 83:5 141:6
Joe
140:7 192:2 198:21
200:12 202:24 203:5
211:16
Joe's
201:5
join
51:1 66:14 73:20
74:6,7,19,20 75:11,
12 76:13,14 81:10
89:18 94:9,20
215:23
joined
139:5
Joint
61:16
Joliet
13:19 57:17 60:4
204:17
jotted
169:2
Joy
198:23
JTC
173:14 204:22
July
45:17
June
11:22,24 13:3 45:17
128:18 129:1 130:2
182:4 184:12,13,14
jurisdiction
16:7
justice
17:21 18:9,12 24:12
25:14 26:9 29:22
34:8 36:23 37:2
40:21,22 142:2,3
148:19 205:15

K

ken
60:2
kill
28:17
kind
29:19 32:23 35:23
36:17 63:12 64:6,10
65:23 71:15 91:19
93:10 186:19 188:23
215:5
kinds
46:5 63:3 68:6
122:12,13 136:21
knew
55:21,23 56:9,17
98:5
knowledge
172:19 189:6

L

lack
7:20 19:22 26:6,7
28:4 132:14 162:11
214:10
lag
10:19
large
33:19 94:6
latest
38:21,22
lawsuit
15:24 160:10 197:13

lawyer
197:23
lawyers
8:24
lay
32:15 64:24 65:9
186:4
lead
18:8 112:8 146:20
leadership
215:4
leave
26:12 104:5
led
68:23 181:21
left
35:2 45:12 58:13
99:2
legal
162:12
legwork
20:7
length
95:14 161:19
letting
29:6 86:22
leukemia
21:22
level
14:10,12 43:9,10
49:11 53:14,15,16,
18 54:5,11,12,17
58:18 59:4 61:7,11,
15,21,24 62:3,7,8,
13,14,20 63:5,14,23
73:7 75:5 76:10
83:11 95:24 140:17,
20,22 154:1,6,12
186:21 187:3
levels
53:7,11 56:23 57:7
58:14 186:22
liability
162:8,11
liar
153:21
license
11:14
licensed
11:7,11 43:10,11
licensure
11:8
lie
150:12
lieutenant
136:8 189:24 190:5,
6 191:4,7 215:1,3,6
lieutenant's
191:5
Life
25:2 97:15,16,23
162:15,16,18,23
light
116:12
lights
27:23
limit
28:24 29:19 37:11
94:11 106:3 150:6
limitation
29:15
limited
94:13 95:7
limiting
29:5 149:14,15,17
150:9 152:16
limits
95:14
list
77:20 199:6

listed
34:11 67:18 146:22
154:18 181:6,24
198:16
listen
67:5 87:14 122:23
139:11 177:9 195:22
198:2 206:24
listener
57:15
listening
207:2,3
literature
36:3,7,16
litigation
49:16,17,20 81:15,
22 134:22 161:23
215:8,10
living
54:23
located
84:21
locations
12:2 24:14 58:24
locked
30:19 33:2 103:18,
23 185:15
long
11:20 14:8 16:12
55:13 58:6 64:4
80:5,7,21 81:16
98:19 103:24 115:11
119:11 132:4
133:18,23 134:3
140:13 147:11 150:1
185:12
long-term
39:15 57:20,23
107:1,7,8 108:16
longer
29:7 58:3 108:11
looked
135:14 168:1 174:3
175:17
lose
27:24
Losing
108:3
loss
32:19 195:9
lot
8:24 190:9,12
lower
177:21
lowering
187:3
Lucky
161:1

M

made
15:10 26:19 28:11
30:13 33:12 39:11
60:19 68:22 84:10
88:5 101:22 111:20
116:21 117:1 141:23
149:9 150:11 151:15
162:9 165:24 166:1
168:18 169:4 180:4
197:23 198:4 215:15
main
13:15 25:6 151:19,
20 166:14
maintain
20:18 64:2 75:8
207:24
maintained
204:16
major
32:19 76:2

make
7:24 8:19 9:12,23
17:5 28:22 30:7,17
41:14 78:15 100:19
103:3 104:6 115:23
125:14 127:13,18
148:7,8 149:10
153:20 158:20 161:7
181:7 185:18
187:18,21 197:17
214:21
maker
116:10
makes
58:17 60:15 164:11
making
30:2 37:15,18 39:3
126:6 153:4
male
17:9,10 19:5 112:20
144:11
manage
28:11 56:18
managed
56:19
management
29:11 57:21 144:5
manifestations
215:20
manning
136:7
Manny
44:17 45:10 101:13
193:18 207:13
210:9,13,21 211:10,
22
Manny's
45:21
manual
64:18,19 86:21
153:1,13,19
March
77:3,12 78:5,8,11
82:1 83:9,13 90:9
154:3 174:24 181:8,
12
mark
128:7 161:10 193:19
married
204:11
master's
14:11 43:9,10,11
140:18,22
materials
23:2,14 26:6 42:4
matter
7:2 10:13 15:11
76:17 121:5 157:5
163:18 167:20
mattress
86:2
max
163:11
maximum
20:19 24:15 54:2
meaning
13:12 19:19 57:24
150:1 195:12
means
67:1 195:4
meant
133:3 201:6 202:14
mechanisms
108:18 164:21
medical
20:3 23:7,9 26:11
50:3 76:2 77:14 95:3
124:19,23,24 125:1,
24 126:14 127:6,7,
10,21 143:21 145:13
153:20 173:7 174:14

183:14 195:14
207:17 208:8 211:5
216:4,6,10
medical-type
127:2
medically
91:20
medicated
65:18
medication
29:11 54:20,23 55:1
65:15 195:14
medications
37:17
meet
20:17 110:20,23
111:1 112:19,22
120:8 139:17,18
meeting
71:16 78:16,19 79:1
83:8,12 118:24
119:23 120:2,14,16
139:4,6 205:9
meetings
63:24 64:4,1 65:17
71:18,23 72:1,4,7,
10,12,16 101:17,18
120:10
member
63:16
members
33:5 163:4
memberships
69:2
memory
42:4 156:15 170:21
209:2
mental
12:13,21 13:7,15
36:5 37:18 42:16,17,
18,24 43:8,14,24
50:10,14,21 51:21
54:12,17 55:10
56:20,23 57:8 60:1
62:18 63:16,20 64:1,
12 65:24 67:16
68:11 71:7,17 75:4,8
84:7 87:10 88:5
89:21,23 92:17 94:7,
18 95:4,8,9,24
105:18,21 106:5,11,
18,24 107:5,17
109:16,22 110:12,
15,16 114:2,21
115:8,19 130:16
132:12,19 133:6
140:14 142:7,21
143:5,20 144:8,13,
17 145:1 152:1
153:2,8,9,20 154:9,
15 155:6,8 156:9,16,
19 159:5,11 160:3,
14 163:23 164:22
165:3 167:21 168:23
169:22 172:1 183:14
191:13 192:4 196:23
207:11,15 208:6,12
213:22 214:12,15
215:19,20
mentally
13:12 20:22 29:2
32:2 42:13 50:22
54:6 55:6 59:3,9
60:12 65:7 66:4,9
67:3,8 68:1 73:15
74:2,14 75:7 76:8,
16,19 79:4 89:5
90:21 94:1 106:19
109:7,15,18 143:1
145:20 146:7 147:8
150:10 152:7,20
153:10 155:7 162:3



**mention**
63:11 171:24
201:13,15
**mentioned**
13:6 14:20 23:17
31:23 32:22 41:23
53:6 63:19 69:5
70:17 112:6 149:24
152:14 154:17,23
166:5 179:6 200:9
213:24 214:21,22
215:1
**met**
77:13 82:1 84:13
118:18,20 119:1
138:24 139:14
**method**
67:7,13
**methods**
99:12 100:1,11
101:3 106:9,18
164:13,17 165:7,13
**meting**
165:4
**microphone**
45:6
**mid**
13:24 21:11 34:5
38:16
**middle**
144:4
**mind**
34:15 140:4 174:23
**Mine**
202:1
**minute**
186:21
**minutes**
34:20 58:8 64:5,7
98:21 138:15 179:20
212:15
**misremembering**
70:22
**misrepresenting**
52:15
**misspoke**
90:7
**misstate**
70:16
**misstates**
215:22
**misstating**
70:22
**misuse**
23:19
**mitigating**
150:4
**modules**
35:19
**moment**
23:17 32:22 53:6
99:2 133:2 208:16
213:10
**Monday**
141:8 187:20 188:21
**money**
21:22
**monitor**
19:14,15 29:22
143:4,9 147:18,21
148:1,14,19 151:4,8
**monitor's**
215:13
**monitored**
54:9 82:21 145:11
147:19
**monitoring**
37:12,17 38:19
54:16 61:18 62:16
63:15,20,22 142:4
143:7,24 146:4

**monitors**
25:12 37:4
**month**
12:24 108:6 129:2
168:15 182:12,16
188:24
**monthly**
35:18
**months**
17:14 45:12 56:1
79:19 97:7 109:2
150:24 151:5,7
169:17
**morbidity**
19:16
**morning**
6:7 124:21 140:1
177:3 188:21
**mortality**
19:17
**mouth**
56:16
**move**
7:17 8:23 189:2
**moved**
11:1,23 112:1 129:8
136:20 152:6 168:22
177:16 188:12
189:8,10
**movement**
59:3
**moving**
29:4 58:23 162:6
191:4
**MRSA**
125:23 173:12
207:20
**MSR**
205:1
**multiple**
145:23
**mumbling**
195:1
**mutilation**
92:2

**N**

**N-U-N-E-Z**
6:14
**named**
7:1 14:23 15:16,19
16:2 18:11 23:15
167:4
**names**
43:17,19 60:23
169:2 170:21 190:13
**National**
37:1
**nature**
55:9 91:16 128:23
**NCCHC**
36:23 37:8,22 38:6
39:7,23 40:21
152:14,24 153:1,7
**needed**
10:23 21:3,21 22:6
56:19 105:11
**negative**
19:18,24 23:21,22
30:4 33:14
**negotiations**
161:19
**news**
205:9
**Nick**
178:3,4 199:11,12
**Nicolette**
63:7 66:15 199:15

**night**
33:1 108:5
**nighttime**
108:8
**non-smi**
31:16,18
**nonlethal**
119:7
**nonseg**
163:21
**nonverbal**
8:15
**normal**
204:5
**north**
44:18 45:9
**Northwestern**
11:6,9 35:11 75:19
76:2 93:22 140:23,
24
**note**
24:5 110:19 193:20,
22,24 194:7,8,11
196:23
**noted**
110:16 119:6
**notes**
16:13 23:5 77:22
78:23 99:19 100:18,
20,22 101:9 102:5,
13 116:23 129:23
136:4 138:16 150:13
156:19 175:14
178:12 179:7 180:3,
4,6,8 186:23 208:13
**notified**
88:8 197:12
**notify**
110:21 191:13
**November**
134:17
**nuance**
158:21
**number**
8:3 30:1 33:20 36:5
77:6 79:18 80:11
92:15 93:18 98:1
102:14 109:2 130:21
132:1 145:14,16
146:5,6,8,9,10,22
150:4 175:15 176:18
**numbers**
117:17 123:22
148:17
**numerous**
55:15
**Nunez**
6:2,14,15 16:19 35:2
149:11 177:20
**nurses**
174:9
**nursing**
29:8 61:14 62:3,5
124:18 143:21 174:4
**nuts**
205:16

**O**

**object**
36:20 38:2 50:24
51:19 52:9 66:12
73:18 74:4,17 80:3
81:9 89:1,7 94:8,19
104:18 105:13
111:10 132:14
206:13,15 214:16
215:21,24
**objected**
51:9

**objecting**
52:19
**objection**
10:1,6 72:5 75:9
76:11 80:14 89:16
104:24
**objections**
9:22 52:10
**objective**
119:10
**obligations**
17:20 18:6 45:24
**observation**
63:17 73:13 74:1
165:18
**occasion**
85:13 109:21 113:21
120:1,16
**occasional**
204:5
**occasions**
6:19 101:6 117:5
138:7 186:23
**occur**
84:17,24 85:5
**occurred**
135:19 197:6
**occurring**
85:9
**offender**
154:19 167:8
**offenders**
162:3 165:3 167:22
**offenders'**
164:22
**offer**
56:22 57:8
**offered**
16:3 40:20 57:7
75:19 157:20
**offering**
40:16 116:9
**office**
15:14 18:10 143:22
**officer**
189:24
**officers**
191:2
**oftentimes**
27:22
**on-call**
128:14 196:24
**on-site**
87:5 90:14
**one's**
92:2,13 192:9 213:2
**ongoing**
25:10 34:12
**online**
24:4 60:5
**open**
44:15 56:15 60:9
80:22 94:5 95:10
115:11 126:12
127:19 154:24 173:9
177:17 216:8
**opened**
115:16
**opening**
86:22
**operated**
169:23
**operating**
64:17 86:20 156:7
**opinion**
10:16 73:14 74:13
126:20
**opinions**
10:10,13

**opportunistic**
126:19 173:22
174:10 216:9
**opportunities**
121:20,24 122:14,19
123:15
**opportunity**
37:19 121:13 127:8
167:13
**opposed**
94:5
**options**
127:9
**oral**
204:7
**order**
17:19,21 18:5,20,23
34:10 37:4 39:12
77:9 100:5 120:1,16
142:16 160:23
**orders**
38:21
**ordinarily**
85:5 91:3
**organized**
178:16
**originate**
64:15
**out-of-cell**
87:2,9,12 88:9 98:11
121:13 149:18
151:13 155:16,19,24
156:20,24 157:5,15,
21 158:10 163:23
166:16 167:5,21
168:5
**outcome**
20:9 125:7,10
**outcomes**
19:18,24 23:20,21,
22 28:8 30:4 33:15
**outlined**
86:21
**outpatient**
54:19 145:9
**overlap**
47:6
**overtime**
21:16 22:6 48:12

**P**

**P-I-E-R-R-E**
6:14
**p.m.**
194:20 207:14
216:20
**packet**
176:2 177:2 199:6
**pages**
199:6
**paragraph**
124:4,16
**paragraphs**
124:17
**paranoia**
32:20
**paranoid**
110:10 119:23
**part**
15:18 40:18 49:16
50:1,2 70:20 83:5
106:2 112:7 151:17
**part-time**
12:5,7 20:13
**participate**
60:18 61:3 109:22
110:14 112:12,17
204:20,21

**participated**
72:18 141:14
**participation**
159:9
**parties**
110:12 161:18,23,24
162:2
**parts**
23:7
**party**
16:4
**passing**
11:7
**patient**
15:17 53:15,16,23
54:15 59:4 60:22
64:2 68:13 76:16,18
77:22 79:5 83:15
89:2,5 100:22 103:7,
9 116:5 126:9 154:5,
11 159:4,19 175:14
180:6,8 188:7 192:3
193:19 194:11,17,22
195:6,8,12,17
196:23 204:15
207:19,23 208:1
**patient's**
46:17,23 58:18
135:3,4,7,11 149:24
159:9 197:1 207:17
**patients**
13:11,17 19:7,9
20:18,20,22,23
26:11 29:2,3 31:13,
15,16,17,18,20,21
32:6,9 54:4,5 59:20,
24 60:9 61:18 62:17
63:23 64:23 67:21
68:24 70:6,7,9,11
71:8 73:8 88:15,18
90:21 103:21 113:11
115:10 134:4 145:21
146:6,8 149:14
151:18 152:18,19
164:19 170:15
**pattern**
61:17
**patterns**
73:12
**pauses**
16:13
**Pay**
179:2
**PDF**
117:23
**pending**
9:4,5
**people**
8:20 12:22 19:19
21:15 22:4 24:17
25:5 26:4,5,12,15,
16,18 27:7,13,17,21
29:6,10,11 30:9,14,
18 33:4,6,8,20,22,23
35:17 37:11,16
39:15 40:15 43:10,
17 46:7 57:19,20,24
58:24 60:23 64:12
65:11,13,15 66:9
67:4,9 68:2 69:1
74:2 76:8 82:6 84:1
86:4,22 88:19 92:9
95:1 96:8,9 97:15,16
98:2,3,7 104:6
108:23 109:7,17
110:10,18 112:20,23
119:21,22 120:2,8
121:8,20 122:6,10,
18 133:18,21,23
144:19 149:16,19
150:5 152:21 153:5,
11 156:18 162:17



163:7,10 164:14
165:8,14,19,20
166:8,13,22 167:12
169:3,6 187:10,12
190:10 214:6
**people's**
28:7,24 68:16 83:20
84:2 94:12
**perceive**
88:23
**perceived**
130:15
**percentage**
65:23 66:1,3,6
**perception**
103:15
**performance**
18:1
**performed**
35:22
**period**
13:23 25:11 28:24
30:5 34:7 37:13
39:14 43:16 45:8,14,
19 46:14 48:7 50:6
52:23 57:11 59:1
74:3,12 81:8 108:9
133:7,8,9,16 142:6,
18 147:11 160:10
164:4 172:8 184:5
185:17
**periods**
29:7 108:11
**permission**
58:23
**permitted**
157:24
**person**
14:10,12 19:22 20:6,
7,8 44:2,15,18,19,22
45:4,7,11 48:14
64:1,12 70:8 72:13
84:10 91:3,4 95:10
101:21 105:18
107:19,24 109:10
110:20 112:20
120:12 121:11,12
126:11 133:20,22
140:18,21,22 164:9
169:10 186:15
187:22,24 189:4
190:2,11 200:11
202:17 209:8 215:2
**person's**
95:6 108:3,13,17
120:10 133:6
**personal**
27:11,15 86:4 198:8,
10
**personality**
55:13
**personnel**
68:14
**perspective**
125:6,15 126:7,8,16
**pertain**
23:10 145:8 177:14
208:14,15
**pertained**
143:19,20 209:6
**pertaining**
36:16
**pertains**
131:23
**Ph.d.**
6:2 11:5
**phone**
33:6,7 46:3 104:6
121:17 175:2,7
178:14 179:11,13,16
192:16 196:3,7

197:6 207:16
**phones**
27:21
**phrased**
9:10,17
**physical**
113:22
**pieces**
173:9
**Pierre**
6:2,13,14 177:19
**place**
15:13 26:18 60:6
71:23 81:15 142:15
164:21
**placement**
59:10 84:5,12,16
85:8 113:7,8 127:14
189:20 215:16
**places**
41:11 60:7
**placing**
172:18
**plaintiff**
15:10 16:6 18:8
**plaintiff's**
146:17 184:7
**Plaintiffs**
161:21
**Plaintiffs'**
161:21
**plan**
42:13 89:14 90:4,11,
13,17 118:17 159:4,
8,9,13,16 169:14
177:8 194:13,21
195:5,20 204:8
**planned**
57:18
**planning**
122:9
**plans**
90:20 91:5
**play**
158:10
**point**
8:13 9:9 35:7 51:24
69:5 75:2 81:7 82:2,
8 100:9 120:20
129:2 135:1 144:22
148:10 154:17
155:14 163:9 188:4
191:12 205:11
206:2,18 208:10
213:20
**policy**
64:6 95:20 149:7
150:8
**Pontiac**
55:24 56:2,5,7,18,24
57:2,4 79:14,17
105:4
**population**
32:8 54:20 55:1
67:19 74:16 76:9
**portions**
23:9
**pose**
91:20
**posing**
9:23
**position**
11:23 44:15 45:15
116:12,14 158:7
169:19 188:19 189:2
190:3,21
**positioned**
62:2
**positions**
73:3

**possibility**
204:10 206:22
**possibly**
211:16
**post**
11:8
**potentially**
68:15
**power**
103:6
**practical**
163:18
**practice**
11:1 64:8 93:21
141:1
**practicing**
214:5
**PREA**
77:21 186:17
**predictable**
119:16,20 120:18
**preferred**
46:21
**preliminary**
141:23
**preparation**
22:24
**prepare**
77:9 176:10 180:5
**prescribed**
37:16
**prescription**
54:22
**present**
13:5 71:15,24 93:24
122:16 127:8 160:9
213:15
**pressuring**
112:22
**pretrial**
153:10 162:20
**pretty**
98:6 146:21
**prevent**
195:18 207:19
**previous**
56:4 194:15
**previously**
55:6 117:1 174:11
192:1 196:2
**primarily**
22:2 24:15,16 31:14
**primary**
12:13 13:7,18 19:22
20:7 48:13,14 69:8,
12,15,16 97:19
**principle**
41:2
**principles**
40:5
**print**
180:15
**printed**
180:17
**prior**
6:17,24 42:3 50:20
78:2 80:2,13 118:20
158:13 195:9
**prison**
20:20 77:21 93:14,
23 94:4,11,12 95:2
106:3 108:20 109:1
131:16 153:11
155:12 169:16
**prisoners**
61:20
**prisons**
152:23 153:6
**private**
75:23 76:1 93:21

114:19,23 139:3,19
141:1
**privileges**
163:22
**problem**
107:3 108:8 126:15
143:11,18 151:22
183:24
**problems**
126:10 143:8 190:19
**procedure**
10:12 64:17 86:20
149:8 150:9 156:7
**proceed**
15:22
**proceeding**
162:12
**proceedings**
164:23
**process**
82:19
**produced**
175:21,23 192:8
201:17
**professional**
22:12,23 43:9,12
50:3 107:18
**professionals**
42:24 68:6,11
**professor**
22:14
**program**
13:14
**programming**
62:21 63:4,13 123:9,
12 146:12 155:5
166:12,13 167:4,22
204:21
**programs**
26:13
**progress**
110:19 180:8
**project**
24:6,11 25:9,10,23
96:17,22
**prolonged**
41:4 81:8
**promote**
195:16
**promoted**
22:12,13
**promotion**
22:16
**prone**
108:1
**property**
27:11,15,18 86:5
163:2
**proportion**
82:9
**proposition**
105:10
**propounded**
38:6,23
**protect**
126:9 162:1
**protocol**
166:15
**provide**
12:6,21 18:15 20:15,
17 45:24 47:21 60:3
61:12 119:16,19
138:12 147:20
190:10 207:23
**provided**
16:16 35:15 37:8
61:8,22 62:7,9,15
63:4,13,22 73:15
74:2,14 75:6 120:20
141:3 142:1,21
155:6

**provider**
154:15 159:12
**providers**
154:9
**providing**
16:4 21:12 46:6
50:21 62:2 75:4 95:4
106:9,19 108:14
140:14 148:6,11
149:2 190:24 206:14
**province**
95:7
**psychiatric**
12:19 13:17 17:10
19:5 26:11 28:2
29:12 32:17 55:1,2
60:17 62:23 75:24
89:9 95:3 103:21
105:12 107:20
169:12
**psychiatrically**
60:14
**psychiatrist**
20:2 29:22 46:17,24
47:1,2,9,15 68:10
89:24 128:9 135:4
144:15 148:4 171:16
197:1 207:22
**psychiatrists**
42:22
**psychiatry**
11:9 63:17 128:15
145:9
**psychological**
10:14 28:7 36:17
48:6 88:24 89:6
93:14 108:17 110:6
123:16 138:13
**psychologist**
6:22 11:4 12:5,7
20:13 21:11 35:7
46:11 47:14,18
48:11,15,17 49:8
64:2 67:20 68:10
69:7,8,12,15,17
71:11 90:20 127:12
135:5 140:17 141:2
144:15 148:5 183:22
213:18 214:4
**psychologists**
22:3 42:23
**psychology**
11:5 22:14 131:13
151:24
**psychotic**
28:20 32:18 108:2
133:10 203:16
**Puga**
140:8
**pull**
16:17 117:15 127:24
134:10
**pulled**
192:10
**purports**
24:4
**purpose**
94:11 95:1,2 106:3
107:8 167:11
**purposes**
160:12
**put**
29:20 95:11 166:3
178:2 187:24
202:13,14
**puts**
152:24
**putting**
172:20

**Q**

**QMHP**
43:6 64:1 133:22
**QMHPS**
42:23
**qualification**
43:12
**qualified**
42:24 43:8 68:11
**quality**
17:7 19:11 73:14
144:12
**question**
7:5 8:2,5 9:4,5,10,
15,16 10:4,5 16:22
21:24 30:10 33:16
36:15 47:11,12 51:4,
10,11 52:18,20 53:1,
4 56:11 63:6 66:20
67:5 69:4 73:11
74:22 75:14,17,22
76:3,5 78:9 81:18,19
87:14,15,19 92:24
105:15,17 106:16,22
107:14 109:11
111:15 113:6 122:24
123:3 131:18 132:17
137:4,15,19,24
139:9,11 151:12
158:18,19 159:2
160:17 164:24
166:4,8 171:3 176:4
177:10,23 179:3
183:4,8 187:1
191:23 192:2
195:21,22 196:2
198:2,3 203:6
206:24 208:9,22
210:4 211:17,18
216:1
**question's**
122:20 193:14
**questioning**
178:19 184:8
**questions**
9:22 10:9 13:22 42:8
117:20 128:5 138:22
139:23 140:3,9
154:22 196:14
212:12,20 213:10
216:13
**quick**
34:16 58:5 138:18
178:20
**quickly**
8:24 133:12
**quit**
210:8
**quote**
79:18

**R**

**raised**
161:20
**Randy**
46:19,21 204:14
205:8,14
**Rape**
77:21
**Rasho**
49:17 159:22 160:2
161:10 215:7
**rate**
24:13 33:19 40:8
162:20
**rates**
24:7 25:16 26:1,22
27:5 28:23 119:12



raw
147:20
re-ask
66:19 123:1
reach
7:7 128:11 182:9
183:5
reached
99:11 161:22
reaching
129:20
read
49:21,22,23 50:1,2,4
51:6 75:13,15 87:18,
20 107:14,15 123:2,
4 124:17 125:12
131:1 132:20,22
137:14,19,20 158:24
162:13 203:12 204:3
208:4,13 215:9
reading
8:20 131:10 174:23
ready
114:16 115:21
202:19,21
real
188:14
reason
10:20 11:15 21:18
49:7 83:17 129:19
130:13 158:14
reasonable
10:14 161:24
reasons
83:24
recall
15:21 16:7 34:2
35:18 45:14 48:20
52:5,12 76:24 80:10,
11 82:2 83:2 96:22
97:3,22 99:8,15
111:5 116:20 128:23
133:14 135:22 158:9
159:23 160:4
170:19,24 181:20
184:16 186:20
189:21 209:24
210:11,21 215:4
recalling
14:23
receive
22:16 35:8 77:17
87:2 88:9 167:4
received
177:3
receiving
37:16 122:12 134:3
155:11
recent
65:12 77:14,18
125:16 126:18
207:20
recognition
50:19
recognize
36:14
recollection
41:20 44:14 49:24
112:2,11 208:17
212:4,9
recommend
87:8 107:18 115:17
155:15 187:2,7
208:1,5
recommendation
29:16,23 30:2,17
31:5,6 40:20 114:10
153:14 187:18,21
210:2 215:17
recommendations
20:11 28:10,22 30:8,

13 32:1,5,7 33:11
34:4 37:21 39:3,6,7,
9,10,22 40:24 111:5,
19 112:4 127:14
143:11 148:24 149:5
168:18 215:15
recommended
29:14 119:14 151:4
recommending
166:19,21 168:22
171:6 207:10 208:11
record
6:11 8:8,19 9:23
23:7,9 51:6 75:15
77:14 87:20 107:15
117:16 118:6 123:4,
22 130:21 132:22
137:20 145:13
160:12
record's
51:8
records
174:15 183:14
189:13 192:10 194:9
recreation
40:17 62:22 121:13
reduce
28:23 39:4,12
119:12 120:23 121:6
reduced
33:24
reducing
150:4
reduction
96:18 99:6,12 100:1
101:2 102:4 107:23
164:13,17 165:7,13
refer
16:19 43:14 49:17
65:6 117:16 118:8
123:19,20 126:5
127:22,23 130:19
134:6,8 209:12
reference
202:7 207:4
referenced
178:24
referred
169:3 180:2,19
referring
13:23 37:5,10 38:5
42:9 52:1 118:7
149:13 152:22
164:18 177:7 178:5,
8 180:7 184:23
194:14,16 196:4
201:4,5,6 209:14
reflecting
100:20
refrain
8:17
refresh
197:22
refusal
110:5 207:17
refusals
181:23
refused
110:18,24 125:22,24
126:1 216:10
refusing
65:15 126:13 173:7,
10,22,24 174:11
184:2 191:17
regard
47:22 77:18 89:11
93:12 101:3,8,24
111:20 113:7,8
124:16 127:18
128:12 136:6 215:7

region
44:18 45:9
regional
43:20,21,23 44:3
regular
21:2,4 23:6 42:15,
20,21 46:1 63:16
72:4 105:11 120:11
122:13 123:9 134:3
136:10
regularly
33:24 98:2 120:8,9
reintegrate
123:11
reissue
153:19
reiterated
210:14
related
15:12 110:9 126:10
133:9 142:24 145:1
149:6 180:12
relating
41:24
relayed
112:24 113:1
release
95:10 169:9,20
172:14,21
released
56:1 116:18,19
169:16,17,18
202:20,22 205:6
relied
39:2
rely
193:11 197:5 207:7
remain
59:21 208:2
remained
129:16 174:17
remark
127:18
remedy
143:4,8,18
remember
18:7,23 52:3 130:9
146:15,20 151:14
158:2 160:16,18
164:14 183:10,18
184:10,20 200:13
202:16,17 209:3,5
210:5
removed
187:7
removes
103:5
rendered
10:11 93:8
Renzi
140:8
repeat
10:22 43:6 44:21
52:20 87:16 165:9
repeated
81:15,22 185:23
186:5
rephrase
9:15
report
20:9 46:16 215:13
reportedly
195:8
reporter
6:12 44:21 216:17
reporting
45:8,18,23 46:13
reports
45:24 77:20 110:21
134:3 142:1 148:7,
18,24 149:4 215:14

represent
140:7
represented
197:17
representing
68:7
request
24:12 25:14 26:9
139:2,10
requested
51:7 75:16 87:21
107:16 123:5 132:23
137:21
requests
142:2
require
159:8
required
50:1 58:18 64:11
89:6 185:23 186:7
requirements
50:14
requiring
163:2
reread
51:4
research
24:3 97:12 99:23
141:16 171:5
Reserve
216:18
residential
13:14 26:13 53:15
resolve
161:19
resolved
143:6
respect
151:12
respond
75:22 212:6
response
111:19 116:3,11
142:2 146:11
191:11,12 204:13,14
210:21 211:23
responsibilities
19:2,10 20:12 50:2
112:7 147:17
responsibility
17:6 20:24 23:18
42:19 49:8 89:13
144:10 158:22 159:3
responsible
19:23 42:12 50:8
73:2,6 87:1 91:5
144:12 145:15
190:22
rest
143:20 188:16
restraining
195:17
restraints
113:9,16
restrictive
103:9
result
33:15 108:2
return
124:20 125:15 126:3
130:5,7 136:23
174:5 183:2 194:19
returned
49:1,2 91:15 126:21
130:4 136:17 216:11
returning
126:13,17 188:20
reveals
203:16

review
19:17 23:1,4,14
33:21 36:16 42:3
50:12 65:17 148:7
160:10
reviewed
23:5,7,10 41:24
77:14 176:5,9,13
197:4
reviewing
33:23 36:3,6
revised
153:2
revision
153:16,18
revoked
11:15
rigorously
16:14
risk
126:16 157:6 173:21
role
19:21 20:16 44:16
69:7 91:4 144:2,4
215:4
roles
74:23
room
30:20 76:20 85:6
103:18,23 104:5
139:5
root
24:6
rotate
190:9
rotating
128:14
rounding
146:12
rounds
29:8,9 31:7 37:14,15
rule
64:6 109:4
rules
108:24
run
58:20 170:4
rundown
83:24
rungs
188:8
running
59:15
Rupcich
36:20 38:2 50:24
51:19,23 52:14
66:12 73:20 74:6,19
75:11 76:13 81:9
89:1,7,18 94:8,19
105:13 132:14
140:3,6,7 147:3
161:6,8 175:6,21
176:8,15 177:4,6,11
178:1,4,11,18,24
179:4,22 180:1,20
189:13,17 192:11
193:8 196:1,19
198:6,23 199:2,4,11,
14,20 200:4 207:1,
12,23 202:8 203:7
205:19 206:16 207:6
209:9 211:21 212:11
213:11 214:16
215:21 216:15

S

sac
173:9
safe
120:24 204:8

safely
56:18
safer
26:14
safety
86:3 121:9 158:16,
17 167:9 194:14,22
195:5 207:23
sake
176:23
Saturday
21:5 90:15 122:11
Saturdays
21:8 46:3 122:6
Savage
25:2 97:14,15,23
162:15,16,18,23
say-so
87:24
scheduled
120:8,9
scheduling
122:9
Schizoaffective
55:12
School
22:13 24:5
screen
16:17 117:16,24
128:1 134:10
scroll
17:1 117:19 161:11
scrotal
173:9
scrotum
91:18 127:19 177:17
195:8,14 207:9
search
180:11
searched
201:21
secure
127:9
security
20:19 24:15 54:2
58:20,24 61:19
63:18 87:4,5 88:6
136:3,6,7,14,16
137:1,6 138:1,9
157:2 189:19,23
190:4
security's
190:21
sees
103:9
seg
29:4 54:2 70:5 108:5
149:20 150:1,3,5
151:13 163:17,20
164:19 165:6 166:5,
7,11,12,13
segment
131:22 135:2
segregation
20:19,22,23 24:15
27:8,17 28:6 29:1,15
31:10,12,17 33:6,8,
22 34:1 35:5,9,16,24
36:18 37:9,12 39:15
40:13,15 41:4,14
53:23 54:7 56:6
57:20,23 79:7,11,13,
16,20 80:1,7,13,18,
21 81:2,5,7,8 82:4,7,
11,21 83:15,18 84:1
95:15,21 96:3,4,12,
13 107:1,7 108:17,
21 109:3,6 121:12,
22 122:1,4 125:15
126:17,22 141:15
145:21 146:6,8



147:7 149:6,15,16,
17,19 150:2,7,10
151:17 152:1,7,16
163:14,15 165:12
166:17,23
**self-harm**
23:24 36:1,9,18 39:5
40:8 88:22 91:19
92:2 96:18 97:12
99:5,12 100:6
129:21 195:18
213:20
**self-harmed**
91:10
**self-harming**
27:5 92:4
**self-inflicted**
125:16
**self-injure**
92:10 129:15 195:13
**self-injured**
33:21 130:1
**self-injuries**
24:18 25:8 36:7
39:13 56:8 128:22
146:10 147:14
182:17,18 185:23
**self-injuring**
102:23 172:9 190:18
**self-injurious**
98:12 119:7
**self-injury**
24:1,7,14 25:17
26:1,23,24 55:14,16,
19,22 65:12 91:15,
16,23 92:12 119:6,
12 129:12 130:8
151:19,20 162:21
163:2 174:12 186:6
**send**
46:2 169:15,16
173:8 189:15
**sending**
86:16 114:1,19
115:6 169:12 191:15
200:20 211:1
**senior**
19:4
**sense**
28:1,15 32:19 65:22
108:3,9 112:16
125:14 126:6 164:11
**sentence**
125:11 171:20
**sentenced**
97:17 106:3 109:1
153:11
**sentences**
170:16
**separate**
181:2
**separately**
145:11
**September**
13:2,4
**sergeant**
190:7
**series**
199:21 206:20
**served**
19:16
**service**
7:21
**services**
11:10 12:22 13:16
14:5 19:6 20:3 29:12
109:23 143:22
152:23 153:3,8,9
155:11 169:24
170:17 171:21

**serving**
170:15 171:20
**set**
39:22 64:7 153:7
157:10 161:20
165:24 176:21
**setting**
13:15,18 27:14 33:2
57:21 76:17 95:5
102:18,21 103:2,22
104:3 105:4,5,8
106:12,24 107:6,18
108:21 123:9 126:13
127:2,7,10 131:14
204:16
**settings**
36:8 93:21 109:1
**settled**
38:18
**settlement**
49:14,20,21 50:9,12,
15,19 51:14,18
142:15,16 159:22
160:2,13 161:11,19
162:2,7,10 215:8
**settling**
161:23
**severe**
67:16 89:9
**severely**
13:12 20:22 29:2
32:2 50:22 54:6 55:6
59:9 60:11 65:14
66:3,9 67:3 68:1
73:15 74:2,14 75:7
76:8,15,19 79:3 89:5
90:21 106:19 109:14
152:20 153:9
**severity**
150:6
**sewed**
207:9
**sex**
112:22
**sexual**
55:17
**share**
182:3,4
**sharing**
161:4
**Sheila**
48:11
**sheriff's**
15:14 18:9 143:21
**shift**
21:2 88:16 136:9
190:9 207:24
**shifts**
21:2,4 88:14
**shirt**
189:24
**shirts**
190:12,14
**short**
34:22 53:19 58:10
80:18,24 98:17,23
119:11 138:19
179:23 212:17,19
**short-staffed**
21:17,20
**short-term**
132:9 133:3
**shortages**
71:3,12,16,22
**shots**
205:1
**show**
16:15 51:23 52:17
117:14 159:21
161:12 199:5

**shower**
157:3,24 164:8
**showing**
161:9 200:1,2
**sic**
58:21 101:13
**side**
84:24 85:4,9 103:11,
13 139:15
**sign**
110:6 214:14
**signal**
24:22 25:21
**Signature**
216:17
**signed**
151:11 161:12
**significant**
36:10 131:14 195:9
**similar**
207:20 210:16
**Similarly**
8:14
**simply**
119:11 122:1
**single**
33:2 131:21 133:20
150:2 151:9,13
**single-person**
86:6
**sit**
41:18 83:2 106:17
165:2 170:19 206:9,
17,19 213:13
**site**
60:21 135:5 194:13,
21 195:4
**sitting**
76:19 191:2
**situated**
137:8 138:4
**situation**
130:16 213:19
**situations**
132:10 133:3
**sixth**
15:5
**size**
86:1,6
**skip**
188:8
**slit**
173:8
**slitting**
177:17
**slow**
194:24 211:18
**small**
162:19
**SMI**
13:12 20:21 29:1
31:13,14,16,21 32:6
33:23 37:12 39:15
40:15 54:4 57:19
67:14,15,21 79:5
83:14 84:5,12 85:8
86:11 89:2 149:6
151:18 152:18,19,21
153:5 154:17 155:20
157:9 163:17
164:19,22 165:3
**smock**
86:3 121:9
**social**
43:11 105:11
106:10,20 111:7
**solitary**
35:9
**solutions**
143:14

**sort**
72:3 94:5 166:1
174:8 188:8
**sound**
8:9,21 9:6,18 10:7,
17,23 117:21
**sounded**
30:22 45:5
**sounds**
25:19 58:9 92:7
98:22 99:23 115:14
147:5 204:14
**sources**
103:20 104:4 140:8
**speak**
7:24 93:6 98:9 115:6
139:2 195:1 207:15
**speaking**
8:8 52:10 102:15
138:1
**special**
53:14,22,24 54:5
**specific**
15:16 24:16,24
31:17 57:24 80:10
81:21 98:15 109:4
143:15,16,23 144:24
148:18 151:15
153:4,7 158:19
164:17 165:7 166:4
169:6 170:22 190:14
**specifically**
20:14 23:11 28:14
53:12 57:19 60:1
66:18 73:17 75:6
86:20 88:21 96:15
97:22 98:3 99:21
101:3,8,12 102:1
107:5 110:13,15
111:21 112:12
114:2,11 115:23
136:2 137:5 143:17
145:5 146:7 155:11
161:14 168:19,22
172:4 177:15 184:13
189:23 216:7
**specifics**
168:8 203:4
**speculate**
52:4
**spell**
6:10 213:3,6
**spelled**
115:14 213:7
**spend**
27:16,19 107:19
121:10 150:5
**spending**
86:12,17
**spent**
79:12,16,19,24
80:12,23 82:3,5,6,10
93:20 131:15 149:15
**split**
70:14
**spoke**
35:21 98:15 99:9
135:19 136:5 214:2,
24
**spoken**
10:6 113:20
**Springfield**
60:20
**sprung**
25:2
**stability**
157:6
**stabilization**
60:17 185:4
**stabilize**
76:17,18 133:11

**stabilizing**
60:14
**staff**
17:7 18:1 19:11
21:15 23:6 29:7,8
31:15,19,20 36:6
42:15,17,20,21 44:2
55:15 57:4 60:20,21
61:19 62:19 63:16,
18,20 64:1,12 67:20
68:9,17,19 69:1 70:8
71:17 72:22 73:2
90:16 95:8,9 97:20
98:6 103:7,8 104:6
106:5,11,19 110:12,
16 112:20,23
119:22,23,24 120:2,
17 124:18 127:6
133:22 136:17
144:8,17 146:5,7,13
147:6,7 156:16
158:12 163:3 164:3,
8 167:8 168:9 174:4
183:16,20 185:22
186:15 187:19
189:20,24 190:4
191:13 214:23
**staffer**
70:12
**staffing**
61:17 70:21 71:3,12,
16,21 73:7,11
**STALEY**
51:1 66:14 74:7,20
75:12 76:14 81:10
89:16 176:23 177:5
178:6 199:13
212:14,19 215:23
**stamped**
192:9
**stand**
53:20 121:2
**standard**
64:17 86:20 156:7
**standards**
152:14,23 153:8
**standing**
191:6
**standpoint**
123:17
**stands**
43:7
**start**
8:5,7 10:2 28:1
43:18 108:12 117:20
200:22 201:24
205:22 209:7
**started**
13:3 25:4 33:21,23
34:3 38:19 90:13
140:19,20 141:20
146:11 152:10
162:19 170:14 204:6
**starting**
38:16
**starts**
202:2,4 203:9
**state**
6:10 11:12 12:19
13:16 37:17 43:21,
24 44:4 61:13,20
83:6 115:1,2,5,9
129:16 132:12,19
135:5 169:12,15,21
184:10,17 186:5
201:17 204:23
213:22
**state's**
67:18 154:18
**statement**
41:14 105:16 149:11
152:8

**static**
68:14
**stationed**
61:23 73:17
**statistic**
82:14,17
**statistics**
19:13 147:6
**status**
46:7 54:4 57:3
120:24 121:3,4,7,9
163:20,22 165:17,
18,20 208:1 215:19,
20
**stay**
80:18,24
**stayed**
183:1
**staying**
174:1
**STC**
53:14,20 54:4,14,18
83:14 84:5,11,12,13
85:8 86:11 123:8
**stemming**
215:9
**step**
8:12 13:21 14:18
35:6 53:16 93:10
99:22 188:3
**step-down**
26:11
**stimulation**
27:10 30:20 33:3
103:20 104:4 105:11
106:10,20 107:24
108:14
**stimulus**
108:2
**Stone**
48:11,16 49:7 69:6,
16 135:4
**stop**
52:18 177:22 178:15
196:16
**stopped**
173:3 183:12
**storages**
70:21
**Strangely**
204:4
**street**
25:3
**stressful**
32:13,21
**strictly**
211:7
**strike**
83:9
**strong**
105:7 204:10
**structured**
155:21,24 156:12
166:16
**struggle**
103:6
**study**
27:2 35:3,21,23
141:13
**stuff**
180:12,18 186:19
**subject**
183:22 203:21
205:23 213:17
**subjects**
209:8
**submit**
110:22
**submitted**
90:18



Pierre Nunes, Ph.D. 04/22/2022

**Subparagraph**
161:15 162:6
**subset**
14:21 31:11 65:6
75:7
**substance**
102:16 136:13
**success**
100:1,11
**successful**
26:23 101:2
**sued**
18:9,13 142:14
197:12
**suffer**
28:1 32:12
**suffered**
195:9 207:20
**Suffering**
32:17
**suggested**
115:21 117:7 160:13
174:4
**suggestion**
115:24 116:7,9,21
117:1
**suicidal**
65:11 96:19
**suicidality**
32:20 133:8
**suicide**
15:12,17 20:10
26:23 36:10 39:5
65:12
**suicides**
19:18,23 26:17
33:19 36:7 146:10
147:15
**suit**
15:19 38:18
**Sunday**
21:6 122:11 178:9
**Sundays**
21:9 46:4 122:6
**super**
163:11
**superiors**
96:17 99:9 100:10
111:4,6,18 114:19
115:7,18 125:3
**supervise**
144:20
**supervised**
144:8
**supervisor**
210:10
**supervisory**
42:18 144:2
**supportive**
33:4
**suppose**
31:5 41:23 47:10,12
61:10 69:3 76:5
91:24 93:11 99:21
**supposed**
84:6 86:16 129:5
132:9 143:24 150:5
158:5 190:16,20
191:9
**suspect**
113:4
**suspended**
11:14
**suspicious**
110:11
**switched**
209:7
**sworn**
6:1,3

**symptom**
109:16 214:11
**symptoms**
28:2,20,23 32:17,18,
19 108:2 109:8
133:10
**system**
13:16 15:15 17:17,
19 18:2,3,10 66:16
83:3,7 143:10
145:13 165:21

— T —

**tackled**
151:21
**takes**
115:9
**taking**
7:22 13:21 35:6
60:11 140:1 170:8,
10 212:19
**talk**
14:17,19 42:7,11
93:11 98:6 101:20
104:7 110:19 140:11
168:21 172:4 186:14
**talked**
48:1 76:22 97:14
98:1 111:13 136:3
165:22 169:10
171:13 175:9,12
186:13 194:1 197:20
**talking**
9:1,24 23:18 24:20
35:3 40:1,6 58:14
66:15,17 78:9 99:3
141:18 154:2,19,21
169:8,12 170:23
172:15 175:8 178:3
186:14 192:12 194:8
197:19 200:14,19
202:19 203:19,24
204:6 207:8,9 209:3
**Tamms**
55:23 79:12,17
80:17,22,23 81:3,4,
14,21 154:23 155:8
**tasked**
143:3,7,17 145:2,5
**teaching**
140:24
**team**
33:11 42:17 68:3,5,
7,14,15,21 69:2
72:3,16 84:7 87:5,7,
11,23 88:6 155:15
156:10,20 157:1
158:3,6 171:10,24
187:11
**team's**
158:2
**technicians**
43:1 68:12
**teleconferencing**
7:21
**telephone**
33:9 34:15 101:16,
21,24 102:8,12
121:15 135:19,20
192:24 193:1,6,10,
11
**telephonically**
102:2
**television**
104:7
**telling**
111:5 202:13
**temporal**
29:19

**ten**
97:7 108:6 156:12
186:21
**ten-hour**
21:6
**tend**
28:15 41:3 120:4
**tended**
30:4
**tendency**
9:1 27:24
**tenure**
69:17
**term**
19:22 23:20 47:6
57:24 58:16 65:5,8
81:16 92:18 119:11
**terminate**
187:19
**terminated**
142:16,17
**terms**
22:11 32:15 48:6
60:11 61:17 64:24
65:9 92:17 93:11,18
95:24 113:10
**terribly**
34:13
**tertiary**
75:23 76:1
**testicles**
91:17,22
**testified**
6:4 80:4
**testimony**
16:3,5 78:1 215:22
**thanked**
116:9 171:23
210:19,23
**thanking**
211:2,4,5
**themself**
157:7
**therapeutic**
103:3 106:24 107:6
119:5
**therapeutically**
89:14
**therapist**
48:13
**therapy**
104:8 181:16
**thereof**
7:20
**thing**
9:3 17:1 52:2 98:16
173:5 188:23 202:16
**things**
7:17 8:15,17,23
37:21 62:19 103:12,
13 110:9 136:21
146:4 151:4,21
158:15 165:22,24
166:14 178:16
210:14
**thinking**
152:1
**thought**
29:24 102:17 112:18
127:1 148:9 173:12
178:11 186:15
200:13,19
**threat**
167:9
**threats**
119:6
**three-month**
45:19
**thrown**
15:20

**ticket**
150:4
**tickets**
83:20,21 84:3
108:24
**tier**
27:22 31:21,22
53:17 78:20 136:8,
18
**till**
7:5 43:3 181:4
**time**
9:20 12:9,12 13:6,15
14:1 15:2,3 19:9
20:16 21:4,7,10,14,
21 23:11 25:11 26:9
27:16,24 28:24 29:4,
7 30:11 32:19 33:18,
22 34:1,6 37:13,19
38:3 40:16,17,19
42:1,5,11 43:13,16
44:5,15 45:14 46:14
47:3 48:7,23 50:20
53:9 55:3,10,19
56:22 57:1,11,15
58:15 59:6,16,21,23
61:22 62:1 64:8
65:21 66:2 68:15
69:14 70:3,18,20
71:13 72:18 73:16,
24 74:12 77:16 78:1,
14,22 79:1,6,16,20
80:1,12,21 81:3,24
82:21 83:23 85:2,15
86:12,15,23 87:3,9,
12 88:10 89:11
90:19 93:4 95:14,17
96:13,15,21 98:12
103:17 104:9 108:3,
9,11 109:19 112:8,
13 113:14 116:24
120:12 121:14
127:12 129:11
131:14 132:4 134:2
136:24 139:23
140:1,11,16 141:18
144:10 146:14
147:9,18 148:14
149:14,16,18,24
150:7 151:14,24
152:4,12,16 153:18
155:16,19 156:1,17,
20,24 157:5,10,15,
21 158:11 163:7,13,
21,23 164:19 165:6,
12 166:6,7,12,16,23
167:5,21 168:5
176:23 177:18
182:12 184:8
190:15,18,19 191:9
194:13,21 195:4
196:15 197:8 203:18
210:8,16
**timeline**
77:7 129:9 179:9
181:11 197:9,11
198:7
**timelines**
24:17
**times**
8:3 15:3,6 29:8,9,10
31:7 47:23 68:20
92:14,16 119:1
120:8 148:16 152:24
180:3 184:24 188:16
**title**
12:2,4 43:20,23
**titles**
43:18
**titrate**
204:7

**today**
6:7,17 9:11 41:18
83:2 106:17 167:18
168:3 175:17 176:6,
13
**today's**
23:1 61:4
**told**
30:12 53:21 79:15
118:23 170:6 183:8
194:5 210:24
**tolerated**
204:8
**Tom**
146:21
**tomorrow**
124:20
**tone**
110:1 190:15
**top**
18:22 70:17 86:9
88:13 92:15 99:19
100:16 102:6 124:6
131:21 145:15
146:19 150:14
152:11,17,23 183:10
190:8 210:11
**topic**
35:16 145:23,24
146:2
**topics**
145:14
**total**
19:6 79:18 82:20
**touched**
53:6 145:20
**track**
19:13 67:2,8 68:18
82:13,16 143:10
151:9 168:12 198:1,
5
**tracked**
66:9 82:22 110:16
145:12
**tracking**
143:13 147:8,14,16
**training**
17:8 19:11 35:7,15,
19 44:17 45:9
144:12
**transfer**
56:2 60:16 80:13
116:14 123:8 171:19
173:2 211:8
**transferred**
12:1,18 13:1,2
48:18,22 49:1,10,11
113:21 114:14
115:18 116:17,22
117:2,8,10 170:16
198:17,18 208:5
211:24
**transferring**
60:22 172:5,6 192:3
**transition**
173:16
**transport**
195:10
**treating**
72:18 89:22,24
134:2 171:16
**treatment**
10:11 12:17 13:14,
19,20 21:7 42:13
47:5 49:13 50:7,22
53:10,22,24 54:5,12
56:23 57:18,22
59:13,15 60:1,4
64:23 65:16,20,21
68:3,5 69:6 72:3,16
75:4 78:7 84:7 87:5,

7,11,23 88:5,7 89:6,
12,14 90:4,10,13,17,
20 91:5 93:5,7 101:4
102:3 103:13 107:20
110:15 111:4,20
112:4,14 113:19,22
114:2,9,15,21
118:17 119:15
120:11,21 122:9
125:21,22 126:24
127:2,9 155:15
157:1 158:1,3,6,22
159:3,8,13,16 160:3,
15 170:4 171:9,24
173:6,11 177:8
195:15,16 204:17
207:11,19 208:2,8
**trends**
147:9
**trick**
106:16
**trigger**
32:23
**triggered**
172:18
**trip**
9:11
**trips**
163:2
**trivial**
91:23
**trouble**
119:22 120:3
**true**
40:11 41:5 69:13
101:19 103:21,22
**trust**
127:10
**trusting**
119:22 120:4
**turn**
40:2 128:15
**Turning**
41:16
**turns**
128:14
**tweak**
137:23
**twice-a-week**
33:9
**two-man**
27:13
**two-minute**
34:16
**two-week**
39:14
**two-year**
11:8
**type**
99:16 100:21 104:2
131:7
**types**
25:7 55:15 133:17
162:21
**typically**
13:23 42:21 91:4
156:13

— U —

**U.S.**
17:20 18:8 41:15
**uh-huh**
7:3 8:16 141:17
197:15 200:7
**uh-uh**
8:16
**ultimately**
116:17



Pierre Nunes, Ph.D. 04/22/2022

**uncomfortable**
119:23
**uncommon**
136:22
**unconstitutional**
143:5
**underlying**
214:11
**understand**
8:15 25:13 28:12
38:20 51:2,10,17
52:8 55:5,9 56:13
59:14 68:8 77:24
79:10 81:12 132:16
142:6 145:19 153:24
160:11 188:7 203:2,
3 205:15 214:22
**understanding**
37:23 39:16 41:5
49:6 50:18 56:3
59:18 61:6 72:2 81:1
83:1,10 84:24 88:4
91:2 108:4 122:18
123:10 124:22 125:5
143:3 147:9 155:18
156:8 157:12 158:4
164:20 192:7
**understood**
9:17 22:8 31:24
70:19 89:20 156:11
185:13 189:12
192:11
**undertake**
25:9
**undertook**
24:6,8
**unintentionally**
8:12
**unique**
93:24 94:3,4
**unit**
14:6 15:17 17:8,11
19:2,9 53:24 54:3,14
57:21 62:23 70:14
84:18 144:9 163:15,
17
**units**
12:21 17:9,10 19:5
26:13,14 27:8 29:5
31:14,16,18,19
144:11 170:4,7
**University**
11:6
**unredacted**
131:22
**unstructured**
155:21,24 156:13
166:16
**unusually**
80:1
**update**
215:14
**updates**
46:7 122:13
**upset**
120:5
**uptick**
133:6
**use-of-force**
146:9 147:15

---

**V**

**vague**
36:20 38:3 51:20
66:12 73:20 81:9
89:1,7,18 94:8,19
105:13 132:14
170:21 214:16
**vary**
73:16,22

---

**verbally**
8:18
**verbatim**
7:23
**version**
16:23
**versus**
18:9 26:20 40:7 96:3
103:16 104:2 122:1
149:22
**Vicki**
7:22 43:3 51:4 75:13
87:18 107:13 123:2
132:21 137:18 195:1
**Vicki's**
7:7
**viewed**
167:9
**visibility**
26:6,15
**visit**
77:13 78:12 151:9
155:3
**visitation**
33:9
**visiting**
90:15
**visits**
19:15 33:6 63:17
181:14
**vitae**
16:21,23 22:21
**vulnerable**
32:9,11

---

**W**

**wait**
7:5 8:4,6 10:1 43:2
181:4 194:4 203:19
**waiting**
65:16
**walk**
53:10
**wanted**
112:19,22 126:2
180:2 186:14
**wanting**
179:7
**WARD**
6:6 7:12 18:21 19:1
22:7 31:3 34:13,19
35:1 37:6 38:4,11
43:5 45:3 51:16,22
52:7,9,11 53:5 56:12
57:13 58:6,9,12
63:8,9 66:17,22,23
67:10 70:1 72:14
73:23 74:11 75:1
76:4,21 80:9,19
81:23 87:18 88:2
89:3,10 90:1 93:3
94:15 95:12 96:6,14
98:19,22 99:1
104:22 105:9 106:8
107:21 109:13
111:17 118:5 123:2,
7 131:20 132:6
133:1 137:18,22
138:15,21,23
139:13,22 199:19
206:13 212:22
213:1,8 214:20
216:5,12
**warden**
93:6,9
**watch**
46:8 53:13,17 54:1,
8,9,13,15 56:7 57:3
64:3 69:9 70:7,9,10,
14 78:20 83:14

---

**watches**
186:9
**watching**
190:23 191:2
**ways**
167:20
**wearing**
86:3 121:9
**website**
153:15
**week**
10:20 29:8,9,10 31:7
33:7 42:15 63:24
84:8 101:23 103:24
122:8,10,15 148:14,
16 156:1 188:5
191:3 195:7 204:7
210:9 213:15
**weekday**
187:11,19
**weekdays**
71:24 72:4,8 122:5
158:6
**weekend**
12:6 20:15,17,24
21:2,9,12 22:6 71:4
72:13 88:14 90:16,
24 91:14 101:20
110:22 112:8,12
128:13,16 130:13
158:13 174:19
183:22 188:6 189:4
194:15,16
**weekends**
45:5 46:9 48:2,3,12
69:10 70:6,11
101:22 168:13
187:11 189:8
**weeks**
22:17 79:19 109:2
**wellness**
75:8
**Wexford**
11:18,24 12:10
20:14 35:15 36:11
40:3 44:1,2,13 45:9,
20 50:5,11 52:23
64:19 66:10 67:2,8
68:20 72:22 73:2,6
89:23 90:14 95:18
96:23 98:10 99:10
100:10 109:20
135:24 140:8 160:8
170:14 180:22,24
192:8 209:21 210:1,
10
**white**
189:24 190:12,14
**wife**
21:20
**window**
150:22 186:6

---

**windows**
86:7
**wing**
78:21 84:18 85:6,14,
17 97:18 163:8,14,
16 189:24 198:19
**Wisconsin**
41:11
**withholding**
103:10
**won**
17:16
**word**
39:19
**worded**
9:10 47:10
**words**
134:1 151:10
**work**
12:6 14:4 17:17
21:6,16 22:6 24:10
25:23 37:3 38:13
40:3 43:11 46:11
47:13,15,18 57:22
65:2,10 71:10 91:13
99:24 102:4 110:2
118:18 131:8
133:11,13 141:8
178:21
**worked**
41:11,12 48:11 57:2
69:10 82:10
**working**
21:5,8 36:11 45:20
48:3 55:11,20 57:9,
14,17 59:16 70:4
75:3 76:7 79:22 82:2
92:8 95:18 97:6
109:19 140:24
143:4,13,17 170:5
214:6
**world**
94:5 105:22,23
106:1,4
**worried**
174:12
**worries**
147:4
**worse**
28:9,13,15 103:20
104:1 105:6
**worth**
167:20 171:4
**wound**
125:16 126:12
195:14 207:18 208:3
216:8
**write**
20:8 90:12,17
110:19 197:11
**writing**
158:24 206:20
208:10,18
**written**
64:11 174:21 206:2
**wrong**
91:6 155:18 200:21
**wrote**
197:8

---

**X**

**X-HOUSE**
20:18,21 49:2 53:18
54:2 69:10 78:20
84:19 85:14,17 96:9,
11,12 97:18 102:19
124:20 126:3 127:3,
8,11 129:9 130:4,5,7
163:8,14,16 172:12
174:2,5,16,18

---

**182:**22,23 189:21
190:5 198:17,19

---

**Y**

**yard**
40:17,18
**year**
11:7 12:24 17:14
19:16 21:23 41:13
92:14,16 97:7 108:6
140:21 148:13,15
**years**
12:15 14:10,11,12
33:18 34:9 79:12,19
80:17,22,23 81:7
82:4,6,10 93:18,20
98:4 108:6 132:10
133:16 140:16,18
153:16,19 154:24
170:13 185:15
190:13 197:14
**yesterday**
167:16 194:19
195:12

---

**Z**

**Zoom**
7:20 10:20

